UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JONATHAN RIVERA-PIEROLA,<br><br>                Plaintiff,<br><br>v.<br><br>BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES; STATE OF OKLAHOMA ex rel. OKLAHOMA STATE UNIVERSITY; and ST. MATTHEWS UNIVERSITY,<br><br>                Defendants. | Civil Action No.:  CIV-21-616-PRW<br><br>**COMPLAINT**<br>**(Jury Demanded)** |

COMES NOW, Plaintiff JONATHAN RIVERA-PIEROLA ("Plaintiff" or "Mr. Rivera-Pierola"), by and through his undersigned attorneys, and hereby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

**INTRODUCTION**

Mr. Rivera-Pierola seeks damages and injunctive relief for breaches of contract by the BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES (the "BOARD"), STATE OF OKLAHOMA, ex rel. OKLAHOMA STATE UNIVERSITY ("OSU," and together with the Board, the "OSU DEFENDANTS"), ST. MATTHEW'S UNIVERSITY ("SMU") that occurred while Mr. Rivera-Pierola was an SMU veterinary student completing clinical rotations at OSU's College of Veterinary Medicine ("CVM").  Mr. Rivera-Pierola was subject to arbitrary and discriminatory treatment during a rotation, subject to false accusations of lying and dishonestly and penalized in his grading without opportunity to defend himself, and then, following a virtual rotation that failed to provide promised

1

instruction for the scheduled length of time, dismissed from OSU and ultimately from SMU as well. These actions were in breach of Mr. Rivera-Pierola's contracts with OSU and SMU. Accordingly, he now petitions this Court for redress in the form of injunctive relief, damages, and costs for breach of contract.

## PARTIES

1. Plaintiff, JONATHAN RIVERA-PIEROLA, is a citizen of Florida. At all times relevant herein, Mr. Rivera-Pierola was a qualified student in good standing at OSU's CVM Year IV clinical program in Stillwater, Oklahoma.

2. Defendant, STATE OF OKLAHOMA, *ex rel.* OKLAHOMA STATE UNIVERSITY, has its principal place of business in Oklahoma. Defendant, BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES, supervises, manages, and controls OSU. The Board establishes all general policies affecting OSU and prescribes rules and regulations as may bring these policies into effect. The Board delegates executive power to the presidents of the institutions and their authorized administrators, retains approval power over decisions made thereto. OSU Defendants operate the CVM Year IV clinical program in Stillwater, Oklahoma.

3. Defendant, ST. MATTHEW'S UNIVERSITY, is a for profit university chartered and operating a School of Veterinary Medicine in Grand Cayman, Cayman Islands. SMU's administrative offices that handle applications and communications with students are located in the state of Florida.

4. SMU has an affiliation agreement in place with the OSU CVM clinical program, whereby SMU pays OSU to provide the SMU clinical program to SMU students and SMU students

become vested with certain rights and responsibilities imparted to all OSU students upon matriculation to the CVM Year IV clinical program.

5. SMU also remains liable for SMU students, who remain enrolled in SMU, as the contractual relationship between SMU and its students remain intact while those students are enrolled in OSU's CVM Year IV program.

6. At all times relevant hereto, and in all the actions described herein, Defendants' actions took place in the State of Oklahoma, County of Payne unless otherwise noted.

## JURISDICTION

7. This Court has jurisdiction over the claims set forth in this action pursuant to 28 U.S.C. § 1332 (diversity of citizens) because the parties are diverse and the amount in controversy exceeds $75,000.00.

8. Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391(b), as Defendants are located in this District or have significant contacts to this District, and all of the events giving rise to Plaintiff's claims occurred therein.

9. All conditions precedent to the maintenance of this suit and Plaintiff's claims have occurred, been performed or otherwise waived.

## GENERAL FACTUAL ALLEGATIONS

10. Mr. Rivera-Pierola matriculated to SMU in 2017 and attended the veterinary program at SMU's Cayman Islands campus while he completed the classroom courses necessary to advance to Year IV status.

11. Following completion of his classroom courses, Mr. Rivera-Pierola was enrolled in clinical rotations at OSU in the CVM Year IV program, as an affiliate SMU student.

12. As an affiliate student, Mr. Rivera-Pierola became vested with certain rights and responsibilities imparted to all OSU students, pursuant to OSU's College of Veterinary Medicine Student Handbook (the "OSU Handbook").

13. SMU promises to provide oversight to SMU students in clinical rotations, and pays its clinical sites, including OSU, to provide the required clinical program to SMU students, in accordance with SMU guidelines.

14. In September 2019, shortly after Mr. Rivera-Pierola started his rotations at OSU, his father experienced significant medical issues and a related serious car accident.

15. Mr. Rivera-Pierola is quite close with his father, and this terrible accident and his father's health, which was hanging in the balance, naturally caused a significant impact on him.

16. He was a thousand miles away from his father, while also trying to navigate his very first clinical rotation experience in veterinary school. While his preceptors noted he had sufficient knowledge to pass the rotation, the situation with his father impacted his performance with respect to patient care responsibilities and led to a poor outcome in his first rotation. Mr. Rivera-Pierola was required to repeat the rotation at a later date.

17. Once the situation with his father resolved, Mr. Rivera-Pierola returned to his previous level of performance and completed the next several months of rotations without issue.

18. In February 2020, Mr. Rivera-Pierola began his Community Practice rotation and right from the beginning, he observed that he, as a Latino male student, and the other male student in the rotation were being singled out for extra scrutiny and unwarranted and unduly harsh criticism from the preceptors compared to the other, female students in the rotation.

19. Throughout the rotation, the preceptors, Dr. Lara Sypniewski ("Dr. Sypniewski") and Dr. Paul DeMars ("Dr. DeMars"), made numerous, baseless allegations against him and

frequently accused him of lying, though he had simply followed instructions and abided by course guidelines.

20. For example, he was told to review a dog's blood work and call the owner to confirm the dog could take her medication so long as two specific lab values were normal. While there were minor abnormalities in the dog's bloodwork, those particular lab values came back normal. Mr. Rivera-Pierola therefore followed instructions and left a message for the owner confirming the dog could take her medication.

21. The following day, Dr. Sypniewski baselessly accused Mr. Rivera-Pierola of concluding the blood work was entirely normal and inappropriately informing the owner of the same. Later, in Mr. Rivera-Pierola's final evaluation meeting, Dr. Sypniewski exaggerated this accusation further, yelling at him that the dog could have died as a result of the blood work.

22. Mr. Rivera-Pierola had in fact spotted the other minor abnormalities, but, per instructions, did not address the full results with the owner. He later confirmed with other preceptors that the abnormalities were not immediately significant and the dog was not in need of critical care. Nor did Dr. Sypniewski, on seeing the blood work, require the dog to return or advise the owner to seek immediate critical care.

23. Dr. Sypniewski then told Mr. Rivera-Pierola to call the friend of the owner, who had brought the dog in, since the owner had not been reached, but claimed she did not have his contact information. The friend's contact information also was not in the system and thus Mr. Rivera-Pierola was unable to reach the friend. However, a later note in the communication log indicated Dr. Sypniewski did in fact have the friend's number

24. Several days later, before a spay surgery, Dr. Sypniewski asked Mr. Rivera-Pierola about how many spays he had done and his experience. He truthfully answered he had done three

5

or four with assistance, and it had been 8 months since his last one and he was therefore quite nervous. Dr. Sypniewski then assisted him through the surgery.

25. Following surgery, Dr. Sypniewski and Dr. DeMars pulled him into a meeting and Dr. Sypniewski falsely accused him of failing to tell her about his lack of experience. Further, in his final evaluation, she again accused him of lying about his experience and criticized him for being "overconfident" as a result of this episode.

26. On another day, Mr. Rivera-Pierola finished his inpatient duties by the 7:30 am deadline set out in the Community Practice rotation expectations sheet he had been provided. However, Dr. Sypniewski nonetheless accused him of neglecting patient care, insisting the deadline was 7:15am and refusing to listen to Mr. Rivera-Pierola's explanation. In the final evaluation, Dr. Sypniewski falsely asserted that Mr. Rivera-Pierola failed to complete rounds by 7:30am.

27. The day after that incident, Dr. Sypniewski accused Mr. Rivera-Pierola of having completed discharge notes that indicated a dog's orthopedic exam was normal. However, Mr. Rivera-Pierola had in fact correctly noted in his discharge notes that abnormalities were found on the exam.

28. In another case, Dr. Sypniewski criticized Mr. Rivera-Pierola for providing the wrong vaccination booster date to an owner. However, Mr. Rivera-Pierola was simply providing the information based on what was already in the file and it was a student in a prior rotation that had apparently recorded the date incorrectly, something Mr. Rivera-Pierola had no way of knowing.

29. Dr. Sypniewski and Dr. DeMars additionally removed cases that were assigned to him, though they did not do so from any other student, and scheduled him for five intern days,

during which he worked on cases that were not counted towards his case total. At the end of the rotation, they then penalized him at the end for having too few cases.

30. One day before the end of the rotation, Dr. Sypniewski and Dr. DeMars informed Mr. Rivera-Pierola he was failing the rotation. This was the first indication he was given that he was failing.

31. While Mr. Rivera-Pierola easily passed the written exam for the rotation, the preceptors raised these false allegations in his final evaluation as the reason for giving him a 12.25/20 in professionalism. This downgrading that resulted in a final grade of 68.317%, just below the passing grade of 70. But for the downgrading as a result of the false allegations, Mr. Rivera-Pierola would have passed the rotation.

32. Mr. Rivera-Pierola's final evaluation relayed the above incidents and accused Mr. Rivera-Pierola of lying about what he had done for patient care on several occasions.

33. Despite this assertion, which qualified as an allegation of an academic integrity violation under both OSU and SMU policy, and the downgrading based on his supposed dishonesty, no academic integrity complaint was filed and Mr. Rivera-Pierola was never provided an adequate opportunity to respond to or rebut the allegations that were the basis for his failing grade.

34. Mr. Rivera-Pierola was contacted in mid-March and told that he would need to appear before the CVM's Professional Standards Committee ("PSC") for a dismissal hearing on March 18.

35. Referral to the PSC is a purely academic review, in which the PSC may allow the student to address the PSC solely to present mitigating circumstances relating to the student's performance. The process does not provide the student an opportunity to contest the grade leading

to PSC referral or allegations such as the allegations of dishonestly alleged in his Community Practice evaluations.

36. PSC recommendations are based solely on PSC's consideration of extenuating or mitigating circumstances, and PSC does not consider validity of the grading and evaluation of the preceptors.

37. Mr. Rivera-Pierola met with the PSC and did his best to answer the questions posed. He nonetheless ran out of time to fully explain what occurred and did not have an opportunity to present his defense.

38. The PSC voted unanimously to dismiss Mr. Rivera-Pierola, sending him a letter dated March 23 which stated as follows:

> The Professional Standards Committee, after meeting and deliberating on March 18th, recommended dismissal from the CVM professional program. This unanimous decision was based on repeated poor academic performance, lack of accountability for clinical errors in multiple rotations, recurrent unprofessional behavior, and inability to take constructive criticism to improve professional and clinical skills. The Committee did not find mitigating circumstances sufficient to explain the concerns above.
>
> The Committee's recommendation for dismissal has been accepted by the Dean. Per CVM policy, you may file a written appeal to the Dean within five working days of receipt of this letter.

39. Under OSU's policies, the PSC makes a recommendation to the Dean, and the Dean determines whether to accept that recommendation.

40. A student may appeal, and the Dean considers whether the basis for appeal "seems sufficiently substantive." If so, the Dean refers to the case back to the PSC for the PSC itself to hear the appeal. After the hearing, the PSC then makes a further recommendation to the Dean, who again decides whether to accept the decision. The Dean's second decision is final.

41. Mr. Rivera-Pierola filed a timely appeal with the Dean, hoping that by accepting responsibility for the issues identified by the PSC, he might avoid antagonizing the Dean, and also included a plan for improving his clinical performance.

42. Mr. Rivera-Pierola also mentioned that he had begun to receive counseling by an on-campus psychologist at OSU, in accordance with the Dean's recommendation to do the same.

43. In the interim, as a result of the COVID-19 pandemic, OSU transitioned to fully virtual rotations. Mr. Rivera-Pierola passed his small animal surgery rotation, and began his virtual anesthesiology rotation.

44. On April 6, two weeks into his three-week anesthesiology rotation, Mr. Rivera-Pierola was informed that while the PSC decided to stand by its original decision, the Dean approved his appeal and he was permitted to stay in the program under Academic Suspension. However, if he received less than a "C" in any further rotations, he would be dismissed without any opportunity to appeal the grade or dismissal, despite OSU policies providing for appeals.

45. Mr. Rivera-Pierola participated in his anesthesiology rotation's activities, however the virtual approach failed to provide students with adequate instruction and anesthesiology experience.

46. Rather than a full day rotation, students were scheduled to meet twice a day, and the preceptor frequently changed the schedule. The preceptor further was inexperienced in and unsure of how to operate the technology necessary to provide virtual instruction, and the rotation was frequently slowed by these issues, significantly detracting from instruction.

47. One student in particular, who often had to try to assist the preceptor with these issues, remarked during the last week that she was tired of the set up.

48. The preceptor heard, taking great offense, and abruptly cancelled the rest of the rotation, nearly three days early in what was only a 21-day rotation.

49. As a result of the preceptor's inability to provide substantive instruction and refusal to provide the last three days of instruction, the students in the rotation did not receive all of the information and instruction that should have been included in the rotation.

50. However, no steps were taken to modify the exam material to account for these issues and students were therefore tested on all the material covered in a normal rotation, not the abbreviated material they were instructed on.

51. While Mr. Rivera-Pierola earned a grade of 79% in the clinical component of the rotation, his exam score was predictably lower, at 66%, given the instructional issues. While this equated to a C, Mr. Rivera-Pierola was nonetheless given a D as a result of failing to meet the rotation's minimum 70% score on the written exam.

52. On April 21, OSU informed Mr. Rivera-Pierola that he was dismissed. He was given no opportunity to appeal the grade or dismissal, or to seek consideration of the inadequate instruction as a result of the pandemic or the preceptor's refusal to teach approximately 14% of the course.

53. While Mr. Rivera-Pierola contacted several administrators seeking to present his case, he was rebuffed.

54. OSU's dismissal was effective only for OSU's clinical program, and thus Mr. Rivera-Pierola remained a student at SMU notwithstanding OSU's dismissal.

55. However, when Mr. Rivera-Pierola contacted SMU to ensure that SMU would independently consider his continuation in the program, briefly summarizing the issues with

OSU's grading and dismissal as well as Mr. Rivera-Pierola's ongoing treatment with a psychologist, SMU instead responded that it too was dismissing him.

56. SMU's indicated that its dismissal was not based on any independent consideration of the situation, but solely based on OSU's decision, and informed Mr. Rivera-Pierola that there was no basis for appeal.

## FIRST CAUSE OF ACTION

*BREACH OF CONTRACT AND THE DUTY OF GOOD FAITH AND FAIR DEALING*
**Against the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, State of Oklahoma *ex rel.* Oklahoma State University, and St. Matthew's University**

57. Each of the allegations set forth in paragraphs 1 through 56, inclusive, are hereby incorporated by this reference as if realleged fully herein.

58. That courts in Oklahoma and the Tenth Circuit impose a contract on the relationship between students and universities. Materials actually provided to students may become part of the agreement.

59. That each contract includes an implied duty of good faith and fair dealing.

60. That Mr. Rivera-Pierola had a contract with the OSU Defendants in connection with rights explicitly guaranteed by the policies outlined in the OSU Handbook pursuant to his entrance into the OSU CVM Year IV program and the Anesthesiology Rotation Course Syllabus.

61. That Mr. Rivera-Pierola had a contract with SMU pursuant to his enrollment in SMU's School of Veterinary Medicine. Some of the terms of that contract are found in the SMU Student Handbook ("SMU Handbook"), which applied to all students enrolled at SMU, regardless of their location.

62. That Mr. Rivera-Pierola dutifully complied with the mandates of the contractual materials governing his relationship with the OSU Defendants and SMU.

11

63. The SMU Handbook provides that, during the student's program, "Faculty must test, grade, and review student work in a manner that is fair and reasonable."

64. Where disputes arise students are entitled to file an academic grievance, which includes an opportunity for three levels of review.

65. Further, the SMU Handbook provides for a procedure for academic integrity violations, including dishonesty, which includes an investigation, formal disciplinary proceedings and an opportunity for a student to present a complete defense.

66. As part of that process, students are given notice of the alleged violation, and an opportunity to respond, including to identify witnesses, documents and other relevant evidence. A student is also entitled to appeal.

67. SMU additionally promised a course of study including complete clinical rotations in all necessary areas, lasting for the scheduled duration and covering all necessary material.

68. SMU breached its contractual promise and its duty of good faith and fair dealing when it dismissed Mr. Rivera-Pierola without independent review or appeal, an opportunity for an academic grievance, or compliance with the disciplinary procedures and an opportunity to rebut the allegations of dishonesty, and when it failed to ensure that OSU provided a complete anesthesiology rotation covering all necessary material for the full three weeks, and then dismissed Mr. Rivera-Pierola based entirely on OSU's flawed decision.

69. The OSU Handbook sets forth the policies applicable to allegations of academic integrity violations, including the Academic Integrity Policy, for students enrolled in OSU, including SMU students.

70. OSU's Academic Integrity Policy, which applies to allegations including "Fabrication of Information," includes multiple procedural steps and protections, including notice

to the student of the allegation, a resolution meeting with the instructor, and, if allegations are not then resolved, consideration by the Academic Integrity Panel ("AIP").

71.     A student has a right to submit documentation and other material in support of their case to the AIP as well as meet with the AIP, composed of both faculty and students, and the instructor.

72.     The appeals process requires the instructor to submit documentation and information to substantiate their allegations, and make themselves available for a hearing.  At the hearing, the student has the right to another person accompanying them, and to ask questions and call and question witnesses in support of their case.

73.     Students are further provided with a final appeal to an appeal panel of independent, objective members.

74.     None of these procedures or protections are provided by the PSC process or were made available to Mr. Rivera-Pierola, and Mr. Rivera-Pierola was never provided with the opportunity to contest the allegations in the final evaluation about his purported lying and the resulting lower grade.

75.     OSU further promised to provide a three-week anesthesiology clinical rotation, in which all relevant material was covered, as part of an approved clinical rotation program for veterinary students.  Further, the syllabus for the Anesthesiology rotation promised a rotation of three weeks in length.

76.     OSU breached its contract when it failed to provide instruction covering all relevant material as a result of moving to a virtual set up, in which the preceptor was unable to operate the necessary technology, and when the preceptor abruptly ended the rotation three days early.

77. OSU, in failing to abide by its procedures, failing to provide the contracted for instruction, and dismissing Mr. Rivera-Pierola based on false allegations and his grade in the abbreviated rotation, acted in bad faith and in breach of its contractual duties.

78. As a direct and proximate result of Defendants' unlawful breaches, Mr. Rivera-Pierola has suffered and continues to suffer irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, and loss of personal and professional reputation, all in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

79. Mr. Rivera-Pierola is entitled to injunctive and declaratory relief to obtain readmission to OSU's CVM program and SMU's program free from the Defendants' breaches of their respective contracts and for an order forbidding all Defendants from further perpetuating any subsequent breach.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which he has a right to jury trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for relief as follows:

1. For general and compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial;

2. For injunctive and declaratory relief described herein, as the Court deems appropriate;

3. For pre-judgment and post-judgment interest, as provided by law;

4. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated this 15th day of June, 2021.

Respectfully Submitted,

**LEVINSON, SMITH & HUFFMAN, PC**

By  */s/ R. Jack Freeman*
R. JACK FREEMAN, OBA #3128
1861 East 71st Street
Tulsa, Oklahoma  74136
Telephone:  (918) 492-4433
Facsimile:  (918) 492-6224
Email:  jack@lsh-law-firm.com

**THE BACH LAW FIRM, LLC**
JASON J. BACH, ESQ.
(*Pro Hac Vice Pending*)
Nevada Bar No. 7984
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email:  jbach@bachlawfirm.com
*Attorneys for Plaintiff*