# EXHIBIT 3

Supreme Court

# Wood *v* Capita Insurance Services Ltd

[2017] UKSC 24

2017 Feb 7;                    Lord Neuberger of Abbotsbury PSC,
     March 29                  Lord Mance, Lord Clarke of Stone-cum-Ebony,
                               Lord Sumption, Lord Hodge JJSC

*Contract — Construction — Indemnity clause — Share capital of company sold under sale and purchase agreement containing clause indemnifying buyer against payments "arising out of claims or complaints registered with" Financial Services Authority — Company making referral to Financial Services Authority regarding mis-selling of insurance and agreeing to pay compensation to customers — Buyer seeking to be indemnified under indemnity clause — Principles of construction to be applied — Whether indemnity clause applying only in relation to claims or complaints made by customers*

The buyer purchased the entire share capital in an insurance brokerage company from the seller and two others. The agreement made between the parties contained an indemnity clause whereby the sellers undertook to pay the buyer an amount equal to the amount required to indemnify the buyer against, inter alia, "all fines, compensation or remedial action or payments imposed on . . . the company . . . arising out of claims or complaints registered with" inter alia, the Financial Services Authority against the company. Shortly after the purchase the company's employees raised concerns about some of the company's sales processes. The company carried out a review which revealed that in many cases the company's telephone operators had misled customers. The buyer was obliged to inform the Financial Services Authority, which informed the buyer that customers had been treated unfairly and had suffered detriment. The company agreed with the authority to establish a scheme for compensation to be paid to customers affected by the mis-selling. The seller brought proceedings against the company and the buyer, and the buyer counterclaimed against the seller under the indemnity clause alleging that the company and its subsidiaries had suffered loss resulting from mis-selling or suspected mis-selling of insurance products in the period prior to the completion of the sale of the company and that the contractual indemnity was not confined to loss arising out of customers' claims or complaints. The seller defended the claim on the ground that the compensation scheme fell outside the scope of the terms of the indemnity clause. The judge construed the indemnity clause as requiring the seller to indemnify the buyer even though there had been no claim or complaint by a customer and accordingly gave judgment for the buyer. The Court of Appeal construed the indemnity clause as being confined to losses arising out of customers' claims or complaints and accordingly allowed the seller's appeal.

On the buyer's appeal—

*Held*, (1) that the court's task in interpreting a contractual term was to ascertain the objective meaning of the language which the parties had chosen to express their agreement; that that was not a literalist exercise focused solely on a parsing of the wording of a particular clause but required consideration of the contract as a whole and, depending on the nature, formality and quality of its drafting, more or less weight to be given to elements of the wider context in reaching its view as to that objective meaning; that the interpretation of a contract was a unitary exercise and, where there were rival meanings, the court could give weight to the implications of rival constructions by reaching a view as to which was more consistent with business common sense; but that, in striking a balance between the indications given by the language and the implications of the competing constructions, the court had to consider the quality of drafting of the clause and also to be alive to the possibility that

© 2017 The Incorporated Council of Law Reporting for England and Wales

one side might have agreed to something which, with hindsight, did not serve his interest; that similarly the court should not lose sight of the possibility that the provision might be a negotiated compromise or that the negotiators had been unable to agree more precise terms; that that unitary exercise involved an iterative process whereby each suggested interpretation was checked against the provisions of the contract and its commercial consequences were investigated; that, when interpreting any contract, textualism and contextualism could be used as tools to ascertain the objective meaning of the language which the parties had chosen to express their agreement and the extent to which each tool would assist the court in its task would vary according to the circumstances of the particular agreements; that agreements which were sophisticated and complex because they had been negotiated and prepared with the assistance of skilled professionals might be successfully interpreted principally by textual analysis; and that the correct interpretation of other contracts, such as those which lacked clarity because of their informality or brevity or the absence of skilled professional assistance, might be achieved by a greater emphasis on considering their factual matrix and the purpose of similar provisions in contracts of the same type (post, paras 10, 11–13).

*Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, SC(E) and *Arnold v Britton* [2015] AC 1619, SC(E) explained.

(2) Dismissing the appeal, that the disagreement between the judge and the Court of Appeal as to the interpretation of the disputed indemnity clause had not been caused by any failure to apply the correct principles but was the result of the clause not having been drafted with precision so that its meaning was avoidably opaque; but that, on analysis of the clause, the Court of Appeal's interpretation was correct (post, paras 24–29, 34, 35, 39–43).

*Per curiam.* The recent history of the common law of contractual interpretation is one of continuity rather than change. One of the attractions of English law as a legal system of choice in commercial matters is its stability and continuity, particularly in contractual interpretation (post, para 15).

Decision of the Court of Appeal [2015] EWCA Civ 839 affirmed.

The following cases are referred to in the judgment of Lord Hodge JSC:

*Arnold v Britton* [2015] UKSC 36; [2015] AC 1619; [2015] 2 WLR 1593; [2016] 1 All ER 1, SC(E)

*Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38; [2009] AC 1101; [2009] 3 WLR 267; [2009] Bus LR 1200; [2009] 4 All ER 677; [2010] 1 All ER (Comm) 365, HL(E)

*Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] EWCA Civ 1047; [2001] 2 All ER (Comm) 299, CA

*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; [1998] 1 All ER 98, HL(E)

*Prenn v Simmonds* [1971] 1 WLR 1381; [1971] 3 All ER 237, HL(E)

*Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900; [2012] Bus LR 313; [2012] 1 All ER 1137; [2012] 1 All ER (Comm) 1, SC(E)

*Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen)* [1976] 1 WLR 989; [1976] 3 All ER 570, HL(E)

*Sigma Finance Corpn, In re* [2009] UKSC 2; [2010] 1 All ER 571, SC(E)

The following additional case was cited in argument:

*Wickman Machine Tool Sales Ltd v L Schuler AG* [1974] AC 235; [1973] 2 WLR 683; [1973] 2 All ER 39, HL(E)

**APPEAL** from the Court of Appeal

By a claim form issued on 8 February 2013 the claimant, Andrew Wood, sought damages for wrongful dismissal against the defendants, Sureterm Direct Ltd and Capita Insurance Services Ltd. The second defendant

© 2017 The Incorporated Council of Law Reporting for England and Wales

A  counterclaimed against the claimant seeking to enforce a right to indemnity for loss incurred, pursuant to clause 7.11 of a share purchase agreement dated 13 April 2010 whereby the second defendant had agreed to buy, and the claimant to sell, all the share capital in the first defendant. On 14 October 2014 Popplewell J sitting in the Commercial Court of the Queen's Bench Division [2014] EWHC 3240 (Comm) gave judgment for the second defendant on a preliminary issue arising in the counterclaim as to
B  the construction of clause 7.11.

By an appellant's notice the claimant appealed. On 30 July 2015 the Court of Appeal (Patten, Gloster and Christopher Clarke LJJ) [2015] EWCA Civ 839 allowed the appeal.

On 25 February 2016 the Supreme Court (Lord Mance, Lord Sumption and Lord Toulson JJSC) granted the second defendant permission to appeal,
C  pursuant to which it appealed.

The facts are stated in the judgment of Lord Hodge JSC.

*Edward Cumming* (instructed by *Enyo Law llp*) for the second defendant buyer.

The buyer's counterclaim seeks to enforce a right to payment contained in clause 7.11 of the share purchase agreement with the claimant seller. It is
D  common ground that all parties to the agreement which the court is called upon to construe were sophisticated commercial persons with experience of the insurance broking industry, and that each was, at the time of the agreement, carefully regulated by the Financial Services Authority. The authority took an active and interventionist approach to regulation and stood poised to intervene to require what it perceived to be fair treatment of the company's customers. From a regulatory perspective there was,
E  therefore, no meaningful significance in a customer or former customer making a complaint or bringing a claim against an entity such as the company before that entity became liable for mis-selling.

Prior to the agreement the seller was a director of the company and had complete control over it. He was well placed to direct, influence and find out about the way in which the company had conducted its business, and its
F  compliance with the rules of the authority. The buyer was in no such position and had no knowledge of those matters, and so had no way of knowing or assessing whether there had been a breach of those rules and whether any insurance policies had been mis-sold to customers. The purpose of clause 7.11 was therefore to allocate to the seller the risk that there had been, or might have been, mis-selling prior to the agreement. For that reason the clause was wide-ranging and was intended to make all potential liabilities
G  pre-dating the sale pertaining to any mis-selling or suspected mis-selling of insurance the responsibility of the seller. That can also be ascertained from the terms of the agreement itself and made perfect commercial sense since the seller was familiar with the way in which the company had sold its insurance policies prior to the agreement in a way which the buyers simply could not have been. Moreover the seller had been in a position to influence the company's compliance with the authority's rules.
H  The proper approach to interpretation of commercial contracts such as the share purchase agreement is set down in the Supreme Court's decision in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900 (from which, contrary to submissions made below, there was no "rowing back" in *Arnold v Britton* [2015] AC 1619).

© 2017 The Incorporated Council of Law Reporting for England and Wales

    Popplewell J [2014] EWHC 3240 (Comm) correctly found that the language, syntax and punctuation of clause 7.11 favoured the buyer's interpretation, as did the commercial context in which the parties entered into the share purchase agreement, commercial common sense and the practical consequences of each rival interpretation. The Court of Appeal [2015] EWCA Civ 839 however preferred a much more complex and strained reading of the clause, separating out its sub-clauses and adding numbering for clarification.

    Where a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business common sense: see the *Rainy Sky* case. Having found that clause 7.11 was capable of more than one meaning, the Court of Appeal misdirected itself and/or erred in law by failing to consider which of the competing interpretations was more consistent with business common sense and to prefer that interpretation. Had the Court of Appeal done so, it would have favoured the buyer's interpretation, which is not only more consistent with the language, syntax and punctuation of clause 7.11, but, importantly, also more consistent with business common sense.

    Given (i) the particular nature of regulation by the Financial Services Authority, and (ii) the likelihood that substantial liabilities in respect of mis-selling would result from intervention by the authority, or self-reporting, rather than specific claims or complaints by customers, it is inherently unlikely that the parties would have attributed the importance to there first being claims or complaints before any liability is triggered under clause 7.11 which is the necessary consequence of the seller's interpretation. From a commercial perspective, whether there would have been claims or complaints would have been economically irrelevant to those operating in financial services. That inherent unlikelihood of the seller's interpretation is also illustrated by various arbitrary and irrational consequences to which it would give rise. As Lord Reid said in *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251, the fact that a particular construction leads to a very unreasonable result must be a relevant consideration: the more unreasonable the result, the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear. Contractual certainty is not achieved by giving contractual terms a meaning which reasonable commercial parties, placed as they were and knowing what they did, would have been unlikely to have intended.

    The Court of Appeal's decision should be set aside and Popplewell J's decision restored.

    *Andrew Twigger QC* (instructed by *Birketts llp, Norwich*) for the claimant seller.

    This appeal falls into a class of case where the purpose of the clause in the share purchase agreement is to allocate risk and it cannot be assumed that all of the relevant risk is intended to be allocated to one party. In such a case it is necessary to start with the clause in order to see what the parties were intending.

    The warranties are very important in this case. The parties were given a two-year period to investigate the way in which the company had previously conducted its business and make a claim under the wide-ranging warranties. The commercial purpose of the indemnity was to cover the case, outside the

© 2017 The Incorporated Council of Law Reporting for England and Wales

A  parties' control, of third party customers making claims against the company after the end of that two-year period. The buyer's interpretation of clause 7.11 is to be rejected because it gives no purpose or effect to parts of the clause which were plainly intended to define the scope of the indemnity being given.

B  The Court of Appeal correctly stated and applied the law on the interpretation of contracts as elucidated in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900; *Arnold v Britton* [2015] AC 1619 and other authorities. The Court of Appeal's interpretation of the clause is its natural and ordinary meaning and the one which the reasonable person, with all the background knowledge reasonably available to the parties at the time of the share purchase agreement, would have understood the parties to have meant. The Court of Appeal's interpretation of clause 7.11 is also the

C  interpretation most consistent with business common sense.

*Cumming* replied.

The court took time for consideration.

D  29 March 2017. **LORD HODGE JSC** (with whom **LORD NEUBERGER OF ABBOTSBURY PSC, LORD MANCE, LORD CLARKE OF STONE-CUM-EBONY** and **LORD SUMPTION JJSC** agree) handed down the following judgment.

1  This appeal raises a question of contractual interpretation. It concerns an indemnity clause in an agreement dated 13 April 2010 ("the SPA") for the sale and purchase of the entire issued share capital of a company, Sureterm

E  Direct Ltd ("the Company"), which carries on business as a specialist insurance broker, primarily offering motor insurance for classic cars.

2  The sellers of the Company were the respondent, Mr Andrew Wood ("Mr Wood"), who owned 94% of its share capital, and Mr Christopher Kightley and Mr Howard Collinge, who owned 1% and 5% of its share capital respectively. Each was a director of the Company and Mr Wood was its managing director. The purchaser was Capita Insurance Services Ltd

F  ("Capita"). Mr Wood remained as managing director of the Company until the end of 2010. He brought proceedings against Capita arising out of the termination of his employment and Capita brought a counterclaim against him under the indemnity provision in the SPA, which is the subject matter of this appeal. Mr Kightley and Mr Collinge were, but are no longer, parties to the proceedings.

G  3  It is not necessary to set out in any detail the circumstances in which Capita came to make its claim under the indemnity. It suffices to summarise Capita's claim as follows.

4  In about August 2008 the Company began to sell motor insurance through online aggregator sites such as Confused.com. The sales were not completed online: potential customers obtained a quotation from the Company on the aggregator site and the Company then contacted the

H  potential customer directly with a view to confirming their risk details before selling them the appropriate insurance policy.

5  Shortly after Capita's purchase of the Company's share capital, employees of the Company raised concerns about the Company's sales processes, which had resulted in some customers paying substantially more

© 2017 The Incorporated Council of Law Reporting for England and Wales

than they had been quoted online. The employees alleged that the Company had presented customers with higher quotations without informing them why the quotations had increased. The Company had thus increased its own arrangement fees when neither the underwriting premium nor the risk profile had changed significantly. The Company responded to the allegations by carrying out a review of its sales between January 2009 and January 2011. This review revealed that in many cases the Company's telephone operators had misled customers into believing that an underwriter had required a higher premium or that their risk profile was worse than it was or had pressurised the customer to make sure that a sale was made.

6   Capita and the Company were obliged to inform the Financial Services Authority ("FSA") of the findings and did so on 16 December 2011. The FSA informed them that the customers had been treated unfairly and had suffered detriment and that there would have to be redress. After the FSA had conducted a risk assessment visit to the Company in November 2012, Capita and the Company agreed with the FSA to conduct a remediation scheme to pay compensation to customers who were identified as potentially affected by the Company's mis-selling. Capita alleges that it, the Company and Capita's other subsidiaries have suffered loss as a result of the mis-selling or suspected mis-selling of insurance products in the period before the completion of the sale under the SPA. Capita's claim is for £2,432.883·10, comprising an estimate of the compensation at £1·35m, interest of about £400,000 and the costs of the remediation scheme.

7   It is appropriate to record that some of Capita's allegations are disputed, including the extent of the mis-selling and any detriment to customers. Other than, perhaps, the facts narrated in para 4 above (which do not appear to be disputed), they are not facts by reference to which the SPA is to be construed. But the circumstances in which Capita and the Company were required to set up the remediation scheme are of some importance because Mr Wood contends that they fall outside the scope of the indemnity clause which is the subject matter of this action. In particular, the requirement to compensate was not the result of a claim by one or more of the Company's customers or a complaint by those customers to the FSA or another public authority. It resulted, as I have said, from information about the internal review which Capita and the Company gave the FSA and the requirement by the FSA that compensation should be paid to the customers.

*Contractual interpretation*

8   In his written case counsel for Capita argued that the Court of Appeal had fallen into error because it had been influenced by a submission by Mr Wood's counsel that the decision of this court in *Arnold v Britton* [2015] AC 1619 had "rowed back" from the guidance on contractual interpretation which this court gave in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900. This, he submitted, had caused the Court of Appeal to place too much emphasis on the words of the SPA and to give insufficient weight to the factual matrix. He did not have the opportunity to develop this argument as the court stated that it did not accept the proposition that *Arnold* had altered the guidance given in *Rainy Sky*. The court invited him to present his case without having to refer to the well known authorities on contractual interpretation, with which it was and is familiar.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    9   It is not appropriate in this case to reformulate the guidance given in the *Rainy Sky* and *Arnold* cases; the legal profession has sufficient judicial statements of this nature. But it may assist if I explain briefly why I do not accept the proposition that the *Arnold* case involved a recalibration of the approach summarised in the *Rainy Sky* case.

10   The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. It has long been accepted that this is not a literalist exercise focused solely on a parsing of the wording of the particular clause but that the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to that objective meaning. In *Prenn v Simmonds* [1971] 1 WLR 1381, 1383H–1385D and in *Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen)* [1976] 1 WLR 989, 997, Lord Wilberforce affirmed the potential relevance to the task of interpreting the parties' contract of the factual background known to the parties at or before the date of the contract, excluding evidence of the prior negotiations. When in his celebrated judgment in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912–913 Lord Hoffmann reformulated the principles of contractual interpretation, some saw his second principle, which allowed consideration of the whole relevant factual background available to the parties at the time of the contract, as signalling a break with the past. But Lord Bingham of Cornhill in an extrajudicial writing, "A New Thing Under the Sun? The Interpretation of Contracts and the ICS decision" (2008) 12 Edin LR 374, persuasively demonstrated that the idea of the court putting itself in the shoes of the contracting parties had a long pedigree.

11   Lord Clarke of Stone-cum-Ebony JSC elegantly summarised the approach to construction in the *Rainy Sky* case [2011] 1 WLR 2900, para 21f. In the *Arnold* case [2015] AC 1619 all of the judgments confirmed the approach in the *Rainy Sky* case: Lord Neuberger of Abbotsbury PSC, paras 13–14; Lord Hodge JSC, para 76 and Lord Carnwath JSC, para 108. Interpretation is, as Lord Clarke JSC stated in the *Rainy Sky* case (para 21), a unitary exercise; where there are rival meanings, the court can give weight to the implications of rival constructions by reaching a view as to which construction is more consistent with business common sense. But, in striking a balance between the indications given by the language and the implications of the competing constructions the court must consider the quality of drafting of the clause (the *Rainy Sky* case, para 26, citing Mance LJ in *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] 2 All ER (Comm) 299, paras 13, 16); and it must also be alive to the possibility that one side may have agreed to something which with hindsight did not serve his interest: the *Arnold* case, paras 20, 77. Similarly, the court must not lose sight of the possibility that a provision may be a negotiated compromise or that the negotiators were not able to agree more precise terms.

12   This unitary exercise involves an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial consequences are investigated: the *Arnold* case, para 77 citing *In re Sigma Finance Corpn* [2010] 1 All ER 571, para 12, per Lord Mance JSC. To my mind once one has read the language in dispute and the relevant parts of the contract that provide its context, it does not matter

© 2017 The Incorporated Council of Law Reporting for England and Wales

whether the more detailed analysis commences with the factual background and the implications of rival constructions or a close examination of the relevant language in the contract, so long as the court balances the indications given by each.

13   Textualism and contextualism are not conflicting paradigms in a battle for exclusive occupation of the field of contractual interpretation. Rather, the lawyer and the judge, when interpreting any contract, can use them as tools to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The extent to which each tool will assist the court in its task will vary according to the circumstances of the particular agreement or agreements. Some agreements may be successfully interpreted principally by textual analysis, for example because of their sophistication and complexity and because they have been negotiated and prepared with the assistance of skilled professionals. The correct interpretation of other contracts may be achieved by a greater emphasis on the factual matrix, for example because of their informality, brevity or the absence of skilled professional assistance. But negotiators of complex formal contracts may often not achieve a logical and coherent text because of, for example, the conflicting aims of the parties, failures of communication, differing drafting practices, or deadlines which require the parties to compromise in order to reach agreement. There may often therefore be provisions in a detailed professionally drawn contract which lack clarity and the lawyer or judge in interpreting such provisions may be particularly helped by considering the factual matrix and the purpose of similar provisions in contracts of the same type. The iterative process, of which Lord Mance JSC spoke in *Sigma Finance Corpn* [2010] 1 All ER 571, para 12, assists the lawyer or judge to ascertain the objective meaning of disputed provisions.

14   On the approach to contractual interpretation, the *Rainy Sky* and *Arnold* cases were saying the same thing.

15   The recent history of the common law of contractual interpretation is one of continuity rather than change. One of the attractions of English law as a legal system of choice in commercial matters is its stability and continuity, particularly in contractual interpretation.

*The sale and purchase agreement*

16   The SPA is a detailed and professionally drafted contract. It provided for the sale and purchase of the Company's share capital (clause 3) for the consideration of £7,681,661 payable on completion (clause 4), and it also provided for deferred consideration: Schedule 8. Clause 1 contained the following definitions which are relevant to the construction of the disputed indemnity:

> "*Authority* means any local, national, multinational, governmental or non-governmental authority, statutory undertaking, agency or public or regulatory body (whether present or future) which has jurisdiction over the Business or any decision, consent or licence which is required to carry out the Business and Authorities shall be construed accordingly.
> "*Company* means Sureterm Direct Ltd . . .
> "*Completion Date* means the date of this agreement.
> "*Employees* has the meaning given to it at paragraph 6 of Schedule 4 [which refers to a list of all of the employees employed by the Company].

© 2017 The Incorporated Council of Law Reporting for England and Wales

A  "*FSA* means the Financial Services Authority and any body which supersedes it.

"*Regulatory Authority* means any body by which any part of the Business is or was regulated pursuant to any Applicable Financial Services Laws (including, but not limited to, the FSA, the Personal Investments Authority Ltd, the General Insurance Standards Council, the Insurance Brokers Registration Council and including the Financial Services

B  Ombudsman and any voluntary regulatory body with whose rules the Company has agreed to comply).

"*Relevant Person* means an Employee or a former employee of the Company and any dependant of an Employee or a former employee of the Company.

"*Shares* means all of the issued shares in the capital of the Company.

C  "*Warranties* means the tax warranties and the warranties set out in Schedule 4."

17  Clause 7 dealt with warranties and indemnities. Each of the sellers severally warranted to the buyer on a proportionate basis in terms of the Warranties (clause 7.1); the Warranties were qualified by matters which had been fairly disclosed in the disclosure letter (clause 7.2); and where a

D  Warranty was qualified by an expression such as "so far as the Sellers are aware" that referred to the actual knowledge of the sellers, who confirmed that they had made due and careful enquiry of the Company's compliance manager, IT Director and HR Director: clause 7.3.

18  The indemnity clause whose interpretation is in dispute is clause 7.11. It provided:

E  "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and all fines, compensation or remedial action or payments imposed on or required to be made by the Company following and arising out of claims or complaints registered with the FSA, the Financial Services

F  Ombudsman or any other Authority against the Company, the Sellers or any Relevant Person and which relate to the period prior to the Completion Date pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

19  This clause must be seen in its contractual context. Schedule 4 contained 30 pages of detailed warranties. In part 12 of that schedule,

G  which concerned litigation, disputes and investigations, the sellers warranted that they were not aware of circumstances which were likely to give rise to any investigation or enquiry by any Authority (para 12.4) and that no breach of contract, tort, statutory duty or law had been committed for which the Company was or might be liable: para 12.5. Part 14 which was concerned with compliance and regulatory matters included the

H  following paragraph:

"14.1  
"(a) The Company conducts, and has conducted the Business in accordance with the requirements of all Competition laws and Applicable Financial Services Laws applicable to the business and has not been and is

not being investigated for any alleged non-compliance or infringement of such Competition Laws and Applicable Financial Services Laws."

"(c) The Company has no reason to believe that any action will be taken against it in relation to any of its current or past activities based on any alleged non-compliance or infringement of any Competition Laws and Applicable Financial Services Laws."

20  Part 14 also contained detailed warranties that the Company had complied with its regulatory obligations and that correspondence between the Company and all Regulatory Authorities had been disclosed, that the Company, its officers and employees had not been subject to any regulatory sanction and that no such sanction was likely or pending; and that the Company had not been subject to a regulatory investigation and, so far as the Sellers were aware, there were no circumstances which could give rise to a visit by any Regulatory Authority.

21  Clause 8 of the SPA provided for limitations on the sellers' liability in schedule 5, which in para 1 provided that the aggregate maximum liability of all claims under the SPA (with one exception) would not exceed the purchase price and that the liability of each seller would not exceed his proportionate liability (i e 94%, 5% and 1%). That limitation applied to claims under clause 7.11 as well as under the warranties. But para 3 of schedule 5 imposed time limits on the warranties by providing:

"3.1 Save in respect of a Warranty Claim or a claim under the Tax Covenant notified in writing to the Sellers prior to such a date, the Sellers will cease to be liable:

"(a) for any claim under the tax warranties or under the Tax Covenant on the seventh anniversary of Completion; and

"(b) for any other Warranty Claim on the second anniversary of Completion."

Thus in contrast to the indemnity under clause 7.11, the warranties relating to, among other things, regulatory compliance, had a lifespan of only two years.

22  In a judgment dated 14 October 2014 Popplewell J [2014] EWHC 3240 (Comm) decided the preliminary issue of the interpretation of the indemnity clause and held, in effect, that it required Mr Wood to indemnify Capita even if there had been no claim or complaint by a customer. The Court of Appeal (Patten, Gloster and Christopher Clarke LJJ) in a judgment written by Christopher Clarke LJ [2015] EWCA Civ 839 disagreed. In its order dated 30 July 2015 the Court of Appeal declared that Mr Wood's liability under the indemnity in clause 7.11 of the SPA:

"cannot arise unless the matter in respect of which indemnity is sought follows and arises out of either (i) a claim made against the Company, a Seller or a Relevant Person or (ii) a complaint registered with the FSA, the Financial Services Ombudsman or any other Authority against the Company, a Seller or a Relevant Person and, in either case, the claim or complaint (a) relates to the period prior to the Completion Date and (b) pertains to any mis-selling or suspected mis-selling of any insurance or insurance related product."

23  Capita appeals against that order, arguing that the contractual indemnity is not confined to loss arising out of a claim or complaint.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A  24  In this case both Popplewell J and the Court of Appeal have considered and weighed both the language of the disputed clause 7.11 and the commercial considerations. They have both started by examining the language but have reached opposing conclusions. This disagreement is not caused by any failure to apply the correct principles but is, in my view, the result of an opaque provision which, as counsel for each party acknowledged, could have been drafted more clearly.

B  25  I have concluded that the Court of Appeal has come to the correct view as to the meaning of this difficult clause. I set out below my reasons, which are essentially the same as those which Christopher Clarke LJ presented.

*Discussion*

C  26  Clause 7.11 has not been drafted with precision and its meaning is avoidably opaque. My preliminary view of the meaning of the clause on a first reading was consistent with the view which the Court of Appeal favoured, namely that the indemnity covered loss and damage which (a) followed and arose out of claims or complaints against the Company, the Sellers or any Relevant Person, (b) related to the period before completion and (c) pertained to the mis-selling or suspected mis-selling of insurance

D  products or services. But it is necessary to place the clause in the context of the contract as a whole, to examine the clause in more detail and to consider whether the wider relevant factual matrix gives guidance as to its meaning in order to consider the implications of the rival interpretations.

27  The contractual context is significant in this case. The indemnity in clause 7.11 is an addition to the detailed warranties in schedule 4. The mis-selling which clause 7.11 addresses is also covered by the warranty in

E  para 14.1 of schedule 4: paras 18 and 19 above. But liability for the schedule 4 warranties is time-limited by schedule 5. In particular para 3.1(b) of that schedule (para 20 above) required the Company to claim within two years of the completion of the sale and purchase. The scope of the clause 7.11 indemnity, breach of which gives rise to a liability which is unlimited in time, falls to be assessed in the context of those time limited

F  warranties.

28  All of the parties to the SPA were commercially sophisticated and had experience of the insurance broking industry. Capita was not involved in the management of the Company before the share purchase. The Sellers were the directors and the only shareholders of the Company. They were the people who knew or ought to have known how the Company had operated its business; Capita would in all probability not have that knowledge. The

G  parties to the SPA would have known this. That lack of knowledge explains why Capita required the disclosures in the disclosure letter and the detailed warranties in schedule 4; but it does not assist the court to determine the scope of the indemnity clause. The court is not aware of the negotiations which led to the SPA; they are not relevant to the task of interpreting that agreement: *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101. Business common sense suggests that Capita had an interest in obtaining as broad an indemnity

H  against the adverse consequences of mis-selling as it could obtain. But the sellers had given warranties of compliance with regulatory requirements, which covered such mis-selling, subject to the agreed limits of quantum and time. The sellers were exposed to a potential liability under those warranties for the two years after the Completion Date, during which Capita could learn

© 2017 The Incorporated Council of Law Reporting for England and Wales

of the Company's sales practices. One may readily infer that they had an interest in minimising their further exposure to liability after that time had elapsed. Business common sense is useful to ascertain the purpose of a provision and how it might operate in practice. But in the tug o' war of commercial negotiation, business common sense can rarely assist the court in ascertaining on which side of the line the centre line marking on the tug o' war rope lay, when the negotiations ended. I therefore turn to examining the clause in more detail before returning to the commercial context.

29  In order to illustrate the competing contentions of the parties Popplewell J helpfully divided clause 7.11 into its constituent parts. I set that presentation out below with the addition in (B) of the sub-headings (i) and (ii) to assist my exegesis.

30  Clause 7.11 thus divided provides:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against
>
> "(1) all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and
>
> "(2) all fines, compensation or remedial action or payments imposed on or required to be made by the Company
>
> "(A) following and arising out of claims or complaints registered with the FSA, the Financial Services Ombudsman or any other authority against the Company, the Sellers or any Relevant Person
>
> "(B) (i) and which relate to the period prior to the Completion Date (ii) pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

31  Counsel for Capita submitted that the clause should be read by treating (2) and (A) as a composite phrase so that the Sellers were bound to indemnify against both (1) and (2+A), each of which was subject to the two conditions in (B). This meant that it was only the fines etc in (2) which had to follow on or arise out of claims or complaints made to the FSA or other Authority against the Company etc as provided in (A). Thus, it was submitted, the indemnity covered all liabilities in (1) provided only that (i) they related to the period prior to the completion date and (ii) pertained to any mis-selling or suspected mis-selling of insurance products etc

32  Counsel for Mr Wood submitted that the clause was properly construed by treating both (1) and (2) as being subject to three conditions, namely (A), B(i) and (B)(ii). He submitted that (A) should be read as if there was a comma after "claims", so that it provided as a condition for the triggering of the indemnity under (1) or (2) that there must be either claims by customers, or complaints made to the regulatory authorities, in each case against the Company, the Sellers or any Relevant Person. Thus, on his approach, either a claim by a customer against the Company, the Sellers or an employee or former employee of the Company, or a complaint to a regulatory authority against the Company, the Sellers or an employee or former employee of the Company would trigger the indemnity if the two conditions in (B) were met.

33  Both counsel accepted that, because of the breadth of the terms used in (1), the types of loss and damage in (1) covered all of the types of loss and damage in (2). Thus it was suggested that (2) must have been included only

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    for the avoidance of doubt. This means that on Mr Wood's approach (2) was otiose while on Capita's approach the composite (2+A) was otiose. I find the latter proposition remarkable and unlikely for two reasons.

34   First, and to my mind most significantly, (A) would serve no purpose by restricting the source of loss and damage if (A) governed only (2) and therefore (1) was unrestricted. (A) would not restrict the scope of the indemnity in any way. On Mr Wood's construction the words in (A) have a purpose as they limit the scope of both (1) and the otiose (2).

35   Secondly, if one airbrushes out (2+A) as otiose, the clause does not specify against whom the actions, proceedings and claims in (1) are directed. The clause would read:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and which relate to the period prior to the Completion Date pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

The identity of the persons against whom the relevant claims etc could be made so as to trigger the sellers' indemnity would, on Capita's approach, be left to implication. There must be a limit on who such persons could be as it would be absurd for Capita to have a claim against the Sellers for indemnity resulting from any mis-selling on its part before the Completion Date. But, even assuming that the target was mis-selling by or on behalf of the Company, it is far from obvious that the delimited class of persons would be "the Company, the Sellers or any Relevant Person".

36   Capita made three further points against Mr Wood's interpretation. First, there is an element of tautology as the "claims" in (1) are said in (A) to follow and arise out of "claims". But as Christopher Clarke LJ observed, tautology in commercial contracts is not unknown and the verbal exuberance (or torrential drafting) of (1) makes tautology difficult to avoid.

37   Secondly, Capita pointed out that there is a comma after "incurred" at the end of (1) and no comma after "Company" at the end of (2). This could support the separation of (1) from (2) and the conjunction of (2) and (A). Similarly, Mr Wood's interpretation would involve inserting in (A) a comma after "claims" and also after "any other Authority" so as to limit both the claims and the regulatory complaints to those against "the Company, the Sellers or any Relevant Person". Again in agreement with Christopher Clarke LJ I do not think that the use of commas in this clause is a strong pointer in favour of Capita's interpretation, both because there are no set rules for the use of commas and in any event the draftsman's use of commas in this clause is erratic.

38   Thirdly, the draftsman used an adjectival participle at the start of (A) ("following and arising out of") and "changed tone" by using a relative pronoun ("and which") at the start of (B). But the use of the adjectival participle does not tie (A) exclusively into (2) because in (B) the adjectival participle ("pertaining to") unquestionably applies to both (1) and (2). These detailed points of style and syntax are of little assistance in construing an admittedly opaque clause.

© 2017 The Incorporated Council of Law Reporting for England and Wales

39  I return to the commercial context and the practical consequences of the rival interpretations. On Mr Wood's interpretation it requires a customer or customers to make a claim, or complaint to the regulatory authorities, against the Company, the sellers or a Relevant Person in order to trigger the indemnity. Thus if a whistle-blower alerted the regulatory authorities of suspected or actual mis-selling, or if (as in fact occurred) management, complying with their regulatory obligations, reported such mis-selling to the FSA, which ordered the payment of compensation, the indemnity would not be triggered. Yet in each case, the mis-selling before the date of completion causes the Company loss.

40  The general purpose of clause 7.11, to indemnify Capita and its group against losses occasioned by mis-selling is clear. Had clause 7.11 stood on its own, the requirement of a claim or complaint by a customer and the exclusion of loss caused by regulatory action which was otherwise prompted might have appeared anomalous. But clause 7.11 is in addition to the wide ranging warranties in part 14 of schedule 4 (paras 18 and 19 above) which probably covered the circumstances which eventuated. Capita had two years after completing the purchase to examine the sales practices of the Company's employees and so uncover any regulatory breaches in order to make a claim under the Schedule 4 indemnities. Prima facie that was not an unreasonable time scale. Indeed, Capita was able to send its findings to the FSA within 20 months of the Completion Date. It is not contrary to business common sense for the parties to agree wide ranging warranties, which are subject to a time limit, and in addition to agree a further indemnity, which is not subject to any such limit but is triggered only in limited circumstances.

41  From Capita's standpoint the SPA may have become a poor bargain, as it appears that it did not notify the sellers of a warranty claim within two years of Completion. But it is not the function of the court to improve their bargain.

42  In this case, the circumstances which trigger that indemnity are to be found principally in a careful examination of the language which the parties have used.

### Conclusion

43  I would therefore dismiss the appeal.

*Appeal dismissed with costs.*

SHIRANIKHA HERBERT, Barrister

END OF VOLUME AND OF APPEAL CASES SERIES FOR 2017

© 2017 The Incorporated Council of Law Reporting for England and Wales