## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

JONATHAN RIVERA-PIEROLA,

        *Plaintiff*,

   v.

BOARD OF REGENTS FOR THE
OKLAHOMA AGRICULTURAL AND
MECHANICAL COLLEGES; STATE OF
OKLAHOMA *ex rel.* OKLAHOMA
STATE UNIVERSITY; and ST.
MATTHEWS UNIVERSITY, INC.,

        *Defendants*.

Civil Action No.:  5:21-cv-00616-PRW

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM

Pursuant to the Court's November 4, 2021 Order (Rec. Doc. 22), Plaintiff, Jonathan Rivera-Pierola ("Plaintiff"), respectfully submits this Supplemental Memorandum to address the choice-of-law issue raised by the Court in its Order.  The Court's Order pertains to the Motion to Dismiss filed by Defendant, St. Matthew's University, Inc. ("SMU"), which has been briefed by the parties.  (Rec. Docs. 14, 20, and 21.)  As noted by the Court, the choice-of-law principles of the forum state (Oklahoma) provide that issues pertaining to the validity and interpretation of a contract are governed by the law of the state where the contract was made in the absence of a choice-of-law provision in the contract itself. (Nov. 4, 2021 Order at 1-2.)

Under Oklahoma contract law, "a contract is to be interpreted according to the law and usage of the place where it is to be performed, or, if it does not indicate a place of

performance, according to the law and usage of the place where it is made." 15 Okla. Stat. Ann. § 162.  This is consistent with Oklahoma case law.  *See Key v. Exxon Mobile Corp.*, 508 F. Supp. 3d 1072, 1078 (E.D. Okla. 2020) ("In Oklahoma, contract choice of law rules require the court to apply the law of the state (1) chosen by the parties, (2) where the contract was made or entered into, or (3) the place of performance if indicated in the contract.") (citing *Moore v. Subaru of Am.*, 891 F.2d 1445, 1449 (10th Cir. 1989)); *see also Bernal v. Charter County Mut. Ins. Co.*, 209 P.3d 309, 315, 2009 OK 28, ¶ 12 ("This state's established general choice-of-law rule for contract actions is bottomed on the terms of 15 O.S. § 162.  According to its provisions, the rule of *lex loci solutionis* – the law where the relevant contract performance occurs – is to be applied.  When there is no indication in the contract's text where performance is to occur, the *lex loci contractus* rule – the law of the place where the contract is made – will govern.").

In this case, Plaintiff's claims are predicated upon the SMU Handbook, which does not contain any choice of law provision.  (*See* Rec. Doc. 14-1.)  The SMU Handbook, however, does expressly contemplate that performance will be conducted in states where students conduct clinical rotations.  (Rec. Doc. 14-1, at Section L, Clinical Rotation Program at Affiliated Schools.)  The SMU Handbook notes that it has affiliations with veterinary schools around the United States for clinical programs and that students will perform those clinical rotations at those affiliated schools.  (*Id.*).  Because SMU maintains a clinical affiliation with Oklahoma State University and because performance took place in Oklahoma through SMU's clinical affiliation with OSU, Oklahoma law should govern

the validity and interpretation of the SMU Handbook.  Plaintiff therefore respectfully requests that the Court apply Oklahoma law.

In a previous case against SMU in this district, Judge Heaton applied Oklahoma contract law in denying SMU's motion to dismiss a breach of contract claim.  *See* Order, *Guillou v. Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, et al.*, Case 5:17-cv-00988-HE, p. 14, *citing Mason v. State ex rel. Bd. Of Regents*, 23 P.3d 964, 970 (Okla. 2000).  A copy of the Court's Order is attached hereto as Exhibit 1.

Alternatively, to the extent that the Court finds that the SMU Handbook does not contemplate performance in Oklahoma, then Plaintiff believes that the contract was made in Florida.  In that regard, Plaintiff is and was a Florida resident at the time he matriculated to SMU, which is when he became subject to the SMU Handbook.  Further, as alleged in the Complaint, SMU maintains administrative offices in Florida where it processes student applications and communicates with students.  (Rec. Doc. 1 at para. 3)  Thus, the making of the contract (agreement to the SMU Handbook) would have taken place in Florida.  Consequently, in the event that Oklahoma law does not govern the SMU Handbook, then Plaintiff requests that the Court apply Florida law.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court apply Oklahoma law in connection with the validity and interpretation of the SMU Handbook on

///

///

the ground that performance was contemplated to take place in Oklahoma.  Alternatively,

Plaintiff requests application of Florida law.

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

By    *Jason J. Bach*
    Jason J. Bach
    *Admitted Pro Hac Vice*
    7881 West Charleston Blvd., Suite 165
    Las Vegas, Nevada 89117
    Telephone: (702) 925-8787
    Facsimile: (702) 925-8788
    Email: jbach@bachlawfirm.com

and

**LEVINSON, SMITH & HUFFMAN, PC**
    R. JACK FREEMAN, OBA #3128
    1861 East 71st Street
    Tulsa, Oklahoma 74136
    Telephone: (918) 492-4433
    Facsimile: (918) 492-6224
    Email: jack@lsh-law.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2021, I caused the foregoing document to be electronically transmitted to the Clerk of the Court using the Court's ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

>Jennifer M. McCoy
>Kimberly F. Williams
>LOCKE LORD LLP
>2200 Ross Avenue, Suite 2800
>Dallas, TX 75201
>Jennifer.mccoy@lockelord.com
>kwilliams@lockelord.com
>
>Jeremy Tubb
>Emma J. Payne
>Courtney K. Warmington
>FULLER TUBB BICKFORD
>WARMINGTON & PANACH, PLLC
>201 Robert S. Kerr Avenue, Suite 1000
>Oklahoma City, OK 73102
>Jeremy.tubb@fullertubb.com
>Emma.payne@fullertubb.com
>Cwarmington@fullertubb.com
>Attorneys for Defendant St. Matthew University, Inc.
>
>Clinton W. Pratt
>Gaylan Towle II
>Board of Regents for the Oklahoma
>Agricultural and Mechanical Colleges
>5th Floor, Student Union Building
>Stillwater, OK 74078
>Clint.pratt@okstate.edu
>Gaylan.towle@okstate.edu
>Attorneys for Defendants Board of Regents and
>the State of Oklahoma *ex rel.* Oklahoma State University

>    */s/ Jason J. Bach*
>    Jason J. Bach

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

ALEXANDRA GUILLOU,              )
                               )
                Plaintiff,     )
vs.                            )        NO. CIV-17-988-HE
                               )
BOARD OF REGENTS FOR THE       )
OKLAHOMA AGRICULTURAL AND      )
MECHANICAL COLLEGES, *et al.*  )
                               )
                Defendants.    )

## <u>ORDER</u>

Plaintiff Alexandra Guillou filed this action against Oklahoma State University ("OSU"),[1] St. Matthew's University ("SMU"),[2] and four individuals employed by OSU (Dr. Daniel Burba, Dr. Chris Ross, Dr. Margi Gilmour, and Lucinda Kershaw).  She asserts claims for retaliation and discrimination under Title II of the American's with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act ("§ 504") and state law claims for breach of contract, breach of the implied duty of good faith and fair dealing, and intentional infliction of emotional distress ("IIED").  Plaintiff seeks compensatory and punitive damages as well as declaratory and injunctive relief.  Defendants have moved to dismiss certain of the claims against them pursuant to Fed.R.Civ.P. 12(b)(6).

---

[1] *Technically, the defendant is the State of Oklahoma, acting through OSU and its regents, as the case caption suggests.*

[2] *SMU is apparently chartered under the laws of the Cayman Islands.  The complaint alleges that its campus is there.*

In considering whether claims should be dismissed under Fed.R.Civ.P. 12(b)(6), the court accepts all well-pleaded factual allegations of the complaint as true and views them in the light most favorable to the plaintiff, the non-moving party.  S.E.C. v. Shields, 744 F.3d 633, 640 (10th Cir. 2014).  To avoid dismissal, the complaint must allege "enough facts to state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007).  In other words, the facts alleged in the complaint must allow the court to infer the defendant's liability.  Shields, 744 F.3d at 640 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  The Twombly/Iqbal pleading standard "is a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do."  Id. at 640-41.

## Background

The complaint alleges that plaintiff attended SMU's veterinarian program at its Cayman Islands campus.  After completing classroom courses, she enrolled in clinical rotations at veterinary medical facilities in Illinois and Oklahoma.  In 2016, she enrolled in clinical rotations at OSU's veterinary training facilities in Stillwater, Oklahoma.  The complaint alleges SMU and OSU have an affiliation agreement in place which allows SMU students to complete their clinical training at OSU.

The complaint alleges that, soon after plaintiff began her clinical rotation at OSU, she experienced health issues.  Specifically, plaintiff alleges that she suffered from "ADD, PTSD, Severe Depression, and an anxiety disorder."  The complaint alleges plaintiff could

2

not be treated for these conditions in Stillwater, so she sought from SMU and OSU a medical leave of absence for a one month period. According to the complaint, OSU officials "demanded" a meeting to learn the reason for the request, resulting in a meeting with defendants Burba and Kershaw. The complaint describes the meeting as "more adversarial than helpful" and alleges that plaintiff felt like she was being interrogated.

The complaint alleges that OSU officials at some point reported the meeting and request to SMU, describing the basis for it as plaintiff's "family issues." This description allegedly led to delay in the processing of plaintiff's request by SMU.

The complaint indicates the handling of the leave request at OSU was by persons in the veterinary program rather than by the Student Disability Services office, which is where plaintiff claims it should have been handled. However, according to the complaint, OSU approved the medical leave request.

The complaint alleges that during plaintiff's medical leave, defendant Kershaw called her and left a voicemail about returning her radiology keys. It further alleges that Ms. Kershaw inadvertently failed to end the call, which caused the ensuing conversation between Ms. Kershaw and other staff members to be recorded by plaintiff's voicemail. In the conversation, Ms. Kershaw and others allegedly discussed plaintiff's medical issues and complained about and ridiculed plaintiff.

The complaint alleges that, after hearing the voicemail, plaintiff contacted defendant Gilmour to complain. Defendant Gilmour allegedly told her that no private information was shared and no one heard the conversation who did not already know plaintiff's medical condition. However, the complaint alleges that others might have heard the conversation.

3

The complaint alleges plaintiff met with Gilmore on more than one occasion and that in one such meeting Gilmour sought to dissuade plaintiff from pursuing the phone recording issue.  Gilmour allegedly said "You are really going to cause a problem for yourself if you decide to do something," and stated that "The veterinary field isn't that big."

The complaint alleges plaintiff then met with an OSU Ombudsman and two officials from OSU's Equal Opportunity Office.  Plaintiff allegedly asked to file a complaint, and the Equal Opportunity officials said they would look into the process.  They also allegedly referred her to Student Disability Services.

The complaint alleges the Equal Opportunity officials and Dr. Ross met with plaintiff again on October 20, 2016.  When plaintiff asked to file a complaint, they allegedly told her it would be handled internally, and would not allow her to file a complaint.  They allegedly also refused to remove Ms. Kershaw from overseeing plaintiff's files.

The complaint alleges that when plaintiff later contacted SMU about an unrelated billing question, the SMU employee with whom she spoke alluded to plaintiff's "issues" with the OSU program and indicated that plaintiff's academic status was jeopardy.  Plaintiff asked the official how OSU had characterized the events surrounding her leave.  Plaintiff alleges that the information that SMU relayed to her showed that OSU provided SMU misinformation and cast plaintiff in a negative light, but the complaint does not indicate what was said or reported.

The complaint indicates Dr. Ross emailed plaintiff in January 2017, apparently requesting that she contact the school, but that plaintiff did not respond.[3]

Two months later, plaintiff's counsel sent correspondence to OSU stating claims she felt she had against OSU. A second correspondence occurred on February 7, 2017. That same day, plaintiff was allegedly locked out of OSU's computer system.

The complaint alleges that defendant Ross contacted plaintiff's mother a week later, inquiring into plaintiff's whereabouts. Plaintiff's mother allegedly told defendant Ross that plaintiff was well and living in Stillwater. The complaint further alleges that the next day, an employee from OSU's Office of Legal Counsel contacted the Stillwater police and "demanded" that the police check on plaintiff's well-being, claiming that her parents were worried. The police allegedly went to plaintiff's home to check on her. According to the complaint, this invasion of her home by the police was "traumatizing, frustrating, and exacerbated Ms. Guillou's medical condition."

This lawsuit was commenced in September 2017. The complaint does not allege that either OSU or SMU ever suspended or terminated plaintiff's participation in the clinical program and plaintiff's current status and circumstances are not reflected by the complaint. However, the complaint seeks "reinstatement" in addition to other legal and equitable relief.

---

[3] *Curiously, the complaint alleges that OSU's claim of contacting plaintiff and seeking to have her contact the school was untrue, because Dr. Ross contacted her by email rather than by a telephone call. [Doc. #1] at 11.*

## Discussion

Separate motions to dismiss have been filed by OSU, SMU and the individual defendants collectively.

### I.      The OSU motion.

Plaintiff asserts claims against OSU for disability retaliation and discrimination under Title II of the ADA, § 504 of the Rehabilitation Act, breach of contract, and breach of the covenant of good faith and fair dealing.  OSU has moved to dismiss the ADA and § 504 claims.

#### a.  *Retaliation.*

The ADA and § 504 prohibit retaliation based on someone's opposition to practices that violate the statutes.   Title 42 U.S.C. § 12203 provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."   Section 504 incorporates § 12203 as the standard to be used in determining whether § 504 has been violated.  29 U.S.C. § 794(d).  The same standards thus apply to both claims.  *See* Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1131 (10th Cir. 2010).

To state a claim for ADA retaliation, plaintiff must allege facts sufficient to show (1) that she engaged in a protected activity; (2) that she suffered a materially adverse action after or contemporaneous with her protected activity; and (3) the existence of a causal

connection between the protected activity and the adverse action.  *See id.*  OSU disputes whether plaintiff has alleged a materially adverse action.

The standard for determining whether an action is adverse under the ADA and § 504 is the same as that established by Title VII of the Civil Rights Act.  *See id.* at 1133.  In the retaliation context, an adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.*  "Acts that carry 'a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects'" may fall under that definition.  *Id.*  Determining whether an adverse action has occurred requires "a case-by-case approach, examining the unique factors relevant to the situation at hand."  McGowan v. City of Eufala, 472 F.3d 736, 742 (10th Cir. 2006).  Trivial harms cannot establish a materially adverse harm, and "the fact that an employee continues to be undeterred in his or her pursuit of a remedy . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable." Somoza v. Univ. of Denver, 513 F.3d 1206, 1214 (10th Cir. 2008).

Most of the alleged actions upon which plaintiff relies to establish adverse action do not meet the necessary standard.  Allegedly harsh questioning about the reason for her requested medical leave does not constitute materially adverse action.  *See* Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (ADA not a civility code).  The inadvertently recorded staff conversation, though unusual, does not qualify.  There is no allegation that the conversation was intended to be heard by plaintiff (i.e. it was not a "threat" directed to her) nor is there any allegation that anyone followed through on any

7

plan to expel her from the program or otherwise "get rid of her."[4]   Telling SMU that plaintiff sought leave due to "family issues" rather than detailing the multiple mental health issues that were the alleged actual basis for the medical leave does not strike the court as an adverse action and, if anything, suggests an effort to protect plaintiff.   Further, the complaint makes clear that the referenced actions did not actually dissuade plaintiff from engaging in further protected activity.

Plaintiff also contends OSU retaliated against her for complaining to Dr. Gilmour about the voicemail.   She asserts that Dr. Gilmour threatened her and that OSU told SMU that Guillou had issues with the program.   However, even assuming that Dr. Gilmour's comments qualify as a threat,[5] there is no allegation suggesting any follow-through on the "threat."   Further, the alleged report to SMU, in and of itself, is insufficient to constitute a materially adverse action.   The complaint does not allege any meaningful harm stemming from those actions.   And once again, these actions did not dissuade plaintiff from continuing to complain about discrimination.

Plaintiff also asserts that OSU's contact of plaintiff's mother to check up on her and its initiation of a welfare check by the Stillwater police are adverse actions.   The court has

---

[4] *The complaint alleges a staff members asked Kershaw "are you tired of babysitting" to which a voice thought to be Kershaw's said plaintiff was "worse than a child," was acting like she was "five years old or something."   These and similar comments "generated audible laughter" and another voice allegedly said "Well, can be get rid of her?" The complaint alleges Ms. Kershaw "exuberantly replied, "Yeah, yeah!" The referenced statements do not support the inference that plaintiff says she cannot rule out—that defendants were plotting to kill her or do physicial harm to her.*

[5] *As noted above, the court views the alleged facts in the light most favorable to plaintiff. Giving plaintiff the fullest benefit of that standard, Gilmour's comments might rise to the status of an implicit threat.*

great difficulty in seeing how an inquiry to a parent about a student on medical leave and who is not responding to inquiries could be deemed "adverse."  Further, apart from plaintiff's characterization of the police visit as "harassment," there is no apparent basis for concluding the request from OSU Legal Counsel's office to check on plaintiff was an adverse action.  *See* Hall v. Hupp, 523 F. App'x 521, 524 (10th Cir. 2013) (conclusory statements that an official's actions were intended to harass are not sufficient to state a claim).

The complaint alleges only one action which plausibly supports an inference of adverse action.  That is the allegation that, at the time of OSU's receipt of the second letter from plaintiff's counsel, it locked plaintiff out of OSU's computer system.   While the complaint does not indicate what plaintiff's status was at that time (i.e. whether she was even participating in the clinical program), the court is obliged to draw all inferences from the alleged facts in plaintiff's favor for purposes of the present motion.  As this act arguably constitutes an adverse action—the absence of which is the basis for defendant's motion— the OSU motion will be denied as to the retaliation claims.

b.  *Discrimination*.

In addition to the retaliation claim, plaintiff also asserts discrimination claims against OSU.  Title II of the ADA states:  ". . . no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The same standard applies to

discrimination claims under § 504 of the Rehabilitation Act. *See* <u>Miller ex rel. S.M. v. Bd. of Educ.</u>, 565 F.3d 1232, 1245 (10th Cir. 2009). To allege a viable claim, plaintiff must allege facts showing (1) she is a qualified individual under the particular act, (2) she was "either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity," and (3) the "exclusion, denial of benefits, or discrimination was by reason of" her disability. *See* <u>J.V. v. Albuquerque Pub. Sch.</u>, 813 F.3d 1289, 1295 (10th Cir. 2016) (quoting <u>Gothier v. Enright</u>, 186 F.3d 1216, 1219 (10th Cir. 1999)). This standard contemplates two types of claims: claims for exclusion from or denial of benefits, and claims that plaintiff was otherwise discriminated against. *Id.*

Here, the complaint lacks allegations suggesting plaintiff was denied benefits. As noted above, there is no suggestion that she was denied admission to the clinical program or expelled from it, on the basis of disability or otherwise. Further, the complaint's allegation that plaintiff did not receive the same level of benefits and program support as other students is wholly conclusory. There is no basis for claim based on denial of program benefits.

Similarly, there is no plausible basis alleged for a conclusion that plaintiff was "otherwise discriminated against" based on her alleged disability. Plaintiff relies on allegations that she was denied the opportunity to file a complaint, but that does not support an inference that any denial was due to her disabled status. The complaint itself suggests that when plaintiff first raised the idea of a complaint, the Office of Equal Opportunity expressed reluctance due to lack of familiarity with students in plaintiff's program,

presumably meaning the clinical program with an affiliated institution. There is no suggestion the Office of Equal Opportunity denied her the opportunity to file a claim because she was allegedly disabled, or that others later did so. Plaintiff also relies on her exclusion from the computer system. But there is nothing alleged which supports an inference that the denial was due to her disabled status. The timing may, as noted above, support an inference that the denial was in retaliation for asserting claims of discrimination, but it does not suggest the denial was due to her disabled status, which had been asserted by plaintiff long before any denial of computer access came about. Finally, generalized claims of "harassment" are insufficient to show discrimination in these circumstances. There is little authority supporting the idea of a "hostile education environment" in the context of ADA or Rehabilitation Act claims. *See* <u>Sutherlin v. Indep. Sch. Dist. No. 40 of Nowata Cnty., Oklahoma</u>, 960 F. Supp. 2d 1254, 1267-8 (N.D. Okla. 2013). However, even if such a claim was recognized as a way of showing discrimination, the court would nonetheless conclude no basis for such a claim is stated here, for substantially the same reasons as were referenced in the retaliation discussion above—that OSU's actions were not materially adverse to plaintiff.

OSU's motion to dismiss will be granted insofar as it is directed to the discrimination claims under the ADA and Rehabilitation Act.

**II. The SMU motion.**

Plaintiff asserts claims for ADA and § 504 harassment, breach of contract, and breach of covenant of good faith and fair dealing against SMU. SMU seeks dismissal of all claims.

11

### c. *ADA and § 504 claims.*

SMU argues that plaintiff's ADA and § 504 claims fail because those statutes do not apply outside the United States, and SMU is located in the Cayman Islands.

"[L]egislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States. <u>Morrison v. Nat'l Austl. Bank Ltd.</u>, 561 U.S. 247, 255 (2010) (quoting <u>EEOC v. Arabian Am. Oil Co.</u>, 499 U.S. 244, 248 (1991)). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id*.

SMU argues, and plaintiff does not dispute, that the ADA and § 504 do not apply extraterritorially. Neither statute contains any indication that Congress intended for it to apply extraterritorially. Therefore, SMU's actions outside the country are not a basis for claim under the applicable statutes.

Plaintiff attempts to avoid the obvious consequence of this conclusion by alleging that "all relevant actions occurred in Oklahoma." But that conclusory allegation is not supported by any factual allegation in the complaint. There is no allegation that SMU personnel did anything in Oklahoma. The essence of plaintiff's claim against SMU is that it was deliberately indifferent to plaintiff's plight—that it did nothing to correct the problems plaintiff was experiencing with OSU. Doing <u>nothing</u> in the Cayman Islands is not the same thing as doing <u>something</u> in Oklahoma. SMU's actions or inactions were beyond the territorial reach of the ADA and § 504.

Even apart from the issue of the territorial reach of the ADA and Rehabilitation Act, the complaint does not otherwise state a basis for claim under those acts.[6]  To state a claim under either act, a plaintiff must allege facts sufficient to support an inference that the defendant either engaged in discrimination or allowed discrimination by others which it could have prevented.  The complaint does not state a basis for either conclusion as to SMU.   The various actions which plaintiff relies on as the basis for her claims were acts allegedly committed by OSU, rather than SMU, personnel.  The complaint does not allege a basis for concluding that SMU was in a position to control or affect anything that OSU did.  The complaint does allege that SMU is "affiliated" with OSU and that they have an arrangement whereby OSU provides the clinical rotation or training for SMU students.  But that does not support an inference that SMU had the power or authority to compel OSU to act, or not act, in any particular way as to a student in the program.  Absent such a showing, there is no basis for claim against SMU under either of the acts and it is therefore unnecessary to consider in detail other grounds urged by defendant.[7]

*Breach of Contract claim.*

---

[6] *Defendant has suggested, and plaintiff concedes, that any claim plaintiff has under the ADA is under Title III of that statute, rather than Title II as pleaded in the complaint, since SMU would be, at most, a place of "public accommodation" rather than a "public entity."   The distinction does not affect the result here.*

[7] *Defendant also challenges the Rehabilitation Act claim on the basis the complaint does not allege SMU's receipt of federal financial assistance, which is a necessary element of a § 504 claim.  Barber ex rel. Barber v. Colo. Dep't. of Revenue, 562 F.3d 1222, 1228 (10th Cir. 2009). Plaintiff relies on a conclusory allegation to that effect, which might be sufficient if the defendant was a domestic educational institution of some sort.  But it is not.  The court will not assume, in the absence of some factual basis, that a school in the Cayman Islands receives financial assistance from the U. S. government.*

13

Plaintiff claims that SMU breached its contract with her by breaching its promise, contained in her application to SMU, that "[n]o person shall be excluded from participation in, denied benefits of, or be subject to discrimination under any program or activity sponsored or conducted by St. Matthew's University, on any basis prohibited by applicable law, including . . . handicap." SMU asserts the referenced language is too vague to qualify as a promise and that, in any event, no basis for a breach of any promise has been alleged.

The court concludes otherwise. A promise or provision in a student handbook or similar document may, in a proper case, be the basis for a contract claim. *See* Mason v. State ex rel. Bd. of Regents, 23 P.3d 964, 970 (Okla. 2000). Further, the particular provision is clear enough in its reach and focus to be the basis for contractual liability.

Construing the allegations of the complaint in the light most favorable to plaintiff, the court concludes the allegations are sufficient to show a breach of the agreement. Unlike the ADA and Rehabilitation Act claims, which require a showing of authority or control over OSU in order for SMU to be liable, the contractual undertaking is different. The referenced language is, in substance, SMU's agreement that it will not permit handicap discrimination in any program it either conducts or sponsors. In the court's view, a college like SMU can "sponsor" an arrangement with another institution even if it has no control over it. The complaint alleges that SMU and OSU are "affiliated," which supports an inference that SMU was, in some sense, "sponsoring" the relationship with OSU. The court therefore concludes the complaint is sufficient to state a contract claim. If plaintiff is able to establish discrimination by OSU based on handicap, she may also be able to

14

establish that SMU's failure to remedy the discrimination constituted a breach of the agreement arising out of the application and its acceptance.

>    d.   *Bad Faith claim.*

SMU has also moved to dismiss plaintiff's claim for breach of the duty of good faith and fair dealing to the extent that the claim sounds in tort.   Under Oklahoma law, every contract is deemed to include an implied covenant of good faith and fair dealing.   Christian v. Am. Home Assur. Co., 577 P.2d 899, 904 (Okla. 1977).   However, breach of the covenant ordinarily gives rise to a claim based in contract, rather than in tort.   *See* Cimarex Energy Co. v. Calhoon, No. CIV-11525, No. CIV-11-725-D, 2012 WL 1371386 at **2-3 (W.D. Okla. Apr. 19, 2012).   A tort claim for breach of the covenant arises only where there is some "special relationship" between the parties.   *Id*. at *3.   *See also*, First Nat'l Bank & Trust Co. of Vinita v. Kissee, 859 P.2d 502, 509 (Okla. 1993).

Plaintiff has not pointed to any authority suggesting Oklahoma would recognize the school/student relationship as one supporting a tort claim, and the court is unaware of any. Oklahoma has limited the tort claim to insurance contracts and other very limited circumstances.   It has not extended that theory to the school/student relationship.   The court concludes there is no basis for concluding Oklahoma would recognize a tort claim in these circumstances.   The motion will therefore be granted to the extent it addresses potential tort liability.

## III. Individual Defendants' motion.

Plaintiff asserts a state law claim for intentional infliction of emotional distress against the individual defendants. To prove intentional infliction of emotional distress under Oklahoma law, a plaintiff must show that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting distress was severe." Computer Publ'ns, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002). The trial court serves as a gatekeeper, and evaluates in the first instance whether the "defendant's conduct may reasonably be regarded so extreme and outrageous as to permit recovery, or whether it is necessarily so." Breeden v. League Servs. Corp., 575 P.2d 1374, 1377 (Okla. 1978). Outrageous or extreme conduct is conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Id. The conduct must be such that, considering the context and environment, "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 856 (10th Cir. 2005).

The court concludes the complaint fails to state facts which would meet this exacting standard. Plaintiff makes the general allegation that the individual defendants "coordinated an ongoing campaign against [plaintiff] to punish her for seeking medical accommodation." However, conclusory allegations of conspiracy are not enough. Rather, a plaintiff "must allege specific facts showing an agreement and concerted action amongst

the defendants . . . ." <u>Brooks v. Gaenzle</u>, 614 F.3d 1213, 1228 (10th Cir. 2010) (quoting

<u>Tonkovich v. Kan. Bd. of Regents</u>, 159 F.3d 504, 533 (10th Cir. 1998)) (rejecting

conclusory allegations of conspiracy in the civil rights context). The complaint does not

do so. Further, the specific acts alleged as to each individual defendant are neither

"outrageous" nor "beyond all possible bounds of decency."

*a. Dr. Burba.*

The complaint alleges that Dr. Burba met with plaintiff after she requested medical

leave and "interrogated" her about her medical needs. Dr. Burba did not refer her to

Student Disability Services, but tried to handle the issue within the academic department.

She claims that during their meeting, Dr. Burba and Ms. Kershaw told her that they

typically did not have students request medical leave, and that they "talked to St. Matthews

about [her]." Finally, Dr. Burba said he was "appalled" that plaintiff asked what defendant

Kershaw discussed with SMU. [Doc. #1] at 6. Dr. Burba's actions do not come close to

being the sort of extreme or outrageous conduct as would state an IIED claim.

*b. Ms. Kershaw.*

Plaintiff alleges the same facts against Ms. Kershaw as she does against Dr. Burba.

As noted above, the meeting did not involve extreme or outrageous conduct. In addition,

she alleges that Ms. Kershaw inadvertently left an offensive voicemail in which she called

plaintiff a liar, mocked her, and discussed "getting rid of her." The voicemail is certainly

an unusual circumstance, but the related allegations still do not meet the IIED standard.

First, the complaint makes clear that Ms. Kershaw did not intentionally leave the extended voice mail or intentionally communicate anything to plaintiff other than the information as to return of the keys.  The portion of the voicemail critical of plaintiff was recorded "inadvertently" and neither Ms. Kershaw nor the others had any expectation their comments would become known to plaintiff.  Nor did Ms. Kershaw act "recklessly", within the meaning of an IIED claim.  Her alleged conduct supports an inference of negligence, in the sense that she did not take care to see that the phone call was actually disconnected.  But recklessness for purposes of an IIED claim requires the defendant to act "in deliberate disregard of a high degree of probability that the emotional distress will follow."  Estate of Trentadue, 397 F.3d at 856 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. i).  It is difficult to infer that sort of deliberate disregard in these circumstances.

Even if Ms. Kershaw's alleged conduct is viewed as "reckless," her behavior was not extreme or outrageous within the meaning of the IIED standard.  The complaint's allegations would support an inference that defendant's conduct was rude, insensitive, and perhaps hostile to plaintiff.  But that showing does not establish that her conduct was extreme or outrageous.  See Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1388-89 (10th Cir. 1991) (insults are not actionable under the IIED tort); Merrick v. N. Natural Gas Co., 911 F.2d 426, 433 (10th Cir. 1990) (harsh criticism, yelling, and cursing not extreme and outrageous); see also Kramer v. Sears Roebuck & Co., 108 F.3d 1388 at *4 (10th Cir. 1997) (unpublished table opinion) (rude, insensitive, and hostile conduct is not extreme and outrageous).  Further, the standard is what would be viewed as outrageous by

an "average member of the community," not someone with the particular anxiety and other issues from which plaintiff allegedly suffers.

    *c.  Dr. Gilmour.*

    Plaintiff alleges that when she met with Dr. Gilmour about the voicemail, Dr. Gilmour minimized her concerns and threatened plaintiff by saying that she would cause a problem for herself if she tried to do something.  Dr. Gilmour also warned her that the veterinary field "isn't that big."  As noted above, it is a stretch to turn these comments into "threats."  But even assuming they are, that is all they are.  Relatively mild "threats" of the type alleged here do not constitute extreme or outrageous conduct.

    *d.  Dr. Ross.*

    Plaintiff claims that Dr. Ross prevented her from filing a complaint, would not remove Ms. Kershaw from overseeing her, contacted her mother to check up on plaintiff, and finally arranged for police to go to plaintiff's apartment.[8]  None of these actions rise to extreme or outrageous conduct.  The most significant allegation, that defendant Ross arranged for the police to go to plaintiff's apartment, does not establish IIED.  The complaint alleges that the police arrived at her apartment to check on her well-being, not on suspicion of any crime or wrongdoing.  The allegations fail to state an IIED claim against Dr. Ross.

---

    [8] *The complaint is also somewhat contradictory as to who initiated the police visit.  The complaint alleges that someone from OSU's legal office called the police, but the complaint also alleges that Ross arranged the police visit.*

## Conclusion

For the reasons stated, OSU's motion to dismiss [Doc. #34] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted as to the discrimination claims but denied as to the retaliation claims.  SMU's motion to dismiss [Doc. # 34] is **GRANTED IN PART** and **DENIED IN PART**.  It is denied as to the breach of contract claim, but is otherwise granted.  The motion to dismiss of the individual defendants [Doc. #31] is **GRANTED** and the claims against them are dismissed.

As some of the deficiencies noted as to particular claims are capable of remediation by amendment, plaintiff is granted leave to file an amended complaint to remedy the various deficiencies if she can do so.  Any such amended complaint shall be filed within **fourteen (14) days**.

**IT IS SO ORDERED.**

Dated this 1st day of March, 2018.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE