## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JONATHAN RIVERA-PIEROLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CIV-21-616-PRW |
| | ) | |
| BOARD OF REGENTS FOR THE | ) | |
| OKLAHOMA AGRICULTURAL AND | ) | |
| MECHANICAL COLLEGES; STATE OF | ) | |
| OKLAHOMA ex rel. OKLAHOMA STATE | ) | |
| UNIVERSITY; and ST. MATTHEWS | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND SUPPORTING BRIEF

Respectfully submitted,

s/Clinton W. Pratt
Clinton W. Pratt, OBA #21329
Gaylan Towle II, OBA #32884
Board of Regents for the Oklahoma
Agricultural and Mechanical Colleges
5th Floor, Student Union Building
Stillwater, OK 74078
(405) 744-6494 (phone)
(405) 744-7998 (fax)
clint.pratt@okstate.edu
gaylan.towle@okstate.edu

**ATTORNEYS FOR DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES.............................................................................. iii, iv

   A.   INTRODUCTION............................................................................... 1

   B.   UNDISPUTED MATERIAL FACTS ................................................ 2

   C.   ARGUMENT AND AUTHORITIES ................................................ 6

      1.  Standard of Review. ................................................................ 6

      2.  Plaintiff Failed to Sufficiently Establish a Claim for Breach of Contract....... 8

         a.  OSU Followed its Policies and Procedures…………………………………………….………8

         b.  OSU Did Not Fail to Provide Plaintiff the Contracted-for Instruction……………………….........................……………..15

            i.   *OSU's Transition to Virtual Learning at the Onset of COVID-19…………………………………………….…15*

           ii.  *OSU's Early Termination of the Anesthesia Rotation…………..19*

         c.  OSU's Dismissal of Plaintiff from the Program…………………….…23

   D.   CONCLUSION………………………………………………………………………...25

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Riser v. QEP Energy*,
     776 F.3d 1191 (10th Cir. 2015)……………………………………………………6

*Pioneer Ctr. Holding Co. Emp. Stock Ownership Plan and Trust v.*
*Alerus Fin., N.A.*,
     858 F.3d 1324 (10th Cir. 2017)……………………………………………………7

*BancOklahoma Mortg. Corp. v. Capital Title Co.*,
     194 F.3d 1089 (10th Cir. 1999)……………………………………………………7

*Bones v. Honeywell Int'l, Inc.*,
     366 F.3d 869 (10th Cir. 2004)……………………………………………………..7

*Latham v. Bd. of Educ. of Albuquerque Pub. Sch.*,
     489 F. App'x 239 (10th Cir. 2012)………………………………………………..7

*Platt v. Winnebago Indus., Inc.*,
     960 F.3d 1264 (10th Cir. 2020)……………………………………………………7

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
     722 F.3d 1229 (10th Cir. 2013)……………………………………………………7

*Hornady Mfg. Co. v. Doubletap, Inc.*,
     746 F.3d 995 (10th Cir. 2014)……………………………………………………..7

*U.S. v. Bowen*,
     527 F.3d 1065 (10th Cir. 2008)……………………………………………………7

*Willis v. Capital One Corp.*,
     611 F. App'x 500 (10th Cir. 2015)………………………………………………...8

*Digital Design Group, Inc. v. Info. Builders, Inc.*,
     24 P.3d 834 (Okla. 2001)…………………………………………………………..8

*Mason v. Bd. of Regents of the Univ. of Okla.*,
     23 P.3d 964 (Okla. Civ. App. 2000)………………………………………………8

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)……………………………………………………………14

*Gokool v. Okla. City Univ.*,
    CIV-16-807-R, 2016 WL 10520949
    (W.D. Okla. Dec. 29, 2016)………………………………………..16, 17, 18, 21

*Soueidan v. St. Louis Univ.*,
    926 F.3d 1029 (8th Cir. 2019)…………………………………………………16, 17

*Dallas Airmotive, Inc., v. FlightSafety Int'l, Inc.*,
    277 S.W.3d 696 (Mo. Ct. App. 2008)…………………………………………..16

*Bittle v. Okla. City. Univ.*,
    6 P.3d 509 (Okla. Civ. App. 2000)…………………………………………17, 21

*Vijay v. State of Okla. ex. rel., Bd. of Regents of the Univ. of Okla.*,
    No. 119,809 (Okla. Civ. App. 2022) (unpublished) ……………………...17, 18, 19

*Zwiker v. Lake Superior State Univ.*,
    986 N.W.2d 427 (Mich. App. 2022)……………………………………………18

*Raimo v. Wash. Univ. in St. Louis*,
    4:20-cv-00634-SEP, 2022 WL 796239 (E.D. Mo. Mar. 16, 2022)………………18

*Dollar Rent A Car Syst., Inc. v. P.R.P. Enterprises, Inc*,
    No. 01 CV 698, 2006 WL 1266515 (N.D. Okla. May 8, 2006)………………21, 22

*Lewis v. Farmers Ins. Co., Inc.*,
    681 P.2d 67, 69 (Okla. 1983)………………………………………………...22

*Chickasaw Tel. Co. v. Southwestern Bell Mobile Syst., Inc.*,
    No. 96-6357, 113 F.3d 1245 (table) (unpublished),
    1997 WL 290951 (10th Cir. 1997)……………………………………………...22

*Regents of Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985)……………………………………………………………24

## STATUTES AND RULES

Fed. R. Civ. P. 56…………………………………………………………………1, 6

Pursuant to Fed. R. Civ. P. 56, Defendants, the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges (the "Board of Regents") and the State of Oklahoma ex rel. Oklahoma State University ("OSU") (hereinafter collectively referred to as the "Defendants") hereby move for Summary Judgment, as there is no genuine issue of material fact, and they are entitled to judgment in their favor.

## A.    INTRODUCTION

Plaintiff, Jonathan Rivera-Pierola ("Plaintiff"), commenced his veterinary medicine studies in the Cayman Islands at Saint Matthew's University ("SMU") in 2017. After completing the didactic portion of his studies, Plaintiff began his clinical rotations in OSU's College of Veterinary Medicine ("CVM") Year IV Program (the "Program") as an affiliate SMU student in the Fall of 2019.[1]

From the onset, Plaintiff struggled to meet the minimum academic standards expected of students participating in the Program. In Plaintiff's very first rotation, he received a grade of "D" and was placed on academic probation. Before the end of his first academic year at OSU, Plaintiff had received three grades of "D" and five grades of "C" in eight total rotations as a clinical student. Ultimately, Plaintiff's consistent inability to meet the minimum academic standards led to his dismissal from the Program.

---

[1] OSU was one of multiple institutions of higher education that provided clinical education opportunities for SMU veterinary medicine students. According to Plaintiff, in addition to OSU, the following institutions also served as affiliate institutions for the SMU veterinary medicine program during Plaintiff's enrollment: University of Illinois Urbana-Champaign, Mississippi State University, Purdue University, North Carolina State University, University of Minnesota, and Washington State University.  Exhibit 1 at 39:3–40:6.

After his dismissal, Plaintiff filed this lawsuit alleging Defendants breached contractual duties owed to him. *See* Complaint, Dkt. No. 1 at ¶ 77. Specifically, Plaintiff alleges OSU failed to abide by its procedures and provide the contracted-for instruction. Plaintiff also alleges his dismissal was "based on false allegations and his grade in the abbreviated rotation." *See id.* In doing so, Plaintiff seeks not only to circumvent the academic decisions made by academic professionals but also to shift responsibility to the Program for his own academic shortcomings. Furthermore, Plaintiff does so despite receiving a second and even a ***third*** opportunity to succeed in the Program.  Plaintiff takes no personal accountability for his pattern of academic deficiency, and instead, he points the finger at whomever or whatever he can to avoid any such accountability.

As outlined in Defendants' Motion for Summary Judgment (the "Motion") below, Plaintiff's attempt to "pass the buck" regarding his academic failures by alleging Defendants breached their contractual duties is flawed, misguided, and lacking both factual and legal support. Defendants respectfully request the Court grant summary judgment in Defendants' favor as a matter of law.

**B.    UNDISPUTED MATERIAL FACTS**

1.    Plaintiff began clinical rotations at OSU in the Program as an affiliate SMU student in the Fall of 2019. *See* Complaint, Dkt. No. 1 at ¶ 11; Exhibit 2; and Exhibit 3.

2.    During Plaintiff's first rotation, Small Animal Internal Medicine ("SAIM"), he received a grade of "D." *See* Exhibit 3.

3.    Students receiving grades of "D" for a rotation are referred to the Professional Standards Committee (the "PSC") for review. *See* Exhibit 4 at 12.

2

4.    In conducting its review, the PSC determines if, in addition to repeating the rotation, the student shall be dismissed from the Program, placed on academic probation, placed on academic suspension, or required to complete a semester/year of academic reprieve. *See id.*

5.    Typically, a student who receives a grade of "D" or "F" during a rotation and is not already on academic probation will be allowed to remediate the rotation and placed on academic probation for the remainder of his/her participation in the Program. *See id.*

6.    On October 3, 2019, Dr. Margi Gilmour, Associate Dean for Academic Affairs ("Dr. Gilmour"), issued a letter to Plaintiff indicating the PSC received notice of Plaintiff's grade of "D" in the SAIM rotation. *See* Exhibit 5.

7.    Dr. Gilmour's letter advised Plaintiff the PSC had voted to allow him to repeat the rotation, and pursuant to academic policy, his grade of "D" placed him on academic probation. *See id.*

8.    Dr. Gilmour's letter further advised Plaintiff that receiving a second grade of "D" or "F" may result in "dismissal, remediation before being allowed to continue in the curriculum, or scheduling remediation of the failed rotation and continuing in clinical rotations." *See id*.

9.    Less than six months later, Plaintiff received a grade of "D" in his Community Practice rotation. *See* Exhibit 3.

10.    The PSC met on March 18, 2020, to review Plaintiff's second grade of "D." *See* Exhibit 6.

3

11.     Plaintiff was present for the meeting and provided information to the PSC regarding his unsatisfactory academic performance. *See* Exhibit 6.

12.     In a letter dated March 23, 2020, Dr. Gilmour advised Plaintiff the PSC had recommended Plaintiff's dismissal from the Program. *See* Exhibit 7.

13.     The letter referenced the PSC's recommendation had been **unanimous** and cited Plaintiff's "repeated poor academic performance, lack of accountability for clinical errors in multiple rotations, recurrent unprofessional behavior, and inability to take constructive criticism to improve professional and clinical skills" as the bases for their decision. *See id.*

14.     The PSC found no mitigating circumstances to explain the listed concerns, and OSU CVM Dean Carlos Risco ("Dean Risco") accepted the recommendation of dismissal from the Program. *See id.*

15.     The letter also advised Plaintiff of his right to appeal the decision by filing a written appeal to Dean Risco. *See id.*

16.     Plaintiff submitted an appeal, and the PSC met on April 3, 2020, to reconsider Plaintiff's dismissal from the Program. *See* Exhibit 8 and Exhibit 9.

17.     In his appeal, Plaintiff acknowledged several areas of necessary improvement (*e.g.*, communication, case preparation, patient care, professional ethical behavior). *See* Exhibit 8.

18.     The PSC did not find the appeal persuasive and elected to stand on the initial recommendation of dismissal. *See* Exhibit 9.

19.    Despite the PSC's determination, Dean Risco allowed Plaintiff an opportunity to continue in the Program, pursuant to the discretion afforded him by the OSU CVM Academic Standards Policy. *See* Exhibit 4 at 15–16.

20.    In a letter dated April 6, 2020, Dean Risco advised the PSC that Plaintiff would be allowed to remain in the Program subject to specific conditions. *See* Exhibit 10.

21.    Dr. Gilmour advised Plaintiff of Dean Risco's deviation from the recommendation of the PSC and that he would be allowed to continue in the Program under academic suspension. *See* Exhibit 11.

22.    One of the conditions of Plaintiff's academic suspension was Plaintiff's placement on academic probation for the duration of the clinical year, and OSU would dismiss him from the Program with no PSC review or appeal if he failed to receive a grade of "C" or higher for any rotation during the remaining clinical year. *See id.*

23.    Shortly thereafter, Plaintiff received a grade of "D" in his Anesthesia rotation. *See* Exhibit 3.

24.    Pursuant to the terms of Plaintiff's academic suspension, he was dismissed from the Program. *See* Exhibit 12.

25.    After his dismissal, Plaintiff brought this lawsuit against Defendants alleging OSU breached a contract with him by failing to abide by its procedures, failing to provide the contracted-for instruction, and dismissing Plaintiff as a result of "false allegations" and the grade Plaintiff received in an "abbreviated" rotation. *See* Complaint, Dkt. No. 1 at ¶ 77.

26.    With respect to Plaintiff, OSU abided by and followed its policies and procedures related to grades of "D" or "F" received by a student during one or more clinical rotations. *See* Exhibit 1 at 209:14–215:22.

27.    Plaintiff's claim regarding OSU's failure to abide by its policies and procedures hinges on his assertion that OSU did ***not*** charge him with an alleged ***academic integrity violation***. According to Plaintiff, had OSU initiated the academic integrity process against him, he would have had a better opportunity to provide an explanation and present evidence on his behalf. *See* Exhibit 1 at 238:13–240:10.

28.    Plaintiff's claim regarding OSU's failure to provide the contracted-for instruction relates solely to Plaintiff's final three-week rotation, Anesthesia. *See* Exhibit 1 at 192:13–195:7.

*29.*    Plaintiff alleges OSU's transition to virtual learning for his Anesthesia rotation, which occurred in March of 2020 at the onset of the COVID-19 pandemic, along with the decision of the instructor, Dr. Steffano Di Concetto ("Dr. Di Concetto"), to end the rotation prior to the scheduled end date failed to provide Plaintiff with "proper learning." *Id.*

## C.    ARGUMENT AND AUTHORITIES

### 1.    Standard of Review.

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). Once Defendant "has met its initial burden of showing an absence of a genuine

issue of material fact, 'the burden then shifts to [Plaintiff], who must offer evidence of specific facts that is sufficient to raise a genuine issue of material fact.'" *Pioneer Ctr. Holding Co. Emp. Stock Ownership Plan and Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (quoting *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999) (internal quotation marks omitted)). In order for Plaintiff "'[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'" *Id.* (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). Thus, "[o]n summary judgment, a district court is tasked with reviewing the record (or at least those portions of the record cited by the parties)," and "is not required to credit a nonmovant's bald assertions marshaled in favor of [his] claim . . . ." *Latham v. Bd. of Educ. of Albuquerque Pub. Sch.*, 489 F. App'x 239, 243 (10th Cir. 2012). Moreover, Plaintiff must "'go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial.'" *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1269 (10th Cir. 2020) (quoting *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013)). "The district court must draw all reasonable inferences in favor of the nonmoving party." *Pioneer Ctr.*, 858 F.3d at 1334 (citing *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014)). However, "an inference is unreasonable if it requires 'a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" *Id.* (quoting *U.S. v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008) (internal quotation marks omitted)).

2.     <u>Plaintiff Failed to Sufficiently Establish a Claim for Breach of Contract.</u>

Plaintiff asserts three claims, all arising from the theory of breach of contract. Under Oklahoma law, to establish a breach of contract claim, Plaintiff "must show: (1) contract formation; (2) breach; and (3) damages resulting therefrom." *Willis v. Capital One Corp.*, 611 F. App'x 500, 503 (10th Cir. 2015) (citing *Digital Design Group, Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001)). While reserving the right to subsequently challenge the ***first*** element of contract formation, for purposes of this Motion, Defendants concede courts have found the relationship created between students and their respective universities may be contractual in nature. *Mason v. Bd. of Regents of the Univ. of Okla.*, 23 P. 3d 964, 970 (Okla. Civ. App. 2000). Additionally, Plaintiff's expert witness has not yet provided Defendants the calculation of Plaintiff's alleged damages; however, for purposes of this Motion, the ***third*** element is inconsequential because Plaintiff cannot establish the necessary second element of his claim—the occurrence of a breach.

a.   <u>OSU Followed its Policies and Procedures</u>

Plaintiff claims OSU acted in bad faith and breached its contractual duties by "failing to abide by its procedures." Complaint, Dkt. No. 1 at ¶ 77. This allegation stems from Plaintiff's assertion that OSU ***should have*** utilized and/or applied its Academic Integrity Policy when addressing Plaintiff's performance during his Community Practice rotation. *See id.* at ¶¶ 69–74; Exhibit 1 at 239:18–240:10. However, Plaintiff's assertion is simply wrong.

OSU's Academic Integrity Policy (the "AIP") is a relatively lengthy policy applicable to all members of the OSU community. The AIP targets behaviors violative of the fundamental values of academic integrity, including, but not limited to, unauthorized collaboration, plagiarism, multiple submissions, cheating on examinations, fabricating information, helping another person cheat, unauthorized advance access to examinations, altering or destroying the work of others, and/or altering academic records. *See* Exhibit 13 at 2–3. Upon discovery of sufficient information to substantiate an alleged academic integrity violation, an instructor may initiate the process found in the AIP by providing the student an Academic Integrity Inquiry Form. *See id.* at 3. That initial step never occurred in this case, as no one ever alleged Plaintiff violated the AIP. Yet, Plaintiff contends he ***should have*** been treated as if he had committed an academic integrity violation, or in other words, as if he had ***cheated***. If this seems counterintuitive, that is because it is.

Plaintiff's argument centers on a sentence found in his performance evaluation for the Community Practice rotation. *See* Exhibit 1 at 239:18–240:10; Exhibit 14. Plaintiff participated in the rotation from February 10, 2020, until March 1, 2020. During the rotation, Plaintiff had two instructors: Dr. Paul Demars ("Dr. Demars") and Dr. Sypniewski ("Dr. Sypniewski") and was additionally supervised by nursing staff and interns, all of whom observed and worked with students and were allowed to provide feedback on the students' evaluations. *See* Exhibit 16 at 36:15–40:18. Plaintiff received a grade of "D" for the rotation, based upon three separately scored components: (1) Subjective Evaluation, (2) Pre-Quiz & Technical Skills, & End of Rotation Quiz, and (3) Professionalism/Work

Ethic. *See* Exhibit 14. The evaluation also contained a comment section, and each of the contributors to the evaluation expressed significant concerns regarding Plaintiff. *See id.*

In their evaluation comments, both Dr. Sypniewski and Dr. Demars documented Plaintiff's performance necessitated considerable improvement. *See* Exhibit 14. Dr. Sypniewski stated, "I found that you were unwilling to take on the role of a learner. In fact, I believe you are overconfident in your abilities/knowledgebase which makes this situation even more critical." Dr. Sypniewski then set forth the following list of areas which she believed Plaintiff was unable to be successful:

- Effectively communicate information to the supervising doctor;

- Perform a physical and accurately identify abnormalities and communicate these to the client and supervising doctor;

- Develop and implement a Treatment Plan for a sick patient;

- Develop a diagnostic plan and interpret these timely and accurately;

- Effectively communicate vital information about the case to stakeholders, including but not limited to clients, students, nurses, staff members and faculty;

- Effectively communicate vital information, including but not limited to diagnostics and case follow up, to clients and team members;

- Demonstrate Professional/Ethical Behavior and Work Ethic.

*See id.*

Moreover, Dr. Demars stated, "your response to our feedback and attempts to illustrate to you our concerns is an issue. We discussed these issues at length for at least 30

minutes. At no time did you appear to listen and accept what we were saying, instead (you) became defensive and argumentative." Exhibit 14. This commentary paints a clear picture of a student who simply failed to meet the minimum threshold of success and who refused to listen, learn, and/or be taught *how* to be successful. Dr. Sypniewski and Dr. Demars demonstrated consistency in their assessment of Plaintiff's poor performance during the rotation.

Regardless, Plaintiff ignores the scathing critique of his performance in the rotation by his instructors and focuses on a single statement in the evaluation contributed by an unnamed supervisor—either a nurse or intern. *See* Exhibit 16 at 39:7–40:18. The entry in the evaluation states, "More than one occasion where this student was not telling the truth regarding what he had or had not done concerning patient care." Exhibit 14. Plaintiff relies on this statement and a comment made by Dr. Demars referring to an incident in which Dr. Irizarry, the intern on the rotation, confronted Plaintiff about his lack of honesty (potentially the same incident addressed in the evaluation entry) to suggest OSU should have charged him with a violation of the AIP. However, no OSU CVM instructor identified and/or treated these comments and/or incidents as academic integrity violations—nor should they have.

As outlined above, OSU's AIP addresses instances of plagiarism, unauthorized collaboration, cheating on exams, and other behaviors allowing students to gain an unfair advantage in the academic setting. *See* Exhibit 1 at 232:2–233:15; Exhibit 13. OSU never accused Plaintiff of any of these violative actions. The comments addressing Plaintiff's

11

honesty, or lack thereof, related to patient care issues, and OSU appropriately addressed those concerns in the Professionalism/Work Ethic component of Plaintiff's grade.[2] Notably, not a single witness deposed in this case, *including Plaintiff*, was aware of OSU ever asserting an academic integrity violation against any participant in the Program for suspected dishonesty regarding patient care. *See* Exhibit 1 at 238:13–239:8; Exhibit 16 at 40:19–41:23; Exhibit 18 at 56:2–12; Exhibit 19 at 54:8–55:3. Dr. Gilmour testified that during her twenty years of employment with OSU CVM, she could not recall OSU CVM filing a single academic integrity violation against a student participating in clinical rotations, because "it just isn't really applicable in that setting." Exhibit 18 at 8:1–25 and 56:2–57:9.

Nevertheless, Plaintiff alleges the comments contained in his Community Practice evaluation regarding his dishonesty required OSU to accuse him of an academic integrity violation for "fabricating information."[3] This argument is fundamentally flawed for multiple reasons. First, the nature of Plaintiff's dishonesty regarding his patient care is inconsistent with the type of behavior addressed by the AIP and/or outlined in the policy as constituting "fabrication of information." Section 6.01 of the AIP, describes "fabrication of information" as follows: "Making up references for a bibliography, falsifying laboratory

---

[2] Plaintiff would not have received a passing grade in the Community Practice rotation even if concerns regarding his honesty had not been expressed. Dr. Sypniewski and Dr. Demars each independently graded Plaintiff's performance in the rotation. *See* Exhibit 17 at 28:9–29:14. Both instructors deemed Plaintiff's performance during the rotation insufficient to receive a passing grade. *See id.* at 24:25–27:2; Exhibit 16 at 22:7–25:18.

[3] Plaintiff definitively testified the *only* violation of the AIP he alleges he could have been accused of committing was fabrication of information. *See* Exhibit 1 at 233:6–234:16.

or research data (for example, tampering with experimental data to obtain 'desired' results or creating results for experiments that were not done), or using a false excuse for an absence or an extension on a due date." Exhibit 13 at 12. Again, **none** of Plaintiff's instructors ever accused Plaintiff of **any** of these violative actions. When pressed during his deposition to identify any allegations that he had fabricated information, Plaintiff was unable to do so. *See* Exhibit 1 at 239:18–243:3.

Additionally, the AIP's language is permissive—not mandatory. Section 1.04 of the AIP states the following: "These behaviors **may** subject the student to disciplinary action including receiving a failing grade on assignment, examination or course, receiving a notation of a violation of academic integrity on the transcript, or suspension from the University." Exhibit 13 at 3 (emphasis added). Therefore, Plaintiff's instructors possess discretion regarding whether a statement, action, and/or behavior rises to the level of an AIP violation and how to proceed. There simply is no basis for Plaintiff's allegation that OSU was required to assert Plaintiff violated the AIP and/or that failing to do so constitutes a breach of contract.

However, OSU **did** follow—as Plaintiff conceded—its **applicable** policies and procedures for CVM students receiving grades of "D," as outlined in the Program's Student Handbook. *See* Exhibit 4 at 12; Exhibit 1 at 209:14–215:22. As a result of his "D" grade in the Community Practice rotation, Plaintiff was subject to PSC review. This was Plaintiff's second grade of "D" while attending OSU, and OSU afforded him an opportunity to meet with the PSC to explain or provide mitigating information relating to his poor academic

13

performance. Ultimately, the PSC determined, unanimously, Plaintiff should be dismissed from the Program. In lay terms, he "flunked out."

OSU's alleged failure to subject Plaintiff to an inapplicable policy—to which no known student has *ever* been subjected—undoubtedly fails to qualify as an actionable breach. Plaintiff has marshalled no evidence, nor established any facts to support his allegation that he should have been subjected to the AIP. Furthermore, Plaintiff has failed to demonstrate a *legitimate* factual dispute even exists. The alleged applicability of the AIP to Plaintiff and/or his situation has *only* been put forth by Plaintiff in his attempt to advance his claim in this lawsuit. No support, whether by witness testimony, similar examples, or any other method, has been established to indicate Plaintiff's claim is anything other than pretext.[4] "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Plaintiff's assertion that OSU should have charged him with an academic integrity violation absent any factual or evidentiary backing simply fails to create a genuine issue of material fact. Therefore, since Plaintiff failed to demonstrate OSU did not follow its policies and procedures, summary judgment should be granted in Defendants' favor on this claim.

---

[4] Notably, there is no indication Plaintiff raised the AIP allegation at any point during his time in the Community Practice rotation, upon receiving his evaluation and grade of "D" for the rotation, during his appeal to the PSC, in his written appeal to Dean Risco, during his meeting with Dean Risco, during his participation in subsequent rotations, or at any other time prior to filing this lawsuit.

b.  <u>OSU Did Not Fail to Provide Plaintiff the Contracted-for Instruction</u>

As his second claim for breach of contract, Plaintiff alleges OSU failed "to provide contracted for instruction." Complaint, Dkt. No. 1 at ¶ 77. This claim is broken into two separate and distinct allegations regarding Plaintiff's Anesthesiology rotation: (1) OSU's transition to and use of "virtual learning" at the onset of COVID-19 "failed to provide students with adequate instruction and anesthesiology experience," *Id.* at ¶ 45; and (2) Dr. Di Concetto's decision to terminate the Anesthesia rotation early prevented Plaintiff from receiving "information and instruction that should have been included in the rotation." *Id.* at ¶ 49. Regarding these claims, Plaintiff cannot establish the existence of a contractual promise which OSU allegedly breached.

i.  *OSU's Transition to Virtual Learning at the Onset of COVID-19*

Plaintiff began the Anesthesia rotation on March 23, 2020, at the onset of the COVID-19 global pandemic. This global catastrophe forced OSU—and the world at large—to make unprecedented attempts to adjust to the drastically changing landscape and determine how to move forward safely. In its endeavor to do so, OSU utilized online or virtual instruction for a vast majority of the courses it offered, an action consistent with the efforts of countless other institutions of higher education across the country. There is no question this abrupt switch to virtual teaching required significant adjustments by all involved, including University administrators, faculty members, and students. Even Plaintiff recognized this fact in an email he sent to his instructor and fellow students near the end of the Anesthesia rotation stating, "These are very stressful times, and the school has really done us a service to offer this class virtually. They are really doing their part to

keep us safe from this virus and we should honor and appreciate them for doing it." Exhibit 15. Despite later claiming in his deposition this statement was ***not*** genuine, it reflects Plaintiff's awareness of the difficult situation created by COVID-19. *See* Exhibit 1 at 204:2–205:6.

Plaintiff now alleges OSU committed a breach by failing to provide "adequate instruction and anesthesiology experience" when it transitioned to virtual instruction during the COVID-19 pandemic. Complaint, Dkt. No. 1 at ¶ 45. Such a claim is barred by the educational malpractice doctrine. Moreover, even if the Court were to determine the claim is not barred, Plaintiff has not established any specific educational services OSU failed to provide.

Oklahoma, like most jurisdictions, does not recognize claims for educational malpractice, whether rooted in contract or tort. *See Gokool v. Okla. City Univ.*, CIV-16-807-R, 2016 WL 10520949, at *4 (W.D. Okla. Dec. 29, 2016) (internal citation omitted). The Eighth Circuit recently articulated when a claim qualifies as an educational malpractice claim:

> A claim that educational services provided were ***inadequate***, substandard, or ineffective constitutes a claim of educational malpractice. Where the court is asked to evaluate the course of instruction or the soundness of the method of teaching that has been adopted by an educational institution, the claim is one of educational malpractice.

*Soueidan v. St. Louis Univ.*, 926 F.3d 1029, 1034 (8th Cir. 2019) (emphasis added) (quoting *Dallas Airmotive, Inc., v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 700 (Mo. Ct. App. 2008)).

Here, Plaintiff's claim unequivocally constitutes a claim for educational malpractice. Plaintiff expressly alleges OSU "failed to provide students with adequate instruction and anesthesiology experience" and "failed to provide instruction covering all relevant material as a result of moving to a virtual set up[.]" Complaint, Dkt. No. 1 at ¶¶ 45, 76. Not only does the claim expressly allege inadequate instruction, but it also cannot be resolved without the Court evaluating the "course of instruction or the soundness of the method of teaching." *Soueidan*, 926 F.3d 1029. Plaintiff's claim therefore constitutes an allegation of educational malpractice and is barred as a matter of law. Defendants are thus entitled to summary judgment.

Should the Court determine Plaintiff's claim is not one for educational malpractice, it nevertheless fails because Plaintiff has not identified any specific service OSU promised but did not provide. Oklahoma courts have recognized a very limited exception to the educational malpractice doctrine. Specifically, courts in Oklahoma—including this Court—refuse to recognize student contract claims against educational institutions alleging improper or inadequate instruction unless a student can "point to 'some specific, identifiable agreement for an educational institution's provision of ***particular services*** to its students'" and a breach of that specific agreement. *Gokool*, 2016 WL 10520949, at *4 (emphasis added) (quoting *Bittle v. Okla. City. Univ.*, 6 P.3d 509, 514 (Okla. Civ. App. 2000)). Recently, many courts across the country have rejected students' claims against their respective institutions that attack the quality of educational services the respective institutions provided during the global pandemic. *See e.g.*, *Vijay v. State of Okla. ex. rel., Bd. of Regents of the Univ. of Okla.*, 2022 OK CIV APP Case No. 119,809 (unpublished)

17

(attached hereto as Exhibit 22); *Zwiker v. Lake Superior State Univ.*, 986 N.W.2d 427, 443–44 (Mich. App. 2022) (holding university defendants did not breach any contract with students when they transitioned to virtual instruction during the COVID-19 pandemic); *Raimo v. Wash. Univ. in St. Louis*, 4:20-cv-00634-SEP, 2022 WL 796239, at *1, 11–12 (E.D. Mo. Mar. 16, 2022) (dismissing student's breach of contract claims regarding provision of online education during the COVID-19 pandemic).

In *Vijay*, the Oklahoma Court of Civil Appeals upheld the trial court's decision to dismiss a breach of contract claim a student asserted against the University of Oklahoma after the university transitioned to on-line instruction during the COVID-19 pandemic. *Vijay*, 2022 OK CIV APP Case No. 119,809, at 2, 9–11. Notably, the Court of Civil Appeals held the applicable statements in the university materials amounted only to "conclusory expressions of intent or aspiration" and fell short of a "definite, identifiable, and specific promise." *Id.* at 9–10. In *Gokool*, this Court dismissed a student's breach of contract claim against her former law school wherein she "essentially" alleged, in part, the school "created less than an ideal learning environment," reasoning the student failed to point to a specific, identifiable contract the school breached. 2016 WL 10520949, at *3, 5. The court quickly determined the language in the school's materials to which the student cited to support her contract claim, including an acceptance letter and handbook, constituted only "broad, policy-driven statements," which fell short of identifiable contracts for the provision of services. *Id.* at *4.

As it did in *Gokool*, this Court can quickly dispel of Plaintiff's claim because he cannot point to any "specific, identifiable agreement" between himself and OSU wherein

OSU promised, **and failed**, to provide a particular educational service during the Anesthesiology rotation. To be sure, the one document Plaintiff mentioned in his Complaint to support his inadequate instruction contract claim, the VCS 7843 Revised Course Syllabus COVID-19 Outbreak Emergency Plan (hereinafter the "Anesthesiology Syllabus" or "Syllabus"), informed students Anesthesia rounds and cases **would be virtual**. *See* Exhibit 20 at 2. The Syllabus does not contain language regarding the caliber of educational content; however, it does state the Anesthesia course "offers students the **opportunity to become acquainted with** common anesthesia techniques, equipment, and drugs" and "[t]he anesthesia team **will do their best** to provide a valuable learning experience compatibly with a rapidly evolving and unpredictable national emergency situation." Exhibit 20 at 1–2 (emphasis added). These statements are a far cry from promising—or even mentioning—the adequacy of educational content. Therefore, at most, the Syllabus contains only "aspirational or information statements" or "unenforceable expressions of intent." *Vijay*, 2022 OK CIV APP Case No. 119,809, at 9. Accordingly, Plaintiff has failed to demonstrate OSU breached any contractual promises, and the Court should grant Defendants' Motion regarding Plaintiff's inadequate education claim.

### ii.  *OSU's Early Termination of the Anesthesia Rotation*

Plaintiff further alleges OSU breached terms set forth in the Anesthesiology Syllabus because the rotation was terminated prior to the scheduled end date. *See* Complaint, Dkt. No. 1 at ¶¶ 60, 75–76. As stated above, the rotation began on March 23, 2020, and was scheduled to last three weeks, until April 12, 2020. On April 8 (*i.e.,*

Wednesday of the third and final week of the rotation), a faculty member overheard a student making a disrespectful comment during one of the virtual rotations. *See* Exhibit 15.

The Anesthesia rotation continued as scheduled, and the students took the end-of-rotation examination on Friday, April 10. Later that afternoon, at 2:15 p.m., Dr. Di Concetto emailed the students advising that due to the unprofessional comment being made earlier in the week and the growing clinic expectations, coupled with the exhaustion of his physical and mental resources, he was cancelling the final afternoon session of virtual rounds. *See* Exhibit 15.

Plaintiff alleges this cancellation constitutes a breach. Yet, Plaintiff acknowledged all material and/or information covered on the end-of-rotation exam had concluded prior to the exam, and the final afternoon session would not have addressed any new material. *See* Exhibit 1 at 199:24–203:24. This contradicts Plaintiff's allegation in the Complaint, which states "students were therefore tested on the material covered in a normal rotation, not the abbreviated material they were instructed on." Complaint, Dkt. No. 1 at ¶ 50. Additionally, Plaintiff acknowledged that despite the rotation schedule ending on Sunday April 12, there was no guarantee of virtual rounds on Saturday and/or Sunday. Exhibit 1 at 199:24–203:24. Weekend participation by students was contingent upon the necessity of emergency services. *See id.* Consequently, Plaintiff's claim that the early termination of the Anesthesia rotation constituted a breach is based solely upon the instructor's decision to cancel the ***last*** afternoon session of virtual rounds ***after*** the students had completed the end-of-rotation exam.

20

Plaintiff's breach of contract claim based on early termination of the Anesthesiology rotation fails because, as set forth above, the Syllabus contains only informative and aspirational statements for the Anesthesiology rotation—not specific contractual promises in an identifiable agreement. *See Gokool*, 2016 WL 10520949, at \*4; *Bittle*, 6 P.3d at 514.

Moreover, even if the Court determines the language "Duration: 3 (three) weeks" in the Syllabus satisfies the standard set forth in *Bittle* and repeated in *Gokool*, Plaintiff's claim fails because the Syllabus informed Plaintiff the Anesthesia rounds schedule and structure, and the Syllabus itself, were subject to modification. The Syllabus stated in conspicuous language, **"*this document is likely to undergo revisions and modifications*,"** Exhibit 20 at 1 (italics in original), and further provided, "[t]he rounds group call platform, schedule and structure may change and changes will be notified by the instructor via email." *Id.* at 2. Additionally, "'as a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract.'" *Dollar Rent A Car Syst., Inc. v. P.R.P. Enterprises, Inc.*, No. 01 CV 698, 2006 WL 1266515, at \*25  (N.D. Okla. May 8, 2006) (quoting 23 Samuel Williston, *A Treatise on the Law of Contracts*, § 63:22, 516 (4th ed. 2002)).

Accordingly, the Syllabus gave Dr. Di Concetto the flexibility to modify the duration of the rotation and rounds schedule ***at any time without limitation***. *See id.* at 1–2. That is precisely what Dr. Di Concetto did when he cancelled virtual rounds ***two hours and forty-five minutes early*** on the last weekday of Plaintiff's Anesthesiology rotation. *See* Exhibit 15. Thus, OSU did not breach any contract, including the implied covenant of good

faith and fair dealing, when the relevant instructor ever-so-slightly modified the schedule on the last afternoon of virtual rounds.

Finally, Oklahoma law defines breach of contract as "a **material** failure of performance of a duty arising under or imposed by agreement." *Lewis v. Farmers Ins. Co., Inc.*, 681 P.2d 67, 69 (Okla. 1983) (emphasis added); *Chickasaw Tel. Co. v. Southwestern Bell Mobile Syst., Inc.*, No. 96-6357, 113 F.3d 1245 (table) (unpublished), 1997 WL 290951, at *3 (10th Cir. 1997) (citing *Lewis*, 681 P.2d at 69). The "[d]etermination of materiality generally focuses upon whether or not the nonperformance defeats the object of the parties in forming the contract." *Dollar Rent A Car Syst., Inc.*, 2006 WL 1266515 at * 22 (citing 14 Richard A. Lord, Williston on Contracts, § 43:6 (4th ed. 2000)). Here, even if the Court determines the existence of an immutable contract between OSU and Plaintiff that required OSU to provide a three-week Anesthesiology rotation, OSU's cancellation of the last afternoon rounds of the rotation could not constitute a **material failure** of its performance obligations under the Syllabus.

Dr. Di Concetto stated the last Friday of the rotation was generally a "Q-and-A open session with the students—because everything was pretty much completed," and no new material would have been presented to the students. *See* Exhibit 21 at 60:14–62:2. Moreover, there was no guarantee, nor has Plaintiff even suggested, Dr. Di Concetto would have called him to participate in an emergency case on Saturday, April 11th or Sunday, April 12th. As to weekend days, the Syllabus imposed an obligation **only on the students** to be available for emergency calls. It imposed no obligation on Dr. Di Concetto or any other anesthesiology instructor to call Plaintiff—or any student for that matter—to

participate in a weekend emergency case. *See* Exhibit 20 at 2; Exhibit 1 at 200:21–25 and 201:1–5.

According to the Syllabus, Plaintiff was to be given "an opportunity to become acquainted with common anesthesia techniques, equipment, and drugs." Exhibit 20 at 1. The cancellation of one set of rounds and emergency on-call (for which there was no obligation to call on Plaintiff) at the end of the rotation ***after the final exam*** could not have defeated the contract's purpose. If the Court were to hold otherwise, educational institutions could be found to have breached contracts every time classes are cancelled due to instructor illness, inclement weather, or for any other reason. Therefore, Dr. Di Concetto's decision to cancel the final set of rounds and a weekend of emergency on-call immediately prior to the conclusion of the rotation did not constitute a material failure by OSU, and Defendants are entitled to summary judgment.

### c.  OSU's Dismissal of Plaintiff from the Program

Plaintiff's third and final claim alleges his dismissal from the Program constitutes a breach of contract. Plaintiff relies on the flawed reasoning of his previous claims (which have been addressed above) and suggests OSU based his dismissal from the Program on "false accusations" (*i.e.*, dishonesty) and his grade in the "abbreviated" Anesthesia rotation. In reality, as has been thoroughly established, OSU dismissed Plaintiff from the Program due to his consistently poor academic performance.

Essentially, Plaintiff seeks to utilize the judicial process to override or circumvent academic decisions made by academic professionals. However, the U.S. Supreme Court

has unequivocally afforded significant deference to faculty members regarding academic decision-making. In *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985), the institution dismissed a medical student from its program after the student failed a National Board of Medical Examiners exam. *See id.* at 216–17. The institution permitted thirty-two medical students who failed the exam to retake it; Ewing was the only student who was not allowed to do so. *See id.* at 219. Nine members of a board which independently reviewed the status of several students unanimously dismissed Ewing. *See id.* at 216. The board met again to review its decision at Ewing's request. *See id.* Ewing appeared before the board and explained his case. *Id.* The board again unanimously affirmed the decision to dismiss Ewing from the medical program. The Court ultimately deferred to the University's decision, finding that deference should be given to the faculty's professional judgment in academic decisions—the Court held, such decisions may not be overruled unless the decision is such "a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* at 225.

Here, Plaintiff ultimately received a grade of "D" in three separate rotations over the course of only a few months. Plaintiff consistently demonstrated significant academic deficiencies, which were both objective and subjective in nature. Plaintiff's shortcomings spanned multiple rotations and several instructors noted them. Regardless of Plaintiff's dislike or disagreement with the decisions made by OSU administrators, faculty members, and/or PSC members, these are the individuals tasked with evaluating the competency of

24

students to ensure they are qualified and prepared to enter the profession of veterinary medicine. Furthermore, these same administrators, faculty members, and PSC members are the individuals *most* qualified to make those determinations. Pursuant to the rationale of *Ewing*, this Court should not substitute its judgment for that of academic professionals but should instead defer to their professional judgment in making this academic decision.

## D.    CONCLUSION

As demonstrated in detail above, there is no genuine issue as to any material fact related to any of the causes of action in Plaintiff's Complaint, and accordingly, Defendants move the Court to grant summary judgment in their favor as a matter of law as to each of Plaintiff's claims.

Respectfully submitted,

s/Clinton W. Pratt
Clinton W. Pratt, OBA #21329
Gaylan Towle II, OBA #32884
Board of Regents for the Oklahoma
Agricultural and Mechanical Colleges
5th Floor, Student Union Building
Oklahoma State University
Stillwater, OK 74078-7044
(405) 744-6494/Fax: (405) 744-7998
clint.pratt@okstate.edu
gaylan.towle@okstate.edu

**ATTORNEYS FOR DEFENDANTS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 29th day of June, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

R. Jack Freeman
1861 East 71st Street
Tulsa, Oklahoma 74136
jack@lsh-law-firm.com

      and

Jason J. Bach
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
jbach@bachlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

s/Clinton W. Pratt

26