1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

JONATHAN RIVERA-PIEROLA,            )
                                    )
                       Plaintiff,   )
                                    )Case Number
vs.                                 )CIV-21-616 PRW
                                    )
BOARD OF REGENTS for the OKLAHOMA   )
AGRICULTURAL and MECHANICAL         )
COLLEGES, et al.,                   )
                                    )
                       Defendant.   )
_____

VIDEOCONFERENCE DEPOSITION OF LARA SYPNIEWSKI, DVM

TAKEN ON BEHALF OF THE PLAINTIFF

ON MAY 15, 2023

IN STILLWATER, OKLAHOMA

REPORTED BY:  BRENDA SCHMITZ, CSR, RPR (VIA ZOOM)
              CITY REPORTERS
       14 Northeast 13th Street, Suite 101
          Oklahoma City, Oklahoma 73104
                  (405)235-3376

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

```
                                                                    2
1    APPEARANCES:

2

3    FOR THE PLAINTIFF: (VIA ZOOM)

4         MR. JASON J. BACH
          Bach Law Firm
5         7881 West Charleston, Suite 165
          Las Vegas, NV  89117
6         Telephone: 702.925.8787
          Email: jbach@bachlawfirm.com
7

8

9    FOR THE DEFENDANT (VIA ZOOM WITH THE WITNESS:

10        MR. CLINTON W. PRATT
          Office of Legal Counsel
11        Student Union, 5th Floor
          Oklahoma State University
12        Stillwater, Oklahoma  74078
          Email: clint.pratt@okstate.edu
13

14

15

16

17

18

19

20

21

22

23

24

25
```

City Reporters
(405)235-3376

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

3

1                           INDEX
2
3      DIRECT EXAMINATION BY MR. BACH................5
4      CROSS EXAMINATION BY MR. PRATT...............46
5
6      Errata.......................................48
7      Jurat........................................49
8      Reporter's Certificate.......................50
9
10  Deposition Exhibits   (marked at a later date)
11       Number 1   Syllabus...........................30
12       Number 2   2/28/20 Burba email................30
13       Number 3   Events described by Plaintiff......32
14       Number 4   2/27/20 DeMars email...............37
15       Number 5   Email Re: CP Rotation Problems.....39
16       Number 6   3/3/20 Sypniewski email............43
17       Number 7   4/10/20 Di Concetto email..........43
18
19
20
21
22
23
24
25

**Exhibit 17 (Excerpts)**

                                                                    4

1                        STIPULATIONS

2          It is hereby stipulated and agreed by and
3    between the parties hereto, through their respective
4    attorneys, that the video conference deposition of
5    LARA SYPNIEWSKI, DVM may be taken on behalf of the
6    Plaintiff on MAY 15, 2023, in the City of
7    Stillwater, Oklahoma by Brenda Schmitz, Certified
8    Shorthand Reporter within and for the State of
9    Oklahoma, and Registered Professional Reporter,
10   taken by notice pursuant to the Federal Rules of
11   Civil Procedure.
12         It is further stipulated and agreed by and
13   between the parties hereto, through their respective
14   attorneys, that all objections, except as to the
15   form of the question and the responsiveness of the
16   answer, are reserved until the time of trial, at
17   which time they may be made with the same force and
18   effect as if made at the time of the taking of this
19   deposition.

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

5

1   And thereupon the following witness was produced
2   by the Plaintiff:
3              LARA SYPNIEWSKI, DVM,
4   the witness hereinbefore named, being first duly
5   cautioned and sworn remotely pursuant to Rule 34,
6   Title 12, Chapter 2, Appendix of the Oklahoma
7   Supreme Court, to testify the truth, the whole
8   truth, and nothing but the truth, testified on her
9   oath as follows:
10              DIRECT EXAMINATION
11  BY MR. BACH:
12      Q.   Can you state your name for the record,
13  please?
14      A.   It's Lara Sypniewski.
15      Q.   Dr. Sypniewski, my name is Jason Bach, I'm
16  a -- the attorney for Jonathan Rivera-Pierola, and
17  you understand he has -- has brought a lawsuit
18  against Oklahoma State University?
19      A.   Yes.
20      Q.   So today, we are -- are taking your
21  deposition in this case.  Have you ever had your
22  deposition taken before?
23      A.   Yes.
24      Q.   On -- on how many occasions?
25      A.   Two, two occasions.

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

24

1  that my technician was in the room, an anesthesia
2  student, as to who else was in the room, I get a
3  little tunnel vision when I'm doing surgery, so I'm
4  not sure who else was in there.
5      Q.   Okay.  And other than the issue with
6  the -- this spaying and Daphne, were there any other
7  issues that you recall with Jonathan?
8      A.   There was a third that I had brought up in
9  his evaluation about his physical exam deficiency on
10 a patient, and I -- I believe I chose that one
11 because it was a very distinct issue, the difference
12 between having some mild tartar to having an
13 incredibly diseased mouth, that's a -- that's a big
14 oversight, either you didn't look or you didn't know
15 how to evaluate.
16     Q.   Did you talk to Jonathan about this?
17     A.   I believe so, I would have talked to him
18 in the moment, because I would have pointed out the
19 disease at the time.  Because I want the students to
20 see it in the moment, because that is when learning
21 happens.  We're all looking at it, we're all talking
22 about it, we're coming up with plans for our
23 patients, and so outside of that moment is
24 difficult, because it's a pretty fast-paced clinic.
25     Q.   In your evaluation, you -- you had said

Lara Sypniewski, DVM
May 15, 2023

25

1  that you believed that Jonathan, at times, had been
2  untruthful.  Is that -- is that accurate?
3      A.   I did not put that in my evaluation.
4      Q.   Is there any -- any time that you believe
5  that he was untruthful with you?
6      A.   I do not recall any times that I thought
7  that Jonathan was untruthful.
8      Q.   Did you at -- at some point, inform
9  Jonathan that he was not going to pass your
10 rotation?
11     A.   Yes.  We had -- Dr. DeMars and myself had
12 met with Jonathan in the second week of the rotation
13 to highlight some concerns that we had, mainly with
14 not bringing laboratory values to the clinicians'
15 table, not bringing it to my table and talking to me
16 about it, as well as some of our concerns with his
17 lack of coachability, if you will, that's probably
18 the best way to describe it, and then in the third
19 week -- because the second week is where we want to
20 give them the opportunity to improve, and my -- my
21 goal is for Jonathan to pass, that's not -- my goal
22 isn't for him to fail.
23     So the second -- second or mid-block rotation
24 discussion is really meant to point out where we see
25 deficiencies and to come up with a plan to improve

City Reporters
(405)235-3376

**Exhibit 17 (Excerpts)**

26

1  them.  And then in the third week, it was my
2  opinion, and I believe Dr. DeMars' opinion as well,
3  that Jonathan needed to repeat the rotation.  So we
4  informed him of that.
5      Q.  And did you inform him of that together,
6  or separately?
7      A.  We informed him of it together.  We
8  typically have those types of discussions with
9  students as a team.
10     Q.  How did that conversation go?
11     A.  It was a frustrating conversation.  I
12  believe for everyone involved.
13     Q.  What -- what happened?
14     A.  We had -- Dr. DeMars and myself had
15  discussed with Jonathan our concerns from the -- the
16  second week and reiterated those during the third
17  week, and as I mentioned before, Jonathan disagreed
18  wholeheartedly with my evaluation, and assessment of
19  his performance.  I believe he disagreed with
20  Dr. DeMars.  And so when we offered opportunities
21  for him to -- to grow and to improve his clinical
22  schools and effectiveness, he disagreed with us.  He
23  was just argumentative as to what we believed, we
24  offered our opinions and our thoughts.  I -- I had
25  hoped that we gave him enough concrete evidence for

Lara Sypniewski, DVM
May 15, 2023

27

1  him to see what we were offering to him, but I know
2  that Jonathan disagreed with me.
3      Q.   Was there a point in time that you -- you
4  left the conversation?
5      A.   I believe what happened, and please, it's
6  been a number of years, what happened was, is that
7  Jonathan and I were talking and I was trying to
8  explain to him my point of view, and he was becoming
9  more and more argumentative.  At that point, I --
10 Dr. DeMars got very frustrated with Jonathan arguing
11 with me and told him to be quiet and said that the
12 conversation was over.  Because it was going in a
13 circle.  We weren't going anywhere, and -- and if we
14 were going to go somewhere, it wasn't going to be
15 positive.  So, Dr. DeMars took Jonathan to the
16 department head's office, Dr. Burba, so he could
17 then take Jonathan and allow for the situation to --
18 I want to say deescalate, probably, the best way to
19 describe it, deescalate.
20     Q.   Did Dr. DeMars tell Jonathan to shut up?
21     A.   He may have.
22     Q.   What interactions did you have with
23 Jonathan after that day?
24     A.   I am unsure.  I know that that day, that
25 particular day, I believe, and this is the best of

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

28

1  my recollection, is that Jonathan was asked to go
2  home, but I am unsure if that is what happened.  I
3  know that he went to Dr. Burba's office, I do not
4  remember seeing him beyond that day.  But I -- I
5  really, honestly, do not remember.
6       Q.   Were you present for the conversation in
7  Dr. Burba's office?
8       A.   No, sir.
9       Q.   How -- is it possible for you to pass a
10 student and Dr. DeMars' to not pass a student?
11      A.   Yes.
12      Q.   How does that happen?
13      A.   We do not discuss ever what we're going to
14 grade students on, so that -- there is never a
15 discussion.  In fact, we keep it very quiet, we
16 don't discuss students ever, when it comes to
17 grading, and so if I find that my experience with a
18 student has been genuinely good, that they have met
19 my expectations, hopefully exceeded them or, you
20 know, worked through the issues that they may have
21 had in a positive way, then I can pass them.
22      Dr. DeMars, on the other hand, may have not had
23 that same experience, so he may -- may fail a
24 student.  Now, it depends, typically, if a student
25 is in -- and I would say from my years of

City Reporters
(405)235-3376

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

29

1  experience, if a student is going to be failing with
2  me, they oftentimes are failing with Dr. DeMars.
3        So basically what I would tell him or what he
4  would tell me is that we need to mid block a student
5  together and/or have a technician in the room to be
6  privy to the conversation if one of us is not
7  available.  But I believe it has happened that
8  someone has been passed by one professor and failed
9  by another and it depends on like how -- how low you
10 failed someone, I suppose.
11       Q.   So is it -- it's an average that
12 determines whether or not they -- they pass the
13 rotation or not?
14       A.   Correct.
15       Q.   All right.  All right.  I'm going to take
16 you through these exhibits here that we've sent
17 over, and we can start with Exhibit Number 1.  Do
18 you have a copy?
19       MR. PRATT:  Jason, I just want to tell
20 you, I think we'll have them in order and
21 consistent, but you may just make sure that we know
22 because they're not listed as Exhibit 1 or 2, so I'm
23 going to hand her the order that I have them, but
24 we'll have to verify.
25       Q.   All right.  Yeah.  Exhibit 1 should be the

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

46

1   that they avoid you if you haven't had your drugs?
2       A.   If I said it, tongue in cheek or as a --
3   as a joke, yes.  But I don't do marijuana, or I
4   don't use marijuana.
5       Q.   All right.
6            MR. BACH:  Well, thank you for your time
7   today, I don't have any further questions.
8            THE WITNESS:  Okay.  Thank you.
9                     CROSS-EXAMINATION
10  BY MR. PRATT:
11      Q.   I have two quick follow-up questions.
12  Dr. Syp, I believe that you indicated that you did
13  not recall any instances in which Mr. Rivera-Pierola
14  was being dishonest during your interactions or
15  evaluations of him during the community practice
16  rotation; is that correct?
17      A.   Yes.
18      Q.   Is it accurate to say that the grade that
19  you gave Mr. Rivera-Pierola for the community
20  practice rotation was not based in any way on
21  dishonesty?
22      A.   Correct.
23      Q.   What was his grade that you gave him based
24  upon?
25      A.   His poor clinical performance, and his

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

47

1  lack of entrustable activities, including
2  communication, physical exam, laboratory
3  interpretation, patient care.
4      Q.   Did you observe anything during
5  Mr. Rivera-Pierola's time in the community practice
6  rotation that would be considered as, what would
7  qualify as academic integrity violation?
8      A.   No.
9      Q.   Are you familiar with those types of
10 violations?
11     A.   Yes.
12     Q.   But you saw nothing in his performance
13 that would lead you to think that he had committed a
14 violation of the academic integrity policy?
15     A.   No.
16          MR. PRATT:  I'll pass the witness.
17          MR. BACH:  Nothing further.
18          MR. PRATT:  And we will take -- we will
19 have a physical copy, along with an e-copy, if
20 that's okay.  But, yes, we'll read and sign.
21          (Deposition concluded at 11:29 a.m.)

City Reporters
(405)235-3376

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

```
                                                              48
 1                          ERRATA SHEET
 2              WITNESS: LARA SYPNIEWSKI, DVM
 3              DATE: MAY 15, 2023
 4              REPORTER:  Brenda Schmitz, CSR, RPR
 5     NO CORRECTIONS ARE NECESSARY _____
 6     PAGE   LINE   CORRECTION                 REASON
 7      10     19    The word "premium" should be "PAVE"
 8      15     21    The last name is Kreiter not
 9                   Crager
10      17     10    Not "pedi"cellular, hepatocellular
11
...
25
```

City Reporters
(405) 235-3376

**Exhibit 17 (Excerpts)**

Lara Sypniewski, DVM
May 15, 2023

```
                                                        49
 1                         JURAT
 2       I, LARA SYPNIEWSKI, DVM, do hereby state under
 3   oath that I have read the above and foregoing
 4   transcript in its entirety, and that the same is a
 5   full, true, and correct transcription of my
 6   testimony so given at said time and place, except
 7   for the corrections noted.
 8
 9
                         _____
10                          LARA SYPNIEWSKI, DVM
11       SUBSCRIBED AND SWORN TO BEFORE ME, the
12   undersigned Notary Public in and for the State of
13   Oklahoma       on this, the   1st    day of
14   June              , 2023
15
                         _____
16                             Notary Public
17
     My Commission Expires:  11-14-2023
18
19
                LUCINDA K. KERSHAW
20           Notary Public - State of Oklahoma
               Commission Number 07010531
21           My Commission Expires Nov 14, 2023
22
23
24        REPORTED BY:  BRENDA SCHMITZ, CSR, RPR
25
```

City Reporters
(405) 235-3376

**Exhibit 17 (Excerpts)**