**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| JONATHAN RIVERA-PIEROLA, | |
| *Plaintiff*, | |
| v. | Civil Action No.:  5:21-cv-00616-PRW |
| BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES; STATE OF OKLAHOMA *ex rel.* OKLAHOMA STATE UNIVERSITY; and ST. MATTHEWS UNIVERSITY, | |
| *Defendants*. | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT**
**<u>OKLAHOMA STATE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT</u>**

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

By   *Jason J. Bach*
    Jason J. Bach
    *Admitted Pro Hac Vice*
    7881 West Charleston Blvd., Suite 165
    Las Vegas, Nevada 89117
    Telephone: (702) 925-8787
    Facsimile: (702) 925-8788
    Email: <u>jbach@bachlawfirm.com</u>

     and

**LEVINSON, SMITH & HUFFMAN, PC**
    R. JACK FREEMAN, OBA #3128
    1861 East 71st Street
    Tulsa, Oklahoma 74136
    Telephone: (918) 492-4433
    Facsimile: (918) 492-6224
    Email: <u>jack@lsh-law.com</u>
    *Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES................................................................................ ii

INTRODUCTION ............................................................................................... 1

RESPONSE TO OSU'S MATERIAL FACTS ................................................... 2

PLAINTIFF'S ADDITIONAL MATERIAL FACTS ........................................ 7

ARGUMENT...................................................................................................... 11

   I.   SUFFICIENT EVIDENCE SUPPORTS PLAINTIFF'S CLAIM THAT OSU FAILED TO FOLLOW THE ACADEMIC INTEGRITY POLICY ................................................................. 11

      A.   The Academic Integrity Policy is Not Optional ................................. 11

      B.   The AIP Applies to the Conduct of Which Plaintiff was Accused .................... 14

   II.   PLAINTIFF'S CLAIM IS FOR A FAILURE TO PROVIDE THE CONTRACTED FOR INSTRUCTION ................................................................................................. 19

      A.   OSU Failed to Provide the Hands-On Clinical Instruction Central to Clinical Rotations............................................................................................. 20

      B.   OSU's Failed to Provide All 21 Days of the Anesthesia Rotation..................... 23

CONCLUSION ................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alsides v. Brown Institute*, 592 N.W.2d 468 (Minn. Ct. App. 1999) ..........................22, 24

*Blake v. Career Education Corporation*,
  No. 4:08CV00821 ERW (E.D. Mo. Aug. 17, 2009) .......................................................22

*Bonner v. Oklahoma Rock Corp.,* 863 P.2d 1176 (Okla. 1993) ........................................25

*Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir. 1961) ...................13

*Doe v. Am. Univ.,* No. 19-cv-03097 (APM) (D.D.C. Sep. 18, 2020)...............................12

*Dollar v. P.R.P,* 242 F. App'x 584 (10th Cir. 2007)........................................................25

*Flatscher v. Manhattan School of Music*, 551 F. Supp. 3d 273 (S.D.N.Y. 2021) ...........22

*Gradeless v. Kan. State Univ.*, No. 22-1148-JWB (D. Kan. Mar. 16, 2023) ..............23, 24

*Hernandez v. Ill. Inst. of Tech.*, No. 22-1741 (7th Cir. Mar. 27, 2023) ...........................22

*Hunter's Modern Appliance v. Bank IV OK*,
  949 P.2d 701 (Okla. Civ. App. 1997)..............................................................................11

*Jamieson v. Vatterott Educational Center, Inc.*,
  473 F. Supp. 2d 1153 (D. Kan. 2007) ..............................................................................24

*Miranda v. Xavier Univ.*, 594 F. Supp. 3d 961 (S.D. Ohio 2022)........................21, 22, 24

*Oral Roberts University v. Anderson,* 11 F. Supp. 2d 1332 (N.D. Okla. 1997) ..............11

*Parsia, Inc. v. John E. Barbre Tr.,* 500 P.3d 667, 673 (Okla. Civ. App. 2021)...............25

*Reynolds v. Concordia Univ., St. Paul*,
  21-cv-2560 (ECT/DTS) (D. Minn. May 3, 2022) ..........................................................22

*State ex rel. Bd. of Regents of the Univ. of Okla. v. Lucas*,
  297 P.3d 378 (Okla. 2013) ..............................................................................................13

*Ye LI v. Univ. of Tulsa,* No. 12-CV-641-TCK-FHM (N.D. Okla. Jan. 29, 2013).............13

**STATUTES**

Okla. Stat. tit. 23 § 98 ........................................................................................................25

Plaintiff, Jonathan Rivera-Pierola ("Plaintiff"), respectfully submits this Memorandum in Opposition to the Motion for Summary Judgment (the "Motion") [Dkt. No. 34] filed by Defendants the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges and the State of Oklahoma *ex rel*. Oklahoma State University (collectively, "OSU").

## INTRODUCTION

Plaintiff attended OSU's College of Veterinary Medicine under contract during his fourth year as a veterinary student at St. Matthew's University ("SMU"). OSU's fourth year program (the "Program") was comprised exclusively of clinical rotations, in which students received instruction and gained experience in hands-on clinical skills. During the course of Plaintiff's participation in the Program, he was accused of lying about patient care, providing billing instructions, and completing various other tasks, as well as alleged to have sought to avoid responsibility for these actions. These accusations were central to his ultimately failing grade in two of his rotations. OSU has an Academic Integrity Policy ("AIP"), which applies to a full range of dishonest conduct in OSU's programs and covers all enrolled students. The AIP provides for a range of procedures intended to provide students with the opportunity to dispute or appeal allegations of dishonestly and other academic integrity violations before any penalty, including a failing grade, is imposed. Despite this policy, OSU never initiated the AIP process, and Plaintiff was never provided with the required opportunity to defend himself before receiving a failing grade.

Further, Plaintiff's last rotation, Anesthesia, was exclusively virtual and included none of the hands-on clinical learning instruction and opportunities that were central to the Program and each rotation. In addition, the instructor cut the 21-day rotation short, ending all instruction and learning opportunities on day 18. When Plaintiff failed this rotation, with the instructor unable to evaluate his clinical skills given the virtual nature, Plaintiff was immediately dismissed from OSU because of the two prior failing grades. OSU's dismissal led immediately to Plaintiff's dismissal from SMU entirely.

1

Plaintiff's claims against OSU are premised on its failure to fulfill its obligations with respect to the AIP and the Anesthesia rotation. Contrary to OSU's assertions, these obligations were clear, as was OSU's breach, and OSU's Motion for Summary Judgment, which challenges solely the existence of a breach, should be denied.

## RESPONSE TO OSU'S MATERIAL FACTS

1.      Plaintiff began clinical rotations at OSU in the Program as an affiliate SMU student in the Fall of 2019.

Response: Undisputed

2.      During Plaintiff's first rotation, Small Animal Internal Medicine ("SAIM"), he received a grade of "D."

Response: Undisputed

3.      Students receiving grades of "D" for a rotation are referred to the Professional Standards Committee (the "PSC") for review.

Response: Undisputed, but immaterial.

4.      In conducting its review, the PSC determines if, in addition to repeating the rotation, the student shall be dismissed from the Program, placed on academic probation, placed on academic suspension, or required to complete a semester/year of academic reprieve. *See id*.

Response: Undisputed, but immaterial.

5.      Typically, a student who receives a grade of "D" or "F" during a rotation and is not already on academic probation will be allowed to remediate the rotation and placed on academic probation for the remainder of his/her participation in the Program. *See id*.

Response: Undisputed, but immaterial.

6.      On October 3, 2019, Dr. Margi Gilmour, Associate Dean for Academic Affairs ("Dr. Gilmour"), issued a letter to Plaintiff indicating the PSC received notice of Plaintiff's grade of "D" in the SAIM rotation.

Response: Undisputed, but immaterial

7.     Dr. Gilmour's letter advised Plaintiff the PSC had voted to allow him to repeat the rotation, and pursuant to academic policy, his grade of "D" placed him on academic probation.

Response: Undisputed

8.     Dr. Gilmour's letter further advised Plaintiff that receiving a second grade of "D" or "F" may result in "dismissal, remediation before being allowed to continue in the curriculum, or scheduling remediation of the failed rotation and continuing in clinical rotations."

Response: Undisputed

9.     Less than six months later, Plaintiff received a grade of "D" in his Community Practice rotation.

Response: Undisputed

10.     The PSC met on March 18, 2020, to review Plaintiff's second grade of "D."

Response: Undisputed

11.     Plaintiff was present for the meeting and provided information to the PSC regarding his unsatisfactory academic performance.

Response: Undisputed, but immaterial.

12.     In a letter dated March 23, 2020, Dr. Gilmour advised Plaintiff the PSC had recommended Plaintiff's dismissal from the Program.

Response: Undisputed

13.     The letter referenced the PSC's recommendation had been **unanimous** and cited Plaintiff's "repeated poor academic performance, lack of accountability for clinical errors in multiple rotations, recurrent unprofessional behavior, and inability to take constructive criticism to improve professional and clinical skills" as the bases for their decision.

Response: Undisputed, but immaterial

14.    The PSC found no mitigating circumstances to explain the listed concerns, and OSU CVM Dean Carlos Risco ("Dean Risco") accepted the recommendation of dismissal from the Program.

Response: Undisputed, but immaterial as to the PSC's findings with respect to mitigating circumstances.

15.    The letter also advised Plaintiff of his right to appeal the decision by filing a written appeal to Dean Risco.

Response: Undisputed

16.    Plaintiff submitted an appeal, and the PSC met on April 3, 2020, to reconsider Plaintiff's dismissal from the Program.

Response: Undisputed

17.    In his appeal, Plaintiff acknowledged several areas of necessary improvement (*e.g.*, communication, case preparation, patient care, professional ethical behavior).

Response: Disputed, but immaterial.  Plaintiff acknowledged criticism from others in communication, case preparation, patient care and professional ethical behavior with respect to miscommunications and presented a plan to address that feedback.  He did not, however, agree that these were areas of necessary improvement, nor did accept those criticisms as accurate.  Rather, he was advised by Dr. Gilmour to "address the clinician's concerns and how he plans to meet expectations."  *See* Dr. Gilmour's meeting notes with Plaintiff (Board 00296-00297), attached hereto as **Exhibit 1**.  Given this, and the prior criticism that his attempts to challenge the false accusations was characterized as a failure to accept responsibility, which was then used as a further reason to fail him, he had no choice but simply to indicate what he would do to address the concerns he was not allowed to dispute.  *See* Letter from Professional Standards Committee to Dr. Gilmour dated March 21, 2020 (Board 00278-00279), attached hereto as **Exhibit 2**.

4

18.    The PSC did not find the appeal persuasive and elected to stand on the initial recommendation of dismissal.

Response: Undisputed, but immaterial

19.    Despite the PSC's determination, Dean Risco allowed Plaintiff an opportunity to continue in the Program, pursuant to the discretion afforded him by the OSU CVM Academic Standards Policy.

Response: Undisputed, but immaterial.

20.    In a letter dated April 6, 2020, Dean Risco advised the PSC that Plaintiff would be allowed to remain in the Program subject to specific conditions.

Response: Undisputed, but immaterial.

21.    Dr. Gilmour advised Plaintiff of Dean Risco's deviation from the recommendation of the PSC and that he would be allowed to continue in the Program under academic suspension.

Response: Undisputed, but immaterial.

22.    One of the conditions of Plaintiff's academic suspension was Plaintiff's placement on academic probation for the duration of the clinical year, and OSU would dismiss him from the Program with no PSC review or appeal if he failed to receive a grade of "C" or higher for any rotation during the remaining clinical year.

Response: Undisputed as to the contents of Dr. Gilmour's letter.

23.    Shortly thereafter, Plaintiff received a grade of "D" in his Anesthesia rotation.

Response: Undisputed

24.    Pursuant to the terms of Plaintiff's academic suspension, he was dismissed from the Program.

Response: Undisputed as to Plaintiff's dismissal or the terms set forth in Dr. Gilmour's letter.  Disputed as such action was contrary to OSU's policies, but immaterial.

25.    After his dismissal, Plaintiff brought this lawsuit against Defendants alleging OSU breached a contract with him by failing to abide by its procedures, failing to provide the contracted-for instruction, and dismissing Plaintiff as a result of "false allegations" and the grade Plaintiff received in an "abbreviated" rotation.

Response: Undisputed

26.    With respect to Plaintiff, OSU abided by and followed its policies and procedures related to grades of "D" or "F" received by a student during one or more clinical rotations.

Response:    Disputed.    The accusations that Plaintiff lied, and fabricated information were accusations of an academic integrity violation.  Pursuant to OSU's AIP, prior to imposing sanctions for such a violation, including in the form of an unsatisfactory course grade, certain procedures must be followed.  *See* OSU's Exhibit 13 to Motion for Summary Judgment "OSU's Ex. 13."  These procedures apply even in clinical rotations. OSU failed to follow these procedures, but nonetheless issued Plaintiff an unsatisfactory grade based on the allegations of fabrication of information.

27.    Plaintiff's claim regarding OSU's failure to abide by its policies and procedures hinges on his assertion that OSU did **not** charge him with an alleged **academic integrity violation**.  According to Plaintiff, had OSU initiated the academic integrity process against him, he would have had a better opportunity to provide an explanation and present evidence on his behalf.

Response: This is not a fact, but a description of Plaintiff's claim.  Regardless, OSU, despite accusing Plaintiff of an academic integrity violation, that is, lying or fabrication of information, failed to abide by its policies and procedures set forth in the AIP prior to imposing a sanction, in the form of a negative grade, on him.  OSU's failure to follow these procedures deprived Plaintiff of the notice and hearing he was entitled to challenge those accusations.

28.     Plaintiff's claim regarding OSU's failure to provide the contracted-for instruction relates solely to Plaintiff's final three-week rotation, Anesthesia.

Response: This is not a fact but a mischaracterization of Plaintiff's claim. Plaintiff's claim is additionally based on the failure to provide the contracted for hands-on, clinical instruction in that rotation.

29.     Plaintiff alleges OSU's transition to virtual learning for his Anesthesia rotation, which occurred in March of 2020 at the onset of the COVID-19 pandemic, along with the decision of the instructor, Dr. Steffano Di Concetto, to end the rotation prior to the scheduled end date failed to provide Plaintiff with "proper learning."

Response: This is not a fact but a mischaracterization of Plaintiff's claim. Plaintiff's claim is based on OSU's failure to provide the hands-on clinical instruction central to clinical rotations during the Anesthesia rotation.  Plaintiff's allegation that the resulting instruction was deficient simply highlights that OSU's promise was material.

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

1.     OSU's AIP applies to all students and instructors at OSU and provides that it "embodies OSU's dedication to maintaining an honest academic environment and **ensures** fair resolution of alleged violations of academic integrity."  *See* OSU's Ex. 13 (emphasis added).

2.     The AIP "encompasses the fundamental values of honesty, trust, respect, fairness, and responsibility," and sets forth the obligations of both students and instructors. *Id.*

3.     The AIP sets forth the procedures that are to be followed when an instructor has sufficient information to substantiate an academic integrity violation.  *Id.*

4.     Among other things, the AIP requires students to uphold those fundamental values and "accept responsibility for their own actions" and states that instructors are expected to "confront students with information about [any] alleged violation [of the policy], **follow the procedures, and report violations**."  (emphasis added).  *Id.*

5.     The AIP provides multiple examples of conduct violating the policy, including, but not limited to, "fabricating information," "using a false excuse to obtain an extension on a due date," "signing an attendance roster for someone who is absent or asking someone else to sign the roster to avoid being counted absent," "fabricating or falsifying a bibliography," "fabricating or falsifying laboratory or research data" whether for a report or assignment or not, including "creating results for experiments that were not done," "using a false excuse for an absence," "altering course withdrawal slip," "forging an instructor or advisor signature," and "falsification of applications for admission." *Id.*

6.     The AIP applies to clinical rotations, though documenting such violations may be more difficult. *See* Carlos Risco Deposition Transcript ("Risco Dep.") attached hereto as **Exhibit 3**, at pp. 54:24-56:4.

7.     The syllabi for the majority of the clinical rotations at OSU in which Plaintiff was enrolled, including Small Animal Medicine and Community Practice, explicitly list the AIP, including its rights, as applicable to the rotation. *See* Syllabi for Plaintiff's clinical rotations at OSU (Board 00096-230, specifically 00096, 00105, 00115, 00118, 00166, 00170-00171, 00177-00178, 00190, 00194, 00196, 00201, 00203, 00208, 00222, 00224) attached hereto as **Exhibit 4**.

8.     Examples of AIP violations include making up data instead of reading bloodwork or a student lying about whether he observed or examined an animal. **Exhibit 3** (Risco Dep.) at pp. 54:24-56:4.

9.     In Plaintiff's Small Animal Medicine Rotation, Dr. Irizarry, Dr. Nafe and Dr. Lyon incorrectly concluded that Plaintiff was lying about the tasks he completed or things he had done, which were described as "just a few examples of big concerns regarding his honest[y]." *See* Emails dated October 1-3, 2019 (Board 00638-00641), attached hereto as **Exhibit 5**.

10.     These conclusions were outlined as a basis for his failing grade in his Small Animal Medicine rotation. *Id.*

11.     No referral for this conduct was submitted under the AIP, and Plaintiff had no opportunity to challenge those conclusions, or the failing grade tainted by them. *See* Jonathan Rivera-Pierola Deposition Transcript ("Rivera-Pierola Dep."), attached hereto as **Exhibit 6**, at pp. 186:11-21, 187:9-188:3.

12.     Dr. Irizarry again incorrectly concluded Plaintiff had falsified records or information and lied about what he had done in his Community Practice rotation, a conclusion that was explicitly connected to her belief that he had done so in the prior rotation. *See* Community Practice Evaluation (Board 00084-00085), attached hereto as **Exhibit 7**.

13.     Plaintiff's evaluation outlining the issues leading to his failing grade included explicit comments asserting multiple instances of dishonesty and outlining one such incident, stating "[Dr. Irizarry] confronted him on this lack of evaluation ***and worse***, lack of honesty.") (emphasis added). *Id.*

14.     No referral for this conduct was made under the AIP, and thus Plaintiff was not afforded the procedures under the AIP. **Exhibit 6** (Rivera-Pierola Dep.) at pp. 187:9-188:3.

15.     Plaintiff was not allowed to challenge the allegations of dishonesty, lying or failing to accept responsibility in his grade appeal for Community Practice. **Exhibit 1** (Board 00296).

16.     The allegations of lying and dishonesty and avoiding responsibility were accepted as true by the PSC, and Plaintiff's attempts to challenge them were seen solely as an attempt to avoid responsibility and were held against him. **Exhibit 2** (Board 00278-00279).

17.     Clinical rotations are intended to include a hands-on component during which students learn and practice clinical skills through providing services to actual animals in front of them. *See* Stefano Di Concetto Deposition Transcript ("Di Concetto Dep.") attached hereto as **Exhibit 8**, at pp. 12:2-13:9, 22:13-20.

18.    To participate in the clinical year, students at OSU must meet a range of technical standards that focus exclusively on the ability to work hands-on with animals. *See* Technical Standards (Requirements/Expectations) (Board 00292-00295), attached hereto as **Exhibit 9**.

19.    The "hands-on" component is where students "apply theoretical knowledge to clinical scenarios and consolidate theoretical knowledge from monitoring and observing" or otherwise working with live animals, working on and receiving feedback on their technical skills.  **Exhibit 8, (**Di Concetto Dep.) at p. 52:11-23.

20.    The syllabus for the Anesthesia rotation immediately prior to the pandemic lists the core activities of the rotation including 23 different procedures, 19 of which required students to be in-person working with an actual animal and a substantial portion of the rotation evaluation was based on performance of hands-on skills. *Id.*, at Ex. 1.

21.    All other rotations included a similarly significant emphasis on hands-on clinical skills and evaluation.  *See* **Exhibit 4** (Board 096-230 – specifically 096-108, 0115, 0117, 0120, 0121-0126, 0127, 0130-0144, 0149-0150, 0166-0175, 0177-178, 0180-0183, 0186-0189, 0190-0191, 0193-194, 0196-201, 0203-0206, 0209-0221).

22.    The virtual Anesthesia rotation OSU provided to Plaintiff was not comparable to the intended rotation as it included no hands-on opportunities or opportunities to apply theoretical knowledge to clinical scenarios and left the instructor unable to evaluate Plaintiff's clinical skills.  **Exhibit 8** (Di Concetto Dep.) at pp. 22:13-20; *Id*. at Ex. 6, *Id*. at Ex. 8.

23.    When Plaintiff enrolled, OSU specifically outlined that all rotations were three weeks long in paperwork provided to Plaintiff, and OSU faculty acknowledged that this scheduling applied to all rotations.  *See* OSU Core Rotations and Electives (Board 00010), attached hereto as **Exhibit 10**; **Exhibit 8** (Di Concetto Dep.) at p. 11:16-24; *see* Margi Gilmour Deposition Transcript ("Gilmour Dep.") attached hereto as **Exhibit 11**, at p. 31:16-22.

24.    The Anesthesia rotation Plaintiff was enrolled in was a 3-week, 21-day rotation, running from March 23, 2020, through April 12, 2020. *See* OSU's Response to Plaintiff's First Set of Interrogatories ("OSU's Responses",) attached hereto as **Exhibit 12**, at Answer to Interrogatory No. 18.

## ARGUMENT

## I. SUFFICIENT EVIDENCE SUPPORTS PLAINTIFF'S CLAIM THAT OSU FAILED TO FOLLOW THE ACADEMIC INTEGRITY POLICY

Given that OSU does not dispute that it did not provide Plaintiff with the due process procedures set forth in the Academic Integrity Policy ("AIP"), OSU's motion rests solely on its argument that the AIP did not set forth an obligation it was required to follow prior to penalizing a student for an academic integrity violation and that the AIP did not apply in this case, either because it covers only "cheating" or because it does not extend to clinical rotations. There are, at minimum, material disputes of fact on both points that preclude summary judgment.

### A.    The Academic Integrity Policy is Not Optional.

The interpretation of a contract is governed first by its explicit language. *See Oral Roberts University v. Anderson,* 11 F. Supp. 2d 1332, 1335 (N.D. Okla. 1997) ("Contracts must be interpreted so as to give effect to the parties intent at the time of contracting; generally, the terms of the contract indicate the parties' intentions."). Where the language is ambiguous, and the meaning is in dispute, "construction of the contract becomes a mixed question of fact and law and should be submitted to the jury." *Hunter's Modern Appliance v. Bank IV OK*, 949 P.2d 701, 703 (Okla. Civ. App. 1997). While Plaintiff believes the language of the AIP here is clear, and on its face defeats OSU's motion, to the extent court determines it is not, there is extent there is a dispute about its meaning and application, that dispute must be submitted to the jury.

OSU's AIP clearly sets forth both the academic integrity expectations students are required to follow and the due process they are entitled to when it is alleged that they have

failed to do so, and it would clearly be understood that way by a student enrolling in OSU. In OSU's own words, the "policy embodies OSU's dedication to maintaining an honest academic environment and ***ensures*** fair resolution of alleged violations of academic integrity." *See* OSU's Ex. 13. (emphasis added).  Section 1.03 sets forth the obligations of instructors, stating that, among other responsibilities, instructors are expected to "confront students with information about the alleged violation [of the policy], ***follow the procedures, and report violations***."  (emphasis added).

The language that OSU relies on, in Section 1.04 of the AIP, simply outlines the sorts of behaviors that may constitute a violation of the AIP.  *See id.*  Nowhere in that section does it suggest that where there is a violation, the procedures of the AIP need not be followed.  Rather, the obligations of students and faculty under the AIP are set forth in sections 1.02 and 1.03, in identical language.  *See id.*  Section 1.04 of the AIP, like Section 6, simply expands upon what it means for a student to be expected to follow OSU's academic integrity guidelines by providing examples of the sort of conduct that would violate the fundamental values set forth above.  *Id.*

It is Sections 2 through 5 that set forth the procedures to be followed in the event of an alleged violation, none of which phrased in a discretionary or optional manner.  *See id.* These procedures apply to all allegations, and begin *before a referral is even made*, when an instructor has enough information to substantiate a violation of academic integrity, and thus clearly are not contingent on the making of the referral, but instead require the referral to be made.  *See id.*; *Doe v. Am. Univ.,* No. 19-cv-03097 (APM), at *36-37 (D.D.C. Sep. 18, 2020) (finding that where the student code of conduct did not indicate a student's right to challenge the composition of a hearing panel was contingent on the student's attendance at the hearing, as the university had argued, the plaintiff had plausibly shown the university breached its contract when it failed to offer him that right).

Given the parallel language in Sections 1.02 and 1.03, if the instructor has discretion to follow the policy, so too do students.  And yet, it is clear that, based on identical

language, OSU views the AIP as binding on students to the extent that it may expel those who violate its requirements, or even revoke the degree of a prior graduate. There is simply no support for OSU's claim that instructors are not similarly bound and, at minimum, a reasonable student reading the policy would understand it to be binding on both parties.

Common sense and well-established legal principles also firmly support a reading that, prior to penalizing a student for an alleged academic integrity violation, OSU will provide the procedures outlined in the policy. It is evident that the purpose of the policies is to provide students with the modicum of due process required by the constitution, and thus are required prior to penalizing the student for the alleged violation. *See Dixon v. Alabama State Board of Education,* 294 F.2d 150, 158 (5th Cir. 1961); *State ex rel. Bd. of Regents of the Univ. of Okla. v. Lucas,* 297 P.3d 378, 390 (Okla. 2013); *Ye LI v. Univ. of Tulsa,* No. 12-CV-641-TCK-FHM, at *15 (N.D. Okla. Jan. 29, 2013) (noting that *"*Based upon the unique student/university relationship, the Tenth Circuit requires private universities to afford certain due process protections during disciplinary proceedings) (citing *Slaughter v. Brigham Young University*, 514 F.2d 622, 625 (10th Cir. 1975)). OSU recognized this explicitly in its contract with SMU, when it indicated that SMU students were required to follow all OSU rules, and that SMU students would be "provided the same due process as resident students as described in" the Handbook. *See* Contract with SMU (Board 00282-00295), attached hereto as **Exhibit 13.** By asserting that the AIP, and its procedures, are voluntary, and OSU or its faculty may choose instead to ignore the policy and fail a student, dismiss them, or revoke a degree already earned for an alleged academic integrity violation without providing any procedures at all, OSU is asserting that it knowingly and intentionally violates its students' rights, as established in the constitution and the caselaw of this circuit. One imagines that is not the position it intends to take, given OSU has recognized the entitlement to due process in other cases. *See State ex rel. Bd. of Regents of the Univ. of Okla.,* 297 P.3d at 390 (finding that disciplinary proceedings leading to expulsion were required to provide certain procedures and the

"University agreed that disciplinary proceedings less than expulsion must comply with due process").

OSU's offered reading is also simply unreasonable. If the AIP were truly optional, why would OSU create those procedures in the first place? If a professor could simply fail a student, OSU could simply dismiss a student, for an alleged, believed, or imagined academic integrity violation, why would anyone make a policy under the referral? OSU of course receives "so many" referrals under the AIP because the policy in not, in fact, optional for instructors. *See* Candace Thrasher Deposition Transcript ("Thrasher Dep.") attached hereto as **Exhibit 14**, at p. 19:16-20.

Finally, OSU may be tempted to point to the deposition of Candace Thrasher, who it offered as a witness to speak to the AIP. However, Ms. Thrasher's testimony undermines the relevance and reliability of her view of the AIP. Ms. Thrasher admitted that upon receiving a referral, her job was not to review or evaluate it, or otherwise make a determination about whether the referral in fact alleged a violation of the AIP. *Id.* at p. 32:12-17. Rather, her job is simply to unquestioningly pass the referral on, a purely administrative process role. *Id.* Accordingly, her assumption or interpretation that faculty may simply choose whether or not to make a referral before penalizing a student for an academic integrity violation carries no weight. While her testimony defies common sense and contradicts the explicit language of the policy and thus carries no weight, even if it did, it would, at best, simply create a dispute of fact as to whether the AIP was in fact optional or an obligation, and thus would preclude summary judgment here.

**B.    The AIP Applies to the Conduct of Which Plaintiff was Accused.**

Perhaps sensing its argument that the AIP's procedures are optional might fail, OSU goes on to assert that, even if the AIP were to create an obligation, it does not cover the alleged conduct here and does not extend to the clinical setting. The evidence, again, contradicts these assertions, raising material disputes of fact barring summary judgment.

The academic integrity policy, by its explicit terms, goes well beyond "cheating" and "encompasses the fundamental values of honesty, trust, respect, fairness, and responsibility," and requires students to "accept responsibility for their own actions." *See* OSU's Ex. 13. The policy sets forth examples of conduct that may violate these "fundamental values," indicating that violations the "may include but are not limited to" those specifically listed behaviors. *Id*. Thus, the fact that a behavior is not explicitly listed is not determinative. Rather, it is the general principles set forth in the policy, including, but not limited to, honesty and accepting responsibility for one's own actions.

Thus, in addition to plagiarizing, cheating, or using another's work, examples of violations include "fabricating information," "altering or destroying the work of others," and "altering academic records." *Id*. The AIP offers further examples in both its sections setting forth possible sanctions and Section 6, including "using a false excuse to obtain an extension on a due date," "signing an attendance roster for someone who is absent or asking someone else to sign the roster to avoid being counted absent," "fabricating or falsifying a bibliography," "fabricating or falsifying laboratory or research data" whether for a report or assignment or not, including "creating results for experiments that were not done," "using a false excuse for an absence," "altering course withdrawal slip," "forging an instructor or advisor signature," and "falsification of applications for admission." *Id*. With the exception of the latter three, those examples all fall within the general category of "fabricating information." *Id*. On the whole, these examples make clear that the AIP applies well beyond the bounds of traditional classroom assignments or typical "cheating" to reach lying about matters relevant to one's academic program.

Making up a bibliography because you failed to do any research, lying about the reason for an absence to avoid some consequence, having someone sign you in, and making up data for an experiment you never completed are not meaningfully different from lying about whether one spoke with an owner or whether you needed to complete a treatment sheet, did in fact complete that sheet, or completed some other required task during a

clinical rotation. The similarities here are evident in the fact that language of the AIP mirrors that used by faculty to describe Plaintiff's alleged conduct, in which he was accused of dishonesty, lying about whether he had in fact done a task required by his rotation, and attempting to avoid responsibility for his actions. Given that the policy explicitly acknowledges that the examples it provides do not constitute the entire universe of violations, it is clear the policy reaches other types of dishonesty relevant to one's academic program.

Further, the AIP is clear it applies to all OSU students, and it makes no distinction between classroom and clinical activities. It indicates application to "all members of the OSU community" and all students, without qualification. *Id*. The extension of the AIP to conduct even before one enrolls at OSU, such as falsifying information on an admissions application, and outside of classroom tests and assignments, such as altering withdrawal slips, making up research data, or lying about a reason for an absent, makes clear it has no such limitation.

There is also substantial evidence with OSU's own documents directly contradicting its assertions here and making clear that OSU's policies, including the AIP, apply equally to students in clinical rotations. For example, the Anesthesia syllabus for the rotation prior to the pandemic provides that violations of the AIP would subject students to sanction, and references the policy – and thus its procedures – specifically and makes clear students will have a right to appeal any charge:

> Oklahoma State University is committed to the maintenance of the highest standards of integrity and ethical conduct of its members. This level of ethical behavior and integrity will be maintained in this course. Participating in a behavior that violates academic integrity (e.g., unauthorized collaboration on homework or assignments, plagiarism, multiple submissions of the same assignment, cheating on examinations, fabricating information, helping another person cheat, having unauthorized advance access to examinations, altering or destroying the work of others, and fraudulently altering academic records) **will result in your being sanctioned. *Violations may subject***

> *you to disciplinary action including the following: receiving a*
> *failing grade on an assignment, examination or course, receiving a*
> *notation of a violation of academic integrity on your transcript, and*
> *being suspended from the University. You have the right to appeal*
> *the charge.*

*See id;* **Exhibit 4** (Board 00224).  This language, which mirrors that of the AIP and the sanctions outlined there, is a clear indication the AIP did and was intended to apply in the clinical setting.  There is simply no reading of this that would support OSU's claim that the AIP does not apply to clinical rotations or that it was discretionary, and this or a materially similar statement appears in the syllabi for nearly all clinical rotations Plaintiff participated in, including Small Animal Medicine and Community Practice.  **Exhibit 4** (Board 00096-00230).

The Dean of Veterinary School, when asked, testified not that the AIP did not apply to clinical students, but, simply, that it was more difficult to document academic integrity violations.  **Exhibit 3** (Risco Dep.) at pp. 54:24-56:4.  When asked for examples of violations, he offered up making up data instead of actually observing something, like the result of bloodwork, or, in a clinical setting, perhaps a student who did not complete the required observation of an animal, such as its temperature and respirations, but claimed to have done so.[1]  *Id.*  This in fact almost precisely the sort of conduct Plaintiff was accused of.

Given the application of the AIP to clinical rotations, and the type of conduct Plaintiff was accused of, it is evident there is more than enough information from which a jury could find a breach by OSU.  In Plaintiff's first rotation, Dr. Irizarry, Dr. Nafe and Dr. Lyon incorrectly concluded that Plaintiff was lying about the tasks he completed or things he had done, which were described as "just a few examples of big concerns regarding his honest[y]," which were outlined as a basis for his failing grade in his Small Animal

---

[1] That OSU has apparently failed to follow the AIP with respect to other clinical students simply suggests it has breached its contract with other students as well.

Medicine rotation **Exhibit 5** (Board 00638-00641) (describing Plaintiff as having "essentially lied about the information" to Dr. Moore about PeeWee, and "lied" regarding the ICU treatment sheet, though the language was intentionally modified in the evaluation Plaintiff saw). However, because this was never raised to Plaintiff and no referral was ever submitted under the AIP, Plaintiff had no opportunity to challenge those conclusions, or the failing grade tainted by them. **Exhibit 6** (Rivera-Pierola Dep.) at pp. 186:11-21, 187:9-188:3.

Unfortunately, Plaintiff came across Dr. Irizarry again, in his Community Practice rotation, where, again, she incorrectly concluded he had falsified records or information and lied about what he had done, a conclusion that was explicitly connected to her belief that he had done so in the prior rotation. **Exhibit 7** (Board 00084-00085). Plaintiff's failing grade was again tainted by this, given the explicit comments in his evaluation, one asserting multiple instances of dishonesty and the other outlining in detail one of those, and again, he was not afforded the required opportunity to defend himself because no referral was made under the AIP and thus he received none of those procedures. *See id.* (highlighting the lack of honesty as significant, indicating "[Dr. Irizarry] confronted him on this lack of evaluation ***and worse***, lack of honesty.") (emphasis added) *Id.*; **Exhibit 6** (Rivera-Pierola Dep.) at pp. 187:9-188:3.

Other evidence confirms that allegations of dishonesty played a substantial part in his failing grades, and that he was therefore penalized for these alleged violations despite the failure to follow the AIP. Absent compliance with the AIP, Plaintiff had no opportunity to challenge the determinations of dishonesty underlying the grades, as even in the context of his eventual grade appeal for Community Practice, the truth of those allegations was simply assumed and not open to dispute. *See* Plaintiff's Response to Defendants' First Set of Interrogatories ("Plaintiff's Responses") attached hereto as **Exhibit 15**, at Answer to Interrogatory No. 10 p. 21-22; **Exhibit 1** (Board 00296), noting that in response to Plaintiff's explanation of the inaccurate allegations of lying, Dr. Gilmour "explained to

[Plaintiff] that a grade appeal is solely based on if the syllabus is followed and applied equally to all students"]. Similarly, in front of the PSC, the truth of those allegations was not only assumed, but Plaintiff's attempts to protest them were held against him. **Exhibit 2** (Board 00278-00279).

With two failing grades that should not have occurred, Plaintiff's ultimate dismissal was nearly guaranteed, all, again, without any opportunity to demonstrate that those accusations were simply wrong. Absent OSU's breach, without those failing grades, Plaintiff would not have been at risk for dismissal.

In sum, the language of the policy itself, and OSU's own documents for students make clear that the AIP does in fact apply to the conduct Plaintiff is alleged to have engaged in and its procedures are not optional and are more than enough to raise a material dispute of fact that OSU was required to follow the AIP with respect to the allegations against Plaintiff. There is no dispute that it did not – OSU readily admits it did not do so, and thus evidence from which to find a breach. Thus, OSU's motion for summary judgment on this claim must be denied.

## II. PLAINTIFF'S CLAIM IS FOR A FAILURE TO PROVIDE THE CONTRACTED FOR INSTRUCTION

The remainder of Plaintiff's claims are based on an assertion that OSU breached its contract with him by providing only virtual instruction, without any of the crucial hands-on instruction, during his Anesthesia rotation and further by providing only 18 of the 21 days of the promised rotation. As noted, at this stage, OSU does not dispute the existence of a contract or the existence or extent of damages as its basis for its motion for summary judgment. Accordingly, OSU challenges Plaintiff's claim for the early cancellation of the Anesthesia rotation only with respect to whether OSU had an obligation and breached that obligation. There is sufficient evidence from which a jury could find that OSU had a contractual obligation to provide full rotation, both in coverage and in person experience

and in length, and thus OSU's shift to virtual instruction, during which material was not in fact taught, and the early termination of that rotation constituted a breach.

### A.    OSU Failed to Provide the Hands-On Clinical Instruction Central to Clinical Rotations.

OSU acknowledges the nature of clinical rotations in its Program.  Such rotations are in person opportunities to learn and practice skills on actual animals seeking various services.  As Dr. Steffano Di Concetto, the instructor for the Anesthesia rotation testified, clinical rotations are intended to include both a more traditional academic instruction component and a hands-on component during which students learn and practice clinical skills through providing services to actual animals in front of them.  **Exhibit 8** (Di Concetto Dep.) at pp. 12:2-13:9, 22:13-20.  The "hands-on" component is where students "apply theoretical knowledge to clinical scenarios and consolidate theoretical knowledge from monitoring and observing" or otherwise working with live animals, working on and receiving feedback on their technical skills.  *Id.* at p. 52:11-23.  The central nature of this hands-on experience is further demonstrated by the syllabus and grading criteria typically applicable to the course.  The syllabus for the rotation immediately prior to the first one disrupted by COVID-19 outline numerous required in-person activities in the rotation forming the core activities of the rotation including 23 different procedures, 19 of which required students to be in-person working with an actual animal, such as placing various monitors, conducting a physical exam, setting up pumps to administer fluids or drugs, and properly administering various kinds of anesthesia using a variety of equipment.  *Id*. (Di Concetto Dep.) at Ex. 1.  Further, a substantial portion of the evaluation of students was based the performance of in person hands on skills.  *Id.*  All rotations imposed similar requirements.  *See* **Exhibit 4** (Board 00096-00230).  Similarly, the Program's required "technical standards" setting for the minimum capabilities of a student to participate in the Program are focused exclusively on hands on work with animals.  **Exhibit 9** (Board 00292-

00295). It is clear then that the Program itself viewed the in person and hands on experience with animals to be central to the Program's rotations.

Dr. Di Concetto, the instructor for the course, testified that the virtual rotation ultimately provided to Plaintiff included aspects that "were clearly not comparably to an in-person situation simply because an anesthesiology rotation is – has a practical component that is not easy to replicate online in – like, hands on." **Exhibit 8** (Di Concetto Dep.) at p. 22:13-20). In fact, Dr. Di Concetto acknowledged the "complete lack of hands-on opportunities and the chance to apply theoretical knowledge to clinical scenarios" in what OSU provided to Plaintiff. *Id*. (Di Concetto Dep.) at Ex. 8. Further, Dr. Di Concetto acknowledged was unable to evaluate Plaintiff's clinical skills given the lack of hands-on component, and thus the evaluation that differed from that which was promised and standard in clinical rotations. *Id*. (Di Concetto Dep.) at Ex. 6). This is sufficient evidence from which a jury could conclude that OSU agreed to, but failed to provide Plaintiff the rotation he contracted for, specifically in its hands-on opportunities and instruction in the clinical setting in person.

Courts have considered similar cases and found that such evidence supports a contractual obligation such that the shift to virtual education was a breach. In *Miranda v. Xavier Univ.*, 594 F. Supp. 3d 961, 970-71 (S.D. Ohio 2022), the plaintiff brought a breach of contract claim based on a university's failure to provide the in person clinical and laboratory instruction promised in a Bachelor of Nursing Science program. The complaint alleged[2] that the program advertised clinical and laboratory experiences, emphasized the importance of them through among other things its mandatory attendance policy, and having students engage in extensive preparation for the in-person component through signing releases, certifying their physical fitness for clinical activities, and undergoing health screenings. *See id.* Finding that a "reasonable person would have assumed the

---

[2] While the case considered a motion to dismiss, the principles are the same to the extent sufficient evidence or a material dispute of fact exist on the same points.

university intended to bind [itself] to providing in person instruction," the court denied the university's motion to dismiss the breach of contract claim. *See id.* The same applies here.

Similarly, the court in *Miranda* rejected the university's attempt to rely on the educational malpractice doctrine, finding that the plaintiff's claims for a failure to provide in person instruction constituted a claim for a failure to provide promised instruction at all, and the adequacy or effectiveness of the education ultimately provided was irrelevant. *See id.* at 970. Other courts considering clinical or specialized programs, rather than general educational programs such as those at issue in the cases cited by OSU or claims for a similarly discrete type of instruction have reached the same conclusion. *See Reynolds v. Concordia Univ., St. Paul*, 21-cv-2560 (ECT/DTS), at *19 (D. Minn. May 3, 2022) (school's emphasis on the in person clinical, laboratory and simulation instruction available was an enforceable promise and plaintiff's claim for a failure to provide the in person instruction during the shift to virtual instruction did not require an evaluation of the quality of instruction); *Flatscher v. Manhattan School of Music*, 551 F. Supp. 3d 273, 283-86 (S.D.N.Y. 2021) (same for claim against a music conservatory where in-person and hands on instruction was fundamental to the program); *Blake v. Career Education Corporation*, No. 4:08CV00821 ERW, at *7 (E.D. Mo. Aug. 17, 2009) (same for a claim for a failure to provide certain promised hands-on instruction, even when providing other in person instruction); *Hernandez v. Ill. Inst. of Tech.*, No. 22-1741, at *11-12 (7th Cir. Mar. 27, 2023) (finding the same when considering claims for a failure to provide in person instruction in a general educational program); *Alsides v. Brown Institute*, 592 N.W.2d 468, 473 (Minn. Ct. App. 1999) (collecting cases).

There is no dispute that hands on clinical experience was central to clinical rotations – it was not merely aspirational, but instead the very purpose of the year. The hands-on clinical aspect is the reason SMU had to contract out its fourth year, and send students to placements such as OSU, because, while SMU could provide typical classroom instruction, it could not provide hands on experience and practice. *See* **Exhibit 9** (Board 00282-

00295). That is a discrete promise to provide specific instruction. And the claim is, simply, that OSU failed to do so. Evaluating this claim does not require a debate about the relative quality of the education provided during the pandemic versus other times and thus is not barred by the educational malpractice doctrine.

**B.    OSU Failed to Provide All 21 Days of the Anesthesia Rotation.**

The Anesthesia rotation OSU supposed to provide to Plaintiff was a 3-week, 21-day rotation, as were *all* clinical rotations at the time (excluding one providing for a one-week vacation), running from March 23, 2020, through April 12, 2020. **Exhibit 12** (OSU's Responses) at Answer to Interrogatory No. 18; **Exhibit 8** (Di Concetto Dep.) at p. 11:16-24; **Exhibit 11** (Gilmour Dep.) at p. 31:16-22. The rotation was terminated at approximately 3:00 pm on April 9, 2020, three days early, by the instructor. *See id.* Only the exam occurred after that. *Id.* OSU did not provide the instruction scheduled for Friday April 10, 2020, nor did it provide students with the opportunity to respond to emergencies on April 11, 2020, or April 12, 2020. *See id.*

The length of the rotation and instruction is a clear objective factor that requires no subjective assessment of instruction – the question of whether OSU breached its obligation to provide a 21-day rotation by terminating the rotation on day 18 can be answered without reference to the nature or quality of the instruction involved. Further, this was a clear and explicit promise made by OSU to Plaintiff. OSU itself recognized that Plaintiff was enrolled in the rotation that had set start and end dates. And at the beginning of Plaintiff's time at OSU, OSU specifically outlined that all rotations were three weeks long. **Exhibit 10 (**Board 00010); **Exhibit 12** (OSU's Responses) at Answer to Interrogatory No. 18; *Gradeless v. Kan. State Univ.*, No. 22-1148-JWB, at *15-16 (D. Kan. Mar. 16, 2023) (noting that handbooks and other material provided by the university can form part of the contract).

OSU's focus on the revised syllabus, created only after Plaintiff enrolled and OSU incurred its obligations, is misplaced. Plaintiff's entire premise is that OSU failed to

provide him what he contracted for, at the beginning, during that time – and both the syllabus and early termination evidence that breach. The fact that the syllabus provided it might be changed at any time does not relieve OSU of the promises it made when Plaintiff enrolled and further cannot be reasonably read to provide OSU unfettered discretion to change any aspect of the rotation, such as length, as OSU claims. *See Miranda,* 594 F. Supp. 3d at 971 (finding that a statement in the handbook that the curriculum was subject to change did not suggest the university had unfettered discretion to remove clinical and lab components entirely and move online and that, at best, the statement was ambiguous and raised a factual issue with respect to intent of the parties). At minimum, there is a material dispute of fact about OSU's promises to Plaintiff initially and its intent with respect to the statement in the syllabus.

As courts in the Tenth Circuit have recognized, a promise to provide a certain length of instruction, such as by enrolling a student for a course for set dates, is precisely the sort of discrete, explicit contractual promise a student may pursue, and a court is well equipped to evaluate. *See Gradeless*, No. 22-1148-JWB, at *15-16 (recognizing that court's routinely find that "a promise to provide a certain number of hours or weeks of instruction" is a sufficiently specific contractual promise, unrelated to the quality of education, and thus a claim for the failure to provide the same is not barred by the educational malpractice doctrine.); *Jamieson v. Vatterott Educational Center, Inc.*, 473 F. Supp. 2d 1153, 1160 (D. Kan. 2007) ("A promise to provide a specific number of hours or weeks of instruction is a contractual promise that can be enforced against an educational institution."); *see also Alsides v. Brown Institute*, 592 N.W.2d at 273 (collecting cases).

Finally, OSU suggests that Oklahoma has developed unique contract law precluding parties from pursuing claims where a breach does not defeat the purpose of the contract. This is, of course, incorrect. The elements of a breach of contract claim are clear, and the element of breach does not include some proof of materiality or purpose of the contract. A plaintiff may seek to recover when he did not receive the full value or thing for which

he contracted, even where the breach does not defeat the contract in full.  The case on which OSU relies to assert any breach must defeat the purpose of the contract was considering a contract term that permitted one party to terminate the contract for "good cause."  *See Dollar v. P.R.P,* 242 F. App'x 584, 587 (10th Cir. 2007).  The court found that the breach at issue was material such that the termination provision applied.  *Id.*  It did not find that in order to form the basis for a breach of contract claim, a breach must defeat the purpose of the contract.  The very fact that a breach must be material to pursue select remedies, such as recission which undoes the entire contract, where the party cannot be otherwise adequately compensated, makes clear that non-material breaches nonetheless exist and while not entitling a party to select remedies, do not preclude them from bringing a breach of contract claim seeking damages or other remedies.  *See Bonner v. Oklahoma Rock Corp.,* 863 P.2d 1176, 1186, n.61 (Okla. 1993).  So too does the fact that a breach is regarded as an independent legal injury, permitting a plaintiff to pursue nominal damages even where there is no apparent detriment.  *See Parsia, Inc. v. John E. Barbre Tr.,* 500 P.3d 667, 673 (Okla. Civ. App. 2021) ("the law is well-settled that a breach of contract is a legal wrong independent of the existence of actual damages.") (quotation omitted); Okla. Stat. tit. 23 § 98 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages.").  This principle cannot be squared with OSU's claim that a breach cannot be pursued unless the detriment is so great that the purpose of the contract is defeated or, even, that a breach is material in the way OSU asserts it.

Finally, as OSU does not challenge damages in its motion, in either existence or amount, its attempt to imply that its breach did not in fact damage Plaintiff is irrelevant to this motion, and it cannot rely on any argument based on the evaluation of damages.  Given this, OSU's Motion for Summary Judgment should be denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant OSU's Motion for Summary Judgment in its entirety.

Dated this 27th day of July, 2023.

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

By_____*Jason J. Bach*_____
   Jason J. Bach
   *Admitted Pro Hac Vice*
   7881 West Charleston Blvd., Suite 165
   Las Vegas, Nevada 89117
   Telephone: (702) 925-8787
   Facsimile: (702) 925-8788
   Email: jbach@bachlawfirm.com

and

**LEVINSON, SMITH & HUFFMAN, PC**
   R. JACK FREEMAN, OBA #3128
   1861 East 71st Street
   Tulsa, Oklahoma 74136
   Telephone: (918) 492-4433
   Facsimile: (918) 492-6224
   Email: jack@lsh-law.com

*Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 27, 2023, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

> Clinton W. Pratt
> Gaylan Towle II
> Board of Regents for the Oklahoma
> Agricultural and Mechanical Colleges
> 5th Floor, Student Union Building
> Stillwater, OK 74078
> Clint.pratt@okstate.edu
> Gaylan.towle@okstate.edu
> Attorneys for Defendants Board of Regents and
> the State of Oklahoma ex. rel. Oklahoma State University

> *  /s/ Jason J. Bach*  
> Jason J. Bach