1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


JONATHAN RIVERA-PIEROLA,               )
                                       )
                         Plaintiff,    )
                                       )Case Number
vs.                                    )CIV-21-616 PRW
                                       )
BOARD OF REGENTS for the OKLAHOMA      )
AGRICULTURAL and MECHANICAL            )
COLLEGES, et al.,                      )
                                       )
                         Defendant.    )
_____


VIDEOCONFERENCE DEPOSITION OF CARLOS RISCO, DVM

TAKEN ON BEHALF OF THE PLAINTIFF

ON JUNE 12, 2023

IN STILLWATER, OKLAHOMA


REPORTED BY:  BRENDA SCHMITZ, CSR, RPR (VIA ZOOM)
                   CITY REPORTERS
        14 Northeast 13th Street, Suite 101
          Oklahoma City, Oklahoma 73104
                 (405)235-3376

**Exhibit 3**

2

1 APPEARANCES:
2
3 FOR THE PLAINTIFF: (VIA ZOOM)
4     MR. JASON J. BACH
      Bach Law Firm
5     7881 West Charleston, Suite 165
      Las Vegas, NV  89117
6     Telephone:  702.925.8787
      Email: jbach@bachlawfirm.com
7
8
9 FOR THE DEFENDANT (VIA ZOOM WITH THE WITNESS):
10    MR. CLINTON W. PRATT
      Office of Legal Counsel
11    Student Union, 5th Floor
      Oklahoma State University
12    Stillwater, Oklahoma  74078
      Email: clint.pratt@okstate.edu
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1               INDEX
2
3    DIRECT EXAMINATION BY MR. BACH.............5
4    CROSS EXAMINATION BY MR. PRATT.............51
5    REDIRECT EXAMINATION BY MR. BACH...........56
6
7    Errata....................................58
8    Jurat.....................................59
9    Reporter's Certificate....................60
10
11 Deposition Exhibits  (marked at a later date)
12    Number 1  3/22/20 Risco/Gilmour email........30
13    Number 2  3/24/20 Rivera-Pierola email.......33
14    Number 3  3/29/20 Risco/Rivera-Pierola
                Email..............................34
15
16    Number 4  3/30/20 Gilmour/Reichard email.....40
17    Number 5  April 3, 2020 PSC letter...........41
18    Number 6  3/30/20 "What Risco Proposed for
                JRP"...............................43
19
20    Number 7  4/6/20 Risco to PSC letter.........44
21    Number 8  4/21/20 De Concetto/Gilmour email..47
22    Number 9  4/21/20 letter of dismissal........50
23
24
25

4

1            STIPULATIONS
2     It is hereby stipulated and agreed by and
3 between the parties hereto, through their respective
4 attorneys, that the video conference deposition of
5 CARLOS RISCO, DVM, may be taken on behalf of the
6 Plaintiff on JUNE 12, 2023, in the City of
7 Stillwater, Oklahoma by Brenda Schmitz, Certified
8 Shorthand Reporter within and for the State of
9 Oklahoma, and Registered Professional Reporter,
10 taken by notice pursuant to the Federal Rules of
11 Civil Procedure.
12     It is further stipulated and agreed by and
13 between the parties hereto, through their respective
14 attorneys, that all objections, except as to the
15 form of the question and the responsiveness of the
16 answer, are reserved until the time of trial, at
17 which time they may be made with the same force and
18 effect as if made at the time of the taking of this
19 deposition.
20
21
22
23
24
25

5

1     And thereupon the following witness was produced
2 by the Plaintiff:
3            CARLOS RISCO, DVM,
4 the witness hereinbefore named, being first duly
5 cautioned and sworn to testify the truth, the whole
6 truth, and nothing but the truth, testified on his
7 oath as follows:
8            DIRECT EXAMINATION
9 BY MR. BACH:
10     Q.  Hi, can you state your name for the
11 record, please?
12     A.  My name is Carlos Risco.
13     Q.  And, Dr. Risco, you understand that my
14 name is Jason Bach, I'm the attorney who represents
15 Jonathan Rivera-Pierola and you understand that he
16 has brought a lawsuit against the university?
17     A.  I do.
18     Q.  Okay.  Have you ever given a deposition
19 before?
20     A.  I have, sir.  Years ago.
21     Q.  Okay.  You understand that the court
22 reporter is taking down everything that's being said
23 here today?
24     A.  I do.
25     Q.  Okay.  And the oath that you took is the

Carlos Risco, DVM
June 12, 2023

6

1  same oath that you would take in court; you
2  understand that?
3      A.  I do.
4      Q.  Okay.  If -- you're doing great here so
5  far, but I just wanted to ask if you could give a
6  verbal, audible response to my questions, you know,
7  for example, a yes or a no as opposed to a huh-uh or
8  uh-huh or a shake of the head or something along
9  those lines.
10     A.  Okay.
11     Q.  Just so we have a clear record here today,
12 okay?
13     A.  Yeah.
14     Q.  If I ask you a question and you don't
15 understand the question, please feel free to ask me
16 to rephrase it, repeat it, I'll do whatever I can to
17 make you understand what it is that I'm asking here
18 today, okay?  However, if I ask you a question and
19 you answer the question, I'm going to assume that
20 you understood the question; is that fair?
21     A.  Yes.
22     Q.  Okay.  I don't think that we're going to
23 be very long here this morning.  But if at any point
24 you want to take a break, we certainly can.  The
25 only thing I would ask is that if there's a question

7

1  that is pending, that you answer the question before
2  we take that break.  Okay?
3      A.  Yes.
4      Q.  Dr. Risco, can you tell me how you're --
5  you're currently employed?
6      A.  Yes.  I'm currently a professor and Dean
7  of the College of Veterinary Medicine at Oklahoma
8  State University.
9      Q.  And how long have you been in that role?
10     A.  A little over five years.
11     Q.  Okay.  Do you recall the date that you
12 became the Dean?
13     A.  Yes.  March 1st, 2018.
14     Q.  Okay.  And -- and before that date, how --
15 how were you employed before that?
16     A.  Prior to arriving here at Oklahoma State,
17 I was a professor at the University of Florida
18 College of Veterinary Medicine for 27 years.  Of
19 those 27 years, the last six, I was a chair of the
20 Department of Large Animal Clinical Sciences at the
21 College of Veterinary Medicine, University of
22 Florida.
23     Q.  When you came to Oklahoma State, did
24 you -- did you learn of a relationship that Oklahoma
25 State had with St. Matthew's University?

8

1      A.  I did, yes.
2      Q.  Okay.  And what is your understanding of
3  what that relationship was?
4      A.  With St. Matthew's University School of
5  Veterinary Medicine, along with two other, Ross
6  University at Saint Kitts and St. George University,
7  my understanding is, and still is, that we would
8  receive their students during the fourth year.
9      So they complete their preclinical training,
10 and then that they would apply to our college and we
11 would accept them, and provide what we call their
12 clinical training, which is -- which is the last
13 year of their veterinary -- of their veterinary
14 training.
15     Q.  And do you know if Oklahoma State and St.
16 Matthew's University had a contractual agreement of
17 some kind?
18     A.  I -- yes, yes, I do.  We -- we had a
19 contractual agreement that we -- that their students
20 would apply, we would evaluate them and then accept
21 them into that program.
22     Q.  Okay.  Do you know if St. Matthew's
23 students who attended Oklahoma State while you've
24 been there, if they have done as well as Oklahoma
25 State students, or better or worse than Oklahoma

9

1  State students?
2      A.  To my recollection, I would say that they
3  have done as -- as well, as other -- as other
4  students.
5      Q.  Other than paying the tuition that the --
6  that the student would pay, did Oklahoma State
7  receive some sort of financial compensation for
8  admitting students from St. Matthew's?
9      A.  No.
10     Q.  So it was just the tuition that the
11 student would pay?
12     A.  That's -- that's correct.
13     Q.  When's the first time that you recall
14 learning of Mr. Rivera-Pierola?
15     A.  Not sure of the exact date, but sometime
16 in October of 2019, my former Associate Dean of
17 students and academic affairs, Dr. Margi Gilmour
18 shared with me that Jonathan, Mr. Rivera, had failed
19 the small animal internal medicine rotation.  And
20 that therefore, he -- as it is our policy that the
21 student, in this case, Jonathan, would go in front
22 of the Professional Standard Committee and to learn
23 more about -- the committee wanted to learn more
24 about the circumstances of -- of why he failed that
25 rotation.

Carlos Risco, DVM
June 12, 2023

10

1    Q.  And do you know if, in fact, he did go
2  before the committee?
3    A.  My recollection is that he did, he went --
4  he -- or I don't recall whether he personally went
5  to, in front of, participated, with -- with the --
6  let's just call it a PSC, we call it a PSC,
7  Professional Standard Committee, but I do know that
8  the committee was aware of the circumstances that
9  led to his poor performance in -- in that rotation.
10   Q.  And do you know what action the committee
11 took?
12   A.  The action that the committee took was to
13 allow him to repeat that rotation.
14   Q.  And did you have -- have any type of say
15 in it?
16   A.  I did not.
17   Q.  Did --
18   A.  So, no, sorry, no.
19   Q.  Okay.  Did you review that decision?  Is
20 that something that you would review and approve?
21   A.  At that -- I -- I did review the -- that
22 decision in terms that the report was provided to me
23 and I was comfortable with it, I said, this is a --
24 so I was fine with it, but I did not have any say-so
25 in that -- in that recommendation.

11

1    Q.  Okay.  You didn't share your opinion as to
2  what you thought that they should do?
3    A.  No.
4    Q.  You say that was October of 2019; is that
5  right?
6    A.  Yes, sir, that's my -- that's my
7  recollection.
8    Q.  Okay.  After that matter, what was the
9  next time that you recall hearing anything about --
10 about Jonathan?
11   A.  Sometime in March, 2020, okay, it was
12 brought to my attention by, again, by Dr. Gilmour,
13 Margi Gilmour, that Jonathan had failed community
14 practice, okay.  And that because he was in academic
15 suspension at that time in March, that he would,
16 again, go in front, this -- in this situation, I am
17 aware that he -- he was asked to be -- to come in
18 front of the Professional Standard Committee, they
19 had some questions, to give him an opportunity to --
20 to share the circumstances that may have led to his
21 poor performance in community practice.  Because he
22 received a D grade.
23   Q.  Okay.  And do you recall who the
24 instructors were in that -- in that course?
25   A.  In the community practice, there were

12

1  Dr. Paul DeMars and Dr. Lara Sypniewski.
2    Q.  Were you made aware of a discussion that
3  took place with -- with Jonathan and those two
4  instructors that became kind of a heated
5  conversation?
6    A.  Not -- not in person, just reading the --
7  I did not witness it personally, I was not there.  I
8  became aware of it as I reviewed the material
9  that -- pertinent to this case.
10   Q.  Okay.  So, in -- in preparation for
11 your -- your deposition here today, is that -- is
12 that when you learned it?
13   A.  That's correct.
14   Q.  Okay.  But at the time, back in 2020, you
15 were not aware of that?
16   A.  No, sir.
17   Q.  Okay.  Other than speaking with a counsel
18 for the university, what did you do to prepare for
19 your deposition today?
20   A.  I reviewed the documents pertinent to --
21 to this case, mainly communications, e-mail
22 communications that I've received from Margi
23 Gilmour, Dr. Gilmour, as well as Dr. Mason Reichard,
24 who was the chair of the Professional Standard
25 Committee, and the -- a summary of -- of the case, I

13

1  say summary of the timelines of -- of Jonathan's
2  situation at Oklahoma State.
3    Q.  Do you recall meeting with Jonathan's
4  parents at one point?
5    A.  I do, I do.  I met with Dr.
6  Rivera-Pierola, his father, and his mother.  I'm
7  trying to remember when, I didn't take any notes, so
8  I don't want to speculate on specific what the date
9  was, we met in our office, in my office, sorry, in
10 my office, and, yes, I did.
11   Q.  What did you discuss during that meeting?
12   A.  So, Dr. Pierola, we -- we exchanged some
13 pleasantries in the sense that I've been at the
14 University of Florida for -- for a number of years,
15 so he was familiar with our college of veterinary
16 medicine.  Then he did, Dr. Pierola did --
17 Rivera-Pierola then shared with me that his son,
18 Jonathan, was having some challenges, as I recall,
19 in -- in our program.  I did -- I let them know that
20 I was not -- at that time, I was not aware of the
21 specific challenges that Jonathan was having.
22   We had a discussion about both kind of
23 reminiscing a little bit about -- he's about my age,
24 Dr. Pierola is, and kind of reminisce a little bit
25 about our time as veterinary students, and I did

Carlos Risco, DVM
June 12, 2023

14

1 mention to him that our students today probably face
2 more challenges than our generation did, simply
3 because there were -- there's more information, far
4 more information, and we still have eight hours a
5 day, so we talked a little bit about that.
6      He -- they -- I'm trying to remember, I think
7 it was both of them that they shared with me, you
8 know, some of the challenges that Jonathan was
9 facing coming to just leaving the island of St.
10 Matthew's, coming to the United States in the sense
11 a new college of adapting to a different -- a
12 different way of learning.
13      And I distinctly remember saying to them that
14 this is very typical.  Even our students, even our
15 Oklahoma State students, they finish their first
16 three years that we call the preclinical training,
17 and then they have to do clinical rotations, where
18 they're seeing clients, they're seeing patients, and
19 they're being instructed on the clinical aspect
20 of -- of a veterinary medical education, and that I
21 can see where that could be challenging, but it's
22 not unique to Jonathan, specifically.
23      And I did mention that our college has, our
24 veterinary college has a council, it's a
25 psychologist, that it's aware, that is there for all

15

1 of our students if they wanted to meet.  And I
2 recall we talked a little bit, also, about some of
3 the wellness programs that -- that the college has
4 under the direction of our Associate Dean of
5 students, and we talked a little bit about -- I
6 remember that I did make the comment, I said, you
7 know, we didn't have that back in the day that we
8 would have someone that is a trained psychologist
9 that can -- that the student can talk to them and
10 the students can -- and this person would listen to
11 them.  That's the recollection of the conversation
12 that I had with them.
13      Q.  Okay.  Did they ask you to do anything in
14 particular to help Jonathan?
15      A.  They -- they did not.  Said, would you
16 look into this, and I think that they were very
17 respectful in that sense, I think they just wanted
18 to share -- they wanted me to hear the -- Jonathan's
19 situation, but, no, they -- they did not.
20      Q.  Do you recall if this is before or after
21 you learned that Jonathan had not passed the
22 community practice rotation?
23      A.  I don't recall.  I don't --
24      Q.  Do you recall --
25      A.  I'm sorry?

16

1      Q.  It would have been around the same time?
2      A.  I would say it would have to have been
3 around the same time that Jonathan must have
4 received notification that he had failed the
5 small animal internal medicine rotation or the --
6 the community practice.  But I just -- I don't
7 recall specifically when did that meeting occur.
8      Q.  Okay.  Did his parents ask you to not
9 dismiss him from the program?
10      A.  I don't recall that they specifically
11 asked me that.
12      Q.  Getting back to the community practice
13 rotation, you said that there came a point in time
14 when you learned that Jonathan had not passed that
15 rotation; is that right?
16      A.  Correct, yes.
17      Q.  And how did you learn that?
18      A.  In two ways.  As -- as it's our protocol,
19 so I have an Associate Dean of Academic and Students
20 Affairs, that can -- Jonathan -- at that time was
21 Dr. Gilmour, and they always alert me, they come to
22 my office and they make me aware, Dean, we have
23 student that is in this -- in this situation, so, in
24 Jonathan's case, that he had failed community
25 practice.  And, of course, I was reminded that he

17

1 had also failed the small animal internal medicine.
2 The -- we had that discussion, so that's one.
3      And then the other one when I saw from Dr.
4 Mason Reichard, who's the chair of the Professional
5 Standard Committee, a summary of the meeting that
6 they had with -- with Jonathan.
7      Q.  And what do you recall about that summary
8 that you received from the PSC?
9      A.  That the summary was -- I'm going to use
10 the same word again, it was the summary of -- a
11 history of Jonathan's performance, I went back to
12 his failure in small animal internal medicine, and
13 then also the -- that he had failed community
14 practice.
15      The -- the context, the primary context or the
16 crux of that communication to me was that -- that
17 the PSC committee had met with Jonathan and they
18 allowed him time to share with the committee the
19 circumstances that may have led to his poor clinical
20 performance, okay?  And based on the faculty
21 evaluation, so, Jonathan was -- was given an
22 opportunity to discuss the -- the circumstances,
23 what was the situation that led to his poor
24 performance.
25      And then the conclusion of that summary was --

Carlos Risco, DVM
June 12, 2023

18

1  from the Professional Standard Committee was that
2  they listened to Jonathan, but that he did not
3  express to them a compelling argument of, one, what
4  led to the poor performance, and secondly, how would
5  he mitigate the circumstances that -- what would he
6  do different, to improve on that clinical
7  performance.
8      Q.  And do you recall if the PSC made a
9  recommendation of some kind?
10     A.  They did.  They recommended dismissal of
11 the program -- from the program.
12     Q.  And -- and that was a recommendation that
13 went to you; is that -- is that correct?
14     A.  Yes.
15     Q.  Okay.  How does that process work, can you
16 explain to me when there is a recommendation for
17 dismissal, how does that process operate and who has
18 the final say in that?
19     A.  I have the final say.  And that's
20 according to our policy.  So, in this situation,
21 the -- when I received the summary from -- from the
22 PSC, I -- I studied it, I -- and I agreed with it,
23 okay.  So I approved it, if you will, I took their
24 recommendation under the circumstances that Jonathan
25 be dismissed from the program.

19

1      Now, according to our guidelines and policies,
2  the student is given an opportunity to provide an
3  appeal, okay, a written appeal to the PSC again,
4  giving another opportunity to explain what led to,
5  in this case, Jonathan's poor performance, and then,
6  again, what would he do, what would the students do
7  to improve on those -- on those areas that the
8  faculty feel that the student was deficient on.  And
9  then I did -- I did -- so that -- I did receive that
10 appeal later from Jonathan.
11     Q.  Okay.
12     A.  That was going to be shared back to the
13 PSC committee.
14     Q.  Okay.  Did there come a point in time when
15 you -- you met with Jonathan in person?
16     A.  I did.  So the -- after I read Jonathan's
17 appeal, okay, I -- I sent a communication to, again,
18 Dr. Mason Reichard, who's the chair of the PSC, for
19 them to reconsider their recommendation to me to
20 dismiss -- to dismiss Jonathan from the program
21 based on the context of his appeal.
22     Q.  Did you believe that there was something
23 in his appeal that warranted their reconsideration?
24     A.  I -- I did.  From my perspective and in
25 reading his appeal, then I think I need to -- I need

20

1  to -- soon after I read the appeal -- let me -- let
2  me give you the timeline.  So, when I read the
3  appeal, and then I recommended and I send it to the
4  PSC to reconsider, I met in -- I met with Jonathan,
5  so he -- that was the first time, as I recall, that
6  I met with Jonathan, so I met with him in my office
7  after he had -- after he had received notification
8  that he was being dismissed, and then after he had
9  written the appeal.
10     So, to answer your question, I think, in my
11 mind, it's both.  What I read in the appeal that was
12 followed by a conversation that I had with Jonathan
13 in person, that he had expressed a compelling plan
14 of action to improve his clinical performance.  And
15 also, what would he do to correct the circumstances,
16 or not to allow himself to be in the same
17 circumstances that resulted in his poor performance.
18 And that was my decision.
19     Q.  Was there anything in particular, or
20 specifically that he said to you in that meeting
21 that -- that changed your mind?
22     A.  He -- and I don't have the document in
23 front of me, but he reiterated what he had mentioned
24 to -- to the Professional Standards Committee, but
25 my discussions with Jonathan, in person, were

21

1  more -- I took the tone more of a faculty-student
2  interaction.
3      Prior to my time here at Oklahoma State, as I
4  mentioned, 27 years, almost 28 years at the
5  University of Florida, I was a faculty member and I
6  taught students in the clinical setting, so we had a
7  conversation that addressed, at least I addressed
8  it, I said, Jonathan, these are the issues that
9  faculty have brought to your attention, better case
10 preparation, better communication with the -- with
11 the faculty, improving knowledge.  I even recall
12 giving him suggestions, this is what I think you
13 need to do in the evenings, you need to review.  You
14 know that there's cases, you may know ahead of time
15 the type of case that you're going to see, you need
16 to review, you need to prepare better.  And it all
17 centered around his -- his knowledge base, you need
18 to improve that.
19     Primarily, the discussion that I had with him
20 was that he -- he needs to do a better job in
21 receiving, accepting constructive criticism from the
22 faculty, from his clinicians.  We spent a few
23 minutes, I mentioned to him, they're there to help
24 you.  And you need to know what you know and what
25 you don't know, and what you don't know, after being

Carlos Risco, DVM
June 12, 2023

22

1    trained to be a veterinarian, you need to accept
2    that and you have to remediate, whether that's
3    following up with the faculty or the clinician or,
4    as I mentioned, continuing to study, to review
5    clinical material, particularly to the rotation that
6    you're at.
7        So based on that, I -- I made the decision to
8    give him, actually, what would be a third chance,
9    and then I -- I -- it's not a question of
10   overturning the -- well, I guess I did overturn the
11   recommendation from the Professional Standard
12   Committee, and I allowed him to come back, to stay
13   in the program with the stipulation that he needed
14   to -- the next -- the next rotation that he was
15   going to go into was anesthesia, so you need to --
16   you need to have a letter grade of C or better, and
17   then also that he was on academic probation, that he
18   would go back, so I was going to allow him to go
19   back and repeat the small animal internal medicine
20   and community practice, and in those, also, he
21   needed to make a letter grade of C or better.  And
22   that -- that was presented to -- to Jonathan.
23       Q.  And was that -- were those conditions or
24   stipulations that -- that you came up with, or were
25   they recommended by someone else?

23

1        A.  They came from me.  Well, I'm sorry, let
2    me be -- the fact -- the fact that he had received
3    the letter grade of D in those rotation, according
4    to our policy, they -- he would be on academic
5    suspension -- probation, I beg your pardon, be on
6    academic probation, he was allowed to come back, and
7    the stipulation of a C or better, that's policy.
8    What I meant was my -- my suggestions, the
9    suggestions that I offer to Jonathan to improve in
10   his -- in the rotation, those were discussions that
11   I had with him.
12       Q.  Okay.  Did Dr. Gilmour ever express to you
13   that she was opposed to Jonathan being allowed to
14   come back?
15       A.  No.
16       Q.  Did she make any recommendations to you as
17   to what you should do with Jonathan?
18       A.  No.  The only -- the only -- not
19   recommendations, but that she did review with me the
20   policies that -- that we have.
21       Q.  Did anyone on the PSC ever express to you
22   that they were opposed to your decision to allow
23   Jonathan to return?
24       A.  Individually, no.  I just -- I never
25   discuss Jonathan's case with any member of the PSC

24

1    committee, I would say that it was in the written --
2    in the written -- in the written communication to me
3    after I requested for them to -- to remove the
4    recommendation, or reconsider the recommendation to
5    dismiss him, but that -- that came from the
6    committee.  That was a report that I received from
7    the committee.  But no -- no personal conversations,
8    no one came to my office and talked to me about it.
9        Q.  Okay.  So after you made that decision, I
10   assume that Jonathan was informed of your decision;
11   is that right?
12       A.  Yes.
13       Q.  And what do you recall happening after
14   that with Jonathan?
15       A.  So, my -- my recollection is, I was -- I
16   was cc'd on the communication, I believe that came
17   from Dr. Gilmour, explaining that the Dean had
18   agreed to allow you -- allow Jonathan to remain in
19   the program, in other words, to continue, with the
20   stipulations that he needed to make a C or better in
21   the subsequent rotations that he was going to -- he
22   was going to receive.
23       And I'm guessing that that must have been
24   sometime around April that he did receive the --
25   yes, because I made sure that, yes, these are the

25

1    stipulations that him and I talked about, and
2    that -- that's -- at that time, that's all that I
3    recall.
4        Q.  Okay.  And this was in March or April of
5    2020, at the beginning of COVID; is that right?
6        A.  That's correct, yes.
7        Q.  Okay.  And what type of changes were going
8    on with the clinical instruction during that time?
9        A.  So, on the -- on the didactic of the
10   students, I think there were about two or three
11   weeks, students that were not on clinic, so this is
12   the preclinical students, all the education, all the
13   lectures were provided by distance, distance
14   education.  For the clinical side, there was a --
15   what I call a hybrid, where the students were -- we
16   couldn't obviously bring all the students to -- to
17   the hospital, so it's kind of like what I call a
18   hybrid, that case presentations were provided, were
19   provided via Zoom or remotely, each service did it a
20   little bit different.  There was a delivery of
21   knowledge.
22       One of the things that I wanted to make sure of
23   when we made this change is on the clinical
24   training, it's not just learning skills, it's not
25   just learning how to give a vaccination or how to

Carlos Risco, DVM
June 12, 2023

26

1  give an intravenous injection, there's knowledge.
2  The student is still acquiring knowledge,
3  particularly on the case, the diagnosis, the
4  physical examination, the diagnosis of the case, so
5  we made -- I made sure that that continued, and that
6  was done through what I call this hybrid.  And then
7  the cases were presented.
8      And I don't recall if it was in -- it wasn't in
9  anesthesia, there were in some rotations that the
10  students -- and we did this later in the summer, we
11  did this in June or July of 2020 that we split up
12  the students and some were allowed, obviously lower
13  numbers of students, to come to the rotation and
14  participate in person, like a Group A and a Group B.
15      **Q.  Do you recall which rotation that Jonathan**
16  **was in when you first went remote?**
17      A.  He was about to enter anesthesia.
18      **Q.  And --**
19      A.  Anesthesiology.
20      **Q.  And do you know who his instructor was for**
21  **that?**
22      A.  His instructor was Dr. Di Concetto.
23      **Q.  Did there come a point in time when you**
24  **learned that Jonathan received a low grade in his**
25  **anesthesia rotation?**

27

1      A.  Yes.
2      **Q.  And do you recall who informed you of**
3  **that?**
4      A.  That would have been, as is usual, as is
5  usual, the case, that would have been Dr. Gilmour,
6  because I -- any information regarding a student
7  case, and this is -- this is my practice as Dean, I
8  delegate to the Associate Dean of students, in this
9  case, Dr. Gilmour, and then that person informs me.
10  So, that's -- that was the situation with
11  Jonathan.  I don't -- I don't remember if it was a
12  week or two week, I don't exactly remember when
13  the -- in the course, I know that he was -- must
14  have been towards the end of that course, that
15  Dr. Gilmour did tell me, he says, I need to inform
16  you that Jonathan has failed the -- that rotation.
17      **Q.  Were you also informed by Dr. Gilmour that**
18  **Dr. Di Concetto wanted to give Jonathan another**
19  **opportunity?**
20      A.  I don't recall -- I don't -- yes, the
21  answer to that is yes, but I don't recall when in
22  the timeline that happened.
23      **Q.  Okay.  Was there a final decision to**
24  **dismiss Jonathan from the school at that time?**
25      A.  So, there was.  And that was my decision

28

1  in that he had not met the stipulation that we had
2  asked for in maintaining a -- a grade of C or
3  better, and then that he would be dismissed, and
4  Dr. -- Dr. Gilmour informed him of that decision, and
5  cc'ing me.
6      **Q.  Okay.  But that was your decision to make;**
7  **is that -- is that right?**
8      A.  Yes, because he -- let me -- sorry, let me
9  go back, because then it goes back to the
10  Professional Standard Committee, okay, so, they
11  evaluate the situation, and then it -- because the
12  committee had already recommended to dismiss him,
13  and I felt that I had spoken to Jonathan --
14  Jonathan, then ultimately was my -- my decision.  As
15  it is in any -- because remember, that the
16  Professional Standards Committee, after they
17  evaluate the students, they make a recommendation to
18  the Dean, and then the Dean decide.
19      **Q.  Okay.  Do you know if Jonathan was given**
20  **the opportunity to go before the PSC after he failed**
21  **his anesthesia rotation?**
22      A.  He -- he was not, because that was, as I
23  recall, that was one of the stipulations, that it
24  was kind of like a final decision in the sense that,
25  look, we're going to allow you to come back, okay,

29

1  on academic probation and you need to make a grade
2  of C or better, and that would be the final
3  decision.
4      **Q.  Okay.  When you made the decision to**
5  **dismiss Jonathan, did you take into account the**
6  **concerns that Dr. Di Concetto had about that**
7  **particular rotation?**
8      A.  I did.  As I recall, yes, I did.
9      **Q.  But you didn't feel that those concerns**
10  **warranted giving Jonathan another opportunity?**
11      A.  I did not.
12      **Q.  Why not?**
13      A.  Well, I felt that, you know, he had been
14  given opportunities to remediate, if you will,
15  certainly, with the discussions that he had with
16  him, and then I felt that -- and I don't remember
17  how many other students, a core group of students
18  that were with him in anesthesia had done well,
19  they -- they -- so I felt that the opportunity to
20  learn was -- even though it was difficult, because
21  it was a new, you know, circumstances with COVID,
22  that the other students did well, so I felt that he
23  had been given ample opportunities, we had -- we had
24  a good discussion about what he could do, so that
25  was my final decision.

Carlos Risco, DVM
June 12, 2023

30

1    Q.  When you say that you had a discussion
2  about what he could do, are you talking about the
3  meeting that you had had with him previously?
4    A.  Yes.  That goes back to -- to that -- not
5  of his letter of appeal, but on the one-on-one that
6  him and I had.
7    Q.  All right.  I'm going to -- I know you
8  have the exhibits there printed out, I believe,
9  right?
10    MR. PRATT:  We do.
11    Q.  We've talked about almost all of these
12  here, but I just want to take you through some of
13  these -- these documents here and make sure that I
14  understand everything here.  The first one I'd like
15  to look at is marked Board 01177 through 1178.  If
16  we could mark that as Exhibit 1.
17    MR. PRATT:  Jason, on the ones that we
18  were sent, none of them have Bates stamp numbers on
19  them.
20    MR. BACH:  You're kidding.
21    MR. PRATT:  No, I don't know why.  We have
22  as the first one, though, an e-mail sent on March
23  22nd, 2020 to Margi Gilmour.
24    MR. BACH:  Okay.
25    MR. PRATT:  Is that -- is that correct?

31

1    MR. BACH:  Yes.  So, it would be the first
2  two pages of that.  So it should be in order.
3    MR. PRATT:  It is.  I believe we have them
4  in the order they were sent, but for whatever
5  reason, these documents, at least I don't see any of
6  them that have Bates stamps on them.
7    MR. BACH:  Does the court reporter have
8  Bates stamps on them, on the documents?
9  BY MR. BACH:
10    Q.  Let's just go ahead here and I'll make
11  sure I do everything I can here and make sure we're
12  looking at the right -- right document here, so...
13    But, Dr. Risco, if you could take a look at
14  those two pages and let me know when you've had an
15  opportunity to -- to see that.
16    A.  These two?  So, yeah, the one -- the one
17  that I have, it says from Dr. Gilmour, "Carlos, we
18  can talk with this Monday when you have time."  Is
19  that the one that you're referring to?
20    Q.  Yes.
21    A.  So prior to that, yes, I'm aware of this
22  communication.
23    Q.  And then it looks like that there was a
24  meeting scheduled for that Monday at 11:00 a.m.; is
25  that right?

32

1    A.  That is correct, yes.
2    Q.  And that -- who attended that meeting?
3    A.  That was Dr. Gilmour and myself.
4    Q.  There was --
5    A.  That I recollect.
6    Q.  Okay.  No one else was there?
7    A.  No one else, no, sir.
8    Q.  And what did you discuss at -- at that
9  meeting?
10    A.  At that time, we -- we discussed the
11  recommendation, so, if you read below, "Dr. Gilmour,
12  please find attached a letter recommending dismissal
13  of Jonathan Rivera," so we discussed that summary,
14  and that's where I -- that's with Dr. Gilmour,
15  that's when I became aware of Jonathan's situation.
16    Q.  But you said that Dr. Gilmour didn't make
17  any type of recommendations as to what you should
18  do?
19    A.  I -- I -- what -- no.  She -- she did not
20  say to me, I think you should accept the
21  recommendation by the PSC.  We -- we -- we did -- we
22  did review in this meeting also his -- Jonathan's
23  failure in small animal internal medicine, and then,
24  of course, his failure in community -- in community
25  practice, but that's -- that's my recollection of my

33

1  meeting with her.  And the main thing that I did is,
2  I asked Margi to make sure that we are compliant of
3  our policies and guidance.
4    Q.  Okay.  All right.  If you take a look at
5  the next two pages, which should be an e-mail from
6  Jonathan to you on March 24th of 2020.
7    A.  Okay.
8    Q.  And there's an e-mail that apparently is
9  scheduling that meeting; do you see that?
10    A.  Yes.  Okay, I see it.
11    Q.  All right.  I'm going to mark this as
12  Exhibit Number 2, and just for the records, Board
13  01223 through 224.  Dr. Risco, let's call your
14  attention to the first page of this document, this
15  e-mail from Jonathan.  In here he says that he
16  wants -- he wants to meet with you as soon as
17  possible, and then he mentions in the second
18  sentence a meeting that you had with his parents a
19  few weeks before that.  Do you see that?
20    A.  Yes.
21    Q.  Do you believe that that's an accurate
22  reflection of the timeline as to when you may have
23  met with his -- his parents?
24    A.  I would say it is, based on the date.
25    Q.  Okay.  And the meeting that was scheduled

Carlos Risco, DVM
June 12, 2023

34

1  with Jonathan is the one-on-one meeting that we had
2  previously talked about here today; is that right?
3       A.  Yes.
4       Q.  All right.  And if we could go on to the
5  next set of documents here, and this is going to be
6  one, two -- six pages.  Starting with an e-mail from
7  Jonathan on March 29th of 2020.  And just for the
8  record, it is Board 01296 through 1301, we'll mark
9  as Exhibit Number 3.
10      Do you have those -- those pages in front of
11  you?
12      MR. PRATT:  I'm trying to ensure that we
13  have the same document.  So, it starts -- it starts
14  with an e-mail sent Sunday, March 29th, 2020 at
15  5:54?
16      MR. BACH:  Right, that's right.
17      MR. PRATT:  Okay.  And it's followed --
18  that is followed by an attached letter of appeal?
19      MR. BACH:  Right.
20      MR. PRATT:  Okay.  And that's a two-page
21  letter.
22      MR. BACH:  Right.
23      MR. PRATT:  Followed by an e-mail that
24  says, "Jonathan's letter, we can discuss"?
25      MR. BACH:  Right.

35

1       MR. PRATT:  It also has the same appeal
2  attached?
3       MR. BACH:  Exactly.
4       MR. PRATT:  And is that --
5       MR. BACH:  That is it.
6       MR. PRATT:  That's it.  Okay.  Just making
7  sure.  I'm sorry, I know that's -- I don't know why
8  the Bate stamps -- if that's on our end or what.
9       MR. BACH:  And, Clint, if you want to take
10  a break, I can have those re-sent over to you, so
11  that you have the ones with Bate stamps on them.
12      MR. PRATT:  They're in order, unless it's
13  causing you a major problem, I think we can navigate
14  it.
15      MR. BACH:  Okay.  All right.
16      THE WITNESS:  Okay.
17  BY MR. BACH:
18      Q.  Okay.  Do you -- I'm sorry, do you recall
19  receiving this document or this e-mail from -- from
20  Jonathan?
21      A.  Yes.
22      Q.  And I -- I believe that you had said
23  earlier that there were some things in his -- his
24  written appeal that resulted in you ultimately
25  making a decision to not dismiss him; is that right?

36

1       A.  That's correct.  That's -- that's his
2  appeal, the attachment, his appeal, that's correct.
3       Q.  All right.  Can you tell me what portions
4  of this appeal changed your mind?
5       A.  May I -- may I take a --
6       Q.  Absolutely.
7       A.  So, on -- on the first page where it says
8  that he addresses the letter to me and the members
9  of the Professional Standard Committee, on that --
10  on that first page he discusses what I mentioned
11  earlier of how -- you know, how would he mitigate
12  the circumstances that led to his poor performance,
13  and then on the second page is, if you -- second
14  page, those four items of communication, case
15  preparation, patient care, and then demonstration of
16  professional ethical behavior, those four points,
17  that's what I -- that's what I mentioned to you
18  earlier that I felt that he had provided me with a
19  compelling plan, plan of action to -- to improve his
20  clinical performance.
21      Q.  And did you receive this after you had met
22  with him, after you met with Jonathan?
23      A.  My recollection is that I received -- I
24  received this first -- I received this documentation
25  before I met with him in person.

37

1       Q.  Okay.
2       A.  And -- and go ahead.
3       Q.  To -- to possibly refresh your
4  recollection here, if you could go back and look at
5  the second exhibit that we had here a few minutes
6  ago, and take a look at the dates on those e-mails
7  and tell me if that refreshes your recollection at
8  all as to that.
9       A.  So March -- March -- Tuesday, March 24,
10  I'm trying to see -- okay.  So, what I have here is
11  March 24th, 9:39 a.m., from Melinda Tharp, telling
12  me that she would schedule -- I guess I will get
13  that on his calendar and I believe -- so I'm sorry,
14  and then the one below that was sent March 24th,
15  9:22 a.m. from Jonathan to Melinda Tharp, 1 -- at
16  1:30 p.m. would be a good time for me.  And if you
17  read below that, Melinda Tharp is saying -- is
18  asking Jonathan to e-mail you on his behalf to set
19  up a meeting for today and the availability that I
20  have.  So that indicates to me that, yes, it was
21  March -- March 24 when I met with Jonathan.
22      Q.  Okay.  And then if you look at the third
23  exhibit, it looks like that was sent on March 29th;
24  is that right?
25      A.  Correct.  Okay, yes, March 29th from

38

1  Jonathan, it was attached is his appeal letter.
2      Q.  Okay.  And so it would appear to me that
3  according to these e-mails, that you met with him on
4  March 24th, and then you received his written appeal
5  on March 29th; is that accurate?
6      A.  I -- I would -- I would agree with that,
7  based on the dates, yes.
8      Q.  Okay.  Okay.  Do you recall when you met
9  with Jonathan, if you gave him any suggestions as to
10 what he should include in his written appeal?
11     A.  Yes.  I recall that mentioning to him that
12 it's not only -- not only to me, the Dean, but also
13 that it would be helpful to the Professional
14 Standards Committee, and I think that's what he
15 included in here, what he would do, what actions he
16 would take to improve.
17     Q.  Okay.  And if you -- so with Exhibit 3
18 here, if you went to the fourth page in this,
19 there's an e-mail from Dr. Gilmour to yourself on
20 March 30th of 2020?
21     A.  March 30th?
22     Q.  Right.
23     A.  Okay.  Yes.  What I have March 30th is
24 from me, is that the one -- Jonathan's letter, we
25 can discuss.

39

1      Q.  Yes, yes.  I misspoke, I apologize, it's
2  from you to Dr. Gilmour on --
3      A.  Okay.
4      Q.  -- March 30th, 2020.  Do you recall if
5  you, in fact, did have a meeting with Dr. Gilmour
6  and discussed this -- this letter from Jonathan?
7      A.  What I recall is that I met with her and
8  informed her that I had received this letter, this
9  appeal letter, but I don't recall if -- sorry, my
10 memory is -- the timing of when I received the
11 letter, the appeal letter and when I met with
12 Jonathan, and I recall that I mentioned to
13 Dr. Gilmour that, you know, based on his written
14 appeal, based on this appeal and the discussion that
15 I had, that I was going to recommend reinstatement.
16     Q.  Okay.  And do you recall if she shared
17 her -- her opinion on that?
18     A.  I don't specifically recall, I think that
19 she may have -- what I do recall is that she -- she
20 did tell me she felt that the standard of --
21 Professional Standard Committee did act accordingly
22 and that he was given an opportunity to, you know,
23 to -- to express his -- his plan of action, and what
24 he would do to -- to improve.
25     Q.  But that didn't sway your decision?

40

1      A.  No.
2      Q.  All right.  If we could go to the next
3  document, which is just a one-page document, an
4  e-mail from -- well, the top e-mail is from Margi
5  Gilmour to Robin Wilson on Monday, March 30th of
6  2020, and just for the record, it's Bates stamped
7  Board 01313.  If we could mark that as Exhibit 4.
8      A.  Yes, sir.
9      Q.  Below the e-mail on top, it just says FYI,
10 it appears to be an e-mail from you; is that -- is
11 that correct?
12     A.  I shared this with Dr. -- well, what I see
13 here is from Dr. Gilmour to Robin Wilson.
14     Q.  And then underneath --
15     A.  FYI, and then below is my recommendation
16 to Dr. Reichard, right, yes, sir.  I'm sorry, what
17 is your question?
18     Q.  In -- in this e-mail, you're simply
19 requesting that the committee reconsider --
20     A.  Oh.
21     Q.  Reconsider their decision; is that right?
22     A.  Yes, sir.  Yes.  So, you know, I mention
23 that I received from Jonathan the attached letter,
24 so it would be an appeal letter, and that I am
25 requesting that the committee consider his appeal

41

1  and respond or make further recommendations to me
2  within five days, yes.
3      Q.  And then the -- the last sentence of the
4  first paragraph there, it says, "Importantly, he
5  provides a plan to improve his professional demeanor
6  and performance on clinical rotations."  Do you see
7  that?
8      A.  Yes, sir.
9      Q.  Okay.  So, at that point in time, had
10 you -- had you already made the decision that you
11 were going to reinstate Jonathan --
12     A.  Yes.
13     Q.  -- regardless of what the committee did?
14     A.  Yes.
15     Q.  All right.  If we go can go to the next
16 document, which is one page, it's a letter addressed
17 to you on April the 3rd, 2020.
18     A.  Well, that one that have -- I'm sorry, I
19 have April the 3rd.  Yes, sir.
20     Q.  And just for the record, it is Board
21 01378, if we could mark that as Exhibit Number 5.
22     A.  Yes.
23     Q.  Do you recognize this document?
24     A.  Yes, sir.  I recognize it.
25     Q.  And this is a letter that the PSC sent to

Carlos Risco, DVM
June 12, 2023

42

1  you after you had asked them to reconsider their
2  decision; is that right?
3      A.  Yes.
4      Q.  And they came back and said they're
5  standing by their original recommendation, is
6  that -- is that fair to say?
7      A.  Yes.
8      Q.  All right.  And if we could go to the next
9  two pages here, which is -- starts off with an
10  e-mail from Dr. Gilmour to you on April 4th of 2020
11  at 4:05 p.m.?
12          MR. PRATT:  Jason, I only have that as a
13  single-page document.
14          MR. BACH:  Okay.  So, there should be
15  another page after that, that originally I think
16  they were separated, but I -- I don't think they
17  should have been and it's just the -- it says what
18  Risco proposed for JRP.
19          MR. PRATT:  Yes, I have those, they were
20  included as a separate exhibit, do you want to
21  combine those or just refer to them separately?
22          MR. BACH:  Yeah, let's combine those,
23  those were supposed to be together.
24          THE WITNESS:  Yes.  So, the document that
25  I have is from Margi Gilmour to me, Saturday, April

43

1  the 4th at 4:05 p.m., "Hi, Carlos, for your
2  information, I summarized the recommendations you
3  had outlined when we last spoke about Jonathan's
4  case.  I have attached them for your convenience in
5  case you would like to let Jonathan continue the
6  program."  Yes, sir.
7      Q.  Okay.
8      A.  That's the document.
9      Q.  All right.  And just for the record is
10  Board 01384 through 85, we can mark that as Exhibit
11  Number 6.  Dr. Risco, on the -- the page after that,
12  there's -- where it says, "What Risco proposed for
13  JRP," and there are a number of items that are
14  numbered one through six.  Do you see that?
15      A.  Yes, sir.
16      Q.  Are -- are these the stipulations that you
17  talked about earlier that Jonathan would have to
18  adhere to in order to stay in the program?
19      A.  Yes.
20      Q.  Okay.  And were each of these stipulations
21  your idea, or were any of them suggested by anyone
22  else?
23      A.  So -- so, they were my idea, based on
24  policies that we have.  So, for example, that he be
25  suspended from the program until we're back

44

1  in-person rotation and then remediate CP and small
2  animal medicine before allowing to complete
3  remaining rotations.  Must receive a C or higher,
4  and that he would be placed on -- yes, they -- they
5  are.
6      Q.  Okay.  And at that point in time, did you
7  have any idea as to when in-person rotations would
8  begin again?
9      A.  I did not.
10      Q.  And you said that they did start back in
11  person, you said around in June, I believe, is
12  that --
13      A.  We went back, we went to -- I think it was
14  June or July, that we went what we're calling kind
15  of like a hybrid, that we allowed students --
16  students were broken down into Group A, Group B and
17  they were allowed one or two days to come back to
18  the hospital and participate in -- in person.
19  That's what I -- what I recall.
20      Q.  Okay.  All right.  The next document is a
21  two-page document, and it's a -- a letter or memo
22  that is from you to the PSC on April 6th of 2020?
23      A.  Yes, I recognize this communication.
24      Q.  Okay.  And for the record, it's Board
25  01415 through 16, we can mark that as Exhibit Number

45

1  7.  Can you tell me what this document is?
2      A.  So, this document is April 6th from me, to
3  the Professional Standards Committee, to
4  Dr. Reichard, who was the chair.  And what it states
5  is that after consideration of the response to the
6  PSC committee that I have decided to take the
7  following actions that will allow him to remain in
8  the professional program with the following
9  conditions or stipulations, that he -- that he would
10  be allowed to complete his current rotation,
11  Rotation 16, and must achieve a C.  That he will be
12  placed on academic suspension, he must receive a C
13  grade or higher in both remediated rotations, yes.
14  And then that he will continue on academic probation
15  for the duration of his clinical year, failure to
16  receive a C grade or higher on any rotation during
17  the remainder of the year will result in dismissal
18  from the program without PSC review or appeal.  And
19  then the last bullet is that he will accountable for
20  the plan of improvement included in his letter of
21  appeal.  And that Dr. Gilmour will inform Jonathan
22  of my decision.
23      Q.  Okay.
24      A.  Yeah.  And then, of course, just that my
25  decision does not trivialize the concerns expressed

Carlos Risco, DVM
June 12, 2023

46

1 by the Professional Standard Committee, so --
2     Q.  Did you have any concern about not
3 following the recommendation of the PSC?
4     A.  I'm sorry, could you restate?
5     Q.  Sure.  Let me see if I can ask that in a
6 better way here.  I imagine it wasn't an easy
7 decision to reverse the recommendation of the PSC,
8 is that -- is that fair to say?
9     A.  That's correct.
10     Q.  Have you -- Is this the only time that you
11 have not followed the recommendation of the PSC?
12     A.  I don't recall in the five and a half
13 years that I've been Dean at Oklahoma State where I
14 have had to -- where I've reversed or did not
15 assent, I should say, the recommendation from the
16 PSC committee.
17     Q.  Okay.  All right.  If we can move on here
18 to the next set of documents, which are numbered
19 pages, let's see how many pages we have.
20     So it's seven pages that begin with an e-mail
21 from Dr. Di Concetto on Tuesday, April 21st at 11:07
22 a.m.  If you want to take a few moments and read
23 that.
24     A.  Yes, please do.
25     Q.  That's fine.

47

1     A.  Okay.
2     Q.  All right.  And just for the record,
3 it's -- the documents are Board 1464 through 1470,
4 we can mark that as Exhibit Number 8.  Dr. Risco, we
5 had previously talked about that Jonathan did not
6 receive a passing score, or passing grade in Dr. Di
7 Concetto's rotation; is that right?
8     A.  Correct.
9     Q.  And that was ultimately what led to you
10 making the final decision to dismiss him from the
11 program; is that -- is that accurate?
12     A.  Yes.
13     Q.  On the first page here of this exhibit,
14 there's an e-mail about two-thirds of the way down
15 from Dr. Di Concetto to Dr. Gilmour on April 20th at
16 5:39 p.m.  Do you see that?
17     A.  Yes.
18     Q.  Okay.  Have you seen this e-mail before?
19     A.  I have.
20     Q.  Had you seen this e-mail before you made
21 the decision to dismiss Jonathan from the program?
22     A.  I don't -- I don't recall the date and the
23 timing.  I don't -- I don't recall that.
24     Q.  Okay.  In the second sentence of that
25 e-mail, I'm just going to read those few sentences

48

1 here.  It says, "Given the abnormal nature of the
2 rotation, to me, it would make sense to allow
3 someone to repeat it once the circumstances are
4 normalized, especially when, in his case, failing
5 this unconventional rotation results in being
6 dismissed from the program.  And if the
7 circumstances don't become normal soon enough, I
8 think he should be at least allowed to retake the
9 written quiz with the agreement that if he fails it,
10 there will be no other chances."  Do you see that
11 there?
12     A.  Yes.
13     Q.  Okay.  You don't recall if you had seen
14 that, though, before you made the final decision to
15 dismiss Jonathan; is that -- is that right?
16     A.  I -- I don't.
17     Q.  Okay.  Regardless, this wouldn't have
18 swayed your decision one way or another?
19     A.  It -- it would not have.
20     Q.  Why not?
21     A.  Well, I -- as I mentioned earlier, I
22 felt -- so, I -- I felt that he -- he had given --
23 he was given the chance, and that his fellow
24 students, that the students that were in his group
25 that were in the same situation that he was, that

49

1 they successfully completed the -- that rotation.
2     Q.  Okay.
3     A.  And so I felt at the time that he -- he
4 was given, you know, a fair opportunity to come back
5 and -- and perform in that -- in that rotation.
6 That was my primary thought.
7     Q.  Did you have any conversations with Dr. Di
8 Concetto about that?
9     A.  I did not.
10     Q.  How about with -- with Dr. Gilmour, did
11 you have any discussions, outside of this e-mail
12 chain, with her?
13     A.  The -- the conversation that I recall
14 having with her is that we need to follow the policy
15 that is written in the syllabus, because that's
16 given to all of us, so what does the policy say.
17 And I do recall that I talked to her, I brought it
18 up, I told her, it seems that all the students were
19 given -- were under the same circumstances in that
20 rotation, you know, that were being trained
21 remotely, and that they did -- they performed well,
22 they completed their rotation.  And at the time, I
23 felt that it was -- that it was -- that the
24 students, that the situation was not a disadvantage,
25 that's -- when I refer to "the situation," I'm

Carlos Risco, DVM
June 12, 2023

---

50

1  talking about, you know, the way that anesthesia
2  rotation, I believe it was Number 16, was delivered,
3  that it wasn't a disadvantage, it wasn't a
4  disadvantage to the students.
5      **Q.  Okay.  If we could just take a look at the**
6  **final document here, which is one page, it appears**
7  **to be a letter from April 21st of 2020.  And for the**
8  **record is Board 01471, and if we could mark that as**
9  **Exhibit 9, please.  Have you seen this document**
10 **before?**
11     A.  I have.
12     **Q.  And can you tell me what it is?**
13     A.  So the document is from Dr. Gilmour dated
14  April 21st, 2020, "Dear Jonathan, I'm very sorry to
15  inform you that due to receiving a D grade in the
16  anesthesia rotation, per the academic suspension
17  guidelines outlined in the letter dated 4" -- "April
18  6th, '20, you are dismissed from our clinical year
19  program, with no Professional Standard Committee
20  review or appeal.  The Dean has reviewed your
21  academic record and has approved the dismissal
22  action."  And it is regrettably I relayed this
23  decision.
24     **Q.  And this was signed by Dr. Gilmour.  But**
25  **did this come at -- at your direction?**

---

51

1      A.  This -- this document came in discussion
2  with me with Dr. Gilmour, after -- after I became
3  aware that he had failed the anesthesia rotation, so
4  he got below a C, and then as it is our policy,
5  the -- I agreed that the Associate Dean for students
6  in academic affairs is the one that informs the
7  student, indicating that I had reviewed his records.
8      **Q.  And that's exactly what happened here,**
9  **right?**
10     A.  That's -- yes.
11     **Q.  Okay.**
12     MR. BACH:  All right, Dr. Risco, I
13  appreciate your time here today, I don't have
14  anything else to ask you here, so I'll pass the
15  witness.
16     THE WITNESS:  Thank you.
17         CROSS-EXAMINATION
18  BY MR. PRATT:
19     **Q.  I have one follow-up question, so I don't**
20  **think we need a break.  Well, I say one, I have a**
21  **couple, but I don't think it will take us very long.**
22  **Dean Risco, in one of your responses to Mr. Bach,**
23  **you briefly touched on the structure of the OSU**
24  **veterinary medicine program being a three-year**
25  **program for preclinical studies, and then a one-year**

---

52

1  **program for the clinical studies via clinical**
2  **rotations; is that correct?**
3      A.  Correct.
4      **Q.  Can you describe for us in a little more**
5  **detail the distinction or the difference between the**
6  **three years of preclinical studies versus what**
7  **students would experience in the singular year of**
8  **clinical studies?**
9      A.  Yes.  So, the first three years, as I
10  mentioned, are what we call the preclinical, they're
11  based in two areas.  One, and there's a series of
12  courses that they take, first year, second year,
13  third year.  Those clinical -- that preclinical
14  program, in essence, they prepare the student to
15  enter clinics.  The preclinical training is
16  lectures, expanse, so they're didactic lectures that
17  we're familiar with, and there's examination, some
18  courses may be a midterm with a final, some courses
19  are just a final.
20     If the student, our students, our Oklahoma
21  State students, if they -- if they do well, in other
22  words, they're not in any academic concern, then
23  they can move to the clinical rotation or the
24  clinical training.  The clinical training is
25  completely different.  The clinical training is

---

53

1  based, depending on the rotation, so, for example,
2  it could be community practice, it could be small
3  animal medicine, the student, with their clinician,
4  they see -- what we call, they see cases.
5      A case comes in, every rotation, that's a
6  little bit different, the student takes a history,
7  they do a physical exam and they're instructed by
8  the clinician on how to do a physical examination,
9  how to take a history, which tests, ancillary tests,
10 would they take blood work, et cetera, and then put
11 the case together and come up with what we call a
12 differential diagnosis.
13     And then the students, and this is what we call
14 rounds, which is away from the client, not in the
15 presence of the client, where the clinician asks
16 questions to the students, how did you arrive at the
17 diagnosis, did you consider this.  I'm going to
18 specific -- into specific detail.  What treatment
19 would you provide and why?  For example, why do
20 you -- why would you prescribe this antibiotics, and
21 that is the very essence of the formation of -- of a
22 veterinarian, active practice.
23     In addition, those students, again, depending
24 on the rotation, are responsible for -- if the
25 patient, while they're under our care to take, for

Carlos Risco, DVM
June 12, 2023

54

1  example, temperature, pulse, respiration, make
2  observations, working with the technicians who
3  administer the -- the treatment, and to provide back
4  to the clinician, how is the case progressing. Now,
5  the clinician is also involved, it's not like we
6  delegate it to the students, so they're working
7  together, that's -- that's the main difference.
8      Q.  Okay.  So, I don't want to put words in
9  your mouth, so please -- please tell me if this is
10  accurate.  The way I've heard you describe these two
11  separate portions of the program, the preclinical
12  versus the clinical portion, I believe the three
13  years of preclinical you have described are more
14  akin to what I think most people would perceive as
15  being a standard college course, you've described
16  lectures and exams.  Would you agree that's
17  accurate?
18      A.  Yes.
19      Q.  But it sounds like you described a unique
20  nature to the clinical portion of the program, it is
21  different from what the standard college course
22  would look like.  Is that correct?
23      A.  That's correct.
24      Q.  In your time as Dean of the Veterinary
25  School at Oklahoma State, are you aware of any

55

1  instances of academic integrity violations being
2  filed or brought against clinical students?
3      A.  No.
4      Q.  Do you know why that might be?
5      A.  When -- so the -- when we use this word
6  "integrity" in the -- there's a number of -- of
7  reasons why that may -- may happen.  One, the
8  obvious one, a student cheated on an exam.  They
9  copied each other, under that umbrella of cheating.
10  That's one.
11      Another one could be plagiarism, depending
12  on -- depending on the course, our students are
13  asked to gather a report for credit as part of their
14  credit, and, of course, it's plagiarism.  The other
15  one that it may happen is, in research, where you
16  simply come up with data, you fill in, and this is
17  not data that came from an observation, whether it's
18  a blood work, whether it's -- regardless of what it
19  is, those are the main -- the main areas.
20      It's -- they -- the integrity of this -- this
21  work in the clinical setting, would be very
22  difficult to -- to document, outside of the fact
23  that you may have a student that then they say,
24  well, the -- remember, I mention that they observed
25  the animal, the temperature, the pulse, the

56

1  respiration, they observe that the animal is eating,
2  and they don't observe, and they say, yes, this
3  is -- that would be a closest one that I could come
4  up with, with a lack of integrity.
5      MR. PRATT:  I have no other questions.
6          REDIRECT EXAMINATION
7  BY MR. BACH:
8      Q.  Dr. Risco, I do have a couple of follow-up
9  questions here.  When you made the decision to
10  dismiss Jonathan from the program, did you consider
11  the entirety of his academic record?
12      A.  I did.
13      Q.  And did you review his academic record?
14      A.  I did, as it was provided to me, yes.
15      Q.  Did you review any documents or e-mails
16  that indicated that Jonathan had been dishonest in
17  some of his rotations?
18      A.  What I -- what I recall reading in his --
19  in his evaluation from the faculty, the word
20  "dishonesty" was used, but I wasn't aware, I'm not
21  aware of any details, specifically, what does that
22  mean, or what was implied.
23      Q.  And were you aware of -- of allegations by
24  the faculty in the community practice rotation that
25  Jonathan had been unprofessional with them?

57

1      A.  Based on, again, the -- the information
2  that I received when I was studying his record,
3  there were indications that he had been
4  unprofessional in his communication, and I also did
5  ask Jonathan, again, in my meeting with him,
6  Jonathan, tell me, what -- what does that mean,
7  what -- what would have occurred, and that's when I
8  did a little bit of my coaching to him, suggestions
9  that I made to him, and it goes back to his
10  willingness and ability to take constructive
11  criticism.  That's my recollection of that.
12      MR. BACH:  I don't have anything further.
13      MR. PRATT:  Okay.  We'll read and sign.
14      MR. BACH:  All right.  Dr. Risco, I
15  appreciate your time here today.
16      (Deposition concluded at 11:34 a.m.)
17
18
19
20
21
22
23
24
25

**Page 58**

```
 1              ERRATA SHEET
 2
 3   WITNESS: CARLOS RISCO, DVM
 4   DATE: JUNE 12, 2023
 5   REPORTER: Brenda Schmitz, CSR, RPR
 6
 7   PAGE LINE  CORRECTION         REASON
 8   ____ ____ _____
 9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
25   ____ ____ _____
```

**Page 59**

```
 1            JURAT
 2
 3   I, CARLOS RISCO, DVM, do hereby state under
 4   oath that I have read the above and foregoing
 5   transcript in its entirety, and that the same is a
 6   full, true, and correct transcription of my
 7   testimony so given at said time and place, except
 8   for the corrections noted.
 9
10
11                _____
12                CARLOS RISCO, DVM
13
14
15
16   SUBSCRIBED AND SWORN TO BEFORE ME, the
17   undersigned Notary Public in and for the State of
18   _____ on this, the _____
19   day of _____
20   _____, 2023.
21
22
23                _____
24                Notary Public
25
     My Commission Expires: _____
```

**Page 60**

```
 1               CERTIFICATE
 2   STATE OF OKLAHOMA  )
                        )  SS:
 3   OKLAHOMA COUNTY  )
 4      I, Brenda Schmitz, Certified Shorthand Reporter
 5   within and for the State of Oklahoma, do hereby
 6   certify that the above-named CARLOS RISCO, DVM, was
 7   by me first duly sworn to testify to the truth, the
 8   whole truth, and nothing but the truth in the case
 9   aforesaid; that the above and foregoing deposition
10   was by me taken in shorthand and thereafter
11   transcribed; that the same is true and correct; and
12   that it was taken on JUNE 12, 2023, at the time of
13   10:04 a.m. in the City of Stillwater, County of
14   Payne, State of Oklahoma under the stipulations
15   hereinbefore set out, and that I am not attorney for
16   or relative of any of said parties or otherwise
17   interested in the event of said action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19   and official seal this 19th day of June, 2023.
20
21
22                _____
23                BRENDA SCHMITZ, CSR, RPR #8230
                  Oklahoma Certified Shorthand Reporter
24                Certificate No. 00823
25                Expires: December 31, 2023
```

REPORTED BY: BRENDA SCHMITZ CSR, RPR

Carlos Risco, DVM
June 12, 2023

61

**A**

**a.m** 31:24 37:11
    37:15 46:22
    57:16 60:13
**ability** 57:10
**abnormal** 48:1
**above-named**
    60:6
**Absolutely** 36:6
**academic** 9:17
    11:14 16:19
    22:17 23:4,6
    29:1 45:12,14
    50:16,21 51:6
    52:22 55:1 56:11
    56:13
**accept** 8:11,20
    22:1 32:20
**accepting** 21:21
**account** 29:5
**accountable** 45:19
**accurate** 33:21
    38:5 47:11 54:10
    54:17
**achieve** 45:11
**acquiring** 26:2
**act** 39:21
**action** 10:10,12
    20:14 36:19
    39:23 50:22
    60:17
**actions** 38:15 45:7
**active** 53:22
**adapting** 14:11
**addition** 53:23
**addressed** 21:7,7
    41:16
**addresses** 36:8
**adhere** 43:18
**administer** 54:3
**admitting** 9:8
**affairs** 9:17 16:20
    51:6
**aforesaid** 60:9

**age** 13:23
**ago** 5:20 37:6
**agree** 38:6 54:16
**agreed** 4:2,12
    18:22 24:18 51:5
**agreement** 8:16
    8:19 48:9
**AGRICULTUR...**
    1:8
**ahead** 21:14 31:10
    37:2
**akin** 54:14
**al** 1:8
**alert** 16:21
**allegations** 56:23
**allow** 10:13 20:16
    22:18 23:22
    24:18,18 28:25
    45:7 48:2
**allowed** 17:18
    22:12 23:6,13
    26:12 44:15,17
    45:10 48:8
**allowing** 44:2
**ample** 29:23
**ancillary** 53:9
**anesthesia** 22:15
    26:9,17,25 28:21
    29:18 50:1,16
    51:3
**Anesthesiology**
    26:19
**animal** 7:20 9:19
    16:5 17:1,12
    22:19 32:23 44:2
    53:3 55:25 56:1
**answer** 4:16 6:19
    7:1 20:10 27:21
**antibiotics** 53:20
**apologize** 39:1
**apparently** 33:8
**appeal** 19:3,3,10
    19:17,21,23,25
    20:1,3,9,11 30:5

34:18 35:1,24
    36:2,2,4 38:1,4
    38:10 39:9,11,14
    39:14 40:24,25
    45:18,21 50:20
**appear** 38:2
**APPEARANCES**
    2:1
**appears** 40:10
    50:6
**apply** 8:10,20
**appreciate** 51:13
    57:15
**approve** 10:20
**approved** 18:23
    50:21
**April** 3:17 24:24
    25:4 41:17,19
    42:10,25 44:22
    45:2 46:21 47:15
    50:7,14,17
**areas** 19:7 52:11
    55:19
**argument** 18:3
**arrive** 53:16
**arriving** 7:16
**asked** 11:17 16:11
    28:2 33:2 42:1
    55:13
**asking** 6:17 37:18
**asks** 53:15
**aspect** 14:19
**assent** 46:15
**Associate** 9:16
    15:4 16:19 27:8
    51:5
**assume** 6:19 24:10
**attached** 32:12
    34:18 35:2 38:1
    40:23 43:4
**attachment** 36:2
**attended** 8:23
    32:2
**attention** 11:12

21:9 33:14
**attorney** 5:14
    60:15
**attorneys** 4:4,14
**audible** 6:6
**availability** 37:19
**aware** 10:8 11:17
    12:2,8,15 13:20
    14:25 16:22
    31:21 32:15 51:3
    54:25 56:20,21
    56:23

**B**

**B** 26:14 44:16
**Bach** 2:4,4 3:3,5
    5:9,14 30:20,24
    31:1,7,9 34:16
    34:19,22,25 35:3
    35:5,9,15,17
    42:14,22 51:12
    51:22 56:7 57:12
    57:14
**back** 12:14 15:7
    16:12 17:11
    19:12 22:12,18
    22:19 23:6,14
    28:9,9,25 30:4
    37:4 42:4 43:25
    44:10,13,17 49:4
    54:3 57:9
**base** 21:17
**based** 17:20 19:21
    22:7 33:24 38:7
    39:13,14 43:23
    52:11 53:1 57:1
**Bate** 35:8,11
**Bates** 30:18 31:6,8
    40:6
**beg** 23:5
**beginning** 25:5
**behalf** 1:15 4:5
    37:18
**behavior** 36:16

**believe** 19:22
    24:16 30:8 31:3
    33:21 35:22
    37:13 44:11 50:2
    54:12
**better** 8:25 21:9
    21:10,16,20
    22:16,21 23:7
    24:20 28:3 29:2
    46:6
**bit** 13:23,24 14:5
    15:2,5 25:20
    53:6 57:8
**blood** 53:10 55:18
**Board** 1:7 30:15
    33:12 34:8 40:7
    41:20 43:10
    44:24 47:3 50:8
**break** 6:24 7:2
    35:10 51:20
**Brenda** 1:22 4:7
    58:4 59:24 60:4
    60:22
**briefly** 51:23
**bring** 25:16
**broken** 44:16
**brought** 5:16
    11:12 21:9 49:17
    55:2
**bullet** 45:19

**C**

**C** 22:16,21 23:7
    24:20 28:2 29:2
    44:3 45:11,12,16
    51:4
**calendar** 37:13
**call** 8:11 10:6,6
    14:16 25:15,17
    26:6 33:13 52:10
    53:4,11,13
**calling** 44:14
**care** 36:15 53:25
**Carlos** 1:14 4:5

Carlos Risco, DVM
June 12, 2023

5:3,12 31:17
43:1 58:2 59:2,9
60:6
case 1:6 9:21 12:9
12:21,25 16:24
19:5 21:9,15
23:25 25:18 26:3
26:4 27:5,7,9
36:14 43:4,5
48:4 53:5,11
54:4 60:8
cases 21:14 26:7
53:4
causing 35:13
cautioned 5:5
cc'd 24:16
cc'ing 28:5
centered 21:17
certainly 6:24
29:15
Certificate 3:9
60:1,23
Certified 4:7 60:4
60:23
certify 60:6
cetera 53:10
chain 49:12
chair 7:19 12:24
17:4 19:18 45:4
challenges 13:18
13:21 14:2,8
challenging 14:21
chance 22:8 48:23
chances 48:10
change 25:23
changed 20:21
36:4
changes 25:7
Charleston 2:5
cheated 55:8
cheating 55:9
circumstances
9:24 10:8 11:20
17:19,22 18:5,24

20:15,17 29:21
36:12 48:3,7
49:19
City 1:22,23 4:6
60:13
CIV-21-616 1:6
Civil 4:11
clear 6:11
client 53:14,15
clients 14:18
clinic 25:11
clinical 7:20 8:12
14:17,19 17:19
18:6 20:14 21:6
22:5 25:8,14,23
36:20 41:6 45:15
50:18 52:1,1,8
52:13,23,24,24
52:25 54:12,20
55:2,21
clinician 22:3 53:3
53:8,15 54:4,5
clinicians 21:22
clinics 52:15
Clint 35:9
clint.pratt@oks...
2:12
CLINTON 2:10
closest 56:3
coaching 57:8
college 7:7,18,21
8:10 13:15 14:11
14:23,24 15:3
54:15,21
COLLEGES 1:8
combine 42:21,22
52:22
come 11:17 16:21
19:14 22:12 23:6
23:14 26:13,23
28:25 44:17 49:4
50:25 53:11
55:16 56:3
comes 53:5
comfortable 10:23

coming 14:9,10
comment 15:6
Commission
59:17
committee 9:22,23
10:2,7,8,10,12
11:18 12:25 17:5
17:17,18 18:1
19:13 20:24
22:12 24:1,6,7
28:10,12,16 36:9
38:14 39:21
40:19,25 41:13
45:3,6 46:1,16
50:19
communication
17:16 19:17
21:10 24:2,16
31:22 36:14
44:23 57:4
communications
12:21,22
community 11:13
11:21,25 15:22
16:6,12,24 17:13
22:20 32:24,24
53:2 56:24
compelling 18:3
20:13 36:19
compensation 9:7
complete 8:9 44:2
45:10
completed 49:1,22
completely 52:25
compliant 33:2
concern 46:2
52:22
concerns 29:6,9
45:25
Concetto 26:22
27:18 29:6 46:21
47:15 49:8
Concetto's 47:7
Concetto/Gilmo...

3:21
concluded 57:16
conclusion 17:25
conditions 22:23
45:9
conference 4:4
consider 40:25
53:17 56:10
consideration
45:5
constructive
21:21 57:10
context 17:15,15
19:21
continue 24:19
43:5 45:14
continued 26:5
continuing 22:4
contractual 8:16
8:19
convenience 43:4
conversation 12:5
15:11 20:12 21:7
49:13
conversations
24:7 49:7
copied 55:9
core 29:17
correct 9:12 12:13
16:16 18:13
20:15 25:6 30:25
32:1 36:1,2
37:25 40:11 46:9
47:8 52:2,3
54:22,23 59:5
60:11
CORRECTION
58:6
corrections 58:5
59:7
council 14:24
counsel 2:10 12:17
County 60:3,13
couple 51:21 56:8

course 11:24
16:25 27:13,14
32:24 45:24
54:15,21 55:12
55:14
courses 52:12,18
52:18
court 1:1 5:21 6:1
31:7
COVID 25:5
29:21
CP 44:1
credit 55:13,14
criticism 21:21
57:11
CROSS 3:4
CROSS-EXAM...
51:17
crux 17:16
CSR 1:22 58:4
59:24 60:22
current 45:10
currently 7:5,6

**D**

D 11:22 23:3
50:15
data 55:16,17
date 3:11 7:11,14
9:15 13:8 33:24
47:22 58:3
dated 50:13,17
dates 37:6 38:7
day 14:5 15:7
59:13 60:19
days 41:2 44:17
De 3:21
Dean 7:6,12 9:16
15:4 16:19,22
24:17 27:7,8
28:18,18 38:12
46:13 50:20 51:5
51:22 54:24
Dear 50:14

Carlos Risco, DVM
June 12, 2023

**December** 60:24
**decide** 28:18
**decided** 45:6
**decision** 10:19,22
  20:18 22:7 23:22
  24:9,10 27:23,25
  28:4,6,14,24
  29:3,4,25 35:25
  39:25 40:21
  41:10 42:2 45:22
  45:25 46:7 47:10
  47:21 48:14,18
  50:23 56:9
**Defendant** 1:9 2:9
**deficient** 19:8
**delegate** 27:8 54:6
**delivered** 50:2
**delivery** 25:20
**DeMars** 12:1
**demeanor** 41:5
**demonstration**
  36:15
**Department** 7:20
**depending** 53:1
  53:23 55:11,12
**deposition** 1:14
  3:11 4:4,19 5:18
  12:11,19 57:16
  60:9
**describe** 52:4
  54:10
**described** 54:13
  54:15,19
**detail** 52:5 53:18
**details** 56:21
**Di** 26:22 27:18
  29:6 46:21 47:6
  47:15 49:7
**diagnosis** 26:3,4
  53:12,17
**didactic** 25:9
  52:16
**difference** 52:5
  54:7

**different** 14:11,12
  18:6 25:20 52:25
  53:6 54:21
**differential** 53:12
**difficult** 29:20
  55:22
**DIRECT** 3:3 5:8
**direction** 15:4
  50:25
**disadvantage**
  49:24 50:3,4
**discuss** 13:11
  17:22 23:25 32:8
  34:24 38:25
**discussed** 32:10
  32:13 39:6
**discusses** 36:10
**discussion** 12:2
  13:22 17:2 21:19
  29:24 30:1 39:14
  51:1
**discussions** 20:25
  23:10 29:15
  49:11
**dishonest** 56:16
**dishonesty** 56:20
**dismiss** 16:9 19:20
  19:20 24:5 27:24
  28:12 29:5 35:25
  47:10,21 48:15
  56:10
**dismissal** 3:22
  18:10,17 32:12
  45:17 50:21
**dismissed** 18:25
  20:8 28:3 48:6
  50:18
**distance** 25:13,13
**distinction** 52:5
**distinctly** 14:13
**DISTRICT** 1:1,2
**document** 20:22
  31:12 33:14
  34:13 35:19 40:3

40:3 41:16,23
  42:13,24 43:8
  44:20,21 45:1,2
  50:6,9,13 51:1
  55:22
**documentation**
  36:24
**documents** 12:20
  30:13 31:5,8
  34:5 46:18 47:3
  56:15
**doing** 6:4
**Dr** 5:13 7:4 9:17
  11:12 12:1,1,23
  12:23 13:5,12,16
  13:24 16:21 17:3
  19:18 23:12
  24:17 26:22 27:5
  27:9,15,17,18
  28:4,4 29:6
  31:13,17 32:3,11
  32:14,16 33:13
  38:19 39:2,5,13
  40:12,13,16
  42:10 43:11 45:4
  45:21 46:21 47:4
  47:6,15,15 49:7
  49:10 50:13,24
  51:2,12 56:8
  57:14
**due** 50:15
**duly** 5:4 60:7
**duration** 45:15
**DVM** 1:14 4:5 5:3
  58:2 59:2,9 60:6

**E**

**e-mail** 12:21 30:22
  33:5,8,15 34:6
  34:14,23 35:19
  37:18 38:19 40:4
  40:4,9,10,18
  42:10 46:20
  47:14,18,20,25

49:11
**e-mails** 37:6 38:3
  56:15
**earlier** 35:23
  36:11,18 43:17
  48:21
**easy** 46:6
**eating** 56:1
**education** 14:20
  25:12,14
**effect** 4:18
**eight** 14:4
**either** 16:4
**email** 2:6,12 3:12
  3:13,14,16,21
**employed** 7:5,15
**ensure** 34:12
**enter** 26:17 52:15
**entirety** 56:11
  59:4
**Errata** 3:7 58:1
**especially** 48:4
**essence** 52:14
  53:21
**et** 1:8 53:10
**ethical** 36:16
**evaluate** 8:20
  28:11,17
**evaluation** 17:21
  56:19
**evenings** 21:13
**event** 60:17
**exact** 9:15
**exactly** 27:12 35:3
  51:8
**exam** 53:7 55:8
**examination** 3:3,4
  3:5 5:8 26:4
  52:17 53:8 56:6
**example** 6:7 43:24
  53:1,19 54:1
**exams** 54:16
**exchanged** 13:12
**exhibit** 30:16

33:12 34:9 37:5
  37:23 38:17 40:7
  41:21 42:20
  43:10 44:25 47:4
  47:13 50:9
**exhibits** 3:11 30:8
**expanse** 52:16
**experience** 52:7
**Expires** 59:17
  60:24
**explain** 18:16 19:4
**explaining** 24:17
**express** 18:3 23:12
  23:21 39:23
**expressed** 20:13
  45:25

**F**

**face** 14:1
**facing** 14:9
**fact** 10:1 23:2,2
  39:5 55:22
**faculty** 17:20 19:8
  21:5,9,11,22
  22:3 56:19,24
**faculty-student**
  21:1
**failed** 9:18,24
  11:13 16:4,24
  17:1,13 27:16
  28:20 51:3
**failing** 48:4
**fails** 48:9
**failure** 17:12
  32:23,24 45:15
**fair** 6:20 42:6 46:8
  49:4
**familiar** 13:15
  52:17
**far** 6:5 14:3
**father** 13:6
**Federal** 4:10
**feel** 6:15 19:8 29:9
**fellow** 48:23

Carlos Risco, DVM
June 12, 2023

64

**felt** 28:13 29:13,16
  29:19,22 36:18
  39:20 48:22,22
  49:3,23
**filed** 55:2
**fill** 55:16
**final** 18:18,19
  27:23 28:24 29:2
  29:25 47:10
  48:14 50:6 52:18
  52:19
**financial** 9:7
**find** 32:12
**fine** 10:24 46:25
**finish** 14:15
**Firm** 2:4
**first** 5:4 9:13
  14:15 20:5 26:16
  30:14,22 31:1
  33:14 36:7,10,24
  41:4 47:13 52:9
  52:12 60:7
**five** 7:10 41:2
  46:12
**Floor** 2:11
**Florida** 7:17,22
  13:14 21:5
**follow** 49:14
**follow-up** 51:19
  56:8
**followed** 20:12
  34:17,18,23
  46:11
**following** 5:1 22:3
  45:7,8 46:3
**follows** 5:7
**force** 4:17
**foregoing** 59:3
  60:9
**form** 4:15
**formation** 53:21
**former** 9:16
**four** 36:14,16
**fourth** 8:8 38:18

**free** 6:15
**front** 9:21 10:5
  11:16,18 20:23
  34:10
**full** 59:5
**further** 4:12 41:1
  57:12
**FYI** 40:9,15

**G**

**gather** 55:13
**generation** 14:2
**George** 8:6
**Getting** 16:12
**Gilmour** 9:17
  11:12,13 12:23
  12:23 16:21
  23:12 24:17 27:5
  27:9,15,17 28:4
  30:23 31:17 32:3
  32:11,14,16
  38:19 39:2,5,13
  40:5,13 42:10,25
  45:21 47:15
  49:10 50:13,24
  51:2
**Gilmour/Reicha...**
  3:16
**give** 6:5 11:19
  20:2 22:8 25:25
  26:1 27:18
**given** 5:18 17:21
  19:2 28:19 29:14
  29:23 39:22 48:1
  48:22,23 49:4,16
  49:19 59:6
**giving** 19:4 21:12
  29:10
**go** 9:21 10:1 11:16
  22:15,18,18 28:9
  28:20 31:10 34:4
  37:2,4 40:2
  41:15,15 42:8
**goes** 28:9 30:4

57:9
**going** 6:19,22 17:9
  19:12 21:15
  22:15,18 24:21
  24:22 25:7 28:25
  30:7 33:11 34:5
  39:15 41:11
  47:25 53:17
**good** 29:24 37:16
**grade** 11:22 22:16
  22:21 23:3 26:24
  28:2 29:1 45:13
  45:16 47:6 50:15
**great** 6:4
**group** 26:14,14
  29:17 44:16,16
  48:24
**guess** 22:10 37:12
**guessing** 24:23
**guidance** 33:3
**guidelines** 19:1
  50:17

**H**

**half** 46:12
**hand** 60:18
**happen** 55:7,15
**happened** 27:22
  51:8
**happening** 24:13
**head** 6:8
**hear** 15:18
**heard** 54:10
**hearing** 11:9
**heated** 12:4
**help** 15:14 21:23
**helpful** 38:13
**hereinbefore** 5:4
  60:15
**hereto** 4:3,13
**hereunto** 60:18
**Hi** 5:10 43:1
**higher** 44:3 45:13
  45:16

**history** 17:11 53:6
  53:9
**hospital** 25:17
  44:18
**hours** 14:4
**huh-uh** 6:7
**hybrid** 25:15,18
  26:6 44:15

**I**

**idea** 43:21,23 44:7
**imagine** 46:6
**implied** 56:22
**Importantly** 41:4
**improve** 18:6 19:7
  20:14 21:18 23:9
  36:19 38:16
  39:24 41:5
**improvement**
  45:20
**improving** 21:11
**in-person** 44:1,7
**include** 38:10
**included** 38:15
  42:20 45:20
**INDEX** 3:1
**indicated** 56:16
**indicates** 37:20
**indicating** 51:7
**indications** 57:3
**Individually**
  23:24
**inform** 27:15
  45:21 50:15
**information** 14:3
  14:4 27:6 43:2
  57:1
**informed** 24:10
  27:2,17 28:4
  39:8
**informs** 27:9 51:6
**injection** 26:1
**instances** 55:1
**instructed** 14:19

53:7
**instruction** 25:8
**instructor** 26:20
  26:22
**instructors** 11:24
  12:4
**integrity** 55:1,6,20
  56:4
**interaction** 21:2
**interested** 60:17
**internal** 9:19 16:5
  17:1,12 22:19
  32:23
**intravenous** 26:1
**involved** 54:5
**island** 14:9
**issues** 21:8
**items** 36:14 43:13

**J**

**J** 2:4
**Jason** 2:4 5:14
  30:17 42:12
**jbach@bachla...**
  2:6
**job** 21:20
**Jonathan** 1:4 5:15
  9:18,21 11:10,13
  12:3 13:18,21
  14:8,22 15:14,21
  16:3,14,20 17:6
  17:17,21 18:2,24
  19:10,15,20 20:4
  20:6,12,25 21:8
  22:22 23:9,13,17
  23:23 24:10,14
  24:18 26:15,24
  27:11,16,18,24
  28:13,14,19 29:5
  29:10 32:13 33:6
  33:15 34:1,7
  35:20 36:22
  37:15,18,21 38:1
  38:9 39:6,12

City Reporters
(405)235-3376

Carlos Risco, DVM
June 12, 2023

65

40:23 41:11 43:5
43:17 45:21 47:5
47:21 48:15
50:14 56:10,16
56:25 57:5,6
**Jonathan's** 13:1,3
15:18 16:24
17:11 19:5,16
23:25 32:15,22
34:24 38:24 43:3
**JRP** 3:18 42:18
43:13
**July** 26:11 44:14
**June** 1:16 4:6
26:11 44:11,14
58:3 60:12,19
**Jurat** 3:8 59:1

**K**

**kidding** 30:20
**kind** 8:17 12:4
13:22,24 18:9
25:17 28:24
44:14
**Kitts** 8:6
**know** 6:6 8:15,22
10:1,7,10 13:19
14:8 15:7 21:14
21:14,24,24,25
21:25 26:20
27:13 28:19
29:13,21 30:7,21
31:14 35:7,7
36:11 39:13,22
40:22 49:4,20
50:1 55:4
**knowledge** 21:11
21:17 25:21 26:1
26:2

**L**

**lack** 56:4
**Lara** 12:1
**Large** 7:20
**Las** 2:5

**Law** 2:4
**lawsuit** 5:16
**learn** 7:24 9:22,23
16:17 29:20
**learned** 12:12
15:21 16:14
26:24
**learning** 9:14
14:12 25:24,25
**leaving** 14:9
**lectures** 25:13
52:16,16 54:16
**led** 10:9 11:20
17:19,23 18:4
19:4 36:12 47:9
**Legal** 2:10
**let's** 10:6 31:10
33:13 42:22
46:19
**letter** 3:17,20,22
22:16,21 23:3
30:5 32:12 34:18
34:21,24 36:8
38:1,24 39:6,8,9
39:11,11 40:23
40:24 41:16,25
44:21 45:20 50:7
50:17
**LINE** 58:6
**lines** 6:9
**listen** 15:10
**listened** 18:2
**little** 7:10 13:23
13:24 14:5 15:2
15:5 25:20 52:4
53:6 57:8
**long** 6:23 7:9
51:21
**look** 15:16 28:25
30:15 31:13 33:4
37:4,6,22 50:5
54:22
**looking** 31:12
**looks** 31:23 37:23

**low** 26:24
**lower** 26:12

**M**

**main** 33:1 54:7
55:19,19
**maintaining** 28:2
**major** 35:13
**making** 35:6,25
47:10
**March** 7:13 11:11
11:15 25:4 30:22
33:6 34:7,14
37:9,9,9,11,14
37:21,21,23,25
38:4,5,20,21,23
39:4 40:5
**Margi** 9:17 11:13
12:22 30:23 33:2
40:4 42:25
**mark** 30:16 33:11
34:8 40:7 41:21
43:10 44:25 47:4
50:8
**marked** 3:11
30:15
**Mason** 12:23 17:4
19:18
**material** 12:8 22:5
**matter** 11:8
**Matthew's** 7:25
8:4,16,22 9:8
14:10
**mean** 56:22 57:6
**meant** 23:8
**MECHANICAL**
1:8
**medical** 14:20
**medicine** 7:7,18
7:21 8:5 9:19
13:16 16:5 17:1
17:12 22:19
32:23 44:2 51:24
53:3

**meet** 15:1 33:16
**meeting** 13:3,11
16:7 17:5 20:20
30:3 31:24 32:2
32:9,22 33:1,9
33:18,25 34:1
37:19 39:5 57:5
**Melinda** 37:11,15
37:17
**member** 21:5
23:25
**members** 36:8
**memo** 44:21
**memory** 39:10
**mention** 14:1,23
40:22 55:24
**mentioned** 20:23
21:4,23 22:4
36:10,17 39:12
48:21 52:10
**mentioning** 38:11
**mentions** 33:17
**met** 13:5,9 17:17
19:15 20:4,4,6,6
28:1 33:23 36:21
36:22,25 37:21
38:3,8 39:7,11
**midterm** 52:18
**mind** 20:11,21
36:4
**minutes** 21:23
37:5
**misspoke** 39:1
**mitigate** 18:5
36:11
**moments** 46:22
**Monday** 31:18,24
40:5
**morning** 6:23
**mother** 13:6
**mouth** 54:9
**move** 46:17 52:23

**N**

**name** 5:10,12,14
**named** 5:4
**nature** 48:1 54:20
**navigate** 35:13
**NECESSARY**
58:5
**need** 19:25,25
21:13,13,15,16
21:17,24 22:1,15
22:16 27:15 29:1
49:14 51:20
**needed** 22:13,21
24:20
**needs** 21:20
**never** 23:24
**new** 14:11 29:21
**normal** 48:7
**normalized** 48:4
**Northeast** 1:23
**Notary** 59:12,16
**noted** 59:7
**notes** 13:7
**notice** 4:10
**notification** 16:4
20:7
**number** 1:6 3:12
3:13,14,16,17,18
3:20,21,22 13:14
33:12 34:9 41:21
43:11,13 44:25
47:4 50:2 55:6
**numbered** 43:14
46:18
**numbers** 26:13
30:18
**NV** 2:5

**O**

**oath** 5:7,25 6:1
59:3
**objections** 4:14
**observation** 55:17
**observations** 54:2
**observe** 56:1,2

Carlos Risco, DVM
June 12, 2023

observed 55:24
obvious 55:8
obviously 25:16
26:12
occur 16:7
occurred 57:7
October 9:16 11:4
offer 23:9
office 2:10 13:9,9
13:10 16:22 20:6
24:8
official 60:19
Oh 40:20
okay 5:18,21,25
6:4,10,12,18,22
7:2,11,14 8:2,22
10:19 11:1,8,11
11:14,23 12:10
12:14,17 15:13
16:8 17:20 18:15
18:23 19:3,11,14
19:17 23:12 24:9
25:4,7 27:23
28:6,10,19,25
29:4 30:24 32:6
33:4,7,10,25
34:17,20 35:6,15
35:16,18 37:1,10
37:22,25 38:2,8
38:8,17,23 39:3
39:16 41:9 42:14
43:7,20 44:6,20
44:24 45:23
46:17 47:1,18,24
48:13,17 49:2
50:5 51:11 54:8
57:13
Oklahoma 1:2,7
1:17,23,23 2:11
2:12 4:7,9 7:7,16
7:23,24 8:15,23
8:24,25 9:6 13:2
14:15 21:3 46:13
52:20 54:25 60:2

60:3,5,14,23
once 48:3
one-on-one 30:5
34:1
one-page 40:3
one-year 51:25
ones 30:17 35:11
operate 18:17
opinion 11:1
39:17
opportunities
29:14,23
opportunity 11:19
17:22 19:2,4
27:19 28:20
29:10,19 31:15
39:22 49:4
opposed 6:7 23:13
23:22
order 31:2,4 35:12
43:18
original 42:5
originally 42:15
OSU 51:23
outlined 43:3
50:17
outside 49:11
55:22
overturn 22:10
overturning 22:10

—————————
**P**
—————————
p.m 37:16 42:11
43:1 47:16
page 33:14 36:7
36:10,13,14
38:18 41:16
42:15 43:11
47:13 50:6 58:6
pages 31:2,14 33:5
34:6,10 42:9
46:19,19,20
paragraph 41:4
pardon 23:5

parents 13:4 16:8
33:18,23
part 55:13
participate 26:14
44:18
participated 10:5
particular 15:14
20:19 29:7
particularly 22:5
26:3
parties 4:3,13
60:16
pass 51:14
passed 15:21
16:14
passing 47:6,6
patient 36:15
53:25
patients 14:18
Paul 12:1
pay 9:6,11
paying 9:5
Payne 60:14
pending 7:1
people 54:14
perceive 54:14
perform 49:5
performance 10:9
11:21 17:11,20
17:24 18:4,7
19:5 20:14,17
36:12,20 41:6
performed 49:21
person 12:6 15:10
19:15 20:13,25
26:14 27:9 36:25
44:11,18
personal 24:7
personally 10:4
12:7
perspective 19:24
pertinent 12:9,20
physical 26:4 53:7
53:8

Pierola 13:12,16
13:24
place 12:3 59:6
placed 44:4 45:12
plagiarism 55:11
55:14
Plaintiff 1:5,15
2:3 4:6 5:2
plan 20:13 36:19
36:19 39:23 41:5
45:20
pleasantries 13:13
please 5:11 6:15
32:12 46:24 50:9
54:9,9
point 6:23 13:4
16:13 19:14
26:23 41:9 44:6
points 36:16
policies 19:1 23:20
33:3 43:24
policy 9:20 18:20
23:4,7 49:14,16
51:4
poor 10:9 11:21
17:19,23 18:4
19:5 20:17 36:12
portion 54:12,20
portions 36:3
54:11
possible 33:17
possibly 37:3
practice 11:14,21
11:25 15:22 16:6
16:12,25 17:14
22:20 27:7 32:25
53:2,22 56:24
PRATT 2:10 3:4
30:10,17,21,25
31:3 34:12,17,20
34:23 35:1,4,6
35:12 42:12,19
51:18 56:5 57:13
preclinical 8:9

14:16 25:12
51:25 52:6,10,13
52:15 54:11,13
preparation 12:10
21:10 36:15
prepare 12:18
21:16 52:14
prescribe 53:20
presence 53:15
presentations
25:18
presented 22:22
26:7
previously 30:3
34:2 47:5
Primarily 21:19
primary 17:15
49:6
printed 30:8
prior 7:16 21:3
31:21
probably 14:1
probation 22:17
23:5,6 29:1
45:14
problem 35:13
Procedure 4:11
process 18:15,17
produced 5:1
professional 4:9
9:22 10:7 11:18
12:24 17:4 18:1
20:24 22:11
28:10,16 36:9,16
38:13 39:21 41:5
45:3,8 46:1
50:19
professor 7:6,17
program 8:21
13:19 16:9 18:11
18:11,25 19:20
22:13 24:19 43:6
43:18,25 45:8,18
47:11,21 48:6

Carlos Risco, DVM
June 12, 2023

50:19 51:24,25
52:1,14 54:11,20
56:10
**programs** 15:3
**progressing** 54:4
**proposed** 3:18
42:18 43:12
**protocol** 16:18
**provide** 8:11 19:2
53:19 54:3
**provided** 10:22
25:13,18,19
36:18 56:14
**provides** 41:5
**PRW** 1:6
**PSC** 3:17,20 10:6
10:6 17:8,17
18:8,22 19:3,13
19:18 20:4 23:21
23:25 28:20
32:21 41:25
44:22 45:6,18
46:3,7,11,16
**psychologist**
14:25 15:8
**Public** 59:12,16
**pulse** 54:1 55:25
**pursuant** 4:10
**put** 53:10 54:8

**Q**

**question** 4:15 6:14
6:15,18,19,20,25
7:1 20:10 22:9
40:17 51:19
**questions** 6:6
11:19 53:16 56:5
56:9
**quiz** 48:9

**R**

**re-sent** 35:10
**read** 19:16 20:1,2
20:11 32:11
37:17 46:22

47:25 57:13 59:3
**reading** 12:6
19:25 56:18
**reason** 31:5 58:6
**reasons** 55:7
**recall** 7:11 9:13
10:4 11:9,23
13:3,18 15:2,20
15:23,24 16:7,10
17:7 18:8 20:5
21:11 24:13 25:3
26:8,15 27:2,20
27:21 28:23 29:8
35:18 38:8,11
39:4,7,9,12,16
39:18,19 44:19
46:12 47:22,23
48:13 49:13,17
56:18
**receive** 8:8 9:7
19:9 24:22,24
36:21 44:3 45:12
45:16 47:6
**received** 11:22
12:22 16:4 17:8
18:21 20:7 23:2
24:6 26:24 36:23
36:24,24 38:4
39:8,10 40:23
57:2
**receiving** 21:21
35:19 50:15
**recognize** 41:23
41:24 44:23
**recollect** 32:5
**recollection** 9:2
10:3 11:7 15:11
24:15 32:25
36:23 37:4,7
57:11
**recommend** 39:15
**recommendation**
10:25 18:9,12,16
18:24 19:19

22:11 24:4,4
28:17 32:11,21
40:15 42:5 46:3
46:7,11,15
**recommendations**
23:16,19 32:17
41:1 43:2
**recommended**
18:10 20:3 22:25
28:12
**recommending**
32:12
**reconsider** 19:19
20:4 24:4 40:19
40:21 42:1
**reconsideration**
19:23
**record** 5:11 6:11
34:8 40:6 41:20
43:9 44:24 47:2
50:8,21 56:11,13
57:2
**records** 33:12
51:7
**REDIRECT** 3:5
56:6
**refer** 42:21 49:25
**referring** 31:19
**reflection** 33:22
**refresh** 37:3
**refreshes** 37:7
**regarding** 27:6
**regardless** 41:13
48:17 55:18
**REGENTS** 1:7
**Registered** 4:9
**regrettably** 50:22
**Reichard** 12:23
17:4 19:18 40:16
45:4
**reinstate** 41:11
**reinstatement**
39:15
**reiterated** 20:23

**relationship** 7:24
8:3
**relative** 60:16
**relayed** 50:22
**remain** 24:18 45:7
**remainder** 45:17
**remaining** 44:3
**remediate** 22:2
29:14 44:1
**remediated** 45:13
**remember** 13:7
14:6,13 15:6
27:11,12 28:15
29:16 55:24
**reminded** 16:25
**reminisce** 13:24
**reminiscing** 13:23
**remote** 26:16
**remotely** 25:19
49:21
**remove** 24:3
**repeat** 6:16 10:13
22:19 48:3
**rephrase** 6:16
**report** 10:22 24:6
55:13
**REPORTED** 1:22
59:24
**reporter** 4:8,9
5:22 31:7 58:4
60:4,23
**Reporter's** 3:9
**REPORTERS**
1:22
**represents** 5:14
**requested** 24:3
**requesting** 40:19
40:25
**research** 55:15
**reserved** 4:16
**respectful** 15:17
**respective** 4:3,13
**respiration** 54:1
56:1

**respond** 41:1
**response** 6:6 45:5
**responses** 51:22
**responsible** 53:24
**responsiveness**
4:15
**restate** 46:4
**result** 45:17
**resulted** 20:17
35:24
**results** 48:5
**retake** 48:8
**return** 23:23
**reverse** 46:7
**reversed** 46:14
**review** 10:19,20
10:21 21:13,16
22:4 23:19 32:22
45:18 50:20
56:13,15
**reviewed** 12:8,20
50:20 51:7
**right** 11:5 16:15
24:11 25:5 28:7
30:7,9 31:12,12
31:25 33:4,11
34:2,4,16,16,19
34:22,25 35:15
35:25 36:3 37:24
38:22 40:2,16,21
41:15 42:2,8
43:9 44:20 46:17
47:2,7 48:15
51:9,12 57:14
**Risco** 1:14 3:18,20
4:5 5:3,12,13 7:4
31:13 33:13
42:18 43:11,12
47:4 51:12,22
56:8 57:14 58:2
59:2,9 60:6
**Risco/Gilmour**
3:12
**Risco/Rivera-Pi...**

Carlos Risco, DVM
June 12, 2023

3:14
**Rivera** 9:18 32:13
**Rivera-Pierola**
1:4 3:13 5:15
9:14 13:6,17
**Robin** 40:5,13
**role** 7:9
**Ross** 8:5
**rotation** 9:19,25
10:9,13 15:22
16:5,13,15 22:5
22:14 23:3,10
26:13,15,25
27:16 28:21 29:7
44:1 45:10,11,16
47:7 48:2,5 49:1
49:5,20,22 50:2
50:16 51:3 52:23
53:1,5,24 56:24
**rotations** 14:17
24:21 26:9 41:6
44:3,7 45:13
52:2 56:17
**rounds** 53:14
**RPR** 1:22 58:4
59:24 60:22
**Rules** 4:10

———————

**S**

**Saint** 8:6
**Saturday** 42:25
**saw** 17:3
**say-so** 10:24
**saying** 14:13
37:17
**says** 27:15 31:17
33:15 34:24 36:7
40:9 41:4 42:17
43:12 48:1
**schedule** 37:12
**scheduled** 31:24
33:25
**scheduling** 33:9
**Schmitz** 1:22 4:7

58:4 59:24 60:4
60:22
**school** 8:4 27:24
54:25
**Sciences** 7:20
**score** 47:6
**seal** 60:19
**second** 33:17
36:13,13 37:5
47:24 52:12
**secondly** 18:4
**see** 14:21 21:15
31:5,15 33:9,10
33:19 37:10
40:12 41:6 43:14
46:5,19 47:16
48:10 53:4,4
**seeing** 14:18,18
**seen** 47:18,20
48:13 50:9
**send** 20:3
**sense** 13:13 14:10
15:17 28:24 48:2
**sent** 19:17 30:18
30:22 31:4 34:14
37:14,23 41:25
**sentence** 33:18
41:3 47:24
**sentences** 47:25
**separate** 42:20
54:11
**separated** 42:16
**separately** 42:21
**series** 52:11
**service** 25:19
**set** 34:5 37:18
46:18 60:15,18
**setting** 21:6 55:21
**seven** 46:20
**shake** 6:8
**share** 11:1,20
15:18 17:18
**shared** 9:18 13:17
14:7 19:12 39:16

40:12
**SHEET** 58:1
**shorthand** 4:8
60:4,10,23
**side** 25:14
**sign** 57:13
**signed** 50:24
**simply** 14:2 40:18
55:16
**single-page** 42:13
**singular** 52:7
**sir** 5:20 11:6 12:16
32:7 40:8,16,22
41:8,19,24 43:6
43:15
**situation** 11:16
13:2 15:19 16:23
17:23 18:20
27:10 28:11
32:15 48:25
49:24,25
**six** 7:19 34:6
43:14
**skills** 25:24
**small** 9:19 16:5
17:1,12 22:19
32:23 44:1 53:2
**son** 13:17
**soon** 20:1 33:16
48:7
**sorry** 10:18 13:9
15:25 23:1 28:8
35:7,18 37:13
39:9 40:16 41:18
46:4 50:14
**sort** 9:7
**sounds** 54:19
**speaking** 12:17
**specific** 13:8,21
53:18,18
**specifically** 14:22
16:7,10 20:20
39:18 56:21
**speculate** 13:8

**spent** 21:22
**split** 26:11
**spoke** 43:3
**spoken** 28:13
**SS** 60:2
**St** 7:25 8:4,6,15
8:22 9:8 14:9
**stamp** 30:18
**stamped** 40:6
**stamps** 31:6,8
35:8,11
**standard** 9:22
10:7 11:18 12:24
17:5 18:1 22:11
28:10 36:9 39:20
39:21 46:1 50:19
54:15,21
**Standards** 20:24
28:16 38:14 45:3
**standing** 42:5
**start** 44:10
**Starting** 34:6
**starts** 34:13,13
42:9
**state** 2:11 4:8 5:10
7:8,16,23,25
8:15,23,25 9:1,6
13:2 14:15 21:3
46:13 52:21
54:25 59:2,12
60:2,5,14
**states** 1:1 14:10
45:4
**stay** 22:12 43:18
**Stillwater** 1:17
2:12 4:7 60:13
**stipulated** 4:2,12
**stipulation** 22:13
23:7 28:1
**stipulations** 4:1
22:24 24:20 25:1
28:23 43:16,20
45:9 60:14
**Street** 1:23

**structure** 51:23
**student** 2:11 9:6
9:11,21 15:9
16:23 19:2,8
26:2 27:6 51:7
52:14,20 53:3,6
55:8,23
**students** 8:8,19,23
8:25 9:1,4,8,17
13:25 14:1,14,15
15:1,5,10 16:19
19:6 21:6 25:10
25:11,12,15,16
26:10,12,13 27:8
28:17 29:17,17
29:22 44:15,16
48:24,24 49:18
49:24 50:4 51:5
52:7,20,21 53:13
53:16,23 54:6
55:2,12
**studied** 18:22
**studies** 51:25 52:1
52:6,8
**study** 22:4
**studying** 57:2
**SUBSCRIBED**
59:11
**subsequent** 24:21
**successfully** 49:1
**suggested** 43:21
**suggestions** 21:12
23:8,9 38:9 57:8
**Suite** 1:23 2:5
**summarized** 43:2
**summary** 12:25
13:1 17:5,7,9,10
17:25 18:21
32:13
**summer** 26:10
**Sunday** 34:14
**supposed** 42:23
**sure** 9:15 24:25
25:22 26:5 30:13

Carlos Risco, DVM
June 12, 2023

31:11,11 33:2
35:7 46:5
**suspended** 43:25
**suspension** 11:15
23:5 45:12 50:16
**sway** 39:25
**swayed** 48:18
**sworn** 5:5 59:11
60:7
**syllabus** 49:15
**Sypniewski** 12:1

**T**

**take** 6:1,24 7:2
13:7 29:5 30:12
31:13 33:4 35:9
36:5 37:6 38:16
45:6 46:22 50:5
51:21 52:12 53:9
53:10,25 57:10
**taken** 1:15 4:5,10
60:10,12
**takes** 53:6
**talk** 15:9 31:18
**talked** 14:5 15:2,5
24:8 25:1 30:11
34:2 43:17 47:5
49:17
**talking** 30:2 50:1
**taught** 21:6
**technicians** 54:2
**Telephone** 2:6
**tell** 7:4 27:15 36:3
37:7 39:20 45:1
50:12 54:9 57:6
**telling** 37:11
**temperature** 54:1
55:25
**terms** 10:22
**testified** 5:6
**testify** 5:5 60:7
**testimony** 59:6
**tests** 53:9,9
**Thank** 51:16

**Tharp** 37:11,15
37:17
**thing** 6:25 33:1
**things** 25:22 35:23
**think** 6:22 14:6
15:16,17 19:25
20:10 21:12
25:10 32:20
35:13 38:14
39:18 42:15,16
44:13 48:8 51:20
51:21 54:14
**third** 22:8 37:22
52:13
**thought** 11:2 49:6
**three** 14:16 25:10
52:6,9 54:12
**three-year** 51:24
**time** 4:16,17,18
9:13 11:9,15
12:14 13:20,25
16:1,3,13,20
17:18 19:14 20:5
21:3,14 25:2,8
26:23 27:24
31:18 32:10
37:16 41:9 44:6
46:10 49:3,22
51:13 54:24
57:15 59:6 60:12
**timeline** 20:2
27:22 33:22
**timelines** 13:1
**timing** 39:10
47:23
**today** 5:23 6:11
6:18 12:11,19
14:1 34:2 37:19
51:13 57:15
**told** 49:18
**tone** 21:1
**top** 40:4,9
**touched** 51:23
**trained** 15:8 22:1

49:20
**training** 8:9,12,14
14:16 25:24
52:15,24,24,25
**transcribed** 60:11
**transcript** 59:4
**transcription** 59:5
**treatment** 53:18
54:3
**trial** 4:16
**trivialize** 45:25
**true** 59:5 60:11
**truth** 5:5,6,6 60:7
60:8,8
**trying** 13:7 14:6
34:12 37:10
**Tuesday** 37:9
46:21
**tuition** 9:5,10
**two** 8:5 12:3 16:18
25:10 27:12 31:2
31:14,16 33:5
34:6 42:9 44:17
52:11 54:10
**two-page** 34:20
44:21
**two-thirds** 47:14
**type** 10:14 21:15
25:7 32:17
**typical** 14:14

**U**

**uh-huh** 6:8
**ultimately** 28:14
35:24 47:9
**umbrella** 55:9
**unconventional**
48:5
**underneath** 40:14
**undersigned**
59:12
**understand** 5:13
5:15,21 6:2,15
6:17 30:14

**understanding**
8:2,7
**understood** 6:20
**Union** 2:11
**unique** 14:22
54:19
**United** 1:1 14:10
**university** 2:11
5:16 7:8,17,21
7:25 8:4,6,6,16
12:18 13:14 21:5
**unprofessional**
56:25 57:4
**use** 17:9 55:5
**usual** 27:4,5

**V**

**vaccination** 25:25
**Vegas** 2:5
**verbal** 6:6
**versus** 52:6 54:12
**veterinarian** 22:1
53:22
**veterinary** 7:7,18
7:21 8:5,13,13
13:15,25 14:20
14:24 51:24
54:24
**video** 4:4
**VIDEOCONFE...**
1:14
**violations** 55:1
**vs** 1:6

**W**

**W** 2:10
**want** 6:24 13:8
30:12 35:9 42:20
46:22 54:8
**wanted** 6:5 9:23
15:1,17,18 25:22
27:18
**wants** 33:16,16
**warranted** 19:23
29:10

**wasn't** 26:8 46:6
50:3,3 56:20
**way** 14:12 46:6
47:14 48:18 50:1
54:10
**ways** 16:18
**we'll** 34:8 57:13
**we're** 6:22 28:25
31:11 43:25
44:14 52:17
**We've** 30:11
**week** 27:12,12
**weeks** 25:11 33:19
**wellness** 15:3
**went** 10:3,4 17:11
18:13 26:16
38:18 44:13,13
44:14
**West** 2:5
**WESTERN** 1:2
**When's** 9:13
**WHEREOF**
60:18
**willingness** 57:10
**Wilson** 40:5,13
**witness** 2:9 5:1,4
12:7 35:16 42:24
51:15,16 58:2
60:18
**word** 17:10 55:5
56:19
**words** 24:19 52:22
54:8
**work** 18:15 53:10
55:18,21
**working** 54:2,6
**worse** 8:25
**wouldn't** 48:17
**written** 19:3 20:9
24:1,2,2 35:24
38:4,10 39:13
48:9 49:15

**X**

Carlos Risco, DVM
June 12, 2023

**Y**

**yeah** 6:13 31:16
42:22 45:24
**year** 8:8,13 45:15
45:17 50:18 52:7
52:12,12,13
**years** 5:20 7:10,18
7:19 13:14 14:16
21:4,4 46:13
52:6,9 54:13

**Z**

**Zoom** 1:22 2:3,9
25:19

**0**

**00823** 60:23
**01177** 30:15
**01223** 33:13
**01296** 34:8
**01313** 40:7
**01378** 41:21
**01384** 43:10
**01415** 44:25
**01471** 50:8

**1**

**1** 3:12 30:16 37:15
**1:30** 37:16
**10:04** 60:13
**101** 1:23
**11:00** 31:24
**11:07** 46:21
**11:34** 57:16
**1178** 30:15
**12** 1:16 4:6 58:3
60:12
**1301** 34:8
**13th** 1:23
**14** 1:23
**1464** 47:3
**1470** 47:3
**16** 44:25 45:11
50:2
**165** 2:5

**18230** 60:22
**19th** 60:19
**1st** 7:13

**2**

**2** 3:13 33:12
**20** 50:18
**2018** 7:13
**2019** 9:16 11:4
**2020** 3:17 11:11
12:14 25:5 26:11
30:23 33:6 34:7
34:14 38:20 39:4
40:6 41:17 42:10
44:22 50:7,14
**2023** 1:16 4:6 58:3
59:14 60:12,19
60:24
**20th** 47:15
**21st** 46:21 50:7,14
**224** 33:13
**22nd** 30:23
**24** 37:9,21
**24th** 33:6 37:11
37:14 38:4
**27** 7:18,19 21:4
**28** 21:4
**29th** 34:7,14
37:23,25 38:5

**3**

**3** 3:14,17 34:9
38:17
**3/22/20** 3:12
**3/24/20** 3:13
**3/29/20** 3:14
**3/30/20** 3:16,18
**30** 3:12
**30th** 38:20,21,23
39:4 40:5
**31** 60:24
**33** 3:13
**34** 3:14
**3rd** 41:17,19

**4**

**4** 3:16 40:7 50:17
**4/21/20** 3:21,22
**4/6/20** 3:20
**4:05** 42:11 43:1
**40** 3:16
**405)235-3376** 1:24
**41** 3:17
**43** 3:18
**44** 3:20
**47** 3:21
**4th** 42:10 43:1

**5**

**5** 3:3,17 41:21
**5:39** 47:16
**5:54** 34:15
**50** 3:22
**51** 3:4
**56** 3:5
**58** 3:7
**59** 3:8
**5th** 2:11

**6**

**6** 3:18 43:11
**60** 3:9
**6th** 44:22 45:2
50:18

**7**

**7** 3:20 45:1
**702.925.8787** 2:6
**73104** 1:23
**74078** 2:12
**7881** 2:5

**8**

**8** 3:21 47:4
**85** 43:10
**89117** 2:5

**9**

**9** 3:22 50:9
**9:22** 37:15

**9:39** 37:11

**From:** Risco, Carlos A <carlos.risco@okstate.edu>
**Sent:** Sunday, March 22, 2020 3:40 PM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: PSC recommendation letter for Jonathan Rivera-Pierola

Hi Margi,
No problem I will have Deborah schedule a time to meet.

Thanks

CARLOS RISCO, DVM, DACT
PROFESSOR AND DEAN
College of Veterinary Medicine
405.744.6648 · 205 McElroy Hall
carlos.risco@okstate.edu · vetmed.okstate.edu

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Sunday, March 22, 2020 3:09 PM
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Subject:** FW: PSC recommendation letter for Jonathan Rivera-Pierola

Hi Carlos,

We can talk about this Monday when you have time so I can go over what can happen at this point. I would like to send Jonathan the letter tomorrow, but would prefer to meet with you first.

Thanks,
Margi

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Saturday, March 21, 2020 9:40 AM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Cc:** Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** PSC recommendation letter for Jonathan Rivera-Pierola

Dr. Gilmour,

Please find attached a letter recommending dismissal of Jonathan Rivera-Pierola. If there is any other information you need from the PSC, please let me know.

Regards,

Mason

Mason Reichard, MS, PhD
Professor
College of Veterinary Medicine
Oklahoma State University
Stillwater, OK 74078

<< File: Rivera-Pierola_PSC Dismissal Recommendation_21Mar2020.docx >>



PLAINTIFF'S EXHIBIT
Risco

**From:** Risco, Carlos A <carlos.risco@okstate.edu>
**Sent:** Monday, March 23, 2020 9:58 AM CDT
**To:** Shields, Deborah <deborah.shields@okstate.edu>
**Subject:** FW: Print for my 11 am
**Attachment(s):** "Rivera-Pierola_PSC Dismissal Recommendation_21Mar2020.docx"

Print the attached letter for my 11 am

Thanks

CARLOS RISCO, DVM, DACT
PROFESSOR AND DEAN
College of Veterinary Medicine
405.744.6648 · 205 McElroy Hall
carlos.risco@okstate.edu · vetmed.okstate.edu

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Sunday, March 22, 2020 3:09 PM
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Subject:** FW: PSC recommendation letter for Jonathan Rivera-Pierola

Hi Carlos,

We can talk about this Monday when you have time so I can go over what can happen at this point. I would like to send Jonathan the letter tomorrow, but would prefer to meet with you first.

Thanks,
Margi

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Saturday, March 21, 2020 9:40 AM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Cc:** Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** PSC recommendation letter for Jonathan Rivera-Pierola

Dr. Gilmour,

Please find attached a letter recommending dismissal of Jonathan Rivera-Pierola. If there is any other information you need from the PSC, please let me know.

Regards,

Mason

Mason Reichard, MS, PhD
Professor
College of Veterinary Medicine
Oklahoma State University
Stillwater, OK 74078

**From:** Rivera-pierola, Jonathan <jonariv@ostatemail.okstate.edu>
**Sent:** Tuesday, March 24, 2020 12:35 AM CDT
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Subject:** urgent; request to meet

Dear Dean Risco,

I just received a letter of dismissal and would like the opportunity to meet with you as soon as possible. As you mentioned to my parents a few weeks ago, I should reach out to talk to you. I understand I only have 5 days to appeal, so I would appreciate your time if you can spare it. I am committed to finishing my studies and would like the opportunity to continue. Thank you for your consideration and I hope to speak with you soon.

Sincerely,

Jonathan Rivera-Pierola



**From:** Tharp, Melinda
**Sent:** Tuesday, March 24, 2020 9:39 AM CDT
**To:** Jonathan Rivera-pierola <jonariv@ostatemail.okstate.edu>
**Subject:** RE: Meeting with Dean Risco

I will get that on his calendar.

Thank you,

**Melinda Tharp**
P | 405.744.6595
F | 405.744.6633

**From:** Jonathan Rivera-pierola <jonariv@ostatemail.okstate.edu>
**Sent:** Tuesday, March 24, 2020 9:22 AM
**To:** Tharp, Melinda <melinda.tharp@okstate.edu>
**Subject:** Re: Meeting with Dean Risco

Hello Melinda, the 1:30pm would be a good time for me. Thank you.

Regards,
Jonathan Rivera-Pierola


> On Mar 24, 2020, at 8:51 AM, Tharp, Melinda < melinda.tharp@okstate.edu> wrote:
>
> <image001.gif>
> Good morning,
>
> Dean Risco asked me to email you on his behalf to set up a meeting for today. He has
> availability at 10:30 a.m. and 1:30 p.m. Please let me know which of these times works best
> for you at your earliest convenience.
>
> Thank you,
>
> <image002.png>                Melinda Tharp
>                               **Senior Admin. Assoc, Office of the Dean**
>                               College of Veterinary Medicine
>                               405.744.6595 • 205C McElroy Hall
>                               _____ • _____ okstate.edu
>                               <image003.png>
>                               <image004.png>
>                               <image005.png>

**From:** Rivera-pierola, Jonathan <jonariv@ostatemail.okstate.edu>
**Sent:** Sunday, March 29, 2020 5:54 PM CDT
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Subject:** Letter of Appeal regarding decision
**Attachment(s):** "Rivera-Pierola, Jonathan 3-29-20.pdf"

Dean Risco,

Attached to this email is my letter of appeal regarding the decision made by the PSC. I hope this letter gives you a better understanding of my goals and willingness to change to become a better clinician. Please allow me the ability to complete my remaining 14 weeks of rotations so I can achieve my long term goal of becoming a veterinarian. Thank you for your time and consideration.

Sincerely,

Jonathan Rivera-Pierola, MPH



PLAINTIFF'S
EXHIBIT
3

PENGAD 800-631-6989

To: Dr. Carlos Risco, DVM, DACT
Dean of the College of Veterinary Medicine of Oklahoma State University

To: The Members of the Professions Standard Committee

Re: Dismissal from the College of Veterinary Medicine Program at Oklahoma State University

I am writing to appeal my academic dismissal from the CVM Program at OSU. Thank you for allowing me to have the opportunity to explain the circumstances that led to this point, as well as my action plan to improve on my performance in the program.

I met with the Professions Standard Committee on March 18, 2020 and I was unable to fully express the circumstances that led to my failed rotations. I got caught up in answering questions and found myself out of time to disclose the background situations that may have affected my performance and which situations I believe are relevant to the decision now being appealed. Also, as we are currently living through the COVID 19 pandemic, the anxiety of the meeting was increased and the distraction of current events did not permit a full discussion of my continued participation in the CVM Program.

I did not ignore the suggestions given to me on the evaluations. I took them seriously and attempted to implement them as best as I could. In retrospect, I failed to portray this clearly so that my professors could see the work I put into the recommended changes. I was perhaps too quiet, giving a misconception of who I am and what I stand for and the seriousness with which I took the suggestions and my continued and strong desire to continue at OSU.

During my Internal Medicine rotation, my father had a syncopal episode leading to a motor vehicle accident. He was rushed to the hospital and found to have a chest contusion, rib and sternal fractures and was admitted to the cardiac critical care unit. He was being evaluated for possible emergent cardiac surgery and stayed in the CCU for several days. This kept me anxious and distracted during my rotation. In retrospect, I now see that I should have communicated this to my professors or even taken a leave of absence rather than continue in the rotation.

On my Community Practice rotation, I got caught up in miscommunications leading to ambiguities and misunderstandings. This caused me to become stressed with fear of getting involved in another misunderstanding that may lead to my failure of the rotation. I truly internalized the constructive criticism and attempted to correct various issues on my own. In retrospect, I should have increased my communication with my professors and asked for assistance when needed.

I am receiving counseling with an OSU psychologist, Mr. Jeremiah Grissett, as recommended by the Dean of CVM. He is helping me see my role in these situations and providing me with good advice.

I truly have learned and appreciate all the clinicians' feedback through my rotations. I plan to utilize every piece of constructive criticism that I have received in the following manner:

1. Communication: I will make sure to communicate with the clinicians/residents/technicians involved in each case to ensure proper feedback on my performance and direction on results and areas of improvement. Specifically, I will ask for feedback from my clinicians at the beginning and end of each week so I could be in constant communication and agreement with them. And, I will ask for clarification if I am unclear on any instructions or assignments.

2. Case Preparation: I will improve on the preparation of cases. I will be more thorough in taking and documenting the history and physical exam. I will bring the documentation to my feedback sessions to go over with the clinicians in detail.

3. Patient care- I will arrive earlier than requested in the syllabus to ensure my review of patient's vital signs, medication sheets and to be sure that overnight notes have been double checked prior to rounds.

4. Demonstrate proper professional ethical behavior by working with my professors more frequently in a verbal and transparent way to avoid miscommunications.

Although I have not passed the Internal Medicine and Community Practice rotations, evaluations in both of these courses stated I have the potential to become a good veterinarian.

For example, from Internal Medicine:

"We are confident that you will achieve these goals. Jonathan, you have the knowledge and skills to pass small animal internal medicine and be a good veterinarian. We are hopeful that you will take these constructive comments and areas of improvement as ways to continue to develop as a future veterinarian. being capable of becoming a good clinician."

After evaluation of above mentioned and taking into consideration the changes I am willing to make now and in the next rotations, I am asking for reconsideration of the decision made on March 18, 2020. Becoming a veterinarian is of paramount importance to me. I am asking for the opportunity to be reinstated to the CVM Program at OSU and to demonstrate my willingness to do all that is necessary to become a competent veterinarian of whom this Program can be proud.

Sincerely,

Jonathan Rivera-Pierola, MPH

**From:** Risco, Carlos A
**Sent:** Monday, March 30, 2020 1:12 PM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Rivera letter
**Attachment(s):** "Rivera-Pierola, Jonathan 3-29-20.pdf"

Jonathan's letter – we can discuss

Thanks



CARLOS RISCO, DVM, DACT
PROFESSOR AND DEAN
College of Veterinary Medicine
405.744.6648 · 205 McElroy Hall
carlos.risco@okstate.edu · vetmed.okstate.edu

To: Dr. Carlos Risco, DVM, DACT
    Dean of the College of Veterinary Medicine of Oklahoma State University

To: The Members of the Professions Standard Committee

Re: Dismissal from the College of Veterinary Medicine Program at Oklahoma State University

I am writing to appeal my academic dismissal from the CVM Program at OSU. Thank you for allowing me to have the opportunity to explain the circumstances that led to this point, as well as my action plan to improve on my performance in the program.

I met with the Professions Standard Committee on March 18, 2020 and I was unable to fully express the circumstances that led to my failed rotations. I got caught up in answering questions and found myself out of time to disclose the background situations that may have affected my performance and which situations I believe are relevant to the decision now being appealed. Also, as we are currently living through the COVID 19 pandemic, the anxiety of the meeting was increased and the distraction of current events did not permit a full discussion of my continued participation in the CVM Program.

I did not ignore the suggestions given to me on the evaluations. I took them seriously and attempted to implement them as best as I could. In retrospect, I failed to portray this clearly so that my professors could see the work I put into the recommended changes. I was perhaps too quiet, giving a misconception of who I am and what I stand for and the seriousness with which I took the suggestions and my continued and strong desire to continue at OSU.

During my Internal Medicine rotation, my father had a syncopal episode leading to a motor vehicle accident. He was rushed to the hospital and found to have a chest contusion, rib and sternal fractures and was admitted to the cardiac critical care unit. He was being evaluated for possible emergent cardiac surgery and stayed in the CCU for several days. This kept me anxious and distracted during my rotation. In retrospect, I now see that I should have communicated this to my professors or even taken a leave of absence rather than continue in the rotation.

On my Community Practice rotation, I got caught up in miscommunications leading to ambiguities and misunderstandings. This caused me to become stressed with fear of getting involved in another misunderstanding that may lead to my failure of the rotation. I truly internalized the constructive criticism and attempted to correct various issues on my own. In retrospect, I should have increased my communication with my professors and asked for assistance when needed.

I am receiving counseling with an OSU psychologist, Mr. Jeremiah Grissett, as recommended by the Dean of CVM. He is helping me see my role in these situations and providing me with good advice.

Board01300

I truly have learned and appreciate all the clinicians' feedback through my rotations. I plan to utilize every piece of constructive criticism that I have received in the following manner:

1. Communication: I will make sure to communicate with the clinicians/residents/technicians involved in each case to ensure proper feedback on my performance and direction on results and areas of improvement. Specifically, I will ask for feedback from my clinicians at the beginning and end of each week so I could be in constant communication and agreement with them. And, I will ask for clarification if I am unclear on any instructions or assignments.

2. Case Preparation: I will improve on the preparation of cases. I will be more thorough in taking and documenting the history and physical exam. I will bring the documentation to my feedback sessions to go over with the clinicians in detail.

3. Patient care- I will arrive earlier than requested in the syllabus to ensure my review of patient's vital signs, medication sheets and to be sure that overnight notes have been double checked prior to rounds.

4. Demonstrate proper professional ethical behavior by working with my professors more frequently in a verbal and transparent way to avoid miscommunications.

Although I have not passed the Internal Medicine and Community Practice rotations, evaluations in both of these courses stated I have the potential to become a good veterinarian.

For example, from Internal Medicine:

"We are confident that you will achieve these goals. Jonathan, you have the knowledge and skills to pass small animal internal medicine and be a good veterinarian. We are hopeful that you will take these constructive comments and areas of improvement as ways to continue to develop as a future veterinarian. being capable of becoming a good clinician."

After evaluation of above mentioned and taking into consideration the changes I am willing to make now and in the next rotations, I am asking for reconsideration of the decision made on March 18, 2020. Becoming a veterinarian is of paramount importance to me. I am asking for the opportunity to be reinstated to the CVM Program at OSU and to demonstrate my willingness to do all that is necessary to become a competent veterinarian of whom this Program can be proud.


Sincerely,

Jonathan Rivera-Pierola, MPH

**From:** Gilmour, Margi
**Sent:** Monday, March 30, 2020 5:07 PM CDT
**To:** Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** FW: Jonathan Rivera-Pieorola appeal to the Dean
**Attachment(s):** "Rivera-Pierola, Jonathan 3-29-20.pdf"

FYI

**From:** Risco, Carlos A <carlos.risco@okstate.edu>
**Sent:** Monday, March 30, 2020 3:47 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>
**Cc:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Jonathan Rivera-Pieorola appeal to the Dean

Dear Dr. Reichard,

On March 29, 2020, I received from Jonathan Rivera-Pieorola the attached written appeal to reconsider the recommendation by the PSC for dismissal from the CVM professional program. In accordance to the CVM  Academic Standards Policy 8.2, Section 14, I am requesting that the committee consider his appeal and respond or make further recommendations to me within (5) working days after the appeals hearing. In his appeal, Jonathan addresses circumstances that contributed to his below acceptable academic performance on the Small Animal Internal Medicine and Community Practice rotations. Importantly, he provides a plan to improve his professional demeanor and performance on clinical rotations.

Thank you for your willingness and that of the committee to consider this request.



CARLOS RISCO, DVM, DACT
PROFESSOR AND DEAN
College of Veterinary Medicine
405.744.6648 · 205 McElroy Hall
carlos.risco@okstate.edu · vetmed.okstate.edu



PLAINTIFF'S
EXHIBIT
4



COLLEGE OF
**VETERINARY MEDICINE**

**Dr. Mason V. Reichard**
Professor
Department of Veterinary

250 McElroy Hall
Stillwater, OK 74078

April 03, 2020

Dr. Risco,

Per your request and in accordance with the CVM Academic Standards Policy 8.2, Section 14, the Professional Standards Committee (PSC) met to reconsider our dismissal recommendation of Mr. Jonathan Rivera-Pierola. This meeting took place on April 03, 2020 wherein we reviewed and discussed the appeal letter written by Mr. Rivera-Pierola. After careful deliberation, the PSC stands by our initial recommendation in which Mr. Rivera-Pierola be dismissed from our academic program.

Upon review of Mr. Rivera-Pierola's appeal letter, we found very little additional information that we did not already understand or appreciate from our meeting with him on March 18th. In fact, we found his appeal to be little more that restating why he did not deserve to fail rather than compelling information justifying reversal of our recommendation.

In his appeal letter, Mr. Rivera-Pierola states, "… I was unable to fully express the circumstances that led to my failed rotations. I got caught up in answering questions and found myself out of time to disclose the background situations that may have affected my performance and which situations I believe are relevant to the decision now being appealed." We do not believe this statement by Mr. Rivera-Pierola as factual. We gave Mr. Rivera-Pierola an open platform to communicate anything he wished. Mr. Rivera-Pierola spoke uninterrupted for more than an hour and used notes he prepared ahead of time. We asked Mr. Rivera-Pierola a few questions seeking nothing more than clarification of comments he made from his prepared notes. Furthermore, Mr. Rivera-Pierola kept referring back to his prepared notes and repeating his same comments. We did ask him to conclude after an hour of him rehashing the exact same comments. We believe Mr. Rivera-Pierola was given able opportunity to express himself fully.

In his appeal letter, Mr. Rivera-Pierola did provide that he has identified areas (e.g., communication, case preparation, patient care, professional ethical behavior) for which he needs to improve. However, we found his improvement plan to be vague, superficial, and lack sufficient detail to reverse our dismissal recommendation. Mr. Rivera-Pierola writes that he has started to seek the services of Mr. Jeremiah Grissett, CVM Counselor and Wellness Coordinator. We were pleased to hear this and hope that Mr. Rivera-Pierola continues to seek the services of a professional counselor. We believe this will help him become self-aware and take ownership of his actions.

Two members of the PSC were unable to attend the appeal meeting however, one of those absent provided written comments to the PCS Chair that were reviewed by all in attendance. The four PSC members present at the meeting were in full agreement to stand by our initial recommendation that Mr. Rivera-Pierola be dismissed.

Regards,

Professional Standards Committee (PSC) 2019–2020
Dr. Kelly Allen
Dr. Mike Davis
Dr. Erik Clary
Dr. Lyndi Gilliam
Dr. Myron Hinsdale
Dr. Mason Reichard, Chair



**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Saturday, April 04, 2020 4:05 PM CDT
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pieorola appeal to the Dean
**Attachment(s):** "Risco proposal for sanctions 3-30-20.docx"

Hi Carlos,

FYI I summarized the recommendations you had outlined when we last spoke about Jonathan's case. I have attached them for your convenience in case you elect to let Jonathan continue in the program. Also, so you don't have to look it up, the academic policy reads at this point: "The PSC shall respond . . . to the Dean within 5 working days after the appeals hearing, **and the Dean shall render his decision within 5 working days of receipt of the recommendation. The decision of the Dean shall be final and no further appeal will be available. The Dean will provide a summary report to the PSC detailing the basis for his final action regarding the appeal.**"

We will want to provide him with a decision before Friday April 10th as that is the last day of the current rotation.

Let me know if you need anything else or have any questions.

M.

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Saturday, April 04, 2020 2:07 PM
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Cc:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pieorola appeal to the Dean

Dr. Risco,

The PSC meet yesterday to hear the appeal of Mr. Jonathan Rivera-Pierola. After a thorough discussion of his letter and comments, we found little to no justification for us to reverse our recommendation for dismissal. Please see the attached letter for more details.

I truly wish we had a different outcome for Mr. Rivera-Pierola.

Respectfully,

Mason

**From:** Risco, Carlos A <carlos.risco@okstate.edu>
**Sent:** Monday, March 30, 2020 3:47 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>
**Cc:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Jonathan Rivera-Pieorola appeal to the Dean

Dear Dr. Reichard,
On March 29, 2020, I received from Jonathan Rivera-Pieorola the attached written appeal to reconsider the recommendation by the PSC for dismissal from the CVM professional program. In accordance to the CVM Academic Standards Policy 8.2, Section 14, I am requesting that the committee consider his appeal and respond or make further recommendations to me within (5) working days after the appeals hearing. In his appeal, Jonathan addresses circumstances that contributed to his below acceptable academic performance on the Small Animal Internal Medicine and Community Practice rotations. Importantly, he provides a plan to improve his professional demeanor and performance on clinical rotations.

Thank you for your willingness and that of the committee to consider this request.



**CARLOS RISCO, DVM, DACT**
PROFESSOR AND DEAN
College of Veterinary Medicine
405.744.6648 · 205 McElroy Hall



3-30-20

What Risco proposed for J R-P:

1. Finish rotation he is currently in (online now)
2. Be suspended from program until we are back to in-person rotation
3. Remediate CP and SAIM before being allowed to complete remaining rotations
4. Must receive C or higher. If he receives a D he will be dismissed with no PSC review or appeal.
5. He will be on probation for the remainder of his time here; if he receives a D in any other rotation, he will be dismissed with no PSC review or appeal.
6. He must adhere to the actionable items in his letter of appeal

Board01385

COLLEGE OF
**VETERINARY MEDICINE**

College of Veterinary Medicine
205 McElroy Hall
Stillwater, Oklahoma 74078

Phone: (405) 744-6651
Fax: (405) 744-6633
Dean: (405) 744-6648
Associate Dean: (405) 744-6595

Date:    April 6, 2020

To:    Professional Standards Committee Oklahoma State University, College of Veterinary
Medicine

From:  Dr. Carlos A. Risco
Dean, Oklahoma State University College of Veterinary Medicine

Dear Dr. Reichard,

After careful consideration of the response of the PSC committee to my request to reconsider the
dismissal of Jonathan Rivera – Pierola based on his letter of appeal, I have decided to take the
following action. I will allow him to remain in the professional program with the following
conditions:

- He will be allowed to complete his current rotation (Rotation 16) and must achieve a C
  grade or higher. Failure to do so will result in dismissal from the program without PSC
  review or appeal.
- He will be placed on Academic Suspension until both failed rotations (Community Practice
  and Small Animal Internal Medicine) are remediated through participation in in-person
  rotations. Due to the COVID-19 crisis and current use of on-line curriculum, he will be
  suspended from clinical rotations until the hospital reopens to students and in-person
  rotations resume.
- He must receive a C grade or higher in both remediated rotations. Failure to do so will
  result in dismissal from the program without PSC review or appeal.
- He will continue on Academic Probation for the duration of his clinical year. Failure to
  receive a C grade or higher on any rotation during the remaining clinical year will result in
  dismissal from the program without PSC review or appeal.
- He will be held accountable for the plan of improvement included in his letter of appeal:
  communication, case preparation, patient care, and professional and ethical behavior.

Dr. Gilmour will inform Jonathan of my decision in a letter outlining these conditions.

My decision does not trivializes the concerns expressed by the PSC committee. Indeed, the
committee points out serious flaws in Jonathan's academic performance and comportment that
concern me. However, I am willing to give him an opportunity to remediate the rotations that he



PLAINTIFF'S
EXHIBIT
7
Risco

Board01415



COLLEGE OF
**VETERINARY MEDICINE**

failed and perform in his remaining rotations at the level expected from all students in our program. I am hopeful that he takes advantage of this opportunity to salvage his education.

I appreciate the committee's time and thoughtful deliberation to Jonathan's appeal.

Sincerely,

Carlos Risco, DVM, DACT
Professor and Dean
Oklahoma State University
Center for Veterinary Health Sciences

Board01416

**From:** Di Concetto, Stefano on behalf of Di Concetto, Stefano <sdiconc@okstate.edu>
**Sent:** Tuesday, April 21, 2020 11:07 AM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**CC:** Risco, Carlos A <carlos.risco@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Subject:** Re: Jonathan Rivera

He failed the quiz pretty badly. If they don't get at least 70% in each of the two components that are assessed, they fail the rotation. This has been the rule in the old syllabus and all the students in the 2019-2020 year have been treated according to this. It is stated in red on the top of the grading sheet.
Those who failed the clinical part and passed the written exam were given the choice to retain the grades from the written exam or to retake it when they repeated the rotation. Those who failed the written exam clearly retook it when they repeated the rotation.

The written exam is what truly captures their knowledge base more objectively. However, in this case, it may be argued that the complete lack of hands on opportunities and of the chance to apply theoretical knowledge to clinical scenarios, and consolidate theoretical knowledge from monitoring and observing live animals under anesthesia might have contributed to a suboptimal performance. That is why I would be open to making him retake the rotation when we are back to the in-person option, so he can be assessed on the full spectrum of activities and will have time to re-study the exam.

If making him come back in person is not an options and the school decides to give him another chance, it may be discussed to make him repeat the online rotation and retake the quiz.

I agreed to go over the failed questions with Jonathan and give him more details about which areas were the weakest.

Lucy, should something like this happen again, I think it would be better to put D as a letter grade, following the rule that getting < 70% in one of the two sections means results in a failing grade.

SD

---

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Tuesday, April 21, 2020 9:48 AM
**To:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Cc:** Risco, Carlos A <carlos.risco@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Subject:** RE: Jonathan Rivera

Hi Stefano,

It looks like from your email below and Jonathan's that he failed the rotation however, the grade sheet Lucy sent me says his overall grade is a C. Can you please clarify what Jonathan's final grade is for the Anesthesia rotation?

M.

**From:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Sent:** Monday, April 20, 2020 5:39 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Re: Jonathan Rivera

It was not a matter of softening things or making exceptions but a way to prepare myself for what you will read below – Jonathan's expected reply to my notification about his failing grade.
Given the abnormal nature of the rotation, to me it would make sense to allow someone to repeat it once the circumstances are normalized, especially when, in his case, failing this unconventional rotation results in being dismissed from the program. And if the circumstances don't become normal soon enough, I think he should be at least allowed to retake the written quiz, with the agreement that if he fails it there will be no other chances.

SD

Hello Dr. Di,

I just read your email and I am left without words. I studied so hard for this course, reviewing all the concepts I could to make sure that I had grasp them properly.Sending you my questions to go over the things that I was unsure about and asking you for your feedback along the way.  Please tell me what concepts I missed on the exam because I thought that I had done well. I know that I missed the final two questions due to time restraints but by no means did I think I failed it.
I have worked all of my life to get to this point. I have three months left of school to complete my veterinary medicine degree, is there anything that I can do to change this failing grade. If I fail this course I can no longer continue my studies. This would devastate me and my family both mentally and financially. I have devoted the last 12 years of my life to this and I'm willing to do anything at this point to finish these last three months and start my life as a veterinarian.

Regards,

PLAINTIFF'S EXHIBIT
8
Risco
PENGAD 800-631-6989

Jonathan Rivera-Pierola

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Friday, April 17, 2020 5:12 PM
**To:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Subject:** RE: Jonathan Rivera

Hello Stefano,

My suggestion is to evaluate Jonathan according to your revised (COVID-19) syllabus and as the other students were evaluated. You do not need to alter, soften or make any exceptions.

Margi

**From:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Sent:** Friday, April 17, 2020 2:23 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Cc:** Naff, Adam <adam.naff@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Subject:** Jonathan Rivera

|  | Possible Points | John Rivera |
|---|---|---|
| General knowledge | 200 | 140 |
| Case work-up and presentation | 100 | 80 |
| Assignments and topics | 100 | 85 |
| Professional conduct | 100 | 90 |
| TOT | 500 | 395 |
|  |  | 79% |

| Written exam | 150 | 99.6 |
|---|---|---|
|  |  | 66.4% |

Hello,

before making Jonathan's grades official I wanted to touch base as I understand his situation is quite delicated. Below is what I wrote in his assessment.
Given the nature of the Covid emergency and the rapid adjusting to online teaching needed, I did my best to try and take notes on what each student said every day. However, I am not in the position to provide a detailed report.

My subjective assessment (see below in red) is that Jonathan's performance was at a C level, he did reasonably well in the open book assignments and was not super-active in rounds. He bombed the final exam and given the fact that there is not assessment of his clinical competencies, the exam remains the most objective way to evaluate his performance. Note that the exam grade would have been even lower: I gave three points back to everyone.

I thought it might be worth giving him the opportunity to repeat the rotation once things are back to normal and we can work with him in the clinics.

Let me know what you think.

SD

Jonathan Rivera

This evaluation is based on subjective and objective assessment of your foundation knowledge of anesthesia, physiology, pathophysiology and other disciplines relevant to anesthesia. Due to the restrictions imposed by the on-line activity, this assessment does not include your clinical competencies and only partly reflects your ability to apply theoretical knowledge to clinical scenarios.

My overall impression is that your foundation knowledge and understanding of anesthesia and related physiology and pathophysiology is not as strong as it should be at this point in your curriculum. There seem to be areas of weakness and lack of clarity and unfortunately the outcome of the written exam confirms this.

Board01465

**From:** Gilmour, Margi
**Sent:** Tuesday, April 21, 2020 2:27 PM CDT
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Subject:** FW: Jonathan Rivera
**Attachment(s):** "Copy of Rivera_Anesthesia_Grade Sheet.xlsx"

Hi Carlos,

Attached is the correct grade sheet (with the D grade). You can read all of Dr. DiConcetto's thoughts, and Jonathan's comments, throughout the email trail below. Please let me know your decision and I will communicate to Jonathan unless you tell me otherwise.

Thanks.
Margi

**From:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Sent:** Tuesday, April 21, 2020 1:34 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Subject:** Re: Jonathan Rivera

Here it is.

SD

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Tuesday, April 21, 2020 12:53 PM
**To:** Kershaw, Lucinda <lucinda.kershaw@okstate.edu>; Di Concetto, Stefano <sdiconc@okstate.edu>
**Subject:** RE: Jonathan Rivera

Will one of you please send me the final grade sheet that will be retained for course records and that has been or will be sent to the student? Obviously it must reflect the final grade accurately.

**From:** Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Sent:** Tuesday, April 21, 2020 11:49 AM
**To:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Cc:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: Jonathan Rivera

Yes. For now, just manually change the grade to **66.40% (D) on the spreadsheet.**



**LUCINDA KERSHAW**
Administrative Associate
College of Veterinary Medicine
405.744.8468 • Academic Center
Lucinda.kershaw@okstate.edu
vet.okstate.edu

**From:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Sent:** Tuesday, April 21, 2020 11:08 AM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Cc:** Risco, Carlos A <carlos.risco@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Subject:** Re: Jonathan Rivera

He failed the quiz pretty badly. If they don't get at least 70% in each of the two components that are assessed, they fail the rotation. This has been the rule in the old syllabus and all the students in the 2019-2020 year have been treated according to this. It is stated in red on the top of the grading sheet.
Those who failed the clinical part and passed the written exam were given the choice to retain the grades from the written exam or to retake it when they repeated the rotation. Those who failed the written exam clearly retook it when they repeated the rotation.

The written exam is what truly captures their knowledge base more objectively. However, in this case, it may be argued that the complete lack of hands on opportunities and of the chance to apply theoretical knowledge to clinical scenarios, and consolidate theoretical knowledge from monitoring and observing live animals under anesthesia might have contributed to a suboptimal performance. That is why I would be open to making him retake the rotation when we are back to the in-person option, so he can be assessed on the full spectrum of activities and will have time to re-study for the exam.

If making him come back in person is not an options and the school decides to give him another chance, it may be discussed to make him repeat the online rotation and retake the quiz.

I agreed to go over the failed questions with Jonathan and give him more details about which areas were the weakest.

Board01466

Lucy, should something like this happen again, I think it would be better to put D as a letter grade, following the rule that getting < 70% in one of the two sections means results in a failing grade.

SD

From: Gilmour, Margi <margi.gilmour@okstate.edu>
Sent: Tuesday, April 21, 2020 9:48 AM
To: Di Concetto, Stefano <sdiconc@okstate.edu>
Cc: Risco, Carlos A <carlos.risco@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
Subject: RE: Jonathan Rivera

Hi Stefano,

It looks like from your email below and Jonathan's that he failed the rotation however, the grade sheet Lucy sent me says his overall grade is a C. Can you please clarify what Jonathan's final grade is for the Anesthesia rotation?

M.

From: Di Concetto, Stefano <sdiconc@okstate.edu>
Sent: Monday, April 20, 2020 5:39 PM
To: Gilmour, Margi <margi.gilmour@okstate.edu>
Subject: Re: Jonathan Rivera

It was not a matter of softening things or making exceptions but a way to prepare myself for what you will read below – Jonathan's expected reply to my notification about his failing grade.
Given the abnormal nature of the rotation, to me it would make sense to allow someone to repeat it once the circumstances are normalized, especially when, in his case, failing this unconventional rotation results in being dismissed from the program. And if the circumstances don't become normal soon enough, I think he should be at least allowed to retake the written quiz, with the agreement that if he fails it there will be no other chances.

SD

Hello Dr. Di,

I just read your email and I am left without words. I studied so hard for this course, reviewing all the concepts I could to make sure that I had them grasp properly, Sending you my questions to go over the things that I was unsure about and asking you for your feedback along the way.  Please tell me what concepts I missed on the exam because I thought that I had done well. I know that I missed the final two questions due to time restraints but by no means did I think I failed it.
I have worked all of my life to get to this point. I have three months left of school to complete my veterinary medicine degree, is there anything that I can do to change this failing grade. If I fail this course I can no longer continue my studies. This would devastate me and my family both mentally and financially. I have devoted the last 12 years of my life to this and I'm willing to do anything at this point to finish these last three months and start my life as a veterinarian.

Regards,
Jonathan Rivera-Pierola

From: Gilmour, Margi <margi.gilmour@okstate.edu>
Sent: Friday, April 17, 2020 5:12 PM
To: Di Concetto, Stefano <sdiconc@okstate.edu>
Subject: RE: Jonathan Rivera

Hello Stefano,

My suggestion is to evaluate Jonathan according to your revised (COVID-19) syllabus and as the other students were evaluated. You do not need to alter, soften or make any exceptions.

Margi

From: Di Concetto, Stefano <sdiconc@okstate.edu>
Sent: Friday, April 17, 2020 2:23 PM
To: Gilmour, Margi <margi.gilmour@okstate.edu>
Cc: Naff, Adam <adam.naff@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
Subject: Jonathan Rivera

Board01467

|  | Possible Points | John Rivera |
|---|---|---|
| General knowledge | 200 | 140 |
| Case work-up and presentation | 100 | 80 |
| Assignments and topics | 100 | 85 |
| Professional conduct | 100 | 90 |
| TOT | 500 | 395 |
|  |  | 79% |

| Written exam | 150 | 99.6 |
|---|---|---|
|  |  | 66.4% |

Hello,

before making Jonathan's grades official I wanted to touch base as I understand his situation is quite delicated. Below is what I wrote in his assessment.

Given the nature of the Covid emergency and the rapid adjusting to online teaching needed, I did my best to try and take notes on what each student said every day. However, I am not in the position to provide a detailed report.

My subjective assessment (see below in red) is that Jonathan's performance was at a C level, he did reasonably well in the open book assignments and was not super-active in rounds. He bombed the final exam and given the fact that there is not assessment of his clinical competencies, the exam remains the most objective way to evaluate his performance. Note that the exam grade would have been even lower: I gave three points back to everyone.

I thought it might be worth giving him the opportunity to repeat the rotation once things are back to normal and we can work with him in the clinics.

Let me know what you think.

SD

Jonathan Rivera

This evaluation is based on subjective and objective assessment of your foundation knowledge of anesthesia, physiology, pathophysiology and other disciplines relevant to anesthesia. Due to the restrictions imposed by the on-line activity, this assessment does not include your clinical competencies and only partly reflects your ability to apply theoretical knowledge to clinical scenarios.

My overall impression is that your foundation knowledge and understanding of anesthesia and related physiology and pathophysiology is not as strong as it should be at this point in your curriculum. There seem to be areas of weakness and lack of clarity and unfortunately the outcome of the written exam confirms this.

Board01468

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Anesthesia   - Rotation  16  (3/23/2020  to  4/12/2020) | | | | | | | |
| 2 | Grading Scale: 90-100 = A; 80-89.9 = B; 70-79.9 = C; 60-69.9 = D; <60 = F  At least 70% must be achieved in each of the two sections in order to pass the rotation. | | | | | | | |
| 3 | Section 1 | John | | | | | | |
| 4 | | Rivera | | | | | | |
| 5 | General Knowledge (200 points) | 140 | | | | | | |
| 6 | Case work-up and presentation (100 points) | 80 | | | | | | |
| 7 | Assignments and topics (100 points) | 85 | | | | | | |
| 8 | Professional conduct (100 points) | 90 | | | | | | |
| 9 | Total Points Possible (500 points) | 395 | | | | | | |
| 10 | Percent Section 1 | 79% | | | | | | |
| 11 | Section 2 | | | | | | | |
| 12 | Written exam points possible (150 points) | 99.6 | | | | | | |
| 13 | Percent Section 2 | 66.40% | | | | | | |
| 14 | Combined Section 1 & 2 Percent | | | | | | | |
| 15 | Letter Grade | D | | | | | | |

Board01469

**From:** Gilmour, Margi
**Sent:** Tuesday, April 21, 2020 2:55 PM CDT
**To:** Rivera-Pierola, Jonathan <jonariv@okstate.edu>
**CC:** Risco, Carlos A <carlos.risco@okstate.edu>; Alan Emsley <Obans_Rover@msn.com>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>; Holyoak, Reed <reed.holyoak@okstate.edu>; Reichard, Mason <mason.reichard@okstate.edu>
**Subject:** Rotation 16
**Attachment(s):** "Rivera-Pierola, Jonathan 4-21-20.pdf"

Jonathan,

Please see the attached letter regarding rotation 16.


Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs
College of Veterinary Medicine
Oklahoma State University
405-744-8471 margi.gilmour@okstate.edu

Board01470

Office of the Dean
205 McElroy Hall
Stillwater, Oklahoma 74078

Phone: (405) 744-6648
Fax: (405) 744-6633

April 21, 2020

Dear Jonathan,

I am very sorry to inform you that due to receiving a D grade in the Anesthesia rotation (rotation 16), per the Academic Suspension guidelines outlined in the letter dated 4-6-20, you are dismissed from the OSU CVM clinical year program with no Professional Standards Committee review or appeal.

The Dean has reviewed your academic record and has approved the dismissal action.

It is with deep regret we relay this decision.

Sincerely,

Margi A. Gilmour

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs

PLAINTIFF'S
EXHIBIT
9
Risco

PENGAD 800-631-6989