```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF OKLAHOMA
 2

 3    JONATHAN RIVERA-PIEROLA,        )
                                      )
 4             Plaintiff,             )
                                      )
 5    -vs-                            )No. 5:21-cv-00616-PRW
                                      )
 6    BOARD OF REGENTS FOR THE        )
      OKLAHOMA AGRICULTURAL AND       )
 7    MECHANICAL COLLEGES; STATE      )
      OF OKLAHOMA ex rel. OKLAHOMA    )
 8    STATE UNIVERSITY; and ST.       )
      MATTHEWS UNIVERSITY, INC.,      )
 9                                    )
               Defendants.            )
10

11                     CERTIFIED COPY

12

13         DEPOSITION OF JONATHAN RIVERA-PIEROLA

14
             TAKEN ON BEHALF OF THE DEFENDANTS
15

16              IN OKLAHOMA CITY, OKLAHOMA

17
                   ON APRIL 26, 2023
18

19

20

21

22

23

24

25    REPORTED BY:  ELIZABETH J. CAMPBELL, CSR #162, RPR
```

Page 2

APPEARANCES

1
2
3 FOR THE PLAINTIFF:
4
5    JASON BACH
     Attorney at Law
6    7881 W. Charleston Boulevard, Suite 165
     Las Vegas, Nevada  89117
7    jbach@bachlawfirm.com
8 FOR THE DEFENDANTS:
9
10   CLINTON W. PRATT
     Attorney at Law
11   Board of Regents for the Oklahoma
     Agricultural and Mechanical Colleges
12   5th Floor, Student Union Building
     Oklahoma State University
13   Stillwater, Oklahoma  74078-7044
     clint.pratt@okstate.edu
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

DEFENDANT EXHIBITS

| Number | Description | Page | Line |
|---|---|---|---|
| 1 | St. Matthew's School of Veterinary Medicine Transcript of Academic Record Bates Board00002 | 47 | 4 |
| 2 | Evaluation of Internal Medicine Rotation Bates Board68-70 | 67 | 10 |
| 3 | Confidential Letter October 3, 2018 to Jonathan from Margi Gilmour Bates Board00089 | 80 | 12 |
| 4 | Community Practice Evaluation Bates Board00084 | 110 | 6 |
| 5 | Letter March 23, 2020 to Jonathan from Margi Gilmour | 133 | 13 |
| 6 | Appeal Letter to Dr. Carlos Risco, The Members of the Professional Standards Committee from Jonathan Rivera-Pierola Bates Board00281 | 139 | 2 |
| 7 | Letter April 6, 2020 to Jonathan from Margi Gilmour Bates Board00094 | 156 | 2 |
| 8 | Anesthesia - Rotation 16 Evaluation Grade Bates Board00086 | 171 | 1 |

Page 4

| 9 | Letter April 21, 2020 to Jonathan from Margi Gilmour Bates Board00095 | 182 | 1 |
| 10 | Group Email April 10, 2020 Bates Board01445 | 197 | 6 |
| 11 | Oklahoma State University Policy and Procedures Academic Integrity Policy | 226 | 10 |

Page 5

CONTENTS

|  | Page | Line |
|---|---|---|
| STIPULATIONS | 6 | 1 |
| DIRECT EXAMINATION BY MR. PRATT | 7 | 6 |
| CROSS EXAMINATION BY MR. BACH | 261 | 19 |
| SIGNATURE REQUIRED | 264 | 13 |
| JURAT | 265 | 1 |
| ERRATA SHEET | 266 | 1 |
| REPORTER'S CERTIFICATE | 268 | 1 |

Page 6

```
1        S T I P U L A T I O N S
2        IT IS HEREBY STIPULATED AND AGREED BY and
3   between the parties hereto, through their respective
4   attorneys, that the deposition of JONATHAN
5   RIVERA-PIEROLA may be taken on behalf of the
6   Defendants on April 26, 2023, in Oklahoma City,
7   Oklahoma, by Elizabeth J. Campbell, a Certified
8   Shorthand Reporter for the State of Oklahoma,
9   pursuant to Notice and Agreement and in accordance
10  with the Federal Rules of Civil Procedure.
11       IT IS FURTHER STIPULATED AND AGREED BY and
12  between the parties hereto, through their respective
13  attorneys, that all objections, except as to the
14  form of the question and responsiveness of the
15  answer, are reserved until the time of trial, at
16  which time they may be made with the same force and
17  effect as if made at the time of the taking of this
18  deposition.
19              * * * * * *
20
21
22
23
24
25
```

Page 7

```
1           JONATHAN RIVERA-PIEROLA,
2   being first duly sworn, deposes and says in reply to
3   the questions propounded as follows
4              * * * * * *
5   (Proceedings commenced at 9:58)
6           DIRECT EXAMINATION
7   BY MR. PRATT:
8       Q   Will you state your full name for the
9   record.
10      A   Sure.  My full name is Jonathan Andrew
11  Rivera-Pierola.
12      Q   What would you prefer I call you as we talk
13  to each other today?  I would normally call you
14  Mr. Rivera-Pierola.
15      A   Sure.
16      Q   Or I can call you Jon or Jonathan, whatever
17  you prefer.
18      A   Jonathan is fine.
19      Q   Okay.  My name is Clint Pratt.  I'm
20  Associate General Counsel for the Board of Regents.  I
21  represent the Board and I represent the institutions
22  that the Board governs.  In this case that's Oklahoma
23  State University.
24      A   Okay.
25      Q   Have you ever been deposed before?
```

Page 8

```
1       A   No.  First time.
2       Q   Okay.  I bet your attorney has talked to you
3   a little bit about what to expect.
4       A   Yes.
5       Q   I'm going to kind of just brief you on what
6   I think we should expect so we're kind of playing with
7   the same rules today and you kind of know what to
8   expect.
9           Okay?
10      A   Sure.
11      Q   First and foremost, we will take breaks
12  whenever you need to.  This is not a marathon where
13  you have to make it through.  If you need a break at
14  any point, please let me know.
15      A   Sure will.  Yes.
16      Q   The only rule to that is if I've asked you a
17  question I would ask that you answer it before we take
18  that break.  That's the only rule I have with regard
19  to breaks.
20          Okay?
21      A   Okay.
22      Q   As you heard earlier, we're going to plan to
23  order lunch in.  If you start feeling like you need
24  food or whatever, my guess is it will be here around
25  noon but we'll just kind of work around that, see
```

Page 9

```
1   where we are in terms of how the deposition is falling
2   and then we'll go from there.
3       A   Okay.
4       Q   As you may know or have noted, the court
5   reporter is here.  She's taking down everything that
6   we are saying so that there will be a transcript at
7   the end that we can review and use for evidence or
8   something that we can at least go back to see what we
9   talked about today.
10      A   Okay.
11      Q   That being said, we want to make sure that
12  the record is clear.  To do that, we have to abide by
13  a few rules.  I myself have to be reminded of this at
14  times.  We want to try to not talk too quickly.  It
15  makes it hard for her to type.  She's probably already
16  saying, would you listen to your own rule.  It's a
17  tendency I have.  I talk too fast.  We want to try to
18  not talk over one another.
19      A   Yes.
20      Q   We want to make sure she can hear what we're
21  saying and not trying to type down while we're
22  interrupting one another.  Sometimes that just happens
23  and that's okay.  But let's try to avoid that.  I'll
24  try to avoid it when I ask a question and I'll try to
25  wait until you give a full response.  And same for me,
```

Page 10

1  if you let me ask my full question before you start to
2  respond.
3      Okay?
4  A   Sure.
5      Q   First probably key rule here that you've
6  probably already been told is with her trying to take
7  down a record, uh-huh, huh-uh, those types of things,
8  they're hard to get down.
9  A   All right.
10     Q   Same with nonverbal communication, head
11 nods, shaking your head, those are hard.  So if I ask
12 you, if you do shake your head or something, and I
13 say, is that a yes or is that a no, that's not me
14 being rude to you, that's just me trying to make
15 sure --
16 A   She understands.
17     Q   -- she can get the record.
18     Okay?
19 A   I understand.
20     Q   I guarantee you I will ask multiple poorly
21 worded questions.  It's going to happen.
22 A   Okay.
23     Q   There's no problem with you telling me, can
24 you please restate that or I don't understand.  We'll
25 make sure that I'm asking you questions that you fully

Page 11

1  understand and can fully respond to.  I'm not playing
2  a game of trying to trick you or ask things that you
3  don't understand.
4  A   Sure.
5      Q   I want to make sure that we're on the same
6  page when I ask a question.
7      Okay?
8  A   Sounds good.
9      Q   Additionally, as we move forward today your
10 attorney may object to some of the questions I ask.
11 Okay.  And that's fine.  That's part of him making his
12 announcement for the record.
13     Unless he instructs you specifically to not
14 answer the question after he objects, you will go
15 ahead and answer the question.
16     Now, oftentimes that kind of messes with you
17 and you may need me to repeat the question and that's
18 fine but just know that just because he objects,
19 that's something that we would expect to hear during a
20 deposition and it doesn't mean you don't answer the
21 question.
22     Okay?
23 A   Okay.
24     Q   All right.  I think we're good to go.  We'll
25 kind of get started with I would just like to get to

Page 12

1  know you a little bit.
2  A   Sure.
3      Q   How old are you?
4  A   I'm 37 years old.
5      Q   Okay.  Are you married?
6  A   No.  Single.
7      Q   Have you ever been married?
8  A   No.
9      Q   Do you have any children?
10 A   No.
11     Q   Where do you currently reside?
12 A   Currently reside in West Palm Beach,
13 Florida.
14     Q   What's your address?
15 A   732 Ibis Way, North Palm Beach.  Actually,
16 it's North Palm Beach, excuse me, North Palm Beach,
17 Florida, 33408.  The big city is in West Palm Beach,
18 so.
19     Q   Do you live alone?
20 A   No.  I live with my family, my parents right
21 now.
22     Q   Okay.  How long have you lived there?
23 A   I've lived there, whew, probably a little
24 over 20 years now.  Yeah.
25     Q   Okay.

Page 13

1  A   It's been quite awhile.
2      Q   Who all lives there with you?
3  A   Currently my mother and my father live there
4  right now.
5      Q   Okay.  So just the three of you?
6  A   Yes.  Correct.
7      Q   Are you currently employed?
8  A   Yes.  I am working with my father in the
9  veterinary clinic as a veterinary assistant.
10     Q   Okay.  I want to talk a little bit about
11 that.
12     So who is your employer?
13 A   My father.
14     Q   Father?
15 A   Yes.
16     Q   Does he own the veterinary clinic?
17 A   Yes, he does.
18     Q   What's the name of the veterinary clinic?
19 A   West Gate Animal Hospital.
20     Q   Okay.  How many veterinarians work there?
21 A   Just him.
22     Q   Okay.  What did you say your title is?
23 A   Veterinary assistant.
24     Q   How many veterinary assistants work there?
25 A   Just me.

Page 14

1    Q   Okay.  Can you give me a total number, and
2  this is an approximation, a total number of employees
3  at the vet clinic?
4    A   Sure.  There's about three others.  We have
5  a technician.  We have two receptionists and --
6  actually, that's it right now.  We had a groomer but
7  she left about a year ago, so.
8    Q   Okay.  So the veterinary technician, what
9  are the roles and responsibilities for that position?
10   A   Sure.  So for the veterinary technician
11 responsibilities, they usually are restraining
12 animals.  They are doing -- they can do small
13 procedures but usually they -- those involve like
14 things in the lab, things like take samples, things
15 like that, nothing too -- that the vet -- that the vet
16 should do instead.  Clean kennels, helping with
17 surgeries I guess sometimes in surgeries.
18       Sometimes in surgeries they're assisting
19 with checking the anesthesia machine with the
20 veterinarian there, helping while he's doing surgery.
21 They are sterilizing equipment.  They're just doing
22 mostly the stuff like that involves to help the
23 veterinarian in some way where when their hands are
24 full situation.
25   Q   What type of training or education do they

Page 15

1  typically have for that role, do you know?
2    A   They usually do an RVT.  So they usually
3  do -- it's not always the case.  It's not required.
4  But in that case, they usually require I think two or
5  three years of experience.
6        They usually go to a technical school for
7  that now.  But it is not required for you to have that
8  education for you to work there.  It usually just
9  deals with experience over time.  They learn what they
10 need to do with the veterinarian or experience from
11 the past.
12   Q   So what duties or responsibilities do you
13 have as the veterinary assistant?
14   A   As a veterinary assistant, I am there to do
15 what he can do but I'm also there to also assist in
16 the surgeries.  I'm actually doing surgeries with the
17 veterinarian in place there as well, my father.
18   Q   When you say "do what he can do," are you
19 referring to the vet tech or the veterinarian stuff?
20   A   The veterinarian, yes.
21   Q   Okay.  Give me a day-to-day idea of what
22 your day looks like at the vet clinic.
23   A   Sure.  So as I enter the vet clinic, I
24 usually look at the surgeries for today.  That's
25 usually the first thing I usually do.  I'll look at

Page 16

1  the surgery list, what's for today, procedures or any
2  procedures that need to be done.  From there I'm also
3  looking at appointments, what appointments are there
4  for today.
5        Every appointment on there, helping
6  animals -- when the technician is not available, when
7  he's in another -- maybe cutting nails or something
8  with another patient in another room, I'm there to
9  restrain the animal, doing the things that he does but
10 plus I'm also able to do procedures with the
11 veterinarian there as well in place, attending there.
12       Those are involving procedures where that
13 the tech cannot do, I guess, certain things and that
14 also involves me actually performing surgery.
15   Q   So am I correct then, if I was to create a
16 tier system, who can do the amount of things in the
17 vet clinic, the vet tech would be at the bottom of
18 that tier, then you as a veterinary assistant.
19   A   This is not including receptionist.  Sorry.
20   Q   Correct.  I'm sorry.
21   A   No problem.
22   Q   And then the veterinarian?
23   A   Correct.  Yes.
24   Q   So there would be some overlap between your
25 job as a veterinary assistant and the vet tech?

Page 17

1    A   Yes.  It can happen, yeah.
2    Q   And there would be some overlap in duties
3  and responsibilities for you as the veterinary
4  assistant and the veterinarian?
5    A   Correct.  Yes.
6    Q   How long have you worked there?
7    A   I've been -- I've worked there for -- since
8  I was in -- since I was 15, 14.  I've been in this
9  clinic like when I was younger but actually working
10 there.  Started working there when I was like about
11 15, 16, like during high school.
12   Q   Okay.
13   A   So, yeah.
14   Q   Okay.  And then you left to go to college?
15   A   Yes.
16   Q   We'll come back to that.
17   A   Sure.
18   Q   Throughout your life you've worked there
19 since you were 15 but with breaks?
20   A   Correct.
21   Q   In the most recent stretch that you've been
22 working there as a veterinary assistant, how long have
23 you been there?
24   A   Sorry.  Can you repeat the question?
25   Q   Yes.  So clearly you went to college, went

Page 18

1  to vet school and at some point you came back and
2  started to work at the vet clinic.
3      Has that been an uninterrupted stretch of
4  working since you've been back at the vet clinic?
5      A   That's correct, yes.
6      Q   When did that start?
7      A   After vet -- after I was dismissed from vet
8  school in Oklahoma, I worked there since April 2020,
9  so that's when I was dismissed.  So I've been working
10 there since with no interruptions.
11     Q   How many hours do you work a week?
12     A   40 hours a week.
13     Q   What's your annual salary?
14     A   My annual salary is only -- right now I
15 think about 24,000.  Yeah.
16     Q   Okay.  Are there benefits associated with
17 the position?
18     A   No.
19     Q   No insurance?
20     A   Well, the insurance, yes.  Actually, my auto
21 insurance is paid so, yes.  Just auto insurance
22 mostly.
23     Q   No health insurance?
24     A   Health insurance is paid by -- in my
25 situation, by the government because of my annual

Page 19

1  salary.
2      Q   Do you have any other sources of income?
3      A   I do.  When it's needed, I do.  My family
4  does help me in that situation, so.
5      Q   Okay.
6      A   When it's needed.
7      Q   Did you file a tax return last year?
8      A   I did.
9      Q   Do you recall how much income you claimed?
10     A   It's still processing right now but I did --
11 I don't know off the top of my head personally but I
12 can get that if needed.
13     Q   Would it be at or around the 22 or 24, what
14 your annual salary from the vet clinic is or would it
15 be more than that?
16     A   It should be around there, in that vicinity.
17     Q   In your position as a veterinary assistant,
18 are you required to maintain any licenses?
19     A   No.
20     Q   Do you undergo any training?
21     A   Besides the training I went to vet school,
22 no.
23     Q   It's a poorly worded question and also I
24 would assume you're training each day as you're
25 learning.

Page 20

1      A   Sure.  Yes.
2      Q   But I meant any professional training
3  outside of the veterinary clinic.
4      A   Besides going to veterinary school or going
5  through things I've learned, no, besides that.
6      Q   I think you may have kind of already
7  answered this but my intention was to ask you where
8  you were employed prior to being employed by the
9  veterinary clinic.
10     Have you had any other employers from the
11 time you were 15 till now other than the veterinary
12 clinic?
13     A   Besides volunteering, no.
14     Q   Okay.
15     A   Because I volunteered mostly at other vet
16 clinics.
17     Q   When did you do that?
18     A   I did those prior to going to vet school, so
19 that was before 2017 so about 20 -- 2013 to 2015 I was
20 volunteering at other veterinary clinics to get other
21 experience.
22     Q   In the area that you reside?
23     A   Yes.
24     Q   Can you give me the names of those clinics?
25     A   Sure.  There was Woodhaven was a big one.

Page 21

1  Woodhaven Animal Clinic in Forest Hill, Florida.  I
2  was there summers when I wasn't -- when I wasn't in
3  school because I was still in college.  I was doing a
4  masters, I believe, at the time I was volunteering
5  there.
6      I did a masters of public health there
7  online, so I was able -- times I would work there
8  during the summer when I was off.
9      Q   Okay.  Where did you attend high school?
10     A   Palm Beach Gardens High School.
11     Q   What year did you graduate from high school?
12     A   2004.
13     Q   Did you attend college immediately after
14 graduation from high school or did you take some time
15 off?
16     A   No.  I went immediately to -- I went to
17 University of Central Florida.
18     Q   Okay.  What did you major in?
19     A   I majored in -- this is a time when I was
20 like managing.  I went from -- I started off as
21 biology and then I chose to switch to chemistry but
22 then I went back to biology.
23     It was just like a time where I was figuring
24 out mid year what I wanted to do --
25     Q   That's understandable.

Page 22

1    A    -- as a freshman so, yes.

2    Q    Did you apply to go to any other
3  undergraduate schools?

4    A    I did.  I felt that -- I went to University
5  of Central Florida about like 2005 to 2008 and then I
6  went to -- I went back home for community college
7  because I felt there was not many courses I needed
8  because I was thinking about going to vet school then.

9        I chose to transfer from my community
10  college that was close to where I lived.  I did there
11  for two years and then I got my AS degree which is
12  applied science degree, and I went to apply to
13  Louisiana State University and I did animal science
14  there.

15    Q    Okay.  So high school, then University of
16  Central Florida?

17    A    Correct.

18    Q    How long did you attend there?

19    A    I attended there about two years, a little
20  over two years.

21    Q    Okay.  Then a transfer to a community
22  college close to home?

23    A    Yes.  Correct.  Palm Beach State College.

24    Q    Okay.  Upon completion of your degree
25  there -- two-year degree?

Page 23

1    A    Yes.

2    Q    You then transferred to Louisiana State
3  University?

4    A    Yes.

5    Q    Okay.  What did you major in once you got to
6  LSU?

7    A    Animal Science, I majored there.

8    Q    Okay.  Did you graduate from LSU?

9    A    I did.

10    Q    Degree in animal science?

11    A    That's right.

12    Q    What did you do upon graduating from LSU?

13    A    After I graduated LSU, I was applying for
14  veterinary schools and I was wait listed on a few.
15  But in the meantime, I felt that I needed to be more
16  competitive because it's very competitive at
17  veterinary school to apply, so I chose to do a masters
18  in public health.

19    Q    What was your plan with a masters in public
20  health?

21    A    Well, the plan in masters of public health
22  with veterinary school, it's very looked upon
23  because -- so I chose that masters because I was
24  interested in it as well.  But there's a lot to do
25  with infectious diseases and things so that's why I

Page 24

1  chose -- it's very -- and I guess in that aspect it's
2  very important, infectious diseases, zoonotic diseases
3  with veterinary so I chose that degree because I was
4  very interested in that subject.  So I chose to do
5  that to be more competitive, to apply at more
6  veterinary schools there.

7    Q    It's fair to say you were boosting your
8  resume?

9    A    Yes.

10    Q    Okay.

11    A    Exactly.

12    Q    Did you obtain your masters?

13    A    I did.

14    Q    And that was also at LSU?

15    A    No.  This was at Capella University.  I did
16  it online.

17    Q    I'm sorry.  Say that again.

18    A    Capella University.  I did it online.

19    Q    Okay.

20    A    Masters.

21    Q    Where did you live while doing your online
22  degree?

23    A    Same address, at home.

24    Q    At home?

25    A    Yes.

Page 25

1    Q    Did you work at the veterinary clinic at
2  that time?

3    A    I did.

4    Q    Did you ultimately receive your masters?

5    A    I did, yes.

6    Q    Do you recall when?

7    A    2016, I believe.

8    Q    Okay.

9    A    Yes.

10    Q    So once you now had boosted your resume and
11  had your masters, what did you do from there?

12    A    I applied to more schools, and this is when
13  I got -- I got an answer from St. Matthew's
14  University.

15    Q    Okay.

16    A    That's when I chose to go there.

17    Q    All right.  I jumped ahead of myself a
18  little bit.  I had a question I wanted to ask that I
19  failed to ask.

20    A    Sure.

21    Q    So before you made the decision to get your
22  masters, you mentioned that you had applied to some
23  veterinary schools and had been wait listed?

24    A    Yes.

25    Q    Do you recall which veterinary schools you

Page 26

1  applied to at that time?
2    A  Yes. I applied to multiple because they're
3  competitive. I applied to about 11 schools. To
4  remember them off the top of my head, it's quite hard.
5  It's been a couple of years. I'm sorry. I know the
6  ones -- are you asking the ones I got wait listed?
7    Q  I would like to know all of the schools that
8  you applied to that you can recall.
9    A  Okay.
10    Q  And if you know what happened upon
11  submitting your application, you can just tell me the
12  status.
13    A  Sure. Okay. Let's see if I can remember
14  all of them. Tufts University was one. University of
15  Florida was another because the resident state there.
16  Louisiana State University because I went there as an
17  alumni. Mississippi State University, Oregon State
18  University. I'm trying to remember. Let's see.
19  Mizzou was another one. Wisconsin Madison University,
20  University of Illinois Urbana-Champaign. Two more.
21  Sorry. It's been quite awhile.
22    Q  Take your time.
23    A  Thank you. Colorado State University. I
24  believe I did also California Davis. That's another
25  one, so that should be 11.

Page 27

1    Q  Okay.
2    A  Yeah. That's it.
3    Q  Which of those schools wait listed you?
4    A  At that time for the first cycle after my
5  masters, I got wait listed by Oregon State University
6  at the time, so.
7    Q  So one?
8    A  One for in the first cycle, yes. Correct.
9    Q  Do you recall what the status was with the
10  other 10?
11    A  The status in the other 10 were that there
12  was an application not available and one that
13  strengthened my application a little more.
14    Q  So it's fair to say that of the 11, you were
15  not admitted to any?
16    A  Yes.
17    Q  Which likely led to your decision to go
18  ahead and get your masters to boost your resume?
19    A  Yes.
20    Q  So now fast forwarding, you now have your
21  masters and you're applying to veterinary school
22  again?
23    A  Correct.
24    Q  How many schools did you apply to this time?
25    A  This time I only applied for a few more,

Page 28

1  just less than what I was before. I focused on the
2  ones that were more, I guess -- yeah, I focused less
3  now because I felt 11 was too broad for the things
4  that they needed or the things that they wanted, I
5  guess. Because I would ask for feedback from the
6  applications just so I understand.
7        Yeah, I think I went down to like five or
8  six, I believe.
9    Q  Do you recall which schools?
10    A  I do recall a few of them. It's been
11  quite -- I think applied at least two or three times
12  in the cycle. St. Matthew's was one. Ross was
13  another one. St. George, Oregon State again,
14  Louisiana State as well. That's five. I think there
15  was one or two more. That's -- that's what I remember
16  so far. But, yeah, those five schools.
17    Q  If you think of any more while we're
18  talking, just let us know.
19    A  Sure.
20    Q  Otherwise, that's fine.
21    A  No problem.
22    Q  I've heard you now say the second go round
23  there were at least two schools stateside, right,
24  within the United States and then Ross, St. Matthew's
25  and I think you listed another that were -- are they

Page 29

1  all in the Caribbean?
2    A  Yes. It was Ross, St. Matthew's and
3  St. George were in the Caribbean.
4    Q  St. George?
5    A  Yes.
6    Q  At the time that you applied, did you have a
7  preference as to whether you would stay stateside or
8  go to the Caribbean?
9    A  Preferably stateside. I mean, I think
10  that's what everyone would like to be near home so,
11  yeah. But at this point I felt, you know, I've
12  already went through three cycles and I knew how
13  competitive it was, so I chose to do the island
14  schools as well, to add those.
15    Q  You mentioned that you often requested
16  feedback from the universities to which you applied?
17    A  Yes.
18    Q  Did any schools provide you with feedback?
19    A  They did, yes.
20    Q  Do you recall any specific schools that
21  provided feedback?
22    A  I don't recall. Sorry.
23    Q  Do you recall whether Oregon State provided
24  feedback?
25    A  They did not. They just mentioned there was

Page 30

1  a wait list involvement and they said that I was a
2  candidate for out of state but the seats -- there
3  wasn't many seats for out of state.  They had this
4  program for Oregon State where the neighboring states
5  would have first priority and that and Hawaii, so that
6  was -- that was the feedback they gave me around that,
7  about the competitiveness of the out of state.
8        So they said, just sit tight and we'll let
9  you know if some things change.
10     Q   Did LSU provide you any feedback?
11     A   They did.  And I actually spoke to someone
12  at LSU regarding the admissions process for
13  veterinary.  They mentioned that since I was an
14  out-of-state person, I was from Florida, so for me to
15  get an in-state resident there, I had to have worked
16  over a year or two there.
17        At that point, I wasn't able to get that and
18  then they said it was -- it was very hard for an
19  out-of-state person to get a seat there at the time.
20        They mentioned that, yeah.  Unfortunately,
21  since you're out of state, it's quite hard at this
22  time for you to get into placement.
23     Q   Do you recall if you received feedback from
24  any other stateside schools?
25     A   I don't recall, no.

Page 31

1   Q   Okay.  I'm going to ask you to kind of --
2  you'll probably need to correct me because I'm going
3  to throw out a summary of what I kind of gathered in
4  asking questions about how these veterinary programs
5  in the Caribbean work.
6   A   Sure.
7   Q   I may be way off base.
8   A   Okay.
9   Q   Or I may have it pretty close.  I'm not
10  trying to suggest that this is how you would describe
11  it but I want to know, get your feedback.
12       Are you okay with that?
13   A   Sure.
14   Q   Okay.  My understanding is that upon
15  receiving a bachelor's degree, you may apply to a
16  veterinary school at one of these three schools you've
17  listed:  Ross University, St. George University or St.
18  Matthew's University.
19       If you are admitted there, you would attend
20  on-site at their location in the Caribbean to do a
21  didactic portion or classwork portion of your
22  veterinary education?
23   A   Yes.  Correct.
24   Q   Upon completion of that portion of their
25  program, each of those three universities would have

Page 32

1  affiliate agreements with stateside universities for
2  their students to attend and participate in clinical
3  rotations?
4   A   That's correct.
5   Q   No changes?  That sounds accurate?
6   A   Sounds accurate, yes.
7   Q   When you graduate at the end of the clinical
8  rotation cycle, who issues the degree?
9   A   The parent school which is the Caribbean
10  school.
11   Q   Can you tell me what you believe the pros
12  and cons -- or I can ask this differently.  What are
13  the benefits of going to one of these three schools in
14  the Caribbean for veterinary school?
15   A   Sure.  So one of the main benefits of going
16  to school, I think I mentioned prior, about people who
17  would like to be close to home.  Because of that
18  reason, I feel like -- well, I feel that's one of the
19  reasons is people like to be in their home, especially
20  in a very stressful situation such as veterinary
21  school.
22   Q   Let me make sure.
23   A   Sure.
24   Q   Are you telling me pros of staying stateside
25  to go to veterinary school?

Page 33

1   A   Yes.  Well, I'm trying to make a point about
2  that the reason -- well, I'm going to lead to the
3  pros.
4   Q   Okay.  No.  You're good.
5   A   The pro is that it is less competitive to
6  get into a Caribbean school than it is to get into a
7  state school, for that reason.
8   Q   I follow now.
9   A   Yes.
10   Q   The pro is that it's less competitive due to
11  the desire of students to stay close to home?
12   A   Correct.  Yes.
13   Q   Are there any other pros?
14   A   Yes.  There's other pros regarding -- I know
15  for many people it is like an adventurous situation.
16  You're going to another country, to an island, which
17  it sounds nice on paper and it is nice but there's
18  times where you still have to study just as hard
19  everything.  So it is a different environment.
20        For many people that live in, you know,
21  harsh environments like back home, it's a nice change
22  of pace.  But you still -- it's still tough.  It's
23  not -- I'm still learning just as well I feel as the
24  other -- at state schools in regards to knowledge and
25  everything.

---

Page 34

1      Other pros that I can think of -- those are
2  the ones that are on the top of my head right now.
3  But at that point that's -- yeah, those are really the
4  pros I can feel right now.
5      It is easier to get in. That's what helps
6  in that situation when you're -- and I went through
7  three cycles already, so that's why I chose to do
8  Caribbean schools at that point.
9      It was nice not having to wait so long to
10 get an answer and it was nice to hear back and get an
11 interview for the schools.
12 **Q   Can you tell me in your opinion what some of**
13 **the cons of attending one of these Caribbean**
14 **veterinary schools would be?**
15 A   Sure. One of the cons I would say is --
16 well, in my situation same, of the three that I
17 mentioned, St. Matthew's is nonaccredited, so that
18 portrays that they are not looking over -- like the
19 AVMA standard is not looking over them in the
20 programs. So that could be a con, in my opinion.
21     Because when you go to an affiliate school,
22 they are accredited so they might have different
23 standards that you might have learned in your school.
24 That could be a situation.
25     Another con could be the facilities that

Page 35

1  they have at the school may not have up to par even
2  though they aren't maybe accredited. Like if I went
3  to St. George or Ross University, they're accredited
4  AVMA. However, the things that they have on island
5  could be not as up to par as they do in the stateside
6  schools.
7  **Q   Can you think of any other cons?**
8  A   Besides that, for some people living on
9  another island or another country could be a big
10 problem, so that might lead to the pro, the other one.
11 But for other people, some people cannot adapt to
12 living new standards, different standards, maybe
13 change of economy or change of, you know, the
14 environment, that could be a con.
15     I know in Cayman it was quite expensive so
16 it could be a con.
17 **Q   When you say "it was quite expensive," are**
18 **you talking about living costs?**
19 A   Yes.
20 **Q   What about tuition costs? Are those**
21 **comparable to stateside schools or is it more**
22 **expensive to go to one of the Caribbean schools?**
23 A   It's actually cheaper on some sides -- on
24 some ways. Other schools, if you're a resident, it's
25 nice. It's cheaper when you do your resident school.

Page 36

1  But in some cases it could be cheaper as well. In
2  some other cases it could be more expensive than
3  stateside. So, actually, I think it's more of a pro
4  in that aspect.
5  **Q   Okay.**
6  A   Yeah.
7  **Q   And in your situation, did you find tuition**
8  **and the cost of attending school, outside of the**
9  **living costs, that it was comparable or less expensive**
10 **than it would have been to go to school stateside?**
11 A   Stateside, I believe, would have been the
12 same price in Florida, if I remember correctly, so.
13 **Q   Had you gotten into Oregon State or LSU and**
14 **they had not given you in-state tuition, you're**
15 **telling me it would be more expensive to go to one of**
16 **those schools than it would be to go --**
17 A   To St. Matthew's.
18 **Q   -- to St. Matthew's?**
19 A   Yes.
20 **Q   But that doesn't take into account the**
21 **living expense part of it?**
22 A   Yes. Correct.
23 **Q   Is that substantial?**
24 A   It's substantial. At least in Cayman
25 Islands, it's substantial.

Page 37

1  **Q   Did you apply to all three of the Caribbean**
2  **schools that we've been mentioned?**
3  A   I did, yes.
4  **Q   Do you recall the response that you received**
5  **with regard to your application to each of the three**
6  **schools?**
7  A   Yes. For St. George, I applied there before
8  I finished my masters at the time, and their feedback
9  was finish your masters and reapply again.
10     Ross, they offered me a pre-vet program
11 which they do where you do three months there as a
12 pre-vet and then they determine whether -- if you pass
13 those courses, you are determined whether or not you
14 can get into the actual school, vet school.
15     I chose not to do that and I applied to
16 St. Matthew's and I got an interview and that's when
17 they gave me the acceptance.
18 **Q   Do you know if St. George is accredited?**
19 A   St. George is accredited, yes.
20 **Q   What about Ross?**
21 A   Ross is also accredited.
22 **Q   So of the three, St. Matthew's is the only**
23 **Caribbean school that you're aware of that's**
24 **unaccredited?**
25 A   That's right, yes.

Page 38

1    Q   So we kind of danced around it, but
2  ultimately you applied to and were admitted to
3  St. Matthew's University?
4    A   Yes.
5    Q   When did you begin your studies there?
6    A   Spring 2017.
7    Q   Can you describe for me how the program was
8  structured while you were at St. Matthew's?
9    A   Yeah.  Sure.  It was involving seven
10 semesters.  This is the didactic portion that you
11 mentioned earlier, so this is regarding every semester
12 I would take courses, involved -- and it was the
13 courses that they did the same in vet school, so they
14 were very -- reflected the same program which was nice
15 to see as a nonaccredited school.  So they still
16 followed what they needed to.  And that included, you
17 know, just like every other vet school, you have
18 tests.
19        You -- most of the tests were multiple
20 choice.  We had some, you know, like they called them
21 OSCEs which are the oral exams that you perform, you
22 know, certain procedures and surgeries as well.
23        What else?  I think that's pretty much how
24 the program worked, seven semesters.  Depending on the
25 semester, I would have more courses than others, you

Page 39

1  know, so.  But it was the same structure like they
2  would do in the U.S.
3    Q   When you applied to St. Matthew's, did you
4  know at that time which university stateside were
5  affiliated with its veterinary program?
6    A   I did.  When I looked at their website and
7  everything, I did see the list, yes, of the clinical
8  schools.
9    Q   Do you recall how many schools were on that
10 list?
11   A   I don't recall off the top of my head the
12 number of schools.  I just know a few of them, that
13 came out of my head.
14   Q   Would it have been more or less than 10?
15   A   I would say it would be less than 10, yeah,
16 at the time.
17   Q   More than five?
18   A   More than five, yes.
19   Q   Do you recall any of the schools that were
20 on that list?
21   A   I do, yes.
22   Q   I know you mentioned that you don't recall
23 them all but whichever ones you do recall, can you
24 tell me who those were?
25   A   Sure.  University of Illinois

Page 40

1  Urbana-Champaign, Oklahoma State University,
2  Mississippi State University, Purdue University, North
3  Carolina State University.  I'm trying to remember.
4  University of Minnesota, Washington State University.
5  Let's see.  Those are the ones I remember off the top
6  of my head, seven.
7    Q   If I recall correctly, of the schools you
8  just listed, at some time during your attempts to
9  apply to schools stateside, you had applied to one of
10 those previously which was the University of Illinois?
11   A   Uh-huh.
12   Q   Is that correct?
13   A   Yes.
14   Q   Were there any others that I missed?  Did
15 you apply to Mississippi State?
16   A   Yes, I did.
17   Q   Okay.  So two?
18   A   Yes.
19   Q   So two of those?
20   A   Yes.
21   Q   Do you have any say as a student at
22 St. Matthew's as to which affiliate institution you
23 will attend should you complete the didactic portion
24 of the program?
25   A   In regards to that, by six semester we chose

Page 41

1  our top three schools we would like to go to.  Whether
2  or not we get our top, our No. 1, it's not the case
3  sometimes.  We are given top three.  We give it to the
4  school.
5        They speak to the schools and they choose
6  whether -- you know, who gets what spot, I guess, that
7  situation.  So we choose our top three.
8    Q   Do you recall your top three?
9    A   I do.  My top three were -- my No. 1 was
10 OSU, so Oklahoma State University.  The second one was
11 University of Illinois Champaign Urbana.  My third was
12 Mississippi State University.
13   Q   What made you select Oklahoma State
14 University as your No. 1 pick?
15   A   I heard about the program from other alumni
16 there at St. Matthew's and I also had a lot of
17 classmates that were going -- that already were there,
18 upper classmates, the class above us.  They were
19 telling us how the program was, everything.  They said
20 it was okay.  It was good, everything.
21        I chose to go there with other classmates in
22 my class as well.  We felt that it was going to be a
23 good program for what I wanted to do.
24   Q   You said that there were alumni!  Did I hear
25 you say that right, alumni that were either working at

Page 42

1 or in the Caribbean that you were able to hear from?
2 Did you say that?
3    A   Yes.
4    Q   What were they saying about the program?
5    A   They said good things and they said some --
6 unfortunately, they said some issues as I was going
7 there.  When -- after I sent my -- after I sent my --
8 I guess my application there or to choose my top
9 three, I heard from alumni that went there, I guess,
10 after.
11        They come to speak, a few of them.  One was
12 from -- went to Oklahoma for their clinical here.
13 They mentioned to me that the school was under
14 probation, academic probation at the time.
15    Q   Was that news to you?
16    A   It was news to me, yes.
17    Q   Did you ever confirm whether that was
18 accurate?
19    A   Yes.
20    Q   You did?
21    A   I did.
22    Q   How did you do so?
23    A   I looked on AVMA website and it did say it
24 was status probation.  I also looked at a website as
25 well and AVMA did have a sub website and they

Page 43

1 mentioned the violations that were done during that
2 time.
3    Q   How would you describe your academic
4 performance while you were at SMU?
5    A   I thought I did well.  I mean, I felt, I
6 mean, I was doing okay.  I did well in regards to
7 what -- how I was performing there over time.
8    Q   You said that there were seven semesters?
9    A   Correct.  Yes.  At St. Matthew's?
10    Q   Yes.
11    A   Yes.
12    Q   All of the courses you took during those
13 semesters were didactic in nature?
14    A   Yes.
15    Q   How many individuals were in each class that
16 you took?
17    A   Depending on -- every class size was
18 different.  In our case, I started with 14.  By my
19 third or fourth semester, we went down to five.
20    Q   Wow.
21    A   Yeah.
22    Q   When you say five, do you mean five students
23 in the entire incoming class that was moving through
24 the program or in each of your specific classes that
25 you took?

Page 44

1    A   I'm sorry.  I'm personally saying about my
2 class that I was in the semester.  So what was
3 different about St. Matthew's, I think just so you can
4 understand, is that it was more -- what I liked about
5 the school, I thought was a pro -- let's go back to
6 the pro with that.  The classes were smaller for
7 St. Matthew's.
8        I did enjoy that because I could go one on
9 one with teachers, professors.  I could speak to
10 clinicians there.  It was very like one on one which I
11 really liked about that school for it.
12        And in that case, because of that, the
13 classes were smaller, like each class was small and I
14 started only 14 and then we went down five.  It's
15 still difficult, I mean, still for that reason.
16    Q   To make sure I understand, I'm going to use
17 an example of how school worked on my end.
18    A   Sure.
19    Q   When I was admitted to law school, I went to
20 law school with an overall incoming class of
21 approximately 120 people.
22    A   Yes.
23    Q   When we got to going to our courses, the
24 first year they separated us into four separate
25 sections of around 30 people apiece.

Page 45

1    A   Right.
2    Q   We had all of those classes together, like
3 we took all of our first year classes we took
4 together.  So the same 30 people were going to class
5 together.
6    A   Right.
7    Q   But there were 120 of us total.  It was like
8 an incoming what they call 1L class.
9    A   Sorry.  Excuse me.  When you mentioned that
10 that's -- are you mentioning your semester or the
11 entire class of this year?
12    Q   For our incoming year, our first year of law
13 school, those of us who had applied and been accepted,
14 there were 120.
15    A   Total for the year?
16    Q   Of just for that year.
17    A   Okay.
18    Q   But we were broken into sections.
19    A   Based on spring, summer, fall?
20    Q   No.  Based on arbitrary just these 30 go to
21 this class, these 30 go to this, these 30.
22        What I'm asking is:  Did the 14 that
23 dwindled to five when you got there, was that the
24 entirety of your incoming class?
25    A   No.  No, no, no.

Page 46

1    Q   So your incoming class was much larger?
2    A   Yes, it was.
3    Q   But you had a group of approximately 14 that
4 took classes together?
5    A   Yes.  Sorry.
6    Q   So similar structure; right?
7    A   Yes.  Similar structure just smaller, yeah.
8 So that 14 was spring 2017, then there was a summer
9 class of 2017 and then was a fall class of 2017.
10 Understand?
11   Q   Yes.
12   A   If you're mentioning that all of those
13 combined those three classes, that was the class of
14 2020.
15   Q   Okay.
16   A   Yeah.
17   Q   It is a little different but I think I
18 follow you.
19   A   Yes.
20   Q   So there were only 14 that came at the same
21 time that you did?
22   A   Yes.
23   Q   But you kind of merged as a class with those
24 who came at different times during that year?
25   A   Yes.  Yes.  We were still like a semester

Page 47

1 ahead of each other, you know, from back and forth but
2 those -- yeah, we as a whole were a class of 2020.
3    Q   Okay.  All right.
4        (Defendant's Exhibit 1 was marked for
5        identification)
6    Q   (BY MR. PRATT) I am going to hand you what
7 is marked as Defendant's Exhibit 1.  Also, just so we
8 don't have any confusion, this was produced in
9 discovery as Board Document No. 2.
10   A   Okay.
11   Q   Can you describe for me what this document
12 is?
13   A   Yes.  This is my St. Matthew's University
14 School of Veterinary Medicine Transcript of Academic
15 Record.
16   Q   Does it appear to be accurate?
17   A   Yes.  Besides the grades that I performed,
18 the last three.  They were IP but I did get grades for
19 those.
20   Q   I noticed that.  And that one threw me a
21 little bit for a loop.  I don't know if you know what
22 IP means.
23   A   Sure.
24   Q   Do you know what it means?
25   A   No.

Page 48

1    Q   If I tell you that I believe it means in
2 progress, would that make sense?
3    A   Yes, it would.
4    Q   The date of the transcript at the top is
5 June 19th of 2019.  It appears that that was the
6 summer 2019 semester.  So I think you were enrolled in
7 those classes at the time this transcript was
8 provided.
9        Would that be accurate?
10   A   Yes, it would be accurate.
11   Q   Okay.  I asked you earlier if you had any
12 recollection of any academic struggles or anything and
13 you said you thought or at least you described your
14 performance as being pretty good.
15   A   Yes.
16   Q   When I look at Spring 2017, Summer 2017,
17 Fall 2017 Spring 2018, Summer 2018 and Fall of 2018,
18 one, two, three, four, five, six semesters beginning
19 with your first one there, it appears from what I'm
20 seeing on the transcript as if you received at least
21 one C minus in each of those semesters.
22       In one instance you had two C minuses in a
23 semester.  That would have been in the summer of 2018.
24   A   Yes.
25   Q   And in the fall of 2018, it appears that you

Page 49

1 received an F in a course.
2    A   Yes.
3    Q   Those are accurate?
4    A   Those are accurate.
5    Q   Would you agree with me that a C minus is
6 below average?
7    A   Yes.
8    Q   Okay.  So I just want to walk through the
9 ones that it appears that you may have had some below
10 average scores.  In your first semester spring 2017,
11 you made a C minus in Veterinary Anatomy I.
12   A   Yes.
13   Q   This probably makes some since.  You made a
14 C minus in the summer of 2017 in Veterinary Anatomy
15 II.
16   A   Yes.
17   Q   It appears that that may have been an area
18 of struggle; is that accurate?
19   A   Yes.
20   Q   Were you required to do any remediary work
21 to raise those grades?
22   A   No.  Because C is a passing grade.
23   Q   Okay.  C minus is also a passing grade?
24   A   Yes, it is.
25   Q   In the fall of 2017, it looks like you had a

Page 50

1  C minus in Veterinary Pathology I.
2     A   Yes.
3     Q   And Veterinary Virology?
4     A   That's a C plus.
5     Q   Is it?
6     A   Yes, it is.
7     Q   Okay.  My copy it looks like a C minus.
8  We'll go with a plus.  I do see that Veterinary
9  Clinical Skills I is a C plus down below.
10    A   Yes.
11    Q   But on my copy it looked as if those other
12 two were C minus.  We'll move on.
13        Spring of 2018, Veterinary Pathology II, it
14 appears that is a C minus; correct?
15    A   Correct.  Yes.
16    Q   In the summer of 2018, you had Veterinary
17 Anesthesiology and Principles of Veterinary Surgery
18 and both of those you received a C minus; is that
19 accurate?
20    A   Yes, that's accurate.
21    Q   Then it appears that your worst grade at the
22 time you were there was in the fall of 2018 in the
23 Veterinary Clinical Skills III and it appears that you
24 received an F.
25    A   Yes.

Page 51

1     Q   Were F's treated differently than your C
2  minuses?
3     A   Yes, they were.
4     Q   How so?
5     A   Those I would have to repeat the course.
6     Q   Okay.  So I noticed that in the spring of
7  2019 it looked like you did retake that and received a
8  C plus; is that accurate?
9     A   Yes, that's correct.
10    Q   Okay.  Can you tell me what your overall
11 GPA -- it's listed there, can you tell me what that
12 was?
13    A   Sure.  2.8.
14    Q   Okay.
15    A   That's not including the in-progress scores.
16    Q   Correct.
17    A   Correct.
18    Q   Do you know, did that GPA increase after you
19 received the grades in the in-progress courses?
20    A   Yes, it did.
21    Q   Did you know what it was at the time of your
22 graduation?
23    A   I do not recall exactly a number but I know
24 it raised over 2. -- yeah, I don't know the exact
25 number.  I know that it did increase over 2.8 though.

Page 52

1     Q   Okay.
2     A   That's all I recall.
3     Q   Were these grades consistent with your
4  performance in undergraduate studies?
5     A   Depends on the course, I would say.
6     Q   Was your overall GPA in undergrad around a
7  2.8 or would it have been higher?
8     A   It would have been actually -- I would say
9  it would be kind of near the -- close to it, I guess,
10 or maybe a little lower, little bit.
11    Q   So is it fair to say that this is a
12 consistent representation of your academic studies to
13 date?
14    A   I wouldn't say that, no.
15    Q   Okay.
16    A   It depends, I guess, based on what classes I
17 took.  I mentioned the semesters the coarse load was
18 different.  For example, my masters I got a 3.93 GPA,
19 so it just really depended, I guess, what was going on
20 or what kind of -- how the workload, everything was.
21    Q   Okay.  And that's fair.  I didn't ask you
22 about your graduate work.
23    A   Yes.  Sorry.
24    Q   You did well there, it sounds like?
25    A   Yes.

Page 53

1     Q   Exceptionally well is what it sounds like.
2     A   Yes.  Cum laude.
3     Q   But the transcript we see here from
4  St. Matthew's is relatively consistent with what we
5  would see from your undergraduate studies?
6     A   Like I mentioned, it depended.  I did get --
7  in semesters there were higher scores in some areas.
8     Q   But overall GPA wise?
9     A   Overall GP, might have been a little lower.
10    Q   Okay.
11    A   Maybe a little lower.  Not too bad.
12    Q   At what point in your studies at
13 St. Matthew's were you made aware which affiliate
14 institution you would be allowed to attend?
15    A   Honestly, no, they did not.  They did not
16 mention, based on GPA standards, there was no GPA
17 standards of like who you could choose.
18    Q   I asked a very bad question.  I apologize.
19    A   Because we went from GPA ---
20    Q   We did.  We did.  I'm moving to a different
21 area now.  I'm done with the GPA talk.
22    A   Okay.
23    Q   No, no.  It's my fault.  So now I want to
24 move to:  So you're at St. Matthew's?
25    A   Yes.

Page 54

1    Q    You clearly have classes still in progress?
2    A    Yes, I do.
3    Q    But you've submitted this material to the
4 school?
5    A    Yes.
6    Q    At what point are you in your studies at
7 St. Matthew's when you become aware of which
8 affiliate institution you'll be attending?
9    A    Sure.  So by fifth semester we choose the
10 top three schools that we want to go to.  By sixth
11 semester we get the answer, like mid/late of the
12 semester we get an answer from the school of where
13 we're going to.
14    Q    So you know before completing the didactic
15 portion where you're going to go?
16    A    Yes.
17    Q    It sounds like you know even maybe two
18 semesters in advance where you're going to end up.
19         Is that accurate?
20    A    Yes, that's accurate.
21    Q    How much time was there between the time
22 you completed your didactic studies at St. Matthew's
23 and you began working or your education as a resident
24 in the OSU College Veterinary Medicine program?
25    A    Less than a month.

Page 55

1    Q    That's a lot to do in a month.
2    A    Yeah, it was.
3    Q    Can you talk me through that process?
4    A    Sure.  So of August 2019 I graduated from
5 St. Matthew's or not fully graduated but we white coat
6 ceremony.  So we put our white coats on and that's
7 where they sent us off to clinics, like a final
8 goodbye.
9         By September of 2017, that's when I was
10 admitted to Oklahoma State -- excuse me, 2019.
11    Q    I think you've already addressed this but
12 were any of your classmates from St. Matthew's in your
13 incoming class as a resident for the OSU Veterinary
14 Medicine program?
15    A    Yes.
16    Q    Do you recall how many?
17    A    In my class there was two others.
18    Q    Okay.  People that you knew?
19    A    Yes.
20    Q    Do you want to take a break for a minute?
21 We don't have to but I'm getting ready to kind of
22 shift gears for a little bit and if you wanted a break
23 then fine or we can just power through.
24    A    Yeah, sure.
25         MR. PRATT:  We'll go off the record for a

Page 56

1 few minutes.
2         (Recess taken from 11:00 to 11:06)
3    Q    (BY MR. PRATT)  All right.  We were
4 transitioning, when we took a break, to your time at
5 Oklahoma State University.
6         Before we jumped into the structure of the
7 program there, I just kind of wanted to get some
8 background information in terms of like your
9 familiarity with Stillwater.
10         Had you been to Stillwater prior to coming
11 there for school?
12    A    No.  First time.
13    Q    Did you live on campus?
14    A    No.  I lived off campus.
15    Q    Did you live in an apartment?
16    A    I did, yes.
17    Q    Did you live alone or did you have a
18 roommate?
19    A    No.  I lived alone.
20    Q    In your words, can you describe how the
21 clinical rotations at the OSU College of Veterinary
22 Medicine structured?
23    A    Sure.  Each of the rotations were different
24 structures based on what subject they were, what
25 rotation.  But most of the -- depending -- actually,

Page 57

1 to be honest, they were all quite different depending
2 on which one we were doing so that's -- yeah.
3    Q    That's fair.
4         As a general program, you have now arrived
5 to do clinical studies versus the didactic studies you
6 did at St. Matthew's?
7    A    Yes.
8    Q    Is it fair to say that this was to be a more
9 hands on type of education?
10    A    Yes.
11    Q    Okay.  Do you recall the length of the
12 rotations?
13    A    Yes.  Three weeks.
14    Q    Okay.  So every rotation was three weeks?
15    A    Yes.
16    Q    Is it accurate then to say that every three
17 weeks you were transitioning to a new area of study?
18    A    Yes.
19    Q    A new area of veterinary medicine?
20    A    Yes.
21    Q    Each rotation had a different instructor?
22    A    Yes.
23    Q    Did you receive grades for each rotation?
24    A    Yes.
25    Q    Did each rotation have its own syllabus?

Page 58

1  A  Yes.
2    Q  Did each rotation have its own grading
3  rubric?
4  A  Yes.
5    Q  Were you working with instructors during the
6  time that you were in the rotation?
7  A  Define "working".
8    Q  Were instructors with you at all times as
9  you were participating in the rotation?
10  A  Not all the time, no.
11    Q  Did they give you feedback about the work
12  that you did?
13  A  Not all the time, no.
14    Q  On occasion?
15  A  On occasion, depending on, yeah, the
16  rotation.
17    Q  At the end of the rotation, would you
18  receive evaluations?
19  A  Yes.
20    Q  Other than at the end of the rotation, were
21  you receiving any evaluations from your instructors?
22  A  Depending on the rotation, yes or no.
23    Q  Okay.  As you participated in your
24  rotations, was it apparent to you that some of the
25  residents were further along in their training than

Page 59

1  others?
2  A  I couldn't tell other than word of mouth
3  that they were in their program long enough.  So, no,
4  I couldn't tell.  No.
5    Q  So from your perception, each of the
6  residents were operating on a similar level of
7  experience and education?
8  A  Yes.
9    Q  You don't recall any residents that were
10  particularly poor at residency training?
11  A  I did see some like performance with others,
12  yes.
13    Q  Okay.  Did you see any residents that were
14  exceptional in their residency training?
15  A  There were a few, yes.
16    Q  In your opinion, where did you fall on that
17  scale?
18  A  In regards to performance -- oh, I'm sorry.
19  There was a confusion.
20    Q  Okay.
21  A  When I think of residents, I think of actual
22  residents, so those are people that already are
23  veterinarians and they are specializing into an actual
24  field of veterinary and then they end up getting a
25  diplomat.  So I think there was a confusion there.

Page 60

1    Q  You're right.  I had another case recently
2  in which I was dealing with a resident.
3      You were a veterinary student.
4  A  That's correct, yes.
5    Q  Okay.  You would not be a resident until
6  further in the process?
7  A  Yes.  This is after I had done an internship
8  which is a one-year thing and then I would have to go
9  to -- then I would go to a residency and be a
10  resident.
11    Q  Great.  Thank you for catching that.  I
12  didn't mean there to be any confusion.  I want to go
13  back then.
14  A  Okay.
15    Q  As you were doing rotations as a veterinary
16  student, did you notice any of the students who were
17  struggling with the clinical practice?
18  A  There were a few, yes.
19    Q  Did you notice any students that were
20  exceptional at the clinical practice?
21  A  As students being exceptional, I did not see
22  that, no.
23    Q  Okay.  On a spectrum of I guess the majority
24  of the students being just average and the few that
25  you noticed that maybe were being below average, where

Page 61

1  would you put yourself on that scale?
2  A  I would say based on the beginning of the
3  program, mid program, are you mentioning overall?
4    Q  If you saw a difference at different times,
5  I would like you to walk me through that.
6  A  Sure.  So in the beginning I would determine
7  myself as average because I needed to know the clinic
8  a little more, how everything worked kind of
9  situation.
10      Over time, I mean, I felt that changed
11  because I knew my area, my belonging.  For those
12  that -- for the Oklahoma students that were available
13  I guess that I knew, I did see the differences between
14  students of their knowledge, their performance,
15  their -- is that what you're asking?
16    Q  It is.  But I would like you to maybe go
17  into a little more detail on that.
18      What differences did you notice?
19  A  I did notice differences in knowledge a lot
20  with students.
21    Q  Yeah.
22  A  Yeah.
23    Q  In terms of the knowledge base that they
24  were operating from?
25  A  Yes.  Yeah.

Page 62

1    Q   Did you think it was higher or lower than
2 the other students?
3    A   I felt it was sometimes lower, other times
4 up to par.
5    Q   Okay.  So I don't want to put words in your
6 mouth.  I'm trying to understand what you're telling
7 me.
8    A   Sure.  Yeah.
9    Q   In your observation of the students in the
10 clinical practice that you were in, I think it's the
11 year four clinical program; is that right?
12   A   That's correct.
13   Q   We're talking about the same thing?
14   A   Yes.
15   Q   You noticed that some of the students seemed
16 to not have as broad of a knowledge base or as deep of
17 a knowledge base as others?
18   A   Yes.
19   Q   I believe you said that in your opinion it
20 was sometimes that you saw that with regard to the
21 students from Oklahoma State or from the state of
22 Oklahoma, in-state students who were in the program?
23   A   Yes.
24   Q   So you would say that the out-of-state
25 students or the students from the schools in the

Page 63

1 Caribbean had a deeper knowledge base, in your
2 opinion?
3    A   Yes.  I felt that was, yes.
4    Q   Okay.
5    A   Yes.
6    Q   Was that reflected in their clinical
7 participation?
8    A   Not always, no.
9    Q   So can you give me an example of a time when
10 you felt like the students from Oklahoma were not as
11 equipped with the knowledge base that they should have
12 been?
13   A   Yes.  There was my first -- actually, my
14 first rotation of internal medicine.  I felt that
15 there was situations where they didn't know the proper
16 knowledge of the -- like when we were in -- during
17 rounds.
18       I had two other St. Matthew's students with
19 me and these were -- they had been in the program
20 longer than I have.  They were one semester above me,
21 so they had been at least there over three to six
22 months in the program in the fourth year.
23       My first semester -- or my first -- sorry,
24 rotation there, I noticed that we were the ones
25 answering the questions when we were asked very

Page 64

1 specific medical knowledge questions, clinical
2 questions.
3    Q   And the students that you referred to as the
4 Oklahoma students, were they unable to answer the
5 questions or did they just elect to not answer the
6 questions?
7       MR. BACH:  Object to that.  Calls for
8 speculation.
9       THE WITNESS:  Yeah, I don't recall that.
10 Like I'm not sure how they felt, to answer that or
11 not.
12   Q   (BY MR. PRATT) That was a bad question.
13 I'll ask it this way:  Were they called upon and
14 unable to answer the question?
15   A   Whether or not they were able to answer the
16 question or they chose not to, I'm not too sure.
17   Q   The question was asked to the group?
18   A   Yes, it was.
19   Q   And you noticed that the St. Matthew's
20 students were the with ones that would often answer
21 the question?
22   A   Yes.
23   Q   You kind of mentioned it.
24       Do you recall your first rotation and what
25 it was?

Page 65

1    A   Yes.  It was internal medicine rotation.
2    Q   Can you describe that rotation for me?
3    A   Sure.  So pretty much it was led by two
4 clinicians.  They were both -- Dr. Lyon and Dr. Nate
5 were involved mostly in the rotation.  We did rotate
6 between the two of them.
7       I think the first week we had Dr. Lyon and
8 then the last two weeks we had Dr. Nate.
9    Q   What was your relationship like with those
10 instructors?
11   A   Good.  Very good.  I enjoyed both of them.
12   Q   What type of activities did the students
13 perform during this rotation?
14   A   Sure.  So that involved taking appointments,
15 performing what we needed to do in those appointments
16 depending on the case.  And from there if needed to be
17 in clinics, it would be in ICU, we would have care for
18 those in-patient care involvement.
19   Q   It's fair to say pretty hands on?
20   A   Yes.
21   Q   Were there surgeries being performed?
22   A   No surgeries but we did -- we were able to
23 observe surgeries that were done by the clinicians and
24 residents and there was a cycle between -- I had
25 mentioned, sorry, there was a cycle of other residents

Page 66

1 that were also there, so they were being -- where they
2 were working under the clinicians for their schooling.
3     There was three different clinicians at the
4 time or three different -- sorry, three different
5 residents at the time. Excuse me.
6     **Q Okay. So the structure of the rotation**
7 **would be the instructor?**
8     A Yes.
9     **Q Usually a few residents, maybe two, three**
10 **residents?**
11     A That's correct, yes.
12     **Q And then students that were in the rotation?**
13     A Yes.
14     **Q To bring back something I did earlier ---**
15     A And the technicians as well.
16     **Q And the technicians as well?**
17     A Yes.
18     **Q Where did the technicians kind of rank in**
19 **that whole?**
20     A Well, regarding to the ones that would grade
21 us would be involving technicians as well. So
22 probably I would say they're with -- they were under
23 the -- we had interns come in, too. So I wouldn't
24 consider that like a big thing but they would come and
25 go.

Page 67

1     There would be at least one intern coming in
2 and below that would be probably technicians, below
3 the interns.
4     **Q Okay. And then were students at the very**
5 **bottom?**
6     A Yes.
7     **Q Did you enjoy that rotation?**
8     A I did, yes.
9     **Q Okay.**
10     (Defendant's Exhibit 2 was marked for
11     identification.)
12     **Q (BY MR. PRATT) I am going to hand you what**
13 **is marked as Defendant's Exhibit 2.**
14     A Sure.
15     **Q I will note that this has been produced in**
16 **discovery and is listed as Board68, 69 and 70.**
17     **Would you take a look at this document and**
18 **when you've had a chance to review it, tell me what**
19 **this is.**
20     A Sure. This is an evaluation of my internal
21 medicine rotation.
22     **Q Did you typically receive evaluations that**
23 **looked like this?**
24     A Yes, I did.
25     **Q If we look at the top, it seems to indicate**

Page 68

1 **it is relating to you.**
2     A Yes.
3     **Q And that it is for Small Animal Internal**
4 **Medicine rotation.**
5     A That's correct. Yes.
6     **Q It also shows the dates of activity are 9-9**
7 **of 2019, so September 9th through September 29th of**
8 **2019 which reflects kind of what you said, like I**
9 **think it would be a three-week rotation.**
10     A That's correct. Yes.
11     **Q Okay. Can you describe the format of this**
12 **evaluation?**
13     A Sure. So this would -- we would be graded
14 based on Communication, Knowledge & Knowledge
15 Application, Patient Assessment, Professional Conduct,
16 Professional Skillset, Problem-Oriented Veterinary
17 Medical Record System Points Received and also
18 Technical Skillset points.
19     **Q Okay. In looking at this, it has each of**
20 **those categories that you've just described broken**
21 **into its own box.**
22     A Yes.
23     **Q Above the first one which is the**
24 **Communication Points Received it gives what appears to**
25 **be a table of different scoring.**

Page 69

1     **Do you see that?**
2     A I do, yes.
3     **Q Can you describe that for us?**
4     A Sure. So within 14 points being the most to
5 7 points being the lowest, there is comments regarding
6 if whether you exceed expectations or you have grounds
7 of failure, so from there you exceed, meet, below
8 expectations, then grounding depending on how many
9 points you received.
10     **Q Thank you. So let's just go through these**
11 **one by one. The first category you mentioned and is**
12 **noted here is Communication Points Received.**
13     A Yes.
14     **Q What score did you receive?**
15     A 7.5.
16     **Q On that scale that we just mentioned, where**
17 **does that fall?**
18     A The lowest would be grounds for failure so
19 it's just a little bit above that.
20     **Q Okay. The next category is Knowledge &**
21 **Knowledge Application.**
22     **What score did you receive in that?**
23     A 8.5.
24     **Q Where did that fall on the scale?**
25     A In between below expectations and grounds

Page 70

1  for failure.
2      Q   The final one on that first page is Patient
3  Assessment Points Received.
4      A   Yes.
5      Q   What did you score in that category?
6      A   9.
7      Q   Where does that fall?
8      A   Below expectations.
9      Q   Turning to the next page, we have a category
10  of Professional Conduct Points Received.
11          What did you score there?
12      A   9.25.
13      Q   Where does that fall on the scale?
14      A   A little above below expectations.
15      Q   Okay.  Next is Professional Skillset Points
16  Received.
17          What did you score there?
18      A   8.5.
19      Q   Where did that fall on the scale?
20      A   In between below expectations and grounds
21  for failure.
22      Q   Next is Problem-Oriented Veterinary Medical
23  Record System Points Received.
24          What did you receive there?
25      A   8.5.

Page 71

1      Q   And that would be the same as the one you
2  just mentioned; right?
3      A   Correct.  Yes.
4      Q   The final category is Technical Skillset
5  Points Received.
6          What did you score there?
7      A   I received an 11.
8      Q   Where does that fall on the scale?
9      A   That falls in between meets expectations and
10  below expectations, in between.
11      Q   Okay.  So one, two, three, four, five, six,
12  seven categories for which you received a score?
13      A   Correct.
14      Q   I'm counting correctly, one, two, three,
15  four, five ---
16      A   Seven, seven scores.
17      Q   Okay.  Five of the seven are below
18  expectations or lower; is that accurate?
19      A   Yes, that's accurate.
20      Q   Okay.  If you will turn to the third page,
21  there's a few things on this page.  At the very top of
22  the page it says Total Points.  Presumably that's a
23  sum of the points we've just discussed?
24      A   Yes.
25      Q   And then a letter grade is assigned; is that

Page 72

1  accurate?
2      A   Yes, that's accurate.
3      Q   What letter grade did you receive?
4      A   D.
5      Q   Below that we see Comments.
6          Do you know who provided these comments?
7      A   Yes.  It was both Dr. Lyon and Dr. Nate
8  (ph).
9      Q   Okay.  I would like for you, and we'll have
10  to do this a little bit today and this is just to make
11  sure the record is clear, I'm not going to have you
12  read this whole thing.  That's too much.
13      A   I already read it in the past, so.
14      Q   Okay.  But would you mind reading the first
15  and second paragraph into the record, please?
16      A   Sure.
17          "Jonathan, throughout your 3-week small
18      animal internal medicine rotation there were
19      some significant concerns regarding
20      communication, attention to detail, patient
21      care, completion of medical records,
22      accurate history taking/preparation and
23      professionalism.  You did display adequate
24      knowledge base for this stage of your
25      training when discussing some topics during

Page 73

1      rounds and deficient with discussing other
2      topics."
3      Q   I will stop you there.
4      A   Sure.
5      Q   There's clearly some type of typo there.  It
6  doesn't read correctly in some way but we can't infer
7  what that might be.
8      A   Okay.
9      Q   I just want to make that clear for the
10  record that you read it verbatim.
11      A   Yes.
12      Q   Onto the next paragraph, please.
13      A   Okay.
14          "You frequently did not communicate
15      effectively with the clinician (faculty or
16      house officer) that you were working with on
17      a specific case.  For example, when Milo was
18      discharged from the hospital on Saturday,
19      September 28th at 2 pm, you did not contact
20      Dr. Moore and specifically ask to be excused
21      from being present at this discharge, as you
22      had worked from 5 p.m. to 11 pm on Friday,
23      September 27th and then were called back in
24      for an emergency and had worked from 2 am to
25      7 am on the morning of Saturday,

Page 74

1    September 28th.  As we discussed during our
2    meeting, we would have been happy for you to
3    go home and sleep on Saturday given your
4    long day Friday and then additional time on
5    ER Saturday morning.  However, you must
6    communicate with clinicians in the hospital
7    so that we can plan accordingly.  You left
8    the hospital before discussing Milo's case
9    with the clinician on the morning of
10   Saturday and did not communicate with the
11   clinician prior to leaving.  You also did
12   not communicate effectively with Dr. Lyon
13   with updates on Lucy's case.  He had to
14   initiate communications with you to discuss
15   the case.  As a student on the case, you are
16   expected to communicate with the clinician
17   on your case to discuss updates and changes
18   to case management."
19   Q    Thank you.
20        Obviously, this continues for multiple
21   paragraphs which go into more examples of issues that
22   they were bringing to your attention.
23        Is that accurate?
24   A    Yes.
25   Q    I'm not going to go through all of those.

Page 75

1    A    Okay.
2    Q    I would like for you to read one more
3    paragraph.  If you will skip down to where the
4    paragraph that begins "Overall" and please read that
5    for us.
6    A    Sure.
7        "Overall, your communication skills, history
8        taking, case preparation, patient care, and
9        professionalism were below average.  We're
10       recommending that you repeat the small
11       animal internal medicine clinical rotation
12       as we feel this is the best for your
13       education and clinical experience."
14   Q    Thank you.
15        So this was the evaluation you received
16   after your first rotation?
17   A    Yes.
18   Q    How was this evaluation shared with you?
19   A    It was shared with me online and -- yeah, it
20   was just shared with me online.  We have a -- we log
21   into a website where we can see our evaluations,
22   grades.
23   Q    Did your grade come as a surprise to you in
24   that rotation?
25   A    For the first two weeks, I felt like I

Page 76

1    performed well.  It was my first rotation so it was
2    bumpy.  So, yes, I -- I was surprised at the actual
3    grade.  I was not surprised it being lower though for
4    sure, yes.
5    Q    Were you surprised by the comments that were
6    included by the instructors?
7    A    On some of them, yes.
8    Q    Did you communicate with the other students
9    in your rotation about the grade that you received?
10   A    To my other St. Matthew's students, yes, I
11   did.
12   Q    Had they been in the rotation with you?
13   A    They were, yes.
14   Q    Do you know if they received lower or higher
15   grades than you did?
16   A    They received higher grades.
17   Q    Okay.
18   A    But as I mentioned, they were already six
19   months in the program.
20   Q    Do you feel as if the grade that you
21   received for the small animal internal medicine
22   rotation was fair?
23   A    Partially, yes; partially, no.
24   Q    Okay.  Can you break that down for me?  Can
25   you tell me why yes and why no?

Page 77

1    A    Sure.  After -- after the end of the
2    rotation, I spoke with Dr. Lyon and Dr. Nate in a
3    meeting regarding my performance.  Well, regarding my
4    performance at the end.  There wasn't any evaluation
5    performance before that at all during the rotation so
6    I was -- a little concerning about that, like for me
7    to try to improve from there for the rotation.
8        I did mention to them that I was dealing
9    with a lot of stress my last week which was where most
10   of the errors happened during this rotation and then
11   led to because of an emotional breakdown of my father
12   in the hospital in the critical unit due to a car
13   accident and health -- from health concerns leading to
14   a car accident.
15   Q    And you discussed this with the instructors
16   after receiving your grade or prior to receiving your
17   grade?
18   A    At the end of the rotation, so that was at
19   that point.  So I tried to -- I felt that I tried the
20   whole, I guess, to perform but it didn't work out, so
21   I told them at the end.
22   Q    I want to be -- let me just state this --
23   sympathetic to the issue with your father.
24        Okay?
25   A    Yes.

Page 78

1    Q   I'm trying to figure out how to ask the
2    question correctly.
3    A   Sure.
4    Q   Did you communicate the stresses or
5    difficulty that you were undergoing at that time to
6    your instructors while you were going through that?
7    A   No, not until the end of the rotation.
8    Q   Okay.  So after you were made aware of
9    receiving a grade of D, do you recall what occurred,
10   if anything, as a result of receiving that grade?
11   A   Could you elaborate on that question a
12   little bit?  Sorry.
13   Q   Sure.  College of Veterinary Medicine has
14   certain procedures that are in effect for students
15   that are participating in the clinical rotations?
16   A   Yes.
17   Q   Are you aware of those?
18   A   Yes.
19   Q   As a result of receiving a D, certain steps
20   are taken at the college level?
21   A   Yes.
22   Q   Can you tell me what steps were taken with
23   regard to you having received a D?
24   A   Yes.  I was put on academic probation.
25   Q   Immediately?

Page 79

1    A   Immediately.
2    Q   How were you made aware that you were placed
3    on academic probation?
4    A   I had to speak to Dr. Gilmour regarding
5    that.
6    Q   Did Dr. Gilmour make the decision to place
7    you on academic probation?
8    A   It involved her and the committee.
9    Q   Okay.  It's taken me a minute to get there.
10       When you say "the committee," which
11   committee is that?
12   A   It is the Professional Standards Committee.
13   Q   It's commonly referred to as PSC?
14   A   That's correct.  Yes.
15   Q   You were familiar with that structure while
16   enrolled at OSU?
17   A   No, I was not.
18   Q   Not until you received notice?
19   A   Right.
20   Q   Do you recall how you received notice that
21   the PSC had reviewed your grade?
22   A   Yes.  It involved going to a meeting with
23   Dr. Gilmour.  But I wanted to speak -- it involved me
24   speaking to my advisor about the concerns I had with
25   the rotation and the stresses I was going through and

Page 80

1    that led to me wanting to talk to Dr. Gilmour
2    regarding that because she was the associate dean at
3    the time of student affairs.
4    Q   Did you have a sitdown meeting with
5    Dr. Gilmour?
6    A   I did, yes.
7    Q   Was the PSC's review of your grade at that
8    time automatic or did you have to file some type of
9    appeal?
10   A   It was automatic.  There was no appeal being
11   done.
12       (Defendant's Exhibit 3 was marked for
13       identification)
14   Q   (BY MR. PRATT) I'm going to hand you what is
15   marked as Defendant's Exhibit 3, previously produced
16   in discovery as Board89.
17       Are you familiar with this document?
18   A   Yes, I am.
19   Q   Can you tell us what it is?
20   A   Sure.  It was an email sent to me which had
21   this letter attached to it involving regarding my D
22   grade in small animal internal medicine that they
23   received a notice and that they were placing me on
24   academic probation.
25   Q   Okay.  And it's from Margi Gilmour?

Page 81

1    A   Yes.
2    Q   Is that who had sent the email as well?
3    A   That's correct.  Yes.
4    Q   Okay.  Will you read the second paragraph
5    for us, please?
6    A   Sure.
7        "Receiving a D grade places you on academic
8        probation.  Per academic policy, receiving a
9        second "D" grade or an "F" grade during the
10       remaining clinical year may result in any of
11       the following:  dismissal, remediation
12       before being allowed to continue in the
13       curriculum, or scheduling remediation of the
14       failed rotation and continuing in clinical
15       rotations.  Please let me know if you have
16       any questions regarding the academic policy.
17       It can also be accessed in the college
18       Student Handbook."
19   Q   Thank you.
20       So you were made aware that you had been
21   placed on academic probation following your first
22   rotation?
23   A   Yes.  In October 3rd, 2019, correct.
24   Q   Give me just a second.
25   A   Sure.

Page 82

1    Q   After having received a document we just
2  discussed, were you allowed to continue in the
3  clinical rotation program?
4    A   Yes, I was.
5    Q   Did you elect to make any changes as to your
6  approach to the program as a result of this letter?
7    A   Yes.
8    Q   Can you tell us what those would be?
9    A   Sure.  It was involving reflecting on
10 recommendation much more, focusing on that, since it
11 was my first rotation.  Yeah, it was mostly really
12 focusing on, reflecting on the evaluations, taking
13 advice.
14   Q   Following the small animal internal medicine
15 rotation, you then would have continued through the
16 remainder of the fall semester?
17   A   That's correct, yes.
18   Q   Were the rotations set up, with them being
19 every three weeks, were you on the same semester
20 schedule as like Oklahoma State in general, the
21 University in general?  Like did you have a fall
22 semester, spring semester and a break in between?
23   A   No.
24   Q   No?
25   A   It was continuous.

Page 83

1    Q   Okay.
2    A   Summers were included.
3    Q   So it was just three-week rotation into the
4  next three-week rotation with no breaks?
5    A   Yes.
6    Q   Did you even consider whether it was fall
7  semester or spring semester or was it just my first
8  year of the program?
9    A   Yes, just my year in the program.  I'm there
10 for nine months continuously.  There is no breaks.
11   Q   The reason I'm asking that is because in my
12 mind, because I wasn't there, I still think like the
13 university lawyer who is thinking about fall semester,
14 spring semester.  So if I say that and it's confusing,
15 just let me know.
16   A   Sure.
17   Q   Because I do have my next set of questions
18 just to kind of ask you like through the remainder of
19 the fall, you know, do you recall which rotations you
20 did that followed the small animal internal medicine
21 rotation?
22   A   Sure.
23   Q   Can you tell us at least what some of those
24 rotations were?
25   A   Are you asking after small animal internal

Page 84

1  medicine?
2    Q   Yes, sir.
3    A   Sure.  The next one after I did that was
4  theory of genealogy which was the next rotation after.
5  The one after that, I believe, was equine internal
6  medicine rotation, and then after that I believe it
7  was exotics medicine rotation.
8    Q   Did you enjoy those rotations?
9    A   I did, yes.
10   Q   Did you do well in those rotations?
11   A   Yes, I did.
12   Q   Okay.  Do you recall any of the ones that
13 would have like started in the spring?  Like I said,
14 that's how I had it in my mind.
15   A   In the spring, so after the fourth, January,
16 I'm trying to recall the one after equine medicine
17 internal medicine.
18   Q   Was it small animal ICU?
19   A   Yes.  Yes.  But that was during -- I think
20 that was during -- yes, that was later, I believe.
21   Q   Okay.
22   A   So, yeah.  Because I'm trying to remember.
23 I know during Christmas I had large animal internal
24 medicine because I was -- I was there for Christmas,
25 so that was at the end of December.  So then the next

Page 85

1  one after that was going to be the spring one.
2    Q   Thinking about back over all of that and the
3  times, the next rotation that I'm going to focus on is
4  going to be community practice.
5        So prior to community practice, do you
6  recall the instructors of any of the rotations that
7  you took?
8    A   Yes.
9    Q   What were your relationships like with them?
10   A   Good.  Very good.
11   Q   With all of them?
12   A   Yes.
13   Q   Across the board?
14   A   Yes.
15   Q   Okay.  We'll move into community practice.
16       Can you describe for me what the community
17 practice rotation is?
18   A   Sure.  Community practice rotation involves
19 doing your daily practices as a veterinarian which
20 involves vaccination protocols.  So these are just
21 your daily like checkups kind of thing, wellness
22 checks.
23       And, you know, some do come in sick but they
24 are the ones that see the cases first and if it is too
25 complicating or something that is specific, not able

Page 86

1  to do, that goes to internal medicine.

2      So that involves, like I said, routine

3  exams, you know, vaccinations, simpler stuff, I would

4  say, like ear cleaning if needed, cutting nails, just

5  simpler stuff I guess you would say, more general

6  practice oriented things.

7      **Q   Is it fair to say that a lot of work you**

8  **would have been doing in that rotation was**

9  **representative of the work you had been doing since**

10  **you were 15 working in your dad's clinic?**

11     A   Yes.

12     **Q   Similar?**

13     A   Similar, uh-huh.

14     **Q   Were there multiple instructors for that**

15  **rotation?**

16     A   Yes, there was.  There was Dr. DeMars and

17  Dr. Syp.  Those are the two clinicians and then we

18  would have an intern also working with us for

19  emergencies.

20         MR. PRATT:  He says Dr. DeMars and Dr. Syp.

21  Syp is short for Sypniewski.  I believe it is spelled

22  S-Y-P-N-I-E-W-S-K-I.

23     **Q   (BY MR. PRATT) Is that accurate?  Not the**

24  **spelling but are we talking about the same individual?**

25     A   Yes, we are.

Page 87

1      **Q   Okay.  What was your relationship like with**

2  **them?**

3      A   At the start it started off good.  I enjoyed

4  both of them really well.  We got -- we -- there was

5  no issues in the beginning of the rotation and like

6  midway was good still.  There was concerns later on

7  after that though.

8      **Q   Okay.  What were your concerns?**

9      A   Well, my concerns were more of the behaviors

10  of them both.  Over time I noticed some different

11  behaviors of them from when I saw them in the

12  beginning of the week.

13     **Q   Such as?**

14     A   Anger issues was a big one.

15     **Q   From both of them?**

16     A   From both of them, yes.

17     **Q   How did that manifest itself?**

18     A   It involved not with per se me.  I wasn't

19  sure why they would be angry but they came in like

20  flustered and kind of overwhelmed I think is

21  probably -- and then they would reflect it out on the

22  student, like all of us students in the class.

23         There was some occasions that would happen,

24  some like happenings, I guess.

25     **Q   But you said never at you?  You said not**

Page 88

1  directly at you?

2      A   There was some discrepancy that were, yes.

3  But it started off that it was to the class and then

4  it targeted certain people.

5      **Q   Gotcha.**

6      **So this rotation, like the others we talked**

7  **about, was three weeks?**

8      A   Yes.

9      **Q   When we talk about a rotation being three**

10  **weeks, I want to dive in a little bit on that.**

11     **Okay?**

12     A   Sure.

13     **Q   Are you working seven days a week?**

14     A   We are working five days a week.

15     **Q   Monday through Friday?**

16     A   Yes.

17     **Q   Any work on the weekends?**

18     A   Yes.  There was one time I did work on the

19  weekend but it involved one case only.

20     **Q   From all of your rotations there was only**

21  **one time you worked on a weekend?**

22     A   No.  It depends.  Like I mentioned earlier,

23  it depended on the rotation.

24     **Q   Okay.  One time in community practice you**

25  **worked on the weekend?**

Page 89

1      A   Yes.

2      **Q   So if we were even to max on this, 21 days**

3  **that you're exposed to these specific set of**

4  **instructors, Dr. DeMars and Dr. Syp?**

5      A   That's correct.  Yes.

6      **Q   And you say that for the beginning of that**

7  **it was a good relationship, at the end it was not and**

8  **in the middle was deteriorating.  So we have a pretty**

9  **short time span there --**

10     A   Yes.

11     **Q   -- for which you're basing your kind of --**

12  **you know, trying to assess your relationship with your**

13  **instructors?**

14     A   Right.  Yes.

15     **Q   Okay.  You mentioned that as it got toward**

16  **the end of the rotation you felt as if they were**

17  **targeting individuals?**

18     A   Yes.

19     **Q   Let's talk about that.**

20     A   Sure.

21     **Q   Who did you feel was being targeted?**

22     A   Depending on certain students, I know there

23  was me and another male student.  We were the only

24  male students in the class.  We were being targeted by

25  Dr. Syp at the time.  There was a few female students

Page 90

1 being targeted by Dr. DeMars.

2    Q   Okay.  So you didn't feel as if you were
3 being targeted by Dr. DeMars?

4    A   Not until the end of the rotation.

5    Q   Okay.  At what point did you feel like you
6 were being targeted by Dr. Syp?

7    A   Within the beginning of the second week I
8 would say after -- during this case that I mentioned
9 over the weekend, that's when I started to feel
10 targeted a bit.

11    Q   Based on what you've said, and I think
12 there's -- we'll get to it later, but there's a
13 statement in your complaint that it seems to be that
14 you believed that targeting to be based on your
15 gender?

16    A   Could be.  I'm not sure how they're
17 targeting me based on that but it could be, you know.
18 I feel it could be not just sex but it could be
19 something else.  I'm not sure.

20    Q   So you felt like you and the only other male
21 resident, is that right, that was in community
22 practice with you at the time?

23    A   Student not resident.

24    Q   I'm sorry.  Thank you.

25    A   It's no problem.

Page 91

1    Q   You were the two male students in the
2 rotation?

3    A   Yes.

4    Q   You felt as if the two of you were targeted
5 specifically by Dr. Syp?

6    A   Yes, I felt that.  Yes.

7    Q   What did the targeting look like?

8    A   It involved -- instead of talking privately,
9 it involved talking in front of other students about
10 concerning matters within our cases instead of just
11 talking to us privately.  You know, it was more -- it
12 kind of felt humiliating, humiliation sort of.  These
13 are your errors, why aren't you doing this, I did do
14 this, you know, communicating.  Well, you didn't.

15        It was kind of -- it got to -- it wasn't
16 very professional.  Let's put it that way.  It could
17 have been more -- this should have been more of a
18 private matter between let's talk about our case
19 together.  Instead it was in front of other
20 students when it shouldn't have been about our
21 performance, I guess, so.

22    Q   In any of those instances that you recall,
23 would it have been possible that Dr. Syp was using the
24 scenario you're describing as a teaching moment for
25 more students other than just yourself?

Page 92

1    A   No.

2    Q   That's not possible?

3    A   No.  I don't think that's possible in my
4 situation, in my scenario, no.

5    Q   Why?

6    A   Because I felt that was or she felt it was
7 an error that I did.  I don't feel that it was an
8 error that other students did or had experience of
9 doing because I'd never saw that in the rotations.

10        So whether it was a teaching matter or not,
11 from what I've seen, things were done privately if
12 there was something that you had a concern -- or they
13 had a concern about your performance.

14        MR. BACH:  Can we take a short break?

15        MR. PRATT:  Sure.

16        (Luncheon recess taken from 11:54 to 12:35)

17    Q   (BY MR. PRATT) We've been on a lunch break.
18 We're back on the record.  We're going to pick up
19 where we left off, but before we do I want to ask you
20 a question and that is, since we took our break, have
21 you thought back on any of your responses or any of
22 the questions asked and have any of your answers
23 changed or is there anything that you would like to
24 add or provide at this time?

25    A   Yes, I do.

Page 93

1    Q   Go ahead.

2    A   Okay.  You mentioned regarding -- when you
3 asked about anger, there was a question regarding
4 community practice.  There was some couple incidents
5 of anger that I noticed.  One was on the first day
6 actually of the rotation.

7        Dr. DeMars, when he presented rounds to us,
8 the first day we were talking about a topic.  I'm
9 trying to remember the topic off my head.  I don't
10 recall.  But there was a topic regarding something
11 with veterinarian and community practice.

12        While we were being lectured, he was on the
13 board about to start his lecture at like 8:00 a.m.
14 where we usually start, he had his diabetic monitor on
15 and it started beeping like constantly and it was
16 interrupting him.

17        There was a point where he couldn't shut it
18 off and he kept trying to shut it off and it got to a
19 point where he was being -- I don't know if it was
20 embarrassment or flustered or just anger in general
21 that he -- I could tell like he started just getting
22 angry, just wouldn't stop and he just took the thing
23 out, put it on the table that we were like in this
24 round room that we have, kind of like a smaller table,
25 and then got his pocketknife out of his pocket and

Page 94

1  started stabbing it profusely on the table.

2  **Q   Okay.  This was his monitor?**

3     A    Yes, his diabetic monitor.  That's correct.

4  He stabbed it profusely at least 10 times or more and

5  just wouldn't stop.  He finally opened it and it

6  stopped and took the batteries out, and then didn't

7  say anything and just continued.

8         He's like, okay, well.  And then he started

9  the lecturing like that, just like flustered.  Within

10 this time, I was -- not being, not being an OSU

11 student, I had no recollection of who Dr. DeMars was.

12 But I was looking at -- I was looking at everyone's

13 face, the OSU students there.

14        I was the only island student in that

15 rotation.  There was one other student that was a

16 foreign student so she was -- I believe was paid

17 student but she came from Louisiana State University.

18 So it was just me and her as non OSU students.

19        So we were looking at each other in just

20 shock, like what is going on.  And then I looked at

21 every other student that I knew from other rotations

22 before this.  I also have been with a few of them.  I

23 was looking at them like what was that, like what is

24 going on.

25        They were just like -- like they were in

Page 95

1  shock, too, like but they were also -- they didn't

2  seem as shocked as the other student and I.  There was

3  talks after about that incident after he left the room

4  and we're all -- I was in shock, like what was that,

5  like that was kind of scary, like this anger came out

6  and he just took out a knife and started stabbing this

7  monitor.

8         They're like, yeah, he kind of has anger

9  issues and stuff like that.  They were used to that

10 kind of situation.  I was pretty in shock after that.

11 I didn't see that kind of anger until like in certain

12 situations where he felt he was in fault.

13        There was another situation where -- that

14 there was a missed -- there was a missed case that was

15 being told for us to do.  We have an intercom to know

16 when we're up next.  Like if there's a case that's

17 coming, they will let us know and they'll call us in

18 the monitor what student is assigned to it.  Because

19 we used a program that tells you the name.

20        There was an incident where that that case

21 was completely missed and we were not -- we were

22 available all the time but we did not hear the

23 intercom at all of anyone's name who was supposed to

24 do it.  Wasn't my case.  It was one of their cases,

25 one of the other students, but it wasn't told to us.

Page 96

1         Apparently, that was an issue in the past

2  that he told us about.  So Dr. DeMars had a meeting

3  with us about that in like a midday kind of situation.

4  We usually do a meeting at the end of the day, kind of

5  tell us what, you know, what we learned and how is

6  everyone doing and everything, like how is everyone

7  doing.

8         We might do like an extra lesson if we have

9  enough time, an extra rounds topic.  We talked about

10 our rounds like each case kind of situation and so

11 that's what the rounds usually are for.

12        At the end of that point, within this mid

13 meeting, both of them came to the room, Dr. Syp and

14 Dr. DeMars.  They kind of were talking us down, saying

15 like someone missed an appointment, all this stuff.

16 You need to hear everything.  You need to hear for

17 this call.

18        We were just like confused, like there was

19 no call, like what do we do if the receptionist

20 doesn't call.  We will never know they came or if they

21 don't actually like physically come, which is very

22 close to the room.  The receptionist's office was

23 literally like maybe 10, 15 feet away of the door to

24 the rounds room, the hallway.

25        We weren't even told that they even came

Page 97

1  from either way.  It was a big concern for them.  I

2  saw the anger like coming out, like they were just

3  flustered, and then the techs were also flustered.

4  Like everybody was just like flustered, like mad and

5  angry.

6         We explained that we didn't hear on the

7  intercom or anything.  We didn't know even it came.

8  Nobody even came to us either from the receptionist's

9  office, like less than 10, 15 feet away.

10        Yeah, they were saying that you can never do

11 this.  This is ridiculous.  Like we were blaming,

12 blaming, blaming.  But we were telling our story, like

13 there was no call, what do we do, how is that our

14 fault.

15        They said, we've had multiple problems.  We

16 cannot have this problem again in this rotation, like

17 they kind of told like this happened before and we're

18 getting blamed constantly.  We can't have this happen

19 again to us.  So there was like a lot of problems

20 that.  Then in regards to anger, there was other anger

21 situations.  Now, that included the class.

22        There was another one where Dr. Syp like

23 second week mentioned that she's very open about her

24 drug use and marijuana.  She did a lot of research on

25 marijuana with animals, so people appreciated, you

Page 98

1  know, her research with animals and everything and
2  marijuana.
3       We know she was I guess, like -- she was an
4  encourager for people to use marijuana for any like
5  ailments needed for health-wise reasons.
6       There was a situation where I guess things
7  were not working up to her par as a class, like things
8  were -- it was a very busy day.  I think we had like
9  10, 15 cases total that day including multiple
10  emergencies and daytime emergencies.
11       So during that time, she -- she was getting
12  flustered and just said like -- because we were
13  working with her that day.  We rotated usually.  It
14  was like DeMars this day and another day Syp.
15       She would mentioned that like you don't want
16  to see me without my meds, like trust me.  You don't
17  want to see me angry, like you don't want to see me
18  angry.  She said this to the entire class, not like
19  targeting anyone there.  So that was kind of
20  concerning to me.
21       Everyone was kind of shocked like, well, who
22  is this other person.  She was usually pretty laid
23  back.  But in that case like there was times where she
24  would just flip, like completely different personality
25  almost, like change immediately, like a switch, like

Page 99

1  boom (indicating), like that.
2       In regards to other angers beside that,
3  there was targeting angers after that like also
4  between those things.  But those of the two big ones I
5  felt like that were very like class oriented, they
6  sent to everybody.  Then there was, like I mentioned,
7  the humiliation portion where she would say it in
8  front of other people when the targeting was
9  happening.
10  Q    Anything else?
11  A    There was -- let me take a pause.  Let me
12  try to think if there's some more, other situations.
13  There was a situation I felt there was anger in my
14  evaluation in regards to when I spoke to her in
15  person.
16       There was a situation where we were put -- I
17  was put in a private room with an intern that was
18  working with me that day emergency and then there was
19  also her which she mentioned about a situation with a
20  case that we were having that there was a poor
21  communication instruction based on something that I
22  did that was on the syllabus that was supposed to be
23  correct.
24       It was based on the time of a patient care
25  and I mentioned there was a syllabus of patient care.

Page 100

1  Her demeanor at that time was very laid back, not
2  worrying about -- that wasn't a big deal, wasn't an
3  issue.  Let's just say like -- let's just think it
4  never happened.  It's not a big deal.  They're going
5  to get the money anyways, the patient -- the client.
6  Because he dropped off the animal at the time.
7       They wanted the money at the beginning
8  before he was dropped off as a deposit for ICU care
9  for seizure watch.
10       The paper communication was an issue because
11  I wasn't told by the intern to give the paper to the
12  receptionist at the time and I didn't and that was an
13  issue because they wanted me to turn it in which I was
14  never told, instructed to.  Because I never did
15  daytime emergency, that was a new thing to me and it
16  wasn't said in the syllabus for those matters.
17       I was a bit concerned regarding that.  She
18  made it not a big deal.  When I read my evaluation
19  grade at the end, it was a huge deal and they actually
20  thought I was lying and that sort of -- part of the
21  reason all those things were happening.
22       There was other little incidents.  But I did
23  see a big switch of tone and voice.  She was -- she
24  played like a laid back person at times but other
25  times she played like nitpicky, like angered, tone of

Page 101

1  voice would switch to anger immediately.
2       My final meeting I saw her anger at full
3  throttle.  When I mean "full throttle," I saw like the
4  demeanor change completely.  She stormed out yelling
5  that this animal could have died.  All these things.
6  She stormed out, like she couldn't even speak at that
7  point, like I felt the anger and she stormed out
8  angry.  That's when he spoke to Dr. DeMars after that,
9  so.
10  Q    Anything else?
11  A    Let's see.  When there was things I
12  mentioned earlier with the class when things were to
13  be blamed at the class for doing -- there was other
14  occasions where -- just smaller occasions where they
15  did show bouts of anger or something wasn't done.
16       When one was gone, the other one came back
17  and then they were flustered and then they had to do
18  other things, like the other person's clinician.
19  Because one time they had half days and I guess one
20  had to teach or something or I don't know the full
21  situation where they have to go.  But one would either
22  have an emergency or something where they had to go
23  and the other one would have to take over.
24       You could just tell like there was
25  uneasiness, kind of feeling like hurrying kind of

Page 102

1 situation or like they would be gone when you're
2 trying to communicate and there's no communication
3 involvement, like it was a huge problem in general.
4 Like communicating with them was quite a hassle and
5 then not because of the reaction that they would give
6 but sometimes they were like distant, like it was a
7 problem.
8    Q   Anything else?
9    A   Yes.  In regards to the anger, that's what I
10 remember at the time.  I might get back to that later
11 but those are the big ones I would say for now.
12    Q   Okay.  You've listed a number of things that
13 you recall that you attribute to anger and to a number
14 of other things.  I had asked you, I believe the
15 question that you were responding to, was how you had
16 seen them act out in anger which you had mentioned.
17    A   Yes.
18    Q   A lot of what I've heard you describe I
19 would categorize as dislike of either Dr. DeMars' or
20 Dr. Syp's personality or dislike of their teaching
21 style.
22        Would you disagree with that categorization?
23    A   Yes, I disagree.
24    Q   Okay.  How would you describe the list of
25 grievances that you've now aired?

Page 103

1    A   I would list that as uncontrollable emotions
2 that shouldn't be brought into a professional
3 environment.
4    Q   Okay.  Earlier where we left off was that
5 you had indicated that you had felt targeted?
6    A   Yes.
7    Q   And that the targeting from Dr. Syp had
8 been, when you described it, I believe your words were
9 a lack of professionalism when I asked how she had
10 targeted you?
11    A   Yes.
12    Q   She talked about mistakes you made in front
13 of the group?
14    A   Yes.
15    Q   That you felt that that was inappropriate?
16    A   Yes.
17    Q   And that instead that those concerns should
18 have been aired in private?
19    A   Yes.  The reason I said that was because
20 everything else that I did in the class with them was
21 in private, and that one thing that wasn't private,
22 that wasn't necessary to me.
23    Q   Did the students, when making the rounds,
24 communicate out loud as a class between themselves and
25 the instructor?

Page 104

1    A   No, they did not.
2    Q   There was no communication between the
3 instructor and the class as rounds were being made?
4    A   In regards to asking questions or answering
5 questions?
6    Q   Yes.
7    A   Yes, there was.
8    Q   Did any students ever give incorrect
9 answers?
10    A   Yes.
11    Q   Were they corrected in front of the group?
12    A   Yes.  On occasion actually.  Excuse me.  On
13 some occasions, yes, they were.  Other occasions they
14 weren't and we -- they were not talked to about their
15 answer.  They would just ignore it.
16    Q   So I think the beginning of this
17 conversation started with a question about what your
18 relationship was like with your instructors.
19    A   Yes.
20    Q   This response has clearly been different
21 than the responses you've given about your other
22 instructors; is that fair?
23    A   Yes.
24    Q   I believe you said that at the beginning it
25 was good?

Page 105

1    A   Yes.
2    Q   At the beginning of the community practice
3 rotation your relationship with Dr. Syp and Dr. DeMars
4 was good?
5    A   Individually, yes.
6    Q   By the time it got to the end of the
7 rotation, you described it as something less than
8 that?
9    A   Yes.
10    Q   Okay.  You indicated that you felt like it
11 was unprofessional for your instructors to display --
12 I don't remember the term you used, but changes, maybe
13 you even said wild changes, but fluctuations in
14 emotion in front of the class.
15        Is that accurate?
16    A   Yes.
17    Q   Your instructors are people, yes?
18    A   Yes.
19    Q   They're not computers?
20    A   Yes.
21    Q   They're not robots?
22    A   Right.
23    Q   They experience emotion?
24    A   Yes.
25    Q   They experience frustration?

Page 106

1   A   Yes.

2   Q   Presumably their goal is to educate the

3   students that are in the rotation?

4   A   Yes.

5   Q   OSU as the sponsor of the clinical program

6   has a responsibility to ensure that its students that

7   graduate with veterinary degrees are competent, yes?

8   A   Yes.

9   Q   Is it unreasonable for an instructor to feel

10  frustration if their class is not picking up whatever

11  it is they're trying to teach?

12  A   Can be frustrating, yes, but there's usually

13  corrections after that that need to be made or need to

14  be said.

15  Q   Would you agree that there's a wide range of

16  how individuals show and display emotion?

17  A   Yes.

18  Q   Isn't it possible that Dr. DeMars shows

19  emotion in a way that's different from other

20  instructors?

21  A   Yes.

22  Q   But you're not asking that Dr. DeMars not

23  experience or show any emotion; correct?

24  A   No.

25  Q   Same for Dr. Syp?

Page 107

1   A   Right.  Yes.  But they -- what I'm trying to

2   say, they've shown emotions that were beyond in a

3   teaching manner.  It wasn't just frustration.  It was

4   more than that.  It wasn't just frustration.  It was

5   anger.

6   Q   But that's your opinion?

7   A   No.  When you raise your voice very loud to

8   a point that you're intimidating people, then it's not

9   just me.  It was other students regarding that when we

10  spoke to each other during rounds rounds and stuff in

11  stuff when they were out, you know, out of the rooms.

12  It was a sense of intimidation.

13  Q   I'm not saying you have to agree with this

14  style but isn't it possible that that is a teaching

15  style?

16  A   It can be a teaching style but it's not a

17  good teaching style for students.

18  Q   For you?

19  A   For multiple -- for I guess all of us if

20  that was the case because we were being blamed for

21  things that we didn't do.  We were being -- there was

22  examples as I mentioned individually where we were

23  being blamed for past discrepancies with other

24  rotations of theirs.  And that's concerning to me.

25  Q   But you can't sit here today and speak for

Page 108

1   other students, can you?

2   A   No.  But from what I've said what we spoke

3   with each other about, I'm telling you that we -- we

4   were speaking to each other about our frustrations and

5   it wasn't just a solo frustration.

6   Q   So you listed a little bit ago for quite

7   some time a number of grievances or issues that you

8   had with the teaching style of both Dr. DeMars and

9   Dr. Syp?

10  A   Yes.  Are you talking about the field

11  process?  Just to be sure.

12  Q   The appeal process?

13  A   Are you mentioning the grievance regarding

14  me trying to talk to Gilmour, the committee?

15  Q   No.  I'm talking about just a little bit ago

16  and I would ask anything else and you kept adding to

17  that.

18  A   Yes.

19  Q   You were detailing a number of issues you

20  had --

21  A   In the rotation, yes.

22  Q   -- during rotation?

23  A   Yes.

24  Q   Correct?

25  A   Yes.  Yes.

Page 109

1   Q   Who did you report those concerns to?

2   A   Dr. Gilmour.

3   Q   Okay.  At what time did you report them?

4   A   At the end of the rotation.

5   Q   At the end of the rotation?

6   A   Yes.

7   Q   Before or after you received a grade?

8   A   After I saw my grade.

9   Q   Okay.

10  A   Actually, I take that back.  I didn't get my

11  grade until two or three weeks after that rotation so

12  I didn't see my grade fully but I had concerns about

13  that rotation in which I reported to Dr. Gilmour.

14  Q   Did you know what grade you were going to

15  receive?

16  A   Yes, because they said I was not going to

17  pass rotation.

18  Q   Okay.

19  A   Not the specific grade.

20  Q   I understand.

21      You didn't know what the letter grade would

22  be but you knew it was not going to be a passing

23  score?

24  A   Yes.

25  Q   Do you recall what grade you ended up

Page 110

1  receiving for the rotation?

2    A  Yes.  A 68.3.

3    Q  What was the letter grade?

4    A  D.

5    Q  Okay.

6      (Defendant's Exhibit 4 was marked for

7      identification)

8    Q  (BY MR. PRATT) I'm going to hand you what is

9  marked as Defendant's Exhibit 4.  Take a look at that.

10   A  Yes.

11   Q  Take a chance to review it and then when you

12 can, let me know what that document is.

13   A  Yes.  This is my evaluation for community

14 practice, my grade.

15   Q  It looks similar in form to some of the

16 other evaluations we've looked at today, doesn't it?

17   A  Yes, it does.  A little different but it has

18 its similarities.

19   Q  Okay.  At the top it indicates that it is

20 with regard to you and your performance in the

21 community practice rotation, yes?

22   A  Yes.

23   Q  And it indicates that the dates of activity

24 were February 10th, 2020, to March 1st, 2020; correct?

25   A  Correct.  Yes.

Page 111

1    Q  Okay.  Now, unless I'm missing it, I don't

2  believe -- while it has boxes similar to the other

3  form, it does not have the scale at the top.

4    A  It does not.

5    Q  So it's slightly different in how it is

6  scored; correct?

7    A  Yes, that's correct.

8    Q  Okay.  So on this form, I believe there are

9  five -- it says there are five questions.  I don't

10 know that that's an accurate description because I

11 think the fifth question is actually a box for

12 comments.

13     Does that make sense?

14   A  Yes.

15   Q  So let's start with the first four.

16     What is the first box of the evaluation?

17   A  Sure.  The first box is Subjective

18 Evaluation of Wellness appointments and Non-wellness

19 appointments.

20   Q  Okay.  Did you receive a score for those?

21   A  I did, yes.

22   Q  What were the scores that you received?

23   A  The wellness appointments was 13.5 out of 20

24 and then the non-wellness appointments was 12 out of

25 20.

Page 112

1    Q  Okay.  And then it shows a total there 25.5;

2  correct?

3    A  Yes, that's correct.

4    Q  And that is out of a total of 40 possible

5  points?

6    A  Yes, that's correct.

7    Q  Okay.  Let's go to the next box.

8      Can you tell me about that box?

9    A  Sure.  Question 2 of 5 is Pre-Quiz &

10 Technical Skills, & End of Rotation Quiz, which is 40

11 points total.

12   Q  Okay.  Did you receive scores for that

13 particular category?

14   A  Yes, I did.

15   Q  Can you tell me with the three breakdown

16 scores that you received?

17   A  Sure.  The Pre-Quiz I received 7.4 out of

18 10.  The Technical Skills I got a 5.6667 out of 10,

19 and the End of Rotation Quiz I got a 17.5 out of 20.

20   Q  That says your Pre-Quiz Subtotal is 30.567;

21 correct?

22   A  That's correct.

23   Q  Out of 40?

24   A  Yes.

25   Q  The third box is what?

Page 113

1    A  Professionalism/Work Ethic out of 20 points.

2    Q  What was your score?

3    A  12.25 out of 20.

4    Q  Okay.  Question 4 isn't really a question

5  again.  That's one that seems to be coming to a sum of

6  what the total points were.

7      Does that appear to be accurate to you?

8    A  Yes.

9    Q  What were your total points?

10   A  68.317.

11   Q  Which resulted in a letter grade of?

12   A  Of D.

13   Q  Okay.  Now, if you'll turn to the next page.

14   A  Yes.

15   Q  It appears to be a full page of commentary.

16   A  Yes.

17   Q  If I'm not mistaken, approximately the first

18 half of the page reflects commentary provided by

19 Dr. Syp?

20   A  Yes.

21   Q  And the bottom half of the page provides

22 commentary by Dr. DeMars?

23   A  Yes.  That's correct.

24   Q  Okay.  Starting with the top of the first

25 half which would have been Dr. Syp's evaluation

Page 114

1  comments, would you read the first paragraph, please?

2    A   Sure.

3        "Jonathan, as we have discussed, I believe

4        it is in your best interest to repeat the

5        CP rotation.  I have based this decision on

6        the syllabus and the described entrustable

7        activities that are a basic expectation for

8        all CP students.  It is my opinion that many

9        areas of your performance need improvement.

10       I will use the following examples to

11       highlight my concerns.  These examples, some

12       big, some small, concern me deeply."

13   Q   Thank you.  Just so we have a clear record,

14 when you use the initials CP rotation, that presumably

15 is community practice rotation; is that correct?

16   A   Yes.  That's correct.

17   Q   Okay.  Would you go ahead and read the

18 second paragraph, please?

19   A   Sure.

20       "I know that you can become a competent if

21 not great veterinarian.  I simply think you need more

22 coaching.  When we discussed these issues and opinions

23 in weeks 2 and 3, I found that you were unwilling to

24 take on the role of a learner.  In fact, I believe you

25 are overconfident in your abilities/knowledge base

Page 115

1 which makes this situation even more critical.  If

2 you're not willing to learn, to be open to a real

3 coaching experience meant to mold you into a good

4 veterinarian, what type of practitioner will you

5 become?"

6    Q   Thank you.  Then the next three paragraphs

7 set forth examples that Dr. Syp points to with regard

8 to specific animals that you provided treatment to; is

9 that correct?

10   A   Yes, that's correct.

11   Q   And she concludes by starting with a

12 paragraph that starts with "Therefore."

13       Would you read that paragraph for me,

14 please?

15   A   Sure.

16       "Therefore, I am not passing you because I

17       believe you are unable to successfully:" --

18       and there's a list of things starting with

19       the first -- "-Effectively communicate

20       information to the supervising doctor.  2.

21       Perform a physical and accurately identify

22       abnormalities and communicate these to the

23       client and the supervising doctor.  3.

24       Develop and implement a treatment plan for a

25       sick patient.  4. Develop a diagnostic plan

Page 116

1        and interpret these timely and accurately.

2        5.  Effectively communicate vital

3        information about the case to stakeholders

4        including but not limited to clients,

5        students, nurses, staff members and faculty.

6        7. Effectively communicate vital

7        information, including but not limited to

8        diagnostics, and case follow up, to clients

9        and team members.  And lastly, Demonstrate

10       Professional/Ethical Behavior and Work

11       Ethic.

12   Q   Thank you.  That's a pretty specific list,

13 would you agree?

14   A   Yes.

15   Q   I forgot what number you ended on, maybe 8?

16   A   I think was eight, yes.

17   Q   Eight specific categories of areas that she

18 felt you needed to improve?

19   A   Yes.

20   Q   Yet up above she still says to you that she

21 thinks "that you can become a competent, if not great,

22 veterinarian"?

23   A   Yes, that's correct.

24   Q   Did you believe when she said that?

25   A   I did, yes.

Page 117

1    Q   Does that sound like someone who wants to

2 target you or has it out for you?

3    A   No, it doesn't.  Which I was shocked because

4 the way I was treated was targeting.

5    Q   In your opinion?

6    A   No.  It was targeting.  Well, in my opinion

7 but, you know, I've been in school for many years.  I

8 know when it's targeting.

9    Q   How do you know when it's targeting?

10   A   When my evaluation showed or explained the

11 certain examples that's not what was reflected when I

12 spoke to her.

13   Q   You're saying your conversations with

14 Dr. Syp differ from what she put in your evaluation?

15   A   Yes.

16   Q   Okay.  Now, I'm a little unsure about where

17 this fits because it appears, in my opinion, to likely

18 be part of Dr. Syp's evaluation but that may be my

19 presumption.

20   A   Yes.

21   Q   It is hard to tell.  The reason I think that

22 is because it is before the date of the one below

23 which leads me to think it was part of Dr. Syp's

24 evaluation.

25   A   It was, yes.

Page 118

1    Q   Okay.  It's a single sentence.

2        Would you please read that for us?

3    A   Sure.

4        The one after LAS?

5    Q   Yes.

6    A   "More than one occasion where this student

7        was not telling the truth regarding what he

8        had or had not done concerning patient

9        care."

10   Q   Okay.  So I don't know if that was meant to

11   be No. 9 on the list?

12   A   I'm not sure.

13   Q   If it was an afterthought?

14   A   Maybe an afterthought.

15   Q   It's unclear?

16   A   Not sure.

17   Q   But it's in the evaluation?

18   A   Yes, it is.

19   Q   Dr. DeMars' evaluation follows and it has a

20   very similar structure, would you agree?

21   A   Yes, it does.

22   Q   Kind of an introductory paragraph?

23   A   Yes.

24   Q   And then multiple examples of animals that

25   you provided treatment to?

Page 119

1    A   Yes.

2    Q   In the middle of the evaluation, there's a

3    paragraph that starts with "While".

4        Would you read that for us, please?

5    A   Sure.

6        "While you performed acceptably on other

7        appointments during the rotation, these

8        specific examples are the greatest influence

9        on assigning a failing grade.  Wellness and

10       dermatology are the two most important

11       appointment types I expect a primary care

12       veterinarian to be able to successfully

13       manage.  Overall you saw nine cases with me

14       in three weeks; five wellness, three

15       dermatologic, and two others.  Seeking

16       feedback from Dr. Irizarry she brought up an

17       example of failed trust as well."

18   Q   Okay.  If you could just finish up and read

19   the final paragraph beginning with "Finally".

20   A   Sure.

21       "Finally, your response to our feedback and

22       attempts to illustrate to you our concerns

23       is an issue.  We discussed these issues at

24       least for at least 30 minutes.  At no time

25       did you appear to listen and accept what we

Page 120

1        were saying, instead became defensive and

2        argumentative.  While I understand the

3        upsetting nature of the topic and the fear

4        of consequences, this was an unexpected

5        response to what I considered a very good

6        relationship we had developed over the

7        weeks.  I hope you believe that we sincerely

8        want to see you succeed and wish to coach

9        you to success."  Much like Dr. Syp, while he is

10   Q   Thank you.  Much like Dr. Syp, while he is

11   critical of some of your performance during the

12   rotation, he also focuses on some positive attributes,

13   does he not?

14   A   Yes, he does.

15   Q   Does that evaluation read to you as someone

16   who was targeting you?

17   A   If you read the rest of the examples, it

18   does.

19   Q   I want to be clear.  I'm not skipping over

20   the examples to not include them in what you're

21   reading as part of the record.  I skipped over them

22   because I do understand that you disagree with the

23   instructors.

24   A   I do.

25   Q   They believed that something should have

Page 121

1    been done one way and they are critical of the way

2    that you did it?

3    A   Yes.  And partially the reason I felt was

4    not fair is I was being blamed for other people's

5    cases that were not mine, in my final meeting of when

6    they determined my grade and my performance.

7        And also, it relates to the examples that

8    they did give of the cases that they had issues with

9    or they gave me feedback for were not reflective of

10   what I did sometimes and I felt that wasn't very fair.

11       They wouldn't let me speak about those

12   issues I had with them.  They didn't give me a podium

13   to talk about disagreements.

14   Q   I want to make sure that you feel as if I'm

15   hearing because I do understand that you disagree with

16   their assessment of your performance.

17   A   Yes.

18   Q   I think based on what we see in the

19   evaluation it's clear that they disagree with your

20   assessment of your performance; correct?

21   A   Yes.

22   Q   So with this evaluation, we know that you

23   have now received your second D for a rotation, so

24   that's two D's within the same year.

25       You read I believe Dr. Gilmour's letter

Page 122

1 earlier that referenced that you were on probation?

2    A   Yes, I did.

3       Q   And that if another D or F was received that

4 it would have consequences; is that correct?

5    A   That is correct, yes.

6       Q   Okay.  So after you received this D, what

7 happened?

8    A   After I received this D, in my final meeting

9 I told them both that there was a lot of things I

10 didn't agree with, what they were mentioning and as

11 much as I thought I had good relationship with them, I

12 felt that there was definitely some holes in

13 communication and I mentioned that.  It was a big

14 thing.

15       Communication was a big problem with this

16 rotation, not just -- I'm talking speaking for myself

17 it's been a problem.  But for others I've heard

18 problems as well for them.  But for me it was a huge

19 problem.

20       Q   When did you convey this to?

21    A   I spoke to both Syp and DeMars about that in

22 the third week meeting.

23       Q   Okay.  And then you were told that you would

24 not be passing the rotation?

25    A   Yes.

Page 123

1       Q   You didn't know what your grade was going to

2 be necessarily but you knew that it was not going to

3 be a passing grade?

4    A   That is correct, yes.

5       Q   When you became aware that you had received

6 a D, what happened from there?

7    A   I was concerned just like he mentioned in

8 his final paragraph.  I mean, he mentioned that it is

9 it is upsetting nature -- it's normal to be an

10 upsetting nature, topic, fear of consequences.

11 However, I was trying to explain the examples that

12 they mentioned to me in the meeting of their cases as

13 they mentioned here.

14       And there was a disagreement because I felt

15 when I did explain the things to them, they were not

16 accepting what I had to say of what happened, actually

17 happened.

18       Q   When you received the D, did it

19 automatically trigger another Professional Standards

20 Committee review?

21    A   Say that again.  Sorry.  Can you repeat

22 that?

23       Q   Yes.

24       Upon receiving this grade of D, for the

25 community practice rotation, did it trigger another

Page 124

1 Professional Standards Committee review?

2    A   Yes, it did.

3    Q   Okay.

4    A   But it didn't -- can I elaborate on that a

5 little more?

6    Q   Sure.  Yes.

7    A   It didn't at the time because I started an

8 appeal process for this grade (indicating) and I spoke

9 to Dr. Gilmour at first.

10       She mentioned that I should speak to the PSC

11 committee or, sorry, the PSC for short, about these

12 concerns of me and the program and what is going on

13 with my performance, why am I performing this way to

14 kind of explain a little bit of what's going on.

15    Q   Okay.  So the first D you received, we

16 talked about that was an automatic PSC review?

17    A   That's correct, yes.

18    Q   You received a letter, said that you were

19 placed on probation?

20    A   Yes.

21    Q   You would proceed in the program?

22    A   Uh-huh.

23    Q   And another receipt of D or F would have --

24 I think it had a list different potential

25 consequences?

Page 125

1    A   Yes.  And I think we mentioned, too, in the

2 letter, there were choices that could have been made

3 beside the quick -- the agreement and this was my

4 first rotation, that they chose to do it immediately

5 academic probation where they could have just let me

6 repeat a rotation, let me continue on the program.

7 That was one of the choices.

8    Q   Okay.  So this time around, was it another

9 automatic PSC review?

10    A   I wasn't sure about the review.  But when he

11 spoke to Dr. Gilmour of my issues and I was trying to

12 show her evidence of my problems with these examples

13 that they were giving me, I didn't have this

14 evaluation (indicating) until once again two weeks

15 after.

16       But from the meeting that they presented to

17 me in the third week meeting, they were showing a

18 couple of these, and I -- I started finding evidence

19 saying, hey, I did do this.  I did do these things,

20 patient care.  I did do this at this time, you know.

21       There was just like certain discrepancies

22 like of what they felt that I guess weren't up to

23 their level of I guess education, but I did do those

24 things and they were telling me I didn't or, you know,

25 there was just details that were not -- we were not --

Page 126

1  there was not agreement nor did they allow me to
2  present to them this evidence.
3      Q   Okay.  So to make sure I'm understanding,
4  you had a meeting with Dr. Syp and Dr. DeMars?
5      A   Yes.  So just a little quick background.
6  That rotation involves two meetings for feedback.  I
7  wasn't given any feedback besides those two meetings.
8      Q   Okay.
9      A   The only feedback I got was in my second
10  week meeting.  This is where they put you in a room in
11  private and you talk to them both and they're like --
12  and this was in DeMars' office, both of them were,
13  where we spoke of, you know, how I was doing,
14  everything, of how is everything going, everything.
15          I wasn't given any feedback on my cases at
16  all during each of my cases before or after.
17      Q   Okay.  But after the second meeting you had
18  with them, you knew that you were not getting a
19  passing grade?
20      A   On the third meeting.
21      Q   Third meeting?
22      A   Yes.
23      Q   Third meeting you had ---
24      A   The third week meeting.  Excuse me.  There
25  was only two meetings.

Page 127

1      Q   But it was the third week?
2      A   Yes.
3      Q   You had a meeting with them?
4      A   Yes.
5      Q   You walked out of that meeting knowing I did
6  not pass this rotation?
7      A   Right.  Yes.
8      Q   And you make contact with Margi Gilmour to
9  say, they're saying some things that I disagree with?
10      A   Yes.
11      Q   So I'm understanding you?
12      A   Yes.  And when I was trying to explain to
13  them those situations, they didn't want to hear it.
14      Q   Right.  You conveyed that to her?
15      A   Yes, I did.
16      Q   Okay.  So the PSC process the first time was
17  they issued you a letter?  They reviewed your grade
18  and they issued you a letter?
19      A   Yes.  In October.  So about two months after
20  I received this letter.
21      Q   The second D was going to the PSC for
22  review, did you this time just receive a letter or did
23  you have an opportunity to meet with them?
24      A   Sorry.  Say that again.
25      Q   The second D you received, when it went to

Page 128

1  the PSC for review, did you have an opportunity to
2  meet with them and discuss?
3      A   I did, yes.
4      Q   Okay.  So this was different, a different
5  process than the first D you received?
6      A   That is correct, yes.  I had no opportunity
7  to see the PSC, the first rotation.
8      Q   Correct.
9      A   Yes.
10      Q   So the second go round you did?
11      A   Yes, I did.
12      Q   Did you meet with anyone in advance of
13  meeting with the PSC in terms of discussing what that
14  process was going to look like or, you know, what to
15  expect?
16      A   I did speak to my advisor Dr. Holyoak
17  regarding my issues with the rotation because this is
18  what started the process of talking to Gilmour for the
19  appeal process.
20          After I spoke to him about my situation, he
21  pushed me to appeal.  He wanted me to appeal because
22  he thought it was ridiculous.
23      Q   So you talked to Dr. Holyoak?
24      A   Yes.
25      Q   And then that led to talking to Dr. Gilmour?

Page 129

1      A   Yes.
2      Q   So did you meet with her about what the
3  meeting with the PSC was going to look like?
4      A   Yes.  She mentioned briefly what it was
5  going to be like.
6      Q   Okay.  And ultimately did you meet with the
7  PSC?
8      A   I did, yes.
9      Q   Can you describe that meeting for me?
10      A   Sure.  It involved multiple clinicians from
11  the school, veterinarians that worked at the school
12  and taught.  Also involved was a chairman or chairmen
13  which is the leader of the group.
14          We spoke in a conference room about my
15  issues of what was going on with my performance,
16  everything.  Dr. Gilmour was also observing inside the
17  room.
18          But what i didn't know was I was able to
19  bring my advisor with me or someone who worked at the
20  school to be with me.  They never -- she never
21  explained that to me.
22      Q   So what was the structure of the meeting?
23  What did it look like?
24      A   Sort of like this room.  You know, there was
25  chairs around a big square table, a round table.  We

Page 130

1  all sat down.  They gave me a chance to speak about my
2  issues I was having with the program of why I wasn't
3  performing.
4       They kind of put me on a podium of the
5  situation and I explained everything to Gilmour of my
6  issues I was having in this specific rotation.
7       When I asked her, did you mention -- did
8  you -- because she communicates with them.  That's
9  like her job is to communicate with PSC as well
10 because she's part of the student affairs, so she
11 speaks about the grades and everything with the
12 students, of the students to the PSC.
13      When I mentioned to her, did you explain the
14 situation I was having, so maybe we can speed up a
15 little bit of this meeting so I don't have to go in
16 detail every little incident I had, you know, that I
17 had in this rotation, and she said, no, I didn't.
18      So I started to speak in detail of every
19 situation but, I mean, the time was -- the time frame
20 was too short, in my opinion.
21 **Q   How long was it?**
22 A    I would say a little over 30 minutes, 45
23 minutes.
24 **Q   Okay.  And you didn't feel like that was**
25 **enough time to express your concerns?**

Page 131

1  A    No.  Because in general I felt it was
2  regarding my whole program and I've already been
3  through seven, eight rotations already.  I felt that,
4  you know, it wasn't enough to talk about not just one
5  rotation when they wanted to hear about the whole
6  thing, so that included my first rotation which I did
7  receive a D, so.
8       I mentioned my father and the car accident
9  and things like that, so my performance.
10 **Q   Did they ask questions or was it just an**
11 **open forum for you to express what was on your mind?**
12 A    Honestly, they did ask a few questions but
13 there wasn't a lot of questions.  They kind of let me
14 talk but there was no -- I felt like there was no
15 structure, like they weren't asking like specific
16 questions where I can zoom in.
17      They just like kind of put me in.
18      Okay.  What do you have to say kind of
19 thing, situation.  But I didn't know what they wanted
20 to know, you know.
21      So there was no guidance.  There was no
22 structure in the meeting.  So there was ongoing
23 tangents or there just wasn't -- there was no focus.
24 There was no concentration regarding what they were
25 asking.

Page 132

1       There was a few questions where it did
2  concentrate but it was -- it just stopped after
3  awhile.  That's when I saw kind of people's faces.  I
4  think I mentioned in your interrogatories that you
5  asked, I noticed there was just unfocused behavior,
6  like I saw their faces when I was giving eye contact
7  to most of them that a lot of them were smirking.
8  Some of them where just like shaking their head like
9  this (indicating), like I-don't-want-to-hear-this kind
10 of attitude.  One was just like not even looking, just
11 like this (indicating), like bored kind of exteriors.
12      So that kind of gave me a bad depiction of
13 what -- you know, this is the administration that
14 deals with people and grading.  I just felt like I --
15 I just -- they didn't want to hear it anymore.  And
16 then at that point when I was still talking but it
17 just -- I just felt it wasn't going anywhere and I
18 just ended it.
19      I'm like, well, is there -- they were like,
20 is there anything else?
21      And I said, no.  I mean, I'm like, I think
22 we're done.  Because I felt like there was no reason
23 to talk anymore.
24 **Q   Okay.  Did they provide you with their**
25 **decision at the end of that meeting?**

Page 133

1  A    No.
2  **Q   Okay.  What ultimately was the result of**
3  **that meeting?**
4  A    The result of that meeting, which I got
5  during my small animal surgery rotation which was my
6  next rotation after community practice is like about
7  my first or second week in they decided that I should
8  be dismissed from the program.
9  **Q   Okay.  How were you made aware of that**
10 **decision?**
11 A    I got an email just like this one
12 (indicating) from Dr. Gilmour.
13      (Defendant's Exhibit 5 was marked for
14      identification)
15 **Q   (BY MR. PRATT)  I'm going to hand you what's**
16 **marked as Defendant's Exhibit 5, produced through**
17 **discovery as Board90.**
18 A    Sure.
19 **Q   Can you take a look at that and see if you**
20 **recognize that document?**
21 A    Yes, I do.
22 **Q   What is this?**
23 A    This is my dismissal letter from Dr. Gilmour
24 mentioning, yeah, my dismissal from the program.
25 **Q   This is dated March 23rd, 2020 addressed to**

Page 134

1  you.

2     A   Yes.

3     Q   And if you can go ahead and read for us what

4  this says.

5     A   Sure.

6     "Dear Jonathan, the Professional Standards

7     Committee, after meeting and deliberating on

8     March 18th, recommended dismissal from the

9     CVM professional program.  This unanimous

10    decision was based on repeated poor academic

11    performance, lack of accountability for

12    clinical errors in multiple rotations,

13    recurrent unprofessional behavior, and

14    inability to take constructive criticism to

15    improve professional and clinical skills.

16    The Committee did not find mitigating

17    circumstances sufficient to explain the

18    concerns above.  The Committee's

19    recommendation for dismissal has been

20    accepted by the Dean.  Per CVM policy, you

21    may file a written appeal to the Dean within

22    five working days of receipt of this letter.

23    Mr. Emsley can assist you with placement

24    options for the remaining portion of your

25    clinical year requirements.  Sincerely,

Page 135

1     Margi Gilmour."

2     Q   Okay.  So this was dated March 23rd.  That

3  was not quite a week after the meeting that you had

4  with them, I believe.

5     A   Yes.  And I had the meeting with them during

6  my small animal surgery rotation, yes.

7     Q   Okay.  That's what I was going to ask.

8        You had moved on to a different rotation?

9     A   Yes, I did.

10    Q   And you were currently performing in that

11 rotation when you received this?

12    A   Yes.

13    Q   What steps did you take after receiving this

14 letter?

15    A   After receiving this letter, I took the next

16 step to write an appeal to the dean, Dr. Risco.

17    Q   Obviously that's documented in this letter.

18       Is that how you became aware of the fact

19 that you could take that next step?

20    A   Yes.

21    Q   And so you drafted a letter to the Dean?

22    A   Yes, I did.

23    Q   As we sit here today, do you recall the

24 basis of your appeal?

25    A   I do, yes.

Page 136

1     Q   What would you describe that as?

2     A   I described kind of what happened in letter

3  now, like it was much easier to speak about it in

4  letter than it was in the meeting because I felt like

5  there was not enough time in the meeting as I

6  mentioned in the letter as well.

7        So I kind of explained my situation of what

8  I was trying to prove in the meeting and what I was

9  trying to convey in the meeting situation to the Dean

10 and to the PSE to understand what was going on.

11    Q   Did you feel as if you had been treated

12 unfairly by the PSC?

13    A   Yes.

14    Q   How so?

15    A   As I mentioned in the last question you

16 asked regarding the time and everything, I felt there

17 was not enough time.  I also felt, as I mentioned, the

18 faces when I was watching, getting eye contact, that

19 they did not seem to care what I had to say based on

20 their professionalism, their showing of, you know,

21 concerns based on their body language and facial

22 expressions.

23    Q   So body language and facial expressions of

24 the PSC members who were not your instructors;

25 correct?

Page 137

1     A   That is correct, yes.

2     Q   You believed them to be unprofessional and

3  uncaring?

4     A   In my situation, yes.

5     Q   Okay.

6     A   I don't know them prior.  I know -- I knew

7  that they taught veterinary classes, the didactic

8  portion in their program but I did not know them.

9     Q   And I believe you said ---

10    A   That were present in the meeting.  There was

11 one that wasn't present in the meeting and that's the

12 one I actually knew because I was in their rotation

13 with him which was small animal surgery rotation.

14    Q   So I want to follow-up on something real

15 quick.

16       You said on a couple of occasions and I do

17 believe you mention this in your complaint, that you

18 were not given enough time with the PSC to describe

19 the circumstances as you saw them?

20    A   Yes.

21    Q   You've also said you don't know for sure how

22 long the meeting lasted but you would estimate between

23 30 and 45 minutes; is that accurate?

24    A   Yes.  I would say probably maybe a little

25 over 45 minutes.  Regarding to talk about the entire

Page 138

1 program that I was in instead of just that one
2 rotation I feel, yeah, there was not enough time.
3    **Q   I also believe you said that you concluded**
4 **the portion of which you were talking by saying,**
5 **there's nothing else.  I'm done.  You didn't think**
6 **they were listening to you but you elected to make the**
7 **decision to end that meeting?**
8    A   I still continued on.  They actually said,
9 okay.  I think we are finished here.  So they actually
10 did finish.  I was -- in my head, that's what I felt
11 but I still continued on and just push it through
12 because this is my opportunity and I had to just
13 continue doing it.
14      But Dr. -- I believe his name was Mason, he
15 was the chairman.  He was the one in charge of the
16 committee.  He ended me and said, okay.  I think -- I
17 think we're done.
18    **Q   And that is at some point you think probably**
19 **in excess of 45 minutes into the meeting?**
20    A   Yes.
21    **Q   Okay.**
22    A   And I wasn't told prior how long this
23 meeting was going to be or anything.  There was no
24 time frame.  I wasn't given, okay, you have one hour.
25 No.

Page 139

1    **Q   Okay.**
2      (Defendant's Exhibit 6 was marked for
3      identification)
4    **Q   (BY MR. PRATT) I'm going to hand you what is**
5 **marked as Defendant's Exhibit 6 and previously**
6 **produced in discovery as Board280.**
7    A   Okay.
8    **Q   Take a look at this.**
9    A   Sure.
10    **Q   Is this familiar to you?**
11    A   Yes.
12    **Q   What is this?**
13    A   This is the letter I -- this is my appeal
14 letter that I gave to Dr. Risco and to the members of
15 the PSC which is Professional Standards Committee
16 regarding my dismissal notice.
17    **Q   Well, as we often do, let's start with the**
18 **first paragraph.**
19    A   Sure.
20    **Q   Would you read that for us?**
21    A   Sure.
22      "I am writing to appeal my academic
23      dismissal from the CVM Program at OSU.
24      Thank you for allowing me to have the
25      opportunity to explain the circumstances

Page 140

1    that led to this point, as well as my action
2    plan to improve on my performance in the
3    program."
4    **Q   Okay.  So stopping there.**
5      **You were letting the Dean know that you're**
6 **appealing?**
7    A   Yes.
8    **Q   And you're also acknowledging that you need**
9 **to take steps by way of an action plan to improve your**
10 **performance; is that accurate?**
11    A   I'm -- yes.  I'm choosing that because I
12 feel that's what they want to hear.
13    **Q   So you weren't genuine in this statement?**
14    A   I was genuine but I felt I was being ignored
15 on the issues I was having with the other rotations.
16    **Q   So you said what you believed they wanted to**
17 **hear in an effort to remain in the program?**
18    A   No.
19    **Q   Is that not what you said?**
20    A   No, I did not say that.  I mentioned I do
21 feel genuine what I was saying and I do appreciate the
22 plan I was doing.  I do want that but I felt I was
23 ignored on the issues I was having in my rotations.
24    **Q   And I understand that.**
25      **You felt as if your instructors in community**

Page 141

1 **practice --**
2    A   Yes.
3    **Q   -- did not listen to your concerns?**
4    A   And nor did Margi Gilmour either.
5    **Q   Nor did Margi Gilmour?**
6    A   No.
7    **Q   Nor did the PSC?**
8    A   Even when I provided the proof to Margi
9 Gilmour and she took copies of it.
10    **Q   I understand.**
11      **You didn't receive the response that you**
12 **wanted from your instructors, from Margi Gilmour or**
13 **from the PSC?**
14    A   There was no response nor concerns.
15    **Q   Okay.**
16    A   Yeah.  Not the response I want to hear nor
17 concerns, both.  Like she didn't go further into what
18 happened.  That's what I was concerned with.
19    **Q   Let's jump down to where you begin a**
20 **paragraph "On my Community Practice rotation."**
21      **Would you read that paragraph?**
22    A   Yes.
23      "On my Community Practice rotation, I got
24      caught up in miscommunications leading to
25      ambiguities and misunderstandings.  This

Page 142

1    caused me to become stressed with fear of
2    getting involved in another misunderstanding
3    that led to my failure of the rotation. I
4    truly internalized the constructive
5    criticism and attempted to correct various
6    issues on my own. In retrospect, I should
7    have increased my communication with my
8    professors and asked for assistance when
9    needed."
10   Q    Where in here do you talk about the lack of
11   professionalism on the parts of Dr. Syp and
12   Dr. DeMars?
13   A    I spoke to Dr. Gilmour regarding those
14   concerns.
15   Q    Well, here when you're talking about the
16   community practice rotation, you talk about getting
17   caught up in miscommunications and misunderstandings,
18   that you were stressed and worried about more of the
19   same of the misunderstandings.
20   A    Right.
21   Q    And that you had "truly internalized the
22   constructive criticism and attempted to correct
23   various issues on my own." That very much sounds
24   like, for lack of a better term, falling on the sword
25   to say it was my fault.

Page 143

1    A    Right.
2    Q    Is that not what you're saying here?
3    A    Yes. And the reason I'm saying this is
4    because they did not want to hear what I had to say.
5    Q    Okay. We're back to that. That's what I
6    asked you earlier.
7    A    Yes.
8    Q    Then you're not being genuine in what you
9    wrote in this? It's either you told them what they
10   wanted to hear that is different from what you
11   believed --
12   A    Yes.
13   Q    -- or you genuinely believed that these were
14   the issues.
15   At the time that you wrote this, which of
16   those was it?
17   A    I was not being fully genuine then, that was
18   the answer.
19   Q    Okay.
20   A    Because when I spoke to Gilmour regarding my
21   issues, they were ignored completely. And they
22   said -- she said, there's nothing I can do.
23   Q    Okay.
24   A    And this is before she felt that when I
25   asked for her to speak to them because I wanted to

Page 144

1    speak to them again, she says, no, don't. You don't
2    need to speak to them. They're flustered already. I
3    think it's best you don't.
4    She didn't even mention that she was going
5    to speak to them.
6    I said, oh, are you going to speak to them?
7    And she said, I'll see what I can do. And
8    she immediately just said, there's nothing I can do
9    that same -- while we're in the meeting. She says,
10   actually, there's nothing I can do.
11   Q    So first off, I appreciate your honesty.
12   You've said, I wasn't entirely genuine when I wrote
13   this. I just wanted to say what I needed to say
14   because that's what they wanted to hear?
15   A    Sadly. Sadly, I couldn't be genuine. I
16   had -- I couldn't be genuine in regards because
17   everything I was mentioning was ignored.
18   Q    Okay. And the part here that we just talked
19   about that you were not necessarily genuine about was
20   the chalking it up to miscommunications,
21   misunderstandings --
22   A    Right.
23   Q    -- and that you "truly internalized the
24   constructive criticism"? Those were the things that
25   you have kind of said were what you thought they

Page 145

1    wanted to hear; correct?
2    A    Correct. And as I mentioned, when you
3    mentioned about being genuine, hundred percent I'm not
4    going to say was genuine because I felt that what I
5    was trying to say was this is -- it's truthful in a
6    way but that's -- they didn't want to hear what I had
7    to say of the issues I had in the rotation. And even
8    with the evidence provided that I did show, they
9    didn't want to put that in subject. They just wanted
10   me to be at fault a hundred percent.
11   Q    I don't think that the words -- I may be
12   missing them, appear in the community practice
13   evaluation, but I do feel like the concept is there.
14   Just follow me.
15   Okay?
16   A    Sure.
17   Q    But in the PSC's letter, they specifically
18   mention they believe that you have an inability to
19   take constructive criticism?
20   A    Right.
21   Q    Which means ---
22   A    Based on this one rotation (indicating).
23   Q    Well, perhaps. But you said the meeting was
24   about the entire duration of your rotation practice.
25   A    Right. But it was based on my point of view

Page 146

1 and what was going on in my program there during my
2 time. And they didn't ask per se of my -- like I
3 mentioned, there wasn't much questions being asked
4 about my performance there.
5        They were just letting me be on a podium.
6 Okay. Go ahead. Talk. What do you have to say for
7 us? What do you have to say regarding -- do you have
8 any concerns? Let us know right now.
9        **Q    But they clearly perceived that you had an**
10 **inability to take constructive criticism as it is**
11 **written in their letter?**
12    A  Right. But based on this rotation.
13    **Q  Fair enough.**
14    A  Yes.
15    **Q    In your appeal you tell the Dean you really**
16 **took to heart the constructive criticism.**
17    A  I did, yes. I did take constructive -- I
18 did take it to heart because like he mentioned in the
19 rotation, when I read it, they do believe I can be a
20 good veterinarian. I did take that genuinely.
21    **Q  That's not criticism.**
22    A  What do you mean?
23    **Q    Constructive criticism is when they're**
24 **telling you things that you did incorrectly in a way**
25 **to help you become better.**

Page 147

1    A  Right.
2    **Q    As opposed to telling you ways that you're**
3 **great.**
4    A  Oh. Sorry. Yes. The performance regarding
5 the constructive criticism what I can do. I did take
6 it to heart. I did.
7    **Q    But you just told me that when you put it in**
8 **here you were just telling the Dean what he wanted to**
9 **hear.**
10    A  What they wanted to hear because it involves
11 the committee as well.
12    **Q    But you wrote this to the Dean. This is an**
13 **appeal to the Dean.**
14    A  But it was also reviewed with the committee
15 as well.
16    **Q  Okay.**
17    A  As it mentions, it says To: Carlos Risco
18 and To: The Members of the Professions Standard
19 Committee.
20        So in regards to that appeal, when he gets
21 the appeal, the Dean, he has to review it with the
22 committee for another answer.
23    **Q  Okay.**
24    A  And that's what he had to with the letter,
25 appeal that had been sent. This is -- I -- did I

Page 148

1 mention or -- did I mention that I spoke with him
2 before doing the appeal in person?
3    **Q    No. I'm glad you brought it up because that**
4 **was a question I was going to ask.**
5    A  Great.
6    **Q  Let's just go back then.**
7    A  Sure.
8    **Q  I want to just keep the timeline straight.**
9    A  Yes.
10    **Q  You have a meeting with the PSC?**
11    A  Yes.
12    **Q    They issue a letter to you or Dr. Gilmour**
13 **issues a letter to you saying that the PSC has**
14 **determined that you are being dismissed from the**
15 **program as a result of receiving a second D?**
16    A  That's correct.
17    **Q    The letter also advises you that you have**
18 **the ability to appeal to the Dean of the College of**
19 **Veterinary Medicine, Dean Risco?**
20    A  Yes.
21    **Q    You draft and submit an appeal which we just**
22 **looked at as Exhibit 6; correct?**
23    A  Yes.
24    **Q    Okay. In conjunction with submitting this**
25 **appeal, did you have conversations with the Dean?**

Page 149

1    A  I did, yes.
2    **Q  Tell me about those.**
3    A  Sure. After speaking with the committee and
4 after the result of I got that letter, I sent an email
5 to Dr. Risco asking if I could speak to him regarding,
6 you know, what's going on about -- because I would
7 like to appeal this grade.
8        I got an answer back from him saying, meet
9 me, you know, at this time frame, an email. And so I
10 went to his office. I spoke to him about my issues
11 with this rotation.
12        He mentioned at first to me that -- he gave
13 me an example of a question and I think that was
14 resulting from the evaluation given to me with
15 Dr. DeMars and his antibiotic question and he took
16 that as one of the reasons why I wasn't taking
17 corrective criticism which kind of revented to that
18 example you mentioned.
19    **Q  Okay.**
20    A  Which is why I would like -- I wanted to
21 bring it up. So basically, he mentioned to me an
22 example that he had prior at UF when he used to work
23 there as a large animal medicine clinician in that
24 rotation.
25        He kind of tried to do an example of the

Page 150

1  same situation with another student that he had when
2  he was teaching there, that just because you answer a
3  question correctly doesn't mean it's fully correct if
4  there's multiple parts to the question, which I
5  completely agree.
6      You cannot have a correct answer completely
7  if that is not a full, correct answer.  Even though
8  you mention one of the four, that's not fully correct.
9  I did -- I did understand that.
10     But that was what he heard from I guess the
11 rest of the committee or from Dr. DeMars.  I'm not
12 sure.  But that's what he had to tell me in the
13 beginning of the meeting.
14     So I took that as, yeah, you're right
15 absolutely, and I agreed with him.  However, that
16 wasn't the issue -- that wasn't the main issue I had
17 in the rotation.
18     **Q   So how long did you talk with Dean Risco?**
19     A   I would say about 15, 30 minutes, around
20 there.
21     **Q   In his office?**
22     A   In his office, that's correct.
23     **Q   Did you feel like he listened to you?**
24     A   He did actually, yes.  And he was very
25 concerned.

Page 151

1      **Q   Were you the only one that was in the office**
2  **with him that day?**
3      A   Yes, I was.
4      **Q   Do you know if anybody communicated with the**
5  **Dean about your appeal on your behalf?**
6      A   No.
7      **Q   You don't know whether your parents had any**
8  **conversations with the Dean?**
9      A   Oh.  Yes, they did.
10     **Q   Okay.**
11     A   But that was before.  Sorry.  Excuse me.
12     **Q   What can you tell me about that?**
13     A   Sure.
14     **Q   If you know.  And if you don't know what**
15 **that conversation was like, I don't expect you to ---**
16     A   Yeah, I have a good bit of -- maybe not like
17 a hundred percent but I have a good like summary, I
18 guess, of what happened.
19     **Q   Were you present when the conversation took**
20 **place?**
21     A   No, I was not.
22     **Q   Who described this conversation for you?**
23 **Was the Dean told you how the conversation went or**
24 **your parents?**
25     A   My parents.

Page 152

1      **Q   Okay.**
2      A   So after my letter of dismissal from the
3  committee, my parents were visiting me because I was
4  in a lot of stress, everything was going on.  They
5  came to visit and they wanted to speak to the Dean
6  about the issues.
7      And my parents explained what was going on
8  and they were telling me what was happening with my
9  concerns.  I told them everything, what was going on.
10     The details that they said to them, I felt
11 were pretty elaborate and from the summary of what
12 happened on rotation -- or not rotation -- the
13 meeting, was that -- because my father is also a
14 veterinarian, as I mentioned earlier, where I work at
15 the family clinic.  He explained that like what it --
16 like the discrepancy was going on, the
17 miscommunication going on, my issues I was having in
18 the rotation, like every bit of detail.
19     Dr. Risco or Dean Risco said back to my
20 father that -- because they felt connected with each
21 other here, they're both professional veterinarians,
22 and they felt like life is much harder now.
23     They expect them to know everything, every
24 little bit, every -- they're just harshly criticized.
25 The program is much harder than it used to be back in

Page 153

1  our day, because they're both kind of near the same
2  age, and saying that, yeah, they have it much harder.
3      He explained to them that, you know, I
4  wouldn't have joined -- I wouldn't have gone to this
5  school unless they added a psychologist for the
6  students because they go through so much stress and I
7  feel so bad that if they -- I wouldn't have -- he
8  said, I wouldn't -- they had to put a psychologist
9  there for him to work in Oklahoma State.
10     So that was a big thing to him was mental
11 health for these students because he sees them
12 stressed.  He sees -- he sees these students just --
13 he said, they're a mess.  They are in so much stress
14 and everything and they have literally no brakes on a
15 lot of stuff, you know.
16     He mentioned that maybe your son, you know,
17 with the talk of that, he said, your son should go,
18 too, like, you know, it's free.  It's with the
19 tuition.  You should tell your son to go.
20     So I took that advice when my parents told
21 me everything.
22     I said, you know, let's -- I'll do it.  Why
23 not, you know.  We all go through so much stress and,
24 you know, even though I hope that -- you know, when I
25 told him -- my parents about everything, that he did

Page 154

1 explain to them that, you know, they're not listening,
2 you know.  The communication is a problem, my concerns
3 and, yeah, he heard everything from them.
4     Q   Okay.
5     A   So I felt that I did need to repeat that.
6     Q   Fair enough.  Because that meeting took
7 place with your parents?
8     A   That's correct.
9     Q   On the phone?
10    A   No.  In person.
11    Q   In person?
12    A   Yes.
13    Q   Prior to you going to see him in his office?
14    A   That is correct.  Yes.
15    Q   Do you know approximate time frame?  Within
16 a week of one another?  Couple of days?
17    A   Maybe about a week.
18    Q   Okay.  We can agree on at least one thing
19 because I agree that Dean Risco, he's a very nice man.
20    A   Very good man, yes.
21    Q   And I enjoy visiting with him.
22    A   Yeah.  I as well.
23    Q   You have now filed your appeal, you've had a
24 conversation with Dean Risco, and your parents have
25 spoken with Dean Risco?

Page 155

1     A   Yes.
2     Q   What ultimately was the result of your
3 appeal?
4     A   The result of my appeal was that I would be
5 put on academic suspension.  Well, excuse me.  The
6 result -- let's take a step back.  The result of my
7 appeal still led to the decision from the committee
8 that I would still be dismissed.
9         They didn't want to change their answer to
10 that.  However, Dean Risco had the final say and said,
11 no, he's staying.  However, we're going to put him on
12 academic suspension.
13    Q   What's your understanding of academic
14 suspension?
15    A   Academic suspension to me is you take a
16 break from the program, so you're out of the program.
17 You're still in the program but you're out, out of the
18 campus and within a certain time frame you come back
19 to it.  At least that's what was going on to me.
20    Q   So you believed you were no longer in the
21 program?
22    A   Yes.
23    Q   You were not continuing with rotations?
24    A   I was -- I was currently in a rotation for
25 my virtual anesthesiology.

Page 156

1     Q   Okay.
2         (Defendant's Exhibit 7 was marked for
3         identification)
4     Q   (BY MR. PRATT) I'm going to hand you what is
5 marked as Defendant's Exhibit 7, previously produced
6 as Board94.
7     A   And I did receive this letter, yes.
8     Q   Can you tell us what this is?
9     A   Sure.  So this is the final answer of the
10 final appeal with the Dean.  So, yes, overall the
11 summary was that:  I would need to get a C or better
12 in my rotation 16 which was my current rotation which
13 was anesthesia virtually due to COVID.  I would be
14 placed on academic suspension until both failed
15 rotations are remediated through participation
16 in-person rotations because of COVID-19.  And because
17 of the current use of online curriculum, I will be
18 suspended from clinical rotations until the hospital
19 reopens to students and in-person rotations resume.
20        Lucy, who is the -- Kershaw, who is the
21        person who works with the schedules will
22        work on that as soon as possible, but
23        understand the date this can be done is
24        currently unknown; that you must receive a C
25        or greater grade in both remediated

Page 157

1        rotations.  Failure to do so will result in
2        dismissal of the program with no PSC review
3        or appeal.  The fourth thing in this letter
4        was that you will be on Academic Probation
5        for the duration of your academic clinical
6        year.  To receive a C grade or higher on any
7        rotation during the remaining clinical year
8        will result in dismissal.
9        That doesn't make sense.  I think that's a
10 typo.
11    Q   Where are you at, on 4?
12    A   "No. 4.  Failure to receive a C grade or
13        higher on any rotation during the remaining
14        clinical year will result in dismissal from
15        the program with no PSC review or appeal."
16    Q   Did something strike you ---
17    A   Yes.
18        "Failure to receive a C grade or higher on
19        any rotation -- which is a passing grade --
20        during the remaining clinical year will
21        result in dismissal from the program."
22    Q   (BY MR. PRATT) It says:
23        "Failure to receive a C grade or higher."
24    A   Oh.  Failure.  Oh, yes, yes, yes.  You're
25 right.  I read that poorly.  Excuse me.

Page 158

1    Failure to receive a C grade or higher, yes,
2    on any rotation, yes.
3    The fifth one was:
4    You will be held accountable to the four
5    items in your plan of improvement listed in
6    your letter of appeal:  communication, case
7    preparation, patient care, and professional
8    and ethical behavior."
9    That's correct.
10    Q   First off, was this welcome news?
11    A   It was good news, yes.  Yeah.  It was -- it
12 was excellent news, yeah.
13    Q   Earlier I think you were trying to explain
14 that it was tough without having something in front of
15 us, I think?
16    A   Yes, it was a little bit.  Yes.
17    Q   Because you submitted your appeal to the
18 Dean, but when you get this letter it tells you that
19 the PSC took your appeal under review --
20    A   Yes.
21    Q   -- considering the mitigating, if any,
22 circumstances that you had provided in your appeal;
23 correct?
24    A   Correct.
25    Q   And they reached the same conclusion of you

Page 159

1 were still dismissed from the program?
2    A   That's correct.  Yes.
3    Q   They didn't believe that there was anything
4 in the appeal to change their decision?
5    A   Including with the letter that they were
6 given, yes.
7    Q   However, the Dean had the final say?
8    A   Yes.
9    Q   And the Dean elected to keep you in the
10 program, subject to these five points that are
11 contained in this letter?
12    A   That's correct.  Yes.
13    Q   That was your understanding?
14    A   Yes.
15    MR. BACH:  Is this a good time for a break?
16    MR. PRATT:  Sure.
17    (Recess taken from 2:01 to 2:09)
18    Q   (BY MR. PRATT) Okay.  We're back on the
19 record after a break.  We were, if I recall,
20 discussing Dean Risco's decision to override the final
21 decision of the PSC to allow you back into the program
22 with five separate conditions that he expected you to
23 meet?
24    A   Yes.  That's correct.
25    Q   Did you feel as if it were significant that

Page 160

1 Dean Risco had decided to override the PSC's decision?
2    A   Yes, it was significant.
3    Q   Okay.  Were you agreeable to all the
4 conditions that had been set forth in front of you in
5 the letter?
6    A   Yes.
7    Q   Did you understand that your participation
8 in the program was ---
9    A   I take that back actually.  I felt like I
10 agreed with most of it but it still didn't solve the
11 problem with this community practice that I had issues
12 with and I proved the issues with to them with
13 evidence.  It just wasn't -- it was put aside
14 definitely.  And I felt like I didn't deserve a failed
15 grade in that rotation.
16    Q   Fair enough.
17    When you say you proved the allegations that
18 you had made, that's from your perspective; correct?
19    A   As a student, yes.
20    Q   No one ever issued any kind of ruling or
21 decision on the fact that, yes, you have in fact
22 proved your case here; correct?
23    A   Yes.
24    Q   So you disagreed with the fact that your
25 prior grade had not been addressed or overridden;

Page 161

1 correct?
2    A   Yes.  It wasn't -- I felt like there wasn't
3 even any thought of it.
4    Q   Okay.  But you felt it significant that the
5 Dean allowed you to remain in the program?
6    A   Yes.  I mean, that was a good -- that was
7 good news.  It's been like two months of not good news
8 until I heard that.  Yeah, it was good news.
9    Q   You wanted to continue in the program?
10    A   Absolutely.
11    Q   And you understood that in order for you to
12 do so you would have to comply with the conditions set
13 forth by the Dean?
14    A   Yes.
15    Q   While you were going through this process,
16 did you continue in your rotations?
17    A   Yes, I did.
18    Q   What rotations were you in during this
19 appeal process?
20    A   Anesthesiology rotation, anesthesia.
21    Q   Okay.  Anesthesiology ended up being your
22 final rotation with the program, did it not?
23    A   Yes, before academic suspension, that's
24 correct.
25    Q   What is the date on the letter that the Dean

Page 162

1  issued to you?
2  A    April 6th, 2020.
3  Q    Okay.
4  A    The Associate Dean, correct, Gilmour.
5  Q    I apologize.  Yes.
6  A    Okay.
7  Q    Yes.  We're talking about 2020?
8  A    Yes.
9  Q    It was a very interesting year.
10  A    Yes, it was.
11  Q    It was during that spring semester that the
12  issues associated with COVID-19 became very apparent
13  at least in the United States; correct?
14  A    That's correct.  Yes.
15  Q    As somebody who is associated with a
16  university campus, can I tell you that March of that
17  year was when things really became prevalent in
18  Oklahoma.
19  A    Yes.  That's correct.
20  Q    And so you were on campus in Stillwater.
21      You would agree that that was the month and
22  the time frame in which there was a lot of scrambling?
23  A    Yes.  Kind of reminded me, at the end of my
24  talk with Gilmour regarding the community practice
25  appeal rotation, about that, in her office she did

Page 163

1  mention something about COVID-19, saying like, how
2  about that COVID-19?
3      And I said, yeah.  It's seems crazy so far.
4      She kind of gave like a forewarning.  She
5  didn't say exactly what was going to happen with the
6  school.  But she said, yeah, things -- we'll see
7  what's going on with that.
8      She just kind of left like a foreshadow, I
9  guess, and that kind of led to I started believing
10  this being more serious than it really is and schools
11  especially, too.
12  Q    Did that end up playing out?
13  A    It did end up playing out.
14  Q    What changes were made during the program
15  that you were a part of once precautions related to
16  COVID-19 went into effect?
17  A    Sure.  So during my -- we actually ended our
18  small animal surgery rotation a few days early.
19  Dr. Clary, at the time Eric Clary, who was our
20  clinician there, he mentioned that we will be ending
21  our rotation three days early, unfortunately, due to
22  the COVID-19 changes that are going on and said that
23  we are no longer be able to do clinic.  There are a
24  lot of changes going on.  You guys will hear more soon
25  what's happening from the school and emails and, yeah,

Page 164

1  unfortunately, we'll have to end that.  We're going to
2  have to end our -- he was planning on bringing all of
3  us to his house with his wife and we were going to
4  celebrate everything, you know, like the end of the
5  rotation and everything.  There was food, everything.
6  It was like a mini kind of like a party going on.
7      He was just being a great person, whatever,
8  just hosting us at his house and the residents that he
9  had or the residents that he was working with and that
10  was going to be canceled, too, unfortunately due to
11  COVID.
12  Q    So at that point there was a level of
13  uncertainty as to how things would progress through
14  the rotation practice?
15  A    Yes.
16  Q    There had not been a shift yet from
17  in-person to virtual teaching?  It was just we're
18  going to have to step back from this in-person
19  teaching style while COVID-19 is impacting us;
20  correct?
21  A    Yes.  Within those couple of days that we
22  were out of the rotation because we ended it, you
23  know, three or four days early, later that week we did
24  get an email from Gilmour that was mass emailed to the
25  entire class regarding for fourth year that we will be

Page 165

1  doing virtual.  All those things were in place and,
2  you know, the rest of the rotation will be virtual
3  from now on.  No students are allowed to be in the
4  campus or in the hospital, teaching hospital and only
5  clinicians and faculty technicians, et cetera, are
6  only to be working in there alone, and there will be
7  classes done virtually with those situations.
8  Q    Based on your observations of the world
9  around you at that time, was that consistent with how
10  other, I don't know, professions, you know, doctors'
11  offices, anything that you can think of that around
12  that time, was that consistent with the actions being
13  taken by other entities?
14  A    Yes.
15  Q    Do you know if it was consistent with what
16  other educational institutions were doing?
17  A    I did hear different stories on some were
18  still going but wearing masks.  Others were -- like
19  they were -- it was required to wear a mask throughout
20  the clinics.
21      Some were completely virtual like us in the
22  situation, and then others were -- they would take
23  turns, I guess, like in groups.  These people only go
24  to the clinics so the least amount of people,
25  students, would go in clinics versus the entire class.

Page 166

1  So they would be split in groups and then the other
2  group do like online coursing, things like that.
3       I think it transcended to that after I was
4  dismissed but I heard schools doing that actually in
5  the beginning versus later.
6       Q   Okay.
7       A   Yeah.  It was very different was what I'm
8  trying to say.  Every school was very different in the
9  way they did the protocols.
10      Q   So you finished the rotation small animal --
11      A   Surgery.
12      Q   -- surgery?
13      A   Yes.
14      Q   It ended a few days early.  That was your
15  last in-person rotation?
16      A   That's correct.  Yes.
17      Q   Shortly thereafter you received a letter or,
18  excuse me, an email that went to the entire class --
19      A   Class, yes.  The fourth year, yes.
20      Q   -- stating that you were going to go to
21  virtual learning?
22      A   That's correct.
23      Q   And then you started your anesthesiology
24  rotation shortly thereafter?
25      A   Yes.  Shortly thereafter, by the next week I

Page 167

1  believe we started, yes, of that incident -- or the
2  notice.
3       Q   Who was the instructor?
4       A   Dr. Di Concetto was the instructor.
5       Q   What was your relationship like with him?
6       A   As non in-person as it was, I thought it
7  was -- well, good.
8       Q   And you're right.  Obviously, the nature of
9  the relationship is going to be different from that of
10  your other instructors?
11      A   Right.
12      Q   Because you're not having any in-person
13  training?
14      A   That's correct.
15      Q   What did the rotation look like as it had
16  transitioned to virtual?
17      A   It was all on Zoom mostly.  Actually, all of
18  it was on Zoom.
19      Q   Was it just lecture?  Was it observations of
20  procedures?  What was happening via Zoom?
21      A   Well, actually, it started off on Skype.
22  Sorry.  I take that back.  It started on Skype.  There
23  were some technical issues going on with that and we
24  ended up going to Zoom after, once he figured out how
25  to use Zoom, and then we started continually using

Page 168

1  Zoom.
2       Q   How was it used?
3       A   It was used in regards to -- sorry.
4       Q   Was he sitting in front of a camera
5  teaching?  Was he taking a camera into the room?
6       A   Yes.  He was mostly taking it into the room
7  where he would have emergencies done or occasionally
8  he'll be in his office and he will be talking as well.
9  So those two scenarios usually would happen.
10      Q   Okay.  But there were scenarios where he was
11  taking you into the operating or surgical room where
12  anesthesia was being utilized?
13      A   Yes.  That was the second odd scenario I
14  mentioned, yes.  So he would take it in a room where
15  he's doing surg -- he's performing anesthesia,
16  preparing for anesthesia for a patient, things like
17  that.
18      Q   And he would talk through that process while
19  you were watching it?
20      A   The best he could, yes.  He tried.  When
21  technological issues weren't happening and connection
22  interruptions because there was times when things
23  slowed down.  He would cut off completely and we would
24  have to wait, you know, in situations.  It was rough,
25  to say the least.

Page 169

1       Q   Kind of the whole COVID hell that we all
2  lived in right when COVID hit?
3       A   Yes.
4       Q   Figuring out how to make things work through
5  technological means?
6       A   Yes.  And, yeah, he had someone helping him
7  or tried to help him for most of it.  It was a student
8  that was trying to help him, so.
9       Q   What days of the week did you have rounds?
10      A   We had rounds Monday through Friday, so most
11  of the week, yeah, from then on.
12      Q   What time of day?
13      A   We usually started morning.  We would have a
14  rounds then.  Then we would usually take a break of an
15  hour or two during lunch which is around 12 noon and
16  then we would have another afternoon rounds again
17  where we would talk.  Not just rounds but just in
18  general just talking about patients and things that he
19  had, prior patients, the way he was trying to teach
20  with the current situation we had unfortunately.
21      But there was times where there was
22  emergencies that would come in and he would use that
23  as a teaching opportunity as well.  He would tell
24  everyone, be available because there might be -- there
25  might be an emergency that comes in and I want to

Page 170

1  record it so you guys can see what's going on and I'll
2  be asking questions while I'm doing the procedure.
3      Q   So there was a morning session and an
4  afternoon session most days, Monday through Friday?
5      A   Yes.  That were like required rounds and
6  then we would have -- which include topics, talking
7  about topics of anesthesia of, you know, learning
8  knowledge and also things that we were assigned to do
9  on topics to research and to present to the class on
10  Zoom, you know, individually if needed or people would
11  be teamed up with certain subjects that were very
12  long, so they would split into two people, things like
13  that.
14      Q   So efforts were being made to have content
15  for both morning and afternoon sessions?
16      A   When available, yes, we tried or he tried on
17  his end, yes, when we could do that.
18      Q   Do you recall what grade you received in the
19  rotation?
20      A   I believe it was a 66 d on exam.  Overall,
21  I'm not entirely sure.
22      Q   Okay.
23      A   But I knew the split was a 79 clinical score
24  and a 66 D on the exam; is that correct?
25      Q   Let's take a look.

Page 171

1          (Defendant's Exhibit 8 was marked for
2          identification)
3      Q   (BY MR. PRATT) I'm going to hand you what is
4  marked Defendant's Exhibit 8, previously produced as
5  Board86?
6      A   Sure.
7      Q   Does this document look familiar to you?
8      A   Yes, it is.  Yes, I've seen this.
9      Q   What is this?
10      A   This is my anesthesia evaluation grade.
11      Q   Okay.  As I look at this evaluation, it's a
12  little different in form than the others.
13      A   Yes.  It's very different.
14      Q   But we can at least pull some of the
15  information.  The top tells us that it was Anesthesia
16  - Rotation 16?
17      A   Yes.
18      Q   That the dates were from March 23rd, 2020 to
19  April 12th, 2020?
20      A   That's correct.
21      Q   It has a grading scale at the top.
22          Do you see that?
23      A   Yes.
24      Q   I would describe that as a traditional
25  grading scale of 90 to 100 being an A., 80 to 89.9

Page 172

1  being a B.
2          Do you agree with that?
3      A   Yes, I do.
4      Q   And it follows with anything less than a 60
5  being an F?
6      A   Yes.
7      Q   Okay.  There's also red type that says:
8          "At least 70%  must be achieved in each of
9          the two sections in order to pass the
10          rotation."
11          Do you see that?
12      A   Yes, I do.
13      Q   Okay.  And then it has kind of a chart and
14  at the top of the chart it has your name on the right
15  side?
16      A   Yes.
17      Q   Okay.  Now, can you then describe for us the
18  points you receive in each of the categories?
19      A   Sure.  For Section 1 on General Knowledge
20  out of 200 points total I got 140.  For Case work-up
21  and presentation of 100 points total I got 80.  In
22  regards to Assignments and topics (100 points), I got
23  85.  professional conduct (100 points), I got a 90.
24  Which had a total points possible was 500, I got a 395
25  with a Percent Section 1 of 79 percent.

Page 173

1      Q   Correct.  So in Section 1 you received a
2  79 percent, that would qualify as a C with regard to
3  the grading scaling above?
4      A   Yes, C plus.  That's correct.
5      Q   And then we start Section 2.
6          Can you tell us the scores that are relayed
7  there?
8      A   Sure.  So Section 2, this is regarding the
9  written exam that we had at the end of the rotation.
10  Written exam points possible is 150 and I received a
11  99.6.
12      Q   And that equated to a percentage of?
13      A   66.4 percent.
14      Q   Okay.  So a 66.40 pursuant to the scale
15  above would be what letter grade?
16      A   It would be a D.
17      Q   Okay.  So you fell into the category of
18  Section 1 receiving a C, Section 2 receiving a D?
19      A   That's correct.
20      Q   And regardless of what the overall
21  percentage might have been, you would have ticked the
22  box of the red type above, right, that says "At least
23  70 percent must be achieved in each of the two
24  sections in order to pass the rotation;" is that
25  correct?

Page 174

1    A    Yes, that's correct.

2    Q    So you received a letter grade of D?

3    A    Yes.

4    Q    Did you believe that that grade of D was

5    fair?

6    A    No, I did not believe that grade was fair.

7    Q    Why not?

8    A    Regarding the written exam, I felt it wasn't

9    very fair.  I explained to Dr. Di Concetto about the

10   situation, that I felt it was not enough time of one

11   hour for 64 questions regarding that majority of the

12   question were fill list formats versus multiple

13   choice.

14   Q    But in this instance, your failure to meet

15   the minimum academic standard was as result of an exam

16   administered across to all of the students in the

17   rotation; correct?

18   A    Yes.

19   Q    This was not a subjective determination as

20   to your academic qualifications; correct?

21   A    Yes.

22   Q    I mean, other than the instructor, I assume,

23   wrote the test but aside from that it was an attempt

24   to have an objective scoring of your academic

25   progress?

Page 175

1    A    Right.  Yes.  Well, my concern was that I

2    heard about this exam from other students that were

3    not from OSU, that what I mentioned other students who

4    were not from OSU was other island students and the

5    majority of them never passed that exam with Dr. Di

6    Concetto the first time, the ones I spoke to, and

7    their concerns were the same.

8        Both schools would take the same type of

9    exams with fill in the blank and, et cetera.  But the

10   questions that they received were -- when we had 70

11   question exams or 64 or above, we were given ample

12   time with extra time depending if there's fill in the

13   blank answers or if there's list format answers.

14       So my concern was that it was really the

15   timing, the time situation was not -- I felt was not

16   to par and I told him that.

17       I had a meeting with him post when I got --

18   received this grade.  I spoke to him.  I would like to

19   review the exam.  After a couple of weeks, I did

20   receive an answer from him that he said he would go

21   over it with me on Zoom when I was back home in

22   Florida.

23       We went over the exam and I mentioned my

24   concerns to him and ---

25   Q    Which were limited to timing only?

Page 176

1    A    Mostly with timing, yes.  Because there was

2    situations that, yeah, honestly, it was mostly just

3    timing management situation.

4        I explained to him that the majority of the

5    questions were list format and we had over 40 pages of

6    notes in general of just -- that we did over the

7    rotation which was a lot of information and it was

8    very fast paced considering everything was done

9    virtually.  He had a time limit to say such things and

10   at the same time trying to teach us with emergency and

11   that it was -- it was very -- it was tough to do all

12   with that much information loaded into one exam and to

13   also manage what in this list format versus like a

14   multiple choice, which he did have a few but the

15   majority were list format, and list these things,

16   list -- those were the type of examples, list these

17   things.  A few were just fill in the blanks just one

18   answer.

19       The majority of them were list four things,

20   list five things.  It was very -- it was a lot for

21   just a one hour with 64 questions.  I managed to tell

22   him that.

23       He did agree that he was willing to let me

24   retake the exam if I appeal it.  He says, I will

25   gladly let you retake the exam.  You did fine

Page 177

1    clinically and he boasted that you had no issues with

2    clinical matters so I'm not worried about that, he

3    says, but I'll let you retake the exam.

4        But unfortunately, due to the letter I was

5    given with the five from the Dean, I was no longer to

6    appeal.

7    Q    And that's what you understood to be the

8    situation?

9    A    Yes.  And I explained to Dr. Di Concetto if

10   there was any possible way to speak to Administration

11   regarding that.  Because I know things have changed.

12   COVID was a huge issue, you know.

13       I asked him also that if he ever gave the

14   same exam virtually versus non-virtual or like online

15   versus in person if that made a change or if he made

16   changes.

17       He said he has before but he didn't mention

18   the actual event when that happened before.

19       And I said, okay.  I asked him if he could

20   speak to anyone.  He said, unfortunately, I can't, you

21   know.  Or he didn't -- he didn't want to or he felt he

22   couldn't do it.

23       So I told him that I'm going to be dismissed

24   then.  There's nothing I can do.  He felt remorse and

25   felt like, you know, don't think that it's over.  He

Page 178

1  kind of gave me like a speech saying like, you know,
2  just because this is happening, don't think it's over,
3  continue what you do, try to find a solution, you
4  know.  That was it.
5      Q   So what happened after you received the
6  grade of D in anesthesiology?
7      A   About a week or two later I received another
8  letter from Gilmour that I was dismissed from the
9  program.  I didn't follow my concerns -- I'm sorry.
10 Before we go onto the next area, I didn't follow my
11 concerns or I didn't communicate, I guess, more about
12 the situation when I talked to other island students,
13 the students that were affiliated towards to go to OSU
14 for the program for the clinical year, that many --
15 the students that I spoke to, two were actually
16 repeating the rotation with me while I was in the
17 anesthesia.
18      The reason why they didn't pass was clinical
19 and most of the situations were also the exam and it
20 was with the same instructor Dr. Di Concetto.  And the
21 ones that did pass that I knew, the other students,
22 one unfortunately passed away over the COVID
23 situation.  She was also in my class.  She -- that
24 she -- one of them didn't pass the exam as well that I
25 knew with Dr. Di Concetto's exam.

Page 179

1      In her case, the one that did pass away
2  unfortunately, that student, she took Dr. Linkey's
3  (ph) exam.  They would rotate sometimes.  Some days --
4  some weeks would be Dr. Di Concetto and other weeks
5  would be Dr. Linkey who is supposed to be the head of
6  the anesthesia department at the time and then he
7  ended up leaving.
8      Q   I've asked multiple times and you've
9  answered multiple times but I want to make sure that
10 this answer is consistent.
11     A   Sure.
12     Q   You've expressed concerns that the exam was
13 not fair as a result of not having enough time.
14     A   Yes.
15     Q   There's been no mention of the exam being
16 unfair in any other way; is that correct?
17     A   Yes.
18     Q   Okay.
19     A   No.  Hold on, actually.  You mention that
20 but my concern was that was always the island students
21 that didn't feel that it was concerning or that it was
22 an issue but we -- you know, you can speculate and
23 things like that, but our concerns or when I would
24 speak with other island students was -- I'm not sure,
25 you know, this could be just speculation but we were

Page 180

1  wondering if maybe one of them had a past test and
2  they were giving it out, OSU students.
3      Q   But you have no reason to know whether
4  that's true or not?
5      A   I don't know full details but we were
6  speculating that.
7      Q   Who was speculating?
8      A   The island students including myself because
9  we were concerned that many of the island students
10 were not passing the test but for some reason there
11 was no issues with the OSU students not passing the
12 exam within an hour.
13     Q   Who proposed the theory?
14     A   Who proposed?  Multiple people.  It wasn't
15 one person.
16     Q   Did all of the island students that you were
17 talking with have the same issue being that they just
18 didn't finish within -- didn't have enough time to
19 finish?
20     A   Yes.
21     Q   So it was solely a time issue?  Nobody was
22 complaining about the fairness of the exam for
23 negative other than the fact that they didn't feel
24 they had enough time?
25     A   It was regarding time and the amount of

Page 181

1  information that we were given in such a -- yeah, one
2  hour is a small time frame, as I mentioned earlier.
3      Q   But there were other students who were able
4  to complete it on time?
5      A   There was a few.  But the ones that were
6  able to do well and finish the rotation, that exam,
7  were the ones that didn't have Di Concetto.
8      Q   So if I'm understanding you correctly,
9  there's a belief that the only students that passed Di
10 Concetto's exam did so because they had a prior exam
11 that they were using?
12     A   Possibly or they had some kind of something
13 that they -- maybe like a sheet that they had, like
14 information, like, oh, this is going to be on the
15 exam, this is going to be on the exam.  So it's like a
16 way -- like a shortcut so they can finish quicker
17 maybe, possible.  We were speculating.
18     Q   So is it your belief then that nobody was
19 capable of passing that exam unless they cheated?
20     A   That's speculation.  I'm not you sure yet.
21     Q   Well, this whole thing is speculation.
22     A   Yeah.  I'm saying generally, yeah, I think
23 it's part of the belief.
24     Q   Okay.
25     A   Partially.

Page 182

1    (Defendant's Exhibit 9 was marked for
2    identification)
3    Q   (BY MR. PRATT) I'm going to hand you what is
4  marked as Defendant's Exhibit 9.
5    A   Yes.
6    Q   Won't spend a lot of time on this.  You've
7  already mentioned what this was and that you received
8  it.  But it is a letter from Margi Gilmour dated
9  April 21st, 2020; correct?
10   A   Yes.  Correct.
11   Q   This letter is essentially letting you know
12 that as a result of receiving the grade of D in the
13 anesthesia rotation you'll be dismissed from the
14 program; correct?
15   A   That's correct.
16   Q   And it advises that the Dean has reviewed
17 your academic record and has approved the dismissal
18 action; correct?
19   A   Yes.  That's correct.
20   Q   Okay.  We're going to shift gears a little
21 bit.
22   A   Okay.
23   Q   So at that point you are dismissed from the
24 program?
25   A   That's correct.

Page 183

1    Q   You leave Stillwater?
2    A   Yes.
3    Q   Go back home, presumably start working with
4  your father again?
5    A   Yes.
6    Q   And ultimately decide to file a lawsuit
7  naming Oklahoma State University and St. Matthew's
8  University; correct?
9    A   Before the lawsuit, we did send letters
10 before, before a lawsuit, like litigating.
11   Q   Correct.  I'll back up.  I wasn't trying to
12 eliminate that step.
13   A   Sure.
14   Q   To some extent that's settlement
15 negotiations we don't want to talk about that.
16   A   Yes.
17   Q   But letters were sent asking for your
18 readmittance, to consider readmittance?
19   A   Yes.
20   Q   I don't know if letters were sent to SMU.
21 But letters were sent to Oklahoma State?
22   A   They were sent to SMU as well.
23   Q   And ultimately though it led to you filing a
24 lawsuit, that being the lawsuit that we're here
25 discussing today; correct?

Page 184

1    A   That's correct.  Yes.
2    Q   Okay.  Are you familiar with the allegations
3  contained in the complaint that was filed in this
4  lawsuit on your behalf?
5    A   Yes, I do.
6    Q   I don't want to go through the whole thing,
7  but there's some paragraphs that I do want to talk
8  about.
9    A   Sure.
10   Q   I'm not sure at this time if I'll enter this
11 as an exhibit.  I might at the end but my guess is I'm
12 just going to ask you a few questions and we'll go
13 from there.
14       But first and foremost, before we do that, I
15 would like to hear in your words, what do you believe
16 that your claims against Oklahoma State are?
17   A   Based on just everything?
18   Q   Yes.  The claims that you have filed in this
19 lawsuit, you are seeking some type of, I don't know,
20 depends, damages of some sort from Oklahoma State
21 University in this lawsuit?
22   A   Right.  That's correct.
23   Q   I would like you to describe for us in your
24 own words what you think that looks like.
25   A   Sure.  So the three like -- you're asking

Page 185

1 regarding what allegations I made?
2    Q   What do you believe the nature of your
3  claims are?
4    A   Nature of my claims.  In regards to the list
5 that I made there regarding this claim?
6    Q   Yes.  I mean, I don't expect you to have a
7  lawyer's understanding.  That's not the requirement
8  that you have to come in here.
9    A   Yes.
10   Q   I'm trying to not ask you purely legal
11 questions.
12   A   Yes.
13   Q   But at some point you decided to consult an
14 attorney?
15   A   Absolutely.
16   Q   I don't want to know about any of the
17 discussions that you had with your lawyer.
18   A   Yes.
19   Q   I'm not asking about any of that.
20   A   Right.
21   Q   But I do want to know, something made you
22 say, you know what, I think I'm going to file a
23 lawsuit against OSU.
24   A   Yes.
25   Q   Based on what?

Page 186

1    A    Based on, as I mentioned earlier in the
2  questions you asked me, they consider me lying, they
3  consider me being poor performance, that wasn't
4  entirely true, and I wasn't given the academic
5  integrity given based on my handbooks rules for me to
6  prove myself that I am innocent and I wasn't given
7  that chance.  So that's one -- that's pretty much a
8  big allegation right there.
9    Q    Okay.  We're going to come to that one.
10   A    Sure.
11   Q    Your belief that the academic integrity
12 policy was not utilized while you were in school and
13 going through this process?
14   A    Right.  And schools in general, when someone
15 lies that is dishonesty, that is fabrication
16 involvement.  When that happens, you are being put on
17 the pedestal, you're put on a podium to explain like a
18 trial, explain to show proof of these things, you
19 know, to prove your evidence that you did not lie.
20 You are given that, you know.  You are given that
21 option to do that.  It's like rights of a person.
22   Q    It's a big deal?
23   A    It is a big deal, absolutely.
24   Q    Do you know anybody while you were in school
25 in the veterinary program that was subject to an

Page 187

1  academic integrity violation?
2    A    I do know one, yes, and it regarded with
3  plagiarism.
4    Q    Plagiarism?
5    A    Yes.  And they were able to prove their
6  innocence.
7    Q    Okay.
8    A    Yes.
9    Q    Before you said the failure to utilize the
10 academic integrity policy.  I wanted to focus on the
11 first couple of things you said because I want to
12 address all of those.  But I'm not a hundred percent
13 sure that I understood you.  I think you said that
14 they -- basically, they falsely claimed that you had
15 poor performance?
16   A    Yes.  And regarded to like, for example,
17 when I mentioned community practice, when they
18 mentioned the constructive criticism in my
19 evaluations, like those are allegations to me.
20 Because a lot of things that were said were not said
21 to me in person.
22        They were a different answer or to me they
23 were fabricated in different -- they would changed
24 what they said to me into their evaluation.  And I had
25 proof.  I had evidence to show that that wasn't --

Page 188

1  what they said was not true, entirely true.
2        I wasn't given the opportunity to prove
3  those things in the school.
4    Q    Instructors in higher education have to
5  apply some level of objective evaluation; correct?
6    A    Yes.
7    Q    What do you believe their level of
8  discretion is in determining whether a student has met
9  academic standards or hasn't met those standards?
10   A    They base it on a rubric as we looked at
11 evaluation, however, based on different -- based on
12 different rotations that could be completely different
13 as we've seen in these grades.  The grade evaluations
14 are completely different based on rotations.
15        In this case in community practice, majority
16 if not 80 percent of it was subjective.  20 percent
17 was objective and that included the exam, the final
18 exam and that, you know, whether you -- that's your
19 score whether you performed any exam or not, that was
20 it.  Right?  That's objective; correct?
21        So in this case 80 percent was subjective
22 which was me going over cases with them, you know,
23 hoping to get feedback which, unfortunately I wasn't
24 given feedback until those two meetings so, yes, it
25 was subjective.

Page 189

1    Q    But that is what a faculty member does,
2  correct, utilizing both the objective and the
3  subjective evaluation of students?
4    A    Yes.
5    Q    And from what I ---
6    A    Basically, yes.
7    Q    And you disagree with the subjective
8  evaluations?
9    A    Yes.
10   Q    And in anesthesiology you disagreed with the
11 objective evaluations because you didn't think you
12 were given enough time?
13   A    That's correct.
14   Q    In the small animal internal medicine
15 evaluation, you said you like him, the professors, you
16 thought they did great, it was fair and you
17 legitimately received a D?
18   A    Sorry.  Which rotations?
19   Q    Small animal internal medicine, your first
20 rotation that you received a D.
21   A    Yes.
22   Q    I didn't hear any complaints about that one.
23   A    There was some complaints I said to Gilmour
24 about it, yes.  There was some complaints.
25   Q    What were those?

Page 190

1    A    A few of the complaints were communication
2 was also an issue there.  The big one was that it was
3 a very busy rotation, probably the most busiest that I
4 had since I'd been there, my first rotation.  And, you
5 know, besides my first rotation like, you know, being
6 my first rotation there, so I'm not like -- I don't
7 have the experience that the other students had.  It
8 was my first.
9         There was another student that was first
10 rotation, too, but she was also struggling.  Like the
11 ones who were struggling were the first ones that it
12 was their first rotation and they understood that
13 which is why I enjoyed those two clinicians because
14 they understood the situation.  They understood.
15        They would speak to us.  But the issue was
16 that they were extremely busy at rotation and the
17 feedback that I -- I wasn't given feedback also in
18 that situation based until like the end.
19        I felt that wasn't okay, you know, me
20 performing daily with cases, you know.  I was given
21 feedback from residents sometimes but clinicians I
22 wasn't given full feedback as much as I wanted to
23 because they were so busy just running, you know.
24 They were just running everywhere.
25        It was a quite -- it wasn't quite fair.  It

Page 191

1 just very busy, like it was really hard to get proper
2 feedback in that rotation.
3        I understand that, you know, there's
4 discrepancies where they couldn't control that and
5 they had to do what they had to do but I felt -- I
6 mean, I explained that to Gilmour regarding those
7 things and I felt the program was extremely
8 frustrating to deal with and that UVIS (ph) at the
9 time.
10        They had a 1997 program where we put in all
11 our information.  Half the time it -- over half the
12 time, 80 percent of the time it would crash.  We had
13 to use a program to get to a Windows 95 so we could
14 use the program into our computers.
15    Q    Were all students required to use the same
16 program?
17    A    Yes.  The difficult part of the whole thing
18 was is that the crashes were random so whatever you
19 did -- and since it was my first rotation, I didn't
20 understand at the time that if I didn't save it into a
21 Word document, like all my information beforehand,
22 before putting stuff in, like that would crash.  So it
23 was like a way to save my information.  Like there's
24 like little steps I had to do and I didn't understand

Page 192

1        Even with the orientation involvement, they
2 didn't explain that it crashed often.  And it crashed
3 very often.  It was very frustrating for students.
4 But when we did those extra little steps, it was
5 tolerable.
6        But the reason I didn't add those in the
7 allegations was is that I accepted my grade because I
8 felt it was my fault for not telling the clinicians of
9 what I was going through with my -- with my father
10 with the accident and everything and that's something
11 I should have been responsible and said beforehand and
12 I agree with that.
13    Q    We've talked about what your understanding
14 of your claims in the case are?
15    A    Yes.
16    Q    Okay.  Again, I'm not going to ask you to
17 apply legal analysis to any of this.
18    A    Sure.
19    Q    But I want to point out that from the legal
20 standpoint there's a singular cause of action against
21 Oklahoma State in this case that is for a breach of
22 contract.
23        Do you understand that?
24    A    Yes, I do.
25    Q    Okay.  And the specifics of that claim in

Page 193

1 terms of what it is titled in the complaint are breach
2 of contract and the duty of good faith and fair
3 dealing against the Board of Regents for the Oklahoma
4 Agricultural and Mechanical Colleges, State of
5 Oklahoma, Oklahoma State University and St. Matthew's.
6        Okay?
7    A    Right.  Correct.
8    Q    So that is the cause of action you have
9 against Oklahoma State that we breached contract with
10 you?
11    A    That's right.
12    Q    And that we breached the duty of good faith
13 and fair dealing?
14    A    That's correct.
15    Q    Now that I've structured it in that way, how
16 would you say that Oklahoma State has breached its
17 contract with you?
18    A    In regards ---
19    Q    Your understanding.
20    A    Sure.  So breach of contract I feel is based
21 on, as I mentioned earlier about the academic
22 integrity violation, that was part of my student
23 rights.
24        I had in my evaluation, she clearly says
25 here as a quote, "More than one occasion where this

Page 194

1  student was not telling the truth regarding what he
2  had or had not done concerning patient care."
3      Q    I agree with you.  We're going to come back
4  to that.  I just want to make sure I'm understanding
5  the entirety of your claims.
6      A    Yes.
7      Q    So that's a way that OSU potentially
8  breached contract according to what you're alleging?
9      A    That one of the reasons, yes.
10     Q    Okay.  What are the others?
11     A    The other would be that -- the other one was
12 the anesthesia situation virtually.
13     Q    Okay.
14     A    It was done in a manner that, as you
15 mentioned, it was difficult for everyone, anybody in
16 school or in other schools; that they didn't give the
17 proper learning environment that we could have been
18 given, you know.
19         As I mentioned, different schools did other
20 ways of managing it, as I mentioned, splitting into
21 groups of less people, you know, performing actual
22 anesthesia, like using machines.  It's an extremely
23 important rotation and we didn't have the opportunity
24 at all.
25         It was -- the learning, as hard as he did,

Page 195

1  you know, no offense to Dr. Di Concetto, great guy,
2  when I spoke to him and everything, but I felt that
3  structurally it just -- it was not -- it was loss.
4  Unfortunately, you know, based on the COVID situation
5  I didn't get the proper learning.  And to make matters
6  worse, it also ended early due to a drama that
7  happened.
8      Q    Okay.  We'll stop there for a minute.  I
9  want to talk about all this because I didn't know we
10 were going to go there yet but I'll shift gears a
11 little bit.
12     A    Okay.  Sure.
13     Q    It ended early.  I want to start with that.
14     A    Yes, it did.
15     Q    Tell me how you think that occurred.
16     A    Sure.  So based on what happened, that day
17 when the incident did happen, there was many
18 complaints and, unfortunately, they were with a mic
19 open and that student didn't understand, and his
20 computer was still there.  He was just gone, taking a
21 patient somewhere.
22         So what happened was the mic was on and the
23 person helping him, the student, was complaining very
24 loudly to all of us, to other students, about her
25 frustrations dealing with his technology knowledge,

Page 196

1  dealing with the connection errors and all these other
2  dealings, like it was very frustrating for her and she
3  had to work on the side to help him also, like by
4  calling him and working because she was I think the
5  SAVIN (ph) president or something, so she was --
6  everyone knew her, I guess.  She was the one that he
7  picked I guess to help or he chose her to help him and
8  she volunteered, too, in a way.
9         There was just a lot of frustrations with
10 her, and she was just venting to us that like I --
11 just two more days of this shit.  That's what she said
12 as a quote, just two more days of this shit.  I'm just
13 over it.
14     Q    Two more days because the rotation was going
15 to end in two days?
16     A    Yeah, including the day we had, so three
17 days.
18     Q    Okay.
19     A    She was mentioning that and she said out
20 loud she didn't -- she just didn't think, okay, like,
21 no one is going to hear about that.
22         We ended up getting a response, an email,
23 after our exam that we took which was already
24 stressful enough, that we took that exam with an hour
25 and then a few hours later that same day we got an

Page 197

1  email saying that he is ending the rotation early.
2      Q    Do you recall what day of the week that was
3  on?
4      A    It was on -- no, I don't actually recall off
5  the top of my head.
6         (Defendant's Exhibit 10 was marked for
7          identification)
8      Q    (BY MR. PRATT) I'm going to hand you what is
9  marked as Defendant's Exhibit 10.
10     A    Sure.
11     Q    Previously produced as Board1445.  I believe
12 this was an email that has redactions at the top
13 because I believe it had a number of students that had
14 been cc'd on here.
15         Looks like it was a group email; is that
16 correct?
17     A    Yes.  That's correct.
18     Q    So I know we're kind of working backwards
19 but let's take a look at your email first which is at
20 the top of the page.
21     A    Sure.
22     Q    Okay.  I believe this email was in response
23 to the email you were just discussing that came from
24 Dr. Di Concetto.
25         Is that accurate?

Page 198

1   A   Yes, that's accurate.
2   Q   Okay.  Will you read your response for us,
3   please?
4   A   Sure.
5       "These are very stressful times, and
6       the school has really done us a service to
7       offer this class virtually.  They are really
8       doing their part to keep us safe from this
9       virus and we should honor and appreciate
10      them for doing it.  I know that this virus
11      is touching our lives in very personal ways,
12      but we should take this opportunity to learn
13      to be more patient and understanding and try
14      to put ourselves in others shoes before
15      speaking.  I know that every person in this
16      class is grateful for Dr. Di and the school
17      for this opportunity and I'm that nothing
18      that was said was with ill will.  As
19      Americans, we have never been placed in a
20      situation where we feel just impotence.
21      This sometimes makes us react to the
22      situation without elegance.  I am confident
23      that through this discussion we can find the
24      opportunity to see our parts in this
25      situation and correct them for the future.

Page 199

1       life is about learning and sometimes
2       learning through our mistakes to make us
3       better people.  We appreciate you and all
4       your efforts!"
5   Q   And that's from you?
6   A   That's from me.
7       "Regards, Jonathan Rivera-Pierola."
8   Q   Those are your words?
9   A   That's me.
10  Q   Will you look at the top and see what date
11  that was sent?
12  A   Sure.  That was Friday, April 10th, 2020.
13  Q   Okay.  And the email that it was in response
14  to was sent from Dr. Di Concetto.  I believe that it
15  says the date and time that he sent that email below.
16      Can you tell me what that was?
17  A   Sure.  April 10, 2020.
18  Q   So that same day?
19  A   Uh-huh.
20  Q   About three hours prior?
21  A   Yes.
22  Q   That's Friday, April 10th?
23  A   Yes.
24  Q   Okay.  We looked earlier at your grade sheet
25  that you received for anesthesia.  I think you

Page 200

1   probably still have it over there.
2   A   Yes, I do.
3   Q   Can you tell me the dates that that rotation
4   says that it goes through?
5   A   Sure.  Here we go.  Rotation 16, 3-23-2020
6   to 4-12-2020.
7   Q   Okay.  So this email was sent on April 10th?
8   A   That's correct.
9   Q   Two days before the end of the rotation?
10  A   Yes.
11  Q   So the rotation was being ended --
12  A   Two days early.
13  Q   -- at 2-17 on Friday before the technical
14  end of the rotation on Sunday, two days later?
15  A   Yes.
16  Q   Now, didn't you tell me earlier that
17  weekends were not typical rotation days?
18  A   That was for community practice.
19  Q   Oh.  So anesthesia was different?
20  A   Yes, it was.
21  Q   You met routinely on Saturdays and Sundays
22  not just in emergency situations?
23  A   Well, you had to be available for Saturdays
24  and Sundays if there was emergencies to be seen.
25      He could call and say, hey, everyone log in.

Page 201

1   Let's look at this emergency.  Let's talk about what's
2   going on.
3   Q   But it wasn't a standard rotation?  It was
4   only in the event an emergency arose?
5   A   Yes.  Through rounds.
6   Q   So the two days of emergency call would not
7   have taken place but Friday morning you took the end
8   of rotation exam; correct?
9   A   Yes.
10  Q   It was not until later that afternoon that
11  you received the email suggesting that the rotation
12  would end early?
13  A   Right.  But we were supposed to meet up
14  right after the exam and that never happened, so there
15  was like a break of just like, so what's going on, are
16  we not going to meet up like in the morning.  Because
17  it was like -- I think the exam was like 8:00 in the
18  morning and ended at 9:00, one hour.
19      We were supposed to meet up and do our class
20  for that day but it never happened.
21  Q   The material that you were tested on would
22  have been concluded before the exam on Friday morning,
23  would it not?
24  A   Yes.  But there was more -- we still -- it
25  was still a rotation day so we still had to do

Page 202

1 activities like either to talk about past cases or to
2 go over cases that you would assign us or to look at
3 patients that were in ICU at the time and talk about
4 their cases with anesthesia.
5     Q   So if I'm understanding you correctly, it's
6 your intention to suggest that OSU breached its
7 contract --
8     A   Yes.
9     Q   -- in one particular instance by ending a
10 rotation a few hours before the afternoon rotation
11 would have taken place?
12     A   Few hours before the morning.
13     Q   No.  It happened -- he canceled it.  You
14 took the test that morning.
15     A   Right.
16     Q   And then he didn't cancel until 2:22 in the
17 afternoon.
18     A   Right.  But the concern was with the
19 students and I we were supposed to, based on, as I
20 mentioned earlier, the scheduling, that we would meet
21 in the morning for rounds or for whatever you would
22 feel that he wants to talk about and to also meet up
23 and do more in the afternoon as well when we had that
24 little lunch break in between.
25         So we had those two meet ups.  The morning

Page 203

1 meet up never happened.  We just took the exam and
2 then it just ended.
3         We didn't know what was going on because the
4 schedule was, you know, twice meet ups, one in the
5 morning, one in the afternoon after lunch.
6     Q   Okay.  So perhaps I misstated.
7     A   Sure.
8     Q   My understanding then is that your argument
9 is that OSU breached its contract with you because
10 during one of its three-week rotations, being
11 anesthesiology, at the end of that third week, Friday,
12 the day of standard rotations, you took your end of
13 rotation exam?
14     A   Yes.
15     Q   And the instructor elected not to have the
16 rest of the day worth of rotations?
17     A   Yes.  Based on what he wrote, yes.
18     Q   And you believe that's reasonable?
19     A   That he ended it early?
20     Q   No.  You believe it's reasonable to suggest
21 that Oklahoma State University breached its contract
22 with you due to ending a rotation on the day of the
23 final exam?
24     A   Yes.
25     Q   Okay.

Page 204

1     A   Absolutely.
2     Q   Now, you also suggested that you didn't
3 think that while you understood that Dr. Di Concetto,
4 he tried, you mentioned several times that he tried,
5 he was really trying?
6     A   Yeah.
7     Q   But you're still suggesting that OSU, if I'm
8 understanding you correctly, breached its contract
9 with you because of changing to virtual learning
10 during the onset of the COVID-19 pandemic?
11     A   Yes.
12     Q   Okay.  And you're saying that now even
13 though in your email you said and you read it into the
14 record just a few minutes ago:
15         "They are really doing their part to keep us
16         safe from this virus and we should honor and
17         appreciate them for doing it."
18     A   And the reason ---
19     Q   "I know that this virus is touching our
20         lives in very personal ways but we should
21         take this opportunity to learn and to be
22         more patient and understanding and try to
23         put ourselves in others shoes before
24         speaking.  I know that every person in this
25         class is grateful for Dr. Di and the school

Page 205

1         for this opportunity and I'm sure that
2         nothing was said was with ill will."
3         Was this again another instance in which you
4 sent an email that was not being genuine?
5     A   Unfortunately, yes.
6     Q   Okay.  I just want to make sure.
7     A   And the reason why is one of our grades, and
8 when we were talking, all the other students were
9 based on professional conduct is one of our grades.
10 So based on his -- based on his email he sent to us
11 regarding his early termination of the rotation, he
12 mentioned that he was -- "I am disappointed with the
13 negative attitude and comments that I've been
14 displayed by this rotation group."
15         So instead of that one person that the
16 technician overheard and told him that someone was
17 complaining, because that's how he got the
18 information, as he mentioned in his email.
19         So in conclusion, the majority of the rest
20 of the rotation, the students, were very concerned
21 about the professionalism grade and they were worried
22 that they were going to fail or get a worse grade
23 because of it.
24     Q   Did they?
25     A   I don't know.

Page 206

1    Q    Did you?
2    A    No.  And the reason why I felt that was
3    because I wrote these things and that's what a lot of
4    other people felt they wrote.  They had to write to be
5    genuine.
6    Q    I don't want to know what you felt.  I want
7    to know what happened.
8         You were worried that he was going to dock
9    your grade because he had to cut the class short out
10   of frustration?
11   A    Yes.
12   Q    Because he's not a robot?
13   A    Yes.
14   Q    He's not a computer?
15   A    Yes.
16   Q    And somebody is saying I'm sick of this shit
17   or whatever it was that you said earlier?
18   A    Yes.  Because he included us as a group so,
19   yes, it was concerning.
20   Q    Is that a human response?
21   A    It is a human response, but to include a
22   whole group when it was one person that said it and
23   that was told by the technicians that they
24   overheard and that and told him that, that is
25   concerning.

Page 207

1    Q    It's concerning to you and you were worried
2    about it and it did not end up manifesting in your
3    grade.  In fact, your grade reflected only that you
4    didn't do well on the exam.
5    A    I did not know I did well on the exam.
6    Q    Well, you might not have.  But I'm just
7    saying, you're trying to put onto him that he was
8    going to do this horrible thing to breach a contract
9    that he never did.
10   A    We did not understand that he might have
11   done that.  That's what we were scared for as
12   students.
13   Q    But it didn't happen.
14   A    Luckily, it did not happen.  But we all
15   responded with answers.  That was the reason for this
16   email, this mass email.  I wasn't the only one that
17   responded.  Every student responded, every student.
18   Q    I've seen the responses.
19   A    Every student in that rotation responded
20   because they were worried about their grade.
21   Q    Or maybe they were being genuine in the fact
22   that they felt like it was unfortunate that a student
23   had spoken up like that and said something
24   disrespectful?
25   A    And I was genuine regarding that but it

Page 208

1    wasn't me.
2    Q    So what is genuine and what's not?  Today
3    you're parsing things.  You are telling me it's
4    genuine then say, well, actually, it's not.
5    Unfortunately, this isn't.  I don't know what's
6    genuine and what's not.
7         Is your testimony today genuine?
8    A    Yes, it is.  What's concerning to me is when
9    he said:  Unfortunately I'm disappointed with the
10   negative attitude and comments that have been
11   displayed by this rotation group.
12        We felt we were all targeted.  So the reason
13   why I'm explaining what I felt was genuine because I
14   did have heart for him as I mentioned earlier;
15   correct?
16   Q    Correct.
17   A    But when you feel you're being targeted as a
18   student, as a group, when it was only one person that
19   said it, whether knew the person or not, he took as a
20   group and said otherwise, that he wasn't being -- that
21   he was taking it out on us personally.
22        And, yes, that could be person oriented or
23   not but who do we know that, what was the result of
24   that.
25        MR. PRATT:  I don't intend to enter this as

Page 209

1    an exhibit but I'd to use it to show it to him.  I
2    know you've seen this.
3         Are you comfortable with that?
4         MR. BACH:  Yes.
5    Q    (BY MR. PRATT) I am going to hand you what
6    is marked as Boards235.  As I mentioned, I don't at
7    this time intend to enter it as an exhibit.  I want
8    you to take a look at it though and tell me what it is
9    and you'll notice I have a blue tab here.
10        I'll probably have to have you hand it back
11   to me so I can tell you what I mean because I only
12   brought one copy of this.
13   A    Sure.  Okay.
14   Q    Do you recognize that document?
15   A    I do.  This is the Student Handbook.
16   Q    From the time that you were there?
17   A    Yes.  That's correct.
18   Q    If you'll turn to the blue tab that I
19   marked.
20   A    Okay.
21   Q    It should be pretty well lined up with a
22   header.
23        Do you see that?
24   A    "Procedure Governing PSC Handling Of D Or F.
25        Grades Earned In One Or More Clinical

Page 210

1    Rotations."
2    Q   Yes.  I think that's pretty
3  self-explanatory.  It's telling you what happens for
4  students in clinical rotations who receive a grade of
5  D or F.
6        Does that appear to be correct?
7    A   That's correct.
8    Q   Okay.  Why don't you read for me the first
9  paragraph.
10   A   Sure.
11       "Under most foreseeable circumstances, a
12       student earning a D in a clinical rotation
13       who is not on academic probation will be
14       allowed to remediate the rotation by
15       repeating the rotation during the next
16       available period in the student's calendar.
17       In many cases, this will be the student's
18       vacation rotation, but if the student's
19       vacation rotation has already passed at the
20       time the student earns a D grade, the
21       remediation will occur during the rotation
22       following the last scheduled rotation of the
23       students fourth year curriculum.  In some
24       cases this could result in not receiving a
25       diploma until the end of the semester.  The

Page 211

1        student will be placed on academic probation
2        for the remainder of his or her professional
3        curriculum."
4    Q   Okay.  Now, the first portion of that talks
5  a lot about how you will be allowed to remediate that
6  particular rotation; correct?
7    A   Correct.
8    Q   But that's not until the end of year four
9  which is the year you were still in; correct?
10   A   Yes.  That's correct.
11   Q   So you didn't have an opportunity to
12 remediate?
13   A   Unfortunately, no.
14   Q   Okay.  But moving to the next part, I didn't
15 hear where it said may.  I think it said the student
16 will be placed on probation, is that correct, academic
17 probation?
18   A   Are you mentioning the second part?
19   Q   Yes.
20   A   "A student earning a D grade while on
21 academic probation."
22   Q   No, no, no.  Not in the second part.  We'll
23 get into that.
24       In the part that you just read, you read a
25 part ---

Page 212

1    A   Who is not on academic probation will be
2        allowed to remediate the rotation by
3        repeating the rotation during the next
4        available period in the student's calendar."
5        What was ---
6        MR. BACH:  Final sentence.
7        THE WITNESS:  Oh.  Final sentence.
8        "The student will be placed on academic
9        probation for the remainder of his/her
10       professional curriculum."
11   Q   (BY MR. PRATT) Early I think you said some
12 students are, some students aren't but that seem to be
13 pretty mandatory language, wouldn't you agree?
14   A   Yes.
15   Q   So your first grade of D was in small animal
16 internal medicine; correct?
17   A   That's correct.  Yes.
18   Q   What did not occur pursuant to that
19 condition other than the fact that you were not
20 allowed to remediate at the end of your fourth year,
21 because you did not complete your fourth year?  What
22 in that did not occur?
23       Let me ask you this.
24   A   Sure.
25   Q   Does it appear that OSU followed its policy

Page 213

1  with regard to your first D?
2    A   Yes.
3    Q   Okay.  Will you hand that back to me for
4  just one second?
5    A   Sure.
6    Q   I think I'm going to have you read the next
7  paragraph.  Yes.
8        Read the next bullet point.  I won't need
9  you to read the third one.
10   A   Sure.
11   Q   So this is the same policy.
12   A   The third one?
13   Q   Second one.
14   A   Second one.  Sure.
15       "A student receiving a D grade while on
16       academic probation (including academic
17       probation that carries on over from the
18       third year curriculum), two or more D grades
19       while not on academic probation, or on a F
20       grade while not on academic probation has
21       the option to meet with the PSC of earning a
22       D or F --"
23       I wasn't given that option.  I believe
24 that's -- that was it.  I take that back.
25       "-- while enrolled and taking the next

Page 214

1    rotation.  The student will have an
2    opportunity to present information to the
3    PSC regarding any mitigating circumstances
4    relative to unsatisfactory performance.
5    Following the meeting, members of the PSC
6    will make a determination and vote as to
7    whether or not to recommend that the student
8    be allowed to remediate the unsatisfactory
9    grades.  The PSC may recommend that the
10   student remediate the unsatisfactory grade
11   before continuing in the professional
12   curriculum.  If the student is allowed to
13   continue in the professional curriculum,
14   he/she will remain on or be placed on
15   academic probation for the remainder of the
16   professional curriculum.  The PSC may
17   recommend dismissal if it is determined
18   there are no sufficient circumstances
19   relative to the unsatisfactory performance."
20   That's it.
21   Q   Thank you.  I'll leave that there so you can
22   refer to it.
23   A   Sure.
24   Q   And I understand that there is some level of
25   discretion that is provided to the PSC there and that

Page 215

1    you may disagree with the discretion that they
2    utilized?
3    A   Yes.
4    Q   But did OSU follow its policy with regard to
5    your second grade of D in community practice?
6    A   Yes.
7    Q   Okay.  Thank you.  Now, with regard to the
8    anesthesiology D that you received, we've already
9    addressed that, I believe, because it was a unique
10   circumstance because the PSC did decide to go ahead
11   and dismiss with no opportunity to remediate; correct?
12   A   Yes.
13   Q   Yet Dean Risco overrode that decision
14   pursuant to policy and gave you an additional
15   opportunity; correct?
16   A   That's correct.
17   Q   And after doing so, he put conditions in
18   place that required you to make a C or better in each
19   of your following rotations for that year?
20   A   That's correct.
21   Q   And you made a D and were dismissed?
22   A   Yes.
23   Q   Okay.  As part of a breach of contract claim
24   or really kind of any lawsuit but particularly the
25   breach of contract claim, one of the things that you

Page 216

1    have to present or bring about is what your damages
2    are, you know, what you're seeking from my client OSU.
3    Now, I've had conversations with your
4    attorney and I'm under the impression that at some
5    point in this case there will likely be an expert whom
6    I will choose to depose and get specifics from him.
7    A   Yes.
8    Q   So I want to be really clear that I'm not
9    here today to break that down in that kind of
10   capacity.
11   A   Yes.
12   Q   That will be for him or her.
13   Okay?
14   A   Yes.
15   Q   But as we sit here today, what amount of
16   damages do you believe that you have suffered as a
17   result of OSU's alleged breach of contract?
18   A   Due to the breach of contract with OSU, I
19   felt I had lost -- I lost everything due to the
20   contract that was involved with St. Matthew's, with
21   OSU and St. Matthew's.  I lost my entire veterinary
22   career.
23   Q   When I say what damages are you seeking,
24   what amount of money are you asking my client to pay
25   you?

Page 217

1    A   It ended up resulting in my entire
2    veterinary career in regards from school, from
3    veterinary school to the end of the curriculum that
4    was OSU, my fourth year.
5    Q   Okay.
6    A   And that included living standards, that
7    included tuition, that included I guess everything
8    that was necessary for living in those areas.  There
9    was a list already involved so we already provided
10   that.
11   Q   Correct.  I want to make sure that I'm
12   understanding it because there may be more there than
13   what I'm understanding.
14   A   Okay.
15   Q   I believe that you have alleged that OSU
16   should pay you damages to compensate you for the
17   tuition that you spent while at Oklahoma State?
18   A   Yes.
19   Q   The living costs associated with the time
20   that you were at Oklahoma State?
21   A   Yes.
22   Q   The tuition that you paid to St. Matthew's
23   University?
24   A   Yes.
25   Q   The living costs that you paid living in the

Page 218

1 Caribbean?
2    A    That's correct.  Yes.
3    Q    Mental health costs associated with the
4 issues that you allege stem from this?
5    A    Yes.  That's right.
6    Q    What else?
7    A    That's pretty much it, yes.  Those are the
8 main -- those are the main things that you mentioned.
9 It involved what -- from my veterinary career so
10 starting in St. Matthew's to ending my rotations in
11 Oklahoma.
12    Q    So it's your believe OSU should pay for all
13 of your veterinary education; correct?
14    A    (Nods head up and down).
15    Q    The time that you left undergrad and also
16 got your masters, obviously?
17    A    Yes.
18    Q    You then went to the Caribbean at St.
19 Matthew's --
20    A    Yes.
21    Q    -- which you said was on par tuition wise
22 but expensive living wise?
23    A    (Nods head up and down).
24    Q    That OSU should be responsible for those
25 living expenses that you incurred, your tuition there

Page 219

1 that you incurred and then those same costs associated
2 with the time you spent in Stillwater?
3    A    Yes.  Based on the decision that because of
4 the contract with St. Matthew's, the decision that OSU
5 makes with my decision and with the allegations that I
6 mentioned, I was dismissed because of that and because
7 of the dismissal I was dismissed from my school, so
8 those damages were done entirely based on OSU's
9 decision.
10    Q    So when this case goes to trial, you're
11 going to sit in the witness stand and tell the jury
12 that those are the costs that you believe are owed to
13 you from Oklahoma State?
14    A    That's correct.
15    Q    And you believe that's reasonable?
16    A    It's a lot of money.  It's a lot.  But based
17 on the decisions that OSU has made, based on the
18 allegations and the policies that they broke with me
19 as a student, my rights, yes.
20    Q    Now, at the beginning of this lawsuit you
21 had named both Oklahoma State and St. Matthew's as
22 codefendants?
23    A    That's correct.  Yes.
24    Q    Obviously, St. Matthew's was dismissed out.
25    A    Unfortunately, yes.

Page 220

1    Q    Okay.  But presumably at the beginning of
2 this whole thing you thought OSU owes me money and
3 St. Matthew's owes me money.  I mean, that's
4 oversimplification but generally that would be why you
5 bring a lawsuit?
6    A    Right.
7    Q    What portion of this expansive amount of
8 damages that you were asking from Oklahoma State did
9 you expect St. Matthew's to pay for?
10    MR. BACH:  Object to the form of the
11 question.
12    Q    (BY MR. PRATT) You can answer.
13    A    I don't want to answer that question.
14    MR. BACH:  You need to answer.
15    THE WITNESS:  Oh, I need to.  Sorry.  Okay.
16    The reason why -- the reason why I asked for
17 the damages to ask for St. Matthew's to pay for was
18 based on your decision as a school, OSU's decision
19 that I -- that this was all -- this was all a mistake.
20    Because as I mentioned in the allegations, I
21 wasn't being -- I wasn't being heard is really the big
22 thing.  I wasn't being heard on the things that I had
23 to say about the rotations and they weren't -- and
24 when I provided evidence, they didn't want to hear me
25 out at all.

Page 221

1    As I mentioned earlier, you know, one of the
2 things of the breach of contract was the integrity,
3 academic integrity.  I wasn't given that right at all
4 when I was considered a liar.
5    Q    (BY MR. PRATT) We're going to talk about
6 that.  I'm asking what portion of these damages which
7 you acknowledged is a lot of money --
8    A    It's a lot of money, yes.
9    Q    -- did you believe was attributable to
10 St. Matthew's versus what was attributable to Oklahoma
11 State.
12    MR. PRATT:  You can have a standing
13 objection if you want.
14    MR. BACH:  Yes.  Thank you.
15    THE WITNESS:  It was involving their portion
16 which was their tuition while I was there for semester
17 one through seven.  That's what I felt that they had
18 to pay for.
19    Q    (BY MR. PRATT) But as you said, as they
20 unfortunately from your perspective got dismissed out,
21 now you expect Oklahoma State University to be solely
22 responsible for all of it; is that correct?
23    A    Due to the contract that was involving due
24 to your decision, yes.
25    Q    Due to St. Matthew's dismissal from the

Page 222

1 lawsuit, you now think OSU is responsible for all of
2 it?
3      A    But that part of the decision was -- OSU's
4 decision was all this had happened was because of the
5 result of what happened at OSU.
6      Q    But as you filed the lawsuit, you just said
7 you felt St. Matthew's was responsible for those first
8 seven semesters.  I'm going to guess, and I know I
9 have a sheet that tells me some of it, but a big chunk
10 of the damages that you're seeking occurred during
11 that time frame.
12     A    Yes.
13     Q    It was a longer time than you spent in
14 Stillwater; right?
15     A    Yes.
16     Q    And it was in the Bahamas -- excuse me.
17 Caribbean?
18     A    No.  Cayman Islands.
19     Q    Cayman Islands?
20     A    Yes.
21     Q    Regardless, expensive place to live?
22     A    Yes.
23     Q    And you expect all of that to be paid by
24 them but now you expect it to all, encompassing
25 everything, be paid by Oklahoma State; is that

Page 223

1 accurate?
2      A    That's accurate.
3      Q    Okay.  And you believe that's reasonable?
4      A    I'm hoping it's not reasonable.  There was
5 other options that were involved.
6      Q    We're here today because there's a lawsuit
7 filed seeking damages against my client.
8      A    Uh-huh.
9      Q    You've expressed to me what you think those
10 damages are?
11     A    Yes.
12     Q    And you told me you think it's reasonable
13 the amount of damages that you're asserting against my
14 client?
15     A    It's a lot of money.
16     Q    I agree with that.  I'm asking is it
17 reasonable from your perspective?
18     A    Yeah, based on the damages.  Yes, it's
19 reasonable.  The damages were done in Oklahoma so,
20 yeah.
21     Q    I'm going to take a quick break because I
22 know you're wanting to talk about the academic
23 integrity stuff.
24     A    Sure.
25     Q    You've mentioned it a couple of times.

Page 224

1      A    Yes.
2      Q    I intended to get to it earlier and we kind
3 of got off track.  We'll come back to it.
4           MR. BACH:  Are we on a break?
5           MR. PRATT:  Sure.
6           (Recess taken from 3:29 to 3:35)
7           MR. PRATT:  Back on the record.  I believe
8 Mr. Rivera-Pierola has a comment that he wanted to
9 make.
10          THE WITNESS:  Sure.  So regards to the
11 finances of the damages done, there was an extra one I
12 forgot to mention it was loss of wages.  As I
13 mentioned earlier, you mentioned -- you asked for how
14 much I was making currently as a veterinary assistant.
15          Currently I'm only making, as I mentioned,
16 24,000ish around there yearly from the State tax, the
17 result from the paper, the papers, the taxes, when you
18 put in your taxes, everything, that's what was my
19 income.
20          I'm losing -- as I mentioned, loss of wages
21 was -- since my dismissal, I've lost over three years
22 of being possibly to be finished as a veterinarian if
23 this didn't occur, the damages done in Oklahoma.
24          So that was a huge loss because as a
25 veterinarian, that's going to include an average

Page 225

1 salary of a new veterinarian entering, so that was
2 also included as well as the monetary damages.
3      Q    Do you have any idea as you sit here today
4 as a rough estimate of how much it is that you plan to
5 ask for from Oklahoma State?
6      A    Yes.  I believe it was over 500,000.
7      Q    Is that what you were wanting to say?  Did
8 we cover it?
9      A    Yes, I did want to include the lost wages.
10     Q    Okay.  It's noted.
11     A    Okay.
12     Q    Now, you've mentioned multiple times that
13 you believe that Oklahoma State violated its -- excuse
14 me.  It breached its contract with you because it
15 didn't follow its own policies I believe is what you
16 said.  Specifically, you referenced the academic
17 integrity policy.
18     A    That's correct.
19     Q    So we've read through the College of
20 Veterinary Medicine Handbook and the policies that
21 apply to when students receive grades of D or F in
22 those rotations.
23          You've indicated to me on the record that
24 you do not believe that OSU breached its policy in any
25 way with regard to those policies.

Page 226

1          Do you recall that?
2      A   Yes.  From the handbook, yes.
3      Q   Yes.  But the reason and I -- and I do know
4  what you're referring to because it has been included
5  in the complaint.  But you have made a reference to
6  the fact that you believe that you should have been
7  subject to Oklahoma State University's academic
8  integrity policy; is that correct?
9      A   That's correct.  Yes.
10         (Defendant's Exhibit 11 was marked for
11         identification)
12     Q   (BY MR. PRATT) Okay.  I'm going to hand you
13  what is marked as Defendant's Exhibit 11.  I don't
14  know if this document will be familiar to you or not.
15         Have you seen this before?
16     A   Yes.
17     Q   Okay.  What is this?
18     A   This is the academic integrity part of the
19  handbook, I believe.  I haven't seen this before in
20  the past.
21     Q   Well, I will assert to you that this is
22  Oklahoma State University's Academic Integrity Policy,
23  its university wide policy.
24     A   Okay.
25     Q   There may be a reference to it in the

Page 227

1  handbook.
2      A   Yes, there is.
3      Q   Okay.  But I can certainly assert that this
4  is the policy that is in place and was in place on the
5  date that you were enrolled in Oklahoma State.
6      A   Right.
7      Q   Do you agree with that?
8      A   I do, yes.
9      Q   Okay.  This policy is broken into several
10  subparts so it will make it relatively easy to
11  navigate, I believe.
12         If we can start with Paragraph 1.01, kind of
13  giving us an introduction as to academic integrity.
14         Would you please read that?
15     A   Sure.
16         "1.01.  Under Policy:  An institution's
17         reputation and intellectual freedom depend
18         on its uncompromising commitment to the
19         ideal of academic integrity.  OSU is
20         committed to instilling and upholding
21         integrity as a core value.  This policy
22         embodies OSU's dedication to maintaining an
23         honest academic environment and ensures fair
24         resolution of alleged violations of academic
25         integrity."

Page 228

1      Q   Thank you.  So that kind of gives us an
2  idea.  This is a lengthy policy that sets forth
3  procedures, ideals?
4      A   Yes.
5      Q   A number of things all dealing with academic
6  integrity.
7         Let me ask you, in your mind, what does
8  academic integrity mean?
9      A   To me academic integrity means as a student
10  in academics you have the integrity or you have to
11  have integrity meaning that you have to have certain
12  responsibilities as a student to withhold to be
13  responsible for certain things while you're doing in
14  school.  So you have to have a right or you have to
15  have a certain truth of what you're doing, and
16  honesty, an honest -- you know, how you're performing
17  and everything.
18     Q   Fair to say that an academic integrity
19  policy would be holding students accountable for their
20  honesty?
21     A   Yes.
22     Q   Their integrity?
23     A   Yes.
24     Q   Okay.  When I think of academic integrity
25  and I'm not looking at this policy, a word that comes

Page 229

1  to mind to me is cheating.
2      A   It's a big one, yes.
3      Q   You say that's consistent with kind of what
4  academic integrity would entail?  Obviously, more than
5  that?
6      A   There's more than that, yeah.
7      Q   You mentioned that you had a fellow student
8  while in the clinical rotation program that had a
9  complaint or an academic integrity violation filed
10  against them alleging plagiarism?
11     A   That's correct.
12     Q   Yes.
13     A   Yes.
14     Q   That's another one that I think is fairly
15  commonly thought of as an academic integrity issue.
16     A   Yes.
17     Q   Cheating on exam, those types of things.
18     A   Sure.
19     Q   So if you will turn to 1.04 which I think is
20  on the bottom of the second page.
21     A   Okay.  1.04.
22     Q   Yes.  Can you read that for us, please?
23     A   Sure.
24         "Behaviors that violate the fundamental
25         values of academic integrity may include but

Page 230

1    are not limited to:"
2    Q   Next page.  There is a list.
3        Can you read that list for us?
4    A   Sure.
5        "A.  Unauthorized collaboration;
6    B. Multiple submissions; C. Plagiarism; D.
7    Cheating on examinations (including
8    prerequisite examinations); E. Fabricating
9    information; F. Helping another person
10   cheat; G.  Unauthorized access to
11   examination; H. altering or destroying the
12   work of others; and I. Altering academic
13   records."
14   Q   Correct.  There's a follow-up paragraph.
15       Can you read that, too?
16   A   Sure.
17       "These behaviors may subject the student
18   to disciplinary action including receiving a
19   failing grade on assignment, examination or
20   course, receiving a notation of a violation
21   of academic integrity on the transcript, or
22   suspension from the University.  Serious
23   violations discovered after a student
24   graduates may lead to revocation of a
25   degree.  These behaviors are described in

Page 231

1    detail in the Academic Integrity
2    Guidelines."
3    Q   Great.  Let's just look at those really
4    quick.
5    A   Sure.
6    Q   "Unauthorized collaboration," that's a fancy
7    way of saying working with somebody on something that
8    you weren't supposed to, I would think.
9        Would you agree?
10   A   Yes.
11   Q   Okay.  That's kind of what -- that's
12   cheating?
13   A   Yes.
14   Q   "Plagiarism" is when you just pull something
15   from someone else and claim that it is yours?
16   A   Okay.
17   Q   You agree?
18   A   Yes.
19   Q   Okay.
20   A   That's right.
21   Q   "Multiple submissions," I'm not entirely
22   sure what that is but I'm assuming that would mean you
23   would submit an assignment multiple times, maybe one
24   after the deadline hoping that you could get credit
25   for the better of the two?

Page 232

1    A   That's my understanding as well.
2    Q   Here's that word, "Cheating on
3    examinations".
4    A   There it is.
5    Q   That's pretty clear there?
6    A   Yes.
7    Q   "Fabricating information," which we're going
8    to come back to because I know this is the one that
9    you've identified as what you're focusing on.
10   A   Yes.
11   Q   "F. Helping another person cheat."  Cheating
12   again.
13       "Unauthorized advance access to
14   examinations," that's giving somebody kind of an edge,
15   and I think you mentioned that you thought that maybe
16   some people in your --
17   A   Possibly.
18   Q   -- rotation had done that.
19       "H. Altering or destroying the work of
20   others."  Okay.  That's clearly going toward hurting
21   somebody else's work.  And then "Altering academic
22   records."
23       In my opinion, which may matter for nothing
24   but I want to see if you agree, this paints a pretty
25   clear picture of the types of behaviors we're trying

Page 233

1    to address.
2    A   Mostly.
3    Q   In most instances, it appears to be a way of
4    keeping the playing field even; right?
5    A   Sure.
6    Q   We're not going to let you cheat on an exam
7    when everybody else doesn't get to?
8    A   Right.
9    Q   We're not going to let you destroy someone
10   else's work because they did the work and you didn't?
11   A   Right.
12   Q   We're not going to let you claim something
13   is yours that's not, aka plagiarism; we're not going
14   to let you do that?
15   A   Right.
16   Q   So we're on the same page.  Now, if you'll
17   turn to the Academic Integrity Guidelines which were
18   just referenced in the paragraph you read.  That is
19   6.01.
20   A   Okay.
21   Q   I think Page 11 of the policy.
22   A   Okay.  6.01?
23   Q   Yes.
24   A   Sure.  Would you like me to read?
25   Q   No, not going to have read all of it.  It's

Page  234

1  too long.

2      A   Okay.

3      Q   You can thank me later.

4      A   Yes.

5      Q   Let me ask you the question because we just

6  kind of summarized and talked about all of those

7  things.

8          Would you agree that none of the outlined

9  academic integrity violations that we just mentioned

10  and discussed would apply to you in any way, shape or

11  form other than the fact that you've alleged that

12  fabrication of information does apply to you?

13      A   That's correct, yes.

14      Q   So none of the other ones we even need to

15  worry about because they don't apply?

16      A   They don't apply.

17      Q   Okay.  Then we can skip ahead to E. which is

18  the definition of fabricating information.

19          Would you read that one for us?

20      A   Sure.

21          "Fabricating Information:  Making up

22          references for a bibliography, falsifying

23          laboratory research data (for example,

24          tampering with experimental data to obtain

25          'desired' results or creating results for

Page  235

1          experiments that were not done), or using a

2          false excuse for an absence or an extension

3          on a due date."

4      Q   Which of those things did you do?

5      A   In the case that there was falsifying

6  laboratory research data, I felt like that was

7  including on my situation.

8      Q   What research data were you falsifying?

9      A   Experimental data which includes results or

10  creating results of experiments which would -- results

11  of blood work and others issues with blood works or

12  vaccinations, things like that.

13      Q   Was it being submitted for laboratory

14  research?

15      A   Does it have to be submitted for ---

16      Q   I didn't say that.  I'm asking.  Was it?

17      A   For research, for test results, yes, you

18  have to submit the results.  You have to submit the

19  blood work to a lab to get the results to get the

20  answers of what's going on with the experiment.

21      Q   It was not a university lab?

22      A   It was actually.

23      Q   Scratch that.  It wasn't a university lab

24  that you would have worked in as part of your course?

25      A   We had to go to the lab in school for the

Page  236

1  course, for the rotation.

2      Q   This is me asking a very poor question.

3      A   Sure.  No problem.

4      Q   You majored in biology at one point?  Didn't

5  we talk about that, in chemistry?

6      A   Yes.

7      Q   Chemistry is even better.  You said

8  chemistry?

9      A   Yes.

10      Q   So you know.  There's a didactic portion of

11  a class and then you also have the lab?

12      A   That's correct.

13      Q   Okay.  Your rotations were not set up that

14  way; correct?

15      A   Can you repeat that?

16      Q   Yes.  The rotations at the College of

17  Veterinary Medicine were not set in a way where you

18  have a didactic portion and then go for a few hours to

19  the laboratory to do experiments and things like that;

20  is that correct?

21          My understanding of what you're suggesting

22  is you might have drawn blood from an animal that had

23  to be submitted for testing for treatment of the

24  animal not for research data.

25          Would that be correct?

Page  237

1      A   Yes.

2      Q   Okay.  So again, we talked about these

3  academic integrity violations being set up to try to

4  ensure that students were on the same playing field;

5  right?

6      A   Yes.

7      Q   Falsifying lab data to help you get desired

8  results is essentially cheating.

9          Would you agree?

10      A   Yes.

11      Q   That's not what you did here; correct?

12      A   No.  Because the situation was when I did

13  give the blood work and I did give the results to the

14  owner, I was said something else, that I didn't do it,

15  I didn't do that part and that wasn't entirely true.

16  So I was being told I was lying in that aspect.

17      Q   To be clear, you disagreed that you were

18  lying?

19      A   Absolutely.  Yes.

20      Q   But you're alleging that because they said

21  they didn't believe you were being honest, that that

22  qualifies as falsifying information?

23      A   Yes.  They thought I was falsifying

24  information, that's correct.

25      Q   Okay.  Now, we talked about this earlier,

Page 238

1  too.  An academic integrity violation, that's a big
2  deal?
3     A   It is.
4     Q   Goes on your transcript?
5     A   Yes.
6     Q   It's a problem?
7     A   Yes.
8     Q   But you wish you had been brought up under
9  that standard?
10    A   I wish I was given the opportunity to
11  explain my allegations, yes, and to provide my
12  evidence, that's correct.
13    Q   You believe that the instructors believing
14  that you were dishonest on a couple of occasions
15  amounts to the fabrication of information which should
16  have resulted in an academic integrity violation,
17  going through the process, and having you come up on
18  an academic integrity violation --
19    A   Trial.
20    Q   -- trial?
21    A   That's correct.
22    Q   Okay.  I wanted to make sure that I'm
23  understanding that.
24    A   Yes.
25    Q   Now, you claim that OSU breached its

Page 239

1  contract because it did not subject you to a policy.
2        Are you aware of anyone in the particular
3  circumstances that you are that has ever been accused
4  of falsifying information and having violated the
5  academic integrity violation?
6     A   At Oklahoma State?
7     Q   At Oklahoma State.
8     A   No.
9     Q   Okay.  Now, I want to go back and look.  I
10  think it's Exhibit 4 that you've already looked at.
11    A   Okay.
12    Q   If that's the community practice rotation
13  evaluation.
14       MR. BACH:  Can we go off the record for just
15  a second?
16       MR. PRATT:  Sure.
17       (Discussion held off the record)
18    Q   (BY MR. PRATT) The allegation that we've
19  talked about is that OSU breached its contract because
20  it did not follow its policies.
21       You allege that it should have followed its
22  academic integrity violation policy?
23    A   Yes.
24    Q   And because it did not, it breached its
25  contract with you?

Page 240

1     A   That's correct.
2     Q   And you base that upon a -- from what I can
3  tell -- singular sentence in this evaluation that
4  says, we've already talked about it:
5        "More than one occasion where this student
6        was not telling the truth regarding what he
7        had or had not done concerning patient
8        care."
9        Is that accurate?
10    A   Yes.
11    Q   Nothing in that sentence says anything about
12  fabricating information, falsifying information,
13  tampering with experimental data to obtain desired
14  results, creating results for experiments that were
15  not done.
16       Do you see anything in there, other than
17  what I read, to base your allegation that you should
18  have been subjected to the academic integrity policy?
19    A   Yes.  I do see a few examples.  One was with
20  Daphne.
21       THE REPORTER:  Daphne?
22       THE WITNESS:  The first example is Daphne.
23  It's the name of the dog, D-A-P-H-N-E.
24       She mentioned the interpretation of the
25  laboratory values and the blood work were not accurate

Page 241

1  "as you overlooked abnormal findings."
2     Q   (BY MR. PRATT) Do you read that as
3  suggesting that you intentionally filed inaccurate
4  results or that you come up with inaccurate results?
5     A   I came in with accurate results to her on
6  the second meeting regarding that and she mentioned --
7  she didn't mention that they were inaccurate until the
8  end of this evaluation (indicating).
9     Q   Well, this says they're not accurate, not
10  that they were fabricated.
11    A   Right.  But she didn't use the word
12  fabrication.
13    Q   Right.  Because "not accurate" means that
14  they were wrong.
15    A   She mentioned that they were not what she
16  wanted to hear, that they were skewed or they were not
17  the right answers.
18    Q   But no suggestion that you did that
19  intentionally?
20    A   Right.
21    Q   Just that you got it wrong?
22    A   She mentioned that they were overlooked
23  which it means -- when I mention the abnormal findings
24  to her in that second meeting, I mentioned to her
25  those findings, those abnormal findings that she

Page 242

1 mentioned here, the liver enzymes and the proteinuria.
2 But in this case regarding -- she mentioned that they
3 were not accurate.  They were -- like as if I
4 didn't -- like I just fabricated it.  Like I
5 didn't ---
6     Q   No, that is not what that says.
7     A   But she's mentioning that they're not --
8 they were overlooked.
9     Q   They're wrong.  They're not accurate.
10 They're wrong.  That to me is an example of the
11 constructive criticism that we've been talking about
12 throughout the day.
13     A   The constructive criticisms were actually
14 allegations.
15     Q   Okay.  Let's move on.  That was your example
16 of fabrication of information?
17     A   Right.
18     Q   Anything else?
19     A   The big one was that she said:
20     "More than one occasion where this student
21     was not telling the truth regarding what he
22     had or had not done concerning patient
23     care."
24     Q   We talked about that.
25     Nothing in there says you fabricated any

Page 243

1 information?  It just indicates that she didn't
2 believe that you were being honest?
3     A   That's correct.
4     Q   Okay.  Now, that is one of what I think
5 earlier -- and it was interesting because you read
6 through the list of bullet point items that she says
7 you are not passing "because I believe you are unable
8 to successfully:"
9     A   Sorry.  Say that again.  Sorry.
10     Q   Earlier you inserted numbers 1 through 8 in
11 a series of bullet points that says:
12     "Therefore, I am not passing you because I
13     believe you are unable to successfully: and
14     then it says:  Effectively communicate
15     information to the supervising doctor."
16     A   Yes, I do see that.
17     Q   Anything about that that would be an
18 academic integrity violation?
19     A   No.
20     Q   "Perform a physical and accurately identify
21     abnormalities and communicate these to the
22     clients and supervising doctor."
23     Anything about that that would be an
24 academic integrity violation?
25     A   Yes.  I feel like that's partially could be

Page 244

1 an accurate -- because I could say a certain thing and
2 they feel like I'm making an excuse or being
3 dishonest, like fabricating information, like trying
4 to change what really -- what happened, and that's
5 part of the honesty situation.
6     So the second one I feel could be possible
7 because it was resulting with abnormalities with blood
8 work and things like that which is experimental data.
9     Q   To be fair, I don't know if there's a
10 confusion in our communication or not.  I seem to
11 think that you're -- something being accurate and not
12 accurate, just because something is not accurate
13 doesn't mean it's fabricated.
14     Would you agree with that?
15     A   No.
16     Q   So your interpretation of fabrication is
17 simply that it's wrong?
18     A   When she mentions when I discuss the blood
19 work and I discussed the blood work which is data, am
20 I wrong about that?
21     Q   No.  I can go with blood work being data.
22     Do you not consider fabrication of any kind
23 of information to have some level of intention behind
24 it, intentionally falsifying?
25     A   Yes.  You're falsifying information.

Page 245

1 According -- what she's telling me is that she says I
2 falsified information, that I was giving wrong
3 abnormalities like or not looking over the
4 abnormalities.
5     Q   So again, you're inserting the word there
6 that you think that she's alleging that you
7 intentionally gave a wrong answer.
8     Do you think it's possible for people to
9 give a wrong answer and do so unintentionally?
10     A   It's possible.
11     Q   Do people make mistakes?
12     A   It's possible.
13     Q   Is it possible that she's saying here that
14 your inability to give accurate reports is because she
15 thinks that you're getting it wrong and not that she
16 thinks you're lying?
17     A   It's possible.  But she said here:
18     "More than one occasion where this student
19     was not telling the truth regarding what he
20     had or had not done concerning patient
21     care."
22     Q   That's a separate one --
23     A   That's involving ---
24     Q   -- that we will get to at the end.
25     A   That's involving journal but, yes.

Page 246

1    Q    So the next one is:
2        "Develop and implement a Treatment Plan for
3    a sick patient."
4        She says you have an inability to do that.
5    A    Okay.
6    Q    Is there anything about that that's an
7    academic integrity violation?
8    A    That could involve data as well so, yeah,
9    it's possible.
10    Q    Okay.  I think you and I, and perhaps we'll
11    just have to see where we go down the road, are going
12    to disagree on what would qualify as an academic
13    integrity violation.
14        Do you not believe that an academic
15    integrity violation requires some level of intent?
16    A    Yes, I believe.  It's possible that
17    intent -- in this case they were intending that I was
18    lying, so in regarding ---
19    Q    Where does it say that?
20    A    At the end in regards to "This student was
21    not telling the truth regarding what he had or had not
22    done concerning patient care."
23    Q    That's No. 9 on the list.
24    A    Okay.  Is it No. 9?
25    Q    No.  You numbered them earlier.

Page 247

1    A    That's correct, yes, but ---
2    Q    The eight others say nothing about that.
3    That is a separate point.
4    A    It seems like a summary though at the end.
5    Q    The next one says:
6        "Effectively communicate vital information
7        about the case to stakeholders including but
8        not limited to clients, students, nurses,
9        staff members and faculty."
10        Anything about that that should qualify as
11    an academic integrity violation?
12    A    I feel that think could be included in there
13    as well so, yeah.
14    Q    "Effectively communicate vital information,
15        including but not limited to diagnostics and
16        case follow-up, to clients and team
17        members."
18    A    Yes.
19    Q    Academic integrity violation?
20    A    Yes.
21    Q    "Demonstrate Professional/Ethical Behavior
22        and Work Ethic."
23    A    Also included because that includes whether
24    or not you're fabricating information or you are
25    per se lying about such results or if you've done said

Page 248

1    results to us as clinicians as the people in charge,
2    yes.
3    Q    So I think you said that the first one was
4    not but the second one ---
5    A    The first one is possible because the second
6    and third one are also involved with supervising
7    doctors, so I take that back.  It does include it then
8    because if you're effectively communicating to a
9    supervising doctor that will include data as well.
10    Q    So do you believe you should have academic
11    integrity violations filed against you?
12    A    Nine?
13    Q    Yeah.
14    A    I don't think they would have done nine.
15    Q    Well, they didn't do any but you're thinking
16    that they should have?
17    A    They should have.
18    Q    And now you're telling me that all of these
19    involve potential fabrication of information which I
20    have to say is concerning in patient care if you're
21    fabricating information with regard to all of them.
22        I will say that when I read this, I have yet
23    to see where that is stated and I'm still wanting you
24    to tell me.  You keep saying data is present.
25        Data is not fabrication.  Wrong data is not

Page 249

1    fabrication.  Intentionally wrong data would be
2    fabrication, is my understanding.  Maybe we disagree.
3    A    Disagreement in regards to integrity
4    situation because fabricating information is based on
5    what they're telling me in this report in this
6    evaluation grade.
7        They're saying that I did not give the data
8    needed to the supervising doctors, the technician,
9    et cetera, et cetera, and I did.  So to me that is
10    fabrication on its own.  I had the proof to show that
11    and I wasn't given that trial that could have happened
12    to prove my innocence that I did such things.  You
13    understand that?
14    Q    So if they told you that you got an answer
15    wrong, that is an allegation that you were falsifying
16    or fabricating information; is that correct?
17    A    According to what they said on this report,
18    yes.  It led to that -- it could have led to that.
19    Q    Okay.  So during your extensive educational
20    studies both in undergrad and in getting your masters,
21    did you ever miss a problem or a question on any exam
22    that you took in any course?
23    A    Sure.  Yeah.  Yes.
24    Q    Did you do so intentionally?
25    A    In certain circumstances, yeah, I would skip

Page 250

1 a question if I didn't have enough time, if I didn't
2 know the answer. Sometimes you intentionally would do
3 that.
4    Q   So every one that you provided an answer to
5 you were correct, you got the correct answer? Unless
6 you skipped it, you got the right answer on every
7 question?
8    A   I don't follow. Can you repeat that?
9    Q   Sure. You take an exam. It has 20
10 questions on it.
11   A   Sure.
12   Q   Two of them are difficult. You skip them.
13   A   Okay.
14   Q   Okay. You got all 18 remaining questions on
15 that exam correct in every single class that you took,
16 other than the ones you skipped, every other answer
17 you gave was correct?
18   A   Possible. I mean, you choose the best
19 answer. It could be wrong or right though.
20   Q   No. It can't be right or wrong. It can
21 either be right or it can be wrong and you either get
22 credit for it or you don't.
23   A   So why is that wrong? I mentioned that. I
24 could be a right or wrong answer. Am I wrong?
25   Q   I'm asking you.

Page 251

1    A   Yes.
2    Q   Maybe you're not understanding my example,
3 so let me start over.
4    A   Sure. Go ahead.
5    Q   In the entire time that you've been in
6 higher education, have you ever missed a problem or a
7 question that you presented an answer for and it was
8 determined to be wrong?
9    A   Yes.
10   Q   So at that point then had you fabricated
11 information?
12   A   I don't think that's a good example.
13   Q   No. It's a perfect example because they're
14 telling you in these that you got things wrong.
15   A   But you're mentioning ---
16   Q   You made mistakes.
17   A   You're mentioning an objective versus
18 subjective situation.
19   Q   No, I'm not. I just want to talk about
20 this. You told me that each one of these involves an
21 academic integrity violation potentially.
22   A   All of them?
23   Q   That's what you said. Every single one of
24 these. You went back. I said the first one doesn't.
25      You said, no. All of them do.

Page 252

1    I'm just trying to get an understanding of
2 what you think fabrication of information means.
3    A   You mentioned -- hold on. I do understand
4 it. You mentioned that there can be multiple academic
5 integrity violations; correct?
6    Q   Okay. Yes.
7    A   But in this case, as I mentioned, this was
8 an overall fabrication of information regarding the
9 lying and everything, the allegations that we -- I
10 mentioned in the Interrogatories.
11      THE REPORTER: Was or wasn't?
12      MR. BACH: Just give her the word.
13      THE WITNESS: Sorry. That was included in
14 the interrogatories and the allegations. I didn't
15 know there was multiple violations that could occur in
16 one certain course. I did not know that. But I
17 thought as a whole, yes, I should have been given an
18 integrity violation and I should have gone to a trial
19 to prove my honesty.
20   Q   (BY MR. PRATT) I understand that that's what
21 you believe. My point to you is there are a number,
22 in fact eight, eight separate points made solely by
23 Dr. Syp. Dr. DeMars has additional comments on which
24 your grade was based.
25   A   Uh-huh.

Page 253

1    Q   You received a D. It was your second D in
2 the program.
3    A   That's right.
4    Q   And OSU followed its policies with regard to
5 that.
6    A   No.
7    Q   You've already acknowledged that they did.
8 You got a D. You got a second D.
9    A   I acknowledged that they ---
10      MR. BACH: Let him finish.
11      THE WITNESS: Sorry.
12   Q   (BY MR. PRATT) You went through the PSC
13 process. I understand that you feel like an academic
14 integrity violation should have been filed in addition
15 to this.
16   A   That's correct.
17   Q   You still received a D. There's eight other
18 reasons there for why you received the grade that you
19 did.
20   A   Yes. The question though was -- or the
21 question I was trying to say was when you mentioned
22 when you sent the exhibit regarding the procedure that
23 OSU did was the appeals process and it was revolving
24 the grades that occurred then that could happen after two
25 D's. That procedure did it correctly.

Page 254

1   What I'm trying to say is, no, they didn't
2   do it all correctly because when someone is saying
3   considered fabrication or changing answers or in this
4   case it meant lying -- it resulted in lying, saying
5   that I lied, that should have been done.
6       There should have been a violation to that
7   and I should have proved my honest regarding that
8   fabrication.
9       **Q   I understand that your belief is that in**
10  **addition to the processes that you were subjected to**
11  **you should have also been given an opportunity to**
12  **defend your truthfulness based on the single comment**
13  **that was made about your honesty in the evaluation.**
14      **Those processes don't occur instead of one**
15  **another.  You would have been subjected to the same**
16  **processes that you've acknowledged were done**
17  **correctly.**
18      A   Sorry.  I'm looking.
19      **Q   You're fine.  Take your time.  I think I can**
20  **speed us through this.  I have one question left and**
21  **then we can move onto something else.**
22      A   Sure.
23      **Q   I don't want speculation.  I want you to**
24  **show me in that evaluation in those first eight points**
25  **where you see an allegation that you intentionally**

Page 255

1   **fabricated, falsified, provided inaccurate data.**
2   **Intentionally is the keyword.**
3       A   No.  I do have a question regarding the
4   fabrication of information.  What if they're
5   fabricating the information versus not me trying to
6   get the right information?
7       **Q   That's not part of this.  What I'm asking is**
8   **in those eight points, she's pointed out eight things**
9   **that -- I think it's eight.  I keep saying eight.  You**
10  **counted eight.  I hope it's eight.**
11      MR. BACH:  It's not.
12      **Q   (BY MR. BACH) It's not eight?  One, two,**
13  **three, four, five, six, seven.  There's seven.**
14      A   There's seven.  That's correct.
15      **Q   Okay.  But she says:**
16      **"Therefore, I am not passing you because I**
17      **believe you are unable to successfully:" ---**
18      A   And this resulted from one -- from what --
19  example that she gave; correct?
20      **Q   And she listed seven things in her**
21  **evaluation of your performance.**
22      A   But from what examples before that?  Why are
23  we skipping the examples?
24      **Q   I'm not asking about the examples.**
25      A   I know.  I understand.  I understand.

Page 256

1       **Q   I'm asking about ---**
2       A   This is a summary from what the examples she
3   gave me though.  But, yes, in regards to what she's
4   saying, I did believe that, yes, there was multiple
5   situations where there were supposed to be fabrication
6   there.
7       **Q   What does that mean?**
8       A   The fabrication violations were done because
9   it involved data, as I mentioned.  And they said, even
10  though I said the correct answers ---
11      **Q   Where does it say that?**
12      A   It involves that.
13      **Q   No.  Where does it say it?**
14      A   It involves based on the examples that were
15  given before that because it's a summary and a list.
16  So this list of seven things is a summary of the
17  example that she gave prior.
18      **Q   I wouldn't even disagree with you if you**
19  **wanted to say that the more than one occasion that**
20  **this student was not telling the truth deals with the**
21  **examples up above as well.**
22      A   Sure.
23      **Q   And shows an opportunity for you to at least**
24  **say she's questioning your honesty.**
25      A   Absolutely.

Page 257

1       **Q   I think that's clear she does question your**
2   **honesty.**
3       A   Yes.
4       **Q   Now, does it qualify as fabrication of**
5   **information?  Perhaps you think it does.**
6       A   It does, yeah.
7       **Q   You think it does.**
8       A   Uh-huh.
9       **Q   The policy I believe says otherwise.**
10  **However, there are seven other points there that have**
11  **nothing to do with the fabrication of information,**
12  **have to do with honesty.  All they have to do with is**
13  **your performance.**
14      A   And the performance involved honesty.
15      **Q   These seven points make no reference to your**
16  **honesty.  Your honesty is addressed in the final**
17  **point.**
18      A   "Effectively communicate information to
19  supervising doctor."  To me that's part of honesty.
20  You're explaining everything that happened with the
21  patient so that could also be included.
22      **Q   Okay.**
23      A   This list has multiple situations where that
24  could happen, where dishonesty and honesty is very
25  important to be explaining of a treatment plan,

Page 258

1 "performing a physical and accurately identify
2 abnormalities and communicate these to the client and
3 the supervising doctor," those are all included and
4 that's important in regards to honesty between the
5 clinician and yourself.
6    Q   I would agree that honesty is a big thing.
7    A   And it involved a lot of those things on the
8 list.
9    Q   Do you believe that OSU should be
10 financially responsible for the education of all
11 students who are unsuccessful in their chosen field?
12   A   No. If they're -- if everything has been
13 following, if that's what you're asking -- you're
14 asking all in general?
15   Q   All in general.
16   A   No. Because there's different circumstances
17 for that.
18   Q   Do you agree that OSU has a responsibility
19 to ensure its graduating veterinarians are competent
20 to provide veterinary care to the general public?
21   A   Yes.
22   Q   Do you agree that it's reasonable for OSU to
23 dismiss a student from its veterinary program if they
24 demonstrate a consistent and repeated inability to
25 meet minimum academic standards?

Page 259

1    A   If there's full proof of that without giving
2 the full student rights, yes.
3    Q   So that's a yes?
4    A   If not -- if given full student rights, yes.
5    Q   Why?
6    A   As a student, you have full rights to prove
7 that you're capable.
8    Q   That's not my question.
9        My question is: Why do you believe that it
10 is reasonable for OSU to dismiss a student from the
11 veterinary medicine program if that student
12 demonstrates a consistent and repeated inability to
13 meet minimum academic standards?
14   A   Based on since the fourth year, the
15 situation is very subjective, meaning that this person
16 can say one thing about you and if it's not accurate
17 on the evaluation, then I don't think that's plausible
18 to dismiss someone based on that.
19   Q   Who gets to determine accuracy of the
20 evaluation?
21   A   That's the reason why the appeal process is
22 formed. Am I wrong?
23   Q   So I'm not asking the question about you.
24 I'm asking the question about a student --
25   A   A student.

Page 260

1    Q   -- who consistently fails to meet minimum
2 academic standards.
3    A   Okay.
4    Q   Is it reasonable for OSU to dismiss such a
5 student?
6    A   No.
7    Q   Why?
8    A   Because there's many -- if I am not included
9 as an example, they should always be included that
10 that based on just subjective grading how do you know
11 that it's all true?
12   Q   So OSU should never have the ability to
13 dismiss a student regardless of however poor their
14 performance may be?
15   A   If full rights are given to the student and
16 the answers are clear that he has not performed -- he
17 or she is not performing well then, yes, they do have
18 the right to do that, but they have to be given full
19 rights as a student.
20   Q   I understand your point.
21       My question is: Is it reasonable, not can
22 they, is it reasonable for OSU to dismiss a student
23 who consistently fails to meet academic standards?
24   A   If full rights are given to the student and
25 everything was resulted that they found the results

Page 261

1 that they need to be dismissed, yes, absolutely.
2    Q   It's a yes or no question.
3    A   Sorry. Yes, then. In simple terms, yes.
4    Q   Do you agree that a student who receives an
5 F and three D's during the course of their veterinary
6 education has consistently failed to meet minimum
7 academic standards?
8    A   Repeat the question again, please.
9    Q   Do you agree that a veterinary student who's
10 received an F and three D's during the course of their
11 veterinary education has consistently failed to meet
12 academic standards?
13       MR. BACH: Object to the form of the
14 question.
15       THE WITNESS: Yes.
16       MR. PRATT: Go off the record for a minute.
17       Pass the witness.
18       (Recess taken from 4:24 to 4:26)
19            CROSS EXAMINATION
20 BY MR. BACH:
21   Q   Jonathan, I just have a question follow-up
22 for you on Exhibit No. 4.
23       Do you still have that in front of you?
24   A   Let's see. Right here, yes, I do. Yes.
25   Q   In addition to the allegations of not

Page 262

1 telling the truth that Dr. Syp --
2    A    Dr. Syp, yes.
3    Q    -- alleged in the top half of the second
4 page here, did Dr. DeMars also accuse you of
5 dishonesty?
6    A    Yes, he did.
7    Q    Can you read the section where he talks
8 about that?
9    A    Sure.  In regards to Papa Alexander and his
10 example, and 185382 is the patient number, he says
11 here on the second sentence:
12        "Suspected of lying about handing the
13        receptionist the estimate sheet as
14        instructed."
15    Q    What does the final sentence in that
16 paragraph say?
17    A    It said that:
18        "She discovered the TPR had not been
19        performed and confronted him on this lack of
20        evaluation and worse, lack of honesty."
21    Q    Was part of your grade in this course
22 professionalism and work ethic?
23    A    Yes, it was.
24    Q    And you received 12.25 out of 20 pointes on
25 that; is that accurate?

Page 263

1    A    That is accurate.
2    Q    Do you believe that if you had had an
3 opportunity to demonstrate that these allegations were
4 not true that that number of points would have been
5 higher?
6    A    Yes.  That's correct.
7    Q    Do you suspect that it would have been more
8 than 1.7 points higher?
9    A    Yes.
10    Q    And that would have resulted in a different
11 grade; is that right?
12    A    That's correct, yes.
13    Q    And that would be a C?
14    A    That would be a C, yes.
15    Q    That's a passing grade?
16    A    That is correct.
17    Q    Okay.  So had you gone into the
18 anesthesiology course with Dr. Di Concetto, regardless
19 of all the other issues that were going on, you would
20 have at the very least had an opportunity to retake
21 that exam had you received a C in community practice?
22    A    Yes.  That's correct.
23    MR. BACH:  That's all I have.
24    MR. PRATT:  Nothing further.
25    You have the opportunity at the end of this

Page 264

1 deposition now, she's been typing down everything that
2 we have been saying, making this long record that we
3 will get to review, once she has it done she will send
4 it to us and you'll get an opportunity to take a look
5 at it.  Okay.
6    In doing so, you'll have an opportunity to
7 review for any mistakes, any typos, anything you might
8 see that needs correction and you can talk about that
9 with your attorney or you can choose to waive today.
10    MR. BACH:  I would encourage you to read it.
11    THE WITNESS:  Absolutely.  I would like to
12 read it.
13    (Signature required; witness excused)
14    (Proceedings concluded at 4:29 p.m.)
15
16
17
18
19
20
21
22
23
24
25

```
 1                    J U R A T

 2
      STATE OF _____)
 3                                             )   SS:
      COUNTY OF _____)
 4

 5            I, JONATHAN RIVERA-PIEROLA, do hereby state

 6    under oath that I have read the above and foregoing

 7    deposition in its entirety and that the same is a

 8    full, true and correct transcription of my testimony

 9    so given at said time and place, except for the

10    corrections noted.

11

12    (___)  CORRECTIONS ATTACHED

13    (___)  NO CORRECTIONS

14
                  _____
15                    JONATHAN RIVERA-PIEROLA

16

17            Subscribed and sworn to before me, a Notary

18    Public in and for the State of _____ by

19    said witness, JONATHAN RIVERA-PIEROLA, on this, the

20    _____ day of _____, 2023.

21

22                _____
                    Notary Public in and for the State of
23                  _____

24
                    My Commission Expires: _____
25
```

```
 1              E R R A T A   S H E E T

 2    DEPOSITION OF JONATHAN RIVERA-PIEROLA

 3    IN RE: RIVERA-PIEROLA vs. BOARD OF REGENTS, et al.;

 4    No. 5:21-cv-00616-PRW

 5    DATE: APRIL 26, 2023

 6    REPORTER:   ELIZABETH J. CAMPBELL, CSR, RPR

 7    PG/LN    CORRECTION          REASON FOR CORRECTION

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

Jonathan Rivera-Pierola
4/26/2023

```
 1   PG/LN      CORRECTION          REASON FOR CORRECTION
 2   _____
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

1              C E R T I F I C A T E

2    STATE OF OKLAHOMA    )
                          )  SS:
3    COUNTY OF OKLAHOMA   )

4

5              I, ELIZABETH J. CAMPBELL, a certified

6    shorthand reporter within and for the State of

7    Oklahoma, certify that JONATHAN RIVERA-PIEROLA was

8    by me sworn to testify the truth; that the

9    deposition was taken by me in stenotype and

10   thereafter transcribed by computer and is a true and

11   correct transcript of the testimony of the witness;

12   that the deposition was taken on April 26, 2023, at

13   9:58 a.m., at the offices of InstaScript, Oklahoma

14   City, Oklahoma; that I am not an attorney for or a

15   relative of any party, or otherwise interested in

16   this action.

17             Witness my hand and seal of office on this

18   the 1st day of May, 2023.

19

20   _____
     Elizabeth J. Campbell, CSR
21   Oklahoma CSR No. 162
     Expires December 31, 2023
22

23

24

25

# St. Matthew's University School of Veterinary Medicine

### Transcript of Academic Record
P.O. Box 32330 SMB
Safe Haven Leeward Three
Grand Cayman, Cayman Islands, BWI

Date of Transcript: 2019-06-19

| Student Number | Name | Address | | Enrollment Date | Degree |
|---|---|---|---|---|---|
| 99353649 | Jonathan Andrew Rivera-Pierola | 732 Ibis Way North Palm Beach, FL 33408 USA | | 2017-01-09 | |
| | Gender | | | | |
| | M | | | Graduation Date | |

| Course No. | Course Title | Credits | Grade |
|---|---|---|---|
| **Spring 2017** | | | |
| VB101 | Veterinary Anatomy I | 4 | C- |
| VB103 | Veterinary Histology and Embryology | 5 | B- |
| VB105 | Veterinary Physiology I | 5 | B |
| VB120 | Veterinary Immunology | 3 | C |
| VCS110 | Professional Development I | 1 | A |
| **Summer 2017** | | | |
| VB201 | Veterinary Anatomy II | 5 | C- |
| VB205 | Veterinary Physiology II | 4 | B |
| VB207 | Veterinary Parasitology | 4 | B- |
| VB211 | Veterinary Bacteriology and Mycology | 4 | B |
| **Fall 2017** | | | |
| VB301 | Veterinary Pharmacology I | 3 | B- |
| VB303 | Veterinary Pathology I | 3 | C- |
| VB305 | Veterinary Virology | 3 | C+ |
| VB307 | Veterinary Public Health/Epidemiology | 4 | B |
| VCS310 | Professional Development II | 0.5 | B+ |
| VCS311 | Veterinary Clinical Skills I (Companion Animals) | 3 | C+ |
| VCS321 | Animal Welfare and Behavior | 2 | B- |
| **Spring 2018** | | | |
| VB401 | Veterinary Pharmacology II | 4 | C+ |
| VB403 | Veterinary Pathology II | 5 | C- |
| VCS405 | Veterinary Clinical Pathology | 4 | A |
| VCS407 | Veterinary Ethics and Communication | 2 | B |
| VCS411 | Veterinary Clinical Skills II (Livestock) | 2 | B+ |
| **Summer 2018** | | | |
| VCS501 | Veterinary Anesthesiology | 2 | C- |
| VCS503 | Principles of Veterinary Surgery | 2 | C- |
| VCS505 | Veterinary Toxicology | 3 | A |
| VCS507 | Veterinary Diagnostic Imaging | 4 | C |
| VCS509 | Veterinary Clinical Nutrition | 3 | B+ |
| VCS511 | Theriogenology | 4 | C+ |
| **Fall 2018** | | | |
| VCS605 | Food Animal Medicine & Surgery | 6 | B- |
| VCS607 | Exotic Companion Animal Medicine | 3 | B |
| VCS611 | Veterinary Clinical Skills III  (Clinical Rotations) | 2 | I- |
| VCS701 | Small Animal Medicine II | 6 | B- |
| **Spring 2019** | | | |
| VCS601 | Small Animal Medicine I | 6 | B- |
| VCS611 | Veterinary Clinical Skills III  (Clinical Rotations) | 2 | C+ |
| **Summer 2019** | | | |
| VCS703 | Small Animal Surgery | 6 | IP |
| VCS705 | Large Animal Medicine & Surgery | 7 | IP |
| VCS710 | Professional Development III | 0.5 | IP |
| **Total Credits** | | 113.5 | |
| **Overall Gpa** | | | 2.8 |


EXHIBIT
Deponent: J. Rivera-Pierola
Date: 4/26/23   Rptr. EC
WWW.DEPOBOOKPRODUCTS.COM

# Oklahoma State University
# Center for Veterinary Health Sciences

| | | | |
|---|---|---|---|
| **Evaluator:** | Grade Report Administrator - FINAL GRADE REPORT | **Subject:** | Jonathan Rivera-Pierola - VM4C |
| **Activity:** | VCS 7743 Small Animal Internal Medicine | **Site:** | Oklahoma State University - CVHS |
| **Evaluation Type:** | Instructor Evaluation of Student - Final | **Completion Date:** | 10/01/2019 |
| **Request Date:** | 09/28/2019 | | |
| **Period:** | Rotation 7 - Class of 2020 | | |
| | | **Dates of Activity:** | 09/09/2019 To 09/29/2019 |
| **Subject Participation Dates:** | 09/09/2019 To 09/29/2019 | | |

**Grading Scale:**
90-100  = A
80-89.9 = B
70-79.9 = C
60-69.9 = D
 <60     = F

**To pass this rotation you must receive a minimum total score of 70.**

### (Question 1 of 10  - Mandatory )

| Exceeds Expectations | Meets Expectations | Below Expectations | Grounds for Failure |
|---|---|---|---|
| **(14 Points)** | **(12 Points)** | **(9 Points)** | **(7 Points)** |
| Communications and rapport with clients, staff, and clinicians are exceptional. Follow-up regarding patients is exceptional | Communications with clients, staff, and clinicians are accurate and timely. Follow-up regarding patients is obtained without prompting. | Communications with clients, staff, and clinicians are occasionally late and/or inaccurate. Follow-up regarding patients is late or requires prompting. | Communications with clients, staff, and clinicians are frequently late and/or inaccurate. Follow-up regarding patients is often late or not completed after prompting. |

| Communication Points Received: | 7.5 |
|---|---|

### (Question 2 of 10  - Mandatory )

| | | | |
|---|---|---|---|
| Displays foundational knowledge in all areas and applies this knowledge on clinical cases. Demonstrates outside reading/research on all clinical cases to improve knowledge of disease mechanism, diagnostic testing, and treatment. | Displays foundational knowledge in most areas and applies this knowledge on clinical cases. Demonstrates outside reading/research on some clinical cases to improve knowledge of disease mechanism, diagnostic testing, and/or treatment | Limited foundational knowledge in some areas but satisfactory in others. Demonstrates outside reading/research occasionally on clinical cases to improve knowledge of disease mechanism, diagnostic testing, or treatment. | Limited foundational knowledge in most areas. Fails to demonstrate outside reading/research on clinical cases to further improve knowledge of disease mechanism, diagnostic testing, or treatment. |

| Knowledge & Knowledge Application Points Received: | 8.5 |
|---|---|

### (Question 3 of 10  - Mandatory )

| | | | |
|---|---|---|---|
| Obtains and assesses diagnostic test results independently. Correctly identifies and assesses all of the patient's problems. Appropriate diagnostic and/or therapeutic plans are routinely suggested. Assessment of patients is timely and thorough. | Obtains and assesses diagnostic test results independently. Correctly identifies and assesses most of the patient's problems. Appropriate diagnostic and/or therapeutic plans are usually suggested. Assessment of patients is timely and adequate. | Obtains and/or assesses diagnostic test results with prompting. Correctly identifies and assesses some of the patient's problems, with some inaccuracies. Appropriate diagnostic and/or therapeutic plans are sometimes suggested, but commonly require modification by the clinician. Assessment of patients is occasionally incomplete or late. | Fails to obtain or assess diagnostic test results, even with prompting. Commonly fails to identify or inaccurately assesses patient's problems. Assessment of the patient is frequently late, incomplete, or not performed. |

| Patient Assessment Points Received: | 9 |
|---|---|

EXHIBIT
Deponent Rivera - Pierola
7/24/23   EC   Rptr.
WWW.DEPOBOOKPRODUCTS.COM

**(Question 4 of 10 - Mandatory )**

| | | | |
|---|---|---|---|
| Performs clerkship duties promptly and volunteers to assist in additional areas. General appearance is well groomed and in alignment with standards outlined in the course syllabus. Displays a courteous and professional manner that is commended by clinicians, staff, and clients. Willing to help whether or not colleagues are available. | Performs clerkship duties without prompting. General appearance is well groomed and in alignment with standards outlined in the course syllabus. Interacts with others in a tactful, courteous, and professional manner. Willing to help when colleagues are not available. | Clerkship duties are sometimes neglected and require prompting. General appearance infrequently violates the standards outlined in the course syllabus. Occasionally acts in an unprofessional or inappropriate manner. Only willing to assist others when asked. | Clerkship duties are frequently neglected and/or require multiple prompts. General appearance often violates the standards outlined in the course syllabus. Frequently acts in an unprofessional or inappropriate manner. Violation of the student code of conduct. |

| Professional Conduct Points Received: | | 9.25 |
|---|---|---|

**(Question 5 of 10 - Mandatory )**

| | | | |
|---|---|---|---|
| Consistently obtains thorough and organized histories. Performs accurate, complete physical examinations. Performs select system specific assessments (e.g. rectal, neurologic, orthopedic, ophthalmologic exams, etc.) without the need for assistance. | Obtains histories and performs physical examinations with minor omissions/errors and inaccuracies. Performs select system specific assessments (e.g. rectal, neurologic, orthopedic, ophthalmologic exams, etc.) but requires some minor assistance with completion/interpretation. | Obtains histories and performs physical examinations with a moderate omissions/errors and inaccuracies. Recognizes the indications to perform select system specific assessments (e.g. rectal, neurologic, orthopedic, ophthalmologic exams, etc.) but requires substantial assistance with completion/interpretation. | Obtains histories and performs physical examinations with frequent, significant omissions/errors and inaccuracies. Fails to recognize the need for select system specific assessments (e.g. rectal, neurologic, orthopedic, ophthalmologic exams, etc.). |

| Professional Skillset Points Received: | | 8.5 |
|---|---|---|

**(Question 6 of 10 - Mandatory )**

| | | | |
|---|---|---|---|
| Problem-oriented medical records are concise and summarize the patient's status accurately. Assessments are excellent. Records are always completed on time. | Student demonstrates an understanding of the problem-oriented medical approach. Records accurately identifies most problems for most patients. Assessments are appropriate for most patients. Records are completed on time. | Records follow the POVMR system but the problems identified and the assessments are frequently inaccurate. Records are late on several occasions. | Student fails to utilize the POVMR system. Problems are frequently missed and/or assessments are inaccurate most of the time. Records are frequently late. |

| Problem-Oriented Veterinary Medical Record System Points Received: | | 8.5 |
|---|---|---|

**(Question 7 of 10 - Mandatory )**

| | | | |
|---|---|---|---|
| Demonstrates proficiency with all technical skills (e.g. jugular blood collection, cystocentesis, IV catheter placement) and demonstrates exceptional practical knowledge (justification, equipment needed, anatomic landmarks, etc.) of less common technical skills (e.g. centesis of abdomen, thorax, pericardium, and/or joints, bone marrow sampling, etc.) | Demonstrates proficiency with most technical skills (e.g. jugular blood collection, cystocentesis, IV catheter placement) and demonstrates foundational practical knowledge of (justification, equipment needed, anatomic landmarks, etc.) less common technical skills (e.g. centesis of abdomen, thorax, pericardium, and/or joints, bone marrow sampling, etc.) | Is often unable to perform common technical skills (e.g. jugular blood collection, cystocentesis, IV catheter placement) but can sufficient describe the process. | Is often unable to perform common technical skills (e.g. jugular blood collection, cystocentesis, IV catheter placement) and fails to sufficiently describe the process. |

| Technical Skillset Points Received: | | 11 |
|---|---|---|

**Points awarded for completing instructor evaluations (2 Points)     (Question 8 of 10 - Mandatory )**

| 2 |
|---|

*(Question 9 of 10  - Mandatory )*

| Total Points | 64.25 |
|---|---|
| Letter Grade | D |

---

**Comments:**  *(Question 10 of 10 )*

Jonathan, throughout your 3-week small animal internal medicine rotation there were some significant concerns regarding communication, attention to detail, patient care, completion of medical records, accurate history taking/preparation, and professionalism. You did display adequate knowledge base for this stage of your training when discussing some topics during rounds and is deficient with discussing other topics.

You frequently did not communicate effectively with the clinician (faculty or house officer) that you were working with on a specific case. For example, when Milo was being discharged from the hospital on Saturday, September 28th at 2 pm, you did not contact Dr. Moore and specifically ask to be excused from being present at this discharge, as you had worked from 5 pm-11 pm on Friday, Sept 27th and then were called back in for an emergency and had worked from 2 am-7 am on the morning of Saturday, Sept 28th. As we discussed during our meeting, we would have been happy for you to go home and sleep on Saturday given your long day Friday and then additional time on ER Saturday morning. However, you must communicate with clinicians in the hospital so that we can plan accordingly. You left the hospital before discussing Milo's case with the clinician on the morning of Saturday and did not communicate with the clinician prior to leaving. You also did not communicate effectively with Dr. Lyon with updates on Lucy's case. He had to initiate communication with you to discuss the case. As the student on the case, you are expected to communicate with the clinician on your case to discuss updates and changes to case management.

On the third week of the rotation, there were repeated errors made on ICU treatment sheets for both of your inpatients (Milo and Lucy). These errors demonstrate concerns pertaining to attention to detail which may compromise patient care and patient safety. As stated in the syllabus, ICU treatment sheets must be completed by 7:30 AM. There were several instances when these documents were not completed by this deadline. In addition, there were several days when you were not present in ICU to discuss your inpatient (Milo) with the clinician on the case (Dr. Moore). When completing an ICU treatment sheet the dose of a medication (butorphanol) was incorrectly listed as 1 mg/kg instead of 0.2 mg/kg. This could have resulted in a 5 times overdose to the patient if it had not been detected by the ICU nurse and corrected. Medications (sildenafil and levetiracetam) prescribed to be given every 8 hours were not appropriately highlighted on the ICU treatment sheet on 9/25. This was corrected and the mistake pointed out to you by Dr. Lyon. The following day a medication prescribed for every 8 hours (sildenafil) was again incorrectly highlighted in the ICU treatment sheet on 9/26. Similar concerns were brought to our attention for another inpatient that you were caring for on the third week of the rotation (Milo). Milo's ICU sheet also consistently contained errors each day. It is critical that patients receive prescribed medications at the appropriate time and the your responsibility to ensure ICU and treatment orders are correct, complete, and on time every day. Failure to have treatment orders completed on time or containing a mistake once can easily be attributed to an oversight, mistake, or poor planning. However, repeated occurrences, particularly after these mistakes have been brought to your attention, pose a significant risk to patient care.

When seeing recheck appointments, there were multiple instances that demonstrated a lack of preparation and knowledge of the case. It is important to familiarize yourself with a case that has been evaluated at the OSU VTH previously. In one particular instance (Emma) you were not aware of the plan for a lymphoma patient that is evaluated at OSU weekly for chemotherapy treatment and/or bloodwork evaluation. Despite the plan for her appointment on Wed, Sept 25th being clear on the previous discharge, you were not aware that she had received a chemotherapy medication the week prior (mitoxantrone) and was due for a CBC one-week post chemotherapy. For another recheck appointment (PeeWee), you demonstrated a lack of preparation by not being familiar with PeeWee's medications, despite them being clearly listed on the previous discharge summary. While we can understand that occasionally you are asked to a see a recheck appointment without much time for preparation (eg; switching with another student, add-on recheck appointment), there were repeated instances like these listed above that demonstrate your lack of preparation. In practice, familiarizing yourself with a case prior to the appointment is an extremely important part of patient care, client care, and case management and failure to do so may result in inappropriate or unnecessary diagnostics, treatments, and/or recommendations.

Overall, your communication skills, history taking, case preparation, patient care, and professionalism were below average. We are recommending that you repeat the small animal internal medicine clinical rotation, as we feel this the best for your education and clinical experience.

Below we have outlined specific areas of improvement that should be met in order to pass the small animal internal medicine clinical rotation.

1. Communication – you must effectively communicate with the clinician on all inpatient cases twice daily and outpatient cases once daily (at minimum). These communications should pertain to the diagnostic test results, plans to communicate with the owner of the pet, and/or case management.
2. Patient care – Inpatient cases in ICU should have an ICU treatment sheet completed no later than 7:30 am. These treatment sheets must be accurate. Please make sure you double check medication dosages and highlighting for medication frequency. In addition, you must perform a full physical examination on your patient twice daily (prior to 7:30 am and ~5-6 pm) and these PE findings should be communicated with the clinician on your case.
3. Case Preparation and history taking – Prior to seeing both new and recheck appointments, you should plan to read over previous discharge summaries and any referral veterinarian case information prior to taking a history from the client. Your case preparation will be assessed by the clinician that is seeing each individual case with you. For recheck appointments, you should demonstrate knowledge of their previous history (including previous diagnosis/diagnoses), current medications, and diagnostic plan for the recheck appointment.

We are confident that you will achieve these goals. Jonathan, you have the knowledge and skills to pass small animal internal medicine and be a good veterinarian. We are hopeful that you will take these constructive comments and areas of improvement as ways to continue to develop as a future veterinarian. Please let us know if you have any questions regarding your evaluation. ---

# *CONFIDENTIAL*

October 3, 2019

Dear Jonathan,

The CVM Professional Standards Committee received notice of your D grade in the Small Animal Internal Medicine rotation. The committee voted to allow you to repeat the rotation. Per the department head's office, this will occur on Rotation 5 (6/29/20-7/12/20).

Receiving a D grade places you on academic probation. Per academic policy, receiving a second "D" grade, or an "F" grade, during the remaining clinical year may result in any of the following: dismissal, remediation before being allowed to continue in the curriculum, or scheduling remediation of the failed rotation and continuing in clinical rotations. Please let me know if you have any questions regarding the academic policy. It can also be accessed in the college Student Handbook.

As this was your first rotation, I urge you to reflect on the recommendations made by your instructors and advisor to help ensure success in future rotations.

Sincerely,

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs



# Oklahoma State University
## Center for Veterinary Health Sciences

| Evaluator: | Grade Report Administrator - FINAL GRADE REPORT | Subject: | Jonathan Rivera-Pierola - VM4C |
|---|---|---|---|
| Activity: | VCS 7733 Community Practice | Site: | Oklahoma State University - CVHS |
| Evaluation Type: | Instructor Evaluation of Student - Final | Completion Date: | 03/05/2020 |
| Request Date: | 02/28/2020 | | |
| Period: | Rotation 14 - Class of 2020 | Dates of Activity: | 02/10/2020 To 03/01/2020 |
| Subject Participation Dates: | 02/10/2020 To 03/01/2020 | | |

**Grading Scale**
90-100 = A
80-89  = B
70-79  = C
60-69  = D
<60    = F

*(Question 1 of 5)*

### Subjective Evaluation – 40 points

| | |
|---|---|
| Wellness appointments<br>20 points | 13.5 |
| Non-wellness appointments<br>20 points | 12 |
| **Subjective Subtotal** | 25.5 |

*(Question 2 of 5)*

### Pre-Quiz & Technical Skills, & End of Rotation Quiz – 40 points

| | |
|---|---|
| Pre-Quiz<br>10 points | 7.4 |
| Technical Skills<br>,10 points | 5.66667 |
| End of Rotation - Quiz<br>20 points | 17.5 |
| **Pre-Quiz Subtotal** | 30.567 |

*(Question 3 of 5)*

### Professionalism/Work Ethic – 20 points

| | |
|---|---|
| Professionalism/Work Ethic<br>20 points | 12.25 |

*(Question 4 of 5)*

| **Total Points** | 68.317 |
|---|---|
| **Letter Grade** | D |

**Comments:**    *(Question 5 of 5)*

EXHIBIT 4
Deponent Rivera-Pierola
Date 4/26/23 Rptr. EC
WWW.DEPOBOOKPRODUCTS.COM

Jonathan-

As we have discussed, I believe it is in your best interest to repeat the CP rotation. I have based this decision on the syllabus and the described entrustable activities that are a basic expectation for all CP students. It is my opinion that many areas of your performance need improvement. I will use the following examples to highlight my concerns. These examples, some big, some small, concern me deeply.

I know that you can become a competent, if not great, veterinarian; I simply think you need more coaching. When we discussed these issues and my opinions in weeks 2 and 3, I found that you were unwilling to take on the role of a learner. In fact, I believe you are overconfident in your abilities/knowledgebase which makes this situation even more critical. If you are not willing to learn, to be open to a real coaching experience meant to mold you into a good veterinarian, what type of a practitioner will you become?

Examples:

- Daphne 193360- As we have discussed many times regarding the mishandling of this case is concerning. Your interpretation of Daphne's laboratory values was not accurate as you overlooked abnormal findings (liver enzymes, proteinuria). You neglected to contact your supervising veterinarian about the bloodwork and then called the owner with recommendations without discussion. In addition, I was the one responsible to find you to discuss the lab work and your inappropriate interpretation; you chose to not communicate with me via any method – call, text, email. When confronted, you stated that you did not know that you could contact me, which I find confusing since my contact information is on the rounds room board and on the syllabus. Finally, your discharge instructions were inappropriate and significant findings were not mentioned or explained. In all, your actions were consistent with practicing veterinary medicine without a license and I find your reactions unacceptable.

- Maggie 193329- When asked prior to performing a surgical procedure it is expected that students discuss their level of confidence with an instructor. As we have discussed, you said that you were very confident performing a spay surgery. Unfortunately, your performance did not reflect your confidence. I do not grade students on their surgical abilities - you are learning and I expect nerves and skills that are not developed. But, I expect students be honest about their skill set. Overconfidence can become a life threatening issue for patients.

- Ember 190686 – When discussing your physical examination, you mentioned tartar on the dog's teeth; when I did an oral exam, I found severe periodontal disease with gingivitis, gingival recession, and severe tartar/purulent material. By the end of the CP rotation students should be adept at completing a physical examination and explaining findings; I think that you understated the dog's disease and this is an issue.

Therefore, I am not passing you because I believe you are unable to successfully:
- Effectively communicate information to the supervising doctor
- Perform a physical and accurately identify abnormalities and communicate these to the client and supervising doctor
- Develop and Implement a Treatment Plan for a Sick Patient
- Develop a diagnostic plan and interpret these timely and accurately.
- Effectively communicate vital information about the case to stakeholders including but not limited to clients, students, nurses, staff members and faculty.
- Effectively communicate vital information, including but not limited to diagnostics and case follow up, to clients and team members.
- Demonstrate Professional / Ethical Behavior and Work Ethic.

LAS ---

More than one occasion where this student was not telling the truth regarding what he had or had not done concerning patient care. ---

4 March 2020

Jon-

I believe it is in your best interest to repeat the CP rotation. I have based this decision on the syllabus and the described entrustable activities that are a basic expectation for all CP students. It is my opinion that many areas of your performance need improvement. I will use the following examples to highlight my concerns; understand these are individual examples to highlight my concerns.

• Feb 25: Augustus Nahs (#192579) – During discharge you instructed the owner that the kitten needed one more set of vaccinations. As we discussed that day, I am concerned that you do not understand the principles of vaccinations and how to apply them to a kitten. This was especially concerning since this was the third week of the rotation and you have seen five wellness cases over this period of time. You were provided the AAFP vaccination guidelines and we have an hour and a half round session on this material. You even performed this kitten's wellness appointment on Feb 11th and had the plan written in the discharge instructions.

• Feb 25th: Cash Waters (#179125) – During the case discussion I asked you a direct question about what four antibiotics are appropriate for pyoderma in the dog. After some time you could only provide a single antibiotic, Clavamox. When asked the same question during our meeting the next day, you still had an insufficient answer. Once again we have had an hour long rounds session on this topic where I provided the answer and we see and treat pyoderma cases nearly every day on clinics. Over the three weeks you managed three dermatology appointments.

While you performed acceptably on other appointments during the rotation, these specific examples are the greatest influence on assigning a failing grade. Wellness and dermatology are the two most common appointment types I expect a primary care veterinarian to be able to successfully manage. Overall you saw nine cases with me in three weeks; five wellness, three dermatologic, and 2 others. Seeking feedback from Dr Irizarry she brought up an example of failed trust as well.

• Papa Alexander (#185382) – Failed to make sure the client stopped at the front desk to have a deposit collected. Suspected of lying about handing the receptionist the estimate sheet as instructed. Additionally, the next morning the expected 7am evaluation had not been performed by 730 and when asked Jon told Dr Irizarry everything was done. She discovered the TPR had not been performed and confronted him on this lack of evaluation and worse, lack of honesty.

Finally your response to our feedback and attempts to illustrate to you our concerns is an issue. We discussed these issues at length for at least 30 minutes. At no time did you appear to listen and accept what we were saying, instead became defensive and argumentative. While I understand the upsetting nature of the topic and the fear of consequences, this was an unexpected response to what I considered a very good relationship we had developed over the weeks. I hope you believe that we sincerely want to see you succeed and wish to coach you to success.

Paul DeMars, DVM, DABVP K9/Fe
Community Practice
Oklahoma State College of Veterinary Medicine

Board00085



COLLEGE OF
**VETERINARY MEDICINE**

Office of the Dean
205 McElroy Hall
Stillwater, Oklahoma 74078

Phone: (405) 744-6648
Fax: (405) 744-6633

March 23, 2020

Dear Jonathan,

The Professional Standards Committee, after meeting and deliberating on March 18th, recommended dismissal from the CVM professional program. This unanimous decision was based on repeated poor academic performance, lack of accountability for clinical errors in multiple rotations, recurrent unprofessional behavior, and inability to take constructive criticism to improve professional and clinical skills. The Committee did not find mitigating circumstances sufficient to explain the concerns above.

The Committee's recommendation for dismissal has been accepted by the Dean. Per CVM policy, you may file a written appeal to the Dean within five working days of receipt of this letter.

Dr. Emsley can assist you with placement options for the remaining portion of your clinical year requirements.

Sincerely,

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs



Board00090

To: Dr. Carlos Risco, DVM, DACT
   Dean of the College of Veterinary Medicine of Oklahoma State University

To: The Members of the Professions Standard Committee

Re: Dismissal from the College of Veterinary Medicine Program at Oklahoma State University

I am writing to appeal my academic dismissal from the CVM Program at OSU. Thank you for allowing me to have the opportunity to explain the circumstances that led to this point, as well as my action plan to improve on my performance in the program.

I met with the Professions Standard Committee on March 18, 2020 and I was unable to fully express the circumstances that led to my failed rotations. I got caught up in answering questions and found myself out of time to disclose the background situations that may have affected my performance and which situations I believe are relevant to the decision now being appealed.  Also, as we are currently living through the COVID 19 pandemic, the anxiety of the meeting was increased and the distraction of current events did not permit a full discussion of my continued participation in the CVM Program.

I did not ignore the suggestions given to me on the evaluations. I took them seriously and attempted to implement them as best as I could. In retrospect, I failed to portray this clearly so that my professors could see the work I put into the recommended changes. I was perhaps too quiet, giving a misconception of who I am and what I stand for and the seriousness with which I took the suggestions and my continued and strong desire to continue at OSU.

During my Internal Medicine rotation, my father had a syncopal episode leading to a motor vehicle accident. He was rushed to the hospital and found to have a chest contusion, rib and sternal fractures and was admitted to the cardiac critical care unit. He was being evaluated for possible emergent cardiac surgery and stayed in the CCU for several days. This kept me anxious and distracted during my rotation. In retrospect, I now see that I should have communicated this to my professors or even taken a leave of absence rather than continue in the rotation.

On my Community Practice rotation, I got caught up in miscommunications leading to ambiguities and misunderstandings. This caused me to become stressed with fear of getting involved in another misunderstanding that may lead to my failure of the rotation. I truly internalized the constructive criticism and attempted to correct various issues on my own. In retrospect, I should have increased my communication with my professors and asked for assistance when needed.

I am receiving counseling with an OSU psychologist, Mr. Jeremiah Grissett, as recommended by the Dean of CVM. He is helping me see my role in these situations and providing me with good advice.



I truly have learned and appreciate all the clinicians' feedback through my rotations. I plan to utilize every piece of constructive criticism that I have received in the following manner:

1. Communication: I will make sure to communicate with the clinicians/residents/technicians involved in each case to ensure proper feedback on my performance and direction on results and areas of improvement. Specifically, I will ask for feedback from my clinicians at the beginning and end of each week so I could be in constant communication and agreement with them. And, I will ask for clarification if I am unclear on any instructions or assignments.

2. Case Preparation: I will improve on the preparation of cases. I will be more thorough in taking and documenting the history and physical exam. I will bring the documentation to my feedback sessions to go over with the clinicians in detail.

3. Patient care- I will arrive earlier than requested in the syllabus to ensure my review of patient's vital signs, medication sheets and to be sure that overnight notes have been double checked prior to rounds.

4. Demonstrate proper professional ethical behavior by working with my professors more frequently in a verbal and transparent way to avoid miscommunications.

Although I have not passed the Internal Medicine and Community Practice rotations, evaluations in both of these courses stated I have the potential to become a good veterinarian.

For example, from Internal Medicine:

"We are confident that you will achieve these goals. Jonathan, you have the knowledge and skills to pass small animal internal medicine and be a good veterinarian. We are hopeful that you will take these constructive comments and areas of improvement as ways to continue to develop as a future veterinarian. being capable of becoming a good clinician."

After evaluation of above mentioned and taking into consideration the changes I am willing to make now and in the next rotations, I am asking for reconsideration of the decision made on March 18, 2020. Becoming a veterinarian is of paramount importance to me. I am asking for the opportunity to be reinstated to the CVM Program at OSU and to demonstrate my willingness to do all that is necessary to become a competent veterinarian of whom this Program can be proud.

Sincerely,

Jonathan Rivera-Pierola, MPH



COLLEGE OF
**VETERINARY MEDICINE**

Office of the Dean
205 McElroy Hall
Stillwater, Oklahoma 74078

Phone: (405) 744-6648
Fax: (405) 744-6633

April 6, 2020

Dear Jonathan,

The Professional Standards Committee (PSC) met on April 3rd to consider your appeal. The Committee's decision was to stand by their recommendation of dismissal. However, the Dean's final decision is to allow you to stay in the professional program under Academic Suspension, the details of which are:

1. You will complete the current rotation (Rotation 16) and must achieve a C grade or higher. Failure to do so will result in dismissal from the program with no PSC review or appeal.
2. You will be placed on Academic Suspension until both failed rotations (Community Practice and Small Animal Internal Medicine) are remediated through participation in in-person rotations. Due to the COVID-19 crisis and current use of on-line curriculum, you will be suspended from clinical rotations until the hospital reopens to students and in-person rotations resume. Lucy Kershaw will work to schedule your rotations as soon as possible, but understand the date this can be done is currently unknown.
3. You must receive a C grade or higher in both remediated rotations. Failure to do so will result in dismissal from the program with no PSC review or appeal.
4. You will be on Academic Probation for the duration of your clinical year. Failure to receive a C grade or higher on any rotation during the remaining clinical year will result in dismissal from the program with no PSC review or appeal.
5. You will be held accountable to the four items in your plan of improvement listed in your letter of appeal: communication, case preparation, patient care, and professional and ethical behavior.

Lucy Kershaw will be in contact with you as soon as we know when the hospital will return to normal operations. Please be sure to update her with any change of your contact information. If you choose not to accept the above conditions of Academic Suspension and Academic Probation, please let me know at your earliest convenience.

Sincerely,

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs

(A) π EXHIBIT 7
J. Rivera-French
Deponent
4/26/23   EC
Date      Rptr.
WWW.DEPOBOOKPRODUCTS.COM

Board00086

## Anesthesia - Rotation 16 (3/23/2020 to 4/12/2020)

**Grading Scale: 90-100 = A; 80-89.9 = B; 70-79.9 = C; 60-69.9 = D; <60 = F**

**At least 70% must be achieved in each of the two sections in order to pass the rotation.**

| Section 1 | John Rivera |
|---|---|
| General Knowledge (200 points) | 140 |
| Case work-up and presentation (100 points) | 80 |
| Assignments and topics (100 points) | 85 |
| Professional conduct (100 points) | 90 |
| Total Points Possible (500 points) | 395 |
| Percent Section 1 | 79% |
| Section 2 | |
| Written exam points possible (150 points) | 99.6 |
| Percent Section 2 | 66.40% |
| Combined Section 1 & 2 Percent | |
| Letter Grade | D |



COLLEGE OF
**VETERINARY MEDICINE**

Office of the Dean
205 McElroy Hall
Stillwater, Oklahoma 74078

Phone: (405) 744-6648
Fax: (405) 744-6633

April 21, 2020

Dear Jonathan,

I am very sorry to inform you that due to receiving a D grade in the Anesthesia rotation (rotation 16), per the Academic Suspension guidelines outlined in the letter dated 4-6-20, you are dismissed from the OSU CVM clinical year program with no Professional Standards Committee review or appeal.

The Dean has reviewed your academic record and has approved the dismissal action.

It is with deep regret we relay this decision.

Sincerely,

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs



Board00095

**From:** Jonathan Rivera-pierola <jonariv@ostatemail.okstate.edu>
**Sent:** Friday, April 10, 2020 5:55 PM CDT
**To:** Di Concetto, Stefano <sdiconc@okstate.edu>
**CC:** ████████████████████████████████████████████

████████████████ Rivera-Pierola, Jonathan <jonariv@okstate.edu>; Burba, Daniel <dburba@okstate.edu>;
Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Re: EARLY TERMINATION OF ANESTHESIA ROTATION

These are very stressful times, and the school has really done us a service to offer this class virtually. They are really doing their part to keep us safe from this virus and we should honor and appreciate them for doing it. I know that this virus is touching our lives in very personal ways, but we should take this opportunity to learn to be more patient and understanding and try to put ourselves in others shoes before speaking. I know that every person in this class is grateful to Dr. Di and the school for this opportunity and I'm sure that nothing that was said was with ill will. As Americans, we have never been placed in a situation where we feel such impotence. This sometimes makes us react to the situation without elegance. I am confident that through this discussion we can find the opportunity to see our parts in this situation and correct them for the future. Life is about learning, and sometimes learning through our mistakes to make us better people.
We appreciate you and all your efforts!

Regards,

Jonathan Rivera-Pierola, MPH


On Apr 10, 2020, at 2:17 PM, Di Concetto, Stefano <sdiconc@okstate.edu> wrote:


Hello students in anesthesia rotation 16,

As you know this has been a very trying time for everyone; we understand this is not how you expected to spend your anesthesia rotation. As others did not our expectation to run a service without any students. As professionals, though, it is an expectation that our student colleagues demonstrate patience, understanding and positive attitudes.

Unfortunately, I am disappointed with the negative attitude and comments that have been displayed by this rotation group. Unbeknownst to you, a comment was overheard on Wednesday 4/8 by faculty and staff that was completely unacceptable. The comment: "Thank God we have only two more days of this s****" is unprofessional- it should have been met with stronger push back from participating students.

Additionally, if you were in the clinics, you would be expected to be available from 7a-5p and be on-call; as such, it is an expectation that you are available for rounds/case discussions/etc. from 7a-5p. Given the situation we are experiencing with Covid, I have not objected to you taking time away from your computer to take a break from learning and disperse in between morning and afternoon rounds, to run errands or else. Perhaps I should have been clearer from the beginning. Your job was to be engaged full time in this rotation, which at times means overworking. Spending longer than expected periods of time on the computer during this virtual rotations is equivalent to being here all day doing one case after the other, without time to eat or take a break. Many students in previous rotation had to do so.

I have been working tirelessly to provide you with as much 'in the moment' learning as possible; this is not an easy task. I would have appreciated a more collegial response from students who are about to join this profession in a few weeks. I am disheartened that you are not working tirelessly as we are in the hospital to get the most out of this rotation together. I appreciate the students who have not complained and who have put in the time and effort to make this experience worthwhile.

As clinic expectations grow and my physical and mental resources are overstretched, I believe it will be in our best interest to terminate the anesthesia rotation at this time, 2.15 pm, Friday April 10th, 2020. Today's afternoon rounds are cancelled.

Your grades will be posted sometime next week.

Best,

Stefano Di Concetto



EXHIBIT 10
Deponent: S. Rivera-Pierola
Date 4/26/23   Rptr. EE
WWW.DEPOBOOKPRODUCTS.COM

## Oklahoma State University Policy and Procedures

| ACADEMIC INTEGRITY | 2-0822 Academic Affairs May 2016 |
|---|---|

### POLICY

1.01    An institution's reputation and intellectual freedom depend on its uncompromising commitment to the ideal of academic integrity.  OSU is committed to instilling and upholding integrity as a core value.  This policy embodies OSU's dedication to maintaining an honest academic environment and ensures fair resolution of alleged violations of academic integrity.

1.02    The following statement summarizes OSU's Commitment to Academic Integrity:

> I will respect OSU's commitment to academic integrity and uphold the values of honesty and responsibility that preserve our academic community.

1.03    All members of the OSU community are entrusted with academic integrity, which encompasses the fundamental values of honesty, trust, respect, fairness, and responsibility. Therefore, students, instructors and members of the Academic Integrity Panel are expected to demonstrate academic integrity through the following actions.
A.   Students are expected to:
1.   Understand and uphold the academic integrity guidelines established by the University and the instructor.

2.   Present their own work for evaluation by their instructors.

3.   Cite appropriately the words and ideas of others.

4.   Protect their work from misuse.

5.   Accept responsibility for their own actions.

6.   Treat instructors and members of the Academic Integrity Panel with respect when violations of academic integrity are examined or appealed.

7.   Trust instructors and members of the Academic Integrity Panel to enforce the academic integrity policy and procedures.

B.   Instructors are expected to:
1.   Understand and uphold this academic integrity policy and procedures. Standards set by instructors in their classes should be consistent with the guidelines provided within this policy.



2.  Discuss and communicate information about academic integrity to students.

3.  Reduce opportunities for dishonesty through vigilant exam security and proctoring, and give clear instructions for homework and projects.

4.  Evaluate students fairly and consistently and award credit based on professionally judged academic performance established by the instructor.

5.  Trust students to follow the academic integrity policy until the instructor has sufficient information to substantiate a violation, then confront students with information about the alleged violation, follow the procedures, and report violations.

6.  Evaluate fairly the information that may indicate a student has violated academic integrity.

7.  Assure that teaching assistants or adjunct instructors who work under their direction understand and uphold academic integrity policy and procedures.

8.  Treat students and members of the Academic Integrity Panel with respect when violations of academic integrity are examined or appealed.

9.  Trust members of the Academic Integrity Panel to enforce the academic integrity policy and procedures when violations are appealed.

C.  Members of the Academic Integrity Panel are expected to:
1.  Accept responsibility for upholding the academic integrity policy and procedures for the University.

2.  Uphold instructors' standards for academic integrity that were clearly communicated to students, consistently enforced, and compatible with the University academic integrity policy, procedure, and guidelines.

3.  Evaluate information that may indicate a student has violated academic integrity.

4.  Treat students and instructors with respect when violations of academic integrity are examined or appealed.

5.  Participate in appropriate training.

Academic Integrity Facilitators are instructors, advisors, or academic administrators who are trained in academic integrity policy and procedures.

1.04    Behaviors that violate the fundamental values of academic integrity may include but are not limited to:

A.  Unauthorized collaboration

B.  Plagiarism

C.  Multiple submissions

D.  Cheating on examinations (including prerequisite examinations)

E.  Fabricating information

F.  Helping another person cheat

G.  Unauthorized advance access to examinations

H.  Altering or destroying the work of others

I.  Altering academic records

These behaviors may subject the student to disciplinary action including receiving a failing grade on assignment, examination or course, receiving a notation of a violation of academic integrity on the transcript, or suspension from the University. Serious violations discovered after a student graduates may lead to revocation of a degree. These behaviors are described in detail in the Academic Integrity Guidelines.

## PROCEDURES

2.01    The instructor (e.g., instructor of record, teaching assistant, member of a graduate student committee, professional education program, or veterinary house officer) discovers sufficient information to substantiate an alleged violation of academic integrity. The information should support a determination that it is "more likely than not" that a violation of academic integrity occurred.

2.02    Within five school days of discovering an alleged violation, but no more than 30 calendar days after the submission due date, the instructor prepares an Academic Integrity Inquiry Form (including a list of possible Academic Integrity Facilitators) and gives or emails the form to the student's University email address. A school day is defined as a regular class day during the fall or spring semester (if the student is enrolled in a class during summer school or intersession, a school day includes regular class days during the same summer or intersession term).

Once an instructor has identified an alleged violation of academic integrity, the student may not drop the course. Students who drop the course will be re-enrolled by the Registrar.
Note: In the event an incident is not resolved at the time grade reports are due to the Registrar (e.g., an alleged violation is discovered during the final examination period), an incomplete grade will be assigned until the allegation is resolved.

2.03    The student contacts the instructor within five school days of receiving Form A to schedule a resolution meeting.  Pre-finals and finals weeks do not count as school days for this purpose, though if all parties agree, a resolution meeting may be held during these weeks.

2.04    The instructor recommends an academic sanction for alleged violations of academic integrity.    For undergraduate, graduate and professional students, the instructor should recommend the appropriate sanction of an admonition or level of either one, two, or three for alleged violations of academic integrity.  The following maximum sanctions are:

    A.   Admonition—essentially a warning by the instructor of record of a course, and not considered a grievance.  The sanction for an admonition will be a grade reduction that does not exceed the value of the assignment in question.  An admonition may be assessed for violations including but not limited to the following:

        1.   Plagiarism/copying of work done for a course, if the plagiarized/copied material makes up less than 10% of the assignment, or deemed a minor violation by the instructor of record (first offense only).

        2.   Unauthorized collaboration on homework assignments making up less than 10% of the assignment, or deemed a minor violation by the instructor of record (first offense only).

A first offense is not automatically treated as an admonition.  If an admonition is assessed, the warning and sanction will be reported to the Academic Integrity Office.  Ordinarily, an admonition may only be assessed once and adjudication of additional academic integrity violations will take into account the admonition.  The resolution of additional academic integrity violations may be adversely impacted by the earlier assessment of an admonition.

    B.   Level one sanction—a grade of "zero" or "F" for the assignment or examination for violations including but not limited to the following:

        1.   Copying or paraphrasing a few sentences of material (1-5 sentences or a minor portion) from a written or Internet source without proper citation.

        2.   Cheating on a quiz or minor assignment. Minor is defined as 10% or less of the total points for the course.

        3.   Receiving unauthorized help on an assignment.

        4.   Working on an assignment with others when the instructor asked for individual work.   Turning in work that is identical or very similar to others' work. Excessively relying upon and using the ideas and work of others in a group effort.

        5.   Using a false excuse to obtain an extension on a due date.

        6.   Signing an attendance roster for someone who is absent or asking someone else to sign the roster to avoid being counted absent.

7.  Failing to observe the rules governing the conduct of examinations (for example, continuing to work on an examination after time is called at the end of an examination).

In addition to assigning a Level One sanction, an instructor can assign the academic integrity education program to a student. After the sanction becomes final, a registration hold will be placed on the student's account. Sanctions become final if the student does not appeal within five school days of receiving official notification from the Academic Integrity Coordinator or an Academic Integrity Panel Hearing. The registration hold will be removed once the student successfully completes the academic integrity education program. The student shall contact the Office of Academic Affairs to schedule a time to complete the academic integrity education program.

C.  Level two sanction—a grade of "F!" for the course. An F! is a grade signifying the student failed the course because of an academic integrity violation. Level two violations include but are not limited to the following:

1.  Turning in a paper copied from another student.

2.  Turning in a paper obtained in full or in part from a term paper "mill" or website.

3.  Copying material almost word for word from a written source and turning it in as one's own work.

4.  Fabricating or falsifying a bibliography.

5.  Getting questions or answers from someone who has taken an examination.

6.  Obtaining an unauthorized copy of an examination in advance.

7.  Using unauthorized notes during an examination.

8.  Having another student take an examination.

9.  Inappropriate use of technology (camera phones, text messaging, programmable calculator, etc.) during an examination.

10. Copying from another student during an examination with or without his/her knowledge.

11. Helping someone else cheat on an examination.

12. Stealing an examination or problem answer from the instructor.

13. Having unauthorized access to solutions and/or instructors or solutions manual for a course.

14. Altering a grade or scoring on an examination or paper to obtain unearned credit.

15. In a course requiring computer work, copying another student's program rather than writing one's own.

16. Fabricating or falsifying laboratory or research data.

17. Inappropriately sharing or using work on an online assignment or examination.

18. Turning in work done by someone else.

19. Submitting substantial portions of the same assignment to more than one class without permission of the instructors.

20. Altering course withdrawal slips and similar academic documents. This includes forging an instructor or adviser signature.

D.  Level three sanction—recommend a transcript notation of "Administrative Withdrawal for Academic Integrity Violation"; and dismissal from the graduate or professional program and dismissal from the University. This transcript notation is permanent and is intended to be used primarily for violations that are not related to a specific course. Level three violations include but are not limited to the following:

1.  Plagiarism or other violations of academic integrity in a thesis or dissertation proposal, qualifying examination, comprehensive examination, thesis or dissertation, report or creative component, thesis or dissertation defense, or professional education portfolio, professional presentations, or publications.

2.  Fabrication or falsification of research or laboratory data used in a creative component, report, thesis or dissertation, presentation, or publication.

3.  Altering academic records such as transcripts, falsification of applications for admission or cheating on required prerequisite exams.

At the undergraduate level, suspension from the University may be recommended for cheating on required prerequisite exams or altering academic records.

The academic integrity violation, such as receipt of a failing grade, may result in additional consequences, including program or aid ineligibility, program dismissal, visa status issues, etc.

2.05    The student, instructor, and Academic Integrity Facilitator meet to discuss the alleged violation and sign the Academic Integrity Resolution Form. The following actions may result from this meeting:

A.  The instructor and student agree that no violation of academic integrity occurred. No further action is needed.

B.  The student admits responsibility for a violation and accepts the instructor's recommended sanction. A copy of the signed form is given to the student, the instructor retains a copy, and copies are sent to the instructor's department head and the Office of Academic Affairs.

C.  The student admits responsibility but does not agree with the sanction. The instructor recommends a sanction and the case is referred to the Academic Integrity Panel. To initiate an appeal the student must submit documentation to the panel within five school days after receiving official notification from the Academic Integrity Coordinator (see procedures for appeal).

D.  The student denies responsibility for the alleged violation and does not agree with the sanction. The instructor recommends a sanction and the case is referred to the Academic Integrity Panel. To initiate an appeal the student must submit documentation to the Panel within five school days after completion of the Academic Integrity Resolution Form (see procedures for appeal).

E.  The student fails to appear for the resolution meeting. The instructor and facilitator discuss the alleged violation, the instructor recommends a sanction, and they sign the Academic Integrity Resolution Form. A copy of the form is emailed to the student's University email address, the instructor retains a copy, and a copy is sent to Office of Academic Affairs.

The assigned sanction becomes final if the student does not submit documentation to the Academic Integrity Coordinator by the five school-day deadline.

In any case where it is determined that an academic integrity violation has occurred, the student's advisor will be notified by the Office of Academic Affairs.

2.06   The instructor or Academic Integrity Panel may permit a student to drop a course with a grade of "W" if the allegation is dismissed or if the student admits responsibility for a level one sanction, however, the student must meet the deadline to drop the course or withdraw from the University. A student may not drop a course in which the "F!" grade was assigned.

2.07   Certain violations (e.g., theft of an examination) may also violate the Student Code of Conduct. Instructors should contact the Student Conduct Office to report such violations.

2.08   Students may remove the first "!" from their transcript by completing an academic integrity education program. The "!" will remain on the transcript for a minimum of one semester.

2.09   Students who are accused of a second alleged violation of academic integrity in the same course in the same semester may have the second violation increased to an F! for the course, even if both incidents were Level One violations. Students who are accused of a second alleged violation of academic integrity resulting in a second F! will be referred to the Academic Integrity Panel.

2.10    Undergraduate students who are found responsible for multiple academic integrity violations could be suspended from the University. If a student is found responsible for a violation resulting in suspension during the spring semester (even if the violation occurred during the previous fall or winter intercession semester), they will be suspended for the subsequent summer and fall semesters. If a student is found responsible for a violation during the fall semester (even if the violation occurred during the previous spring or summer semester), they will be suspended the subsequent spring and summer semesters. Examples of circumstances that could result in suspension include, but are not limited to:

    A.   Two or more level two violations.

    B.   A level two violation followed by a level one violation.

    C.   Three or more violations (level one and/or level two).

    D.   In rare circumstances, the Academic Integrity Panel may consider a different sanction if two violations occur at or about the same time.

2.11    If clear and convincing evidence of a serious violation of academic integrity is discovered (including but not limited to the violations listed under level three sanctions in 2.05.c.) after a student graduates, revocation of the degree may be recommended by following the Degree Revocation Procedures.

2.12    Academic integrity violations and student conduct violations are entered into the University's student conduct database and become a part of the student's educational records. Employers, licensing boards, graduate, professional schools, state and federal agencies, and others may request a copy of these educational records. With the student's consent, OSU will release student education records, which are available at the time of the request.

No record of admonitions will be noted on the student's transcript. Admonitions are reported to the Academic Integrity Office and will be taken into account if other academic integrity violations are reported. No record of Level One violations will be noted on the student's academic transcript, but will appear in the student's educational record. Level Two violations will result in an F! on the transcript. Students may remove the first "!" from their transcript (see section 2.08) but the violation will remain a part of their educational record.

## PROCEDURES FOR APPEALS OF ALLEGED ACADEMIC INTEGRITY VIOLATIONS

3.01    If the student appeals the alleged violation of academic integrity the student and instructor will meet with the Academic Integrity Panel.

3.02    The student will use the following procedures to file an appeal:

    A.   The student obtains and completes an appeal form that is available online or from the Office of Academic Affairs. The student should submit documentation to support his or her appeal.

B.    The student submits the appeal form to the Academic Integrity Coordinator within five school days after the official email is sent from the Academic Integrity office to the student's University email address. For alleged violations which occur at the end of the semester, the five day appeal period will roll over into the next regular (fall or spring) semester. The Coordinator, who can be contacted in the Office of Academic Affairs, gives the student notice of receipt of the appeal, notifies the instructor of the course, assists the instructor and student in understanding the appeals process, assembles the supporting documents, and transmits the case to the Academic Integrity Panel.

3.03    The instructor submits the necessary forms, sufficient information to substantiate the alleged violation of academic integrity, and the recommended sanction. The instructor must return the evidence and make themselves and any graduate assistants/teaching assistants available for a hearing within 20 school days after the student returns the appeal form or the case will be dismissed.

3.04    The student and instructor have the right to appear in a hearing before an Academic Integrity Hearing Panel. (Refer to the Academic Integrity Guidelines for a complete list of the rights in the Academic Integrity procedures.)

3.05    The Academic Integrity Panel determines if A) the student committed an act that violates academic integrity and B) the sanction is appropriate. The Panel will make one of the following decisions:

A.    The student is found not responsible for a violation of academic integrity. The Academic Integrity Coordinator shall remove the sanction and the instructor shall assign an appropriate grade. The instructor or Academic Integrity Panel may permit a student to drop a course with a grade of "W."

B.    The student is found responsible for a violation and the sanction is appropriate. The instructor or Academic Integrity Panel may permit a student to drop a course with a grade of "W" if the student admits responsibility for a level one sanction. A student may not drop a course in which the "F!" grade was assigned.

C.    The student is found responsible for a violation but the sanction is not appropriate. The panel may uphold, increase, or decrease the sanction.

3.06    If the student is found responsible for a violation of academic integrity, the Academic Integrity Panel may also assign an academic integrity education sanction which requires the student to complete the academic integrity education program. A registration hold will be placed on the student's account within five school days of the Academic Integrity Hearing Panel if the student does not appeal. The registration hold will be removed once the student successfully completes the academic integrity education program. The student shall contact the Office of Academic Affairs to schedule a time to complete the academic integrity education program.

3.07    After each decision, Academic Integrity Coordinator sends a Hearing Report to the student, instructor, advisor, instructor's department, student's dean and the Registrar (if needed).

3.08    The student may submit a written request for a final appeal before the Appeals Panel. The student must submit an appeal within five school days after the Hearing Report if academic integrity procedures were not followed.  If new information becomes available after the hearing that could substantially affect the outcome, the student may submit an appeal within one year. The Appeals Panel will determine if the final appeal will be considered.

3.09    The student will use the following procedures in filing a final appeal:
    A.    The student obtains and completes a final appeal form that is available online or from the Office of Academic Affairs. The burden of proof rests upon the student to establish his/her case with a preponderance of information.

    B.    The appellant submits the final appeal form to the Academic Integrity Coordinator by the date specified on the email sent to the student's University email address. The Coordinator, who can be contacted in the Office of Academic Affairs, gives the appellant notice of receipt of the appeal, notifies the instructor, assembles the supporting documents, and transmits the case to the Appeals Panel.

3.10    The Appeals Panel reviews written materials and determines if the academic integrity procedure was followed or if the new information warrants another hearing in front of the Academic Integrity Panel. The Appeals Panel may take any of the following actions:
    A.    The academic integrity procedure was not followed. The Appeals Panel may remand the case to the Academic Integrity Panel.

    B.    Academic integrity procedure was followed.   The Appeals Panel upholds the decision of the Academic Integrity Panel.

    C.    New information does not warrant a new hearing.  The Appeals Panel upholds the decision of the Academic Integrity Panel.

    D.    New information warrants another hearing in front of the Academic Integrity Panel.

3.11    The Academic Integrity Coordinator notifies the student and the instructor of the Appeals Panel decision.

3.12    The decision of the Appeals Panel is final except when revocation of a degree is recommended by the Academic Integrity Panel.  Revocation of a degree requires approval of the Provost, OSU-Stillwater President, A&M Board of Regents, and Oklahoma State Regents for Higher Education.

## COMPOSITION OF THE ACADEMIC INTEGRITY PANEL

4.01    Each college will have at least three faculty representatives (at least one should be a full member of the graduate faculty) and up to seven student representatives (5 undergraduate and 2 masters, doctoral, or professional students) on the Academic Integrity Panel.  For each college, faculty representatives will be appointed by Faculty Council or by Graduate Council. The college

will nominate student representatives; these nominations will be approved by the Student Government Association for undergraduate students and the Graduate and Professional Student Government Association for graduate students. Each student representative should complete at least one semester at OSU in good academic standing before serving on the Panel.

4.02   All members of the Panel must complete training on academic integrity.

4.03   When a Hearing Panel is convened to hear an appeal, it will be composed of at least five members: a student chair, at least two student members and at least two faculty members. The chair will always be a student who has experience on the Academic Integrity Panel.

4.04   For appeals involving alleged violations of academic integrity by graduate students outside of class (e.g., comprehensive or qualifying examination, proposal, theses/dissertation defense), graduate students and graduate faculty will serve on the Academic Integrity Hearing Panel.

## COMPOSITION OF THE ACADEMIC INTEGRITY APPEALS PANEL

5.01   For final appeals involving violations of academic integrity, three members of the Academic Integrity Panel who were not involved in the case will be selected to serve on the Appeals Panel. The Panel will be composed of one student chair, one student member and one faculty member.

## ACADEMIC INTEGRITY GUIDELINES

6.01   Oklahoma State University's Academic Integrity policy identifies some behaviors that violate the fundamental values of academic integrity. These behaviors are described below:

A.   Unauthorized Collaboration: Completing an assignment or examination with other students, turning in work that is identical or very similar to others' work, or receiving help on assignments without permission of the instructor. This may also include excessively relying upon and borrowing the ideas and work of others in a group effort.

B.   Plagiarism: Presenting the written, published or creative work of another as the student's own work. Whenever the student uses wording, arguments, data, design, etc., belonging to someone else in a paper, report, oral presentation, or other assignment, the student must make this fact explicitly clear by correctly citing the appropriate references or sources. The student must fully indicate the extent to which any part or parts of the project are attributed to others. The student must also provide citations for paraphrased materials. The following are examples of plagiarism:

1.   Copying another student's assignment, computer program or examination with or without permission from the author.

2.   Copying another student's computer program and changing only minor items such as logic, variable names, or labels.

3. Copying or paraphrasing material from an Internet or written source without proper citation.

4. Copying words and then changing them a little, even if the student gives the source.

5. Verbatim copying without using quotation marks, even if the source is cited.

6. Expressing in the student's own words someone else's ideas without giving proper credit.

C. Multiple Submissions: Submitting substantial portions of the same academic work for credit to more than one class (or to the same class if the student repeats a course) without permission of the instructors.

D. Cheating on Examinations: Gathering unauthorized information before or during an examination from others, using notes or other unapproved aids during an examination, failing to observe the rules governing the conduct of examinations (for example, continuing to work on an examination after time is called at the end of an examination), or having another student take an examination for the student.

E. Fabricating Information: Making up references for a bibliography, falsifying laboratory or research data (for example, tampering with experimental data to obtain "desired" results or creating results for experiments that were not done), or using a false excuse for an absence or an extension on a due date.

F. Helping Another Person Cheat: Providing information about an examination to another student (for example, sending an electronic message with answers during an examination), giving unauthorized help on assignments, or failing to prevent misuse of work by others (for example, allowing another student to copy an examination, assignment, or computer program). A student must take reasonable care that examination answers are not seen by others or that term papers or projects are not plagiarized or otherwise misused by others. This category also includes taking an examination on behalf of another student.

G. Unauthorized Advance Access to Examinations: Obtaining an advance copy of an examination without the instructor's permission or getting questions and answers from someone who took the examination earlier.

H. Altering or Destroying the Work of Others: Changing or damaging computer files, papers or other academic products that belong to others.

I. Altering Academic Records: Altering graded papers, computer materials/records, course withdrawal slips, or academic documents. This includes forging an instructor or advisor signature and altering transcripts.

6.02    Instructors may identify other behaviors that violate academic integrity.

6.03    Students have the following rights during the Academic Integrity hearing:

A.    Written notification of the time and place of the appeal hearing. This notice will be sent to the student's University email address.

B.    A copy of the Academic Integrity Violation and Resolution forms.

C.    The right to appear in person and present his/her case. Either party may elect not to appear; in this instance, the hearing shall be held in his/her absence. Failure to appear must be noted without prejudice.

D.    The right to meet with the hearing panel at the same time, so no further allegations can be made against the student without the student's knowledge or against the instructor without the instructor's knowledge.

E.    The right to be accompanied by one person (colleague or friend); however, this person may not address the hearing panel.

F.    The right to call witnesses to assist in establishing facts of the case.

G.    The right to ask questions.

H.    The right to an explanation of the reasons for any decision rendered.

I.    The right to be free from retaliation by the instructor.

J.    The assurance that all personally identifiable information about alleged violations of academic integrity will be confidential under provisions of the Family Educational Rights and Privacy Act (FERPA) and will not be disclosed except as permitted by FERPA or with written permission of the student.

6.04    The Academic Integrity Panel determines if A) the student committed an act that violates academic integrity and B) the sanction is appropriate. The following guidelines have been developed for the Panel to use when examining an alleged academic integrity violation:

A.    The Panel will review the course syllabus statements about academic integrity.

B.    The Panel will determine if the instructor clearly communicated the parameters of the assignment to the students.

C.    If more than one student was involved in the alleged violation, the Panel will consider if the students were sanctioned fairly or if one student was singled out for arbitrary or discriminatory treatment.

D.   If the student has more than one alleged violation, the Panel will consider when the violations occurred.

E.   The Panel will not consider issues related to the quality of instruction or the academic soundness of the instructor's teaching methods.

**PROCEDURES FOR DEGREE REVOCATION**

7.01   Allegations of serious violations of academic integrity directed at graduates of Oklahoma State University should be made directly to the Dean of the Graduate College (for graduate students) or the Associate Vice President for Undergraduate Education (for undergraduate students), hereafter referred to as the Investigating Official.

7.02   The Investigating Official will review the allegations and make a preliminary determination regarding whether the allegation provides sufficient reason to warrant the formation of a Review Committee. He or she will consult with the Office of Legal Counsel to the Board of Regents prior to making a preliminary determination regarding the allegation.

7.03   The Review Committee will be composed of one Academic Integrity Facilitator, one faculty member appointed by the Investigating Official, and one faculty member appointed by the Dean of the graduate's academic college. Persons appointed to the Review Committee may not have a conflict of interest with the graduate, the person making the allegation, or any other person involved in the case.

7.04   The purpose of the Review Committee is to determine whether clear and convincing evidence of a serious violation of academic integrity supports a recommendation of revocation of the graduate's degree.

7.05   The Investigating Official, as soon as reasonably practicable, will notify the graduate in writing of the pending allegation against him or her, the possibility of revocation of his or her degree, the placement of a transcript hold, and the formation of a Review Committee to conduct an initial inquiry into the allegation. The written notice must include:
A.   The alleged violation of academic integrity committed by the graduate.

B.   The information supporting the allegation.

C.   The course grades that may be changed to "F!".

D.   The identities of the Review Committee members.

E.   The procedure to be followed by the Review Committee.

F.   The opportunity for appeal.

7.06   The graduate will respond to the allegations and submit factual reasons for any objections to the composition of the Review Committee within 20 school days of receipt of the written

notice.  The graduate may request replacement of up to one member of the Review Committee for cause.

7.07    After the 20 school day period, the Review Committee will schedule a meeting with the graduate to discuss the alleged violation. Refer to the Academic Integrity Guidelines (6.03) for a complete list of the rights in the Academic Integrity procedures. The graduate may have legal counsel, at his or her own expense, present for advisory purposes only.  Legal counsel may not question Committee members, make statements, or answer questions for persons called to appear before the Review Committee.  The following actions may result from the meeting:

A.    The Review Committee and graduate agree that the alleged serious violation of academic integrity is not supported by clear and convincing evidence.  No further action is needed and the graduate is held harmless against further allegations warranting degree revocation;

B.    The graduate admits responsibility for a serious violation and accepts the Review Committee's recommendation of degree revocation;

C.    The Review Committee recommends degree revocation. The graduate admits responsibility for the alleged violation but does not agree with the sanction.  The case is referred to the Academic Integrity Panel;

D.    The Review Committee recommends degree revocation but the graduate denies responsibility for the alleged violation and does not agree with the sanction.  The case is referred to the Academic Integrity Panel;

E.    The graduate fails to appear for the meeting with the Review Committee.  If the Review Committee recommends degree revocation the case is referred to the Academic Integrity Panel.

The Review Committee will provide a written report of their findings to the graduate, the Academic Integrity Panel, and the Investigating Official.  If degree revocation is recommended, the Review Committee will submit sufficient information to substantiate clear and convincing evidence of a serious violation of academic integrity and the recommended sanction of degree revocation.

7.08    If degree revocation is recommended the graduate will participate in a hearing with the Academic Integrity Panel unless he or she admits responsibility for a serious violation and accepts the Review Committee's recommendation.  Refer to the Academic Integrity Guidelines (6.03) for a complete list of the rights in the Academic Integrity procedures.  The graduate may have legal counsel, at his or her own expense, present for advisory purposes only.  Legal counsel may not question Panel members, make statements, or answer questions for persons called to appear before the Academic Integrity Hearing Panel.  The graduate will use the following procedures in filing an appeal:

A.    The graduate obtains and completes an appeal form that is available online or from the Office of Academic Affairs.  The graduate should submit documentation to support his or her appeal.

B.  The graduate submits the appeal form to the Academic Integrity Coordinator within 20 school days after the graduate receives the written report from the Review Committee. The Coordinator, who can be contacted in the Office of Academic Affairs, will assign a consulting member of the Academic Integrity Panel to assist the graduate in understanding the appeals process, assemble the supporting documents, and present the case to the Academic Integrity Panel.

7.09    The Investigating Official will act as the proponent in presenting the alleged violation to the Academic Integrity Hearing Panel.

7.10    If the graduate does not respond within 20 school days or fails to appear for the hearing, the consulting member of the Academic Integrity Panel will act as respondent on behalf of the graduate before the Hearing Panel.

7.11    After the hearing, the Academic Integrity Hearing Panel will determine A) if the graduate committed an act that was a serious violation of academic integrity and B) if degree revocation is an appropriate sanction. The Panel will make one of the following decisions:

A.  The graduate is found not responsible for a serious violation of academic integrity;

B.  The graduate is found responsible for a serious violation and the sanction is appropriate. The Hearing Panel will recommend degree revocation to the Provost

C.  The graduate is found responsible for a serious violation but recommends a lesser sanction.

The Academic Integrity Coordinator will provide a written report of the Hearing Panel's findings to the graduate, Provost, and Investigating Official.

7.12    If the Hearing Panel recommends degree revocation the graduate will have 20 school days after receipt of the report of the Hearing Panel to submit a written request for a decision appeal before the Appeals Panel. The graduate will use the following procedures to file a decision appeal:

A.  The graduate obtains and completes a decision appeal form that is available online or from the Office of Academic Affairs. The burden of proof rests upon the graduate to establish his/her case with clear and convincing evidence;

B.  The appellant submits the final appeal form to the Academic Integrity Coordinator by the date specified on the report from the Chair of the Academic Integrity Hearing Panel. The Coordinator, who can be contacted in the Office of Academic Affairs gives the graduate notice of receipt of the appeal, notifies the Investigating Official, assembles the supporting documents, and transmits the case to the Appeals Panel.

7.13    The Appeals Panel reviews written materials and determines if the academic integrity procedure was followed or if additional information provided by the graduate warrants another

hearing in front of the Academic Integrity Panel. The Appeals Panel may take any of the following actions.

    A.   The academic integrity procedure was not followed. The Appeals Panel may remand the case to the Academic Integrity Panel or recommend against degree revocation.

    B.   The academic integrity procedure was followed. The Appeals Panel upholds the decision of the Academic Integrity Panel and recommends degree revocation.

    C.   Additional information provided by the graduate does not warrant a new hearing. The Appeals Panel upholds the decision of the Academic Integrity Panel and recommends degree revocation.

    D.   New information warrants another hearing in front of the Academic Integrity Panel.

The Chair of the Appeals Panel will provide a written report of the Panel's findings to the graduate, Provost and Investigating Official.

7.14    The Provost will review the written statements of the graduate and recommendations of the Review Committee, Academic Integrity Hearing Panel, and Appeals Panel. If the Provost supports the recommendation for degree revocation, he or she will submit a letter to the President with a copy to the graduate. If the Provost does not support the recommendation for degree revocation, the graduate will be notified in writing and the case will be considered closed with the graduate held harmless against further allegations warranting degree revocation.

7.15    The President will review the written statements of the graduate and recommendations of the Provost, Review Committee, Academic Integrity Hearing Panel, and Appeals Panel. If the President supports the recommendation for degree revocation, he or she will submit a letter to the OSU/A&M Board of Regents with a copy to the graduate. If the President does not support the recommendation for degree revocation, he or she will notify the graduate in writing and the case will be considered closed with the graduate held harmless against further allegations warranting degree revocation.

7.16    The OSU/A&M Board of Regents will review the recommendation of the President. If the OSU/A&M Board of Regents supports the recommendation for degree revocation, the President will submit a letter to the Oklahoma State Regents for Higher Education (OSRHE) with a copy to the graduate. If the OSU/A&M Board of Regents does not support the recommendation for degree revocation, the President will notify the graduate in writing and the case will be considered closed with the graduate held harmless against further allegations warranting degree revocation.

7.17    OSRHE will review the recommendation of the President and the OSU/A&M Board of Regents. The Chancellor will notify the President of the OSRHE decision. The President will provide a copy of the OSRHE decision to the graduate in writing. If the OSRHE does not support the recommendation for degree revocation, the President will notify the graduate in writing and the case will be considered closed with the graduate held harmless against further allegations warranting degree revocation.

7.18    If the degree revocation is approved by OSRHE, the Registrar will remove the degree designation from the transcript, assign F! grades for applicable courses, and send copies of the revised transcript to all individuals who have previously received official copies of the transcript. The Registrar will request that the graduate return the diploma.  In cases of serious violations involving theses or dissertations, the Graduate Dean will remove the thesis or dissertation from the library and electronic copies will be recalled.

Approved:
E- Team, March 2015
Faculty Council, March 2016
Instruction Council, March 2016
Council of Deans, April 2016
Executive Team, May 2016

Unauthorized Collaboration: Completing an assignment or examination with other students, turning in work that is identical or very similar to others' work, or receiving help on assignments without permission of the instructor. This may also include excessively relying upon and borrowing the ideas and work of others in a group effort.

Plagiarism: Presenting the written, published or creative work of another as the student's own work. Whenever the student uses wording, arguments, data, design, etc., belonging to someone else in a paper, report, oral presentation, or other assignment, the student must make this fact explicitly clear by correctly citing the appropriate references or sources. The student must fully indicate the extent to which any part or parts of the project are attributed to others. The student must also provide citations for paraphrased materials.   The following are examples of plagiarism:

- Copying another student's assignment, computer program or examination with or without permission from the author.
- Copying another student's computer program and changing only minor items such as logic, variable names, or labels.
- Copying or paraphrasing material from an Internet or written source without proper citation.
- Copying words and then changing them a little, even if the student gives the source.
- Verbatim copying without using quotation marks, even if the source is cited.
- Expressing in the student's own words someone else's ideas without giving proper credit.
- Turning in a paper obtained in part or in full from a "term papermill."

Multiple Submissions: Submitting substantial portions of the same academic work for credit to more than one class (or to the same class if the student repeats a course) without permission of the instructors.

Cheating on Examinations: Gathering unauthorized information before or during an examination from others, using notes or other unapproved aids during an examination, failing to observe the rules governing the conduct of examinations (for example, continuing to work on an examination after time is called at the end of an examination), or having another student to take an examination for the student.

Fabricating Information: Making up references for a bibliography, falsifying laboratory or research data (for example, tampering with experimental data to obtain "desired" results or creating results for experiments that were not done), or using a false excuse for an absence or an extension on a due date.

Helping Another Person Cheat: Providing information about an examination to another student (for example, sending an electronic message with answers during an examination), giving unauthorized help on assignments, or failing to prevent misuse of work by others (for example, allowing another student to copy an examination, assignment, or computer program). A student must take reasonable care that examination answers are not seen by others or that term papers or projects are not plagiarized or otherwise misused by others. This category also includes taking an examination on behalf of another student.

Unauthorized Advance Access to Examinations: Obtaining an advance copy of an examination without the instructor's permission or getting questions and answers from someone who took the examination earlier.

Altering or Destroying the Work of Others: Changing or damaging computer files, papers or other academic products that belong to others.

Fraudulently Altering Academic Records: Altering graded papers, computer materials/records, course withdrawal slips, or academic documents. This includes forging an instructor or adviser signature and altering transcripts.

Instructors may identify other behaviors that violate academic integrity.

# Resources

**Students**
→ Top 10 Ways to Promote Academic Integrity
→ Overview of Academic Integrity Policy
→ Student Guidelines
→ FAQ About Academic Integrity
→ Common Academic Integrity Issues
→ Student Tips for Academic Integrity Hearing

**Instructors**
→ Notifying Student of Possible Violation
→ Tips to Prevent Cheating
→ Academic Integrity Handbook
→ Academic Integrity Q&A
→ Policy Overview
→ Using Turnitin for Plagiarism Detection in Canvas
→ Advanced Turnitin Options
→ Understanding Turnitin Similarity Score

**Facilitators**
→ Facilitator Checklist
→ Procedures at a Glance
→ Facilitator Training
→ Panel Member Training