1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


JONATHAN RIVERA-PIEROLA,                )
                                        )
                        Plaintiff,)
                                        )Case Number
vs.                                     )CIV-21-616 PRW
                                        )
BOARD OF REGENTS for the OKLAHOMA       )
AGRICULTURAL and MECHANICAL             )
COLLEGES, et al.,                       )
                                        )
                        Defendant.)
_____


VIDEOCONFERENCE DEPOSITION OF MARGI GILMOUR, DVM

TAKEN ON BEHALF OF THE PLAINTIFF

ON MAY 15, 2023

IN STILLWATER, OKLAHOMA


REPORTED BY:  BRENDA SCHMITZ, CSR, RPR (VIA ZOOM)
CITY REPORTERS
14 Northeast 13th Street, Suite 101
Oklahoma City, Oklahoma 73104
(405)235-3376

**Exhibit 11**

Margi Gilmour, DVM
May 15, 2023

---

**2**

1 APPEARANCES:
2
3 FOR THE PLAINTIFF (VIA ZOOM):
4    MR. JASON J. BACH
        Bach Law Firm
5    7881 West Charleston, Suite 165
        Las Vegas, NV  89117
6    Telephone:  702.925.8787
        Email:  jbach@bachlawfirm.com
7
8
9 FOR THE DEFENDANT (VIA ZOOM):
10   MR. CLINTON W. PRATT
        Office of Legal Counsel
11   Student Union, 5th Floor
        Oklahoma State University
12   Stillwater, Oklahoma  74078
        Telephone:  405.744.6494
13   Email: clint.pratt@okstate.edu
14
15                   INDEX
16

17 DIRECT EXAMINATION BY MR. BACH...............5
18 CROSS EXAMINATION BY MR. PRATT..............53
19
20 Errata.......................................58
21 Jurat........................................59
22 Reporter's Certificate.......................60
23
24
25

---

**3**

1                INDEX (CONTINUED)
2 Deposition Exhibits  (marked at a later date)

3       Number 1   Nominees for placement email.......21
4       Number 2   Nominees for clinicals email.......25
5       Number 3   Chris Ross/St. Matthew's emails....27
6       Number 4   Student Grade for SAIM Rotation....27
7       Number 5   Failed Rotation email..............28
8       Number 6   (not used).........................30
9       Number 7   Rivera-Pierola Advisee email.......30
10      Number 8   CP Rotation Problems email.........34
11      Number 9   Notes from 3-11-20 meeting.........37
12      Number 10  3/21/20 Dr. Reichard letter.......38
13      Number 11  3/23/20 Dismissal Recommendation..39
14      Number 12  Email Re: PSC Protocol.............39
15      Number 13  Rivera appeal letter..............40
16      Number 14  Email Re: Appeal to the Dean......42
17      Number 15  4/6/20 letter from Gilmour........44
18      Number 16  Early Termination of Anesthesia
                      Rotation letter..................46
19
20      Number 17  Emails Re: Early termination of
                      rotation.........................47
21
22      Number 18  Email Re: Repeating rotation......49
23      Number 19  Letter Re: Dismissal..............51
24
25

---

**4**

1                STIPULATIONS
2       It is hereby stipulated and agreed by and
3 between the parties hereto, through their respective
4 attorneys, that the video conference deposition of
5 MARGI GILMOUR may be taken on behalf of the
6 Plaintiff on MAY 15, 2023, in the City of
7 Stillwater, Oklahoma by Brenda Schmitz, Certified
8 Shorthand Reporter within and for the State of
9 Oklahoma, and Registered Professional Reporter,
10 taken by notice pursuant to the State of Oklahoma
11 Rules of Civil Procedure.
12       It is further stipulated and agreed by and
13 between the parties hereto, through their respective
14 attorneys, that all objections, except as to the
15 form of the question and the responsiveness of the
16 answer, are reserved until the time of trial, at
17 which time they may be made with the same force and
18 effect as if made at the time of the taking of this
19 deposition.
20
21
22
23
24
25

---

**5**

1       And thereupon the following witness was produced
2 by the Plaintiff:
3              MARGI GILMOUR,
4 the witness hereinbefore named, being first duly
5 cautioned and sworn remotely pursuant to Rule 34,
6 Title 12, Chapter 2, Appendix of the Oklahoma
7 Supreme Court, to testify the truth, the whole
8 truth, and nothing but the truth, testified on her
9 oath as follows:
10              DIRECT EXAMINATION
11 BY MR. BACH:
12       Q.  Can you state your name for the record,
13 please?
14       A.  I'm sorry?
15       Q.  Can you state your name for the record,
16 please?
17       A.  Margi Gilmour.
18       Q.  All right.  And have you ever had your
19 deposition taken before?
20       A.  Yes.
21       Q.  On -- on how many occasions?
22       A.  Once.
23       Q.  And how -- how long ago was that?
24       A.  30 years.
25       Q.  Okay.  All right.  Well, just to go over a

---

Margi Gilmour, DVM
May 15, 2023

6

1  few of the ground rules, you understand that the
2  court reporter here today is taking down everything
3  that is said?
4      A.  Yes.
5      Q.  Okay.  And you understand that the oath
6  that you took here today is the same oath that you
7  would take in court?
8      A.  Yes.
9      Q.  Okay.  My name is Jason Bach, and I'm the
10  attorney for -- for Jonathan Rivera-Pierola and I'm
11  going to be asking you some questions here today,
12  and if I ask you a question that is incoherent or
13  that you don't understand, please feel free to ask
14  me to repeat it or rephrase it and I'll do my best
15  to make you understand or help you understand what
16  it is I'm asking.
17      It's very possible that I will ask bad
18  questions, so I may need to rephrase or -- or repeat
19  things from -- from time to time.  However, if I ask
20  you a question and you answer the question, I'm
21  going to assume that you understood the question, is
22  that -- is that fair?
23      A.  Yes.
24      Q.  Okay.  If you answer a question with a
25  uh-huh or huh-uh or something like that, I may ask

7

1  you, "Is that yes, is that no", it's not that I'm
2  trying to be rude or anything, I'm just trying to
3  make a clear record here -- here today, okay?
4      A.  Understood.
5      Q.  Did you review any documents to prepare
6  for your deposition today?
7      A.  I did.
8      Q.  What did you review?
9      A.  I reviewed some e-mails, I reviewed the
10  PSC summary reports, and I reviewed the notes that I
11  had regarding the two meetings I had with Jonathan.
12  That's it.
13      Q.  Okay.  And you had mentioned a PSE, can
14  you tell us what that -- what that stands for?
15      A.  Professional Standards Committee.
16      Q.  Other than one of the attorneys from the
17  school, have you spoken with anyone about your
18  deposition here today?
19      A.  Just that I'm giving one.
20      Q.  Okay.  Who -- who did you speak to about
21  that?
22      A.  My significant other, and two of my best
23  friends.
24      Q.  Okay.  Anyone at the -- at the university?
25      A.  No.

8

1      Q.  Are you -- are you currently employed?
2      A.  No, I am not, I'm retired.
3      Q.  Okay.  What was the last employment that
4  you had?
5      A.  At the Oklahoma State University College
6  of Veterinary Medicine, I was the Associate Dean for
7  Academic Affairs.
8      Q.  And for how long were you in -- in that
9  position?
10      A.  I was interim for two years, and then I
11  was Associate Dean for three and a half before
12  retirement.
13      Q.  Okay.  What was your -- do you have a
14  position at the school before that?
15      A.  Yes, I did.
16      Q.  What was your position then?
17      A.  Professor of ophthalmology.
18      Q.  And -- and how long were you in -- in that
19  role for?
20      A.  I was -- let's see, let me do some math,
21  at the university for 20 years, so I was in that
22  position for 16 years.
23      Q.  I see.  You said that you were at the
24  university for 20 years; is that right?
25      A.  Total, yeah.

9

1      Q.  Can you just give me a brief rundown of
2  your education after high school?
3      A.  Yes.  After high school graduation, I
4  obtained my bachelor's degree in zoology from
5  Michigan State University.  Following that, I went
6  to veterinary school at Michigan State University
7  and obtained my doctor of veterinary medicine
8  degree.
9      Q.  And what -- what year was that?
10      A.  1986.
11      Q.  And as I mentioned, we're here concerning
12  a lawsuit that Jonathan Rivera-Pierola has brought
13  against the -- the university.  Do you have a
14  recollection of Jonathan?
15      A.  Yes, to a very small degree.
16      Q.  When's the first time that you recall
17  meeting him?
18      A.  I actually don't remember our meeting.  I
19  can't -- I can't say I remember the meeting, but I
20  know I met with him because I had the notes from the
21  meeting, if that makes sense.
22      Q.  Sure, sure.  And you reviewed those notes
23  before your deposition here today?
24      A.  I did, yes.
25      Q.  Did that refresh your recollection as to

Margi Gilmour, DVM
May 15, 2023

10

1  what you met with him about?
2      A.  Yes, what I met with him about, yes.  But
3  again, details, no.
4      Q.  Okay.  Can you tell me what you remember
5  from that meeting?
6      A.  From the first meeting?
7      Q.  Yes.
8      A.  I really don't have firsthand memory, but
9  from my notes, what we spoke about was his grade in
10  the small animal internal medicine rotation, and
11  usually what the discussion entails is the student
12  will tell me what happened, their perspective, and
13  then I try to guide them as far as helping give them
14  pointers for how to do better, or improve in their
15  ensuing clinical rotations, just kind of an extra
16  guidance there.
17      Q.  Do you have the understanding that
18  Jonathan was a student from -- from St. Matthew's?
19      A.  Yes, I did know that.
20      Q.  To your knowledge, had you -- had you
21  dealt with students from St. Matthew's in the past,
22  before Jonathan?
23      A.  When you say "dealt with," we had students
24  enrolled from St. Matthew's.  My role, as I became
25  the full Associate Dean, was to review transcripts.

11

1  Other than that, I generally -- I gave a welcome at
2  their orientation, but after that, I didn't really
3  interact with the students.
4      Q.  Were you involved at all with -- with the
5  relationship that -- that OSU had with St.
6  Matthew's?
7      A.  The contract, I was not part of, the only
8  relationship I had was, again, receiving the
9  transcripts, looking at those, and then if any of
10  the students had any academic difficulty, I would be
11  the one that would communicate that to their
12  Associate Dean.
13      Q.  So was it ultimately your decision whether
14  to accept a student from St. Matthew's or not?
15      A.  Yes.  It -- when I would -- I say that,
16  when I was interim for a period, Dr. Ross was making
17  that decision, and then I was slowly moving into
18  that role.  And then once I became the full
19  Associate Dean, yes, I would look at the transcripts
20  and I would make the decision.
21      Q.  Were there ever any students from St.
22  Matthew's that you denied admission to?
23      A.  Not that I remember.  But I can't -- I
24  can't say 100 percent, I don't, yeah.
25      Q.  Okay.  Do you recall if students from St.

12

1  Matthew's tended to do as well as OSU students or
2  did they do not as well or did they do better than
3  OSU students in the program?
4      A.  The St. Matthew's students did not do as
5  well in the clinical year as the OSU students.
6      Q.  Why did OSU accept students from St.
7  Matthew's?
8      A.  I don't know what went into that initial
9  contract with St. Matthew's.  We do take students
10  from offshore schools, because they need a clinical
11  year, but I -- I'm not familiar with what went into
12  that decision.
13      Q.  Okay.  Do you know if OSU ended their
14  relationship with St. Matthew's?
15      A.  Yes, they did.
16      Q.  Do you know why?
17      A.  Yes.  We were not getting many applicants,
18  and also, the ones we did have in our program
19  struggled more in our clinical program than the
20  other students.
21      Q.  Now, Jonathan was eventually dismissed
22  from the program; is that right?
23      A.  Yes, that's right.
24      Q.  Were there any other students during your
25  time there from St. Matthew's who were also

13

1  dismissed?
2      A.  I know there were -- there were a couple
3  other students dismissed, I don't -- I honestly
4  don't remember if they were St. Matthew's or one of
5  the other offshore schools.
6      Q.  How many students from St. Matthew's would
7  you have in your program at any given time?
8      A.  We would have two to potentially five, I
9  would say, in any given area of 12 months.
10      Q.  When Jonathan was there, do you recall how
11  many other students from St. Matthew's were in the
12  program?
13      A.  No, I do not.
14      Q.  So you had mentioned that you had met with
15  Jonathan the first time because he didn't receive a
16  passing grade in this small --
17      A.  Small animal internal medicine.
18      Q.  There you go.  And was he allowed to
19  continue in the program after he did not pass that
20  rotation?
21      A.  Yes, he was.
22      Q.  And did there come a point in time when
23  you met with Jonathan for a second time?
24      A.  Our second meeting was after he failed the
25  community practice rotation.  He had, I think -- I

Margi Gilmour, DVM
May 15, 2023

14

1  think we're going to talk again about strategies, I
2  think he wanted to talk about a potential appeal,
3  and then because it was the second failure, normally
4  those students will meet with the Professional
5  Standards Committee, and I would normally meet with
6  any student before that to try and coach them and
7  give them some strategy on how to best present
8  themselves in front of the Professional Standards
9  Committee.
10     Q.  And did you do that with Jonathan, give
11  him any strategy ideas?
12     A.  I did.
13     Q.  And so he met with the PSC; is that right?
14     A.  He did, yes.
15     Q.  And did the PSC make a recommendation as
16  to what should happen with Jonathan?
17     A.  Their initial recommendation was that he
18  be dismissed from the program following that second
19  fail.
20     Q.  And did -- did Jonathan appeal that
21  decision?
22     A.  Yes, he did.
23     Q.  Okay.  And what's involved with appealing
24  that decision?
25     A.  I can't -- I can't remember all the exact

15

1  details on -- on days, but how this usually goes is,
2  a Professional Standards Committee will give a
3  recommendation, and if that is dismissal, or not,
4  it's my job to communicate that decision to both the
5  student and to the Dean.  And I communicated to
6  Jonathan that the recommendation was for dismissal,
7  and then he has -- the student has the option to
8  appeal that decision, and he makes that appeal to
9  the Dean.
10     Q.  And is that something that is done in
11  writing?
12     A.  Yes.
13     Q.  And so did -- did Jonathan submit an
14  appeal to the Dean then?
15     A.  He did appeal to the Dean.
16     Q.  And did you have any conversations with
17  the Dean about that appeal?
18     A.  I don't remember.
19     Q.  Do you recall if the Dean met with
20  Jonathan?
21     A.  I don't know if he met with Jonathan.
22     Q.  Do you recall if the Dean asked the
23  committee to reevaluate their -- their
24  recommendation to a dismissal?
25     A.  I don't -- now, I don't remember the --

16

1  sorry, it's been a long while -- the process after
2  the student submits that appeal letter, I do know
3  the Professional Standards Committee met again, so,
4  at the bequest of the Dean, so he must have asked
5  the Professional Standards Committee to review their
6  decision, because there was another meeting.
7     Q.  After they reviewed their decision, what
8  was their -- their recommendation at that point?
9     A.  They still stood by the dismissal.
10     Q.  Who has the ultimate authority to decide
11  who's dismissed and who's not?
12     A.  The Dean.
13     Q.  And what did the Dean decide in this
14  situation?
15     A.  He decided to give Jonathan another chance
16  and so -- under certain stipulations, and so
17  Jonathan was allowed back into the program.
18     Q.  Did you agree with that decision?
19     A.  No.
20     Q.  Why not?
21     A.  I believed that everything the
22  Professional Standards Committee had outlined was
23  accurate, and that their decision was in the best
24  interests of Jonathan and the profession.
25     Q.  Did the Dean share with you why he was

17

1  allowing Jonathan to -- to continue on?
2     A.  No, I don't -- not that I remember having
3  a conversation about that, no.
4     Q.  You had mentioned that Jonathan was
5  allowed to stay in the program with some
6  stipulations; is that right?
7     A.  Yes.
8     Q.  Do you recall what those stipulations
9  were?
10     A.  Well, one is that he would have to sit
11  out, or I think he was in a rotation, so he would
12  finish that rotation, but then sit out until he
13  could successfully complete the two failed
14  rotations.
15     Q.  And -- and this happened to be right when
16  the rotations were -- were moving to online or
17  remote learning; is that -- is that right?
18     A.  I don't actually remember, in a couple of
19  the e-mails it sounded like, yes, that they were --
20  we were somewhere in the COVID business.
21     Q.  Okay.  Who came up with the stipulations
22  that Jonathan had to have reached in order to remain
23  in the program?
24     A.  The Dean.
25     Q.  And as we've already briefly discussed,

Margi Gilmour, DVM
May 15, 2023

18

1  Jonathan was eventually dismissed from the program;
2  is that right?
3      A.  Yes.
4      Q.  Why was he dismissed?
5      A.  I believe somewhere in the stipulations,
6  he had to successfully complete all the rotations
7  with a C or better, and there was not going to be an
8  option of an appeal, should he fail a rotation.  And
9  when he did come back, he failed another rotation,
10  the anesthesia rotation.
11      Q.  And who was the instructor for that
12  rotation?
13      A.  Dr. Di Concetto.
14      Q.  Do you recall there being, you know, some
15  sort of incident that had took place at the end of
16  that rotation and the rotation was ended early?
17      A.  I do from the e-mails that I reviewed.
18      Q.  Okay.  What -- what happened during that
19  rotation that caused it to end early?
20      A.  I remember hearing, this was secondhand,
21  but at that time, they were doing a lot of their
22  rounds or these discussions, whatever, virtually, so
23  they would be on a Zoom or something similar.  And a
24  student apparently thought they were muted, and they
25  weren't, and made a derogatory comment that upset

19

1  Dr. Di Concetto.  And he was upset and he -- that
2  was the last day of the rotation, and it was already
3  in the afternoon or Friday afternoon and he just
4  said, you know, we'll -- we'll just end it here.
5  That's my understanding.
6      Q.  And did you ever find out who the student
7  was who -- who made that comment?
8      A.  Not that I remember.
9      Q.  And that was the -- the rotation, the
10  final rotation that Jonathan did not receive a
11  passing score; is that -- is that correct?
12      A.  I believe so, yes.
13      Q.  Do you recall Dr. Di Concetto contacting
14  you about Jonathan's score in that -- in that
15  rotation?
16      A.  Yes.  If a student fails, the instructor
17  will contact me and let me know that a student
18  failed a rotation.
19      Q.  Did Dr. Di Concetto suggest to you that
20  Jonathan be given another opportunity in -- in
21  his -- in his rotation?
22      A.  He offered that as -- as an option because
23  of the circumstances, you know, being in COVID and
24  not having a hands on, and -- and so on and so
25  forth.  Yes, he did.

20

1      Q.  And did you have a say in -- as to whether
2  or not that would be allowed?
3      A.  I -- Dr. Di Concetto suggested it, he
4  never went beyond that, but what I always counsel
5  all faculty is, they must stick to their syllabus,
6  which is the contract with all the students, follow
7  the syllabus and be sure that all the students are
8  treated equally.
9      And so that was my recommendation, and I -- I
10  understand where he was coming from, faculty, you
11  know, faculty have hearts, but ultimately, it's very
12  important, in order to be fair to all students, that
13  the syllabus be adhered to.
14      Q.  And because of the stipulations that were
15  placed on Jonathan, he didn't have the right to
16  appeal that decision; is that correct?
17      A.  That is correct.
18      Q.  And that's what ultimately led to his
19  dismissal; is that right?
20      A.  Failure of that rotation did.
21      Q.  All right.  So I have some exhibits here I
22  wanted to go through with you.
23      MR. BACH:  And, Clint, were you able to
24  get those?
25      MR. PRATT:  Yes.

21

1      MR. BACH:  I apologize it took so long,
2  but with no electricity, it made it a little more
3  difficult than usual.
4      MR. PRATT:  That's okay, I think we have
5  them.
6  BY MR. BACH:
7      Q.  Okay.  All right.  So I want to start with
8  Exhibit Number 1, which is Board 353 to 354.  Do you
9  have that in front of you?
10      A.  Yes.
11      Q.  Let me know when you've had an opportunity
12  to read it then.
13      MR. NARVAEZ:  Mr. Bach, this is Larry at
14  City Reporters, did you want me to bring that
15  exhibit up?
16      MR. BACH:  I think we're -- we're probably
17  good, but, Clint, if there's an issue and you need
18  him to put it on the screen, we should be able to do
19  that, okay?
20      MR. PRATT:  Okay.  As long as we're able
21  to identify we're looking at the same document, I
22  don't think there's a need to pull it up.
23      MR. NARVAEZ:  Okay.  I'll be here, just
24  holler out if you need me.
25      MR. BACH:  Okay.

22

1     MR. NARVAEZ: Okay, sir.
2     THE WITNESS: Okay.
3 BY MR. BACH:
4     Q. All right. Do you recognize this
5 document?
6     A. I don't have a great memory of it, but
7 obviously they're my e-mails.
8     Q. And these are e-mails in August of 2018;
9 is that right?
10    A. Yes.
11    Q. And these are the initial e-mails, an
12 e-mail from St. Matthew's, it looks like,
13 recommending two different students for placement
14 at -- at OSU, is that -- is that fair?
15    A. Yes.
16    Q. Is that normal for them to contact you in
17 August of the year before the student would begin?
18    A. I don't -- I don't really remember, I'm
19 sorry, the -- the timeframe. All the schools have
20 to notify us before they -- the students had
21 completed their last semester because they had to
22 make these placements in advance, so I'm -- I assume
23 this was normal.
24    Q. On the first page, there about halfway
25 down, there appears to be an e-mail from you on

23

1 August 21st of 2018?
2     A. Uh-huh.
3     Q. Do you see that?
4     A. Yes.
5     Q. And it says in there, "I may be too late
6 since I seem to be entering later into this
7 conversation. But I would be cautious with
8 Rivera-Pierola because St. Matthew's students
9 struggle more than others in our program. He
10 received C's and C minus in pretty much all the
11 clinical courses." Is that -- is that your e-mail?
12    A. Yes.
13    Q. Did you have any conversations with anyone
14 outside of this e-mail chain about your concerns?
15    A. Not to my recollection, no. It would have
16 been between me and Dr. Ross.
17    Q. Ultimately you -- it was your
18 authorization that allowed Jonathan to attend our
19 program, right?
20    A. I think it was Dr. Ross making the call
21 then, but since he was involved, I don't really
22 remember when we switched, to be honest, and --
23    Q. And what was --
24    A. -- I was making the decision.
25    Q. What role was Dr. Ross in?

24

1     A. Associate Dean before me and then he was
2 Interim Dean.
3     Q. And when did you become Associate Dean?
4     A. Full Associate Dean?
5     Q. Well, let's -- let's take both. When did
6 you become interim and then when did you become a
7 permanent?
8     A. Somewhere in 2018, I believe I became
9 permanent.
10    Q. Do you know why Jonathan was allowed to
11 join your program considering the concerns that you
12 had about him?
13    A. Dr. Ross, I believe, made the ultimate
14 call, and at that time, he would look, usually, at a
15 cutoff of GPA, so I'm assuming that Jonathan met the
16 GPA cutoff.
17    Q. In the e-mail right above yours from
18 Dr. Ross, his last sentence says, "Also, did we not
19 agree that we were going to pull back from SMU."
20 Did you see that?
21    A. Yes.
22    Q. Did you have a conversation with him about
23 not allowing SMU students to attend your program?
24    A. We were having conversations because they
25 sent so few students to us and that the students did

25

1 struggle more, clinically. He was doing, at that
2 point, most of the communications between St.
3 Matthew's and our school, so I know we had had that
4 discussion, but I can't tell you the exact time
5 frame when it started and when we concluded.
6     Q. Do you know why OSU was still accepting
7 students from St. Matthew's if there had been a
8 decision to not allow students from St. Matthew's to
9 attend?
10    A. Well, while we were still admitting the
11 students, that decision had not been made.
12    Q. Do you know when that decision was made?
13    A. It was once Dr. Risco was here, but I
14 don't remember the date. I'm sorry.
15    Q. When did Dr. Risco become Dean, if you
16 recall?
17    A. I don't remember.
18    Q. Do you know if it was in 2018 or 2019?
19    A. I'm sorry, I don't remember. I think it
20 was 2018, but --
21    Q. Sure, okay. All right. We can move on to
22 Exhibit Number 2, which is Board 355 through 356,
23 and let me know when you've had an opportunity to
24 review that.
25    A. Okay.

Margi Gilmour, DVM
May 15, 2023

26

1    Q.   And a lot of this is the same as Exhibit
2  Number 1.
3    A.   Uh-huh.
4    Q.   I'd like to call your attention to the
5  short e-mail at the very top of the first page here
6  from Dr. Ross to you.  Do you recall receiving this
7  e-mail?
8    A.   I don't recall, but clearly I did.
9    Q.   So Dr. Ross says, "I can see letting SMU
10  know about our concerns in this case, maybe imposing
11  a GPA limit on the applications going forward.
12  Bringing up Rivera-Pierola's GPA would get the" --
13  I'm sorry, "would get the discussion started."  Do
14  you recall any conversations with St. Matthew's
15  about -- about Jonathan in particular?
16    A.   No.
17    Q.   Do you recall having any conversations or
18  being a part of any conversations with St. Matthew's
19  about a grade point average minimum?
20    A.   No.
21    Q.   Do you believe that that's something that
22  Dr. Ross had established with them, with St.
23  Matthew's?
24    A.   I don't know.
25    Q.   Is Dr. Ross still with the university?

27

1    A.   Dr. Ross is deceased.
2    Q.   Okay.  All right.  Will you take a look at
3  Exhibit Number 3, it's just one page.  It's Board
4  357.
5    A.   Okay.
6    Q.   All right.  Do you recall seeing this
7  e-mail at the top of this page from Dr. Ross to --
8  it looks like a number of individuals at St.
9  Matthew's and Oklahoma State, including yourself?
10    A.   I honestly don't recall it, but I know I
11  received it.
12    Q.   Okay.  In this e-mail, Dr. Ross expresses
13  his concern about Jonathan to St. Matthew's.  Do you
14  recall if Dr. Ross or anyone at OSU had any
15  additional conversations with St. Matthew's about
16  these concerns?
17    A.   I did not, and I don't know if anyone else
18  did.
19    Q.   All right.  We can move on to Exhibit
20  number 4, which is 4580 through 581.  Let me know
21  when you've had a chance to do read through that.
22    A.   Okay.
23    Q.   So, is this the e-mail you received when
24  Jonathan did not receive a passing score on his
25  first rotation?

28

1    A.   Yes.
2    Q.   And is this when you would have met with
3  Jonathan for the first time?
4    A.   No.  Typically I would not meet with a
5  student with their first fail.
6    Q.   But you did meet with him in this -- in
7  this situation, did you not?
8    A.   Yes, per his request, I believe.
9    Q.   On the second page of this exhibit, it
10  appears to be an e-mail from you asking who
11  Jonathan's advisor is; is that right?
12    A.   Yes.
13    Q.   Did you speak with Jonathan's advisor
14  about this?
15    A.   No, I will typically e-mail the advisor
16  when a student fails a rotation and just bring them
17  into the loop, so that they know, and I'll often
18  suggest that they meet with them, just in case they
19  don't think of it themselves.
20    Q.   And in this case, did you contact his
21  advisor?
22    A.   I don't recall, but I know from review of
23  e-mails, I did let Dr. Holyoak know that Jonathan
24  had failed a rotation.
25    Q.   Okay.  All right.  If we go to Exhibit

29

1  Number 5, which is 4598.  Let me know when you've
2  had a chance to review that.
3    A.   Okay.
4    Q.   At the bottom of this page, there -- this
5  appears to be an e-mail from you to Mason Reichard;
6  is that right?
7    A.   Reichard, yes.
8    Q.   Reichard, okay.  And in this e-mail,
9  you're asking for the PSC to take a vote as to
10  whether or not to allow Jonathan to continue -- or
11  I'm sorry, to allow him to repeat his -- his
12  rotation; is -- is that correct?
13    A.   Yes, uh-huh.
14    Q.   Is that normal?
15    A.   Yes.
16    Q.   Is that --
17    A.   Yes.
18    Q.   And it appears that it was agreed by the
19  PSC that he could repeat that rotation; is that
20  right?
21    A.   Yes.
22       MR. PRATT:  Jason, I'm sorry, this is --
23  this is my fault.  Did you ask her the question of
24  was that normal or was that abnormal?  I'm sorry, I
25  couldn't --

Margi Gilmour, DVM
May 15, 2023

30

1        MR. BACH:  I said normal.
2        MR. PRATT:  Okay.  All right.  My fault.
3        THE WITNESS:  Yeah, okay, okay.
4     Q.  We can skip Exhibit 6 here, we've already
5  talked about that.  All right.  We go to Exhibit
6  Number 7, which is Board 638 through 642.
7     A.  Okay.
8     Q.  Do you recall seeing this document before?
9     A.  Yes.
10     Q.  And if you go to the very last page of
11  this, there appears to be an e-mail from you, which
12  if you look at the page before that, indicates that
13  you sent it on October 1st of 2019.  Is -- is that
14  right?
15     A.  Oh, there it is, at the bottom.  I'm
16  sorry.
17     Q.  That's okay.
18     A.  Yes.  Still seems like I'm -- okay.  Yes.
19  Yes.  Yes, I'm -- got it.
20     Q.  Is there anything about this that doesn't
21  seem to be accurate, or --
22     A.  No.
23     Q.  Is this -- this e-mail that you sent on
24  October 1st of 2019?
25     A.  Uh-huh.

31

1     Q.  Is this before or after you met with
2  Jonathan?
3     A.  It would have -- it would have been
4  before, because these usually go right out to my
5  e-mails -- I'm sorry, to an advisor usually goes out
6  right away as soon as I'm notified that a student
7  has failed a rotation.  So, this should -- this
8  should have been before I met with Jonathan.
9     Q.  Okay.  In the e-mail that you had received
10  or that you received later that day from
11  Dr. Holyoak, he is informing you that Jonathan did
12  not have a mid-block evaluation.  Do you see that?
13     A.  Yes.
14     Q.  Is that -- well, what is a mid-block
15  evaluation?
16     A.  A mid-block evaluation is where the
17  students on a clinical rotation are given an
18  evaluation of their performance somewhere in the
19  middle of that rotation.  So, these, I think, were
20  still three week rotations at this time, so it
21  usually would have been somewhere in the middle
22  during week two.
23     Q.  And is this something that the instructors
24  are -- are required to do?
25     A.  No, they are not.

32

1     Q.  Dr. Holyoak also indicated in his e-mail
2  that there seems to be some significant
3  communication lapses, I believe, as in -- in all of
4  these that there was a lack on both sides.  Do you
5  see that?
6     A.  Yes.
7     Q.  And then ultimately, in the e-mail above
8  that, you then inquired as to -- you inquired about
9  this; is that right?
10     A.  It seemed to me that when Jonathan spoke
11  to Dr. Holyoak, there was a lot of focus on
12  communication lapses, which is -- and Dr. Holyoak
13  had asked him to come see me, so, yes, I wanted to
14  have as much information about their communications
15  with Jonathan in case I was to meet with him, yes.
16     Q.  Is the point of the mid-block evaluation
17  so that the student knows how they're progressing in
18  the rotation?
19     A.  Yeah, mid-blocks can be used solely for
20  that purpose, to advise the student what they're
21  doing well, what they can improve on, and then some
22  of us also used it to get feedback from the student
23  on what we could do better to help them.  So, yes.
24     Q.  So, if you go to the front of this
25  exhibit, eventually you received an e-mail from

33

1  Laura Nafe; is that correct?
2     A.  Yes.
3     Q.  And in that e-mail in the first paragraph
4  on the first page of this exhibit, she indicates
5  that she believed that Jonathan -- that there was
6  situations that he was dishonest.  Is that fair to
7  say?
8     A.  Yes.
9     Q.  Did you speak with Jonathan about that?
10     A.  I don't remember.
11     Q.  Would that normally be something that you
12  spoke with a student about if an instructor raised
13  that concern to you?
14     A.  I guess it would depend on the students
15  and usually when I meet with them, I like to hear
16  their take on the rotation and their perception of
17  the evaluation, and have discussions based on that.
18     Q.  But you don't recall if you had any
19  conversations with Jonathan about this allegation;
20  is that right?
21     A.  I don't remember, no.
22     Q.  Do you know if Jonathan ever had an
23  opportunity to respond to that allegation?
24     A.  Respond to -- to the instructors?
25     Q.  Let me rephrase.  Do you know if Jonathan

Margi Gilmour, DVM
May 15, 2023

34

1  was ever notified that there was this allegation
2  about him being dishonest?
3      A.  I don't know if that came up in their
4  discussion with him when they told him he was
5  receiving a D, so, I -- I don't know.
6      Q.  So -- so Jonathan was allowed to continue
7  in the program after not passing his first rotation.
8  Was the next time that you recall hearing anything
9  about Jonathan, is that when he did not pass the
10 second rotation that he did not receive a passing
11 score on?
12     A.  That is my understanding, yes.
13     Q.  All right.  So then let's move on to
14 Exhibit 8 here, which is 41034 through 1035.
15     A.  Okay.
16     Q.  Did you recall seeing these e-mails in the
17 past?
18     A.  Not until I reviewed them.
19     Q.  Do you recall being made aware of there
20 being some sort of incident involving Jonathan and
21 Dr. Syp -- and I'm drawing a blank here, just give
22 me a second -- and Dr. DeMars?
23     A.  I do remember.
24     Q.  Did you ever have any conversations
25 with -- with either one of those instructors about

35

1  this incident?
2      A.  Not that I remember.
3      Q.  Your -- your entire sort of information
4  from this incident came from Dr. Burba; is that
5  accurate?
6      A.  I believe so, I just -- I don't remember
7  if I spoke to Dr. DeMars or Dr. Syp.  I remember
8  first hearing about it through Dr. Burba, though.
9      Q.  Had you been made aware of any other
10 incidents of these instructors not acting in a
11 professional way?
12     A.  No.
13     Q.  Did this come as a surprise to you?
14     A.  Yes.
15     Q.  In your role as the Associate Dean for
16 academic affairs, did you supervise or have any type
17 of supervisory authority over instructors or
18 professors?
19     A.  No, my role was over students, and issues
20 with faculty would be brought to their department
21 head.
22     Q.  And Dr. Burba was their -- he was their
23 department head; is that -- that right?
24     A.  Yes.
25     Q.  And do you know if Dr. Burba took any

36

1  action with these instructors after this incident?
2      A.  I don't know, or I don't remember.
3      Q.  He didn't tell you about any conversations
4  that he had with them about this?
5      A.  Not that I remember.
6      Q.  At the very bottom on the second page of
7  this exhibit, there's an e-mail from a Jon Marlow.
8  Have you seen this e-mail before?
9      A.  Yes.
10     Q.  Did you have any conversations with
11 Mr. Marlow about -- about this e-mail or about his
12 concerns?
13     A.  No.
14     Q.  Do you know if anyone did?
15     A.  No, I don't know.
16     Q.  In the e-mail that appears to be from you
17 that starts at the very bottom of the first page and
18 continues on to the second page, you indicate that
19 "I'm not sure I understand how two faculty members
20 could lose emotional control when speaking to the
21 student."
22     Did you ever resolve that question, or did
23 anyone ever explain to you how this incident
24 exploded the way that it did?
25     A.  Dr. -- it was my understanding Dr. Burba

37

1  was going to address it with the faculty, and I
2  don't -- I don't remember a conversation after that,
3  we may have had one, I just -- I don't remember.
4      Q.  And then on the e-mail from Dr. Burba at
5  the top of the first page, looks like the second
6  paragraph, he says, "I'm" -- "I'm going to meet with
7  Paul and challenge him to go a step further and
8  demonstrate with leadership by maintaining total
9  control from the beginning of the situation or the
10 conversation."  Did Dr. Burba ever inform you that
11 he -- he did meet with Paul?
12     A.  Not that I remember.
13     Q.  All right.  If you can take a look at
14 what's been marked as Exhibit 9, which is Board 296.
15     A.  Okay.
16     Q.  Is this your notes?
17     A.  Yes.
18     Q.  I just wanted to confirm that.  And in
19 this, you indicate that Jonathan would like to
20 address the PSC, since there's the possibility of
21 being dismissed.  Does the PSC ever meet and discuss
22 students without the students having the opportunity
23 to meet with them?
24     A.  I'm sorry, could you ask that again?
25     Q.  Sure.  Is it unusual for a student to

Margi Gilmour, DVM
May 15, 2023

---

38

1  request to address the PSC in -- in this type of
2  situation where they failed the second -- second
3  rotation?
4     A.  No.  It's routine after a second rotation
5  fail.  In fact, we encourage it.
6     Q.  All right.  If you could take a look at
7  Exhibit Number 10, which is 41175 through 1176.
8     A.  Okay.
9     Q.  All right.  Can you tell me what this is?
10    A.  Yes.  This is the summary from the Chair
11 of the Professional Standards Committee, that was
12 Dr. Reichard, and following the Professional
13 Standards Committee meeting, he provides me with a
14 summary and the ultimate decision.
15    Q.  When you receive this, what do you do with
16 it?
17    A.  I notify the student of the Professional
18 Standards Committee decision and the Dean.
19    Q.  And is -- is the student allowed to
20 continue in the program while they're being notified
21 of -- of this -- this recommendation for dismissal?
22    A.  From the time that they receive their
23 grade, and then there's an answer from the
24 Professional Standards Committee, yes, they stay in
25 their rotation.

---

40

1  planned, it would have been the same day, yes.
2     Q.  In that e-mail you're saying that the Dean
3  had suggested that -- that the student's advisor be
4  present with them at the PSC, when they meet with
5  the PSC; is that -- is that right?
6     A.  At some point, it looks like he
7  recommend -- or, yes, that we considered that, yes.
8     Q.  And in an e-mail a little ways above that
9  from you, it says, "I say we make it so, included in
10 the Student handbook for next year."
11    A.  Uh-huh.
12    Q.  Do you see that?
13    A.  Yes.
14    Q.  Did that happen?
15    A.  I don't remember.
16    Q.  Do you know if Jonathan had his advisor
17 with him at -- when he met with the PSC?
18    A.  I don't recall Dr. Holyoak being there.
19    Q.  Do you know if this topic came up with the
20 Dean because Jonathan's advisor was not with him at
21 the PSC?
22    A.  I honestly don't remember what the Dean
23 and I talked about, if that was part of it or -- I
24 don't recall.
25    Q.  All right.  If we could move on to Exhibit

---

39

1     Q.  All right.  If you could take a look at
2  Exhibit 11, which is Board 1178.
3     A.  Okay.
4     Q.  All right.  On this -- on this document,
5  there appears to be an e-mail from you to the Dean
6  on March 22nd.  Do you see that?
7     A.  Yes.
8     Q.  And you're -- essentially, you're asking
9  to meet with the Dean about Jonathan -- well, about
10 Jonathan; is that right?
11    A.  Yes.
12    Q.  Did you, in fact, meet with the Dean?
13    A.  I -- I don't remember.  I assume I did,
14 but I don't remember.
15    Q.  All right.  I assume you don't recall what
16 you discussed with him; is that right?
17    A.  I don't.
18    Q.  All right.  If you could take a look at
19 Exhibit 12, which is Board 121 -- 1215 through 1216.
20    A.  Okay.
21    Q.  Would you agree that the e-mail at the
22 bottom of page 1 from you was written on the same
23 day, that, according to the previous exhibit, that
24 you met with the Dean?
25    A.  I -- if I did meet with him, as was

---

41

1  Number 13, which is Board 1299 through 1301.
2     A.  Okay.
3     Q.  All right.  And Exhibit 13 here, is this
4  the appeal that Jonathan submitted after it was
5  recommended that he be dismissed?
6     A.  Yes.
7     Q.  And the first page of this appears to be
8  an e-mail from the Dean to you and says, "Jonathan's
9  letter, we can discuss."  Do you see that?
10    A.  Yes.
11    Q.  Did you, in fact, have a discussion with
12 the Dean about this letter?
13    A.  I don't remember.
14    Q.  Would you have had any notes or anything
15 that you would have taken if you did meet with the
16 Dean?
17    A.  Not necessarily.  I don't usually make
18 notes when I meet with the Dean.
19    Q.  Do you recall having a conversation with
20 anyone about this letter that Jonathan submitted?
21    A.  I do not.  Well, until the Professional
22 Standards Committee met about it, because I am on
23 that committee.
24    Q.  Okay.  What was discussed there?
25    A.  Well, the Dean had asked the committee to

---

Margi Gilmour, DVM
May 15, 2023

42

1  review their decision, and so we would have reviewed
2  this appeal letter.
3      Q.  So you are also a member of -- of the
4  committee, as well?
5      A.  Ex-officio.
6      Q.  So you didn't have a vote on the
7  committee; is that right?
8      A.  That's correct.
9      Q.  All right.  We can move on to Exhibit
10  Number 14, Board 1384 through 1385.
11      A.  Okay.
12      Q.  Do you recall seeing this before?
13      A.  I'm actually not sure what this is.
14      Q.  What, the second page?
15      A.  Yeah.  Was that an attachment to one of
16  these?
17      Q.  Well, I would normally be asking you that
18  question, but that is my understanding.
19      A.  Is it that --
20      Q.  If you --
21      A.  Yes, yes, yes.
22      MR. PRATT:  I just directed her attention
23  to the top of the e-mail.
24      THE WITNESS:  The attachment, yeah.  Okay.
25  So this must be -- okay.  Yes.

43

1      Q.  So would you agree with me that this
2  starts off with an e-mail from the Dean to the PSC
3  asking them to consider Jonathan's appeal?
4      A.  Yes, uh-huh.
5      Q.  And then -- and then there's a response
6  that -- that the PSC met and they don't see a reason
7  to reverse their recommendation; is that right?
8      A.  Yes.
9      Q.  And then there appears to be an e-mail
10  from you to the Dean saying, "FYI, I summarized the
11  recommendations you had outlined when we last spoke
12  about Jonathan's case," and then it appears that the
13  second page here is that attachment.  Will you agree
14  with that?
15      A.  Yes.  Looks like it, yes.
16      Q.  And are these the conditions that we spoke
17  about earlier that Jonathan would have to adhere to
18  if he were to continue in the program?
19      A.  Yes.
20      Q.  And did you come up with any of these, or
21  was this all from the Dean?
22      A.  Those are all from the Dean.
23      Q.  Had you met with Jonathan at this point,
24  for the second time?
25      A.  The second time I met with Jonathan was

44

1  before he met with the Professional Standards
2  Committee, so that would have been before this in
3  the appeal.
4      Q.  When you met with Jonathan that time, do
5  you recall his demeanor at all?
6      A.  I really don't recall the meeting, to be
7  honest.
8      Q.  Okay.  Do you recall if you had a positive
9  or negative impression of him?
10      A.  No.
11      Q.  Were you surprised that Dr. Risco was
12  giving Jonathan another opportunity?
13      A.  Yes.
14      Q.  And do you recall if he ever informed you
15  why he was giving him another opportunity?
16      A.  No.  Just one more chance, but nothing
17  specific.
18      Q.  Did you inform Dr. Risco that you
19  disagreed with his decision?
20      A.  I don't remember.
21      Q.  All right.  We can move on to Exhibit
22  Number 15 here, which is Plaintiff 056.
23      MR. PRATT:  Hey, Jason, can we take a
24  five-minute break?  We've been going about an hour,
25  about an hour, stop and take a break.

45

1      MR. BACH:  Yeah, that's fine, I can tell
2  you, I don't have much more.
3      MR. PRATT:  I figured as much.  That's why
4  I figured we won't need long, just maybe a quick
5  opportunity for a break.
6      MR. BACH:  No problem.
7      MR. PRATT:  All right.  Thank you.
8      (Recess taken.)
9  BY MR. BACH:
10      Q.  All right.  We can move on to Exhibit
11  Number 15 there, which is Plaintiff 056.
12      A.  Okay.
13      Q.  Do you recognize this document?
14      A.  Yes.
15      Q.  And what is it?
16      A.  This is a letter that I sent to Jonathan
17  advising him that the committee stood by their
18  initial recommendation of dismissal, but the Dean's
19  final decision was to allow him to stay in the
20  program, and then outlining the details.
21      Q.  Outlining the conditions that would be in
22  place if he continued the program, is that --
23      A.  Yes, under academic suspension, yes.
24      Q.  And did you have a discussion with
25  Jonathan about this?

Margi Gilmour, DVM
May 15, 2023

---

46

1    A.  No.  This was all done via e-mail.
2    Q.  Did this require Jonathan to agree to this
3  or to sign any agreement of any kind?
4    A.  No.
5    Q.  Do you recall the Dean meeting with
6  Jonathan's parents?
7    A.  No.
8    Q.  Did you ever meet with his parents?
9    A.  No.
10    Q.  All right.  If we can move on to Exhibit
11  Number 16 here, which is Plaintiff 057 through 061.
12    A.  Okay.
13    Q.  Do you recognize this e-mail thread?
14    A.  Yes.
15    Q.  Is this the incident with Dr. Di Concetto
16  when someone had made a derogatory comment?
17    A.  It looks like it, yes.
18    Q.  And then would you agree that the e-mails
19  that come after that are -- are all responses from
20  the students in that rotation?
21    A.  Yes.
22    Q.  Were you ever -- did you ever hear any
23  allegation that -- that Jonathan was the one who
24  made that comment on -- on that video meet up?
25    A.  I don't remember any student being

---

47

1  implemented or incriminated on that, honestly.
2    Q.  You had asked Dr. Di Concetto to tell you
3  who the student was; is that right?
4    A.  When there is an unprofessional occurrence
5  like this, I like to know, I always ask the
6  instructor who is it, so I can meet with the student
7  and have a discussion why this is not professional
8  behavior.  And some instructors tell me and others
9  don't or some just honestly don't know.  We always
10  give it a shot anyway.
11    Q.  And what's your recollection as to what
12  Dr. Di Concetto told you?
13    A.  I don't remember what Dr. Di Concetto
14  said, but I don't remember meeting with any student
15  about this.
16    Q.  If we can move on to Exhibit Number 17,
17  and that is Board 1451 through 1454.  Are we missing
18  a page here?
19    MR. PRATT:  It appears that 1452 is
20  missing, I don't know if that was maybe a blank
21  page, I don't see that there is a -- any -- anything
22  that's actually missing, but I noticed that, as
23  well.
24    Q.  All right.  I don't think it's going to be
25  important here, but let's -- let's roll with this.

---

48

1    A.  Okay.
2    Q.  So would you agree with me that Exhibit
3  Number 17 is the e-mail that Dr. Di Concetto sent
4  out about the rotation ending early, and then above
5  that is a response that Jonathan had sent to
6  Dr. Di Concetto and everyone and all the students
7  who were in that rotation?
8    A.  Yes.
9    Q.  And then you sent in -- or you forwarded
10  to Robin Wilson; is that -- is that correct?
11    A.  Yes.
12    Q.  Who is Robin Wilson?
13    A.  She is the Director of Student Services
14  for the college.
15    Q.  And your comment occurs, "Interesting.
16  Mr. MPH is the only one excusing the comment and
17  making the excuses."  By Mr. MPH, I assume that
18  you're referring to Jonathan and his master's of
19  public health that he -- he lists after his name
20  there?
21    A.  I guess, I don't -- I actually don't
22  remember this, but I would assume so.
23    Q.  What -- what excuses did you feel that
24  Jonathan was making in this situation?
25    A.  Well, I don't know.  I honestly don't know

---

49

1  what I was referring to.
2    Q.  Did you have a negative opinion of
3  Jonathan by this time?
4    A.  Not that I recall.  A student that, you
5  know, was struggling and he's not the only one we've
6  seen.
7    Q.  By referring to Jonathan as Mr. MPH, were
8  you attempting to be derogatory?
9    A.  I don't remember.  I don't remember
10  sending this, so I don't remember my intent, and I
11  didn't remember he had an MPH.
12    Q.  All right.  If we can move on to Exhibit
13  18, which is Board 1460 through 1461.
14    A.  Okay.
15    Q.  All right.  We had talked earlier about
16  Dr. Di Concetto wanting to give Jonathan another
17  opportunity after he didn't pass his rotation; is
18  that fair to say?
19    A.  Dr. Di Concetto, I would say, suggested
20  it, not that he necessarily felt that it should be
21  done, it wasn't uncommon for Dr. Di Concetto to
22  make, you know, kind of suggestions going a little
23  bit out of our policy or his syllabus or things like
24  that.
25    Q.  Meaning he tended to be more flexible than

---

Margi Gilmour, DVM
May 15, 2023

50

1  other instructors?
2      A.  No.  He -- it was more that he didn't
3  understand, I think, sometimes that we -- we
4  can't -- we can't treat students differently.
5      Q.  In the e-mail that's at the top of the
6  first page here from Dr. Di Concetto to you on April
7  20th of 2020, it says, "Given the abnormal nature of
8  the rotation, to me, it would make sense to allow
9  someone to repeat it once the circumstances are
10  normalized."  Do you see that?
11      A.  Yes.
12      Q.  And again, this is, you know, mid to late
13  April of 2020 shortly after the COVID lockdown; is
14  that -- is that accurate?
15      A.  Yes.
16      Q.  Is it your understanding that that's the
17  abnormal nature that he's referring to?
18      A.  Yes.
19      Q.  So, did -- did you ultimately have a
20  conversation with Dr. Di Concetto and ask him that
21  Jonathan was not going to be given another
22  opportunity?
23      A.  No, I don't believe we discussed anything
24  outside of this e-mail.
25      Q.  Did Dr. Di Concetto have the authority to

51

1  give Jonathan another opportunity?
2      A.  No.
3      Q.  What about another opportunity to retake
4  his exam, is that something that would have been
5  within his power?
6      A.  Not if it is outside his syllabus.
7      Q.  All right.  If you could take a look at
8  our last exhibit here, Exhibit 19, which is
9  Plaintiff 084.
10      A.  Okay.
11      Q.  Can you tell me what this is?
12      A.  This would have been a letter that I sent
13  to Jonathan advising him he was dismissed from the
14  program.
15      Q.  Did you have a conversation with the Dean
16  about this before you sent this letter?
17      A.  I don't remember that discussion.  I would
18  assume I did, because this has been quite a long,
19  protracted -- of course, he wanted to give Jonathan
20  another chance, so I would think that I did, but I
21  don't remember.
22      Q.  Would you need for the Dean to give you
23  the final go ahead to send a letter like this, even
24  though those stipulations were in place?
25      A.  That's a good question.  Technically,

52

1  probably not, but professionally, it would be
2  unusual, anytime a student is dismissed, I always
3  advise the Dean, so I would assume that he knew
4  before I sent this letter out.
5      Q.  Do you know if he told the Dean that
6  Dr. Di Concetto was mentioning given -- giving
7  Jonathan another opportunity?
8      A.  I don't remember.
9      Q.  Did you have any conversations with
10  Jonathan after you sent this letter?
11      A.  I don't -- I don't think so.
12      Q.  Did you have any conversations with the
13  Dean after you sent this letter about Jonathan?
14      A.  Not that I remember.
15      Q.  Do you recall having any conversations
16  with anyone else at the college about Jonathan after
17  this letter was sent?
18      A.  I don't remember.
19      Q.  All right.  Just give me a minute here
20  just to look through my notes and let me see if I
21  have anything else for you.
22          MR. BACH:  All right.  I'll pass the
23  witness.
24          MR. PRATT:  Okay.  I have a few follow-up
25  questions, but I don't think we'll be long.

53

1              CROSS-EXAMINATION
2  BY MR. PRATT:
3      Q.  Dr. Gilmour, do you recall a conversation
4  that you had with counsel a little while back
5  referencing some e-mail communications about the
6  possibility of including a student academic advisor
7  in the meetings with the PSC?
8      A.  Yes.
9      Q.  Okay.  I think you have all of the
10  exhibits in front of you right now that have been
11  labeled 1 through 19.  Would you please locate
12  Exhibit 12 and take a look at that?  I believe it's
13  a two-page exhibit, Board 1215 through Board 1216.
14      A.  Yes.
15      Q.  You have that in front of you now?
16      A.  Yes.
17      Q.  Okay.  And do you recall those
18  conversations, in fact, I believe a question was
19  asked specifically about the e-mail midway through
20  the first page dated March 23rd of 2020 where you
21  had indicated about the suggestion that a academic
22  advisor be included, but you said, "I say we make it
23  so and include it in the student handbook next
24  year."  Do you recall that?
25      A.  Yes.

Margi Gilmour, DVM
May 15, 2023

54

1    Q.  Would you please look to the e-mail that
2  precedes that from you down below at the bottom of
3  the page?
4    A.  Yes.
5    Q.  And if you'll notice, it -- it seems to
6  span page -- or Board 1215 and Board 1216, there is
7  a sentence on 1216.  What -- what does that say?
8    A.  "This does not have anything to with the
9  Rivera-Pierola decision.  Dr. Risco was very
10 complimentary of the letter we provided."
11   Q.  Okay.  Do you believe that was an accurate
12 and honest statement that you made at that time?
13   A.  Yes.
14   Q.  Do you know why the conversation was
15 happening at this time, if it did not have anything
16 to do with the Rivera-Pierola decision?
17   A.  Not specifically.  It was not unusual that
18 when we came up with things we thought would be an
19 improvement to our processes, that we'd mention it,
20 in this case, to Robin Wilson and then Dr. Reichard,
21 who was the chair at the time, have a discussion and
22 then put it on a list of change for the next year.
23   Q.  As a nonvoting member of the PSC, you were
24 present for, I assume, a relatively large numbers of
25 PSC's; is that accurate?

55

1    A.  Yes.
2    Q.  Were advisors, student academic advisors
3  ever present during those meetings that you recall?
4    A.  I recall one meeting with an advisor,
5  student asked to bring their advisor.
6    Q.  But only one?
7    A.  Yes.
8    Q.  Okay.  At the time that Mr. Rivera-Pierola
9  was participating in the program, did OSU follow its
10 policies and procedures with regard to academic
11 advisors' presence at a PSC meeting?
12   A.  Yes.
13   Q.  But you said you do not recall
14 definitively whether Dr. Holyoak was present or not,
15 correct?
16   A.  No, I can't say, huh-uh.
17   Q.  But regardless of whether he was there or
18 not, OSU would have been complying with its policies
19 and procedures?
20   A.  Yes.
21   Q.  Is there anything that's been discussed
22 today or anything that you were aware of during
23 Mr. Rivera-Pierola's time in the program that would
24 have necessitated or even warranted an academic
25 integrity violation being filed against him?

56

1    A.  No.
2    Q.  So during your time of involvement with
3  the Oklahoma State University College of Veterinary
4  Medicine program, do you recall a number or estimate
5  of academic integrity violations filed against
6  students specifically participating in the year four
7  clinical program?
8    A.  None.
9    Q.  None that you can recall?
10   A.  (Witness shakes head.)
11   Q.  Not a single one?
12   A.  Correct.
13   Q.  So it would be quite unusual for a faculty
14 member to file an academic integrity violation
15 against a student participating in a year four
16 program?
17   A.  Yes.
18   Q.  And why is that?
19   A.  Year four is very different.  You are
20 expected to assimilate a lot of information and act
21 professional and communicate well and you just have
22 to bring everything like that together.  And it's
23 not like you have some way you're going to cheat on
24 that.  You bring your A game, but there's no way to
25 cheat.

57

1    In years one through three, of course, it's
2  very different, you're in a class, there's high
3  stakes, there's exams, there's things to turn in,
4  and there, we have seen some academic integrity
5  issues come up in students looking on another
6  student's paper, or, you know.  But fourth year,
7  it's that, you know, doing some action to get ahead
8  or to cheat, it just isn't really applicable in that
9  setting.
10        MR. PRATT:  I'll pass the witness.
11             REDIRECT EXAMINATION
12 BY MR. BACH:
13   Q.  If you don't mind, I know that you're
14 retired.  Is there any reason that you wouldn't be
15 available for -- to attend a trial in September?
16   A.  No.
17   Q.  So, no, you -- you wouldn't have any --
18 any obstacle to attend a trial, if, in fact, it goes
19 to trial in September?
20   A.  No, I would not.
21        MR. BACH:  I don't have anything further.
22        MR. PRATT:  Okay.  We'll read and sign.
23        MR. BACH:  All right.  Thank you very much
24 for your time here today.
25        (Deposition concluded at 3:42 p.m.)

58

1            ERRATA SHEET
2       WITNESS: MARGI GILMOUR
3       DATE: MAY 15, 2023
4       REPORTER:  Brenda Schmitz, CSR, RPR
5   NO CORRECTIONS ARE NECESSARY _____
6   PAGE LINE  CORRECTION            REASON
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____

59

1            JURAT
2       I, MARGI GILMOUR, do hereby state under oath
3   that I have read the above and foregoing transcript
4   in its entirety, and that the same is a full, true,
5   and correct transcription of my testimony so given
6   at said time and place, except for the corrections
7   noted.
8
9       _____
        MARGI GILMOUR
10
11      SUBSCRIBED AND SWORN TO BEFORE ME, the
12  undersigned Notary Public in and for the State of
13  _____ on this, the _____ day of
14  _____, 2023.
15
16      _____
        Notary Public
17
    My Commission Expires: _____
18
19
20
21
22
23
24      REPORTED BY:  BRENDA SCHMITZ, CSR, RPR
25

60

1            CERTIFICATE
2   STATE OF OKLAHOMA  )
                       )  SS:
3   OKLAHOMA COUNTY    )
4       I, Brenda Schmitz, Certified Shorthand Reporter
5   within and for the State of Oklahoma, do hereby
6   certify that the above-named MARGI GILMOUR was by me
7   first duly sworn to testify to the truth, the whole
8   truth, and nothing but the truth in the case
9   aforesaid; that the above and foregoing deposition
10  was by me taken in shorthand and thereafter
11  transcribed; that the same is true and correct; and
12  that it was taken on MAY 15, 2023, at the time of
13  2:04 p.m. in the City of Stillwater, County of
14  Payne, State of Oklahoma under the stipulations
15  hereinbefore set out, and that I am not attorney for
16  or relative of any of said parties or otherwise
17  interested in the event of said action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  and official seal this 25th day of May, 2023.
20
21
22      _____
        BRENDA SCHMITZ, CSR, RPR #18230
23      Oklahoma Certified Shorthand Reporter
        Certificate No. 00823
24      Expires: December 31, 2023
25

**A**

**able** 20:23 21:18
21:20
**abnormal** 29:24
50:7,17
**above-named**
60:6
**academic** 8:7
11:10 35:16
45:23 53:6,21
55:2,10,24 56:5
56:14 57:4
**accept** 11:14 12:6
**accepting** 25:6
**accurate** 16:23
30:21 35:5 50:14
54:11,25
**act** 56:20
**acting** 35:10
**action** 36:1 57:7
60:17
**additional** 27:15
**address** 37:1,20
38:1
**adhere** 43:17
**adhered** 20:13
**admission** 11:22
**admitting** 25:10
**advance** 22:22
**advise** 32:20 52:3
**Advisee** 3:9
**advising** 45:17
51:13
**advisor** 28:11,13
28:15,21 31:5
40:3,16,20 53:6
53:22 55:4,5
**advisors** 55:2,2
**advisors'** 55:11
**affairs** 8:7 35:16
**aforesaid** 60:9
**afternoon** 19:3,3
**ago** 5:23
**agree** 16:18 24:19

39:21 43:1,13
46:2,18 48:2
**agreed** 4:2,12
29:18
**agreement** 46:3
**AGRICULTUR...**
1:8
**ahead** 51:23 57:7
**al** 1:8
**allegation** 33:19
33:23 34:1 46:23
**allow** 25:8 29:10
29:11 45:19 50:8
**allowed** 13:18
16:17 17:5 20:2
23:18 24:10 34:6
38:19
**allowing** 17:1
24:23
**anesthesia** 3:18
18:10
**animal** 10:10
13:17
**answer** 4:16 6:20
6:24 38:23
**anytime** 52:2
**anyway** 47:10
**apologize** 21:1
**apparently** 18:24
**appeal** 3:15,16
14:2,20 15:8,8
15:14,15,17 16:2
18:8 20:16 41:4
42:2 43:3 44:3
**appealing** 14:23
**APPEARANCES**
2:1
**appears** 22:25
28:10 29:5,18
30:11 36:16 39:5
41:7 43:9,12
47:19
**Appendix** 5:6
**applicable** 57:8

**applicants** 12:17
**applications** 26:11
**April** 50:6,13
**area** 13:9
**asked** 15:22 16:4
32:13 41:25 47:2
53:19 55:5
**asking** 6:11,16
28:10 29:9 39:8
42:17 43:3
**assimilate** 56:20
**Associate** 8:6,11
10:25 11:12,19
24:1,3,4 35:15
**assume** 6:21 22:22
39:13,15 48:17
48:22 51:18 52:3
54:24
**assuming** 24:15
**attachment** 42:15
42:24 43:13
**attempting** 49:8
**attend** 23:18
24:23 25:9 57:15
57:18
**attention** 26:4
42:22
**attorney** 6:10
60:15
**attorneys** 4:4,14
7:16
**August** 22:8,17
23:1
**authority** 16:10
35:17 50:25
**authorization**
23:18
**available** 57:15
**average** 26:19
**aware** 34:19 35:9
55:22

**B**

**Bach** 2:4,4,17

5:11 6:9 20:23
21:1,6,13,16,25
22:3 30:1 45:1,6
45:9 52:22 57:12
57:21,23
**bachelor's** 9:4
**back** 16:17 18:9
24:19 53:4
**bad** 6:17
**based** 33:17
**beginning** 37:9
**behalf** 1:15 4:5
**behavior** 47:8
**believe** 18:5 19:12
24:8,13 26:21
28:8 32:3 35:6
50:23 53:12,18
54:11
**believed** 16:21
33:5
**bequest** 16:4
**best** 6:14 7:22
14:7 16:23
**better** 10:14 12:2
18:7 32:23
**beyond** 20:4
**bit** 49:23
**blank** 34:21 47:20
**Board** 1:7 21:8
25:22 27:3 30:6
37:14 39:2,19
41:1 42:10 47:17
49:13 53:13,13
54:6,6
**bottom** 29:4 30:15
36:6,17 39:22
54:2
**break** 44:24,25
45:5
**Brenda** 1:22 4:7
58:4 59:24 60:4
60:22
**brief** 9:1
**briefly** 17:25

**bring** 21:14 28:16
55:5 56:22,24
**Bringing** 26:12
**brought** 9:12
35:20
**Burba** 35:4,8,22
35:25 36:25 37:4
37:10
**business** 17:20

**C**

**C** 18:7 23:10
**C's** 23:10
**call** 23:20 24:14
26:4
**case** 1:6 26:10
28:18,20 32:15
43:12 54:20 60:8
**caused** 18:19
**cautioned** 5:5
**cautious** 23:7
**certain** 16:16
**Certificate** 2:22
60:1,23
**Certified** 4:7 60:4
60:23
**certify** 60:6
**chain** 23:14
**chair** 38:10 54:21
**challenge** 37:7
**chance** 16:15
27:21 29:2 44:16
51:20
**change** 54:22
**Chapter** 5:6
**charleston** 2:5
**cheat** 56:23,25
57:8
**Chris** 3:5
**circumstances**
19:23 50:9
**City** 1:22,23 4:6
21:14 60:13
**CIV-21-616** 1:6

**Civil** 4:11
**class** 57:2
**clear** 7:3
**clearly** 26:8
**clinical** 10:15 12:5
  12:10,19 23:11
  31:17 56:7
**clinically** 25:1
**clinicals** 3:4
**Clint** 20:23 21:17
**clint.pratt@oks...**
  2:13
**CLINTON** 2:10
**coach** 14:6
**college** 8:5 48:14
  52:16 56:3
**COLLEGES** 1:8
**come** 13:22 18:9
  32:13 35:13
  43:20 46:19 57:5
**coming** 20:10
**comment** 18:25
  19:7 46:16,24
  48:15,16
**Commission**
  59:17
**committee** 7:15
  14:5,9 15:2,23
  16:3,5,22 38:11
  38:13,18,24
  41:22,23,25 42:4
  42:7 44:2 45:17
**communicate**
  11:11 15:4 56:21
**communicated**
  15:5
**communication**
  32:3,12
**communications**
  25:2 32:14 53:5
**community** 13:25
**complete** 17:13
  18:6
**completed** 22:21

**complimentary**
  54:10
**complying** 55:18
**concern** 27:13
  33:13
**concerning** 9:11
**concerns** 23:14
  24:11 26:10
  27:16 36:12
**Concetto** 18:13
  19:1,13,19 20:3
  46:15 47:2,12,13
  48:3,6 49:16,19
  49:21 50:6,20,25
  52:6
**concluded** 25:5
  57:25
**conditions** 43:16
  45:21
**conference** 4:4
**confirm** 37:18
**consider** 43:3
**considered** 40:7
**considering** 24:11
**contact** 19:17
  22:16 28:20
**contacting** 19:13
**continue** 13:19
  17:1 29:10 34:6
  38:20 43:18
**continued** 3:1
  45:22
**continues** 36:18
**contract** 11:7 12:9
  20:6
**control** 36:20 37:9
**conversation** 17:3
  23:7 24:22 37:2
  37:10 41:19
  50:20 51:15 53:3
  54:14
**conversations**
  15:16 23:13
  24:24 26:14,17

26:18 27:15
  33:19 34:24 36:3
  36:10 52:9,12,15
  53:18
**correct** 19:11
  20:16,17 29:12
  33:1 42:8 48:10
  55:15 56:12 59:5
  60:11
**CORRECTION**
  58:6
**corrections** 58:5
  59:6
**counsel** 2:10 20:4
  53:4
**County** 60:3,13
**couple** 13:2 17:18
**course** 51:19 57:1
**courses** 23:11
**court** 1:1 5:7 6:2,7
**COVID** 17:20
  19:23 50:13
**CP** 3:10
**CROSS** 2:18
**CROSS-EXAM...**
  53:1
**CSR** 1:22 58:4
  59:24 60:22
**currently** 8:1
**cutoff** 24:15,16

_____

**D**

**D** 34:5
**date** 3:2 25:14
  58:3
**dated** 53:20
**day** 19:2 31:10
  39:23 40:1 59:13
  60:19
**days** 15:1
**dealt** 10:21,23
**Dean** 3:16 8:6,11
  10:25 11:12,19
  15:5,9,14,15,17

15:19,22 16:4,12
  16:13,25 17:24
  24:1,2,3,4 25:15
  35:15 38:18 39:5
  39:9,12,24 40:2
  40:20,22 41:8,12
  41:16,18,25 43:2
  43:10,21,22 46:5
  51:15,22 52:3,5
  52:13
**Dean's** 45:18
**deceased** 27:1
**December** 60:24
**decide** 16:10,13
**decided** 16:15
**decision** 11:13,17
  11:20 12:12
  14:21,24 15:4,8
  16:6,7,18,23
  20:16 23:24 25:8
  25:11,12 38:14
  38:18 42:1 44:19
  45:19 54:9,16
**Defendant** 1:9 2:9
**definitively** 55:14
**degree** 9:4,8,15
**DeMars** 34:22
  35:7
**demeanor** 44:5
**demonstrate** 37:8
**denied** 11:22
**department** 35:20
  35:23
**depend** 33:14
**deposition** 1:14
  3:2 4:4,19 5:19
  7:6,18 9:23
  57:25 60:9
**derogatory** 18:25
  46:16 49:8
**details** 10:3 15:1
  45:20
**Di** 18:13 19:1,13
  19:19 20:3 46:15

47:2,12,13 48:3
  48:6 49:16,19,21
  50:6,20,25 52:6
**different** 22:13
  56:19 57:2
**differently** 50:4
**difficult** 21:3
**difficulty** 11:10
**DIRECT** 2:17
  5:10
**directed** 42:22
**Director** 48:13
**disagreed** 44:19
**discuss** 37:21 41:9
**discussed** 17:25
  39:16 41:24
  50:23 55:21
**discussion** 10:11
  25:4 26:13 34:4
  41:11 45:24 47:7
  51:17 54:21
**discussions** 18:22
  33:17
**dishonest** 33:6
  34:2
**dismissal** 3:13,23
  15:3,6,24 16:9
  20:19 38:21
  45:18
**dismissed** 12:21
  13:1,3 14:18
  16:11 18:1,4
  37:21 41:5 51:13
  52:2
**DISTRICT** 1:1,2
**doctor** 9:7
**document** 21:21
  22:5 30:8 39:4
  45:13
**documents** 7:5
**doing** 18:21 25:1
  32:21 57:7
**Dr** 3:12 11:16
  18:13 19:1,13,19

20:3 23:16,20,25
24:13,18 25:13
25:15 26:6,9,22
26:25 27:1,7,12
27:14 28:23
31:11 32:1,11,12
34:21,22 35:4,7
35:7,8,22,25
36:25,25 37:4,10
38:12 40:18
44:11,18 46:15
47:2,12,13 48:3
48:6 49:16,19,21
50:6,20,25 52:6
53:3 54:9,20
55:14
**drawing** 34:21
**duly** 5:4 60:7
**DVM** 1:14

**E**

**e-mail** 22:12,25
23:11,14 24:17
26:5,7 27:7,12
27:23 28:10,15
29:5,8 30:11,23
31:9 32:1,7,25
33:3 36:7,8,11
36:16 37:4 39:5
39:21 40:2,8
41:8 42:23 43:2
43:9 46:1,13
48:3 50:5,24
53:5,19 54:1
**e-mails** 7:9 17:19
18:17 22:7,8,11
28:23 31:5 34:16
46:18
**earlier** 43:17
49:15
**early** 3:18,20
18:16,19 48:4
**education** 9:2
**effect** 4:18

**either** 34:25
**electricity** 21:2
**email** 2:6,13 3:3,4
3:7,9,10,14,16
3:22
**emails** 3:5,20
**emotional** 36:20
**employed** 8:1
**employment** 8:3
**encourage** 38:5
**ended** 12:13 18:16
**enrolled** 10:24
**ensuing** 10:15
**entails** 10:11
**entering** 23:6
**entire** 35:3
**entirety** 59:4
**equally** 20:8
**Errata** 2:20 58:1
**essentially** 39:8
**established** 26:22
**estimate** 56:4
**et** 1:8
**evaluation** 31:12
31:15,16,18
32:16 33:17
**event** 60:17
**eventually** 12:21
18:1 32:25
**Ex-officio** 42:5
**exact** 14:25 25:4
**exam** 51:4
**EXAMINATION**
2:17,18 5:10
57:11
**exams** 57:3
**excuses** 48:17,23
**excusing** 48:16
**exhibit** 21:8,15
25:22 26:1 27:3
27:19 28:9,25
30:4,5 32:25
33:4 34:14 36:7
37:14 38:7 39:2

39:19,23 40:25
41:3 42:9 44:21
45:10 46:10
47:16 48:2 49:12
51:8,8 53:12,13
**exhibits** 3:2 20:21
53:10
**expected** 56:20
**Expires** 59:17
60:24
**explain** 36:23
**exploded** 36:24
**expresses** 27:12
**extra** 10:15

**F**

**fact** 38:5 39:12
41:11 53:18
57:18
**faculty** 20:5,10,11
35:20 36:19 37:1
56:13
**fail** 14:19 18:8
28:5 38:5
**failed** 3:7 13:24
17:13 18:9 19:18
28:24 31:7 38:2
**fails** 19:16 28:16
**failure** 14:3 20:20
**fair** 6:22 20:12
22:14 33:6 49:18
**familiar** 12:11
**far** 10:13
**fault** 29:23 30:2
**feedback** 32:22
**feel** 6:13 48:23
**felt** 49:20
**figured** 45:3,4
**file** 56:14
**filed** 55:25 56:5
**final** 19:10 45:19
51:23
**find** 19:6
**fine** 45:1

**finish** 17:12
**Firm** 2:4
**first** 5:4 9:16 10:6
13:15 22:24 26:5
27:25 28:3,5
33:3,4 34:7 35:8
36:17 37:5 41:7
50:6 53:20 60:7
**firsthand** 10:8
**five** 13:8
**five-minute** 44:24
**flexible** 49:25
**Floor** 2:11
**focus** 32:11
**follow** 20:6 55:9
**follow-up** 52:24
**following** 5:1 9:5
14:18 38:12
**follows** 5:9
**force** 4:17
**foregoing** 59:3
60:9
**form** 4:15
**forth** 19:25
**forward** 26:11
**forwarded** 48:9
**four** 56:6,15,19
**fourth** 57:6
**frame** 25:5
**free** 6:13
**Friday** 19:3
**friends** 7:23
**front** 14:8 21:9
32:24 53:10,15
**full** 10:25 11:18
24:4 59:4
**further** 4:12 37:7
57:21
**FYI** 43:10

**G**

**game** 56:24
**generally** 11:1
**getting** 12:17

**Gilmour** 1:14 3:17
4:5 5:3,17 53:3
58:2 59:2,9 60:6
**give** 9:1 10:13
14:7,10 15:2
16:15 34:21
47:10 49:16 51:1
51:19,22 52:19
**given** 13:7,9 19:20
31:17 50:7,21
52:6 59:5
**giving** 7:19 44:12
44:15 52:6
**go** 5:25 13:18
20:22 28:25 30:5
30:10 31:4 32:24
37:7 51:23
**goes** 15:1 31:5
57:18
**going** 6:11,21 14:1
18:7 24:19 26:11
37:1,6 44:24
47:24 49:22
50:21 56:23
**good** 21:17 51:25
**GPA** 24:15,16
26:11,12
**grade** 3:6 10:9
13:16 26:19
38:23
**graduation** 9:3
**great** 22:6
**ground** 6:1
**guess** 33:14 48:21
**guidance** 10:16
**guide** 10:13

**H**

**half** 8:11
**halfway** 22:24
**hand** 60:18
**handbook** 40:10
53:23
**hands** 19:24

Margi Gilmour, DVM
May 15, 2023

64

**happen** 14:16
40:14
**happened** 10:12
17:15 18:18
**happening** 54:15
**head** 35:21,23
56:10
**health** 48:19
**hear** 33:15 46:22
**hearing** 18:20
34:8 35:8
**hearts** 20:11
**help** 6:15 32:23
**helping** 10:13
**hereinbefore** 5:4
60:15
**hereto** 4:3,13
**hereunto** 60:18
**Hey** 44:23
**high** 9:2,3 57:2
**holler** 21:24
**Holyoak** 28:23
31:11 32:1,11,12
40:18 55:14
**honest** 23:22 44:7
54:12
**honestly** 13:3
27:10 40:22 47:1
47:9 48:25
**hour** 44:24,25
**huh-uh** 6:25 55:16

**I**

**ideas** 14:11
**identify** 21:21
**implemented** 47:1
**important** 20:12
47:25
**imposing** 26:10
**impression** 44:9
**improve** 10:14
32:21
**improvement**
54:19

**incident** 18:15
34:20 35:1,4
36:1,23 46:15
**incidents** 35:10
**include** 53:23
**included** 40:9
53:22
**including** 27:9
53:6
**incoherent** 6:12
**incriminated** 47:1
**INDEX** 2:15 3:1
**indicate** 36:18
37:19
**indicated** 32:1
53:21
**indicates** 30:12
33:4
**individuals** 27:8
**inform** 37:10
44:18
**information** 32:14
35:3 56:20
**informed** 44:14
**informing** 31:11
**initial** 12:8 14:17
22:11 45:18
**inquired** 32:8,8
**instructor** 18:11
19:16 33:12 47:6
**instructors** 31:23
33:24 34:25
35:10,17 36:1
47:8 50:1
**integrity** 55:25
56:5,14 57:4
**intent** 49:10
**interact** 11:3
**interested** 60:17
**Interesting** 48:15
**interests** 16:24
**interim** 8:10 11:16
24:2,6
**internal** 10:10

13:17
**involved** 11:4
14:23 23:21
**involvement** 56:2
**involving** 34:20
**issue** 21:17
**issues** 35:19 57:5

**J**

**J** 2:4
**Jason** 2:4 6:9
29:22 44:23
**jbach@bachla...**
2:6
**job** 15:4
**join** 24:11
**Jon** 36:7
**Jonathan** 1:4 6:10
7:11 9:12,14
10:18,22 12:21
13:10,15,23
14:10,16,20 15:6
15:13,20,21
16:15,17,24 17:1
17:4,22 18:1
19:10,20 20:15
23:18 24:10,15
26:15 27:13,24
28:3,23 29:10
31:2,8,11 32:10
32:15 33:5,9,19
33:22,25 34:6,9
34:20 37:19 39:9
39:10 40:16 41:4
41:20 43:17,23
43:25 44:4,12
45:16,25 46:2,23
48:5,18,24 49:3
49:7,16 50:21
51:1,13,19 52:7
52:10,13,16
**Jonathan's** 19:14
28:11,13 40:20
41:8 43:3,12

46:6
**Jurat** 2:21 59:1

**K**

**kind** 10:15 46:3
49:22
**knew** 52:3
**know** 9:20 10:19
12:8,13,16 13:2
15:21 16:2 18:14
19:4,17,23 20:11
21:11 24:10 25:3
25:6,12,18,23
26:10,24 27:10
27:17,20 28:17
28:22,23 29:1
33:22,25 34:3,5
35:25 36:2,14,15
40:16,19 47:5,9
47:20 48:25,25
49:5,22 50:12
52:5 54:14 57:6
57:7,13
**knowledge** 10:20
**knows** 32:17

**L**

**labeled** 53:11
**lack** 32:4
**lapses** 32:3,12
**large** 54:24
**Larry** 21:13
**Las** 2:5
**late** 23:5 50:12
**Laura** 33:1
**Law** 2:4
**lawsuit** 9:12
**leadership** 37:8
**learning** 17:17
**led** 20:18
**Legal** 2:10
**let's** 8:20 24:5,5
34:13 47:25,25
**letter** 3:12,15,17
3:18,23 16:2

41:9,12,20 42:2
45:16 51:12,16
51:23 52:4,10,13
52:17 54:10
**letting** 26:9
**limit** 26:11
**LINE** 58:6
**list** 54:22
**lists** 48:19
**little** 21:2 40:8
49:22 53:4
**locate** 53:11
**lockdown** 50:13
**long** 5:23 8:8,18
16:1 21:1,20
45:4 51:18 52:25
**look** 11:19 24:14
27:2 30:12 37:13
38:6 39:1,18
51:7 52:20 53:12
54:1
**looking** 11:9 21:21
57:5
**looks** 22:12 27:8
37:5 40:6 43:15
46:17
**loop** 28:17
**lose** 36:20
**lot** 18:21 26:1
32:11 56:20

**M**

**maintaining** 37:8
**making** 11:16
23:20,24 48:17
48:24
**March** 39:6 53:20
**Margi** 1:14 4:5
5:3,17 58:2 59:2
59:9 60:6
**marked** 3:2 37:14
**Marlow** 36:7,11
**Mason** 29:5
**master's** 48:18

math 8:20
Matthew's 3:5
  10:18,21,24 11:6
  11:14,22 12:1,4
  12:7,9,14,25
  13:4,6,11 22:12
  23:8 25:3,7,8
  26:14,18,23 27:9
  27:13,15
Meaning 49:25
MECHANICAL
  1:8
medicine 8:6 9:7
  10:10 13:17 56:4
meet 14:4,5 28:4,6
  28:18 32:15
  33:15 37:6,11,21
  37:23 39:9,12,25
  40:4 41:15,18
  46:8,24 47:6
meeting 3:11 9:17
  9:18,19,21 10:5
  10:6 13:24 16:6
  38:13 44:6 46:5
  47:14 55:4,11
meetings 7:11
  53:7 55:3
member 42:3
  54:23 56:14
members 36:19
memory 10:8 22:6
mention 54:19
mentioned 7:13
  9:11 13:14 17:4
mentioning 52:6
met 9:20 10:1,2
  13:14,23 14:13
  15:19,21 16:3
  24:15 28:2 31:1
  31:8 39:24 40:17
  41:22 43:6,23,25
  44:1,4
Michigan 9:5,6
mid 50:12

mid-block 31:12
  31:14,16 32:16
mid-blocks 32:19
middle 31:19,21
midway 53:19
mind 57:13
minimum 26:19
minus 23:10
minute 52:19
missing 47:17,20
  47:22
months 13:9
move 25:21 27:19
  34:13 40:25 42:9
  44:21 45:10
  46:10 47:16
  49:12
moving 11:17
  17:16
MPH 48:16,17
  49:7,11
muted 18:24

N
Nafe 33:1
name 5:12,15 6:9
  48:19
named 5:4
NARVAEZ 21:13
  21:23 22:1
nature 50:7,17
necessarily 41:17
  49:20
NECESSARY
  58:5
necessitated 55:24
need 6:18 12:10
  21:17,22,24 45:4
  51:22
negative 44:9 49:2
never 20:4
Nominees 3:3,4
nonvoting 54:23
normal 22:16,23

29:14,24 30:1
normalized 50:10
normally 14:3,5
  33:11 42:17
Northeast 1:23
Notary 59:12,16
noted 59:7
notes 3:11 7:10
  9:20,22 10:9
  37:16 41:14,18
  52:20
notice 4:10 54:5
noticed 47:22
notified 31:6 34:1
  38:20
notify 22:20 38:17
number 1:6 3:3,4
  3:5,6,7,8,9,10,11
  3:12,13,14,15,16
  3:17,18,20,22,23
  21:8 25:22 26:2
  27:3,8,20 29:1
  30:6 38:7 41:1
  42:10 44:22
  45:11 46:11
  47:16 48:3 56:4
numbers 54:24
NV 2:5

O
oath 5:9 6:5,6
  59:2
objections 4:14
obstacle 57:18
obtained 9:4,7
obviously 22:7
occasions 5:21
occurrence 47:4
occurs 48:15
October 30:13,24
offered 19:22
Office 2:10
official 60:19
offshore 12:10

13:5
Oh 30:15
okay 5:25 6:5,9,24
  7:3,13,20,24 8:3
  8:13 10:4 11:25
  12:13 14:23
  17:21 18:18 21:4
  21:7,19,20,23,25
  22:1,2 25:21,25
  27:2,5,12,22
  28:25 29:3,8
  30:2,3,3,7,17,18
  31:9 34:15 37:15
  38:8 39:3,20
  41:2,24 42:11,24
  42:25 44:8 45:12
  46:12 48:1 49:14
  51:10 52:24 53:9
  53:17 54:11 55:8
  57:22
Oklahoma 1:2,7
  1:17,23,23 2:11
  2:12 4:7,9,10 5:6
  8:5 27:9 56:3
  60:2,3,5,14,23
once 5:22 11:18
  25:13 50:9
ones 12:18
online 17:16
ophthalmology
  8:17
opinion 49:2
opportunity 19:20
  21:11 25:23
  33:23 37:22
  44:12,15 45:5
  49:17 50:22 51:1
  51:3 52:7
option 15:7 18:8
  19:22
order 17:22 20:12
orientation 11:2
OSU 11:5 12:1,3,5
  12:6,13 22:14

25:6 27:14 55:9
  55:18
outlined 16:22
  43:11
outlining 45:20,21
outside 23:14
  50:24 51:6

P
p.m 57:25 60:13
page 22:24 26:5
  27:3,7 28:9 29:4
  30:10,12 33:4
  36:6,17,18 37:5
  39:22 41:7 42:14
  43:13 47:18,21
  50:6 53:20 54:3
  54:6 58:6
paper 57:6
paragraph 33:3
  37:6
parents 46:6,8
part 11:7 26:18
  40:23
participating 55:9
  56:6,15
particular 26:15
parties 4:3,13
  60:16
pass 13:19 34:9
  49:17 52:22
  57:10
passing 13:16
  19:11 27:24 34:7
  34:10
Paul 37:7,11
Payne 60:14
percent 11:24
perception 33:16
performance
  31:18
period 11:16
permanent 24:7,9
perspective 10:12

place 18:15 45:22
  51:24 59:6
placed 20:15
placement 3:3
  22:13
placements 22:22
Plaintiff 1:5,15
  2:3 4:6 5:2 44:22
  45:11 46:11 51:9
planned 40:1
please 5:13,16
  6:13 53:11 54:1
point 13:22 16:8
  25:2 26:19 32:16
  40:6 43:23
pointers 10:14
policies 55:10,18
policy 49:23
position 8:9,14,16
  8:22
positive 44:8
possibility 37:20
  53:6
possible 6:17
potential 14:2
potentially 13:8
power 51:5
practice 13:25
PRATT 2:10,18
  20:25 21:4,20
  29:22 30:2 42:22
  44:23 45:3,7
  47:19 52:24 53:2
  57:10,22
precedes 54:2
prepare 7:5
presence 55:11
present 14:7 40:4
  54:24 55:3,14
pretty 23:10
previous 39:23
probably 21:16
  52:1
problem 45:6

Problems 3:10
Procedure 4:11
procedures 55:10
  55:19
process 16:1
processes 54:19
produced 5:1
profession 16:24
professional 4:9
  7:15 14:4,8 15:2
  16:3,5,22 35:11
  38:11,12,17,24
  41:21 44:1 47:7
  56:21
professionally
  52:1
Professor 8:17
professors 35:18
program 12:3,18
  12:19,22 13:7,12
  13:19 14:18
  16:17 17:5,23
  18:1 23:9,19
  24:11,23 34:7
  38:20 43:18
  45:20,22 51:14
  55:9,23 56:4,7
  56:16
progressing 32:17
Protocol 3:14
protracted 51:19
provided 54:10
provides 38:13
PRW 1:6
PSC 3:14 7:10
  14:13,15 29:9,19
  37:20,21 38:1
  40:4,5,17,21
  43:2,6 53:7
  54:23 55:11
PSC's 54:25
PSE 7:13
public 48:19
  59:12,16

pull 21:22 24:19
purpose 32:20
pursuant 4:10 5:5
put 21:18 54:22

_____

Q

question 4:15 6:12
  6:20,20,21,24
  29:23 36:22
  42:18 51:25
  53:18
questions 6:11,18
  52:25
quick 45:4
quite 51:18 56:13

_____

R

raised 33:12
reached 17:22
read 21:12 27:21
  57:22 59:3
really 10:8 11:2
  22:18 23:21 44:6
  57:8
reason 43:6 57:14
  58:6
recall 9:16 11:25
  13:10 15:19,22
  17:8 18:14 19:13
  25:16 26:6,8,14
  26:17 27:6,10,14
  28:22 30:8 33:18
  34:8,16,19 39:15
  40:18,24 41:19
  42:12 44:5,6,8
  44:14 46:5 49:4
  52:15 53:3,17,24
  55:3,4,13 56:4,9
receive 13:15
  19:10 27:24
  34:10 38:15,22
received 23:10
  27:11,23 31:9,10
  32:25
receiving 11:8

26:6 34:5
Recess 45:8
recognize 22:4
  45:13 46:13
recollection 9:14
  9:25 23:15 47:11
recommend 40:7
recommendation
  3:13 14:15,17
  15:3,6,24 16:8
  20:9 38:21 43:7
  45:18
recommendations
  43:11
recommended
  41:5
recommending
  22:13
record 5:12,15 7:3
REDIRECT
  57:11
reevaluate 15:23
referencing 53:5
referring 48:18
  49:1,7 50:17
refresh 9:25
regard 55:10
regarding 7:11
regardless 55:17
REGENTS 1:7
Registered 4:9
Reichard 3:12
  29:5,7,8 38:12
  54:20
relationship 11:5
  11:8 12:14
relative 60:16
relatively 54:24
remain 17:22
remember 9:18,19
  10:4 11:23 13:4
  14:25 15:18,25
  17:2,18 18:20
  19:8 22:18 23:22

25:14,17,19
  33:10,21 34:23
  35:2,6,7 36:2,5
  37:2,3,12 39:13
  39:14 40:15,22
  41:13 44:20
  46:25 47:13,14
  48:22 49:9,9,10
  49:11 51:17,21
  52:8,14,18
remote 17:17
remotely 5:5
repeat 6:14,18
  29:11,19 50:9
Repeating 3:22
rephrase 6:14,18
  33:25
REPORTED 1:22
  59:24
reporter 4:8,9 6:2
  58:4 60:4,23
Reporter's 2:22
Reporters 1:22
  21:14
reports 7:10
request 28:8 38:1
require 46:2
required 31:24
reserved 4:16
resolve 36:22
respective 4:3,13
respond 33:23,24
response 43:5
  48:5
responses 46:19
responsiveness
  4:15
retake 51:3
retired 8:2 57:14
retirement 8:12
reverse 43:7
review 7:5,8 10:25
  16:5 25:24 28:22
  29:2 42:1

reviewed 7:9,9,10
9:22 16:7 18:17
34:18 42:1
right 5:18,25 8:24
12:22,23 14:13
17:6,15,17 18:2
20:15,19,21 21:7
22:4,9 23:19
24:17 25:21 27:2
27:6,19 28:11,25
29:6,20 30:2,5
30:14 31:4,6
32:9 33:20 34:13
35:23 37:13 38:6
38:9 39:1,4,10
39:15,16,18 40:5
40:25 41:3 42:7
42:9 43:7 44:21
45:7,10 46:10
47:3,24 49:12,15
51:7 52:19,22
53:10 57:23
Risco 25:13,15
44:11,18 54:9
Rivera 3:15
Rivera-Pierola
1:4 3:9 6:10 9:12
23:8 54:9,16
55:8
Rivera-Pierola's
26:12 55:23
Robin 48:10,12
54:20
role 8:19 10:24
11:18 23:25
35:15,19
roll 47:25
Ross 11:16 23:16
23:20,25 24:13
24:18 26:6,9,22
26:25 27:1,7,12
27:14
Ross/St 3:5
rotation 3:6,7,10

3:18,20,22 10:10
13:20,25 17:11
17:12 18:8,9,10
18:12,16,16,19
19:2,9,10,15,18
19:21 20:20
27:25 28:16,24
29:12,19 31:7,17
31:19 32:18
33:16 34:7,10
38:3,4,25 46:20
48:4,7 49:17
50:8
rotations 10:15
17:14,16 18:6
31:20
rounds 18:22
routine 38:4
RPR 1:22 58:4
59:24 60:22
rude 7:2
Rule 5:5
rules 4:11 6:1
rundown 9:1

_____

**S**

SAIM 3:6
saying 40:2 43:10
says 23:5 24:18
26:9 37:6 40:9
41:8 50:7
Schmitz 1:22 4:7
58:4 59:24 60:4
60:22
school 7:17 8:14
9:2,3,6 25:3
schools 12:10 13:5
22:19
score 19:11,14
27:24 34:11
screen 21:18
seal 60:19
second 13:23,24
14:3,18 28:9

34:10,22 36:6,18
37:5 38:2,2,4
42:14 43:13,24
43:25
secondhand 18:20
see 8:20,23 23:3
24:20 26:9 31:12
32:5,13 39:6
40:12 41:9 43:6
47:21 50:10
52:20
seeing 27:6 30:8
34:16 42:12
seen 36:8 49:6
57:4
semester 22:21
send 51:23
sending 49:10
sense 9:21 50:8
sent 24:25 30:13
30:23 45:16 48:3
48:5,9 51:12,16
52:4,10,13,17
sentence 24:18
54:7
September 57:15
57:19
Services 48:13
set 60:15,18
setting 57:9
shakes 56:10
share 16:25
SHEET 58:1
short 26:5
shorthand 4:8
60:4,10,23
shortly 50:13
shot 47:10
sides 32:4
sign 46:3 57:22
significant 7:22
32:2
similar 18:23
single 56:11

sir 22:1
sit 17:10,12
situation 16:14
28:7 37:9 38:2
48:24
situations 33:6
skip 30:4
slowly 11:17
small 9:15 10:10
13:16,17
SMU 24:19,23
26:9
solely 32:19
soon 31:6
sorry 5:14 16:1
22:19 25:14,19
26:13 29:11,22
29:24 30:16 31:5
37:24
sort 18:15 34:20
35:3
sounded 17:19
span 54:6
speak 7:20 28:13
33:9
speaking 36:20
specific 44:17
specifically 53:19
54:17 56:6
spoke 10:9 32:10
33:12 35:7 43:11
43:16
spoken 7:17
SS 60:2
St 10:18,21,24
11:5,14,21,25
12:4,6,9,14,25
13:4,6,11 22:12
23:8 25:2,7,8
26:14,18,22 27:8
27:13,15
stakes 57:3
Standards 7:15
14:5,8 15:2 16:3

16:5,22 38:11,13
38:18,24 41:22
44:1
stands 7:14
start 21:7
started 25:5 26:13
starts 36:17 43:2
state 2:11 4:8,10
5:12,15 8:5 9:5,6
27:9 56:3 59:2
59:12 60:2,5,14
statement 54:12
STATES 1:1
stay 17:5 38:24
45:19
step 37:7
stick 20:5
Stillwater 1:17
2:12 4:7 60:13
stipulated 4:2,12
stipulations 4:1
16:16 17:6,8,21
18:5 20:14 51:24
60:14
stood 16:9 45:17
stop 44:25
strategies 14:1
strategy 14:7,11
Street 1:23
struggle 23:9 25:1
struggled 12:19
struggling 49:5
student 2:11 3:6
10:11,18 11:14
14:6 15:5,7 16:2
18:24 19:6,16,17
22:17 28:5,16
31:6 32:17,20,22
33:12 36:21
37:25 38:17,19
40:10 46:25 47:3
47:6,14 48:13
49:4 52:2 53:6
53:23 55:2,5

56:15
**student's** 40:3
57:6
**students** 10:21,23
11:3,10,21,25
12:1,3,4,5,6,9,20
12:24 13:3,6,11
14:4 20:6,7,12
22:13,20 23:8
24:23,25,25 25:7
25:8,11 31:17
33:14 35:19
37:22,22 46:20
48:6 50:4 56:6
57:5
**submit** 15:13
**submits** 16:2
**submitted** 41:4,20
**SUBSCRIBED**
59:11
**successfully** 17:13
18:6
**suggest** 19:19
28:18
**suggested** 20:3
40:3 49:19
**suggestion** 53:21
**suggestions** 49:22
**Suite** 1:23 2:5
**summarized**
43:10
**summary** 7:10
38:10,14
**supervise** 35:16
**supervisory** 35:17
**Supreme** 5:7
**sure** 9:22,22 20:7
25:21 36:19
37:25 42:13
**surprise** 35:13
**surprised** 44:11
**suspension** 45:23
**switched** 23:22
**sworn** 5:5 59:11

60:7
**syllabus** 20:5,7,13
49:23 51:6
**Syp** 34:21 35:7

___

**T**

**take** 6:7 12:9 24:5
27:2 29:9 33:16
37:13 38:6 39:1
39:18 44:23,25
51:7 53:12
**taken** 1:15 4:5,10
5:19 41:15 45:8
60:10,12
**talk** 14:1,2
**talked** 30:5 40:23
49:15
**Technically** 51:25
**Telephone** 2:6,12
**tell** 7:14 10:4,12
25:4 36:3 38:9
45:1 47:2,8
51:11
**tended** 12:1 49:25
**termination** 3:18
3:20
**testified** 5:8
**testify** 5:7 60:7
**testimony** 59:5
**Thank** 45:7 57:23
**things** 6:19 49:23
54:18 57:3
**think** 13:25 14:1,2
17:11 21:4,16,22
23:20 25:19
28:19 31:19
47:24 50:3 51:20
52:11,25 53:9
**thought** 18:24
54:18
**thread** 46:13
**three** 8:11 31:20
57:1
**time** 4:16,17,18

6:19,19 9:16
12:25 13:7,15,22
13:23 18:21
24:14 25:4 28:3
31:20 34:8 38:22
43:24,25 44:4
49:3 54:12,15,21
55:8,23 56:2
57:24 59:6 60:12
**timeframe** 22:19
**Title** 5:6
**today** 6:2,6,11 7:3
7:6,18 9:23
55:22 57:24
**told** 34:4 47:12
52:5
**top** 26:5 27:7 37:5
42:23 50:5
**topic** 40:19
**total** 8:25 37:8
**transcribed** 60:11
**transcript** 59:3
**transcription** 59:5
**transcripts** 10:25
11:9,19
**treat** 50:4
**treated** 20:8
**trial** 4:16 57:15,18
57:19
**true** 59:4 60:11
**truth** 5:7,8,8 60:7
60:8,8
**try** 10:13 14:6
**trying** 7:2,2
**turn** 57:3
**two** 7:11,22 8:10
13:8 17:13 22:13
31:22 36:19
**two-page** 53:13
**type** 35:16 38:1
**typically** 28:4,15

___

**U**

**uh-huh** 6:25 23:2

26:3 29:13 30:25
40:11 43:4
**ultimate** 16:10
24:13 38:14
**ultimately** 11:13
20:11,18 23:17
32:7 50:19
**uncommon** 49:21
**undersigned**
59:12
**understand** 6:1,5
6:13,15,15 20:10
36:19 50:3
**understanding**
10:17 19:5 34:12
36:25 42:18
50:16
**understood** 6:21
7:4
**Union** 2:11
**UNITED** 1:1
**university** 2:11
7:24 8:5,21,24
9:5,6,13 26:25
56:3
**unprofessional**
47:4
**unusual** 37:25
52:2 54:17 56:13
**upset** 18:25 19:1
**usual** 21:3
**usually** 10:11 15:1
24:14 31:4,5,21
33:15 41:17

___

**V**

**Vegas** 2:5
**veterinary** 8:6 9:6
9:7 56:3
**video** 4:4 46:24
**VIDEOCONFE...**
1:14
**violation** 55:25
56:14

**violations** 56:5
**virtually** 18:22
**vote** 29:9 42:6
**vs** 1:6

___

**W**

**W** 2:10
**want** 21:7,14
**wanted** 14:2 20:22
32:13 37:18
51:19
**wanting** 49:16
**warranted** 55:24
**wasn't** 49:21
**way** 35:11 36:24
56:23,24
**ways** 40:8
**we'll** 19:4,4 52:25
57:22
**we're** 9:11 14:1
21:16,16,20,21
**we've** 17:25 30:4
44:24 49:5
**week** 31:20,22
**welcome** 11:1
**went** 9:5 12:8,11
20:4
**weren't** 18:25
**West** 2:5
**WESTERN** 1:2
**When's** 9:16
**WHEREOF**
60:18
**Wilson** 48:10,12
54:20
**witness** 5:1,4 22:2
30:3 42:24 52:23
56:10 57:10 58:2
60:18
**wouldn't** 57:14,17
**writing** 15:11
**written** 39:22

___

**X**

Margi Gilmour, DVM
May 15, 2023

69

**Y**

**yeah** 8:25 11:24
30:3 32:19 42:15
42:24 45:1
**year** 9:9 12:5,11
22:17 40:10
53:24 54:22 56:6
56:15,19 57:6
**years** 5:24 8:10,21
8:22,24 57:1

**Z**

**zoology** 9:4
**Zoom** 1:22 2:3,9
18:23

**0**

**00823** 60:23
**056** 44:22 45:11
**057** 46:11
**061** 46:11
**084** 51:9

**1**

**1** 3:3 21:8 26:2
39:22 53:11
**10** 3:12 38:7
**100** 11:24
**101** 1:23
**1035** 34:14
**11** 3:13 39:2
**1176** 38:7
**1178** 39:2
**12** 3:14 5:6 13:9
39:19 53:12
**121** 39:19
**1215** 39:19 53:13
54:6
**1216** 39:19 53:13
54:6,7
**1299** 41:1
**13** 3:15 41:1,3
**1301** 41:1
**1384** 42:10
**1385** 42:10

**13th** 1:23
**14** 1:23 3:16 42:10
**1451** 47:17
**1452** 47:19
**1454** 47:17
**1460** 49:13
**1461** 49:13
**15** 1:16 3:17 4:6
44:22 45:11 58:3
60:12
**16** 3:18 8:22 46:11
**165** 2:5
**17** 3:20 47:16 48:3
**18** 3:22 49:13
**18230** 60:22
**19** 3:23 51:8 53:11
**1986** 9:10
**1st** 30:13,24

**2**

**2** 3:4 5:6 25:22
**2:04** 60:13
**20** 8:21,24
**2018** 22:8 23:1
24:8 25:18,20
**2019** 25:18 30:13
30:24
**2020** 50:7,13
53:20
**2023** 1:16 4:6 58:3
59:14 60:12,19
60:24
**20th** 50:7
**21** 3:3
**21st** 23:1
**22nd** 39:6
**23rd** 53:20
**25** 3:4
**25th** 60:19
**27** 3:5,6
**28** 3:7
**296** 37:14

**3**

**3** 3:5 27:3

**3-11-20** 3:11
**3/21/20** 3:12
**3/23/20** 3:13
**3:42** 57:25
**30** 3:8,9 5:24
**31** 60:24
**34** 3:10 5:5
**353** 21:8
**354** 21:8
**355** 25:22
**356** 25:22
**357** 27:4
**37** 3:11
**38** 3:12
**39** 3:13,14

**4**

**4** 3:6 27:20
**4/6/20** 3:17
**40** 3:15
**405)235-3376** 1:24
**405.744.6494** 2:12
**41034** 34:14
**41175** 38:7
**42** 3:16
**44** 3:17
**4580** 27:20
**4598** 29:1
**46** 3:18
**47** 3:20
**49** 3:22

**5**

**5** 2:17 3:7 29:1
**51** 3:23
**53** 2:18
**58** 2:20
**581** 27:20
**59** 2:21
**5th** 2:11

**6**

**6** 3:8 30:4
**60** 2:22
**638** 30:6

**642** 30:6

**7**

**7** 3:9 30:6
**702.925.8787** 2:6
**73104** 1:23
**74078** 2:12
**7881** 2:5

**8**

**8** 3:10 34:14
**89117** 2:5

**9**

**9** 3:11 37:14

**From:** Ross, Chris
**Sent:** Tuesday, August 21, 2018 8:55 PM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Re: Nominees for placement into clinicals in May 2019

No, not so bad.  Let's see what they say.  Our call.

Sent from my iPad

On Aug 21, 2018, at 4:29 PM, Gilmour, Margi <margi.gilmour@okstate.edu> wrote:

> Hmm – after pondering since we talked, I still have concerns about the River-Perola student. Is it so bad to tell them we are concerned that with his grades in the clinical courses he will not be successful here?
>
> **From:** Ross, Chris
> **Sent:** Tuesday, August 21, 2018 1:36 PM
> **To:** Gilmour, Margi <margi.gilmour@okstate.edu>
> **Subject:** Re: Nominees for placement into clinicals in May 2019
>
> Well, I forwarded the transcripts to you about five minutes after I got them.
> Should we put a floor under the gpa?
> Also, did we not agree that we were going to pull back from SMU?
>
> Sent from my iPhone
>
> On Aug 21, 2018, at 1:28 PM, Gilmour, Margi <margi.gilmour@okstate.edu> wrote:
>
>> It may be too late since I seem to be entering later into this conversation. But I would be caustious with River-Perola because St. Matthews students struggle more than others in our program, and he received Cs and C-s in pretty much all the clinical courses.
>>
>> **From:** Ross, Chris
>> **Sent:** Tuesday, August 21, 2018 12:28 PM
>> **To:** Gilmour, Margi <margi.gilmour@okstate.edu>
>> **Subject:** FW: Nominees for placement into clinicals in May 2019
>>
>> Fyi
>> I don't see any huge issues in either.  I will check to see why Mr. River-Perola is not enrolled this fall.
>> CR
>>
>> **From:** Gloria Miranda-Avila [mailto:gmavila@stmatthews.edu]
>> **Sent:** Tuesday, August 21, 2018 11:57 AM
>> **To:** Alan Emsley
>> **Cc:** Ross, Chris; Kershaw, Lucinda; Gregg BeVier
>> **Subject:** Re: Nominees for placement into clinicals in May 2019
>>
>> Hello,
>>
>> Please see the attached transcripts as requested by Dr. Emsley.
>>
>> Kindly,
>> Gloria
>>
>> *Gloria Miranda Avila*
>> *Registrar*
>> *St. Matthew's University*
>> *U.S. Office 12124 High Tech Ave. #290*
>> *Orlando, FL  32817*
>> *Phone: 800.498.9700 x-1005*
>> *Fax: 800.565.7177 or 407.488.1743*
>> *Fax Email:  815-377-3837*
>> *E-mail: registrar@stmatthews.edu*
>>
>>
>> On Mon, Aug 6, 2018 at 10:42 AM, Alan Emsley <Obans_Rover@msn.com> wrote:
>>> Hi Chris and Lucy,
>>> We have two nominees for placement into your program in May 2019.  They are:
>>>
>>> ▮▮▮▮▮▮▮▮▮▮  and

Gilmour Deposition
Exhibit 1

Jonathan Rivera-Pierola

By copy of this email, I am requesting that our registrar, Gloria Miranda-Avila, email you their transcripts through fifth semester after grades are recorded later this month.

In the case of ▮▮▮▮ there will appear on ▮ transcript an "Incomplete" that will be resolved early in the next semester. ▮ just completed the MARVET program. SMU students can get one elective credit for Aquatic Animal Medicine if they do 12 hours of MARVET and then do a presentation on a related topic. What usually happens though is that they get an incomplete for the elective at the end of the summer semester (this semester) and then they do the presentation at the beginning of next semester (week 2) and once they pass the presentation they get the incomplete changed to a pass (or fail).  I am asking that Gloria send you an updated transcript after the 'Incomplete' grade has been replaced by a grade. If you have any concerns about this, please let me know.

Thanks for all you do for our students.
Alan

**From:** Ross, Chris
**Sent:** Wednesday, August 22, 2018 8:55 AM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: Nominees for placement into clinicals in May 2019

I can see letting SMU know about our concerns in this case. Maybe imposing a gpa limit on applications going forward. Bringing up Rivera-Perola's gpa would get the discussion started.

**From:** Gilmour, Margi
**Sent:** Tuesday, August 21, 2018 4:30 PM
**To:** Ross, Chris
**Subject:** RE: Nominees for placement into clinicals in May 2019

Hmm – after pondering since we talked, I still have concerns about the River-Perola student. Is it so bad to tell them we are concerned that with his grades in the clinical courses he will not be successful here?

**From:** Ross, Chris
**Sent:** Tuesday, August 21, 2018 1:36 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Re: Nominees for placement into clinicals in May 2019

Well, I forwarded the transcripts to you about five minutes after I got them.
Should we put a floor under the gpa?
Also, did we not agree that we were going to pull back from SMU?

Sent from my iPhone

On Aug 21, 2018, at 1:28 PM, Gilmour, Margi <margi.gilmour@okstate.edu> wrote:

> It may be too late since I seem to be entering later into this conversation. But I would be caustious with River-Perola because St. Matthews students struggle more than others in our program, and he received Cs and C-s in pretty much all the clinical courses.
>
> **From:** Ross, Chris
> **Sent:** Tuesday, August 21, 2018 12:28 PM
> **To:** Gilmour, Margi <margi.gilmour@okstate.edu>
> **Subject:** FW: Nominees for placement into clinicals in May 2019
>
> Fyi
> I don't see any huge issues in either. I will check to see why Mr. River-Perola is not enrolled this fall.
> CR
>
> **From:** Gloria Miranda-Avila [mailto:gmavila@stmatthews.edu]
> **Sent:** Tuesday, August 21, 2018 11:57 AM
> **To:** Alan Emsley
> **Cc:** Ross, Chris; Kershaw, Lucinda; Gregg BeVier
> **Subject:** Re: Nominees for placement into clinicals in May 2019
>
> Hello,
>
> Please see the attached transcripts as requested by Dr. Emsley.
>
> Kindly,
> Gloria
>
>
> *Gloria Miranda Avila*
> *Registrar*
> *St. Matthew's University*
> *U.S. Office 12124 High Tech Ave. #290*
> *Orlando, FL 32817*
> *Phone: 800.498.9700 x-1005*
> *Fax: 800.565.7177 or 407.488.1743*
> *Fax Email: 815-377-3837*
> *E-mail: registrar@stmatthews.edu*
>
>
> On Mon, Aug 6, 2018 at 10:42 AM, Alan Emsley <Obans_Rover@msn.com> wrote:
>
>> Hi Chris and Lucy,
>> We have two nominees for placement into your program in May 2019. They are:

Gilmour Deposition
Exhibit 2

█████████████

Jonathan Rivera-Pierola

By copy of this email, I am requesting that our registrar, Gloria Miranda-Avila, email you their transcripts through fifth semester after grades are recorded later this month.

In the case of ██████ there will appear on ██ transcript an "Incomplete" that will be resolved early in the next semester. ██ just completed the MARVET program. SMU students can get one elective credit for Aquatic Animal Medicine if they do 12 hours of MARVET and then do a presentation on a related topic. What usually happens though is that they get an incomplete for the elective at the end of the summer semester (this semester) and then they do the presentation at the beginning of next semester (week 2) and once they pass the presentation they get the incomplete changed to a pass (or fail). I am asking that Gloria send you an updated transcript after the 'Incomplete' grade has been replaced by a grade. If you have any concerns about this, please let me know.

Thanks for all you do for our students.

Alan

**From:** Ross, Chris
**Sent:** Wednesday, August 22, 2018 12:24 PM CDT
**To:** Gloria Miranda-Avila <gmavila@stmatthews.edu>; Alan Emsley <Obans_Rover@msn.com>
**CC:** Kershaw, Lucinda <lucinda.kershaw@okstate.edu>; Gregg BeVier <gbevier@mac.com>; Gilmour, Margi
<margi.gilmour@okstate.edu>
**Subject:** RE: Nominees for placement into clinicals in May 2019

Hello, all,
Just a note to confirm our acceptance of both of your students.  We do have some concerns about Mr. Rivera-Pierola
based on his gpa.  I hope that they both do well.
Chris.

**From:** Gloria Miranda-Avila [mailto:gmavila@stmatthews.edu]
**Sent:** Tuesday, August 21, 2018 11:57 AM
**To:** Alan Emsley
**Cc:** Ross, Chris; Kershaw, Lucinda; Gregg BeVier
**Subject:** Re: Nominees for placement into clinicals in May 2019

Hello,

Please see the attached transcripts as requested by Dr. Emsley.

Kindly,
Gloria


*Gloria Miranda Avila*
*Registrar*
*St. Matthew's University*
*U.S. Office 12124 High Tech Ave. #290*
*Orlando, FL  32817*
*Phone: 800.498.9700 x-1005*
*Fax: 800.565.7177 or 407.488.1743*
*Fax Email:  815-377-3837*
*E-mail: registrar@stmatthews.edu*


On Mon, Aug 6, 2018 at 10:42 AM, Alan Emsley <Obans_Rover@msn.com> wrote:

Hi Chris and Lucy,
We have two nominees for placement into your program in May 2019.  They are:

███████████████  and

Jonathan Rivera-Pierola

By copy of this email, I am requesting that our registrar, Gloria Miranda-Avila, email you their transcripts through fifth semester after grades are recorded later this month.

In the case of ███████ there will appear on ███ transcript an "Incomplete" that will be resolved early in the next semester. ███ just completed the MARVET program. SMU students can get one elective credit for Aquatic Animal Medicine if they do 12 hours of MARVET and then do a presentation on a related topic. What usually happens though is that they get an incomplete for the elective at the end of the summer semester (this semester) and then they do the presentation at the beginning of next semester (week 2) and once they pass the presentation they get the incomplete changed to a pass (or fail).  I am asking that Gloria send you an updated transcript after the 'Incomplete' grade has been replaced by a grade. If you have any concerns about this, please let me know.

Thanks for all you do for our students.
Alan

Gilmour Deposition
Exhibit 3

Board00357

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Tuesday, October 01, 2019 11:10 AM CDT
**To:** Naff, Adam <adam.naff@okstate.edu>
**Subject:** FW: Student Grade for SAIM Rotation 7
**Attachment(s):** "Rivera-Pierola, Jonathan (final).xlsx","Jonathan Evalue comments.docx"

Hi Adam,

Can you send me this student's E-Value evaluation? Thanks!

Dr. G

---

**From:** Lyon, Shane <shane.lyon@okstate.edu>
**Sent:** Tuesday, October 01, 2019 8:52 AM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Cc:** Nafe, Laura <nafe@okstate.edu>
**Subject:** Student Grade for SAIM Rotation 7

Dr. Gilmour and Lucy,

Attached you will find the grade information for Jonathan Rivera-Pierola.  For SAIM, the clinicians and residents independently score the student using our grading rubric (which can be found in the SAIM syllabus on Moodle) and then those scores are averaged.  The attached Excel file represents the average score he received and this is what will be entered into E-Value.  You will also find a Word document which contains the comments for him on the rotation.  Dr. Nafe will enter this information in E-Value today, but I wanted to get it sent to you both as soon as possible so that you can begin the processes required for him at this time.

Dr. Nafe and I met with him yesterday and discussed these concerns in person and informed him that he would be receiving a 'D' on the rotation.  We also informed him that he would be required to repeat the rotation and that he should be able to do this on his vacation rotation.

Please let us know if there is anything further you need from us at this time.

Shane

**Shane D. Lyon, DVM, MS, DACVIM (SAIM)**
Associate Professor, Small Animal Internal Medicine
Oklahoma State University College of Veterinary Medicine
Stillwater, OK  74078
(405) 744-7000

Gilmour Deposition
Exhibit 4

Board00580

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Tuesday, October 01, 2019 11:18 AM CDT
**To:** Naff, Adam <adam.naff@okstate.edu>
**Subject:** PS

I also need to know who Jonathan's (Rivera-Pierola) advisor is.

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs
College of Veterinary Medicine
Oklahoma State University
405-744-8471 margi.gilmour@okstate.edu

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Tuesday, October 01, 2019 3:41 PM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: Failed rotation

Perfect, that makes things even easier!

I'll send to PSC shortly.

_____

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Tuesday, October 1, 2019 3:41 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>
**Subject:** RE: Failed rotation

This was his first rotation.

_____

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Tuesday, October 01, 2019 3:25 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Cc:** Wilson, Robin <robin.wilson@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>; Holyoak, Reed <reed.holyoak@okstate.edu>
**Subject:** RE: Failed rotation

Hi Dr. Gilmour,

Yes, I can send to the PSC for review shortly.

Can you arrange to have evaluations from Jonathan's previous rotations sent to me as well? Despite this being a straight forward case as Jonathan is not on probation and is eligible to repeat, some members of the committee are likely to inquiry how he did on his previous rotations.

Regards,

Mason

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Tuesday, October 1, 2019 11:50 AM
**To:** Reichard, Mason <mason.reichard@okstate.edu>
**Cc:** Wilson, Robin <robin.wilson@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>; Holyoak, Reed <reed.holyoak@okstate.edu>
**Subject:** Failed rotation

Hi Mason,

Jonathan Rivera-Pierola, a St. Matthews student, failed his first rotation in Small Animal Internal Medicine. He can re-take it on Rotation 5 (June 29-July 12). Attached is his evaluation sheet from the rotation, and Dr. Lyon's email describing the grading and that they met with Jonathan (note the attachments in the email are all contained in the evaluation PDF). Could you please send out the PSC for a vote on allowing Jonathan to repeat the SAIM rotation?

Thank you!

Margi

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs
College of Veterinary Medicine
Oklahoma State University
405-744-8471 margi.gilmour@okstate.edu

Gilmour Deposition
Exhibit 5

Board00598

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Wednesday, October 02, 2019 8:21 AM CDT
**To:** Clary, Erik <erik.clary@okstate.edu>
**Subject:** RE: Review and vote needed for PSC

Thanks Erik!

Mason

**From:** Clary, Erik <erik.clary@okstate.edu>
**Sent:** Tuesday, October 1, 2019 9:42 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>
**Cc:** Davis, Michael <michael.davis@okstate.edu>; Allen, Kelly <kelly.allen10@okstate.edu>; Gilliam, Lyndi <l.gilliam@okstate.edu>; Gilmour, Margi <margi.gilmour@okstate.edu>; Hinsdale, Myron <myron.hinsdale@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** Re: Review and vote needed for PSC

i agree - allow Jonathan to repeat the rotation.

Erik




Erik M. Clary, DVM, PhD
Diplomate, ACVS
Associate Professor of Surgery and Bioethics
Oklahoma State University
Center for Veterinary Health Sciences
erik.clary@okstate.edu

On Oct 1, 2019, at 4:43 PM, Reichard, Mason <mason.reichard@okstate.edu> wrote:

Thanks Mike!

Mason

**From:** Davis, Michael <michael.davis@okstate.edu>
**Sent:** Tuesday, October 1, 2019 4:09 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>; Allen, Kelly <kelly.allen10@okstate.edu>; Clary, Erik <erik.clary@okstate.edu>; Gilliam, Lyndi <l.gilliam@okstate.edu>; Gilmour, Margi <margi.gilmour@okstate.edu>; Hinsdale, Myron <myron.hinsdale@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** Re: Review and vote needed for PSC

I vote to recommend repeating the rotation.    Also suggest that Dr. Nafe be explicitly commended for the time and thought that she invested in this evaluation.


Sent via the Samsung Galaxy S7, an AT&T 4G LTE smartphone


-------- Original message --------
From: "Reichard, Mason" <mason.reichard@okstate.edu>
Date: 10/1/19 15:57 (GMT-06:00)
To: "Allen, Kelly" <kelly.allen10@okstate.edu>, "Clary, Erik" <erik.clary@okstate.edu>, "Davis, Michael" <michael.davis@okstate.edu>, "Gilliam, Lyndi" <l.gilliam@okstate.edu>, "Gilmour, Margi" <margi.gilmour@okstate.edu>, "Hinsdale, Myron" <myron.hinsdale@okstate.edu>, "Reichard, Mason" <mason.reichard@okstate.edu>, "Wilson, Robin" <robin.wilson@okstate.edu>
Subject: Review and vote needed for PSC

All,

Dr. Gilmour has requested our review and recommendation for Jonathan Rivera-Pierola, a St. Matthews student, who received a "D" grade in the Small Animal Internal Medicine rotation. This was Jonathan's first rotation here at OSU. Attached is Jonathan's evaluation for SAIM.

Please let us know your vote "yea" or "nay" giving Jonathan the opportunity repeat the rotation.

Gilmour Deposition
Exhibit 6

If Jonathan is allow to repeat, he can re-take SAIM on Rotation 5 (June 29 through July 12).

As this is Jonathan's first rotation here and there are no known mitigating circumstances, my vote is "yea" to have him repeat the rotation.

Regards,

Mason

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Thursday, October 03, 2019 5:38 PM CDT
**To:** Nafe, Laura <nafe@okstate.edu>
**CC:** Lyon, Shane <shane.lyon@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pierola advisee

Thank you very much. My meeting went pretty much as would be expected. ;)

No mention of a grade appeal, however.

Gilmour Deposition
Exhibit 7

---

**From:** Nafe, Laura <nafe@okstate.edu>
**Sent:** Thursday, October 03, 2019 2:41 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Lyon, Shane <shane.lyon@okstate.edu>
**Subject:** Re: Jonathan Rivera-Pierola advisee

Hi Margi,
I agree with everything Shane said in his email regarding Jonathan's performance and the timing of things that happened during the rotation.

One thing that I did not mention in his evaluation on E-value (that perhaps I should have) is that I had 3 separate people (2 doctors and a technician) approach me regarding concerns that Jonathan was dishonest. I did not include these situations in his evaluation, because I did not witness these specific instances. While I trust the 2 doctors (Dr. Moore and Dr. Irizarry) and technician (Marla) that they would not make up these scenarios, I wanted to give Jonathan the benefit of the doubt and perhaps these were more of a miscommunication than a blatant lie. However, after meeting with him on Monday, September 30th, I believe that these situations were likely to be dishonesty on his part and not a misunderstanding or miscommunication. There are just too many examples of situations like this during his time on medicine and ER. I have explained the 2 situations that I am referencing below.

1. Jonathan saw a recheck of a chronic medicine patient (Pee Wee Walker) who has IMHA and has been managed the past few years at OSU with various immunosuppressive medications and a splenectomy. He has had many recheck evaluations during that time. His owner is very well educated on his medications and disease. When Dr. Moore asked Jonathan what medications PeeWee was receiving, Jonathan told Dr. Moore that PeeWee was not receiving any medications. When Dr. Moore informed Jonathan that he knows PeeWee is on medications (as he is very familiar with PeeWee's case). Jonathan replied that he asked the owner and she was not sure what medications PeeWee was receiving or prescribed. This owner knows exactly what medications this dog is receiving. So either he didn't ask her and said he did. Or he did ask her and he didn't ask it in a way that allowed her to properly answer the question? I think the first possibility is most likely (but that is my opinion). Marla approached me about this case separate from Dr. Moore and was concerned that "Jonathan lied to Dr. Moore about PeeWee." Marla is not the type of come talk to me about student performance so this concerned me. This case was on the last week of the rotation (Tuesday 9/24).
2. Dr. Nikol Irizarry saw a case on emergency with Jonathan on 9/14/19 (Rex #191358) that I did not hear about until the last week of the rotation. She informed me that Jonathan asked if he could leave at the end of his shift. She asked him if the ICU sheet had been completed for Rex and if so he could go. He informed her that he had completed the ICU sheet. She let him go and then an hour later she noticed that the ICU sheet was not complete. None of the inside was highlighted and not all of the medications were included on the inside of the ICU sheet. When the technician on ICU called Jonathan about this he told them that Dr. Irizarry told him he didn't have to complete the ICU sheet. So again, a case of either him being dishonest OR a misunderstanding or miscommunication between Jonathan and Dr. Irizarry.

These are just a few examples of big concerns regarding his honest and communication skills. Like Dr. Lyon said, this is much deeper than a few mishaps with communication. He was frequently not prepared for his cases, did not complete medical records, medical records were inaccurate, ICU treatment sheets were both late and inaccurate (including significant medication errors in dosages or frequency that could have been fatal depending on the medication), and an overall lack of work ethic in my opinion. He is fairly smart in some areas demonstrated by his rounds knowledge and even knowledge about his inpatients when rounding on the morning of Thursday, Sept 26th. He knew what medications his patients (Milo and Lucy) were receiving and why they were receiving those medications. So I know he has the skills. In my opinion, he doesn't seem to care enough about his performance to rise to his full potential and this could lead to significant errors in case management if he were to pass medicine and not have to repeat this rotation to improve his educational experience.

I have included the evaluations from Dr. Adam Moore (3rd year resident) and Dr. Sam Bailey (2nd year resident). This includes their comments. I condensed the comments for his official evaluation on E-value so he has not seen these comments word for word.

I also know that the situation with Milo's discharge on Saturday, Sept 28th was also a big concern. I have included a series of group-me texts from his conversation with Dr. Moore regarding Milo's discharge. I do think Dr. Moore could have communicated his expectations for Jonathan's presence for the discharge better; however, Milo was Jonathan's patient for almost an entire week. I would hope that he would be interested in being present for the discharge. He did work from Friday at 7am - 11 pm and then Saturday from 2 am to 7 am. However, that would have given him approximately 5 hours to sleep (accounting for an with an hour to get home and fall asleep and an hour to wake up and get ready) before the discharge. He was clearly awake and texting Dr. Moore via group-me at 1:03 pm on Saturday (discharge was scheduled for 2 pm). He also should have never left that morning (Saturday morning) without touching based with Dr. Moore about his inpatient (Milo).

Another example that I mentioned, but wanted to expand on was a case I saw with Jonathan on 9/25 (also the last week of the rotation). This was a recheck lymphoma patient that is underlying chemotherapy. He did not seem to know that this patient had received mitoxantrone (chemo) the week prior and was only here for bloodwork. He told me she was due for mitoxantrone (which the discharge is very clear this is not the case). He could not explain to me why we would be checking bloodwork on this patient 1 week post-chemotherapy. Again, even if you don't know that it is standard to check white blood cell count 1 week post-mitoxantrone, this demonstrates to me that he did not read the prior discharge, as it very clearly states why the patient was returning on 9/25. I am attaching a copy of his attempt at the discharge for this patient which also lists a complete neurological exam. I did not witness him performing a full neuro exam (neither did I at this visit), but I guess it is possible he did this when I was not around. But to me, this is again an example of him being lazy with a lack of attention to detail, as many aspects of the discharge are incorrect or were not performed at this visit (see the highlighted portions).

I am happy to discuss more in person. Sorry this is so long and late. Thanks for your help!
Laura

Below are comments from both residents regarding Jonathan's performance:

I had a number of cases with Jonathan and he was consistently not prepared to discuss the case with the clinician. He displayed blatant dishonesty when presenting the case and often failed to ask key questions when gathering a history. For example, PeeWee Walker was one of the rechecks he signed up for and he initially stated PeeWee was not currently prescribed any medications at the time of recheck. I disagreed with him given I am very familar with PeeWee's history. He then stated the owner was not aware of the current medications that PeeWee was prescribed. These are contradictory statements. Jonathan was a poor communicator with regard to hospitalized in patients and was never present in ICU at 7:15 to discuss our hospitalized in patient (Milo Butler). Jonathan was consitently late with having the treatment sheet completed and the document contained multiple errors each day. Often the drug calculations were incorrect and ICU called Jonathan into the ICU each morning to correct these inaccuracies. Jonathan also did not complete Milo's 7am treatments and would frequently only write the respiratory rate. When I asked Jonathan why Milo was not receiving a physical examination every morning he replied that Milo was sleeping and he did not want to wake him. Interestingly, Milo consistently had values written for the 7am TPR and ICU mentioned to me that a physical examination was not performed. Jonathan also failed to be present for Milo's discharge from the hospital despite a verbal communication I had with him in the hallway on Friday afternoon. I had told him that the owner would arrive at the hospital at 2pm. Jonathan did not show for the discharge despite our communication via groupme at 1pm, one hour prior to discharge. The medical record for Milo was below average and did not contain a cohesive summary of Milo's medical problems despite Milo being hospitalized for an extended period of time. I feel that Jonathon should have to repeat the small animal rotation and should take ownership of his cases. The dishonesty is also concerning.

Medical records are frequently incomplete, late, and erroneous. Patient care is minimal at best, student made ICU do all of his physical exams for hospitalized patients. Treatment sheets were significantly late every morning (30-60 minutes). Incomplete histories taken from owners. Student had complete physical exams when he did perform them. Did not read up on cases or have a solid knowledge base. Overall, his attitude was not professional and he was not interested in learning. Student would leave without talking with the clinician, even before all of his patients were discharged.

**Laura A. Nafe, DVM, MS, DACVIM (SAIM)**
Assistant Professor, Small Animal Internal Medicine
Oklahoma State University

---

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Wednesday, October 2, 2019 8:43 AM
**To:** Lyon, Shane <shane.lyon@okstate.edu>; Nafe, Laura <nafe@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pierola advisee
Thank you so much. This will help me a lot if I have to meet with him. It will put an end to the he-said/she-said business.

**From:** Lyon, Shane <shane.lyon@okstate.edu>
**Sent:** Tuesday, October 01, 2019 8:41 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Nafe, Laura <nafe@okstate.edu>
**Subject:** Re: Jonathan Rivera-Pierola advisee
Hi Dr. Gilmour,
I can fill you in on the case I was involved with (Lucy) and I am cc'ing Laura to provide additional information on the other instances. Lucy was in the hospital Monday to Friday of last week. I was off clinics, but she is a long term patient of mine and I was the clinician on the case. I would arrive in the morning (before 7:00 in most instances) to look at her and see how she did overnight. Jonathan routinely did not have his ICU orders completed by 7:30 in the morning, there was maybe 2 days out of 4 that he did. He never initiated communication with me (text, GroupMe, email, phone call) about how he thought Lucy was doing. I had to check in with him and instigate those conversations. This included both morning and afternoon/evening assessments of her. The only time that he would message me was if she was out of a medication that I needed to fill from pharmacy or if she was regurgitating. His discharge instructions for this visit were copied and pasted from her prior visit in August. At that time we suspected she had a bacterial infection in her airway. This visit was comprised of a fracture of her tracheal stent, suspected granulation tissue in her trachea, and suspected infection in her airway +/- pneumonia. When she was scheduled to be discharged, there were several medications which she had been on for >24 hours orally in hospital (metoclopramide, enrofloxacin, and maropitant) that were not included in her discharge instructions. He did have the amoxi/clav in her discharges, but that information was copied and pasted from he previous visit. I essentially wrote the discharges so that she could be discharged on time. He was in grand rounds when she was discharged and I discharged her alone (which is totally fine - just letting you know in case that is brought up). He should have had ample time to draft complete and accurate discharges, but failed to do

so. So, my perspective was that he didn't communicate with me at all about her case. Granted, I was off clinics and not readily available, so again I am willing to forgive many of these issues. However, SAIM utilize GroupMe (a group message app) to communicate with each other about patients.

The rest of the concerns I will need Laura to help clarify if I am misunderstanding. Another case, PeeWee, which was seen by Dr. Moore is a long term patient of SAIM. He was presented for routine recheck. Jonathan informed Dr. Moore that PeeWee was on no medications. Marla was a witness to this conversation. PeeWee is on several medications for a chronic disease. This was confirmed by the owner when Dr. Moore asked her. It appeared that Jonathan didn't ask the client this information, but when questioned by Dr. Moore he essentially lied about the information (again confirmed by Marla). There was another instance were Laura was concerned that he was being dishonest. It revolved around his ER shift. Laura was informed that he failed to complete his ICU treatment sheet for a patient that was seen on ER. When asked about this, he informed us that Dr. Irizzary told him he didn't need to do the ICU treatment sheet and that he could go home. Dr. Irizzary recalls the story differently and reports that she told him to do so before he left. She called him and him come back to complete the paperwork. As these both MAY have been some communication problems, we elected to leave this out of his final grade report but we do feel strongly that he lied to us on 2 occasions.

As far as the situation around discharging his patient on Saturday (last Saturday of the rotation). He was on SAIM on Friday. He had an ER shift from 5:00 PM to 11:00 PM on Friday. He then went home, but was called back in at 2:00 AM. He was there until just before 8:00. He left the hospital before Dr. Moore had a chance to speak with him about his inpatient Saturday morning, which was the patient that was scheduled for discharge. Dr. Moore, having no idea that he was in the hospital all night. did text him to inquire about discharging the patient. There was no reply. When asked about this he told us that we was sleeping and didn't receive the text. That is completely fine. However, it was his responsibility to remain in the hospital to speak with Dr. Moore (or Dr. Nafe) regarding his inpatient before leaving for the day. Had he done this we would have known that he was in the hospital all night and would not have expected him to be present for the patient's discharge. We tell the students in orientation (and it is in the syllabus) that it is their responsibility to inform us in the morning if they were on ER the previous night. If so, we will gladly send them home to sleep and excuse them for the day. He failed to do so. When Laura and I asked him about this on Monday morning, when we informed him that we were going to give him a 'D' for the rotation, his reply was that we should know who was on ER the previous day. We informed him that yes, there is a schedule for ER, but we have no idea which students leave for the day at 11:00 PM (when the scheduled shift is over) and which students are there longer. Students on ER are not always there until 7:00 or 8:00 in the morning and we cannot keep up with their individual schedules. So yes, Dr. Holyoak is correct that we as a service failed to realize that he was supposed to be off that Saturday after working for nearly 24 hours. However, it was his responsibility to communicate that information to us, which he did not do.

He did not receive a mid-block evaluation. The first week I was on clinics. He had 1 inpatient (with Dr. Clark I believe) and there were a few missteps. We attributed those to this being his first rotation ever and moved on. The second week was slower for him (no inpatients and lots of rechecks) and his deficiencies were not obvious. The third week was when all of these aforementioned problems arose.

This is beyond the requested highlighted information, but my final comment is that he did not fail for poor communication alone. There were several other grading criteria which places him in jeopardy of failing. The most significant of these was repeated mistakes/oversight for patient treatment orders. I am completely willing to overlook a single incident where a medication dose is listed incorrectly or where treatment times are misidentified. However, I pointed these mistakes out to him and the very next day he failed to highlight the correct times for a medication to be given - the SAME drug as the day before. To me this conveys one of two things: a lack of attention to detail or an apathetic approach to patient care. Either one, in my opinion, constitutes grounds for failure, even without the communication problems.

Laura - please clarify if I have made any mistakes and to expound on anything beyond what I have listed here.

Dr. Gilmour, please let us know if there are any additional points of clarification needed. I am sure that either one/both of us would be happy to meet with you in person if that would help.

Shane

On Oct 1, 2019, at 7:12 PM, Gilmour, Margi <margi.gilmour@okstate.edu> wrote:
Just so I have all my ducks in a row if I meet with this student, can you comment on highlighted section?

**From:** Holyoak, Reed <reed.holyoak@okstate.edu>
**Sent:** Tuesday, October 01, 2019 3:53 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pierola advisee

Margi,

I just spoke with Jonathan. He didn't have a mid-block evaluation. There seems to be some significant communications lapses. I believe as in all of these, there was a lack on both sides. He has texts and timelines that suggest that communications to him during the day after he had filled an all-night ICU shift did not recognize that he was to be off.

I did not communicate that to Johnathan, however. He did have a personal issue with his father being in an accident and in the hospital that may have affected his performance too. But we all must be professional.

I asked him to come visit with you. I am not sure that this grade would withstand an appeal.

Let me know if there is anything further you would have me do.

## Reed

G. Reed Holyoak, DVM, PhD, DACT
reed.holyoak@okstate.edu
<image002.jpg>

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Tuesday, October 1, 2019 11:52 AM

**To:** Holyoak, Reed <reed.holyoak@okstate.edu>
**Subject:** Jonathan Rivera-Pierola advisee
Hi Reed,
Can you reach out to Jonathan to see if you can guide him in strategies to improve his performance in clinics? I think Shane and Laura tried to, but at the time Jonathan was a bit defensive due to his failing grade. Maybe talking to a more "neutral" person would help! J
Thank you!!
Margi
Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs
College of Veterinary Medicine
Oklahoma State University
405-744-8471 margi.gilmour@okstate.edu

Board00642

**From:** Burba, Daniel on behalf of Burba, Daniel <dburba@okstate.edu>
**Sent:** Tuesday, March 03, 2020 7:52 AM CST
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: CP Rotation Problems

Good morning Margi,
As a follow up to Jonathan R-P's meeting, I met with Dr. Syp. From her perspective Jonathan was deficient in knowledge and skills. It sounded like he was non-aggressively argumentive, would not admit to his mistakes. In one situation, Dr. Syp asked if him if he was comfortable to doing spays and he said he was. Well, according to Dr. Syp he broke sterility twice and was not approaching the procedure correctly. She had to step in. At the meeting on Thursday, Dr. Syp, Paul, Jonathan met in Paul's office. Dr. Syp was explaining his deficiencies to Jonathan and that he will need to repeat the rotation. He became more argumentive and relentless. To the point that Dr. Syp stated that she had no more to say but Jonathan just continued. According to Dr. Syp, that is when Paul stepped in and told Jonathan to "shut up". At that point the discussion escalated to the point that Paul needed an out before he felt he was going to go too far. That's when he came to my office with Jonathan.
So, I am glad that Paul recognized that he needed to get his anger under control, but I am going to meet with Paul and challenge him to go a step further and demonstrate leadership by maintaining total control from the beginning of the situation or conversation.
I had a meeting with the Dean and he told me that he had just met with the parent of Jonathan.
Jonathan has already failed one other rotation (SAIM) and he still has SAS, anesthesia, Shelter Surgery to get through.

Let me know if you need anything else from me.

Have a good day.

Dan

**Daniel J Burba, DVM, DACVS**
*Professor, Equine Surgery*
*Head, Department of Veterinary Clinical Sciences*
*McCasland Professor of Biomedical Laser Surgery*

 COLLEGE OF
VETERINARY MEDICINE

405-744-8469 (o)

Sent from Mail for Windows 10

**From:** Gilmour, Margi
**Sent:** Friday, February 28, 2020 12:17 PM
**To:** Burba, Daniel
**Subject:** RE: CP Rotation Problems

Thanks. Keep me in the loop since I will be meeting with the student. I met with him over the last failed rotation and he is not an easy student to discuss with – very defensive and lots of excuses – but again, why this would prompt the instructors to meltdown is beyond me.

M.

**From:** Burba, Daniel <dburba@okstate.edu>
**Sent:** Friday, February 28, 2020 12:09 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: CP Rotation Problems

I agree this is not acceptable. Both (Paul and Dr. Syp) of them could have easily de-escalated the conversation with J R-P, but it sounded like after talking to Jonathan R-P they continued to persist to try to impose their will. So I am going to meet with Dr. Syp to get her side of the story.

**Daniel J Burba, DVM, DACVS**
*Professor, Equine Surgery*
*Head, Department of Veterinary Clinical Sciences*
*McCasland Professor of Biomedical Laser Surgery*

 COLLEGE OF
VETERINARY MEDICINE

405-744-8469 (o)

Sent from Mail for Windows 10

**From:** Gilmour, Margi
**Sent:** Friday, February 28, 2020 10:00 AM
**To:** Burba, Daniel
**Subject:** RE: CP Rotation Problems




Gilmour Deposition
Exhibit 8

Interesting. I was going to talk to you about the meltdown with Jonathan R-P. I'm not sure I understand how 2 faculty members could lose emotional control when speaking to a student. Do you know more? Both Jonathans have their unique problems, but losing control or "targeting" (if she truly was) is not acceptable.

**From:** Burba, Daniel <<u>dburba@okstate.edu</u>>
**Sent:** Friday, February 28, 2020 7:42 AM
**To:** Gilmour, Margi <<u>margi.gilmour@okstate.edu</u>>
**Subject:** FW: CP Rotation Problems

Good morning Margi,

███████████ sent me this email last night and just wanted to pass it along to you FYI.  Interestingly, my meeting with Jonathan Rivera-Pierola yesterday had a similar theme.  I am getting concerned about Dr. Syp. I am going to meet with her. Jeff has told me that he has gotten complaints from clients of her rudeness.

It never ends!

**Daniel J Burba, DVM, DACVS**
*Professor, Equine Surgery*
*Head, Department of Veterinary Clinical Sciences*
*McCasland Professor of Biomedical Laser Surgery*

  COLLEGE OF
VETERINARY MEDICINE

405-744-8469 (o)

Sent from <u>Mail</u> for Windows 10

**From:** ███████
**Sent:** Thursday, February 27, 2020 7:15 PM
**To:** <u>Burba, Daniel</u>
**Subject:** CP Rotation Problems

Hi Dr. Burba,

I'm having some issues with Dr. Syp. Everything was going well the first week, but once I came back from my conference her entire attitude towards me had changed. She seems like she's acting passive aggressive towards me. Last week my mentor died while I was at the conference. I tried my best to keep it together that week. I thought I was doing a decent job, but she confronted me on Friday saying I had been "snippy" with receptionists and accused me of case dodging in not so exact words. She told me I should put it behind me and bring my A game the next week (this week) and sign up for a lot of cases. She said based on my case load she could not adequately evaluate me. However, at that time I had been there a total of 7 days, 4 of which they put me on intern and 1 day of Dr. Demars. I had seen several cases through ER. She said that the intern's evaluation doesn't count for very much and that I need to sign up for more cases or she can't evaluate me. So this entire week I have been trying to bring 110% to try to prove my aptitude, and she had only criticized me and put a lot of pressure on me to perform. Aside from nervousness (that I think is justified given the situation), I think I have been performing very well. Yet she still treats me like I have done something terribly wrong. At this point Dr. Demars said he has not seen anything wrong with my performance, and sounds like he has the exact opposite opinion of me than Dr. Syp does. But he said that in her eyes I am on the edge and if I don't do phenomenally on the exam, my grade will suffer severely. He doesn't think I will fail, but I also get the impression that she is sugar coating her feelings to Dr. Demars and will try to fail me or give me a D so I have to repeat the rotation. They waited until the day before the last day to bring this up (right before the exam). They told me to sign up for more cases for tomorrow, but there are only 7 appointments for 4 students which I have 2 of them and none of my rotation mates will give up their cases. I don't know what to do and I don't want to do and I don't want to have to repeat the rotation. They approved my days off and I think it is unfair that I am under this much criticism. Especially considering they made the schedule and put me on intern for those days, then criticize me for not having enough cases.

I just wanted to bring this to your attention. I'm not sure if there's anything anybody can do at this point. I don't know what else to do except keep doing the best that I can.

Thank you for your time,
Jon Marlow



Meeting with Jonathan Rivera-Pierola 3-11-20 part b 3:15-5:00 pm

See scanned notes.

After listening to Jonathan's review of the rotation, I explained that a grade appeal is solely based on if the syllabus is followed and applied equally to all students with respect to expectations and grading. Similar concerns were noted by both clinicians and the grading policy was followed as described.

We discussed the case of not having treatments done by 7:30 am. Jonathan presented a UVIS screenshot where the TPR was entered at 7:30, and several documents he said were from the CP Packet that showed a discrepancy in times for ICU treatments to be done. (All scanned as part c). Because this one case was a relatively minor concern with respect to the largest issues of inadequate knowledge and overconfidence and/or not communicating his level of comfort with cases, even if this case was not included, he still would not have passed the rotation.

I did ask if he would like to address the PSC since there is the possibility of being dismissed from the program. He does. I discussed strategy for approaching that meeting – i.e. address the clinician's concerns and how he plans to meet expectations should he be given the opportunity to repeat the rotation. Stay very focused and positive.

Also discussed ways of demonstrating engagement on a rotation as he describes himself as "laid back" which he feels is interpreted as not caring/not engaged.

Gilmour Deposition
Exhibit 9

**Dr. Mason V. Reichard**
Professor
Department of Veterinary

250 McElroy Hall
Stillwater, OK 74078

COLLEGE OF
**VETERINARY MEDICINE**

March 21, 2020

Dr. Gilmour,

The Professional Standards Committee (PSC) met on March 18, 2020 and reviewed the case of Mr. Jonathan Rivera-Pierola, a St. Matthews University student, who earned two "D" grades during his 4th-year clinical rotations. At this meeting, Mr. Rivera-Pierola was given the opportunity to:

1. Present mitigating circumstances relative to his below acceptable academic performance on Small Animal Internal Medicine (SAIM) and Community Practice (CP) rotations
2. Provide a compelling plan to improve his performance on clinical rotations

After meeting with Mr. Rivera-Pierola and thorough deliberation, it is the recommendation of the PSC that Mr. Rivera-Pierola be dismissed from our academic program. We do not take this recommendation lightly. Ultimately, our recommendation for dismissal was based on his repeated poor academic performances, lack of accountability for clinical errors in multiple rotations, recurrent unprofessional behavior, and inability to take constructive criticism to improve his professional and clinical skills.

Mr. Rivera-Pierola was first brought to the attention of the PSC on October 01, 2019 when he earned a "D" in SAIM. Mr. Rivera-Pierola was provided a thorough and constructive evaluation of his performance on SAIM particularly noting deficiencies in communication, attention to detail, patient care, completion of medical records, accurate history taking/preparation, and professionalism. At that time, the PSC recommended Mr. Rivera-Pierola remediate SAIM by repeating it. This was communicated to him on October 3, 2019 in a letter from Dr. Margi Gilmour, Associate Dean of Academic Affairs. Also in that letter, Mr. Rivera-Pierola was informed that he was placed on academic probation which is standard policy (Section X, CVM-OSU Handbook, 2019–2020) for any student that earns a "D" grade.

After earning a "D" in SAIM, Mr. Rivera-Pierola earned an "A" in the Theriogenology Elective, "C" in Equine Medicine, "C" in Zoological Medicine Elective, "C" in Small Animal ICU/EMS, "C" in Food Animal Medicine, and "B" in Radiology. Of note for these rotations that Mr. Rivera-Pierola passed, were unfavorable comments from his instructors. These comments demonstrated a repeated lack of clinical performance and in some cases, an inability to improve despite instruction from different clinicians on separate rotations. Please see his rotation evaluations for all comments, select examples are provided:

Equine Medicine: "… it seemed like you were reluctant to take cases. This is how you will learn the most during your clinical year. Additionally, I think punctuality could be improved. Your laid back attitude made you easy to work with but sometimes it could be viewed as lack of interest in cases."

Zoological Medicine: "You've shown some improvement but in several cases/instances, we have concern about your clinical judgement and interpretation of the information. Ensure with each case you have reviewed all details and not only remember to include these details in your medical record but also apply critical thinking to why each abnormality occurred. We recommend reviewing your previous cases and seeing the edits that were performed on these medical records. Consider the overall case. For example, an animal should not be considered healthy if you know it has active disease that you are treating it for…there are some aspect like giving injections or maintaining sterility of an IV line that are expected at this time…"

Small Animal ICU/EMS: "During the time in ICU, I felt as if Jonathan did struggle quite a bit. With patient treatments, he would take a prolonged amount of time completing a single patient. Also, when it came to trying to complete patient treatments, sometimes he would ask or tell his ICU shift partner to complete his patient treatments. Although he did improve with some communication from the

Gilmour Deposition
Exhibit 10

technicians and his peers…Overall you did well…My biggest critique was not finishing one patient before beginning on another. When you do this, things will get missed or are done incorrectly…"

Food Animal: Your case log was pretty low owing to having more simple cases and fewer overall cases; we encourage you to remember to utilize your time on clinics as a learning opportunity. Was not as helpful to rotation mates and less working as a team member. I would recommend working hard to improve your basic knowledge and clinical skills; keep a positive and open attitude; don't be afraid to ask questions, but also when answering, try to focus on the specifics of the question and not just ramble something off to get an answer out…be thoughtful about your responses. Its ok not to know all the questions, just keep at it; Thanks and good luck!!"

On March 13, 2020, the PSC was informed that Mr. Rivera-Pierola earned a second "D" grade in CP. As he was already on academic probation, Mr. Rivera-Pierola was given the opportunity to present any mitigating circumstances to the PSC relative to his unsatisfactory performance. During the meeting, Mr. Rivera-Pierola continually implicated others for miscommunications that lead to conflicts with clinicians, indicated he was blamed for things he did not do, that he was wrongly accused, and that it was not fair he had SAIM for his first rotation at CVM-OSU. Furthermore Mr. Rivera-Pierola communicated little to take ownership of his situation and tell us how he was going to learn from this situation and improve his skills to become a clinical veterinarian. He did mention that he would essentially inundate the clinicians on his next rotations at every decision point as to what to do or what should be done. The PSC interpreted his response as an inappropriate course of action and that he would not willing to take ownership of his future clinical decisions.

It is the opinion of the PSC that Mr. Rivera-Pierola did not comprehend that the clinicians were trying to teach him to improve his clinical skills. Instead, he was fixated on several instances which he thinks caused him to be given the "D" grades as opposed to an overall level of below standard performance. It also become apparent to the PSC that Mr. Rivera-Pierola's professional relationship with CP clinicians deteriorated precipitously to the point it became toxic when they met to go through his rotation evaluation. Despite thorough and constructive comments from the clinicians, Mr. Rivera-Pierola's unprofessional response and inability to accept constructive criticism was deemed unacceptable by the PSC.

The PSC determined that Mr. Rivera-Pierola's mitigating circumstances were not sufficient to explain his unsatisfactory performance. Similarly, Mr. Rivera-Periola provided no logical plan of improvement for his training to become a clinical veterinarian. Of the four PSC members present during the meeting, all four voted to recommend dismissal of Mr. Rivera-Pierola from our professional curriculum. Two members of the PSC were not able to attend the meeting and did not vote.

Regards,

Professional Standards Committee (PSC) 2019–2020
Dr. Kelly Allen
Dr. Mike Davis
Dr. Erik Clary
Dr. Lyndi Gilliam
Dr. Myron Hinsdale
Dr. Mason Reichard, Chair

Board01176

**From:** Risco, Carlos A <carlos.risco@okstate.edu>
**Sent:** Monday, March 23, 2020 9:58 AM CDT
**To:** Shields, Deborah <deborah.shields@okstate.edu>
**Subject:** FW: Print for my 11 am
**Attachment(s):** "Rivera-Pierola_PSC Dismissal Recommendation_21Mar2020.docx"

Print the attached letter for my 11 am

Thanks

**CARLOS RISCO, DVM, DACT**
**PROFESSOR AND DEAN**
College of Veterinary Medicine
405.744.6648 • 205 McElroy Hall
carlos.risco@okstate.edu • vetmed.okstate.edu

---

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Sunday, March 22, 2020 3:09 PM
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Subject:** FW: PSC recommendation letter for Jonathan Rivera-Pierola

Hi Carlos,

We can talk about this Monday when you have time so I can go over what can happen at this point. I would like to send Jonathan the letter tomorrow, but would prefer to meet with you first.

Thanks,
Margi

---

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Saturday, March 21, 2020 9:40 AM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Cc:** Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** PSC recommendation letter for Jonathan Rivera-Pierola

Dr. Gilmour,

Please find attached a letter recommending dismissal of Jonathan Rivera-Pierola. If there is any other information you need from the PSC, please let me know.

Regards,

Mason

Mason Reichard, MS, PhD
Professor
College of Veterinary Medicine
Oklahoma State University
Stillwater, OK 74078

Gilmour Deposition
Exhibit 11

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Monday, March 23, 2020 5:07 PM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** RE: PSC protocol

Sounds good

```
┌─────────────────────────┐
│   Gilmour Deposition     │
│       Exhibit 12         │
└─────────────────────────┘
```

---

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Monday, March 23, 2020 4:58 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** RE: PSC protocol

Yes – ABSOLUTELY NO HURRY TO THIS! I just wanted to throw it out there before I forgot. We'll review after the semester when we usually make changes to handbook.

---

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Monday, March 23, 2020 4:55 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** RE: PSC protocol

I agree. I also have a few note somewhere about other edits we wanted to make in the handbook for PSC. I'll find them, compile them, and send you way. I'll wait till after things calm a bit. I think everyone is still scrambling to implement online teaching. Hopefully it is not so onerous after this first week back.

Have a good evening,

Mason

---

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Monday, March 23, 2020 4:45 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** RE: PSC protocol

I say we make it so, and include in the Student handbook for next year.

---

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Monday, March 23, 2020 4:32 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** RE: PSC protocol

That is a great idea. Having their advisor present seems so obvious now that it has come to light.

I'm glad the letter was well received. I really do feel bad for Jonathan. It appeared he had the abilities to be successful here. For some reason, his chosen behavior was self-destructive.

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Monday, March 23, 2020 4:17 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** PSC protocol

Hi,

Have not had time to bring this up previously, but the dean suggested we consider having the student's advisor be present when a student meet with the PSC. After the meeting with the student, the PSC would excuse the student and ask for input from the advisor. This would just provide another layer of information/insight to consider for decision purposes. Like if the student had non-academic issues, or if the student never contacted his/her advisor after attempts made by the advisor, etc.

Board01215

This does NOT have anything to do with the Rivera-Pierola decision. Dr. Risco was very complimentary of the letter you provided!

M.

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs
College of Veterinary Medicine
Oklahoma State University
405-744-8471 [margi.gilmour@okstate.edu](mailto:margi.gilmour@okstate.edu)

Board01216

**From:** Risco, Carlos A
**Sent:** Monday, March 30, 2020 1:12 PM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Rivera letter
**Attachment(s):** "Rivera-Pierola, Jonathan 3-29-20.pdf"

Jonathan's letter – we can discuss

Thanks



**CARLOS RISCO, DVM, DACT**
**PROFESSOR AND DEAN**
College of Veterinary Medicine
405.744.6648 • 205 McElroy Hall
carlos_risco@okstate.edu • vetmed.okstate.edu

Gilmour Deposition
Exhibit 13

Board01299

To: Dr. Carlos Risco, DVM, DACT
   Dean of the College of Veterinary Medicine of Oklahoma State University

To: The Members of the Professions Standard Committee

Re: Dismissal from the College of Veterinary Medicine Program at Oklahoma State University

I am writing to appeal my academic dismissal from the CVM Program at OSU. Thank you for allowing me to have the opportunity to explain the circumstances that led to this point, as well as my action plan to improve on my performance in the program.

I met with the Professions Standard Committee on March 18, 2020 and I was unable to fully express the circumstances that led to my failed rotations. I got caught up in answering questions and found myself out of time to disclose the background situations that may have affected my performance and which situations I believe are relevant to the decision now being appealed.  Also, as we are currently living through the COVID 19 pandemic, the anxiety of the meeting was increased and the distraction of current events did not permit a full discussion of my continued participation in the CVM Program.

I did not ignore the suggestions given to me on the evaluations. I took them seriously and attempted to implement them as best as I could. In retrospect, I failed to portray this clearly so that my professors could see the work I put into the recommended changes. I was perhaps too quiet, giving a misconception of who I am and what I stand for and the seriousness with which I took the suggestions and my continued and strong desire to continue at OSU.

During my Internal Medicine rotation, my father had a syncopal episode leading to a motor vehicle accident. He was rushed to the hospital and found to have a chest contusion, rib and sternal fractures and was admitted to the cardiac critical care unit. He was being evaluated for possible emergent cardiac surgery and stayed in the CCU for several days. This kept me anxious and distracted during my rotation. In retrospect, I now see that I should have communicated this to my professors or even taken a leave of absence rather than continue in the rotation.

On my Community Practice rotation, I got caught up in miscommunications leading to ambiguities and misunderstandings. This caused me to become stressed with fear of getting involved in another misunderstanding that may lead to my failure of the rotation. I truly internalized the constructive criticism and attempted to correct various issues on my own. In retrospect, I should have increased my communication with my professors and asked for assistance when needed.

I am receiving counseling with an OSU psychologist, Mr. Jeremiah Grissett, as recommended by the Dean of CVM. He is helping me see my role in these situations and providing me with good advice.

Board01300

I truly have learned and appreciate all the clinicians' feedback through my rotations. I plan to utilize every piece of constructive criticism that I have received in the following manner:

1. Communication: I will make sure to communicate with the clinicians/residents/technicians involved in each case to ensure proper feedback on my performance and direction on results and areas of improvement. Specifically, I will ask for feedback from my clinicians at the beginning and end of each week so I could be in constant communication and agreement with them. And, I will ask for clarification if I am unclear on any instructions or assignments.

2. Case Preparation: I will improve on the preparation of cases. I will be more thorough in taking and documenting the history and physical exam. I will bring the documentation to my feedback sessions to go over with the clinicians in detail.

3. Patient care- I will arrive earlier than requested in the syllabus to ensure my review of patient's vital signs, medication sheets and to be sure that overnight notes have been double checked prior to rounds.

4. Demonstrate proper professional ethical behavior by working with my professors more frequently in a verbal and transparent way to avoid miscommunications.

Although I have not passed the Internal Medicine and Community Practice rotations, evaluations in both of these courses stated I have the potential to become a good veterinarian.

For example, from Internal Medicine:

"We are confident that you will achieve these goals. Jonathan, you have the knowledge and skills to pass small animal internal medicine and be a good veterinarian. We are hopeful that you will take these constructive comments and areas of improvement as ways to continue to develop as a future veterinarian. being capable of becoming a good clinician."

After evaluation of above mentioned and taking into consideration the changes I am willing to make now and in the next rotations, I am asking for reconsideration of the decision made on March 18, 2020. Becoming a veterinarian is of paramount importance to me. I am asking for the opportunity to be reinstated to the CVM Program at OSU and to demonstrate my willingness to do all that is necessary to become a competent veterinarian of whom this Program can be proud.

Sincerely,

Jonathan Rivera-Pierola, MPH

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Saturday, April 04, 2020 4:05 PM CDT
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pieorola appeal to the Dean
**Attachment(s):** "Risco proposal for sanctions 3-30-20.docx"

Hi Carlos,

FYI I summarized the recommendations you had outlined when we last spoke about Jonathan's case. I have attached them for your convenience in case you elect to let Jonathan continue in the program. Also, so you don't have to look it up, the academic policy reads at this point: "The PSC shall respond .  .  . to the Dean within 5 working days after the appeals hearing, **and the Dean shall render his decision within 5 working days of receipt  of the recommendation. The decision of the Dean shall be final and no further appeal will be available. The Dean will provide a summary report to the PSC detailing the basis for his final action regarding the appeal**."

We will want to provide him with a decision before Friday April 10th as that is the last day of the current rotation.

Let me know if you need anything else or have any questions.

M.

---

**From:** Reichard, Mason <mason.reichard@okstate.edu>
**Sent:** Saturday, April 04, 2020 2:07 PM
**To:** Risco, Carlos A <carlos.risco@okstate.edu>
**Cc:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pieorola appeal to the Dean

Dr. Risco,

The PSC meet yesterday to hear the appeal of Mr. Jonathan Rivera-Pierola. After a thorough discussion of his letter and comments, we found little to no justification for us to reverse our recommendation for dismissal. Please see the attached letter for more details.

I truly wish we had a different outcome for Mr. Rivera-Pierola.

Respectfully,

Mason

---

**From:** Risco, Carlos A <carlos.risco@okstate.edu>
**Sent:** Monday, March 30, 2020 3:47 PM
**To:** Reichard, Mason <mason.reichard@okstate.edu>
**Cc:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Jonathan Rivera-Pieorola appeal to the Dean

Dear Dr. Reichard,
On March 29, 2020, I received from Jonathan Rivera-Pieorola the attached written appeal to reconsider the recommendation by the PSC for dismissal from the CVM professional program. In accordance to the CVM  Academic Standards Policy 8.2, Section 14, I am requesting that the committee consider his appeal and respond or make further recommendations to me within (5) working days after the appeals hearing. In his appeal, Jonathan addresses circumstances that contributed to his below acceptable academic performance on the Small Animal Internal Medicine and Community Practice rotations. Importantly, he provides a plan to improve his professional demeanor and performance on clinical rotations.

Thank you for your willingness and that of the committee to consider this request.



**CARLOS RISCO, DVM, DACT**
**PROFESSOR AND DEAN**
College of Veterinary Medicine
405.744.6648 • 205 McElroy Hall
carlos.risco@okstate.edu • vetmed.okstate.edu

Gilmour Deposition
Exhibit 14

Board01384

3-30-20

What Risco proposed for J R-P:

1. Finish rotation he is currently in (online now)
2. Be suspended from program until we are back to in-person rotation
3. Remediate CP and SAIM before being allowed to complete remaining rotations
4. Must receive C or higher. If he receives a D he will be dismissed with no PSC review or appeal.
5. He will be on probation for the remainder of his time here; if he receives a D in any other rotation, he will be dismissed with no PSC review or appeal.
6. He must adhere to the actionable items in his letter of appeal



Office of the Dean
205 McElroy Hall
Stillwater, Oklahoma 74078

Phone: (405) 744-6648
Fax: (405) 744-6633

April 6, 2020

Dear Jonathan,

The Professional Standards Committee (PSC) met on April 3rd to consider your appeal. The Committee's decision was to stand by their recommendation of dismissal. However, the Dean's final decision is to allow you to stay in the professional program under Academic Suspension, the details of which are:

1.  You will complete the current rotation (Rotation 16) and must achieve a C grade or higher. Failure to do so will result in dismissal from the program with no PSC review or appeal.
2.  You will be placed on Academic Suspension until both failed rotations (Community Practice and Small Animal Internal Medicine) are remediated through participation in in-person rotations. Due to the COVID-19 crisis and current use of on-line curriculum, you will be suspended from clinical rotations until the hospital reopens to students and in-person rotations resume. Lucy Kershaw will work to schedule your rotations as soon as possible, but understand the date this can be done is currently unknown.
3.  You must receive a C grade or higher in both remediated rotations. Failure to do so will result in dismissal from the program with no PSC review or appeal.
4.  You will be on Academic Probation for the duration of your clinical year. Failure to receive a C grade or higher on any rotation during the remaining clinical year will result in dismissal from the program with no PSC review or appeal.
5.  You will be held accountable to the four items in your plan of improvement listed in your letter of appeal: communication, case preparation, patient care, and professional and ethical behavior.

Lucy Kershaw will be in contact with you as soon as we know when the hospital will return to normal operations. Please be sure to update her with any change of your contact information. If you choose not to accept the above conditions of Academic Suspension and Academic Probation, please let me know at your earliest convenience.

Sincerely,

Margi A. Gilmour, DVM, DACVO
Associate Dean for Academic Affairs

Gilmour Deposition
Exhibit 15



Rivera-pierola, Jonathan <jonariv@ostatemail.okstate.edu>

## EARLY TERMINATION OF ANESTHESIA ROTATION

6 messages

**Di Concetto, Stefano** <sdiconc@okstate.edu>    Fri, Apr 10, 2020 at 3:17 PM
To: Huma Valji <humavalji@gmail.com>, Tiffany Chisholm <tiffanylchisholm@gmail.com>, "Barritt, Alisha L" <alisha.barritt@okstate.edu>, "Kraft, Trey" <trey.kraft@okstate.edu>, "Larrabee, Kyre Ellen" <kyre.larrabee@okstate.edu>, "Mizuno, Hisato" <hmizuno@okstate.edu>, "Powell, Aubrey" <aubrey.powell10@okstate.edu>, "Stuart, Megan" <megan.stuart@okstate.edu>, "Rivera-Pierola, Jonathan" <jonariv@okstate.edu>
Cc: "Burba, Daniel" <dburba@okstate.edu>, "Gilmour, Margi" <margi.gilmour@okstate.edu>

Hello students in anesthesia rotaon 16,

As you know this has been a very trying me f or everyone; we understand this is not how you expected to spend your anesthesia rotaon.  In addion, it w    as also not our expectaon t  o run a service without any students.  As professionals, though, it is an expectaon tha  t our student colleagues demonstrate paence, under  standing and posiv  e attudes.

Unfortunately, I am disappointed with the negav  e attitude and comments that have been displayed by this rotaon group.  Unbeknownst to you, a comment was overheard on Wednesday 4/8 by faculty and staff that was completely unacceptable.  The comment: "Thank God we have only two more days of this s***" is unprofessional- it should have been met with stronger push back from parcipa  ng s  tudents.

Addionally  , if you were in the clinics, you would be expected to be available from 7a-5p and be on-call; as such, it is an expectaon tha  t you are available for rounds/case discussions/etc. from 7a-5p.  Given the situaon w  e are experiencing with Covid, I have not objected to you taking me a  way from your computer to take a break from learning and disperse in between morning and a. ernoon rounds, to run errands or else.  Perhaps I should have been clearer from the beginning.  Your job was to be engaged full me in this r  otaon, which a  t mes means o  verworking. Spending longer than expected periods of me on the c  omputer during this virtual rotaons is equiv  alent to being here all day doing one case after the other, without me t  o eat or take a break. Many students in previous rotaon had to do so.

I have been working r  elessly to provide you with as much 'in the moment' learning as possible; this is not an easy task.  I would have appreciated a more collegial response from students who are about to join this profession in a few weeks.  I am disheartened that you are not working r  elessly as we are in the hospital to get the most out of this rotaon t  ogether.  I appreciate the students who have not complained and who have put in the me and e  ffort to make this experience worthwhile.

As clinic expectaons gr  ow and my physical and mental resources are overstretched, I believe it will be in our best interest to terminate the anesthesia rotaon a  t this me, 2.15 pm, Frida  y April 10th, 2020.  Today's afternoon rounds are cancelled.

Your grades will be posted someme ne  xt week.

Best,

Stefano Di Concetto

<div style="border:1px solid black;">Gilmour Deposition<br>Exhibit 16</div>

**Trey Kraft** <wallaek@ostatemail.okstate.edu>    Plaintiff 057  Fri, Apr 10, 2020 at 4:09 PM
To: "Di Concetto, Stefano" <sdiconc@okstate.edu>

Cc: Huma Valji <humavalji@gmail.com>, Tiffany Chisholm <tiffanylchisholm@gmail.com>, "Barritt, Alisha L" <alisha.barritt@okstate.edu>, "Kraft, Trey" <trey.kraft@okstate.edu>, "Larrabee, Kyre Ellen" <kyre.larrabee@okstate.edu>, "Mizuno, Hisato" <hmizuno@okstate.edu>, "Powell, Aubrey" <aubrey.powell10@okstate.edu>, "Stuart, Megan" <megan.stuart@okstate.edu>, "Rivera-Pierola, Jonathan" <jonariv@okstate.edu>, "Burba, Daniel" <dburba@okstate.edu>, "Gilmour, Margi" <margi.gilmour@okstate.edu>

Dr. Di,

I want to speak on behalf of the whole group in saying we didn't mean to make you feel unappreciated and upset you. We understand that you were doing your best under the current conditions.

On our end we are all working double time to take care of school in the midst of this pandemic and times are stressful. We should've been better at supporting each other and you.

Again I'm sorry we made you feel bad - you are appreciated and you went above and beyond to get us the best experience.

Best,

Trey Kraft

On Apr 10, 2020, at 2:17 PM, Di Concetto, Stefano <sdiconc@okstate.edu> wrote:

[Quoted text hidden]

---

**Larrabee, Kyre** <kyrel@ostatemail.okstate.edu>                                    Fri, Apr 10, 2020 at 4:19 PM
To: "Di Concetto, Stefano" <sdiconc@okstate.edu>
Cc: Huma Valji <humavalji@gmail.com>, Tiffany Chisholm <tiffanylchisholm@gmail.com>, "Barritt, Alisha L" <alisha.barritt@okstate.edu>, "Kraft, Trey" <trey.kraft@okstate.edu>, "Larrabee, Kyre Ellen" <kyre.larrabee@okstate.edu>, "Mizuno, Hisato" <hmizuno@okstate.edu>, "Powell, Aubrey" <aubrey.powell10@okstate.edu>, "Stuart, Megan" <megan.stuart@okstate.edu>, "Rivera-Pierola, Jonathan" <jonariv@okstate.edu>, "Burba, Daniel" <dburba@okstate.edu>, "Gilmour, Margi" <margi.gilmour@okstate.edu>

Dr. Di Concetto,

This email has come as a shock to many of us. I completely understand how trying this situation is for all parties involved and many of us in this rotation have commented several times how hard this must be for clinicians to alter their teaching styles. We have mentioned many times through the technical challenges how we admire how hard you were trying for us. It did not go unnoticed.

As for the comment that was mentioned on Wednesday, although I do not know who stated it but as a group we all agree that it is highly unprofessional. Yes, we may all get frustrated at times but we recognize as future colleagues that it is unacceptable.

We also understand that if we were able to be in the clinic that we would be expected to be available from 7am-5pm. I know your job hasn't been made any easier by having to take on double duty at the hospital while we are gone. If I may say without offending you, the set of expectations as far as the scheduling were made with students understanding that the student on-call would be available throughout the day when they were scheduled. Many of us, since we are unable to come to OSU-VTH, have moved home and started working at their respective jobs or are working other jobs throughout the day. It seemed frustrating for the group to have erratic times to access our computers when we thought we were scheduled for rounds at 9:00am and 3:30pm. I am sincerely asking you to not take this in disrespect. Lastly, if I may defend myself this morning, we had been on the computer for 4 hours already and I merely suggested we take a break and recovene at our afternoon rounds to discuss the protocols for the cases in surgery. I know you expect us to be on the computer virtually to be equivalent to being in person, but it is extremely hard to stay focused and stay motivated at a desk. There are so many factors that I feel we should consider when learning online. I know I can speak for others on this rotation that we would wholeheartedly rather be in the hospital working alongside than behind our computer screen.

Plaintiff 058

Dr. Di, we have been putting in the effort and I can proudly state that we have put together a collection of anesthesia material to take with us to practice. My rotation-mates and myself have been working on taking notes from everything we talk about and this document is over 40 pages long. Not to mention all of the material that we have been researching and storing.

I know this was extremely challenging for you and after working with you personally to help with some technical glitches, I'm extremely proud of you as a clinician. I know you hate technology, but you have come leaps and bounds in preparing for this rotation while learning along the way. I do not want you to leave this rotation with a bad taste in your mouth. If you would like to reconsider having afternoon rounds we will all be available at 3:30pm and we also have the case protocols for today's surgery cases prepped and ready to present.

Sincerely,

*Kyre   E. Larrabee*

**National Student AVMA Immediate Past President**
**Zoetis Student Representative, OSU-CVHS Ambassador**
**Zuku Review Student Representative**
**OSU Center for Veterinary Health Sciences, 2020**

**Phone. 620-635-0442**
**Email. kyre.larrabee@okstate.edu**

[Quoted text hidden]

---

**Mizuno, Hisato** <hmizuno@ostatemail.okstate.edu>            Fri, Apr 10, 2020 at 4:36 PM
To: Huma Valji <humavalji@gmail.com>, Tiffany Chisholm <tiffanylchisholm@gmail.com>, "Barritt, Alisha L" <alisha.barritt@okstate.edu>, "Kraft, Trey" <trey.kraft@okstate.edu>, "Larrabee, Kyre Ellen" <kyre.larrabee@okstate.edu>, "Stuart, Megan" <megan.stuart@okstate.edu>, "Rivera-Pierola, Jonathan" <jonariv@okstate.edu>, "Powell, Aubrey" <aubrey.powell10@okstate.edu>


Hisato D Mizuno
(310) 612-6426
hmizuno@okstate.edu


---------- Forwarded message ---------
From: **Mizuno, Hisato** <hmizuno@ostatemail.okstate.edu>
Date: Fri, Apr 10, 2020 at 3:10 PM
Subject: Re: EARLY TERMINATION OF ANESTHESIA ROTATION
To: Di Concetto, Stefano <sdiconc@okstate.edu>

Dear Dr. Di,

Thank you very much for the past 3 weeks.

Regardless of the unprecedented situation, we were definitely encouraged by your enthusiasm and felt that we are effectively learning as much as we can in this unexperienced circumstance. I felt very happy being in this rotation, being able to learn a lot despite this condition, until I received the email that you were upset.

I assume we were one of the busiest rotations, which I am really grateful for since it was impossible to have the opportunity to do an in-hospital experience for now. That wouldn't have been accomplished without Dr. Di, all the anesthesia team and OSU's efforts.

I am very sorry for the words remote from our intentions. I do not recall who said that but I think that was not an intention. We definitely had difficulty not only with online education but also from the occasional bad connection. Indeed, we sometimes got kicked out of the meeting. It was not uncommon having voices break up, video freezing and difficult to understand. Although, that would not be an excuse to show an unprofessional attitude.

Honestly, I hope that I can continue this anesthesia rotation, learn more and more from you and finish it.
Again, I am very sorry to betray your expectations.

Plaintiff 059

Sincerely,

Hisato D Mizuno
(310) 612-6426
hmizuno@okstate.edu

On Fri, Apr 10, 2020 at 2:17 PM Di Concetto, Stefano <sdiconc@okstate.edu> wrote:
[Quoted text hidden]

---

**Jonathan Rivera-pierola** <jonariv@ostatemail.okstate.edu>　　　　　　Fri, Apr 10, 2020 at 6:55 PM
To: "Di Concetto, Stefano" <sdiconc@okstate.edu>
Cc: Huma Valji <humavalji@gmail.com>, Tiffany Chisholm <tiffanylchisholm@gmail.com>, "Barritt, Alisha L"
<alisha.barritt@okstate.edu>, "Kraft, Trey" <trey.kraft@okstate.edu>, "Larrabee, Kyre Ellen" <kyre.larrabee@okstate.edu>,
"Mizuno, Hisato" <hmizuno@okstate.edu>, "Powell, Aubrey" <aubrey.powell10@okstate.edu>, "Stuart, Megan"
<megan.stuart@okstate.edu>, "Rivera-Pierola, Jonathan" <jonariv@okstate.edu>, "Burba, Daniel" <dburba@okstate.edu>,
"Gilmour, Margi" <margi.gilmour@okstate.edu>

These are very stressful times, and the school has really done us a service to offer this class virtually.  They are really
doing their part to keep us safe from this virus and we should honor and appreciate them for doing it. I know that this virus
is touching our lives in very personal ways, but we should take this opportunity to learn to be more patient and
understanding and try to put ourselves in others shoes before speaking. I know that every person in this class is grateful
to Dr. Di and the school for this opportunity and I'm sure that nothing that was said was with ill will.  As Americans, we
have never been placed in a situation where we feel such impotence. This sometimes makes us react to the situation
without elegance.  I am confident that through this discussion we can find the opportunity to see our parts in this situation
and correct them for the future. Life is about learning, and sometimes learning through our mistakes to make us better
people.
We appreciate you and all your efforts!

Regards,

Jonathan Rivera-Pierola, MPH


On Apr 10, 2020, at 2:17 PM, Di Concetto, Stefano <sdiconc@okstate.edu> wrote:


[Quoted text hidden]

---

**Huma Valji** <humavalji@gmail.com>　　　　　　　　　　　　　　　　Fri, Apr 10, 2020 at 7:32 PM
To: "Di Concetto, Stefano" <sdiconc@okstate.edu>
Cc: Tiffany Chisholm <tiffanylchisholm@gmail.com>, "Barritt, Alisha L" <alisha.barritt@okstate.edu>, "Kraft, Trey"
<trey.kraft@okstate.edu>, "Larrabee, Kyre Ellen" <kyre.larrabee@okstate.edu>, "Mizuno, Hisato" <hmizuno@okstate.edu>,
"Powell, Aubrey" <aubrey.powell10@okstate.edu>, "Stuart, Megan" <megan.stuart@okstate.edu>, "Rivera-Pierola, Jonathan"
<jonariv@okstate.edu>, "Burba, Daniel" <dburba@okstate.edu>, "Gilmour, Margi" <margi.gilmour@okstate.edu>

Dr DiConcetto,

I sincerely apologize for any disrespect my colleagues and I have shown you. I truly appreciate all your efforts to go
above and beyond to teach us as much as possible. Despite our limitations with online rotations, I was able to expand my
foundation in anesthesia.

Once again I sincerely apologize on behalf of all my colleagues. Thank you so much for going the extra mile.

Thanks,
Huma Valji

Plaintiff 060

Sent from my iPhone

On Apr 10, 2020, at 2:17 PM, Di Concetto, Stefano <sdiconc@okstate.edu> wrote:

Hello students in anesthesia rotaon 16,

[Quoted text hidden]

Plaintiff 061

**From:** Gilmour, Margi
**Sent:** Sunday, April 12, 2020 5:35 PM CDT
**To:** Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** FW: EARLY TERMINATION OF ANESTHESIA ROTATION

Interesting. Mr. MPH is the only one excusing the comment and making excuses.

**From:** Jonathan Rivera-pierola <jonariv@ostatemail.okstate.edu>
**Sent:** Friday, April 10, 2020 5:55 PM
**To:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Cc:** ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
Rivera-Pierola, Jonathan <jonariv@okstate.edu>; Burba, Daniel <dburba@okstate.edu>; Gilmour, Margi
<margi.gilmour@okstate.edu>
**Subject:** Re: EARLY TERMINATION OF ANESTHESIA ROTATION


These are very stressful times, and the school has really done us a service to offer this class virtually. They are really doing their part to
keep us safe from this virus and we should honor and appreciate them for doing it. I know that this virus is touching our lives in very
personal ways, but we should take this opportunity to learn to be more patient and understanding and try to put ourselves in others shoes
before speaking. I know that every person in this class is grateful to Dr. Di and the school for this opportunity and I'm sure that nothing
that was said was with ill will. As Americans, we have never been placed in a situation where we feel such impotence. This sometimes
makes us react to the situation without elegance. I am confident that through this discussion we can find the opportunity to see our parts
in this situation and correct them for the future. Life is about learning, and sometimes learning through our mistakes to make us better
people.
We appreciate you and all your efforts!

Regards,

Jonathan Rivera-Pierola, MPH


> On Apr 10, 2020, at 2:17 PM, Di Concetto, Stefano <sdiconc@okstate.edu> wrote:
>
> Hello students in anesthesia rotation 16,
>
> As you know this has been a very trying time for everyone; we understand this is not how you expected to spend your
> anesthesia rotation. In addition, it was also not our expectation to run a service without any students. As professionals,
> though, it is an expectation that our student colleagues demonstrate patience, understanding and positive attitudes.
>
> Unfortunately, I am disappointed with the negative attitude and comments that have been displayed by this rotation
> group. Unbeknownst to you, a comment was overheard on Wednesday 4/8 by faculty and staff that was completely
> unacceptable. The comment: "Thank God we have only two more days of this s***" is unprofessional- it should have
> been met with stronger push back from participating students.
>
> Additionally, if you were in the clinics, you would be expected to be available from 7a-5p and be on-call; as such, it is an
> expectation that you are available for rounds/case discussions/etc. from 7a-5p. Given the situation we are experiencing
> with Covid, I have not objected to you taking time away from your computer to take a break from learning and disperse in
> between morning and afternoon rounds, to run errands or else. Perhaps I should have been clearer from the beginning.
> Your job was to be engaged full time in this rotation, which at times means overworking. Spending longer than expected
> periods of time on the computer during this virtual rotations is equivalent to being here all day doing one case after the
> other, without time to eat or take a break. Many students in previous rotation had to do so.
>
> I have been working tirelessly to provide you with as much 'in the moment' learning as possible; this is not an easy task.
> I would have appreciated a more collegial response from students who are about to join this profession in a few weeks. I
> am disheartened that you are not working tirelessly as we are in the hospital to get the most out of this rotation together.
> I appreciate the students who have not complained and who have put in the time and effort to make this experience
> worthwhile.
>
> As clinic expectations grow and my physical and mental resources are overstretched, I believe it will be in our best
> interest to terminate the anesthesia rotation at this time, 2.15 pm, Friday April 10th, 2020. Today's afternoon rounds are
> cancelled.
>
> Your grades will be posted sometime next week.
>
> Best,
>
> Stefano Di Concetto

Gilmour Deposition
Exhibit 17

**From:** Wilson, Robin <robin.wilson@okstate.edu>
**Sent:** Monday, April 13, 2020 7:23 AM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Re: EARLY TERMINATION OF ANESTHESIA ROTATION

And he didn't exactly deny he is the one who said it.

Robin


On Apr 12, 2020, at 5:36 PM, Gilmour, Margi <margi.gilmour@okstate.edu> wrote:


PS – wanna bet his mother wrote this?

**From:** Jonathan Rivera-pierola <jonariv@ostatemail.okstate.edu>
**Sent:** Friday, April 10, 2020 5:55 PM
**To:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Cc:** Huma Valji <humavalji@gmail.com>; Tiffany Chisholm <tiffanylchisholm@gmail.com>; Barritt, Alisha L
<alisha.barritt@okstate.edu>; Kraft, Trey <trey.kraft@okstate.edu>; Larrabee, Kyre Ellen <kyre.larrabee@okstate.edu>;
Mizuno, Hisato <hmizuno@okstate.edu>; Powell, Aubrey <aubrey.powell10@okstate.edu>; Stuart, Megan
<megan.stuart@okstate.edu>; Rivera-Pierola, Jonathan <jonariv@okstate.edu>; Burba, Daniel <dburba@okstate.edu>;
Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Re: EARLY TERMINATION OF ANESTHESIA ROTATION


These are very stressful times, and the school has really done us a service to offer this class virtually.  They are really doing
their part to keep us safe from this virus and we should honor and appreciate them for doing it. I know that this virus is
touching our lives in very personal ways, but we should take this opportunity to learn to be more patient and understanding
and try to put ourselves in others shoes before speaking. I know that every person in this class is grateful to Dr. Di and the
school for this opportunity and I'm sure that nothing that was said was with ill will.  As Americans, we have never been
placed in a situation where we feel such impotence. This sometimes makes us react to the situation without elegance.  I am
confident that through this discussion we can find the opportunity to see our parts in this situation and correct them for the
future. Life is about learning, and sometimes learning through our mistakes to make us better people.
We appreciate you and all your efforts!

Regards,

Jonathan Rivera-Pierola, MPH


On Apr 10, 2020, at 2:17 PM, Di Concetto, Stefano <sdiconc@okstate.edu> wrote:


Hello students in anesthesia rotation 16,

As you know this has been a very trying time for everyone; we understand this is not how you expected to
spend your anesthesia rotation.  In addition, it was also not our expectation to run a service without any
students.  As professionals, though, it is an expectation that our student colleagues demonstrate patience,
understanding and positive attitudes.

Unfortunately, I am disappointed with the negative attitude and comments that have been displayed by this
rotation group.  Unbeknownst to you, a comment was overheard on Wednesday 4/8 by faculty and staff that
was completely unacceptable.  The comment: "Thank God we have only two more days of this s***" is
unprofessional- it should have been met with stronger push back from participating students.

Additionally, if you were in the clinics, you would be expected to be available from 7a-5p and be on-call; as
such, it is an expectation that you are available for rounds/case discussions/etc. from 7a-5p.  Given the
situation we are experiencing with Covid, I have not objected to you taking time away from your computer to
take a break from learning and disperse in between morning and afternoon rounds, to run errands or else.
Perhaps I should have been clearer from the beginning.  Your job was to be engaged full time in this rotation,
which at times means overworking. Spending longer than expected periods of time on the computer during
this virtual rotations is equivalent to being here all day doing one case after the other, without time to eat or
take a break. Many students in previous rotation had to do so.

I have been working tirelessly to provide you with as much 'in the moment' learning as possible; this is not an
easy task.  I would have appreciated a more collegial response from students who are about to join this
profession in a few weeks.  I am disheartened that you are not working tirelessly as we are in the hospital to
get the most out of this rotation together.  I appreciate the students who have not complained and who have

Board01453

put in the time and effort to make this experience worthwhile.

As clinic expectations grow and my physical and mental resources are overstretched, I believe it will be in our best interest to terminate the anesthesia rotation at this time, 2.15 pm, Friday April 10th, 2020.  Today's afternoon rounds are cancelled.

Your grades will be posted sometime next week.

Best,

Stefano Di Concetto

Board01454

**From:** Di Concetto, Stefano on behalf of Di Concetto, Stefano <sdiconc@okstate.edu>
**Sent:** Monday, April 20, 2020 5:38 PM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** Re: Jonathan Rivera

It was not a matter of softening things or making exceptions but a way to prepare myself for what you will read below - Jonathan's expected reply to my notification about his failing grade.
Given the abnormal nature of the rotation, to me it would make sense to allow someone to repeat it once the circumstances are normalized, especially when, in his case, failing this unconventional rotation results in being dismissed from the program. And if the circumstances don't become normal soon enough, I think he should be at least allowed to retake the written quiz, with the agreement that if he fails it there will be no other chances.

SD

Hello Dr. Di,

I just read your email and I am left without words. I studied so hard for this course, reviewing all the concepts I could to make sure that I had grasp them properly,Sending you my questions to go over the things that I was unsure about and asking you for your feedback along the way.  Please tell me what concepts I missed on the exam because I thought that I had done well. I know that I missed the final two questions due to time restraints but by no means did I think I failed it.
I have worked all of my life to get to this point. I have three months left of school to complete my veterinary medicine degree, is there anything that I can do to change this failing grade. If I fail this course I can no longer continue my studies. This would devastate me and my family both mentally and financially. I have devoted the last 12 years of my life to this and I'm willing to do anything at this point to finish these last three months and start my life as a veterinarian.

Regards,
Jonathan Rivera-Pierola

---

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Friday, April 17, 2020 5:12 PM
**To:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Subject:** RE: Jonathan Rivera

Hello Stefano,

My suggestion is to evaluate Jonathan according to your revised (COVID-19) syllabus and as the other students were evaluated. You do not need to alter, soften or make any exceptions.

Margi

**From:** Di Concetto, Stefano <sdiconc@okstate.edu>
**Sent:** Friday, April 17, 2020 2:23 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Cc:** Naff, Adam <adam.naff@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Subject:** Jonathan Rivera

|  | Possible Points | John Rivera |
|---|---|---|
| General knowledge | 200 | 140 |
| Case work-up and presentation | 100 | 80 |
| Assignments and topics | 100 | 85 |
| Professional conduct | 100 | 90 |
| TOT | 500 | 395 |
|  |  | 79% |
| Written exam | 150 | 99.6 |
|  |  | 66.4% |

Hello,

before making Jonathan's grades official I wanted to touch base as I understand his situation is quite delicated. Below is what I wrote in his assessment.
Given the nature of the Covid emergency and the rapid adjusting to online teaching needed, I did my best to try and take notes on what each student said every day. However, I am not in the position to provide a detailed report.

Gilmour Deposition
Exhibit 18

Board01460

My subjective assessment (see below in red) is that Jonathan's performance was at a C level, he did reasonably well in the open book assignments and was not super-active in rounds. He bombed the final exam and given the fact that there is not assessment of his clinical competencies, the exam remains the most objective way to evaluate his performance. Note that the exam grade would have been even lower: I gave three points back to everyone.

I thought it might be worth giving him the opportunity to repeat the rotation once things are back to normal and we can work with him in the clinics.

Let me know what you think.

SD

Jonathan Rivera
This evaluation is based on subjective and objective assessment of your foundation knowledge of anesthesia, physiology, pathophysiology and other disciplines relevant to anesthesia. Due to the restrictions imposed by the on-line activity, this assessment does not include your clinical competencies and only partly reflects your ability to apply theoretical knowledge to clinical scenarios.

My overall impression is that your foundation knowledge and understanding of anesthesia and related physiology and pathophysiology is not as strong as it should be at this point in your curriculum. There seem to be areas of weakness and lack of clarity and unfortunately the outcome of the written exam confirms this.

Board01461



Office of the Dean
205 McElroy Hall
Stillwater, Oklahoma 74078

Phone: (405) 744-6648
Fax: (405) 744-6633

April 21, 2020


Dear Jonathan,

I am very sorry to inform you that due to receiving a D grade in the Anesthesia rotation
(rotation 16), per the Academic Suspension guidelines outlined in the letter dated 4-6-20, you
are dismissed from the OSU CVM clinical year program with no Professional Standards
Committee review or appeal.

The Dean has reviewed your academic record and has approved the dismissal action.

It is with deep regret we relay this decision.

Sincerely,

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs


Gilmour Deposition
Exhibit 19

Plaintiff 064