1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

JONATHAN RIVERA-PIEROLA,          )
                                  )
                     Plaintiff,   )
                                  )Case Number
vs.                               )CIV-21-616 PRW
                                  )
BOARD OF REGENTS for the OKLAHOMA )
AGRICULTURAL and MECHANICAL       )
COLLEGES, et al.,                 )
                                  )
                     Defendant.   )
_____

VIDEOCONFERENCE DEPOSITION OF CANDACE THRASHER

TAKEN ON BEHALF OF THE PLAINTIFF

ON JULY 17, 2023

IN STILLWATER, OKLAHOMA

REPORTED BY:  BRENDA SCHMITZ, CSR, RPR (VIA ZOOM)
CITY REPORTERS
14 Northeast 13th Street, Suite 101
Oklahoma City, Oklahoma 73104
(405)235-3376

**Exhibit 14**

**2**

1 APPEARANCES:
2
3 FOR THE PLAINTIFF: (VIA ZOOM)
4     MR. JASON J. BACH
      Bach Law Firm
5     7881 West Charleston, Suite 165
      Las Vegas, NV 89117
6     Telephone: 702.925.8787
      Email: jbach@bachlawfirm.com
7
8
9 FOR THE DEFENDANT (VIA ZOOM WITH THE WITNESS):
10    MR. CLINTON W. PRATT
      Office of Legal Counsel
11    Student Union, 5th Floor
      Oklahoma State University
12    Stillwater, Oklahoma 74078
      Email: clint.pratt@okstate.edu
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1              STIPULATIONS
2       It is hereby stipulated and agreed by and
3 between the parties hereto, through their respective
4 attorneys, that the video conference deposition of
5 CANDACE THRASHER may be taken on behalf of the
6 Plaintiff on JULY 17, 2023, in the City of
7 Stillwater, Oklahoma by Brenda Schmitz, Certified
8 Shorthand Reporter within and for the State of
9 Oklahoma, and Registered Professional Reporter,
10 taken by notice pursuant to the Federal Rules of
11 Civil Procedure.
12       It is further stipulated and agreed by and
13 between the parties hereto, through their respective
14 attorneys, that all objections, except as to the
15 form of the question and the responsiveness of the
16 answer, are reserved until the time of trial, at
17 which time they may be made with the same force and
18 effect as if made at the time of the taking of this
19 deposition.
20
21
22
23
24
25

**3**

1                    INDEX
2
3      DIRECT EXAMINATION BY MR. BACH..............5
4      CROSS EXAMINATION BY MR. PRATT.............33
5      REDIRECT EXAMINATION BY MR. BACH..........42
6
7      Errata.....................................43
8      Jurat......................................44
9      Reporter's Certificate.....................45
10
11 Deposition Exhibits  (marked at a later date)
12      Number 1  Student Code of Conduct, 2019......17
13      Number 2  Student Evaluation.................20
14      Number 3  10/3/19 email......................22
15      Number 4  3/4/20 email.......................30
16
17 Defendant's Exhibit
18      Number 1  CP Syllabus........................37
19
20
21
22
23
24
25

**5**

1    And thereupon the following witness was produced
2 by the Plaintiff:
3              CANDACE THRASHER,
4 the witness hereinbefore named, being first duly
5 cautioned and sworn to testify the truth, the whole
6 truth, and nothing but the truth, testified on her
7 oath as follows:
8              DIRECT EXAMINATION
9 BY MR. BACH:
10    Q.  Can you state your name for the record,
11 please?
12    A.  Candace Thrasher.
13    Q.  And, Ms. Thrasher, have you ever had your
14 deposition taken before?
15    A.  No.
16    Q.  Okay.  You -- you understand that the oath
17 that the court reporter gave you is the same oath
18 that you would take in court?
19    A.  Yes.
20    Q.  I'm going to be asking you a series of
21 questions here this afternoon.  If I ask you a
22 question and you don't understand a question, please
23 feel free to ask me to rephrase it or repeat it,
24 I'll do whatever I need you to do to help you
25 understand what it is that I'm -- I'm asking.

Candace Thrasher
July 17, 2023

3 (Pages 6 to 9)

---

6

1 However, if I ask you a question and you answer the
2 question, I'm going to assume that you understood
3 the question. Is that fair?
4     A. Yes.
5     Q. I don't anticipate that we're going to be
6 very long here this afternoon, but if at any -- at
7 any point you want to take a break, you're more than
8 welcome to do so, but, again, I would ask is that
9 you answer the question as pending before we take a
10 break, okay?
11     A. Okay.
12     Q. My name is Jason Bach, I'm -- I'm the
13 attorney for Jonathan Rivera-Pierola and you
14 understand that he was a former student who has
15 brought a lawsuit against the university?
16     A. Yes.
17     Q. Have you ever had any interaction with my
18 client before?
19     A. Not that I recall.
20     Q. Can you tell me how you're -- you're
21 currently employed?
22     A. So, I am the manager for the academic
23 integrity process at Oklahoma State University.
24     Q. And can you explain to me what your job
25 responsibilities are in that capacity?

---

7

1     A. Yes. So, I -- once an allegation of
2 academic -- or a violation of academic integrity is
3 brought against the student, there is an initial
4 process that the student and instructor meet with a
5 facilitator, and once a decision or outcome of the
6 violation is made, that paperwork comes to my office
7 and I process it, so I enter it into our student
8 conduct database, notify the student of the
9 allegation and provide details of the sanction and
10 their appeal deadline. And if they appeal, then I
11 work with the student and instructor to schedule the
12 appeal hearing with our Academic Integrity Panel.
13     Q. Okay. And do you work with -- with all
14 students at the university, or only undergraduates,
15 or how -- how does that work?
16     A. So I work with graduates and undergraduate
17 students at OSU Stillwater and OSU Tulsa.
18     Q. Okay. And does that include students in
19 the veterinary school as well?
20     A. It could.
21     Q. Okay. How long have you been in -- in
22 this role, in this job position?
23     A. Almost eight years.
24     Q. Can you give me just kind of a breakdown
25 of your -- your education post high school?

---

8

1     A. Sure. I have a bachelor's degree in
2 leisure studies from Oklahoma State University, I
3 have a master's in teaching, learning and
4 leadership, also from Oklahoma State University, and
5 I'm currently working on my doctorate of business
6 administration degree from Oklahoma Wesleyan.
7     Q. Can you walk me through the process of
8 what happens when an academic integrity violation is
9 reported to your office?
10     A. Okay. So the instructor would discover
11 the allegation, they would complete -- we call it an
12 inquiry form and provide that to the student, that
13 inquiry form details the date of the alleged
14 violation, the course, and what the alleged
15 violation was, as well as the potential outcome.
16     They arrange for a meeting with the student and
17 one of our academic integrity facilitators, that
18 meeting occurs, and at the end of that meeting they
19 complete a resolution form, and that details the
20 student's responsibility, so either they're
21 responsible or they're not responsible, and the
22 sanction that the instructor assigns, and then
23 the -- the student has an opportunity to indicate if
24 they plan to appeal or not.
25     Regardless of how they mark that last question

---

9

1 of whether they appeal or not, they are given five
2 school days to appeal the sanction assigned, and
3 then if that -- so then that paperwork comes to our
4 office. I enter it into the student conduct
5 database. I generate a letter that is e-mailed to
6 the student's OSU e-mail address that is a summary
7 of that resolution meeting, so what the violation
8 was, what the sanction assigned was, their deadline
9 to appeal.
10     And then if they appeal, they provide a written
11 form, or they provide a form and then a written
12 statement explaining why they're appealing, and then
13 I work with the student and the instructor to
14 schedule a time that they can meet with the Academic
15 Integrity Panel.
16     Do you want me to explain the appeal process or
17 do you want me to stop there?
18     Q. Let's go ahead and stop there. When --
19 when you talk about the Academic Integrity Panel
20 meeting with them, is that actually a -- a hearing
21 that they have?
22     A. It would --
23     Q. Well, let me ask it a different way.
24     A. Okay.
25     Q. Can you tell me what happens when a

---

Candace Thrasher
July 17, 2023

4 (Pages 10 to 13)

---

10

1  student first meets with the Academic Integrity
2  Panel?
3      A. Okay. So if the student appeals, then we
4  arrange the meeting time with the Academic Integrity
5  Panel. Our Academic Integrity Panel is a
6  student-led panel and so it's a student chair, at
7  least two student representatives, at least two
8  faculty members. They are given the packet of
9  information ahead of time, so to review so they can
10  see all of the written materials regarding the
11  alleged violation, and then the panel meets with the
12  student instructor in person or virtually, and has
13  the -- they each -- the student and the instructor
14  have the opportunity to make a brief opening comment
15  or opening statement, and then the panel asks the --
16  either of them questions to help clarify either why
17  the student is appealing, or why the instructor
18  brought forth the allegation, and then the panel
19  does deliberate and make a decision, they determine
20  if the student is responsible, or not, and then if
21  the student is found responsible, they determine if
22  -- according to guidelines in the policy, if the
23  sanction that the instructor assigned is appropriate
24  or not.
25      Q. And you mentioned a -- policy. What's

---

11

1  the name of -- of this policy?
2      A. I believe it's the academic integrity
3  policy.
4      Q. Okay.
5      A. I don't have the exact PMP number, but --
6      Q. And that's okay. And is this policy
7  published anywhere?
8      A. It is on our BP for administrative finance
9  website, and then we also link to that from our
10  website in academic integrity.
11      Q. And is it -- are there any publications
12  that the university issues that includes this
13  policy?
14      A. In its entirety, I don't believe so.
15      Q. And what about going back to 2019, do you
16  know if it was physically published anywhere, other
17  than the website, back then?
18      A. I believe it was only published on our
19  website at that point.
20      Q. Do you know when -- when it became only
21  available on the website?
22      A. I don't know.
23      Q. Okay. So, if -- if a student goes through
24  the Academic Integrity Panel and they're still not
25  happy with that result, is there any other recourse

---

12

1  after that?
2      A. They do have an option for a final appeal,
3  and that is based on policy and procedure not being
4  followed or new information being made available
5  that was not made available during -- or not
6  available during the academic integrity meeting.
7      Q. And who -- who reviewed that appeal?
8      A. So the student would provide a written
9  request for a final appeal through our office, and
10  we have a subset of the Academic Integrity Panel
11  that would -- that would hear decision appeals of
12  cases that had already been reviewed by the Academic
13  Integrity Panel, and that panel is comprised of a
14  student chair, a student representative that was not
15  involved in the initial meeting, as well as a
16  faculty member that was not involved in the initial
17  meeting. So it would be a subset of our Academic
18  Integrity Panel.
19      Q. And is their decision then a final
20  decision at that point?
21      A. At that point, it's a final decision.
22      Q. The student and faculty members of the --
23  the panels, do they receive any type of training
24  before they go onto the panel?
25      A. Yeah. So, I provide an online orientation

---

13

1  to all new student and faculty members of the panel.
2      Q. How does Oklahoma State define academic
3  integrity?
4      A. I don't have the policy in front of me,
5  but essentially, you know, being -- not engaging in
6  behaviors that would lead to plagiarism or cheating
7  on an exam, or altering records, fabricating
8  information.
9      Q. Anything else?
10      A. Not that I can think of off the top of my
11  head.
12      Q. If a faculty member sets -- suspects an
13  academic integrity issue with a student, can -- do
14  they have the option of reporting them to your
15  office or not reporting them?
16      A. Yes.
17      Q. How does that discretion work, what do --
18  what do they have discretion over and what they
19  don't have discretion over?
20      A. So, there is -- I mean, it -- it really
21  kind of comes down to if they report it, then our
22  office knows about it, and if it's not reported,
23  then our office doesn't know about it, so it would
24  be, you know, their discretion if they handled it
25  through their syllabus or used it as a teachable

---

14

1  moment with the student to help direct them and give
2  them further instruction.
3      **Q. And if a faculty member suspects an**
4  **academic integrity violation, can they just simply**
5  **choose to reduce the student's grade instead of**
6  **referring them over to your office?**
7      A. As far as I know, there's nothing in our
8  academic integrity policy that would prevent them
9  from making adjustments without going through the
10  policy, or the process.
11      **Q. Would -- if a student lied to a faculty**
12  **member about whether or not they completed an**
13  **assignment, would you consider that to be an**
14  **academic integrity violation?**
15      A. So you're asking if the student told an
16  instructor that they completed an assignment when
17  they didn't?
18      **Q. Yes.**
19      A. I personally would not, because, you know,
20  you could -- I mean, I don't know that there's
21  anything that the student would have to gain from
22  telling them that they had done something that they
23  hadn't, or an assignment, and if they don't turn it
24  in, there's nothing for that instructor to grade
25  anyway.

15

1      **Q. Well, if part of their grade was to simply**
2  **complete a task, let's say, and they informed the**
3  **instructor that they had completed the task, hoping**
4  **that the instructor wouldn't find out that they**
5  **hadn't, would you consider that to be an academic**
6  **integrity violation?**
7      A. Could you --
8      MR. PRATT: Object to the form. You
9  can -- you can answer.
10      THE WITNESS: Could you give me an example
11  of what kind of task you're referring to?
12      **Q. Yeah, let's say it's a -- just simply a**
13  **pass-fail. You complete the task, you pass, you**
14  **don't complete the task, you fail that -- that**
15  **particular assignment. And student tells the**
16  **faculty member that they completed the assignment**
17  **hoping that they won't -- won't realize that they**
18  **were being dishonest about it, hoping that they**
19  **would receive the credit for it, would that be an**
20  **academic integrity violation?**
21      MR. PRATT: Object to the form.
22      THE WITNESS: From my understanding, I
23  would say that if it was a deliverable that they're
24  turning in, I mean, the instructor would be giving a
25  pass-fail, not a letter grade for the assignment

16

1  that they're, you know, turning in, completing this
2  task or turning in a quiz or something like that,
3  and they -- again, if they just lied and said that
4  they did it, you know, most instructors are going to
5  have that deliverable, so they're going to know if
6  the instructor did -- or the student did or did not
7  complete it. So I don't know that telling an
8  instructor that you submitted or completed something
9  that you didn't would be a violation.
10      **Q. So lying to a faculty member, a student**
11  **lying to a faculty member is not an academic**
12  **integrity violation?**
13      A. I think it would depend on what it was.
14      **Q. Okay. But in this situation, let's say**
15  **the faculty member didn't realize that the student**
16  **hadn't turned it in and -- and passed them anyway.**
17  **But, you know, would that be an academic integrity**
18  **violation?**
19      MR. PRATT: Object to the form.
20      THE WITNESS: It would be up to the
21  instructor to determine if they felt that was an
22  academic integrity violation.
23      **Q. Well, but the university has an academic**
24  **integrity policy; is that right?**
25      A. Right. Yes.

17

1      **Q. Would that be -- would the -- the**
2  **hypothetical I gave you be a violation of Oklahoma**
3  **State's academic integrity policy?**
4      A. I'm not sure.
5      **Q. In -- in your role, do you also -- are you**
6  **involved at all with the Oklahoma State Student Code**
7  **of Conduct, as well?**
8      A. No.
9      **Q. Okay. Are you aware of anything that is**
10  **contained within Oklahoma State Student Code of**
11  **Conduct?**
12      A. It's not within my purview, so I know that
13  there's a code of conduct, but I'm not familiar with
14  its conduct -- contents.
15      **Q. Okay. If we could take a look at Exhibit**
16  **Number 1 here, and -- and I'm only going to be**
17  **asking you information about pages 5 and 6, but**
18  **you're -- you're welcome to review the whole**
19  **document if you would like, but if you could take a**
20  **look at that and just let me know when you've had an**
21  **opportunity to take a look at it.**
22      A. Okay.
23      **Q. All right. Have -- have you seen this**
24  **document before?**
25      A. I don't know that I have seen this

Candace Thrasher
July 17, 2023

6 (Pages 18 to 21)

---

**18**

1  version, but I have seen the Student Code of Conduct
2  before.
3      Q.  Okay.  And -- and just to direct you, this
4  is the version from 2019, it appears; is that
5  correct?
6      A.  Yes.
7      Q.  On -- on page 5, towards the bottom has
8  number 2, "Prohibited Conduct".  Do you see that?
9      A.  Yes.
10     Q.  Okay.  And then the first header on the
11 left side says "Integrity."  Do you see that?
12     A.  Yes.
13     Q.  And then it has Number 1, Academic
14 Misconduct, where it talks about cheating,
15 plagiarism, and then we have Attempts and
16 Complicity, Number 2, and then on Number 3 is False
17 Reporting, and now this is on page 6 here, and then
18 on Number 5, it has, "False representations.
19 Knowingly making false representations to the
20 university in any form, written or verbal."
21     So is it your understanding that under the
22 Student Code of Conduct, that it's an academic
23 integrity violation to knowingly make false
24 representations to the university in any form?
25     A.  No.

---

**19**

1      Q.  Why not?
2      A.  So, academic integrity, or they refer to
3  it as academic misconduct is number 1, and that is
4  handled through the academic integrity policy.  If
5  an instructor has an issue of false representation,
6  that would not go through the academic integrity
7  policy, that would be student conduct.
8      Q.  And that would be a different office?
9      A.  Correct.
10     Q.  So, in -- in what scenario then -- well,
11 strike that.
12     How many reports of academic misconduct or
13 academic integrity violations, on average, do you
14 receive from the veterinary school on an annual
15 basis?
16     A.  I know that for the last academic year, we
17 received none.  Prior to that, I don't have the
18 exact number.  And off the top of my head, I've seen
19 so many cases, I don't always know which school they
20 belong to.
21     Q.  Do you know if the veterinary school has
22 their own internal way of handling academic
23 integrity violations?
24     A.  I am not aware of one, I don't know.
25     Q.  Do you have an understanding as to how a

---

**20**

1  veterinary program works, for example, if there's a
2  portion of it that is in the classroom and then
3  there's a portion of it is in the clinic, do you
4  have that understanding?
5      A.  I am somewhat familiar with the way that
6  that program works.
7      Q.  Okay.  And do you understand that when
8  students are in the classroom that that very much --
9  they're graded on assignments like most programs
10 where you're in a classroom-type setting, and then
11 when they move into a clinic, they're -- they're
12 graded on their performance and the -- and the tasks
13 that they complete in the clinical situations.  Do
14 you have that understanding?
15     A.  Yes.
16     Q.  All right.  If you could take a look at
17 what we will mark as Exhibit Number 2 here, and I
18 recognize that you probably have never seen these
19 before, so please take your time in reviewing it and
20 let me know when you've had a chance to take a look
21 at it.
22     A.  Okay.
23     Q.  So, Exhibit 2 is Board 00565 through 566.
24 And this is a document that the university has
25 produced to us throughout the course of this

---

**21**

1  litigation here, and this is a form, I'll represent
2  to you, this is a form where instructors and people
3  who work with students can give their feedback on
4  what they observed when students are in clinical
5  rotation in the veterinary school.
6      And I wanted to point out, on the second page
7  here, in the -- in the comments, this -- this person
8  is reporting, "I had a number of cases with
9  Jonaston" -- "with Jonathan and he was consistently
10 not prepared to discuss the case with clinician.  He
11 displayed blatant dishonesty when presenting the
12 case and often failed to ask key questions when
13 gathering a history."
14     If presenting a case is something that he's
15 receiving a grade for, a score for, and he is
16 being -- being accused of being blatantly dishonest,
17 do you think that falls within the category of
18 academic integrity violation or a academic integrity
19 violation?
20     A.  Not necessarily.
21     Q.  Why not?
22     A.  I mean, just as you pointed out, these are
23 rotations where they're getting experience under a
24 veterinarian, so I would view this more in a
25 professionalism realm than an academic integrity

---

Candace Thrasher
July 17, 2023

22

1  realm.
2      Q.  Even if he's receiving a grade for his --
3  his presentation of the case?
4      A.  Yes.
5      Q.  I'm going to ask you to take a look at
6  Exhibit Number 3 here, and this is a five-page
7  document, Board 00622 through 626, I'm only going to
8  be asking you about the e-mail on the first page,
9  essentially that the top half of it that's indented
10  there, and then also the e-mail on the fourth page,
11  the -- the third paragraph on that page.  But you're
12  welcome to read the whole thing, I just -- if you
13  don't want to, those are the areas I'm going to be
14  asking you about.
15          MR. PRATT:  Jason, would you repeat the
16  pages you intend to focus on?
17          MR. BACH:  Yeah, the first page, up -- up
18  until the end of number 2 on that e-mail.
19          MR. PRATT:  Okay.
20          MR. BACH:  And then -- and then on the 4th
21  page, the third paragraph that starts with, "So the
22  rest of the concerns."
23          MR. PRATT:  Okay.  Thank you.
24          MR. BACH:  Yeah.
25          THE WITNESS:  Okay.  All right.  I'm going

23

1  to read part of this into the record here.  The
2  first page is an e-mail from Laura Nafe to Margi
3  Gilmour on October 3rd of 2019.  And starting with
4  the second paragraph here on the first page, it
5  says, "One thing I did not mention is his evaluation
6  on E-value, and perhaps I should have, is that I had
7  three separate people, two doctors and a clinician,
8  approach me regarding concerns that Jonathan was
9  dishonest.  I did not include these situations for
10  his evaluation because I did not witness these
11  specific instances.  While I trust the two doctors,
12  Dr. Moore and Dr. Irizarry, and the technician,
13  Marla, that they would not make up these scenarios,
14  I wanted to give Jonathan the benefit of the doubt
15  and perhaps these were more a miscommunication than
16  a blatant lie.  However, after meeting with him on
17  Monday, September 30th, I believe that these
18  situations were likely to be dishonesty on his part
19  and not a misunderstanding or miscommunication."
20      And then it goes on to -- to two different
21  scenarios here, one of them that we've already
22  touched on here briefly, but just for the record,
23  I'll read it in here.  "Jonathan saw a recheck of a
24  chronic medicine patient, Pee Wee Walker, who has
25  IMHA and has been managed the past few years at OSU

24

1  with various immunosuppressive medications and a
2  splenectomy.  He has had many recheck evaluations
3  during that time.  His owner is very well educated
4  on his medications and disease.  When Dr. Moore
5  asked Jonathan what medications Pee Wee was
6  receiving, Jonathan told Dr. Moore that Pee Wee was
7  not receiving any medications.  When Dr. Moore
8  informed Jonathan that he knows Pee Wee is on
9  medications, as he is very familiar with Pee Wee's
10  case, Jonathan replied that he asked the owner, and
11  she was not sure what medications Pee Wee was
12  receiving or prescribed.  This owner knows exactly
13  what medications this dog is receiving.  So either
14  he didn't ask her and said he did or he did ask her
15  and he didn't ask it in a way that allowed her to
16  properly answer the question.  I think the first
17  possibly is most likely, but that is -- is my
18  opinion."
19      And then it goes on to say, "Marla approached
20  me about this case separate from Dr. Moore and was
21  concerned that Jonathan lied to Dr. Moore about Pee
22  Wee."
23      So -- so my question to you is, if this
24  exchange that is described here between Jonathan and
25  Dr. Moore is part of Jonathan's clinical rotation

25

1  that he's being evaluated on or graded on is, would
2  this -- if this allegation of dishonesty is
3  accurate, would you consider that to be an academic
4  integrity violation?
5      A.  No.
6      Q.  Why not?
7      A.  Again, this is more in the professionalism
8  realm about how he is supposed to behave in this
9  clinic, versus an academic integrity violation.
10      Q.  If having certain information about a
11  patient and -- or not having information about a
12  patient and misrepresenting that you do in order to
13  achieve a better grade, then that's not an academic
14  integrity violation?
15      A.  Again, I would think that that would be in
16  the realm of professionalism and how he's supposed
17  to conduct himself in the clinic.
18      Q.  Couldn't you say that about every academic
19  integrity violation, wouldn't that also be
20  considered a professionalism violation?
21      A.  Not necessarily, because our -- our policy
22  defines what plagiarism is, and if an instructor has
23  an allegation of plagiarism, they are going to have
24  documentation to substantiate that allegation.  So
25  they're either going to find the initial source that

Candace Thrasher
July 17, 2023

8 (Pages 26 to 29)

26

1 the student was alleged to have copied or at least
2 turned it in, so they would have to turn it in
3 similarity report, so I don't see how these would be
4 on the same field.
5     Q.  If -- if an instructor suspects that there
6 is a plagiarism violation or there is plagiarism,
7 are they required to report that student to your
8 office?
9     A.  Our policy does not require instructors,
10 it's not mandatory.
11     Q.  Do you know if -- if an instructor, if
12 they suspect that there was plagiarism and they
13 simply reduced the grade of the student without
14 reporting them to your office?
15     A.  I suspect that they could.
16     Q.  You're not aware of any policy saying that
17 they can't take that action?
18     A.  No.
19     Q.  All right.  Moving on, on this e-mail here
20 from October 3rd of 2019, under Number 2, I'm just
21 going to read this in here.  "Dr. Nikol Irizarry saw
22 a case on emergency with Jonathan on September 14th,
23 2019 that I did not hear about until the last week
24 of the rotation.  She informed me that Jonathan
25 asked if he could leave at the end of his shift.

27

1 She asked him if the ICU sheet had been completed
2 for Rex, and if so, he could go.  He informed her
3 that he had completed the ICU sheet, she let him go,
4 and then an hour later, she noticed that the ICU
5 sheet was not complete.  None of the inside was
6 highlighted and not all the medications were
7 included on the inside of the ICU sheet.  When the
8 technician on ICU called Jonathan about this, he
9 told him that Dr. Irizarry told him he didn't have
10 to complete the ICU sheet."
11     So my question for you, if the rotation that
12 Jonathan was on, in order to receive a satisfactory
13 grade in that rotation, if that required him to
14 complete a certain list of tasks, and he lied about
15 whether or not he completed those tasks as -- as
16 described here that I just read, would you consider
17 that to be an academic integrity violation?
18     MR. PRATT:  Object to the form.
19     THE WITNESS:  Not necessarily.
20     Q.  Why not?
21     A.  Well, I'm going to read that section
22 again.
23     Q.  Sure.
24     A.  Can you repeat the question?
25     Q.  Sure.  With this scenario here that --

28

1 that I just read into the record regarding Rex and
2 the ICU sheet, if part of the grade that Jonathan
3 received in this rotation was based on him
4 completing a certain set of tasks, including the
5 completion of this ICU sheet, and he -- he
6 misrepresented or lied about whether or not he had
7 completed it to an instructor, would that be an
8 academic integrity violation?
9     MR. PRATT:  Object to the form.  Go ahead.
10     THE WITNESS:  So, not necessarily.  You
11 know, again, it's something that's occurring in the
12 clinic, not in a classroom.  The way I read this
13 statement is that, you know, he, for whatever
14 reason, did not complete a task that he was asked
15 to, so not completing a task, not completing an
16 assignment would not be an academic integrity
17 violation, and then being asked about the completion
18 of that ICU sheet, you know, even the person that
19 wrote this said that it could have either been him
20 being dishonest or a misunderstanding or a
21 miscommunication, so there's nothing here that led
22 me to believe that it would be an academic integrity
23 violation.
24     Q.  You said that this happened in a clinical
25 setting and not in the classroom.  Are you of the

29

1 opinion that students in a clinical rotation cannot
2 commit an academic integrity violation?
3     A.  Not -- I mean, there may be a situation
4 where that occurs, but in the clinical rotation, you
5 know, they are expected to, you know, complete
6 evaluations, it looks like they're supposed to, you
7 know, check on patients and make notes of those
8 things, so that would all be performance related,
9 and, you know, do they have the skill set to
10 complete that rotation, versus, you know, I guess a
11 more traditional assignment.  I think it would be
12 easier to identify academic integrity violation if
13 it was a more traditional assignment versus a very
14 practical, hands-on professional situation.
15     Q.  Can you tell me what your understanding is
16 as to why Oklahoma State has an academic integrity
17 policy?
18     A.  The history that I know about the policy
19 is that it was developed or essentially redeveloped
20 in about 2006, to distinguish between academic
21 integrity issues and grade appeal issues, and to
22 make the policy more educationally based than
23 sanction based.  So students still can receive
24 sanctions as part of the policy, but there was a
25 desire, again, from my understanding of the history,

30

1  to make it less punitive.
2      Q.  All right.  But I -- I imagine that
3  Oklahoma State has an academic integrity policy
4  because they want their students to be honest when
5  it comes to their academics.  Is that fair to say?
6      A.  Yes.
7      Q.  And pursuant to the academic integrity
8  policy, there is a process that is -- is identified
9  as part of that -- part of that policy.  Is that
10  right?
11      A.  Yes.
12      Q.  And part of that process allows a student
13  certain opportunities to be heard.  Is that right?
14      A.  Yes.
15      Q.  And part of that process is allowing them
16  to appeal if they don't approve of a determination.
17  Is that right?
18      A.  Yes.
19      Q.  I was going to ask you something on the
20  fourth page there, but I think we already covered
21  that, so I'm going to skip that here.
22      I'm going to ask you to take a look at Exhibit
23  Number 4 here, which is Board 0140 through 01048.
24  And I am only going to be asking you about the third
25  page, the bullet point towards the bottom that

31

1  starts with Papa Alexander.
2      A.  Okay.
3      Q.  I'll represent to you that this is a
4  document that has been discussed in other
5  depositions in this case, and is final evaluation to
6  Jonathan from Dr. DeMars, and I'm referring to Board
7  01042, and it's dated March 4th of 2020.  And I'm
8  just going to read in this one section here that I
9  want to ask you about.
10      In his final evaluation to Jonathan, Dr. DeMars
11  says, "Papa Alexander.  Failed to make sure the
12  client stopped at the front desk to have a deposit
13  collected.  Suspected of lying about handling" --
14  I'm sorry, "Suspected of lying about handing the
15  receptionist the estimate sheet as instructed.
16  Additionally, the next morning, the expected 7:00
17  a.m. evaluation had not been performed by 7:30, and
18  when asked, Jon told Dr. Irizarry everything was
19  done.  She discovered the TPR had not been performed
20  and confronted him on his lack of evaluation, and
21  worse, lack of honesty."
22      If Jonathan -- if his grade was based on, in
23  part, performing this task and he lied about whether
24  or not he did, in fact, perform this task, would you
25  consider that to be an academic integrity violation?

32

1      A.  No.
2      Q.  Why not?
3      A.  Again, it's -- to me, this would fall
4  under professionalism, and just because someone is
5  lying or shows a lack of honesty, that does not
6  equate to an academic integrity violation.
7      Q.  If Dr. DeMars had sent this over to your
8  office and said, here's this scenario involving Papa
9  Alexander and I believe the student has committed an
10  academic integrity violation, would you accept it or
11  would you send it back?  How would you handle it?
12      A.  So, I, in my position, I don't make those
13  decisions.  If they go through the process of
14  notifying the student, having that resolution
15  meeting and sending the resolution form to my
16  office, then I would process it.  So it's not up to
17  me whether they get processed or not.
18      Q.  Okay.  Who -- who does make that decision?
19      A.  The instructor, that's the instructor's
20  discretion that they feel that an academic integrity
21  violation has occurred and then they initiate the
22  process.
23      Q.  At any point, would your office say to the
24  instructor, hey, we don't think this is an academic
25  integrity violation and we're not going to proceed

33

1  with this?
2      A.  No.  If -- like I said, if it -- if they
3  initiate the process, notify the student, have the
4  resolution meeting, submit a resolution form to our
5  office, it gets processed.
6      Q.  And then if -- if the student doesn't
7  accept the outcome, then they would have the option
8  of going to the panel and then the panel would make
9  a decision; is that fair to say?
10      A.  They could appeal, yes.
11      MR. BACH:  All right.  I will pass the
12  witness.
13      MR. PRATT:  Okay.  Based on one line of
14  the questioning, if I can have maybe 5 to 10
15  minutes, I want to just see if I can find a
16  document, and if I can't, we'll just move forward,
17  but there's one that I think I want to take a look
18  at if I can.  So if you can give me maybe 5 minutes,
19  I'll be right back.
20      MR. BACH:  No problem.
21      (Recess taken.)
22      CROSS-EXAMINATION
23  BY MR. PRATT:
24      Q.  Ms. Thrasher, I want to ask you a few
25  follow-up questions.  I'd like to start with, can

Candace Thrasher
July 17, 2023

10 (Pages 34 to 37)

34

1  you remind us how many years you have been in your
2  role at Oklahoma State University?
3      A.  I've been in this role for almost eight
4  years.
5      Q.  In that role, what percentage of academic
6  integrity violations filed by instructors of courses
7  on the OSU campus would you say that you handle?
8      A.  So, anything that is submitted after the
9  resolution process, I handle all of it, so if it's
10  submitted, 100 percent.
11      Q.  100 percent.  How would you characterize
12  your level of familiarity with the OSU Academic
13  Integrity Policy?
14      A.  I am pretty familiar with it.
15      Q.  Would you think that you are the
16  individual on this campus that utilizes that policy
17  the most?
18      A.  Probably.
19      Q.  I am going to hand you what was previously
20  admitted as Exhibit 4 in this deposition, you can
21  take a look at that.  And that should be the grade
22  report, final grade report for the community
23  practice rotation for Jonathan Rivera-Pierola, it's
24  Board Number 0084.  Do you have that?
25      A.  The number is different.

35

1      Q.  Oh, yes, it is different because he used
2  his.  What's the number on yours?
3      A.  01047.
4      Q.  Yes.  Now, that should be a two-page
5  document; is that correct?
6      A.  Yes.
7      Q.  In terms of the evaluation portion?
8      A.  Yes.
9      Q.  Okay.  On the first page of the
10  evaluation, you see a series of categories in which
11  points are assigned.  Do you see that?
12      A.  Yes.
13      Q.  And what are those categories?
14      A.  Subjective -- Subjective Evaluation,
15  Pre-Quiz and Technical Skills, End of Rotation Quiz
16  and Professionalism/Work Ethic.
17      Q.  And we're going to come back to those
18  categories in just a little bit, but if we turn on
19  to page 2 of the evaluation, it contains a series of
20  comments.  Do you see that?
21      A.  Yes.
22      Q.  And I believe you were asked to read
23  through this earlier, so, if you are still familiar
24  with it, I'd like to follow-up with you about that;
25  do you need another chance to read through it?

36

1      A.  Yes, please.
2      Q.  Okay.
3      A.  Okay.
4      Q.  In your opinion, does anything contained
5  in page two of that evaluation, the Comments section
6  indicate or strike you as an academic integrity
7  violation?
8      A.  No.
9      Q.  To be even more specific, if I represent
10  to you that Mr. Rivera-Pierola has previously
11  testified that he believes statements in that
12  evaluation in front of you constitute fabrication of
13  information, would you agree with that assessment?
14      A.  No.
15      Q.  And I think you touched on this earlier,
16  but does alleged dishonesty automatically equate to
17  fabrication of information?
18      A.  No.
19      Q.  Would alleged dishonesty automatically
20  equate to an academic integrity violation being
21  filed?
22      A.  No.
23      Q.  And I think you touched on this as well,
24  but are you aware of other methods or mechanisms
25  that an instructor for a course or for a rotation

37

1  might utilize to address issues of honesty or
2  dishonesty?
3      A.  We could have a syllabus statement
4  regarding what their expectations are for the
5  student, if an issue occurs that could be used as a
6  teachable moment between the instructor and the
7  student to help the student understand what their
8  expectations were of them, and to help guide them or
9  coach them to performing at the expected level.
10      Q.  I'm going to hand you what I have just
11  sent to everybody as Defendant's Exhibit 1.  If you
12  can take a look at that.
13      A.  Okay.
14      Q.  Earlier, we referenced Exhibit --
15  Plaintiff's Exhibit 4 in this deposition, and as
16  part of the e-mail chain, it had a two-page
17  evaluation form, and we talked about the first page
18  having different categories that you listed for us
19  in which a student receives points.  Do you recall
20  that?
21      A.  Yes.
22      Q.  If we look at page 2 of this document,
23  Defendant's Exhibit 1, toward the bottom, Number 5,
24  it references Grading Policies.  Do you see that?
25      A.  Yes.

Candace Thrasher
July 17, 2023

38

1    Q.  And then if we turn further to page 3, it
2   begins listing that same group of components of the
3   student's grade.  Do you see that?
4    A.  Yes.
5    Q.  Are they identical?  You can compare them
6   if you need to.
7    A.  They appear to be.
8    Q.  Are the points assigned for them, does
9   that appear to be accurate?
10    A.  Yes.
11    Q.  Under the category of Professionalism/work
12   Ethic, there's a definition provided.  Would you
13   mind reading that for us, please?
14    A.  "Professionalism/work ethic is essential
15   for success.  Students are expected to be solid team
16   players and uphold high ethical standards.  You will
17   be graded on strict adherence to courtesy, honesty
18   and responsibility in dealing with colleagues,
19   clients and patients.  Points will be given based on
20   the level of excellence, i.e. going above and beyond
21   basic requirements.  A good work ethic includes
22   demonstration of ownership and accountability with
23   your cases, as well as completing tasks in a timely
24   manner."
25    Q.  Thank you.  Now, you've mentioned that

39

1   instructors can include statements in their syllabus
2   to address issues of honesty, correct?
3    A.  Yes.
4    Q.  And in reading that definition of
5   professionalism, which makes up a component of the
6   student's grade in the community practice rotation,
7   you specifically reference that they're graded on
8   honesty; is that correct?
9    A.  Yes.
10    Q.  If you look further down at Number 6, it's
11   titled "Grading Expectations."  Do you see that?
12    A.  Yes.
13    Q.  If you go to page 4, under the same
14   overage heading of Grading Expectations, if you go
15   to point number 4a., would you read for me what that
16   says?
17    A.  "Professional and ethical behavior
18   includes, but is not limited to attire, personal
19   grooming, demonstrating a positive attitude,
20   honesty, respect, courtesy and building good
21   interpersonal relationships with clients, students,
22   nurses, staff members and faculty."
23    Q.  So here we have another specific reference
24   to honesty within the syllabus within the grading
25   structure; is that correct?

40

1    A.  Yes.
2    Q.  Mr. Bach asked you if you believe that
3   there is no possibility of an academic integrity
4   violation being filed against a clinical student.
5   Do you recall that?
6    A.  Yes.
7    Q.  Are you aware of any being filed against
8   clinical students?
9    A.  Not that I can recall.
10    Q.  And you assume that's based on the
11   rationale that you gave Mr. Bach, I believe, which
12   was that it's a clinical setting and things are
13   addressed through a professional -- a
14   professionalism grade or -- or marking in their
15   evaluation, correct?
16    A.  Yes.
17    MR. BACH:  Object to the form of the
18   question.
19    Q.  Can you look -- in the event that a
20   student is found responsible for an academic
21   integrity violation, what are the potential
22   consequences of that?
23    A.  So, our policy lays out four possible
24   sanctions, the first is an admonition, the second is
25   an F on the assignment or project or whatever

41

1   they're submitting.  The third one is an F!, which
2   we call an F shriek, and that goes on the student's
3   academic transcript, and then for both the zero or F
4   on the assignment and the F shriek, a record is
5   notated in the student conduct database, and we do
6   keep that record and can release it, with the
7   written student's permission, for up to ten years.
8   And then the final sanction is permanent -- let's
9   see, it's a permanent transcript notation that the
10   student was dismissed due to an academic integrity
11   violation, so that would be a permanent record on
12   their transcript, as well as a record in the student
13   conduct database.
14    Q.  In your opinion, would that, those
15   consequences, would you classify them as
16   significant?
17    A.  I would.
18    Q.  To your knowledge, has any student ever
19   requested an academic integrity violation be filed
20   against them?
21    A.  Not that I recall.
22    Q.  Outside of the claims being brought in
23   this lawsuit, has any student, to your knowledge,
24   claimed that an academic integrity violation should
25   have been filed against them, but was not?

Candace Thrasher
July 17, 2023

12 (Pages 42 to 45)

---

42

1      A.  Not that I recall.
2      **Q.  Mr. Rivera-Pierola is the first?**
3      A.  Yes.
4      **Q.  As far as you know?**
5      A.  As far as I know.
6      **Q.  Mr. Rivera-Pierola is the only one, as far**
7  **as you know?**
8      A.  As far as I know.
9          MR. PRATT:  I'll pass the witness.
10             REDIRECT EXAMINATION
11  BY MR. BACH:
12     **Q.  Ms. Thrasher, in your eight years in your**
13  **current role here, have you ever become aware of a**
14  **department that dismissed a student from their**
15  **program for an academic integrity violation without**
16  **going through your office?**
17     A.  Not that I'm aware of.
18         MR. BACH:  All right.  I don't have
19  anything further.
20         MR. PRATT:  Okay.  We'll read and sign.
21         (Deposition concluded at 4:29 p.m.)
22
23
24
25

---

43

1              ERRATA SHEET
2      WITNESS: CANDACE THRASHER
3          DATE: JULY 17, 2023
4      REPORTER:  Brenda Schmitz, CSR, RPR
5  NO CORRECTIONS ARE NECESSARY _____
6  PAGE  LINE  CORRECTION            REASON
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____

---

44

1              JURAT
2      I, CANDACE THRASHER, do hereby state under
3  oath that I have read the above and foregoing
4  transcript in its entirety, and that the same is a
5  full, true, and correct transcription of my
6  testimony so given at said time and place, except
7  for the corrections noted.
8
9      _____
                CANDACE THRASHER
10
11     SUBSCRIBED AND SWORN TO BEFORE ME, the
12  undersigned Notary Public in and for the State of
13  _____ on this, the _____ day of
14  _____, 2023.
15
        _____
16          Notary Public
17
  My Commission Expires: _____
18
19
20
21
22
23
24     REPORTED BY:  BRENDA SCHMITZ, CSR, RPR
25

---

45

1              CERTIFICATE
2  STATE OF OKLAHOMA   )
                     ) SS:
3  OKLAHOMA COUNTY    )
4      I, Brenda Schmitz, Certified Shorthand Reporter
5  within and for the State of Oklahoma, do hereby
6  certify that the above-named CANDACE THRASHER was by
7  me first duly sworn to testify to the truth, the
8  whole truth, and nothing but the truth in the case
9  aforesaid; that the above and foregoing deposition
10  was by me taken in shorthand and thereafter
11  transcribed; that the same is true and correct; and
12  that it was taken on JULY 17, 2023, at the time of
13  3:11 p.m. in the City of Stillwater, County of
14  Payne, State of Oklahoma under the stipulations
15  hereinbefore set out, and that I am not attorney for
16  or relative of any of said parties or otherwise
17  interested in the event of said action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  and official seal this 19th day of July, 2023.
20
21
22     _____
       BRENDA SCHMITZ, CSR, RPR #18230
23     Oklahoma Certified Shorthand Reporter
       Certificate No. 00823
24     Expires: December 31, 2023
25

---

**A**

**a.m** 31:17
**above-named** 45:6
**academic** 6:22 7:2 7:2,12 8:8,17 9:14,19 10:1,4,5 11:2,10,24 12:6 12:10,12,17 13:2 13:13 14:4,8,14 15:5,20 16:11,17 16:22,23 17:3 18:13,22 19:2,3 19:4,6,12,13,16 19:22 21:18,18 21:25 25:3,9,13 25:18 27:17 28:8 28:16,22 29:2,12 29:16,20 30:3,7 31:25 32:6,10,20 32:24 34:5,12 36:6,20 40:3,20 41:3,10,19,24 42:15
**academics** 30:5
**accept** 32:10 33:7
**accountability** 38:22
**accurate** 25:3 38:9
**accused** 21:16
**achieve** 25:13
**action** 26:17 45:17
**Additionally** 31:16
**address** 9:6 37:1 39:2
**addressed** 40:13
**adherence** 38:17
**adjustments** 14:9
**administration** 8:6
**administrative** 11:8

**admitted** 34:20
**admonition** 40:24
**aforesaid** 45:9
**afternoon** 5:21 6:6
**agree** 36:13
**agreed** 4:2,12
**AGRICULTUR...** 1:8
**ahead** 9:18 10:9 28:9
**al** 1:8
**Alexander** 31:1 31:11 32:9
**allegation** 7:1,9 8:11 10:18 25:2 25:23,24
**alleged** 8:13,14 10:11 26:1 36:16 36:19
**allowed** 24:15
**allowing** 30:15
**allows** 30:12
**altering** 13:7
**annual** 19:14
**answer** 4:16 6:1,9 15:9 24:16
**anticipate** 6:5
**anyway** 14:25 16:16
**appeal** 7:10,10,12 8:24 9:1,2,9,10 9:16 12:2,7,9 29:21 30:16 33:10
**appealing** 9:12 10:17
**appeals** 10:3 12:11
**appear** 38:7,9
**APPEARANCES** 2:1
**appears** 18:4
**approach** 23:8

**approached** 24:19
**appropriate** 10:23
**approve** 30:16
**areas** 22:13
**arrange** 8:16 10:4
**asked** 24:5,10 26:25 27:1 28:14 28:17 31:18 35:22 40:2
**asking** 5:20,25 14:15 17:17 22:8 22:14 30:24
**asks** 10:15
**assessment** 36:13
**assigned** 9:2,8 10:23 35:11 38:8
**assignment** 14:13 14:16,23 15:15 15:16,25 28:16 29:11,13 40:25 41:4
**assignments** 20:9
**assigns** 8:22
**assume** 6:2 40:10
**Attempts** 18:15
**attire** 39:18
**attitude** 39:19
**attorney** 6:13 45:15
**attorneys** 4:4,14
**automatically** 36:16,19
**available** 11:21 12:4,5,6
**average** 19:13
**aware** 17:9 19:24 26:16 36:24 40:7 42:13,17

**B**

**Bach** 2:4,4 3:3,5 5:9 6:12 22:17 22:20,24 33:11 33:20 40:2,11,17

42:11,18
**bachelor's** 8:1
**back** 11:15,17 32:11 33:19 35:17
**based** 12:3 28:3 29:22,23 31:22 33:13 38:19 40:10
**basic** 38:21
**basis** 19:15
**begins** 38:2
**behalf** 1:15 4:5
**behave** 25:8
**behavior** 39:17
**behaviors** 13:6
**believe** 11:2,14,18 23:17 28:22 32:9 35:22 40:2,11
**believes** 36:11
**belong** 19:20
**benefit** 23:14
**better** 25:13
**beyond** 38:20
**bit** 35:18
**blatant** 21:11 23:16
**blatantly** 21:16
**Board** 1:7 20:23 22:7 30:23 31:6 34:24
**bottom** 18:7 30:25 37:23
**BP** 11:8
**break** 6:7,10
**breakdown** 7:24
**Brenda** 1:22 4:7 43:4 44:24 45:4 45:22
**brief** 10:14
**briefly** 23:22
**brought** 6:15 7:3 10:18 41:22
**building** 39:20

**bullet** 30:25
**business** 8:5

**C**

**call** 8:11 41:2
**called** 27:8
**campus** 34:7,16
**Candace** 1:14 4:5 5:3,12 43:2 44:2 44:9 45:6
**capacity** 6:25
**case** 1:6 21:10,12 21:14 22:3 24:10 24:20 26:22 31:5 45:8
**cases** 12:12 19:19 21:8 38:23
**categories** 35:10 35:13,18 37:18
**category** 21:17 38:11
**cautioned** 5:5
**certain** 25:10 27:14 28:4 30:13
**Certificate** 3:9 45:1,23
**Certified** 4:7 45:4 45:23
**certify** 45:6
**chain** 37:16
**chair** 10:6 12:14
**chance** 20:20 35:25
**characterize** 34:11
**Charleston** 2:5
**cheating** 13:6 18:14
**check** 29:7
**choose** 14:5
**chronic** 23:24
**City** 1:22,23 4:6 45:13
**CIV-21-616** 1:6

**Civil** 4:11
**claimed** 41:24
**claims** 41:22
**clarify** 10:16
**classify** 41:15
**classroom** 20:2,8
  28:12,25
**classroom-type**
  20:10
**client** 6:18 31:12
**clients** 38:19
  39:21
**clinic** 20:3,11 25:9
  25:17 28:12
**clinical** 20:13 21:4
  24:25 28:24 29:1
  29:4 40:4,8,12
**clinician** 21:10
  23:7
**clint.pratt@oks...**
  2:12
**CLINTON** 2:10
**coach** 37:9
**code** 3:12 17:6,10
  17:13 18:1,22
**colleagues** 38:18
**collected** 31:13
**COLLEGES** 1:8
**come** 35:17
**comes** 7:6 9:3
  13:21 30:5
**comment** 10:14
**comments** 21:7
  35:20 36:5
**Commission**
  44:17
**commit** 29:2
**committed** 32:9
**community** 34:22
  39:6
**compare** 38:5
**complete** 8:11,19
  15:2,13,14 16:7
  20:13 27:5,10,14

28:14 29:5,10
**completed** 14:12
  14:16 15:3,16
  16:8 27:1,3,15
  28:7
**completing** 16:1
  28:4,15,15 38:23
**completion** 28:5
  28:17
**Complicity** 18:16
**component** 39:5
**components** 38:2
**comprised** 12:13
**concerned** 24:21
**concerns** 22:22
  23:8
**concluded** 42:21
**conduct** 3:12 7:8
  9:4 17:7,11,13
  17:14 18:1,8,22
  19:7 25:17 41:5
  41:13
**conference** 4:4
**confronted** 31:20
**consequences**
  40:22 41:15
**consider** 14:13
  15:5 25:3 27:16
  31:25
**considered** 25:20
**consistently** 21:9
**constitute** 36:12
**contained** 17:10
  36:4
**contains** 35:19
**contents** 17:14
**copied** 26:1
**correct** 18:5 19:9
  35:5 39:2,8,25
  40:15 44:5 45:11
**CORRECTION**
  43:6
**corrections** 43:5
  44:7

**Counsel** 2:10
**County** 45:3,13
**course** 8:14 20:25
  36:25
**courses** 34:6
**court** 1:1 5:17,18
**courtesy** 38:17
  39:20
**covered** 30:20
**CP** 3:18
**credit** 15:19
**CROSS** 3:4
**CROSS-EXAM...**
  33:22
**CSR** 1:22 43:4
  44:24 45:22
**current** 42:13
**currently** 6:21 8:5

_____ **D** _____
**database** 7:8 9:5
  41:5,13
**date** 3:11 8:13
  43:3
**dated** 31:7
**day** 44:13 45:19
**days** 9:2
**deadline** 7:10 9:8
**dealing** 38:18
**December** 45:24
**decision** 7:5 10:19
  12:11,19,20,21
  32:18 33:9
**decisions** 32:13
**Defendant** 1:9 2:9
**Defendant's** 3:17
  37:11,23
**define** 13:2
**defines** 25:22
**definition** 38:12
  39:4
**degree** 8:1,6
**deliberate** 10:19
**deliverable** 15:23

16:5
**DeMars** 31:6,10
  32:7
**demonstrating**
  39:19
**demonstration**
  38:22
**department** 42:14
**depend** 16:13
**deposit** 31:12
**deposition** 1:14
  3:11 4:4,19 5:14
  34:20 37:15
  42:21 45:9
**depositions** 31:5
**described** 24:24
  27:16
**desire** 29:25
**desk** 31:12
**details** 7:9 8:13,19
**determination**
  30:16
**determine** 10:19
  10:21 16:21
**developed** 29:19
**different** 9:23
  19:8 23:20 34:25
  35:1 37:18
**direct** 3:3 5:8 14:1
  18:3
**discover** 8:10
**discovered** 31:19
**discretion** 13:17
  13:18,19,24
  32:20
**discuss** 21:10
**discussed** 31:4
**disease** 24:4
**dishonest** 15:18
  21:16 23:9 28:20
**dishonesty** 21:11
  23:18 25:2 36:16
  36:19 37:2
**dismissed** 41:10

42:14
**displayed** 21:11
**distinguish** 29:20
**DISTRICT** 1:1,2
**doctorate** 8:5
**doctors** 23:7,11
**document** 17:19
  17:24 20:24 22:7
  31:4 33:16 35:5
  37:22
**documentation**
  25:24
**dog** 24:13
**doubt** 23:14
**Dr** 23:12,12 24:4
  24:6,7,20,21,25
  26:21 27:9 31:6
  31:10,18 32:7
**due** 41:10
**duly** 5:4 45:7

_____ **E** _____
**e-mail** 9:6 22:8,10
  22:18 23:2 26:19
  37:16
**e-mailed** 9:5
**E-value** 23:6
**earlier** 35:23
  36:15 37:14
**easier** 29:12
**educated** 24:3
**education** 7:25
**educationally**
  29:22
**effect** 4:18
**eight** 7:23 34:3
  42:12
**either** 8:20 10:16
  10:16 24:13
  25:25 28:19
**email** 2:6,12 3:14
  3:15
**emergency** 26:22
**employed** 6:21

engaging 13:5
enter 7:7 9:4
entirety 11:14
    44:4
equate 32:6 36:16
    36:20
Errata 3:7 43:1
essential 38:14
essentially 13:5
    22:9 29:19
estimate 31:15
et 1:8
ethic 35:16 38:12
    38:14,21
ethical 38:16
    39:17
evaluated 25:1
evaluation 3:13
    23:5,10 31:5,10
    31:17,20 35:7,10
    35:14,19 36:5,12
    37:17 40:15
evaluations 24:2
    29:6
event 40:19 45:17
everybody 37:11
exact 11:5 19:18
exactly 24:12
exam 13:7
**EXAMINATION**
    3:3,4,5 5:8 42:10
example 15:10
    20:1
excellence 38:20
exchange 24:24
Exhibit 3:17
    17:15 20:17,23
    22:6 30:22 34:20
    37:11,14,15,23
Exhibits 3:11
expectations 37:4
    37:8 39:11,14
expected 29:5
    31:16 37:9 38:15

experience 21:23
Expires 44:17
    45:24
explain 6:24 9:16
explaining 9:12

### F

F 40:25 41:1,2,3,4
fabricating 13:7
fabrication 36:12
    36:17
facilitator 7:5
facilitators 8:17
fact 31:24
faculty 10:8 12:16
    12:22 13:1,12
    14:3,11 15:16
    16:10,11,15
    39:22
fail 15:14
failed 21:12 31:11
fair 6:3 30:5 33:9
fall 32:3
falls 21:17
false 18:16,18,19
    18:23 19:5
familiar 17:13
    20:5 24:9 34:14
    35:23
familiarity 34:12
far 14:7 42:4,5,6,8
Federal 4:10
feedback 21:3
feel 5:23 32:20
felt 16:21
field 26:4
filed 34:6 36:21
    40:4,7 41:19,25
final 12:2,9,19,21
    31:5,10 34:22
    41:8
finance 11:8
find 15:4 25:25
    33:15

Firm 2:4
first 5:4 10:1
    18:10 22:8,17
    23:2,4 24:16
    35:9 37:17 40:24
    42:2 45:7
five 9:1
five-page 22:6
Floor 2:11
focus 22:16
follow-up 33:25
    35:24
followed 12:4
following 5:1
follows 5:7
force 4:17
foregoing 44:3
    45:9
form 4:15 8:12,13
    8:19 9:11,11
    15:8,21 16:19
    18:20,24 21:1,2
    27:18 28:9 32:15
    33:4 37:17 40:17
former 6:14
forth 10:18
forward 33:16
found 10:21 40:20
four 40:23
fourth 22:10
    30:20
free 5:23
front 13:4 31:12
    36:12
full 44:5
further 4:12 14:2
    38:1 39:10 42:19

### G

gain 14:21
gathering 21:13
generate 9:5
getting 21:23
Gilmour 23:3

give 7:24 14:1
    15:10 21:3 23:14
    33:18
given 9:1 10:8
    38:19 44:6
giving 15:24
go 9:18 12:24 19:6
    27:2,3 28:9
    32:13 39:13,14
goes 11:23 23:20
    24:19 41:2
going 5:20 6:2,5
    11:15 14:9 16:4
    16:5 17:16 22:5
    22:7,13,25 25:23
    25:25 26:21
    27:21 30:19,21
    30:22,24 31:8
    32:25 33:8 34:19
    35:17 37:10
    38:20 42:16
good 38:21 39:20
grade 14:5,24
    15:1,25 21:15
    22:2 25:13 26:13
    27:13 28:2 29:21
    31:22 34:21,22
    38:3 39:6 40:14
graded 20:9,12
    25:1 38:17 39:7
grading 37:24
    39:11,14,24
graduates 7:16
grooming 39:19
group 38:2
guess 29:10
guide 37:8
guidelines 10:22

### H

half 22:9
hand 34:19 37:10
    45:18
handing 31:14

handle 32:11 34:7
    34:9
handled 13:24
    19:4
handling 19:22
    31:13
hands-on 29:14
happened 28:24
happens 8:8 9:25
happy 11:25
head 13:11 19:18
header 18:10
heading 39:14
hear 12:11 26:23
heard 30:13
hearing 7:12 9:20
help 5:24 10:16
    14:1 37:7,8
hereinbefore 5:4
    45:15
hereto 4:3,13
hereunto 45:18
hey 32:24
high 7:25 38:16
highlighted 27:6
history 21:13
    29:18,25
honest 30:4
honesty 31:21
    32:5 37:1 38:17
    39:2,8,20,24
hoping 15:3,17,18
hour 27:4
hypothetical 17:2

### I

i.e 38:20
ICU 27:1,3,4,7,8
    27:10 28:2,5,18
identical 38:5
identified 30:8
identify 29:12
imagine 30:2
IMHA 23:25

immunosuppre... 24:1
include 7:18 23:9 39:1
included 27:7
includes 11:12 38:21 39:18
including 28:4
indented 22:9
INDEX 3:1
indicate 8:23 36:6
individual 34:16
information 10:9 12:4 13:8 17:17 25:10,11 36:13 36:17
informed 15:2 24:8 26:24 27:2
initial 7:3 12:15 12:16 25:25
initiate 32:21 33:3
inquiry 8:12,13
inside 27:5,7
instances 23:11
instructed 31:15
instruction 14:2
instructor 7:4,11 8:10,22 9:13 10:12,13,17,23 14:16,24 15:3,4 15:24 16:6,8,21 19:5 25:22 26:5 26:11 28:7 32:19 32:24 36:25 37:6
instructor's 32:19
instructors 16:4 21:2 26:9 34:6 39:1
integrity 6:23 7:2 7:12 8:8,17 9:15 9:19 10:1,4,5 11:2,10,24 12:6 12:10,13,18 13:3 13:13 14:4,8,14

15:6,20 16:12,17 16:22,24 17:3 18:11,23 19:2,4 19:6,13,23 21:18 21:18,25 25:4,9 25:14,19 27:17 28:8,16,22 29:2 29:12,16,21 30:3 30:7 31:25 32:6 32:10,20,25 34:6 34:13 36:6,20 40:3,21 41:10,19 41:24 42:15
intend 22:16
interaction 6:17
interested 45:17
internal 19:22
interpersonal 39:21
involved 12:15,16 17:6
involving 32:8
Irizarry 23:12 26:21 27:9 31:18
issue 13:13 19:5 37:5
issues 11:12 29:21 29:21 37:1 39:2

J

J 2:4
Jason 2:4 6:12 22:15
jbach@bachla... 2:6
job 6:24 7:22
Jon 31:18
Jonaston 21:9
Jonathan 1:4 6:13 21:9 23:8,14,23 24:5,6,8,10,21 24:24 26:22,24 27:8,12 28:2 31:6,10,22 34:23

Jonathan's 24:25
July 1:16 4:6 43:3 45:12,19
Jurat 3:8 44:1

K

keep 41:6
key 21:12
kind 7:24 13:21 15:11
know 11:16,20,22 13:5,23,24 14:7 14:19,20 16:1,4 16:5,7,17 17:12 17:20,25 19:16 19:19,21,24 20:20 26:11 28:11,13,18 29:5 29:5,7,9,10,18 42:4,5,7,8
knowingly 18:19 18:23
knowledge 41:18 41:23
knows 13:22 24:8 24:12

L

lack 31:20,21 32:5
Las 2:5
Laura 23:2
Law 2:4
lawsuit 6:15 41:23
lays 40:23
lead 13:6
leadership 8:4
learning 8:3
leave 26:25
led 28:21
left 18:11
Legal 2:10
leisure 8:2
let's 9:18 15:2,12 16:14 41:8
letter 9:5 15:25

level 34:12 37:9 38:20
lie 23:16
lied 14:11 16:3 24:21 27:14 28:6 31:23
limited 39:18
line 33:13 43:6
link 11:9
list 27:14
listed 37:18
listing 38:2
litigation 21:1
little 35:18
long 6:6 7:21
look 17:15,20,21 20:16,20 22:5 30:22 33:17 34:21 37:12,22 39:10 40:19
looks 29:6
lying 16:10,11 31:13,14 32:5

M

making 14:9 18:19
managed 23:25
manager 6:22
mandatory 26:10
manner 38:24
March 31:7
Margi 23:2
mark 8:25 20:17
marked 3:11
marking 40:14
Marla 23:13 24:19
master's 8:3
materials 10:10
mean 13:20 14:20 15:24 21:22 29:3
MECHANICAL 1:8

mechanisms 36:24
medications 24:1 24:4,5,7,9,11,13 27:6
medicine 23:24
meet 7:4 9:14
meeting 8:16,18 8:18 9:7,20 10:4 12:6,15,17 23:16 32:15 33:4
meets 10:1,11
member 12:16 13:12 14:3,12 15:16 16:10,11 16:15
members 10:8 12:22 13:1 39:22
mention 23:5
mentioned 10:25 38:25
methods 36:24
mind 38:13
minutes 33:15,18
miscommunicat... 23:15,19 28:21
misconduct 18:14 19:3,12
misrepresented 28:6
misrepresenting 25:12
misunderstandi... 23:19 28:20
moment 14:1 37:6
Monday 23:17
Moore 23:12 24:4 24:6,7,20,21,25
morning 31:16
move 20:11 33:16
Moving 26:19

N

Nafe 23:2

name 5:10 6:12
  11:1
named 5:4
necessarily 21:20
  25:21 27:19
  28:10
NECESSARY
  43:5
need 5:24 35:25
  38:6
never 20:18
new 12:4 13:1
Nikol 26:21
Northeast 1:23
Notary 44:12,16
notated 41:5
notation 41:9
noted 44:7
notes 29:7
notice 4:10
noticed 27:4
notify 7:8 33:3
notifying 32:14
number 1:6 3:12
  3:13,14,15,18
  11:5 17:16 18:8
  18:13,16,16,18
  19:3,18 20:17
  21:8 22:6,18
  26:20 30:23
  34:24,25 35:2
  37:23 39:10,15
nurses 39:22
NV 2:5

_____

O

oath 5:7,16,17
  44:3
Object 15:8,21
  16:19 27:18 28:9
  40:17
objections 4:14
observed 21:4
occurred 32:21

occurring 28:11
occurs 8:18 29:4
  37:5
October 23:3
  26:20
office 2:10 7:6 8:9
  9:4 12:9 13:15
  13:22,23 14:6
  19:8 26:8,14
  32:8,16,23 33:5
  42:16
official 45:19
Oh 35:1
okay 5:16 6:10,11
  7:13,18,21 8:10
  9:24 10:3 11:4,6
  11:23 16:14 17:9
  17:15,22 18:3,10
  20:7,22 22:19,23
  22:25 31:2 32:18
  33:13 35:9 36:2
  36:3 37:13 42:20
Oklahoma 1:2,7
  1:17,23,23 2:11
  2:12 4:7,9 6:23
  8:2,4,6 13:2 17:2
  17:6,10 29:16
  30:3 34:2 45:2,3
  45:5,14,23
once 7:1,5
online 12:25
opening 10:14,15
opinion 24:18
  29:1 36:4 41:14
opportunities
  30:13
opportunity 8:23
  10:14 17:21
option 12:2 13:14
  33:7
order 25:12 27:12
orientation 12:25
OSU 7:17,17 9:6
  23:25 34:7,12

outcome 7:5 8:15
  33:7
Outside 41:22
overage 39:14
owner 24:3,10,12
ownership 38:22

_____

P

p.m 42:21 45:13
packet 10:8
page 18:7,17 21:6
  22:8,10,11,17,21
  23:2,4 30:20,25
  35:9,19 36:5
  37:17,22 38:1
  39:13 43:6
pages 17:17 22:16
panel 7:12 9:15,19
  10:2,5,5,6,11,15
  10:18 11:24
  12:10,13,13,18
  12:24 13:1 33:8
  33:8
panels 12:23
Papa 31:1,11 32:8
paperwork 7:6
  9:3
paragraph 22:11
  22:21 23:4
part 15:1 23:1,18
  24:25 28:2 29:24
  30:9,9,12,15
  31:23 37:16
particular 15:15
parties 4:3,13
  45:16
pass 15:13 33:11
  42:9
pass-fail 15:13,25
passed 16:16
patient 23:24
  25:11,12
patients 29:7
  38:19

Payne 45:14
Pee 23:24 24:5,6,8
  24:9,11,21
pending 6:9
people 21:2 23:7
percent 34:10,11
percentage 34:5
perform 31:24
performance
  20:12 29:8
performed 31:17
  31:19
performing 31:23
  37:9
permanent 41:8,9
  41:11
permission 41:7
person 10:12 21:7
  28:18
personal 39:18
personally 14:19
physically 11:16
place 44:6
plagiarism 13:6
  18:15 25:22,23
  26:6,6,12
Plaintiff 1:5,15
  2:3 4:6 5:2
Plaintiff's 37:15
plan 8:24
players 38:16
please 5:11,22
  20:19 36:1 38:13
PMP 11:5
point 6:7 11:19
  12:20,21 21:6
  30:25 32:23
  39:15
pointed 21:22
points 35:11 37:19
  38:8,19
Policies 37:24
policy 10:22,25
  11:1,3,6,13 12:3

13:4 14:8,10
  16:24 17:3 19:4
  19:7 25:21 26:9
  26:16 29:17,18
  29:22,24 30:3,8
  30:9 34:13,16
  40:23
portion 20:2,3
  35:7
position 7:22
  32:12
positive 39:19
possibility 40:3
possible 40:23
possibly 24:17
post 7:25
potential 8:15
  40:21
practical 29:14
practice 34:23
  39:6
PRATT 2:10 3:4
  15:8,21 16:19
  22:15,19,23
  27:18 28:9 33:13
  33:23 42:9,20
Pre-Quiz 35:15
prepared 21:10
prescribed 24:12
presentation 22:3
presenting 21:11
  21:14
pretty 34:14
prevent 14:8
previously 34:19
  36:10
Prior 19:17
probably 20:18
  34:18
problem 33:20
procedure 4:11
  12:3
proceed 32:25
process 6:23 7:4,7

Candace Thrasher
July 17, 2023

51

8:7 9:16 14:10
30:8,12,15 32:13
32:16,22 33:3
34:9
**processed** 32:17
33:5
**produced** 5:1
20:25
**professional** 4:9
29:14 39:17
40:13
**professionalism**
21:25 25:7,16,20
32:4 39:5 40:14
**Professionalism...**
35:16 38:11,14
**program** 20:1,6
42:15
**programs** 20:9
**Prohibited** 18:8
**project** 40:25
**properly** 24:16
**provide** 7:9 8:12
9:10,11 12:8,25
**provided** 38:12
**PRW** 1:6
**Public** 44:12,16
**publications**
11:11
**published** 11:7,16
11:18
**punitive** 30:1
**pursuant** 4:10
30:7
**purview** 17:12

**Q**

**question** 4:15 5:22
5:22 6:1,2,3,9
8:25 24:16,23
27:11,24 40:18
**questioning** 33:14
**questions** 5:21
10:16 21:12

33:25
**quiz** 16:2 35:15

**R**

**rationale** 40:11
**read** 22:12 23:1
23:23 26:21
27:16,21 28:1,12
31:8 35:22,25
39:15 42:20 44:3
**reading** 38:13
39:4
**realize** 15:17
16:15
**really** 13:20
**realm** 21:25 22:1
25:8,16
**reason** 28:14 43:6
**recall** 6:19 37:19
40:5,9 41:21
42:1
**receive** 12:23
15:19 19:14
27:12 29:23
**received** 19:17
28:3
**receives** 37:19
**receiving** 21:15
22:2 24:6,7,12
24:13
**receptionist** 31:15
**Recess** 33:21
**recheck** 23:23
24:2
**recognize** 20:18
**record** 5:10 23:1
23:22 28:1 41:4
41:6,11,12
**records** 13:7
**recourse** 11:25
**redeveloped** 29:19
**REDIRECT** 3:5
42:10
**reduce** 14:5

**reduced** 26:13
**refer** 19:2
**reference** 39:7,23
**referenced** 37:14
**references** 37:24
**referring** 14:6
15:11 31:6
**regarding** 10:10
23:8 28:1 37:4
**Regardless** 8:25
**REGENTS** 1:7
**Registered** 4:9
**related** 29:8
**relationships**
39:21
**relative** 45:16
**release** 41:6
**remind** 34:1
**repeat** 5:23 22:15
27:24
**rephrase** 5:23
**replied** 24:10
**report** 13:21 26:3
26:7 34:22,22
**reported** 1:22 8:9
13:22 44:24
**reporter** 4:8,9
5:17 43:4 45:4
45:23
**Reporter's** 3:9
**REPORTERS**
1:22
**reporting** 13:14
13:15 18:17 21:8
26:14
**reports** 19:12
**represent** 21:1
31:3 36:9
**representation**
19:5
**representations**
18:18,19,24
**representative**
12:14

**representatives**
10:7
**request** 12:9
**requested** 41:19
**require** 26:9
**required** 26:7
27:13
**requirements**
38:21
**reserved** 4:16
**resolution** 8:19
9:7 32:14,15
33:4,4 34:9
**respect** 39:20
**respective** 4:3,13
**responsibilities**
6:25
**responsibility**
8:20 38:18
**responsible** 8:21
8:21 10:20,21
40:20
**responsiveness**
4:15
**rest** 22:22
**result** 11:25
**review** 10:9 17:18
**reviewed** 12:7,12
**reviewing** 20:19
**Rex** 27:2 28:1
**right** 16:24,25
17:23 20:16
22:25 26:19 30:2
30:10,13,17
33:11,19 42:18
**Rivera-Pierola**
1:4 6:13 34:23
36:10 42:2,6
**role** 7:22 17:5
34:2,3,5 42:13
**rotation** 21:5
24:25 26:24
27:11,13 28:3
29:1,4,10 34:23

35:15 36:25 39:6
**rotations** 21:23
**RPR** 1:22 43:4
44:24 45:22
**Rules** 4:10

**S**

**sanction** 7:9 8:22
9:2,8 10:23
29:23 41:8
**sanctions** 29:24
40:24
**satisfactory** 27:12
**saw** 23:23 26:21
**saying** 26:16
**says** 18:11 23:5
31:11 39:16
**scenario** 19:10
27:25 32:8
**scenarios** 23:13
23:21
**schedule** 7:11
9:14
**Schmitz** 1:22 4:7
43:4 44:24 45:4
45:22
**school** 7:19,25 9:2
19:14,19,21 21:5
**score** 21:15
**seal** 45:19
**second** 21:6 23:4
40:24
**section** 27:21 31:8
36:5
**see** 10:10 18:8,11
26:3 33:15 35:10
35:11,20 37:24
38:3 39:11 41:9
**seen** 17:23,25 18:1
19:18 20:18
**send** 32:11
**sending** 32:15
**sent** 32:7 37:11
**separate** 23:7

24:20
**September** 23:17
26:22
**series** 5:20 35:10
35:19
**set** 28:4 29:9
45:15,18
**sets** 13:12
**setting** 20:10
28:25 40:12
**sheet** 27:1,3,5,7,10
28:2,5,18 31:15
43:1
**shift** 26:25
**shorthand** 4:8
45:4,10,23
**shows** 32:5
**shriek** 41:2,4
**side** 18:11
**sign** 42:20
**significant** 41:16
**similarity** 26:3
**simply** 14:4 15:1
15:12 26:13
**situation** 16:14
29:3,14
**situations** 20:13
23:9,18
**skill** 29:9
**Skills** 35:15
**skip** 30:21
**solid** 38:15
**somewhat** 20:5
**sorry** 31:14
**source** 25:25
**specific** 23:11
36:9 39:23
**specifically** 39:7
**splenectomy** 24:2
**SS** 45:2
**staff** 39:22
**standards** 38:16
**start** 33:25
**starting** 23:3

**starts** 22:21 31:1
**state** 2:11 4:8 5:10
6:23 8:2,4 13:2
17:6,10 29:16
30:3 34:2 44:2
44:12 45:2,5,14
**State's** 17:3
**statement** 9:12
10:15 28:13 37:3
**statements** 36:11
39:1
**STATES** 1:1
**Stillwater** 1:17
2:12 4:7 7:17
45:13
**stipulated** 4:2,12
**stipulations** 4:1
45:14
**stop** 9:17,18
**stopped** 31:12
**Street** 1:23
**strict** 38:17
**strike** 19:11 36:6
**structure** 39:25
**student** 2:11 3:12
3:13 6:14 7:3,4,7
7:8,11 8:12,16
8:23 9:4,13 10:1
10:3,6,7,12,13
10:17,20,21
11:23 12:8,14,14
12:22 13:1,13
14:1,11,15,21
15:15 16:6,10,15
17:6,10 18:1,22
19:7 26:1,7,13
30:12 32:9,14
33:3,6 37:5,7,7
37:19 40:4,20
41:5,10,12,18,23
42:14
**student's** 8:20 9:6
14:5 38:3 39:6
41:2,7

**student-led** 10:6
**students** 7:14,17
7:18 20:8 21:3,4
29:1,23 30:4
38:15 39:21 40:8
**studies** 8:2
**Subjective** 35:14
35:14
**submit** 33:4
**submitted** 16:8
34:8,10
**submitting** 41:1
**SUBSCRIBED**
44:11
**subset** 12:10,17
**substantiate**
25:24
**success** 38:15
**Suite** 1:23 2:5
**summary** 9:6
**supposed** 25:8,16
29:6
**sure** 8:1 17:4
24:11 27:23,25
31:11
**suspect** 26:12,15
**Suspected** 31:13
31:14
**suspects** 13:12
14:3 26:5
**sworn** 5:5 44:11
45:7
**syllabus** 3:18
13:25 37:3 39:1
39:24

**T**

**take** 5:18 6:7,9
17:15,19,21
20:16,19,20 22:5
26:17 30:22
33:17 34:21
37:12
**taken** 1:15 4:5,10

5:14 33:21 45:10
45:12
**talk** 9:19
**talked** 37:17
**talks** 18:14
**task** 15:2,3,11,13
15:14 16:2 28:14
28:15 31:23,24
**tasks** 20:12 27:14
27:15 28:4 38:23
**teachable** 13:25
37:6
**teaching** 8:3
**team** 38:15
**Technical** 35:15
**technician** 23:12
27:8
**Telephone** 2:6
**tell** 6:20 9:25
29:15
**telling** 14:22 16:7
**tells** 15:15
**ten** 41:7
**terms** 35:7
**testified** 5:6 36:11
**testify** 5:5 45:7
**testimony** 44:6
**Thank** 22:23
38:25
**thing** 22:12 23:5
**things** 29:8 40:12
**think** 13:10 16:13
21:17 24:16
25:15 29:11
30:20 32:24
33:17 34:15
36:15,23
**third** 22:11,21
30:24 41:1
**Thrasher** 1:14 4:5
5:3,12,13 33:24
42:12 43:2 44:2
44:9 45:6
**three** 23:7

**time** 4:16,17,18
9:14 10:4,9
20:19 24:3 44:6
45:12
**timely** 38:23
**titled** 39:11
**told** 14:15 24:6
27:9,9 31:18
**top** 13:10 19:18
22:9
**touched** 23:22
36:15,23
**TPR** 31:19
**traditional** 29:11
29:13
**training** 12:23
**transcribed** 45:11
**transcript** 41:3,9
41:12 44:4
**transcription** 44:5
**trial** 4:16
**true** 44:5 45:11
**trust** 23:11
**truth** 5:5,6,6 45:7
45:8,8
**Tulsa** 7:17
**turn** 14:23 26:2
35:18 38:1
**turned** 16:16 26:2
**turning** 15:24
16:1,2
**two** 10:7,7 23:7,11
23:20 36:5
**two-page** 35:4
37:16
**type** 12:23

**U**

**undergraduate**
7:16
**undergraduates**
7:14
**undersigned**
44:12

Candace Thrasher
July 17, 2023

53

understand 5:16
  5:22,25 6:14
  20:7 37:7
understanding
  15:22 18:21
  19:25 20:4,14
  29:15,25
understood 6:2
Union 2:11
UNITED 1:1
university 2:11
  6:15,23 7:14 8:2
  8:4 11:12 16:23
  18:20,24 20:24
  34:2
uphold 38:16
utilize 37:1
utilizes 34:16

**V**

various 24:1
Vegas 2:5
verbal 18:20
version 18:1,4
versus 25:9 29:10
  29:13
veterinarian
  21:24
veterinary 7:19
  19:14,21 20:1
  21:5
video 4:4
VIDEOCONFE...
  1:14
view 21:24
violation 7:2,6 8:8
  8:14,15 9:7
  10:11 14:4,14
  15:6,20 16:9,12
  16:18,22 17:2
  18:23 21:18,19
  25:4,9,14,19,20
  26:6 27:17 28:8
  28:17,23 29:2,12

31:25 32:6,10,21
  32:25 36:7,20
  40:4,21 41:11,19
  41:24 42:15
violations 19:13
  19:23 34:6
virtually 10:12
vs 1:6

**W**

W 2:10
walk 8:7
Walker 23:24
want 6:7 9:16,17
  22:13 30:4 31:9
  33:15,17,24
wanted 21:6 23:14
way 9:23 19:22
  20:5 24:15 28:12
we'll 33:16 42:20
we're 6:5 32:25
  35:17
we've 23:21
website 11:9,10
  11:17,19,21
Wee 23:24 24:5,6
  24:8,11,22
Wee's 24:9
week 26:23
welcome 6:8
  17:18 22:12
Wesleyan 8:6
West 2:5
WESTERN 1:2
WHEREOF
  45:18
witness 2:9 5:1,4
  15:10,22 16:20
  22:25 23:10
  27:19 28:10
  33:12 42:9 43:2
  45:18
work 7:11,13,15
  7:16 9:13 13:17

21:3 38:21
working 8:5
works 20:1,6
worse 31:21
wouldn't 15:4
  25:19
written 9:10,11
  10:10 12:8 18:20
  41:7
wrote 28:19

**X**

**Y**

Yeah 12:25 15:12
  22:17,24
year 19:16
years 7:23 23:25
  34:1,4 41:7
  42:12

**Z**

zero 41:3
ZOOM 1:22 2:3,9

**0**

00565 20:23
00622 22:7
00823 45:23
0084 34:24
01042 31:7
01047 35:3
01048 30:23
0140 30:23

**1**

1 3:12,18 17:16
  18:13 19:3 37:11
  37:23
10 33:14
10/3/19 3:14
100 34:10,11
101 1:23
13th 1:23
14 1:23

14th 26:22
165 2:5
17 1:16 3:12 4:6
  43:3 45:12
18230 45:22
19th 45:19

**2**

2 3:13 18:8,16
  20:17,23 22:18
  26:20 35:19
  37:22
20 3:13
2006 29:20
2019 3:12 11:15
  18:4 23:3 26:20
  26:23
2020 31:7
2023 1:16 4:6 43:3
  44:14 45:12,19
  45:24
22 3:14

**3**

3 3:14 18:16 22:6
  38:1
3/4/20 3:15
3:11 45:13
30 3:15
30th 23:17
31 45:24
33 3:4
37 3:18
3rd 23:3 26:20

**4**

4 3:15 30:23 34:20
  37:15 39:13
4:29 42:21
405)235-3376 1:24
42 3:5
43 3:7
44 3:8
45 3:9
4a 39:15

4th 22:20 31:7

**5**

5 3:3 17:17 18:7
  18:18 33:14,18
  37:23
566 20:23
5th 2:11

**6**

6 17:17 18:17
  39:10
626 22:7

**7**

7:00 31:16
7:30 31:17
702.925.8787 2:6
73104 1:23
74078 2:12
7881 2:5

**8**

89117 2:5

# Oklahoma State University
# Student Code of Conduct
# 2019

Cowboy Community Standards
I. Introduction
    A.  Purpose
    B.  Authority
    C.  Interpretation
    D.  Definitions
    E.  Applicability of the Code of Conduct
    F.  Good Samaritan
II. Prohibited Conduct
III. Student Conduct Process
    A.  Student Conduct Procedures
        1. Complaints
        2. Interim Suspension
        3. Evidentiary Standards
        4. Disposition of Allegations
    B. Student Rights in the Conduct Process
    C. Student Conduct Meeting
    D. Student Conduct Hearing
        1. Pre-Hearing Procedures
        2. Four Days in Advance of the Hearing
        3. Hearing Procedures
        4. Hearing Deliberations and Decision
    E. Student Conduct Committee Panel Hearing
        1. Pre-Hearing Procedures
        2. Four Days in Advance of the Hearing
        3. Hearing Procedures
        4. Hearing Panel Deliberations and Decision
    F. Complainant Notification
IV. Sanctions
    A.  Parental Notification
    B.  Failure to Complete Conduct Sanctions or Comply with Conduct Office Requests
    C.  Implementation of Sanctions
V. Appeal Procedure
VI. Reviewing Authority
VII. Conduct Files and Records



PLAINTIFF'S
EXHIBIT
1
PENGAD 800-631-6989

1

Oklahoma State University (OSU) is committed to creating and maintaining a productive living and learning community that fosters the intellectual, personal, cultural, and ethical development of its students. Self-discipline and valuing the rights of others are essential to the educational process and to good citizenship. Attending Oklahoma State University is a privilege and students are expected to meet or exceed the university's standards of conduct both on and off campus.

## Cowboy Community Standards

Oklahoma State University students aspire to promote:

**Integrity:** Oklahoma State University students are expected to exemplify honesty, honor, and respect for the truth in all of their actions.

**Community:** Oklahoma State University students build and enhance their community. They understand and appreciate how their decisions and actions impact others and are just and equitable in their treatment of all members of the community.

**Social Justice:** Oklahoma State University students recognize that respecting the dignity of every person is essential for creating and sustaining a flourishing university community. They act to discourage and challenge those whose actions may be harmful to and/or diminish the worth of others.

**Respect:** Oklahoma State University students must show positive regard for each other and for the community.

**Responsibility:** Oklahoma State University students are expected to accept responsibility for their learning, personal behavior and future success, and students should appropriately challenge others to do the same. Students should use good judgment, be trustworthy and take personal responsibility for their actions.

## I. Introduction

### A. Purpose
The Student Code of Conduct outlines university policies and procedures to which all students are expected to adhere during their time at Oklahoma State University. The primary focus of the conduct process is on educational and corrective outcomes; however, sanctions such as suspension or expulsion from the university may be necessary to uphold community standards and to protect the campus community. The current version of the Student Code of Conduct is available at **studentconduct.okstate.edu/code**. For questions regarding the Student Code of Conduct, contact the Office of Student Conduct Education and Administration (405-744-5470) or the Office of the Vice President for Student Affairs (405-744-5328).

### B. Authority
Under authority granted by Article 6, Sections 31 and 31a of the Constitution of the State of Oklahoma and Title 70, Oklahoma Statutes, Section 3412 Oklahoma State University is granted full authority to adopt policies and procedures governing the conduct of its students. Attendance at Oklahoma State University is optional, voluntary and a privilege. When students enroll at Oklahoma State University, they voluntarily accept obligations of performance and behavior consistent with Oklahoma State University's lawful mission, processes, and functions. In

2

general, these obligations are considered much higher than the obligations imposed by civil and criminal law for all citizens.

Students are expected to comply with all university policies, contracts, and/or agreements. Failure to do so may result in students being required to participate in the conduct process. Conduct action may also be taken for any violation of local ordinances, state, or federal law, on or off campus, which adversely affects the university community or the pursuit of the university's lawful educational mission, process or function. The university will take necessary and appropriate action to protect the safety and well-being of the campus community. In addition, if a student has been found to have violated state or federal law, the university reserves the right to notify the appropriate authority.

Students will be afforded due process and the ability to appeal as prescribed in this document and other relevant university policies, rules or regulations. Students may be subject to civil and criminal penalties in addition to campus sanctions. Campus resolution may proceed before, during, or after civil or criminal actions are concluded and is not subject to challenge based on the action or inaction of civil authorities.

### C. Interpretation
Any question of interpretation regarding the Student Code of Conduct will be determined at the sole discretion of the Vice President for Student Affairs or their designee.

### D. Definitions

**Action Plan:** During a Student Conduct Meeting, the student and the conduct officer will work together to develop an Action Plan that will consist of various assignments to aid the student in their ethical, personal and intellectual development.

**Advisor:** A person who has agreed to assist a complainant or respondent during the university conduct process. The advisor may be a person of the student's choosing, including an Oklahoma State University faculty or staff member, an Oklahoma State University student, a parent, a friend, or an attorney. For more information go to https://studentconduct.okstate.edu/advisors.

**Back on TRAC** (Treatment, Responsibility and Accountability on Campus): The Back on TRAC program is a collaborative team approach that uses a community drug court model to address alcohol and drug issues among students. Students may have the opportunity to apply to the Back on TRAC program if they are suspended from Oklahoma State University or removed from Housing and Residential Life for drug or alcohol reasons. As a condition of remaining in school or in housing, students must be accepted into and remain in good standing with the program. This process includes assessments, interviews, and a contract. Back on TRAC provides an assessment-based intervention for students whose substance use is jeopardizing their standing within the Oklahoma State University academic community. The program offers opportunities for treatment and recovery through support and accountability as students make lifestyle changes to achieve their academic and personal goals.

**Complainant:** An individual who files a disciplinary complaint; the university may also serve as a complainant.

**Day:** University working day, not including Saturday, Sunday, or university holidays. Time deadlines may be extended during breaks and university holidays.

Board00300

**Honesty Statement:** The university expects that all information presented will be truthful and accurate. If false information is willfully provided, a student will be in violation of Section II (21) of the Student Code of Conduct and may be held accountable through the student conduct process.

**Incapacitation:** Temporarily incapable of appraising or controlling their conduct due to the influence of drugs or alcohol, unconsciousness, being asleep, or for any other reason that makes the individual physically or verbally unable to communicate willingness to act.

**Institution**: Oklahoma State University and Northern Oklahoma College

**Parental Notification:** FERPA permits educational institutions to notify parents of students under the age of 21 when a student has been found responsible for an alcohol or drug related violation. Students are generally notified when parents or guardians will be contacted and are given the opportunity to contact their parents first.

**Respondent:** Any student that is alleged to have violated the Student Code of Conduct.

**Sanction:** A disciplinary correction which is imposed on students who are found responsible for violating the Student Code of Conduct. Typically sanctions include educational measures that hold students accountable for their behavior, providing the opportunity for behavior change in an individual. Sanctions can range from a verbal warning to suspension or expulsion. Sanctions are primarily educational and corrective; however, sanctions such as suspension or expulsion from the university may be necessary to uphold community standards and to protect the campus community.

**Student**: Any person who has been admitted and/or enrolled for the current term or a future term at Oklahoma State University, including correspondence study, online courses, study abroad and auditing courses. This also includes students who are enrolled in courses offered in Stillwater through Northern Oklahoma College or the English Language Institute. Students who leave the university before a conduct complaint is resolved may be prohibited from future enrollment until the matter is resolved.

**The Family Educational Rights and Privacy Act (FERPA):** A federal law originally passed in 1974 that defines student educational records and regulates who may access those records and under what circumstances. The purpose of FERPA is to protect the privacy of student education records.

**Title IX:** A clause in the 1972 Federal Education Act that states that no person shall be denied the benefits of any educational program or activity because of sex. Title IX prohibits sexual harassment, gender-based discrimination and sexual violence.

**University Premises:** Any buildings or grounds owned, leased, operated, controlled, or supervised by the university. Students should be advised that this includes properties that are not a part of the main university campus. Examples of these areas include, but are not limited to, Camp Redlands and Lake Carl Blackwell.

**University-sponsored Activity:** Any activity on university premises or at an off-campus location that is directly initiated or supervised by the university or a university recognized group or organization. This includes, but is not limited to, fraternity and sorority organizations, study

4

Board00301

abroad programs, and sporting events. In addition, university-operated or -leased transit, such as THE BUS or THE BOB, is included even if the behavior occurs off university premises.

### E. Applicability of the Student Code of Conduct
As previously stated, the Oklahoma State University Student Code of Conduct applies to conduct which occurs on university premises, at Oklahoma State University-sponsored events both on and off campus, and to off-campus conduct that adversely affects the Oklahoma State University community or the pursuit of its objectives.

Each student is responsible for all of their actions from the time of application for admission through the actual awarding of the degree. Inappropriate conduct that occurs before classes begin or after classes end, as well as during the academic year and periods between terms of actual enrollment (even if the conduct is not discovered until after a degree is awarded) is covered by the Student Code of Conduct. The Student Code of Conduct will apply even if the student withdraws from the university while a conduct matter is pending.

The university will take necessary and appropriate action to protect the safety and well-being of the campus community. Off-campus behavior that allegedly violates ordinances, local, state or federal law adversely affects the university community and the pursuit of the university's lawful educational mission, and may be subject to university conduct action. The Director of Student Conduct Education and Administration will decide whether off-campus inappropriate conduct is subject to university conduct action. Examples of off-campus behavior that may be subject to university conduct action include, but are not limited to: selling or otherwise providing alcohol to underage students, selling or distributing illicit drugs, sexual harassment, sexual violence, actions that result in the serious injury or death of another person(s), alcohol or drug offenses, or any alleged violation that jeopardizes an individual's or community's educational opportunities.

### F. Good Samaritan
The university may offer amnesty for minor conduct violations to (1) a student who may have committed a minor violation at the time of a more serious incident or (2) a student who offers help to those who need medical assistance. If amnesty is offered, educational options may be explored, but no conduct actions or record will result.

## II. Prohibited Conduct

The following list describes actions that detract from the effectiveness of a university community and for which students may be subject to conduct action. All violations below may be addressed by the university when the behavior potentially jeopardizes the individual's or community's safety or educational opportunities.

### Integrity

1. **Academic Misconduct:** Cheating, plagiarism, unauthorized collaboration, alteration of academic materials or other academic misbehavior. For more information, visit *https://academicintegrity.okstate.edu*.

2. **Attempts and Complicity:** Attempting to or encouraging others to commit acts prohibited by this Code. Apathy or acquiescence in the presence of prohibited conduct may constitute a violation of this policy.

5

3. **False Reporting:** Knowingly making a false report of a bomb, fire or other emergency.

4. **False Representation(s):** Knowingly making false representation(s) to the university in any form, written or verbal. Submission of false information or withholding information at the time of admission or readmission may make an individual ineligible for admission to, or continuation at, Oklahoma State University.

5. **Forgery or Unauthorized Use:** Forging or using without authorization university documents or records, financial aid documents, computers, electronic mail, telephones, identification, or university property.

6. **Theft:** Engaging in theft, attempted theft, or unauthorized possession of property belonging to the university or other individuals or recognized groups on university property or facilities on or near campus.

**Community**

7. **Animals:** Failing to properly leash and control the animal and properly dispose of its organic waste. Having unauthorized animals in university buildings. Emotional support animals are not allowed in non-residential university buildings. Emotional support animals are only allowed in residential university buildings when approved by Housing and Residential Life and Student Disability Services.

8. **Classroom Disruption:** Engaging in behavior that a reasonable person would view as substantial or repeated interference with the instructor's ability to teach the class or the ability of other students to benefit from instruction.

9. **Disorderly Conduct:** Behaving in a disorderly, lewd, or indecent manner or breaching the peace on university property or at university-sponsored activities. Includes, but is not limited to, any nonconsensual photography, video or audio recording of another person when such recording causes or is likely to cause injury or distress.

10. **Disruption or Obstruction:** Disrupting or obstructing normal university or university-sponsored or -hosted activities, including, but not limited to: studying, teaching, research, university administration, or fire, police or emergency services on university premises or at university sponsored activities off campus. This includes disrupting or obstructing other individuals' right to expressive activity as defined by Oklahoma law.

11. **Fire Safety:** Engaging in misuse or unauthorized use of firefighting equipment, fire sprinkling systems, and other safety equipment or warning devices, engaging in behavior that creates a fire hazard, or failure to evacuate when a fire alarm is activated.

12. **Housing & Residential Life Policies:** Failing to comply with on-campus residence hall policies. Policies are available in the *Housing and Residential Life Handbooks* at *https://reslife.okstate.edu* and *https://reslife.oksate.edu/fgsh*.

13. **Information Technology Policies:** Failing to comply with the university's Information Technology policies. Policies are available online at *https://it.okstate.edu/about*.

14. **Parties and Gatherings:** Participating in parties or gatherings that disturb the peace of campus residences or off-campus neighborhoods.

6

Board00303

15. **Property Damage:** Attempting to or completion of defacing, damaging, or destroying property belonging to the university or other individuals or recognized groups on university property or facilities on or near campus.

16. **Unauthorized Entry:** Entering into, attempting to enter into, or using without proper authorization, any university building, facility, vehicle, equipment, room, area or university approved housing. This includes unauthorized possession or use of university keys, computers, lock combinations or other special access codes or passwords.

17. **Use of Tobacco:** Using tobacco in any form or using electronic cigarettes (vaping) on campus, as prohibited by OSU Policy and Procedures Letter No. 1-0530.

18. **Weapons:** Possessing, using, or storing firearms, explosives (including firecrackers), weapons or dangerous chemicals on university property or in the course of any university activity, except as specifically authorized under applicable state law. This includes, but is not limited to, BB guns, paintball guns, knives, swords, crossbows, handguns, shotguns, and rifles. See OSU Policy and Procedures Letter 1-1301 for more information.

**Social Justice**

19. **Harassment:** Engaging in verbal abuse, threats, intimidation, harassment, coercion, bullying or other conduct that threatens or endangers the mental or physical health/safety of any person or causes reasonable apprehension of such harm that is persistent, severe or pervasive and is subjectively offensive to the complainant and objectively offensive to a reasonable person.

20. **Discrimination:** Discrimination includes but is not limited to, disparate treatment directed toward an individual or group of individuals based on sex, race, color, sexual orientation, age, status as a veteran, gender identity or expression, national origin, religion or qualified individual with a disability that adversely affects their employment or education. See OSU Policy and Procedures Letter 2-0823 or http://eeo.okstate.edu for more information.

21. **Interfering with the Conduct Process:** Interfering with conduct procedures or outcomes, including but not limited to: falsification; distortion or misrepresentation of information before a conduct officer or Hearing Panel; knowingly initiating a complaint without good cause; harassment or intimidation of any member of a Hearing Panel, witness(es), or university personnel before, during, or after a proceeding; violating a No Contact Order; and failure to comply with the sanction(s) imposed by either a conduct officer or Hearing Panel.

22. **Retaliation:** Retaliating against a person who, acting in good faith, brings a complaint forward or against an individual who has participated in an investigation or conduct process. For more information, see Board of Regents for the Oklahoma Agricultural and Mechanical Colleges Policy 3.06 Non-Retaliation.

**Respect**

23. **Dating Violence:** Dating violence is committed by a person who is or has been in a social relationship of a romantic or intimate nature with another person. The existence of such a relationship shall be determined based on consideration of the following factors: length of relationship, type of relationship, and frequency of interaction between the persons

7

involved in the relationship. Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts that meet the definition of domestic violence.

24. **Domestic Violence:** Domestic violence is a crime of violence committed by a:

   a. current or former spouse or intimate partner of the victim;
   b. person with whom the victim shares a child in common;
   c. person who is cohabitating with or has cohabited with the victim as a spouse or intimate partner;
   d. person similarly situated to a spouse of the victim.

Domestic violence is a pattern of abusive behavior in any relationship that is used by one partner to gain or maintain power and control over another intimate partner. Domestic violence can be physical, sexual, emotional, economic, or psychological actions, or threat of actions that influence another person.

25. **Hazing:** Engaging in any action or activity that causes or is likely to cause physical or mental discomfort or distress, that may demean, degrade, or disgrace any person, regardless of location, intent or consent of participants, for the purpose of initiation, admission into, affiliation with, or as a condition for continued membership in a group or organization. Apathy or acquiescence in the presence of hazing are not neutral acts; they are violations of this rule. State law classifies hazing as a crime, Title 21 Oklahoma Statutes Section 1190.

26. **Physical Violence:** Engaging in physical violence of any nature against any person, on or off campus. This includes fighting; assaulting; battering; using a knife, gun, or other weapon; physically abusing, restraining or transporting someone against their will; or acting in a manner that threatens or endangers the physical health or safety of any person or causes reasonable apprehension of such harm.

27. **Sexual Harassment:** Making unwelcomed sexual advances, requests for sexual favors, and other verbal or physical contact or communication of a sexual nature when:

   a. Submission to such conduct or communication is made either explicitly or implicitly a term or condition of educational benefits, employment, academic evaluations or other academic opportunities;
   b. Submission to or rejection of such conduct or communication by an individual is used as the basis for an employment decision or academic decision affecting such individual; or
   c. Such conduct is sufficiently severe, pervasive or persistent, and both subjectively and objectively offensive, that it has the effect of creating an intimidating, hostile or offensive environment which negatively affects an individual's academic or employment environment.

Sexual harassment does not include verbal expressions or written materials that are relevant and appropriately related to course subject matter or curriculum, and this policy shall not abridge academic freedom or the university's educational mission.

28. **Sexual Misconduct:** Engaging in non-consensual contact of a sexual nature. Sexual misconduct may vary in its severity and consists of a range of behavior or attempted behavior including, but not limited to, the following examples of prohibited conduct:

Board00305

   a. **Unwelcome sexual touching:** Touching an unwilling or non-consensual person's intimate parts (such as genitalia, groin, breast, buttocks, mouth, or clothing covering same); touching an unwilling person with one's own intimate parts; or forcing an unwilling person to touch another's intimate parts.

   b. **Exposure:** Engaging in indecent exposure, sexual acts in a public place, voyeurism, or non-consensual sharing of sexually explicit images.

   c. **Non-consensual sexual assault:** Penetrating any bodily opening of an unwilling or non-consensual person with any object or body part.

   d. **Forced sexual assault:** Penetrating any bodily opening of an unwilling or non-consensual person with any object or body part that is committed either by force, threat, intimidation, or through exploitation of another's mental or physical condition (such as lack of consciousness, incapacitation due to ingestion of drugs or alcohol, age or mental disability) of which the respondent was aware or should have been aware.

**Effective consent** is informed, freely and actively given, using mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. Initiators of sexual activity are responsible for obtaining effective consent. Silence or passivity is not effective consent. The use of intimidation, coercion, threats, force or violence negates any consent obtained. Consent is not effective if obtained from an individual who is incapable of giving consent due to lack of consciousness, age, mental disability or incapacitation due to use of drugs or alcohol.

29. **Stalking:** Stalking refers to one who engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress.

- **Course of conduct** means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
- **Reasonable person** means a person under similar circumstances and with similar identities to the victim.
- **Substantial emotional distress** means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

## Responsibility

30. **Alcohol:** Consuming, possessing, manufacturing, distributing, selling or serving alcoholic beverages on university premises (including residence halls and sorority and fraternity housing) or at university-sponsored activities regardless of age, except as expressly permitted by university policy. Knowingly being in the presence of alcohol where it is not permitted on campus is also prohibited. The following are also violations on or off campus:

   a. Public intoxication or under the influence of alcohol
   b. Driving under the influence of alcohol or while impaired
   c. Actual physical control of a vehicle while under the influence of alcohol
   d. Providing alcohol to individuals under 21 years of age
   e. Social Host: Providing a location for any individual under 21 years of age to possess or consume alcohol
   f. Transporting an open container of alcohol
   g. Incapacitation due to alcohol

9

   h.  Possession or use of a fake ID
   i.  Underage in possession of alcohol
   j.  Underage in a liquor (package) store.

Lawful and responsible alcohol consumption is permitted only in designated areas of the OSU campus, properties and facilities as authorized by the Board of Regents.

31. **Drugs:** Acting or intending to act to illegally use, possess, sell, share, distribute, cultivate, manufacture or be under the influence of any state or federally controlled drug or substance. Possessing drug paraphernalia. Inhaling or ingesting any substances (e.g., nitrous oxide, glue, paint, etc.) that will alter a student's mental state. Knowingly providing a location for individuals to possess or consume drugs, or knowingly being in the presence of drugs are also prohibited. While the use of medical marijuana has been legalized in the state of Oklahoma, federal law continues to prohibit marijuana. Therefore, the possession or use of prescribed medical marijuana is prohibited on campus property and at University-sponsored activities.

32. **Failure to Comply:** Failing to comply with the lawful directions of any university employee acting within the scope of their official duties or failing to identify oneself to such a person when requested to do so.

33. **Gambling:** Illegal gambling for money or other things of value on campus or at university-sponsored activities.

### III. Student Conduct Process

The responsibility for the campus student conduct system is delegated from the Board of Regents for Oklahoma State University to the Vice President for Student Affairs through the President. The Vice President for Student Affairs further delegates authority for student conduct to Student Conduct Education and Administration, Housing and Residential Life, and designated conduct officers. A conduct officer is a university employee who is an officially designated administrator, staff member, or graduate student working under the direct supervision of a professional staff member. The goal is to resolve cases by the lowest appropriate authority for maximum educational benefit.

#### A. Student Conduct Procedures

The following information is provided to inform students of the procedures in place at OSU for resolving alleged violations of university regulations. The procedures are designed to allow for fact-finding and decision-making in the context of the OSU educational community. The objective is to provide procedures that balance the rights of the individual with the legitimate interests of the university and community.

1.  **Complaints:**
   a.  Any member of the university community (faculty, staff or student) or any person who is unaffiliated with the university who has knowledge of an alleged violation of the Student Code of Conduct may file a complaint against a student alleging that a violation of the Student Code of Conduct has occurred. The university may itself initiate a complaint.
   b.  Such complaint should be filed with Student Conduct Education and Administration as soon as possible but within 180 calendar days (not university business days) of the alleged violation. A late complaint may be accepted with the approval of the Vice

10

President for Student Affairs, the Director of Student Conduct Education and Administration or their designee.

c. The complaint must be submitted via approved online form and electronically signed by appropriate technical method. Online form is found at _https://studentconduct.okstate.edu/report._

d. Complaints may be initiated for incidents where concurrent criminal charges are pending. The university may adjudicate incidents without regard to either pending civil litigation or criminal prosecution. University conduct proceedings may proceed before, during or after court proceedings.

2. **Interim Suspension:** In cases where student health or safety is reasonably believed to be significantly jeopardized, the Vice President for Student Affairs, in consultation with the President of the university, or designee, may suspend a student for the period of time required to allow a thorough investigation and an opportunity for a hearing. Students who are so suspended are not permitted on campus or in university buildings, facilities, or activities at any time for any reason during the period of the interim suspension, unless otherwise permitted in writing by the Director of Student Conduct Education and Administration.

If the conduct or behavior of a student residing in an Oklahoma State University residence hall is determined by the Vice President for Student Affairs, the Director of Housing and Residential Life, or the Director of Student Conduct Education and Administration to be a threat to others, the ability to live in the residence hall may be immediately suspended for a period of time pending the outcome of a hearing. During an interim housing suspension, the student is immediately removed from the residence hall and is not to reenter any campus residence hall until a hearing is held and a decision regarding the pending complaint has been made.

3. **Evidentiary Standard:** In order for a student to be found responsible, the information must support a determination by a preponderance of evidence, that it is more likely than not that a violation of the Student Code of Conduct occurred. Hearsay evidence may be considered but will be weighed accordingly.

4. **Disposition of Allegations:** The university conduct process is administered through Student Conduct Education and Administration. Alleged violations of university regulations where neither suspension nor expulsion are a possibility will normally be resolved through a **Student Conduct Meeting (see Section III (C) below)**.

Allegations which may result in suspension and where a one-on-one meeting between the conduct officer and the respondent would be the most effective way to establish the facts of the case are typically referred to a **Student Conduct Hearing (see Section III (D) below)**.

Allegations which could result in suspension or expulsion, or that are complex, sensitive, or require a number of witnesses or that involve an alleged victim are often referred to a **Hearing Panel (see Section III (E) below)**.

At the conclusion of a Student Conduct Hearing, the conduct officer may refer the case to a Hearing Panel if further development of the facts is warranted and would be aided by a more formal hearing. If this is done, the conduct officer will not make any findings. Additionally, a respondent or complainant in a case assigned to a Student Conduct Hearing may request that their case be resolved by a Hearing Panel. Such a request must be made before the scheduled hearing to the assigned conduct officer.

11

Board00308

If a student is assigned to a Hearing Panel and admits responsibility for the alleged violation(s), a Student Conduct Hearing may be conducted. In instances when a complainant is involved, both parties must agree on any changes to the hearing type.

In instances where a student has been convicted of a felony through the criminal process or the university believes it has enough information that would make it more likely than not a violation of the Student Code of Conduct has occurred, the university may file a complaint against the alleged student without the cooperation of the victim.

## B. Student Rights in the Conduct Process

The university views the conduct process primarily as an educational experience that can promote growth in personal understanding of one's role as a member of an educational community and one's rights, responsibilities, and privileges therein. However, sanctions such as suspension or expulsion from the university may be necessary to uphold community standards and to protect the campus community.

During a conduct process, both the respondent and the complainant have the rights to:
1. A written notice of the alleged violation(s);
2. An explanation of the student conduct process upon request;
3. Have no violation assumed;
4. A timely hearing;
5. Be accompanied by an advisor during the conduct process. In matters not involving possible suspension or expulsion, the advisor is limited to advising the student and may not present information, question relevant parties or make statements during the proceedings;
6. Have access to the information and documents to be presented at the hearing in advance;
7. Be present during the entire proceeding, except during deliberation;
8. Question any party or witness present, either directly or indirectly, at the discretion of Hearing Panel Chair;
9. Present material witnesses (those with firsthand knowledge of the incident). The respondent and complainant are responsible for contacting and arranging for the attendance of their own witnesses in all cases;
10. Receive a written notification of the outcome of the conduct process; the complainant can only receive written notification of the outcome of the conduct process when permitted by federal law; and
11. An avenue for appeal from a hearing.

## C. Student Conduct Meeting

Upon determining that sufficient evidence exists to believe that a violation of the Student Code of Conduct may have occurred, the Director of Student Conduct Education and Administration, or another conduct officer with jurisdiction, will notify the student in writing of the alleged violations against them. The written notice will be hand delivered directly to the student, sent electronically to the student's institutional email address, or mailed to the student's last known address as filed in the Registrar's Office. (Students are responsible for providing and maintaining a current local address and e-mail address with the Registrar's Office.)

At the meeting, the student will be provided with the following:

1. An explanation of the alleged violation(s) of university policy;
2. A summary of the facts and information that substantiate the allegations;

12

3. The opportunity to reflect upon and give their account of the incident or circumstances pertaining to the allegation(s);

An explanation of the decision of the conduct officer that may result in the following:
   a. The allegation(s) may be dismissed as unfounded.
   b. The student may admit responsibility for the violation(s) and have a sanction(s) imposed.
   c. The student may be found responsible for violating the Student Code of Conduct and have a sanction(s) imposed.
   d. Any sanction (except suspension, deferred suspension, and expulsion) may be imposed.
   e. Decisions reached at the meeting will be final with no option to appeal or other proceedings.
   f. Failure to respond to a written allegation(s) or failure to complete the assigned sanction(s) will result in either a hold being placed on the student's enrollment privileges or graduation, additional alleged violations or a decision being made based on the information available at the time.

## D. Student Conduct Hearing

Hearing procedures are provided for allegations against an individual where suspension from the university is possible, if found responsible. Cases of suspension and expulsion are only processed through Student Conduct Education and Administration.

Students have the right to be accompanied by an advisor, who may advise and support the student. The advisor may participate directly to the same extent as the student. Such direct participation is a privilege which, if abused, may be withdrawn by the conduct officer. If the privilege is withdrawn, the advisor may continue to advise the student. However, if the advisor fails to act in accordance with hearing procedure, the conduct officer may bar the advisor from the hearing. The student must notify Student Conduct Education and Administration four days in advance of the hearing if accompanied by an advisor. In such cases, the university may have an attorney in attendance.

## 1. Pre-Hearing Procedures

Student Conduct Education and Administration will prepare and send a written notice to the respondent and complainant at least five days before the hearing. The notice will be delivered in person, sent electronically to the student's institutional email address or mailed to the student's last known address of record as filed in the Registrar's Office and will include:
   a. The date, time, place and nature of the hearing;
   b. Reference to the section(s) of the Student Code of Conduct involved;
   c. A brief explanation of the alleged violation(s), including the approximate date and place where the alleged violation(s) occurred;
   d. Names of witnesses, if known;
   e. The right to be accompanied by an advisor and the advisor's role in the hearing;
   f. Names of the conduct officer(s) for the case.

The Director of Student Conduct Education and Administration or designee will be available to meet with the complainant and the respondent, separately, to discuss and explain the hearing procedure and answer questions.

## 2. Four Days in Advance of the Hearing
   a. The respondent and the complainant will provide to the Office of Student Conduct Education and Administration copies of documents to be presented at the hearing and the names of witnesses who will be called.

Board00310

b. Each student must notify their witnesses of the date, time and location of the hearing.
c. The respondent and the complainant will have access to copies of documents to be presented at the hearing by prior appointment. Materials will be sent via email three days in advance of the hearing.
d. The respondent and the complainant will provide notice to the Office of Student Conduct Education and Administration if they will be accompanied by an advisor.

3. **Hearing Procedures**
The hearing provides a forum where all the information and documents can be presented, where questions can be asked of all parties, and where the conduct officer(s) can deliberate and make a decision using a preponderance of evidence, that is it more likely than not that a violation of the Student Code of Conduct did, or did not, occur. Formal rules of process, procedure, and technical rules of evidence, such as those applied in criminal or civil court, are not used in student conduct proceedings. Deviations from prescribed procedures will not necessarily invalidate a decision or proceeding unless significant prejudice to the student or the university may result.

To protect the privacy of all parties and in accordance with FERPA (Family Educational Rights and Privacy Act), hearings will be closed.

The respondent and complainant can present witnesses who may be questioned by the conduct officer(s). Questioning by the complainant or the respondent is permitted so long as it is relevant and is not threatening or harassing.

In the case of sexual harassment or sexual misconduct, the conduct officer may, at their discretion, exclude evidence of the complainant's sexual history with the respondent from discussion during the hearing. The sexual history of the complainant with persons other than the respondent is irrelevant.

The hearing (excluding the deliberations) will be audio recorded. The recordings are the property of the university. Others will not be allowed to make a recording of any type. The university is not responsible for equipment malfunctions. Requests to review audio recordings may be made to Student Conduct Education and Administration.

If the respondent elects not to appear for the hearing, the hearing will be held in their absence. Failure to appear will be noted without prejudice. Findings will be based on information presented at the hearing.

Material witnesses will be present during the introductory comments of the hearing, including the honesty statement, at which point they will be excused until time to give their testimony. Witnesses will be excused upon completion of testimony and questioning, but they may be asked to remain available for recall. The complainant and respondent may remain throughout the hearing.

At the conclusion of the hearing, all parties will be dismissed except for the conduct officer(s), who will deliberate and reach a decision.

A student's past conduct record may be subject to an educational discussion at the hearing. Past conduct history does not impact the finding of responsibility but could be used as information in determining appropriate sanctions.

Board00311

The conduct officer(s) may accommodate concerns for the personal safety, well-being or fears of confronting the complainant, respondent, or other witnesses. Procedures or the hearing environment may be modified as determined by the Director of Student Conduct Education and Administration to be appropriate.

### 4. Hearing Deliberations and Decision

The conduct officer(s) will deliberate and determine whether it is more likely than not that a violation(s) of the Student Code of Conduct did or did not occur as alleged.

  a. The conduct officer(s) may find that the information presented was not sufficient to establish that a violation of the Student Code of Conduct was committed and dismiss the case.
  b. The conduct officer(s) may find that the information presented was sufficient to affirm the alleged violations and impose a sanction appropriate for the violation(s).

The decision of the conduct officer(s) will be communicated in writing to the respondent and, if appropriate, the complainant within two days. The notification letter will include findings of fact, sanction(s) imposed (if any), and the rationale for the decision. The notification letter will be delivered in person, sent electronically to the institutional email address, or sent by certified mail to the student's last known address of record as filed with the Registrar's Office. The notification letter may also be picked up in the Student Conduct Education and Administration office within two days of the hearing.

### E. Student Conduct Committee Panel Hearing

Hearing procedures are provided for allegations against a student where suspension or expulsion from the university is possible, if they are found responsible, and for student discrimination grievances.

The Student Conduct Committee Panel Hearing option may not be available during dead week, final examinations, breaks or other periods. If feasible, a hearing will proceed during these times. Additionally, a Student Conduct Committee Panel Hearing may not be available when the Director of Student Conduct Education and Administration or Vice President for Student Affairs determine that appearing before the panel poses a threat to the physical welfare of panel members or witness(es). Hearings are scheduled around academic schedule on record of complainant and respondent.

The Student Conduct Committee Panel Hearing (Hearing Panel) shall be selected from the Student Conduct Committee which is comprised of a minimum of 10 faculty nominated by the Faculty Council and appointed by the President; 10 staff nominated by the Staff Advisory Council and appointed by the President; and 10 students, eight appointed by the President of the Student Government Association and two appointed by the President of the Graduate and Professional Student Government Association.

A Hearing Panel shall consist of three disinterested members — one faculty member, one student member, and one staff member —selected from the Student Conduct Committee by Student Conduct Education and Administration. The faculty member will be the chairperson. A list of Hearing Panel members will be available three days in advance of the hearing. Prior to the hearing, alternate Hearing Panel members may be seated to be available in case of conflicts.

Board00312

A professional staff member from Student Conduct Education and Administration will be present as a non-voting participant. Their role will be to facilitate dialogue between the Hearing Panel and the student(s) involved, ensure appropriate participation from advisors, and answer procedural questions as needed. A member of Legal Counsel may be present at the hearing to serve as a non-voting advisor to the Hearing Panel.

A student's advisor may participate directly to the same extent as the student. Such direct participation is a privilege which, if abused, may be withdrawn by the Chair of the Hearing Panel or the Student Conduct Education and Administration staff member. If the privilege is withdrawn, the advisor may continue to advise the student. However, if the advisor fails to act in accordance with hearing procedure, the Chair of the Hearing Panel or the Student Conduct Education and Administration staff member may bar the advisor from the hearing. The student must notify Student Conduct Education and Administration four days in advance of the hearing if they will be accompanied by an advisor.

In cases of sexual harassment, sexual misconduct, discrimination, and/or when the university conducts an investigation, the university investigator will present an investigation report as part of the hearing proceedings. The investigator will present the report and answer questions. The role of the investigator is to serve as an unbiased party conducting a thorough investigation of all allegations of sexual harassment or sexual misconduct. The investigation report is a compilation of facts, not a verbatim report, and is not appealable or rebuttable. The investigation report will be available three days in advance for all parties to review.

1. **Pre-Hearing Procedures**
Hearing Panel members will be selected by Student Conduct Education and Administration based on their availability.

Student Conduct Education and Administration will prepare and send a written notice to the respondent and the complainant at least five days before the hearing. The notice will be delivered in person, sent electronically to the institutional email address, or sent via certified mail to the student's last known address of record as filed with the Registrar's Office and will include:
   a. The date, time, place and nature of the hearing;
   b. Reference to the section(s) of the Student Code of Conduct involved;
   c. A brief explanation of the alleged violation(s) including the approximate date, time and place where the alleged violation(s) occurred;
   d. Names of witnesses, if known;
   e. The right to be accompanied by an advisor and the advisor's role in the hearing.

The Director of Student Conduct Education and Administration or designee will be available to meet with the complainant and the respondent, separately, to discuss and explain the hearing procedure and answer questions.

2. **Four Days in Advance of the Hearing**
   a. The respondent and the complainant will provide to the Office of Student Conduct Education and Administration copies of documents to be presented at the hearing and the names of witnesses who will be called.
   b. It is the responsibility of each student to notify witnesses of the date, time and location of the hearing.

Board00313

c. The respondent and the complainant have the right to access documents to be presented at the hearing, by prior appointment. Materials will be sent via email three days in advance of the hearing.
d. The respondent and the complainant will provide notice to the Office of Student Conduct Education and Administration if they will be accompanied by an advisor.

## 3. Hearing Procedures

The hearing provides a forum where all the information and documents can be presented, where questions can be asked of all parties, and where the Hearing Panel can deliberate and decide to the standard of "more likely than not" that a violation of the Student Code of Conduct did, or did not, occur. Formal rules of process, procedure, and technical rules of evidence – such as are applied in criminal or civil court – do not apply to student conduct proceedings. Deviations from prescribed procedures will not necessarily invalidate a decision or proceeding unless significant prejudice to the student or the university may result.

To protect the privacy of all parties and in accordance with FERPA (Family Educational Rights and Privacy Act), all hearings will be closed.

The respondent and complainant can present witnesses, who may be questioned by the Hearing Panel. Questioning by the complainant or the respondent is permitted so long as it is relevant and is not threatening or harassing.

In the case of sexual harassment or sexual misconduct, the Hearing Panel may, in its discretion, exclude evidence of the complainant's sexual history with respondent from discussion during the hearing. The past sexual history of the complainant with persons other than the respondent is irrelevant.

The hearing (excluding the deliberations) will be audio recorded. The recordings are the property of the university. Others will not be allowed to make a recording of any type. The university is not responsible for equipment malfunctions. Requests to review audio recordings may be made to Student Conduct Education and Administration.

If the respondent or complainant elects not to appear for the hearing, the hearing will be held in their absence. Failure to appear will be noted without prejudice. Findings will be based on information presented at the hearing.

Material witnesses will be present during the introductory comments of the hearing, including the honesty statement, at which point they will be excused until time to give their testimony. Witnesses will be excused upon completion of testimony and questioning, but they may be asked to remain available for recall. The complainant and respondent remain throughout the hearing. It is preferred all witnesses be present in person; however if a witness cannot be present for the hearing, arrangements can be made for a witness to participate via phone or other electronic means as long as adequate notice is provided.

At the conclusion of the hearing, all parties will be dismissed except for the Hearing Panel so they may deliberate and reach a decision.

Conduct history is not relevant in determining responsibility but can be used as information in determining an appropriate sanction. A student's conduct history will be available to the Hearing Panel if the respondent is found responsible.

17

The order of presentation at the hearing will be as follows:
    a.  Opening statement provided by the Hearing Panel Chair.
    b.  The complainant may present an opening statement.
    c.  The respondent may present an opening statement.
    d.  If relevant, the university investigator will present the investigation report and answer related questions in cases of sexual harassment, sexual misconduct, discrimination, or when the university has conducted an investigation.
    e.  The complainant will present information and call witnesses.
    f.  The respondent will present information and call witnesses.
    g.  At the conclusion of each witness statement, the witness may be questioned by the Hearing Panel, the respondent, and the complainant, either directly or indirectly.
    h.  The complainant may make a closing statement.
    i.  The respondent may make a closing statement.
    j.  All parties are dismissed for Hearing Panel deliberation.

The Hearing Panel may accommodate concerns for the personal safety, well-being or fears of confronting the complainant, respondent, or other witnesses. Procedures or the hearing environment may be modified as determined by the Director of Student Conduct Education and Administration.

**4.  Hearing Panel Deliberations and Decision**
The Hearing Panel will deliberate and, by majority vote, a decision will be made using a preponderance of evidence, that is it is more likely than not that a violation of the Student Code of Conduct did, or did not, occur as alleged.
    a.  The Hearing Panel may find that the information presented was not sufficient to establish a finding of responsibility for a violation(s) of the Student Code of Conduct.
    b.  The Hearing Panel may find that the information presented was sufficient to find the respondent responsible for violating the Student Code of Conduct and impose a sanction appropriate with the violation(s).

The Hearing Panel's decision will be communicated in writing to Student Conduct Education and Administration, which will notify the respondent, and if appropriate, simultaneously notify the complainant in writing within two days.

The notification letter will include findings of fact, sanction(s) imposed (if any), and the rationale for the decision. The notification letter will be delivered in person, sent electronically to the institutional email address or sent by certified mail to the student's last known address of record as filed with the Registrar's Office. The notification letter may also be picked up in the Office of Student Conduct Education and Administration, 328 Student Union, within two days of the hearing.

In compliance with Department of Education requirements in cases of sexual violence, sexual harassment, or physical violence, the complainant will be notified of the outcome at the same time as the respondent. For other violations, the complainant will not be notified of the outcome.

**F. Complainant Notification**
Complainants are entitled to know about the results of proceedings involving alleged crimes of violence or non-forcible sex offenses, as defined by FERPA. Both the respondent and complainant will be notified in writing of the results of any hearing involving alleged crimes of violence or non-forcible sex offenses.

Board00315

Complainants who have alleged a sexual assault will be provided with notification in writing of the final outcome of the conduct hearing against the alleged perpetrator, as required by federal law.

## IV. Sanctions

Although not intended to be inclusive, the following are possible sanctions that may be imposed, either singularly or in combination, for a student if a violation of the Student Code of Conduct is found. During a Student Conduct Meeting the student and the conduct officer will work together to develop an Action Plan to aid the student in their ethical, personal and intellectual development.

1. **Written Warning** is an official written notice that the student has violated university policies and that more severe conduct action will result should the student be involved in other violations while the student is enrolled at the university.

2. **Restriction** is a limitation on a student's privileges for a period of time and may include, but not be limited to, the denial of the use of facilities or access to parts of campus, denial of the right to represent the university, or denial of participation in extracurricular activities not directly associated with academics (e.g., intramural sports, attending athletic events, student organizations/clubs/associations, or leadership positions within housing, fraternities/sororities, or other organizations). Students must apply to re-instate the privilege by submitting documentation of their significant proactive efforts to become good citizens of the community and engage in responsible, productive behavior.

3. **Educational and Behavioral Change Requirements** are assigned as an opportunity for personal development and can include, but are not limited to, attending alcohol education, a reflection essay, community service, seeking academic counseling, decision making class, and other relevant educational opportunities.

4. **Class Removal** occurs when a student is dropped from a class or moved to another section of a class. Faculty members, in consultation with the Director of Student Conduct Education and Administration, reserve the right to interim suspend a student from class pending a hearing for alleged violations of the Student Code of Conduct occurring in the classroom that substantially interfere with teaching or other students' ability to learn.

5. **No Contact Order** is an absolute prohibition from contact with specified person or persons in any form whatsoever, including, but not limited to, contact in person, by phone, electronically, or through another person. A No Contact Order may be implemented as an interim measure for Title IX issues. Interim measures can be put in place without a formal complaint, conduct process, or a finding of responsibility. Violating a No Contact Order may result in suspension from the university.

6. **Restitution** is compensation for the damage caused to the university or any person's property on campus. This is not a fine, but rather a repayment for labor costs and/or value of property destroyed, damaged, consumed, or stolen.

7. **Residence Hall Status Change**: The following sanctions may include:
    a. **Restrictions** on visitation to specified buildings or all university housing.
    b. **Reassignment** to another university housing facility as determined by Residential Life staff.

Board00316

    c. **Suspension** from a university housing facility for a specified period of time, after which the student is eligible to return. Conditions for returning may be specified.

    d. **Removal** from living in or visiting any university housing facility.

8. **Deferred Residence Status Change** is Residence Hall Status Change from a result of alcohol or drug offenses which may be deferred pending acceptance into the Back on TRAC program. Students who are accepted into the program must successfully complete the program as a condition to remain in their residence hall. Failure to complete the program will result in the original Residence Hall Status Change.

9. **Conduct Probation** is a specified period of time during which the student is placed on formal notice that they are not in good standing with the university and that further violations of university regulations will subject them to suspension or expulsion from the university.

10. **Conduct Suspension** is the exclusion from enrollment in classes and other privileges or activities for a definite period of time not to exceed three years and until the conditions which are set forth in the hearing outcome letter are met. Students who are suspended from Oklahoma State University are not permitted on campus or in university buildings, facilities or activities at any time for any reason during the period of suspension, unless otherwise permitted by the Director of Student Conduct Education and Administration. Notation on the transcript is not made; however, a record of the action is maintained in the student's record in the Registrar's Office. If a transcript is requested during the period of suspension, a letter will be sent with the transcript to the requesting party/institution stating the student is under suspension for conduct reasons. Only unofficial transcripts will be released to the student directly. Any refund of tuition or fees will be subject to the university's normal withdrawal policy.

11. **Deferred Suspension** is suspension involving alcohol or drug offenses that may be deferred pending acceptance into the Back on TRAC program. Students who are accepted into the program must successfully complete the program to remain in school. Failure to complete the program will result in suspension from the university. Notation on the transcript is not made; however, a record of the action is maintained in the student's record in the Registrar's Office for the duration of the deferment. If a transcript is requested during the period of deferment, a letter will be sent with the transcript to the requesting party/institution stating the student is under deferred suspension for conduct reasons. Only unofficial transcripts will be released to the student directly.

12. **Conduct Expulsion** is termination of student status for an indefinite period. Students who are expelled from Oklahoma State University are not permitted on campus or in university buildings, facilities or activities at any time for any reason, unless otherwise permitted by the Director of Student Conduct Education and Administration. Notation on the transcript is not made; however, a permanent record of the action is maintained in the student's record in the Registrar's Office. If a transcript is requested, a letter will be sent with the transcript to the requesting party/institution stating the student has been expelled for conduct reasons. Only unofficial transcripts will be released to the student directly. Expulsion becomes a permanent part of a student's conduct record. Any refund of tuition or fees will be subject to the university's normal withdrawal policy.

## A. Parental Notification

Oklahoma State University reserves the right to notify the parents/guardians of dependent students regarding any conduct situation, particularly alcohol and other drug violations. The university may also notify parents/guardians of non-dependent students who are under the age

Board00317

of 21 of alcohol and/or other drug violations. Parental notification may also be utilized discretionarily by administrators when permitted by FERPA or consent of the student.

## B.  Failure to Complete Conduct Sanctions or Comply with Conduct Office Requests

All students, as members of the university community, are expected to comply with conduct sanctions within the timeframe specified by Student Conduct Education and Administration. Failure to follow through on conduct sanctions by the date specified, whether by refusal, neglect or any other reason, may result in additional sanctions and an enrollment hold, which is a "hold" on enrollment privileges. This hold can prevent the adding or dropping of classes or enrollment for subsequent terms. Cancellation of enrollment occurs when a previous enrollment hold has been cleared with the condition that the enrollment will be cancelled for failure to meet the conditions of the clearance. If cancelled, the refund of tuition or fees will be subject to the university's normal withdrawal policy. A graduation hold is a hold on a student's participation in graduation exercises and diploma for failure to respond to a request to meet with the Director of Student Conduct Education and Administration or other conduct officer, or for noncompliance with conduct sanctions. The Vice President for Student Affairs may recommend a graduation hold.

## C. Implementation of Sanctions

Conduct actions or grievance decisions shall not be implemented until the time for appeal has expired, until the entire appeal process is completed, or until the individual voluntarily waives the right to appeal in writing. The exceptions to delaying sanctions until the process is complete include:  1) when interim suspension has been imposed or 2) to protect the well-being of students on the campus.

### V. Appeal Procedure

An appeal is a review of the record of the original hearing, not a new hearing. It is the responsibility of the person who initiated the appeal to show that one or more of the listed grounds for appeal has merit. The parties will not appear before the university Conduct Appeal Panel (Appeal Panel) unless specifically requested to do so by the Appeal Panel.

Any outcome decided in a hearing may be appealed to the Appeal Panel by the respondent or the complainant.

The Appeal Panel has three members selected from the Student Conduct Committee: the Chief Justice of the Student Government Association or any student representative of the Student Conduct Committee; one staff representative of the Student Conduct Committee; and one faculty representative of the Student Conduct Committee. The faculty representative serves as the Chair. The Appeal Panel will have one advisor, either a representative from Student Conduct Education and Administration or from Legal Counsel.

Appeals must be submitted and authenticated online to Student Conduct Education and Administration by 5 p.m. within seven days of the original hearing. The appeal form can be found at *https://studentconduct.okstate.edu/appeal*. Failure to file an appeal within the prescribed time constitutes a waiver of any right to an appeal. The appeal must cite at least one of the following appeals criteria as the reason for appeal and provide supporting argument(s) as to why an appeal should be granted on these grounds. Appeals criteria include the following:
1.  The hearing was not conducted in conformity with prescribed procedures, and substantial prejudice to the complaint or the respondent resulted;

Board00318

2. New information that could substantially affect the outcome of the previous lower hearing has been discovered since that hearing. The information must not have been available at the time of the original hearing. Failure to present information that was available is not grounds for an appeal under this provision.
3. The sanction is not appropriate for the violation. This provision is intended to be utilized when a determined sanction is inherently inconsistent with university procedures or precedent. Simple dissatisfaction with a sanction is not grounds for overturning a sanction under this provision.

Prior to the Appeal Panel review, if there is an opposing party or university investigator involved in the case, they will be given seven days to provide a written response to the appeal. The Appeal Panel will review the record of the original hearing, including documents, the appeal and written response/s to appeal, if applicable, and issue a finding as to the merits of the criteria cited as the reason for appeal.

1. If the Appeal Panel finds there is no merit to any of the grounds cited in the appeal, it will issue a finding as such and that decision will be final
2. If the Appeal Panel finds the previous hearing was not conducted as prescribed and substantial prejudice resulted, the matter may be remanded to a new hearing.
3. If the Appeal Panel is presented with new information that could not have been presented at the original hearing and finds the new information is relevant, the matter may be resubmitted to the original hearing body.
4. If the Appeal Panel finds that the sanction is inappropriate for the violation, the Appeal Panel may recommend the sanction be modified by the Vice President for Student Affairs or their designee and state the reasons for that recommendation.

The Appeal Panel's final decision will be communicated in writing by Student Conduct Education and Administration to the complainant and the respondent. The decision will normally be communicated within two days of receiving the written decision.

If the appeal panel recommends modifying the outcome or the sanction, the Vice President for Student Affairs or their designee will review the Appeal Panel's recommendation. The final decision will be communicated in writing by the Vice President for Student Affairs or their designee to the complainant and the respondent. The decision will normally be communicated within 10 days of receiving the written recommendation. The decision of the Vice President for Student Affairs or their designee will be final.

### VI. Reviewing Authority

Reviewing authority is retained by the Vice President for Student Affairs, at their discretion, to convert any sanction imposed to a lesser sanction, to rescind any previous sanction, or to return a recommended sanction to a Hearing Panel for review or reconsideration.

### VII. Conduct Files and Records

Case referrals will result in the development of a conduct file in the name of the respondent. If the student is found not responsible for the allegations, the file will be marked no action. A no action record will not constitute a conduct record. Student Conduct records with sanctions less than suspension or expulsion will be maintained in the Office of Student Conduct Education and Administration for seven years following the calendar year of record and then destroyed. Records of cases in which suspension from the university occurred are kept for at least 10 years. Records of cases in which expulsion from the university occurred are kept indefinitely.

Board00319

All conduct records are education records and may not be disclosed in whole or in part except as provided by law, by the written authorization of the student, under legal compulsion or where the safety of other persons may be involved. Conduct records are maintained separate from the student's academic record but are part of the student's educational record.

Board00320

**From:** ███████████████████████
**Sent:** Sunday, September 29, 2019 10:37 AM CDT
**To:** Nafe, Laura <nafe@okstate.edu>
**Subject:** Re: SAIM Student Evaluation
**Attachment(s):** "SAIM Grades - Rivera-Pierola, Jonathan (Moore, Adam).xlsx"

Hello Nafe,

Please find my assessment of Jonathan. Please let me know if you have any questions.

Thanks,

█████

**From:** Nafe, Laura <nafe@okstate.edu>
**Sent:** Friday, September 27, 2019 6:57 AM
**To:** ████████████████████████████████████

**Subject:** SAIM Student Evaluation

Hi all,

Please complete the attached evaluation for Jonathan before **Sunday, Sept 29th**. Please provide comments if you worked with him directly. If you had concerns about his performance during the rotations, please provide specific examples demonstrating these concerns.

Thank you for your help and attention to this!
Laura

**Laura A. Nafe, DVM, MS, DACVIM (SAIM)**
Assistant Professor, Small Animal Internal Medicine
Oklahoma State University



PLAINTIFF'S EXHIBIT
2
FEIRGAD 000-051-0030

| | A | B |
|---|---|---|
| 1 | Rivera-Pierola, Jonathan | |
| 2 | | Score |
| 3 | Communication | 7 |
| 4 | Knowledge & Knowledge Application | 7 |
| 5 | Patient Assessment | 9 |
| 6 | Professional Conduct | 9 |
| 7 | Professional Skillset | 7 |
| 8 | Problem-Oriented Veterinary Medical Record System | 9 |
| 9 | Technical Skillset | 9 |
| 10 | | 57 |
| 11 | Comments |
| 12 | I had a number of cases with Jonathan and he was consistently not |
| 13 | prepared to discuss the case with the clinician. He displayed blatant |
| 14 | dishonesty when presenting the case and often failed to ask key questions |
| 15 | when gathering a history. For example, PeeWee Walker was one of the |
| 16 | rechecks he signed up for and he initially stated PeeWee was not currently |
| 17 | prescribed any medications at the time of recheck. I disagreed with him |
| 18 | given I am very familar with PeeWee's history. He then stated the owner |
| 19 | was not aware of the current medications that PeeWee was prescribed. |
| 20 | These are contradictory statements. Jonathan was a poor communicator with |
| 21 | regard to hopitalized in patients and was never present in ICU at 7:15 to |
| 22 | discuss our hospitalization in patient (Milo Butler). Jonathan was consitently |
| 23 | late with having the treatment sheet completed and the document contained |
| 24 | multiple errors each day. Often the drug calculations were incorrect and |
| 25 | ICU called Jonathan into the ICU each morning to correct these |
| 26 | inaccuracies. Jonathan also did not complete Milo's 7am treatments and |
| 27 | would frequently only write the respiratory rate. When I asked Jonathan |
| 28 | why Milo was not receiving a physical examination every morning he |
| 29 | replied that Milo was sleeping and he did not want to wake him. |
| 30 | Interestingly, Milo consistently had values written for the 7am TPR and ICU |
| 31 | mentioned to me that a physical examination was not performed. Jonathan |
| 32 | also failed to be present for Milo's discharge from the hospital despite a |
| 33 | verbal communication I had with him in the hallway on Friday afternoon. I |
| 34 | had told him that the owner would arrive at the hospital at 2pm. Jonathan |
| 35 | did not show for the discharge despite our communication via groupme at |
| 36 | 1pm, one hour prior to discharge. The medical record for Milo was below |
| 37 | average and did not contain a cohesive summary of Milo's medical problems |
| 38 | despite Milo being hospitalized for an extended period of time. I feel that |
| 39 | Jonathon should have to repeat the small animal rotation and should take |
| 40 | ownership of his cases. The dishonesty is also concerning. |

Board00566

PLAINTIFF'S
EXHIBIT
3

**From:** Nafe, Laura on behalf of Nafe, Laura <nafe@okstate.edu>
**Sent:** Thursday, October 03, 2019 2:40 PM CDT
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Lyon, Shane <shane.lyon@okstate.edu>
**Subject:** Re: Jonathan Rivera-Pierola advisee
**Attachment(s):** "Emma DeVoll - Jonathan Discharge.docx","Rivera-Pierola, Jonathan - Dr. Adam Moore
evaluation.xlsx","Rivera-Pierola, Jonathan - Dr. Sam Bailey Evaluation.xlsx","Moore Jonathan Text Convo 1.PNG","Moore
Jonathan Text Convo 2.PNG","Moore Jonathan Text Convo 3.PNG"

Hi Margi,
I agree with everything Shane said in his email regarding Jonathan's performance and the timing of things that happened during the rotation.

One thing that I did not mention in his evaluation on E-value (that perhaps I should have) is that I had 3 separate people (2 doctors and a technician) approach me regarding concerns that Jonathan was dishonest. I did not include these situations in his evaluation, because I did not witness these specific instances. While I trust the 2 doctors (Dr. Moore and Dr. Irizarry) and technician (Marla) that they would not make up these scenarios, I wanted to give Jonathan the benefit of the doubt and perhaps these were more of a miscommunication than a blatant lie. However, after meeting with him on Monday, September 30th, I believe that these situations were likely to be dishonesty on his part and not a misunderstanding or miscommunication. There are just too many examples of situations like this during his time on medicine and ER. I have explained the 2 situations that I am referencing below.

1. Jonathan saw a recheck of a chronic medicine patient (Pee Wee Walker) who has IMHA and has been managed the past few years at OSU with various immunosuppressive medications and a splenectomy. He has had many recheck evaluations during that time. His owner is very well educated on his medications and disease. When Dr. Moore asked Jonathan what medications PeeWee was receiving, Jonathan told Dr. Moore that PeeWee was not receiving any medications. When Dr. Moore informed Jonathan that he knows PeeWee is on medications (as he is very familiar with PeeWee's case). Jonathan replied that he asked the owner and she was not sure what medications PeeWee was receiving or prescribed. This owner knows exactly what medications this dog is receiving. So either he didn't ask her and said he did. Or he did ask her and he didn't ask it in a way that allowed her to properly answer the question? I think the first possibility is most likely (but that is my opinion). Marla approached me about this case separate from Dr. Moore and was concerned that "Jonathan lied to Dr. Moore about PeeWee." Marla is not the type of come talk to me about student performance so this concerned me. This case was on the last week of the rotation (Tuesday 9/24).

2. Dr. Nikol Irizarry saw a case on emergency with Jonathan on 9/14/19 (Rex #191358) that I did not hear about until the last week of the rotation. She informed me that Jonathan asked if he could leave at the end of his shift. She asked him if the ICU sheet had been completed for Rex and if so he could go. He informed her that he had completed the ICU sheet. She let him go and then an hour later she noticed that the ICU sheet was not complete. None of the inside was highlighted and not all of the medications were included on the inside of the ICU sheet. When the technician on ICU called Jonathan about this he told them that Dr. Irizarry told him he didn't have to complete the ICU sheet. So again, a case of either him being dishonest OR a misunderstanding or miscommunication between Jonathan and Dr. Irizarry.

These are just a few examples of big concerns regarding his honest and communication skills. Like Dr. Lyon said, this is much deeper than a few mishaps with communication. He was frequently not prepared for his cases, did not complete medical records, medical records were inaccurate, ICU treatment sheets were both late and inaccurate (including significant medication errors in dosages or frequency that could have been fatal depending on the medication), and an overall lack of work ethic in my opinion. He is fairly smart in some areas demonstrated by his rounds knowledge and even knowledge about his inpatients when rounding on the morning of Thursday, Sept 26th. He knew what medications his patients (Milo and Lucy) were receiving and why they were receiving those medications. So I know he has the skills. In my opinion, he doesn't seem to care enough about his performance to rise to his full potential and this could lead to significant errors in case management if he were to pass medicine and not have to repeat this rotation to improve his educational experience.

I have included the evaluations from Dr. Adam Moore (3rd year resident) and Dr. Sam Bailey (2nd year resident). This includes their comments. I condensed the comments for his official evaluation on E-value so he has not seen these comments word for word.

I also know that the situation with Milo's discharge on Saturday, Sept 28th was also a big concern. I have included a series of group-me texts from his conversation with Dr. Moore regarding Milo's discharge. I do think Dr. Moore could have communicated his expectations for Jonathan's presence for the discharge better; however, Milo was Jonathan's patient for almost an entire week. I would hope that he would be interested in being present for the discharge. He did work from Friday at 7am - 11 pm and then Saturday from 2 am to 7 am. However, that would have given him approximately 5 hours to sleep (accounting for an with an hour to get home and fall asleep and an hour to wake up and get ready) before the discharge. He was clearly awake and texting Dr. Moore via group-me at 1:03 pm on Saturday (discharge was scheduled for 2 pm). He also should have never left that morning (Saturday morning) without touching based with Dr. Moore about his inpatient (Milo).

Another example that I mentioned, but wanted to expand on was a case I saw with Jonathan on 9/25 (also the last week of the rotation). This was a recheck lymphoma patient that is underlying chemotherapy. He did not seem to know that this patient had received mitoxantrone (chemo) the week prior and was only here for bloodwork. He told me she was due for mitoxantrone (which the discharge is very clear this is not the case). He could not explain to me why we would be checking

Board00622

bloodwork on this patient 1 week post-chemotherapy. Again, even if you don't know that it is standard to check white blood cell count 1 week post-mitoxantrone, this demonstrates to me that he did not read the prior discharge, as it very clearly states why the patient was returning on 9/25. I am attaching a copy of his attempt at the discharge for this patient which also lists a complete neurological exam. I did not witness him performing a full neuro exam (neither did I at this visit), but I guess it is possible he did this when I was not around. But to me, this is again an example of him being lazy with a lack of attention to detail, as many aspects of the discharge are incorrect or were not performed at this visit (see the highlighted portions).

I am happy to discuss more in person. Sorry this is so long and late. Thanks for your help!
Laura

Below are comments from both residents regarding Jonathan's performance:

I had a number of cases with Jonathan and he was consistently not prepared to discuss the case with the clinican. He displayed blatant dishonesty when presenting the case and often failed to ask key questions when gathering a history. For example, PeeWee Walker was one of the rechecks he signed up for and he initially stated PeeWee was not currently prescribed any medications at the time of recheck. I disagreed with him given I am very familar with PeeWee's history. He then stated the owner was not aware of the current medications that PeeWee was prescribed. These are contradictory statements. Jonathan was a poor communicator with regard to hopitalized in patients and was never present in ICU at 7:15 to discuss our hospitalized in patient (Milo Butler). Jonathan was consitently late with having the treatment sheet completed and the document contained multiple errors each day. Often the drug calculations were incorrect and ICU called Jonathan into the ICU each morning to correct these inaccuracies. Jonathan also did not complete Milo's 7am treatments and would frequently only write the respiratory rate. When I asked Jonathan why Milo was not receiving a physical examination every morning he replied that Milo was sleeping and he did not want to wake him. Interestingly, Milo consistently had values written for the 7am TPR and ICU mentioned to me that a physical examination was not performed. Jonathan also failed to be present for Milo's discharge from the hospital despite a verbal communication I had with him in the hallway on Friday afternoon. I had told him that the owner would arrive at the hospital at 2pm. Jonathan did not show for the discharge despite our communication via groupme at 1pm, one hour prior to discharge. The medical record for Milo was below average and did not contain a cohesive summary of Milo's medical problems despite Milo being hospitalized for an extended period of time. I feel that Jonathon should have to repeat the small animal rotation and should take ownership of his cases. The dishonesty is also concerning.

Medical records are frequently incomplete, late, and erroneous. Patient care is minimal at best, student made ICU do all of his physical exams for hospitalized patients. Treatment sheets were significantly late every morning (30-60 minutes). Incomplete histories taken from owners. Student had complete physical exams when he did perform them. Did not read up on cases or have a solid knowledge base. Overall, his attitude was not professional and he was not interested in learning. Student would leave without talking with the clinician, even before all of his patients were discharged.

**Laura A. Nafe, DVM, MS, DACVIM (SAIM)**
Assistant Professor, Small Animal Internal Medicine
Oklahoma State University

---

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Wednesday, October 2, 2019 8:43 AM
**To:** Lyon, Shane <shane.lyon@okstate.edu>; Nafe, Laura <nafe@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pierola advisee

Thank you so much. This will help me a lot if I have to meet with him. It will put an end to the he-said/she-said business.

**From:** Lyon, Shane <shane.lyon@okstate.edu>
**Sent:** Tuesday, October 01, 2019 8:41 PM

Board00624

**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Nafe, Laura <nafe@okstate.edu>
**Subject:** Re: Jonathan Rivera-Pierola advisee

Hi Dr. Gilmour,

I can fill you in on the case I was involved with (Lucy) and I am cc'ing Laura to provide additional information on the other instances.

Lucy was in the hospital Monday to Friday of last week. I was off clinics, but she is a long term patient of mine and I was the clinician on the case. I would arrive in the morning (before 7:00 in most instances) to look at her and see how she did overnight. Jonathan routinely did not have his ICU orders completed by 7:30 in the morning, there was maybe 2 days out of 4 that he did. He never initiated communication with me (text, GroupMe, email, phone call) about how he thought Lucy was doing. I had to check in with him and instigate those conversations. This included both morning and afternoon/evening assessments of her. The only time that he would message me was if she was out of a medication that I needed to fill from pharmacy or if she was regurgitating. His discharge instructions for this visit were copied and pasted from her prior visit in August. At that time we suspected she had a bacterial infection in her airway. This visit was comprised of a fracture of her tracheal stent, suspected granulation tissue in her trachea, and suspected infection in her airway +/- pneumonia. When she was scheduled to be discharged, there were several medications which she had been on for >24 hours orally in hospital (metoclopramide, enrofloxacin, and maropitant) that were not included in her discharge instructions. He did have the amoxi/clav in her discharges, but that information was copied and pasted from her previous visit. I essentially wrote the discharges so that she could be discharged on time. He was in grand rounds when she was discharged and I discharged her alone (which is totally fine - just letting you know in case that is brought up). He should have had ample time to draft complete and accurate discharges, but failed to do so. So, my perspective was that he didn't communicate with me at all about her case. Granted, I was off clinics and not readily available, so again I am willing to forgive many of these issues. However, SAIM utilize GroupMe (a group message app) to communicate with each other about patients.

The rest of the concerns I will need Laura to help clarify if I am misunderstanding. Another case, PeeWee, which was seen by Dr. Moore is a long term patient of SAIM. He was presented for routine recheck. Jonathan informed Dr. Moore that PeeWee was on no medications. Marla was a witness to this conversation. PeeWee is on several medications for a chronic disease. This was confirmed by the owner when Dr. Moore asked her. It appeared that Jonathan didn't ask the client this information, but when questioned by Dr. Moore he essentially lied about the information (again confirmed by Marla). There was another instance were Laura was concerned that he was being dishonest. It revolved around his ER shift. Laura was informed that he failed to complete his ICU treatment sheet for a patient that was seen on ER. When asked about this, he informed us that Dr. Irizzary told him he didn't need to do the ICU treatment sheet and that he could go home. Dr. Irizzary recalls the story differently and reports that she told him to do so before he left. She called him and him come back to complete the paperwork. As these both MAY have been some communication problems, we elected to leave this out of his final grade report but we do feel strongly that he lied to us on 2 occasions.

As far as the situation around discharging his patient on Saturday (last Saturday of the rotation). He was on SAIM on Friday. He had an ER shift from 5:00 PM to 11:00 PM on Friday. He then went home, but was called back in at 2:00 AM. He was there until just before 8:00. He left the hospital before Dr. Moore had a chance to speak with him about his inpatient Saturday morning, which was the patient that was scheduled for discharge. Dr. Moore, having no idea that he was in the hospital all night, did text him to inquire about discharging the patient. There was no reply. When asked about this he told us that he was sleeping and didn't receive the text. That is completely fine. However, it was his responsibility to remain in the hospital to speak with Dr. Moore (or Dr. Nafe) regarding his in-patient before leaving for the day. Had he done this we would have known that he was in the hospital all night and would not have expected him to be present for the patient's discharge. We tell the students in orientation (and it is in the syllabus) that it is their responsibility to inform us in the morning if they were on ER the previous night. If so, we will gladly send them home to sleep and excuse them for the day. He failed to do so. When Laura and I asked him about this on Monday morning, when we informed him that we were going to give him a 'D' for the rotation, his reply was that we should know who was on ER the previous day. We informed him that yes, there is a schedule for ER, but we have no idea which students leave for the day at 11:00 PM (when the scheduled shift is over) and which students are there longer. Students on ER are not always there until 7:00 or 8:00 in the morning and we cannot keep up with their individual schedules. So yes, Dr. Holyoak is correct that we as a service failed to realize that he was supposed to be off that Saturday after working for nearly 24 hours. However, it was his responsibility to communicate that information to us, which he did not do.

He did not receive a mid-block evaluation. The first week I was on clinics. He had 1 inpatient (with Dr. Clark I believe) and there were a few missteps. We attributed those to this being his first rotation ever and moved on. The second week was slower for him (no inpatients and lots of rechecks) and his deficiencies were not obvious. The third week was when all of these aforementioned problems arose.

This is beyond the requested highlighted information, but my final comment is that he did not fail for poor communication alone. There were several other grading criteria which places him in jeopardy of failing. The most significant of these was repeated mistakes/oversight for patient treatment orders. I am completely willing to overlook a single incident where a medication dose is listed incorrectly or where treatment times are misidentified. However, I pointed these mistakes out to him and the very next day he failed to highlight the correct times for a medication to be given - the SAME drug as the day before. To me this conveys one of two things: a lack of attention to detail or an apathetic approach to patient care. Either one, in my opinion, constitutes grounds for failure, even without the communication problems.

Laura - please clarify if I have made any mistakes and to expound on anything beyond what I have listed here.

Dr. Gilmour, please let us know if there are any additional points of clarification needed. I am sure that either one/both of us would be

Board00625

happy to meet with you in person if that would help.

Shane

On Oct 1, 2019, at 7:12 PM, Gilmour, Margi <margi.gilmour@okstate.edu> wrote:

Just so I have all my ducks in a row if I meet with this student, can you comment on highlighted section?

**From:** Holyoak, Reed <reed.holyoak@okstate.edu>
**Sent:** Tuesday, October 01, 2019 3:53 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Subject:** RE: Jonathan Rivera-Pierola advisee

Margi,

I just spoke with Jonathan. He didn't have a mid-block evaluation. There seems to be some significant communications lapses. I believe as in all of these, there was a lack on both sides. He has texts and timelines that suggest that communications to him during the day after he had filled an all-night ICU shift did not recognize that he was to be off.
I did not communicate that to Johnathan, however. He did have a personal issue with his father being in an accident and in the hospital that may have affected his performance too. But we all must be professional.

I asked him to come visit with you. I am not sure that this grade would withstand an appeal.

Let me know if there is anything further you would have me do.

Reed

G. Reed Holyoak, DVM, PhD, DACT
reed.holyoak@okstate.edu

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Tuesday, October 1, 2019 11:52 AM
**To:** Holyoak, Reed <reed.holyoak@okstate.edu>
**Subject:** Jonathan Rivera-Pierola advisee

Hi Reed,

Can you reach out to Jonathan to see if you can guide him in strategies to improve his performance in clinics? I think Shane and Laura tried to, but at the time Jonathan was a bit defensive due to his failing grade. Maybe talking to a more "neutral" person would help! J

Thank you!!

Margi

Margi Gilmour, DVM, DACVO
Associate Dean for Academic Affairs
College of Veterinary Medicine
Oklahoma State University
405-744-8471 margi.gilmour@okstate.edu

Board00626

**From:** Sypniewski, Lara on behalf of Sypniewski, Lara <lara.sypniewski@okstate.edu>
**Sent:** Wednesday, March 04, 2020 6:34 PM CST
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**CC:** Demars, Paul <paul.demars@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Subject:** Re: Jonathan Rivera-Pierola

Yes.

Get Outlook for iOS

---

**From:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Sent:** Wednesday, March 4, 2020 5:35:44 PM
**To:** Sypniewski, Lara <lara.sypniewski@okstate.edu>
**Cc:** Demars, Paul <paul.demars@okstate.edu>; Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Subject:** Re: Jonathan Rivera-Pierola

Is all of this going on the evaluation form? Where are we with the official evaluation and final grade?

---

**From:** Sypniewski, Lara <lara.sypniewski@okstate.edu>
**Sent:** Tuesday, March 3, 2020 6:00 PM
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>
**Cc:** Demars, Paul <paul.demars@okstate.edu>
**Subject:** Jonathan Rivera-Pierola

Dr. Gilmour-
I have not passed Jonathan Rivera-Pierola on the CP rotation; he was made aware of my concerns the second and third weeks of the rotation. I do not feel that he made any improvements and I do not trust him with the professional activities outlined in the syllabus. I have attached my comments for you. Of course, depending on the others grading Jonathan, he may end up with a passing grade, but I wanted to give you a heads up as to the situation.
Please contact me with any questions or concerns.
LAS



**Lara A. Sypniewski, DVM, DABVP**
Henthorne Clinical Professor of Small Animal Medicine
Clinical Associate Professor Small Animal Community Practice
College of Veterinary Medicine
2065 W. Farm Road Stillwater, OK 74078
lara.sypniewski@okstate.edu • vetmed.okstate.edu


OKLAHOMA STATE UNIVERSITY



**From:** Demars, Paul <paul.demars@okstate.edu>
**Sent:** Thursday, March 05, 2020 1:52 PM CST
**To:** Naff, Adam <adam.naff@okstate.edu>
**Subject:** Jon Rivera's Grade Sheet
**Attachment(s):** "Jon Rivera PD.docx","Jonathon Rivera-Pierola Syp.docx"

We need to incorporate both of these comments into Jon's official grade sheet.

Paul DeMars, DVM, DABVP K9/Fe
Community Practice
Oklahoma State Center for Veterinary Health Sciences

Board01041

4 March 2020

Jon-

I believe it is in your best interest to repeat the CP rotation. I have based this decision on the syllabus and the described entrustable activities that are a basic expectation for all CP students. It is my opinion that many areas of your performance need improvement. I will use the following examples to highlight my concerns; understand these are individual examples to highlight my concerns.

• Feb 25: Augustus Nahs (#192579) – During discharge you instructed the owner that the kitten needed one more set of vaccinations. As we discussed that day, I am concerned that you do not understand the principles of vaccinations and how to apply them to a kitten. This was especially concerning since this was the third week of the rotation and you have seen five wellness cases over this period of time. You were provided the AAFP vaccination guidelines and we have an hour and a half round session on this material. You even performed this kitten's wellness appointment on Feb 11th and had the plan written in the discharge instructions.

• Feb 25th: Cash Waters (#179126) – During the case discussion I asked you a direct question about what four antibiotics are appropriate for pyoderma in the dog. After some time you could only provide a single antibiotic, Clavamox. When asked the same question during our meeting the next day, you still had an insufficient answer. Once again we have had an hour long rounds session on this topic where I provided the answer and we see and treat pyoderma cases nearly every day on clinics. Over the three weeks you managed three dermatology appointments.

While you performed acceptably on other appointments during the rotation, these specific examples are the greatest influence on assigning a failing grade. Wellness and dermatology are the two most common appointment types I expect a primary care veterinarian to be able to successfully manage. Overall you saw nine cases with me in three weeks; five wellness, three dermatologic, and 2 others.

Seeking feedback from Dr Irizarry she brought up an example of failed trust as well.

• Papa Alexander (#185382) – Failed to make sure the client stopped at the front desk to have a deposit collected. Suspected of lying about handing the receptionist the estimate sheet as instructed. Additionally, the next morning the expected 7am evaluation had not been performed by 730 and when asked Jon told Dr Irizarry everything was done. She discovered the TPR had not been performed and confronted him on this lack of evaluation and worse, lack of honesty.

Finally your response to our feedback and attempts to illustrate to you our concerns is an issue. We discussed these issues at length for at least 30 minutes. At no time did you appear to listen and accept what we were saying, instead became defensive and argumentative. While I understand the upsetting nature of the topic and the fear of consequences, this was an unexpected response to what I considered a very good relationship we had developed over the weeks. I hope you believe that we sincerely want to see you succeed and wish to coach you to success.

Paul DeMars, DVM, DABVP K9/Fe

Community Practice
Oklahoma State College of Veterinary Medicine

Board01043

Jonathan Riveria-Pierola 3-3-20

Jonathan-

As we have discussed, I believe it is in your best interest to repeat the CP rotation. I have based this decision on the syllabus and the described entrustable activities that are a basic expectation for all CP students. It is my opinion that many areas of your performance need improvement. I will use the following examples to highlight my concerns. These examples, some big, some small, concern me deeply.

I know that you can become a competent, if not great, veterinarian; I simply think you need more coaching. When we discussed these issues and my opinions in weeks 2 and 3, I found that you were unwilling to take on the role of a learner. In fact, I believe you are overconfident in your abilities/knowledgebase which makes this situation even more critical. If you are not willing to learn, to be open to a real coaching experience meant to mold you into a good veterinarian, what type of a practitioner will you become?

Examples:

Daphne 193360- As we have discussed many times regarding the mishandling of this case is concerning. Your interpretation of Daphne's laboratory values was not accurate as you overlooked abnormal findings (liver enzymes, proteinuria). You neglected to contact your supervising veterinarian about the bloodwork and then called the owner with recommendations without discussion. In addition, I was the one responsible to find you to discuss the lab work and your inappropriate interpretation; you chose to not communicate with me via any method – call, text, email. When confronted, you stated that you did not know that you could contact me, which I find confusing since my contact information is on the rounds room board and on the syllabus. Finally, your discharge instructions were inappropriate and significant findings were not mentioned or explained. In all, your actions were consistent with practicing veterinary medicine without a license and I find your reactions unacceptable.

Maggie 193329- When asked prior to performing a surgical procedure it is expected that students discuss their level of confidence with an instructor. As we have discussed, you said that you were very confident performing a spay surgery. Unfortunately, your performance did not reflect your confidence. I do not grade students on their surgical abilities- you are learning and I expect nerves and skills that are not developed. But, I expect students be honest about their skill set. Overconfidence can become a life threatening issue for patients.

Ember 190686 – When discussing your physical examination, you mentioned tartar on the dog's teeth; when I did an oral exam, I found severe periodontal disease with gingivitis, gingival recession, and severe tartar/purulent material. By the end of the CP rotation students should be adept at completing a physical examination and explaining findings; I think that you understated the dog's disease and this is an issue.

Therefore, I am not passing you because I believe you are unable to successfully:

Effectively communicate information to the supervising doctor

Perform a physical and accurately identify abnormalities and communicate these to the client and supervising doctor

Develop and Implement a Treatment Plan for a Sick Patient

Board01044

Jonathan Riveria-Pierola 3-3-20

Develop a diagnostic plan and interpret these timely and accurately.

Effectively communicate vital information about the case to stakeholders including but not limited to clients, students, nurses, staff members and faculty.

Effectively communicate vital information, including but not limited to diagnostics and case follow up, to clients and team members.

Demonstrate Professional / Ethical Behavior and Work Ethic.

Board01045

**From:** Kershaw, Lucinda <lucinda.kershaw@okstate.edu>
**Sent:** Friday, March 06, 2020 2:44 PM CST
**To:** Gilmour, Margi <margi.gilmour@okstate.edu>; Wilson, Robin <robin.wilson@okstate.edu>
**Subject:** Jonathan Rivera-Pierola
**Attachment(s):** "Rivera-Pierola_Jonathan_Sept_2019_Revised2.docx","Rivera-Pierola_Jonathan_CPract_E-Value.pdf","Rivera-Pierola_Jonathan_EQM_E-Value.pdf","Rivera-Pierola_Jonathan_FAM_E-Value.pdf","Rivera-Pierola_Jonathan_HB Therio_E-Value.pdf","Rivera-Pierola_Jonathan_ICU_E-Value.pdf","Rivera-Pierola_Jonathan_Rad_E-Value.pdf","Rivera-Pierola_Jonathan_Zoo_E-Value.pdf","Rivera-Pierola_Jonathan_SAIM_E-Value.pdf","Rivera-Pierola_Jonathan_SAIM_Rotation 1.pdf"

Jonathan received a "D" in his Community Practice rotation.



LUCINDA KERSHAW
Administrative Associate
College of Veterinary Medicine
405.744.8468 · Academic Center
Lucinda.kershaw@okstate.edu
vet.okstate.edu

# Oklahoma State University
## Center for Veterinary Health Sciences

| | | | |
|---|---|---|---|
| **Evaluator:** | Grade Report Administrator - FINAL GRADE REPORT | **Subject:** | Jonathan Rivera-Pierola - VM4C |
| **Activity:** | VCS 7733 Community Practice | **Site:** | Oklahoma State University - CVHS |
| **Evaluation Type:** | Instructor Evaluation of Student - Final | **Completion Date:** | 03/05/2020 |
| **Request Date:** | 02/28/2020 | | |
| **Period:** | Rotation 14 - Class of 2020 | **Dates of Activity:** | 02/10/2020 To 03/01/2020 |
| **Subject Participation Dates:** | 02/10/2020 To 03/01/2020 | | |

**Grading Scale**
90-100 = A
80-89  = B
70-79  = C
60-69  = D
<60    = F

*(Question 1 of 5 )*

### Subjective Evaluation — 40 points

| | |
|---|---|
| Wellness appointments<br>20 points | 13.5 |
| Non-wellness appointments<br>20 points | 12 |
| **Subjective Subtotal** | **25.5** |

*(Question 2 of 5 )*

### Pre-Quiz & Technical Skills, & End of Rotation Quiz — 40 points

| | |
|---|---|
| Pre-Quiz<br>10 points | 7.4 |
| Technical Skills<br>10 points | 5.66667 |
| End of Rotation - Quiz<br>20 points | 17.5 |
| **Pre-Quiz Subtotal** | **30.567** |

*(Question 3 of 5 )*

### Professionalism/Work Ethic — 20 points

| | |
|---|---|
| Professionalism/Work Ethic<br>20 points | 12.25 |

*(Question 4 of 5 )*

| | |
|---|---|
| **Total Points** | 68.317 |
| **Letter Grade** | D |

**Comments:**     *(Question 5 of 5 )*

Jonathan-

As we have discussed, I believe it is in your best interest to repeat the CP rotation. I have based this decision on the syllabus and the described entrustable activities that are a basic expectation for all CP students. It is my opinion that many areas of your performance need improvement. I will use the following examples to highlight my concerns. These examples, some big, some small, concern me deeply.

I know that you can become a competent, if not great, veterinarian; I simply think you need more coaching. When we discussed these issues and my opinions in weeks 2 and 3, I found that you were unwilling to take on the role of a learner. In fact, I believe you are overconfident in your abilities/knowledgebase which makes this situation even more critical. If you are not willing to learn, to be open to a real coaching experience meant to mold you into a good veterinarian, what type of a practitioner will you become?

Examples:
- Daphne 193360- As we have discussed many times regarding the mishandling of this case is concerning. Your interpretation of Daphne's laboratory values was not accurate as you overlooked abnormal findings (liver enzymes, proteinuria). You neglected to contact your supervising veterinarian about the bloodwork and then called the owner with recommendations without discussion. In addition, I was the one responsible to find you to discuss the lab work and your inappropriate interpretation; you chose to not communicate with me via any method – call, text, email. When confronted, you stated that you did not know that you could contact me, which I find confusing since my contact information is on the rounds room board and on the syllabus. Finally, your discharge instructions were inappropriate and significant findings were not mentioned or explained. In all, your actions were consistent with practicing veterinary medicine without a license and I find your reactions unacceptable.

- Maggie 193329- When asked prior to performing a surgical procedure it is expected that students discuss their level of confidence with an instructor. As we have discussed, you said that you were very confident performing a spay surgery. Unfortunately, your performance did not reflect your confidence. I do not grade students on their surgical abilities - you are learning and I expect nerves and skills that are not developed. But, I expect students be honest about their skill set. Overconfidence can become a life threatening issue for patients.

- Ember 190686 – When discussing your physical examination, you mentioned tartar on the dog's teeth; when I did an oral exam, I found severe periodontal disease with gingivitis, gingival recession, and severe tartar/purulent material. By the end of the CP rotation students should be adept at completing a physical examination and explaining findings; I think that you understated the dog's disease and this is an issue.

Therefore, I am not passing you because I believe you are unable to successfully:
- Effectively communicate information to the supervising doctor
- Perform a physical and accurately identify abnormalities and communicate these to the client and
supervising doctor
- Develop and Implement a Treatment Plan for a Sick Patient
- Develop a diagnostic plan and interpret these timely and accurately.
- Effectively communicate vital information about the case to stakeholders including but not limited to
clients, students, nurses, staff members and faculty.
- Effectively communicate vital information, including but not limited to diagnostics and case follow up,
to clients and team members.
- Demonstrate Professional / Ethical Behavior and Work Ethic.

LAS —

More than one occasion where this student was not telling the truth regarding what he had or had not done concerning patient care. —

4 March 2020

Jon-

I believe it is in your best interest to repeat the CP rotation. I have based this decision on the syllabus and the described entrustable activities that are a basic expectation for all CP students. It is my opinion that many areas of your performance need improvement. I will use the following examples to highlight my concerns; understand these are individual examples to highlight my concerns.

• Feb 25: Augustus Nahs (#192579) – During discharge you instructed the owner that the kitten needed one more set of vaccinations. As we discussed that day, I am concerned that you do not understand the principles of vaccinations and how to apply them to a kitten. This was especially concerning since this was the third week of the rotation and you have seen five wellness cases over this period of time. You were provided the AAFP vaccination guidelines and we have an hour and a half round session on this material. You even performed this kitten's wellness appointment on Feb 11th and had the plan written in the discharge instructions.

• Feb 25th: Cash Waters (#179126) – During the case discussion I asked you a direct question about what four antibiotics are appropriate for pyoderma in the dog. After some time you could only provide a single antibiotic, Clavamox. When asked the same question during our meeting the next day, you still had an insufficient answer. Once again we have had an hour long rounds session on this topic where I provided the answer and we see and treat pyoderma cases nearly every day on clinics. Over the three weeks you managed three dermatology appointments.

While you performed acceptably on other appointments during the rotation, these specific examples are the greatest influence on assigning a failing grade. Wellness and dermatology are the two most common appointment types I expect a primary care veterinarian to be able to successfully manage. Overall you saw nine cases with me in three weeks; five wellness, three dermatologic, and 2 others.
Seeking feedback from Dr Irizarry she brought up an example of failed trust as well.

• Papa Alexander (#185382) – Failed to make sure the client stopped at the front desk to have a deposit collected. Suspected of lying about handing the receptionist the estimate sheet as instructed. Additionally, the next morning the expected 7am evaluation had not been performed by 730 and when asked Jon told Dr Irizary everything was done. She discovered the TPR had not been performed and confronted him on this lack of evaluation and worse, lack of honesty.

Finally your response to our feedback and attempts to illustrate to you our concerns is an issue. We discussed these issues at length for at least 30 minutes. At no time did you appear to listen and accept what we were saying, instead became defensive and argumentative. While I understand the upsetting nature of the topic and the fear of consequences, this was an unexpected response to what I considered a very good relationship we had developed over the weeks. I hope you believe that we sincerely want to see you succeed and wish to coach you to success.

Paul DeMars, DVM, DABVP K9/Fe
Community Practice
Oklahoma State College of Veterinary Medicine

VCS 7733
Small Animal Community Practice
Revised: April 2019

Instructor of Record: Paul DeMars, DVM, DABVP K9/Fe
BVMTH Rm.: 121B
Office: (405) 744-6237
Cell:   (405) 412-8798
EMail: paul.demars@okstate.edu

Lara Sypniewski, DVM, DABVP K9/Fe
BVMTH Faculty Offices
Office:  (405) 744-7305
Cell:    (918) 704-2273
Email: lara.sypniewski@okstate.edu

Number of Student Contact Periods: 15
Number of Contact Hours:        120
Number of Outside Effort Hours:  60

## SECTION II: Instructional Content

Instructional rounds will be given every morning and most afternoons covering a variety of topics pertinent to veterinary medicine and general practice. Students will be intimately involved in seeing clients, diagnosing and treating patients, and performing as a general practitioner. By the end of the rotation, students will be expected to accurately and efficiently take a history, perform a physical exam, identify problems, design a diagnostic and therapeutic plan, perform these plans, perform elective surgery, and communicate effectively with the client.

## SECTION III: Class Meetings (See CP expectations for additional information)

- Students will be present and prepared for clinical duty at 7:15 am to receive in drop off and surgical cases.
- Students will be present in BVMTH Rm. 120 at 8:00 am prepared for rounds. Any in house patients will be examined and all medical records prepared by this time. Students will bring assigned homework when applicable to rounds sessions to encourage participation.
- At 9:00 am clinic appointment hours begin and all students will participate in any cases seen by the service. One student will be appointed for primary care and any available students will assist as needed.
- Lunch hour will be taken from 12:00 pm to 1:00 pm except for one student who will be available for phone calls and emergencies. This student will rotate daily within the service. The student on lunch duty will take lunch either at 11:00 am or 1:00 pm, whichever is more convenient.
- At 1:00 pm clinic appointment hours resume and continue until 4:00 pm or later depending on the caseload. No student is excused until the instructors determine all patients have been appropriately dealt with for the day.
- Afternoon rounds will begin at 4:30 pm.
- Appointments will be seen in exam rooms 16, 18, or 20. These rooms are equipped with video recording equipment. **Unless the client refuses or other valid reasons prohibit, all appointments will be videotaped.**



DEFENDANT'S
EXHIBIT
1
Thrasher

VCS 7733
Small Animal Community Practice
Revised: April 2019

- Every Wednesday afternoon, from 3-5 pm, we will conduct group reviews of an example video submitted by the students.
- Every Friday afternoon, from 3-5, a quiz will be administered and self-assessment discussions will occur.
- The students are also responsible for after-hours duty according to a schedule produced at the beginning of the rotation. It is the responsibility of students to be available to the emergency clinician during their shift and for isolation duty. Any changes to the published schedule must be annotated on all posted schedules, especially the one posted in intensive care.

**SECTION IV:      Course Information**

1. **Text Book Requirements:**   None

2. **Recommended Reference Materials:**  See Problem Set. All reference materials and problem set are posted on Moodle.

3. **Clothing and/or Special Equipment:**
   All students will dress professionally. Males will wear a clean dress shirt, preferably with a tie, dress slacks, clean dress shoes or boots, and a clean smock. Females will wear a clean blouse with skirt or slacks, or a dress, clean shoes or boots, and a clean smock. Jeans, shorts, cut-offs, sandals, tee shirts, tank tops, scrubs, hats and the like are not considered professional attire at any time. Surgical scrubs should be available at all times and worn when in the operating room. Full scrubs for surgery and scrub tops for dentals and minor procedures. See OR protocol and adhere to requirements.

   All students will have an approved nametag, penlight, bandage scissors, hemostat, stethoscope, thermometer, slipleash, and a black ballpoint pen with them at all times.

4. Grading Standards
   A = 90-100
   B = 80-89
   C = 70-79
   D = 60-69
   F = <60

5. **Grading Policies:**
   Students are graded on a variety of aspects including medical knowledge, problem solving, participation in rounds, technical skills, organization and preparation, medical records, client communication, and teamwork. Grades are determined by subjective evaluation of the student's performance, during and after clinic hours, as well as quizzes that determine the student's knowledge and application of wellness medicine and common problems.

   All students will record and turn in 10 video-recorded appointments and associated self-evaluation log. This video will be part of the student's evaluation, especially in the areas of client interaction, communication, medical knowledge, history, and physical examination. Students are encouraged to review their own videos for self-assessment.

Board00197

**Evaluator Subjective Evaluation** (appointment assessments): 40 pts total
    20 pts from Wellness appointments.
    20 pts from Non-well appointments.

**Pre-Rotation Quiz:** 10 pts

**End of Rotation Quiz:** 20 pts

**Technical Skills:** 10 pts

**Professionalism/work ethic:** 20 pts

    Definition: Professionalism/work ethic is essential for success. Students are expected to be solid team players and uphold high ethical standards. You will be graded on strict adherence to courtesy, honesty and responsibility when dealing with colleagues, clients, and patients. Points will be given based on the level of excellence (i.e. going above and beyond basic requirements). A good work ethic includes demonstration of ownership and accountability with your cases, as well as, completing tasks in a timely manner.

**Other requirements:**

    **Videos** (10 total): no points, but required to complete the rotation; an incomplete grade will be submitted.

    **PxDx:** You must complete and submit **12** PxDx skills by the end of the rotation.

    **Homework:** You must turn in a written copy for all 5 homework assignemts.

    Failure to achieve these benchmarks without special dispensation will result in an incomplete grade submitted until these tasks are performed.

6. **Grading Expectations:**

Student Entrustable Professional Abilities
1. Develop and Implement a Wellness Plan for a Healthy Patient
   a. Perform a history using appropriate communication skills to gather information and owner's concerns. Effectively communicate this information to the supervising doctor.
   b. Perform a physical and accurately identify abnormalities and communicate these to the client and supervising doctor.
   c. Develop and implement a vaccination protocol
   d. Develop and implement a parasite control protocol including external parasites, intestinal parasites and heartworms.
   e. Effectively communicate the cost of the wellness plan to the client prior to exiting the room.
   f. Effectively communicate recommendations on preventative and therapeutic topics including but not limited to dental disease, behavior, pain, and nutrition.
   g. Perform effective restraint, venipuncture, and subcutaneous injection.
   h. Perform this task in a time effective manner.

Board00198

2. Develop and Implement a Treatment Plan for a Sick Patient
   a. Perform a history using appropriate communication skills to gather information.
   b. Perform a physical and accurately identify abnormalities.
   c. Develop a diagnostic plan and interpret these timely and accurately.
   d. Prescribe and / or administer appropriate medications.
   e. Perform appropriate medical and / or surgical procedures.
   f. Monitor the patient for complications of the disease and / or treatment.
   g. Plan necessary rechecks to monitor the treatment.
   h. Effectively communicate vital information about the case to stakeholders including but not limited to clients, students, nurses, staff members and faculty.
3. Demonstrate Effective Communication Skills.
   a. Effectively communicate information verbally in the moment or on the phone to clients and team members.
   b. Effectively complete your medical record in a timely manner.
   c. Complete and deliver discharge instructions in a timely manner.
   d. Effectively communicate vital information, including but not limited to diagnostics and case follow up, to clients and team members.
4. Demonstrate Professional / Ethical Behavior and Work Ethic.
   a. Professional and ethical behavior includes but is not limited to attire, personal grooming, demonstrating a positive attitude, honesty, respect, curtesy and building good interpersonal relationships with clients, students, nurses, staff members and faculty.
   b. Good work ethics are by being on time, prepared, understand and follow procedures, providing exemplary patient and client care, and willingness to help team members, especially before being asked.

Board00199

7. **Evaluations/PxDx Skills:**

Instructor evaluations and PxDx skills must be completed electronically via E-Value by the last day of the rotation. Students who do not complete their evaluations at the end of the rotation will not receive their grade until this has been completed. PxDx skills that are submitted past the last day of the rotation **_WILL NOT_** be accepted.

PxDx Skills:  12/57 required
1.  SA abdominocentesis
2.  SA abnormal cardiac examination
3.  SA assist/observe euthanasia
4.  SA biopsy (tru cut, surgical wedge, Baker's punch, etc)
5.  SA calculate CRI
6.  SA calculate m2 for a dog and cat
7.  SA canine demonstrate effective restraint
8.  SA canine male urinary catheterization
9.  SA castration
10. SA cephalic catheterization
11. SA cystocentesis
12. SA demonstrate numeric dentition system canine and feline
13. SA develop/institute analgesic plan
14. SA devise a treatment plan for pyometra
15. SA devise a treatment plan for unwanted pregnancy without spaying
16. SA devise treatment plan for benign prostatic hyperplasia w/o castration
17. SA diagnose congenital orthopedic condition
18. SA ear cleaning
19. SA esophagostomy tube placement (participate)
20. SA fecal sample collection & preparation
21. SA feline declaw (perform)
22. SA feline demonstrate effective restraint
23. SA feline male urinary catheterization
24. SA fine needle aspirate
25. SA identify and demonstrate appropriate feline vaccine injection technique
26. SA jugular venipuncture
27. SA laceration repair
28. SA limb bandage (assist)
29. SA limb immobilization: apply cast
30. SA limb immobilization: apply splint
31. SA mass removal (participate)
32. SA nail trim
33. SA obtain and interpret dental radiographs
34. SA OHE
35. SA open wound management
36. SA otoscopic examination
37. SA perform a complete neurologic examination
38. SA perform a complete orthopedic examination
39. SA perform a digital prostate examination
40. SA perform and interpret a vaginal cytology
41. SA perform Doppler blood pressure
42. SA peripheral venipuncture
43. SA place and interpret ECG

Board00200

44.    SA place surgical drain (passive, active)
45.    SA record ECG
46.    SA rectal exam including anal sac palpation and expression
47.    SA remove surgical drain
48.    SA sample collection for bacteria culture
49.    SA scale and clean teeth
50.    SA skin scraping
51.    SA SNAP heartworm or FeLV/FIV test
52.    SA staple or suture removal
53.    SA subcutaneous or intramuscular injection technique
54.    SA thoracocentesis
55.    SA urinary surgery (participate)
56.    SA Wood's light examination
57.    SA write outside prescription

58. **Policy on Attendance**
Students are expected to attend each class period and complete each assigned project. To obtain an excused absence the student must notify the instructor and obtain permission prior to the class period or present appropriate documentation of the emergency if prior permission was not obtained. Points lost through lack of participation associated with unexcused absence will result in a lower grade, which may be as severe as failure of the course.

59. <u>**General Expectations of Students**</u>:
By enrolling at Oklahoma State University, you accept responsibility for complying with all University policies and contracts, and for local, state and federal laws on- or off-campus that relate to the University's mission. **The Student Rights and Responsibilities Governing Student Behavior** document explains the standards of behavior expected of you, processes in place for enforcing the rules, and the University's response to violations *http://studentconduct.okstate.edu/*

In general, the University expects you to respect the rights of others and authorities, represent yourself truthfully and accurately at all times, respect private and public property, and take responsibility for your own actions and the actions of your guests. Call 405-744-5470 for more information.

60. <u>**Academic Integrity**</u>:
Oklahoma State University is committed to the maintenance of the highest standards of integrity and ethical conduct of its members. This level of ethical behavior and integrity will be maintained in this course. Participating in a behavior that violates academic integrity (e.g., unauthorized collaboration on homework or assignments, plagiarism, multiple submissions of the same assignment, cheating on examinations, fabricating information, helping another person cheat, having unauthorized advance access to examinations, altering or destroying the work of others, and fraudulently altering academic records) will result in your being sanctioned. Violations may subject you to disciplinary action including the following: receiving a failing grade on an assignment, examination or course, receiving a notation of a violation of academic integrity on your transcript, and being suspended from the University. You have the right to appeal the charge. Contact the Office of Academic Affairs, 101 Whitehurst, 405-744-5627, (http://osu.okstate.edu/acadaffr/aa/academicintegrity.htm).

Board00201

Course materials may not be copied, redistributed, published, given, leased, or sold to others, or used for any purpose other than your own individual study without the written permission of the OSU Veterinary faculty member in charge of this course. A limited license granting you access to materials for this course, including Power-point slides, audio/video recordings, written, or other material has been provided by the faculty member only as a means to ensure your successful study. Copyright and all rights of listed publications are maintained by the authors or publications as noted.

61. **Special Accommodations for Students:**
According to the Americans with Disabilities Act, each student with a disability is responsible for notifying the University of his/her disability and requesting accommodations. If you think you have a qualified disability and need special accommodations, you should notify the instructor and request verification of eligibility for accommodations from the Office of SDS. Please advise the instructor of your disability as soon as possible, and contact Student Disability Services, to ensure timely implementation of appropriate accommodations. Faculty has an obligation to respond when they receive official notice of a disability but are under no obligation to provide retroactive accommodations. To receive services, you must submit appropriate documentation and complete an intake process to verify the existence of a qualified disability and identify reasonable accommodations..

62. **Office of Equal Opportunity**     *408 Whitehurst/405-744-9153*
OSU is committed to maintaining a learning environment that is free from discriminatory conduct based on race, color, religion, sex, sexual orientation, gender identity, national origin, disability, age or protected veteran status.  OSU does not discriminate on the basis of sex in its educational programs and activities. Examples of sexual misconduct and/or sex discrimination include: sexual violence, sexual harassment, sexual assault, domestic and intimate partner violence, stalking, or gender-based discrimination.  OSU encourages any student who thinks that he or she may have been a victim of sexual misconduct or sexual discrimination to immediately report the incident to the Title IX Coordinator (405-744-9153) or Deputy Title IX Coordinator (405-744-5470).

Students may also report incidents of sexual misconduct or sex discrimination to a faculty or staff member, who is then required by federal law (Title IX) to notify the Title IX or Deputy Title IX Coordinator. If a reporting student would like to keep the details confidential, the student may speak with staff in the Student Counseling Center (405-744-5472) or the University's Victim Advocate (Suzanne Burks: 405-744-5458). For more information regarding Title IX violations, go to: *https://1is2many.okstate.edu/.*

**For more information concerning academic affairs, including important dates and where to go for help, please go to http://osu.okstate.edu/acadaffr/aa/CurrentStudents.htm, and download the appropriate syllabus attachment.**

Board00202