### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JONATHAN RIVERA-PIEROLA, | |
| *Plaintiff*, | |
| v. | Civil Action No.: 5:21-cv-00616-PRW |
| BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES; STATE OF OKLAHOMA *ex rel.* OKLAHOMA STATE UNIVERSITY; and ST. MATTHEWS UNIVERSITY, INC., | |
| *Defendants*. | |

### PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERRGATORIES TO PLAINTIFF

COMES NOW, Plaintiff, Jonathan Rivera-Pierola ("Plaintiff"), by and through his attorney, Jason J. Bach of The Bach Law Firm, LLC, pursuant to Rule 33 of the Federal Rules of Civil Procedure, and hereby submits his responses to the First Set of Interrogatories to Plaintiff  propounded by Defendants, the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges ("Board of Regents") and the State of Oklahoma *ex rel*. Oklahoma State University ("OSU," and together with the Board of Regents, collectively referred to as "Defendants"), as follows:

### INTERROGATORY NO. 1:

Identify all persons answering or assisting in the answering of these interrogatories. For each person identified, specify which interrogatory or interrogatories each person answered or assisted in answering.

**Exhibit 15**

**RESPONSE TO INTERROGATORY NO. 1:**

All interrogatories were answered by Plaintiff, Jonathan Rivera-Pierola, with the assistance of his attorney, Jason J. Bach.

**INTERROGATORY NO. 2:**

Identify all persons believed or known by you to have any knowledge concerning any of the issues raised by the pleadings in this matter and specify the issues for which each person has knowledge. Include in your response the full name, title, address, telephone number, and a brief description of the discoverable information of each person identified.

**RESPONSE TO INTERROGATORY NO. 2:**

Objection, this request is overly broad and vague. Without waiving said objection, please see Plaintiff's Rule 26(A)(1) Initial Disclosure of witnesses and Plaintiff's Rule 26(A)(1) Supplemental Disclosure of witnesses. Plaintiff reserves the right to supplement a description of witness testimony

**INTERROGATORY NO. 3:**

Identify any expert witnesses you expect to call to testify at trial and provide the following information:

    A.    State the subject matter to which each expert is expected to testify;
    B.    State the substance of the facts and opinions to which each expert is expected to testify;
    C.    List the qualifications of each expert, including a current CV and a list of all publications authored by the expert within the preceding ten (10) years;
    D.    State the compensation to be paid to each expert for the testimony and preparation for the testimony; and
    E.    List any other cases in which each expert has testified as an expert at trial or by deposition within the preceding four (4) years.

**RESPONSE TO INTERROGATORY NO. 3:**

Please see Plaintiff's Rule 26(A)(1) Initial Disclosure of witnesses and Plaintiff's Rule 26(A)(1) Supplemental Disclosure of witnesses. Plaintiff has not yet retained an expert. Plaintiff reserves the right to supplement a description of witness testimony.

**INTERROGATORY NO. 4:**

Identify and state the anticipated testimony of all witnesses whom you anticipate calling to testify on your behalf at trial. *[NOTE: for the purposes of answering this Interrogatory, it is not sufficient to merely state that you have not yet determined who will be called as witnesses. This Interrogatory is intended to identify all persons who you reasonably anticipate may be called as a witness on your behalf even though your attorneys have not made a final determination as to which witnesses to call.]*

**RESPONSE TO INTERROGATORY NO. 4:**

Objection, this request is overly broad and vague. Without waiving said objection, please see Plaintiff's Rule 26(A)(1) Initial Disclosure of witnesses and Plaintiff's Rule 26(A)(1) Supplemental Disclosure of witnesses. In addition, Plaintiff may call to testify on his behalf at trial the following witnesses:

1. Dr. Andrew Manley, DVM
   Address to be provided
   Telephone: (918) 214-7668

2. Reed Holyoak, DVM, Ph.D, DACT
   Professor
   Veterinary Clinical Sciences
   1 BVMTH
   STILLWATER, OK 74078
   Telephone: (405) 744-8475
   reed.holyoak@okstate.edu

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

**INTERROGATORY NO. 5:**

Identify and describe with specificity the facts and/or information that supports your claim that you, "as a Latino male student, and the other male student in the rotation were being singled out for extra scrutiny and unwarranted and unduly harsh criticism from the preceptors compared to the other, female students in the rotation" as alleged in paragraph 18 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

Objection, this request is vague and overly broad. Without waiving said objections, the following supports Plaintiff's claims that "as a Latino male student, and the other male student in the rotation were being singled out for extra scrutiny and unwarranted and unduly harsh criticism from the preceptors compared to the other, female students in the rotation" as alleged in paragraph 18 of the Complaint.

1. **Community Practice Rotation**

• All of Plaintiff's cases were either reviewed by Dr. Paul Demars or Dr. Lara Sypniewski ("Dr. Syp") depending on what assigned day it was on his schedule. On daytime emergency days, Plaintiff was assigned with the veterinary intern Dr. Nikol M. Irizarry or another intern, Dr. (first name known) Gross on one case, who was on duty.

• There were 2 rotation meetings to evaluate Plaintiff's performance of a 3-week rotation:

○      a mid-rotation meeting (during the second week of the rotation) and an end of rotation meeting (during the third or last week of the rotation).

•     Communications between Plaintiff and female technicians or Dr. Syp, a female clinician, were more harsh and less friendly especially in a learning environment. There was also a sense of anger or hostility in their tone of voice directed at Plaintiff. In addition, their actions also appeared to be passive-aggressive towards Plaintiff.

•     Example 1:  Before rounds one early morning on a surgery day, Heather Yates, one of our vet technicians, muttered something in a passive-aggressive tone of voice as Plaintiff brought in his surgery patient to do his routine physical exam. Even though Plaintiff was early that morning, she displayed a sense of urgency as if he was late. Her behavior did not change throughout the day, even during the vaccination of patients, etc. Plaintiff tried his best to work with her, however, even if he took her advice and did what she asked of him he still felt like she wasn't satisfied with him.

•     Example 2:  Ms. Yates also accused Plaintiff of not doing the discharges for his patients/animals, which consisted of him sending an email to the owner (client). However, Plaintiff did all his discharges on time, usually the day of the case, so he wouldn't forget. Plaintiff even tried to show her where all his discharges were in a PC folder, which was a sub-folder of the Community Practice's school email inbox.  At the time, every other student was doing the same exact procedures as Plaintiff by emailing their discharges, however, the other students were never called out or questioned.

- Example 3:  When Plaintiff typed his homework regarding rounds topics, he placed them in the same place as the other rotation students, which was a shelf with a basket labeled "homework" located in the Community Practice rounds room. The vet technician, Tiffany Twomey, questioned Plaintiff again if he even did his homework. Plaintiff's response to her was that "I always place it in the basket before rounds start and on time the next day" which was expected.

- Example 4:  Earlier in the third week, Dr. Syp entered the rounds room with all the rotation students present.  She proceeded to speak to Plaintiff, in front of everyone, regarding his discharge with the patient dog named, Daphne.  Dr. Syp went on to state that Plaintiff indicated on his discharge that Daphne was normal even though they had a long discussion in the second week meeting that Plaintiff agreed that the bloodwork/urinalysis/orthopedic exam was abnormal.  Plaintiff corrected that statement and replied, "That is strange because I listed the abnormalities in the physical exam tab and the bloodwork."  Knowing that Plaintiff had trouble communicating with the owner/owner's friend and that Plaintiff could not fully finish the discharge, Dr. Syp finished it anyway and with a passive-aggressive tone and she took credit in listing the abnormalities.  Dr. Syp told Plaintiff to send the discharge to the owner's email.  This led to Dr. Syp thinking that Plaintiff thought the patient was "normal," which he was accused of in the third week rotation meeting and graded evaluation.  Plaintiff believes this should have been a private conversation with Plaintiff as it was a form of humiliation.

///

2. **Week 2: Mid Rotation Meeting 2/20/2020- With Dr. Demars and Dr. Syp (Community Practice):**

**Subject: "A student that did not care."**

When Plaintiff was a veterinary student in his last year, during his 3-week rotation in Community Practice, he was labeled unfairly as a "student that did not care" throughout his work with patient cases. Plaintiff was not provided feedback, as he expected, to point out any error or deficit to be corrected.

Dr. Demars and Dr. Syp mentioned that in the past they had several students in the Community Practice rotation who portrayed this same behavior. Hearing their accusations against him, Plaintiff was worried but tried to be calm and collected. As a result, he nervously smiled and answered, "I will work on it."

Dr. Demars mentioned that Plaintiff's nervous smile "can portray that [he did] not care." Plaintiff thought that stating, "I will work on it" and following their recommendation would show that he did care about the rotation.

Plaintiff made sure he responded to Dr. Demars that he really did care about the rotation and further stated that his career was going to be dedicated to a veterinary small animal general practice. This involved most cases in the city within the daily community practice.

Plaintiff then asked if they had any corrective feedback regarding his past cases. Dr. Demars and Dr. Syp answered there was nothing wrong, other than Plaintiff should communicate more and be more dependent in some circumstances such as discussing lab results like bloodwork with the clinician. Dr Syp addressed this issue at the end of the

rotation with *all* of the students that no one in the group discussed patient bloodwork with her.

Plaintiff listened to their advice and began communicating more, and the meeting ended with a friendly agreement.

**3.**   **Meeting with Dr. Syp (clinician) and Dr. Irizarry (intern) Thursday 2/20/2020:**

**Subject:  Lying about billing instructions**

Dr. Syp and Dr. Irizarry asked Plaintiff to come speak with them in a patient room behind closed doors.  Dr. Irizarry accused Plaintiff of lying for not giving the proper billing instructions and the billing sheet to the receptionist for the patient, a dog named Papa, who was left overnight (24 hours) for a seizure watch.  Plaintiff went to Dr. Irizarry, the same day of the incident, to speak to her privately about this issue.  Plaintiff told her that he was not given the proper instructions of what to do with the billing sheet and that he tried to give it to the receptionist, Pam Hazlip, but she was distracted and preoccupied with another matter at that moment.  Plaintiff asked the other rotation students and was told Ms. Hazlip was supposed to take the billing sheet, but she never did.

In summary, being honest about the mistake and explaining the situation to Dr. Irizarry is what caused this whole problem. Dr. Syp seeing the argument between Dr. Irizarry and Plaintiff said that it was not a big deal, and the owner would be able to pay when he picked up the dog. This was reflected negatively on Plaintiff's evaluation grade by Dr Demars.

///

**4.    ICU (Intensive Care Unit) treatments/duties for "Papa" – Meeting with Dr. Syp (clinician) and Dr. Irizarry (intern) Thursday, February 20, 2020:**

Plaintiff was accused of not finishing his in-patient ICU duties/treatments on time by 7:15 a.m.  In the syllabus there are two paper sheet reports:  one to be completed by 7:30 a.m., and another by 7:15 a.m.    Plaintiff only saw the one timed deadline and completed them both by 7:30am.

As is listed in the syllabus:  ICU sheet and ICU duties and treatments need to be done by 7:30am (in proof of evidence).  *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 028-029.***

**Case duties for "Papa" dog - seizure watch patient in ICU**

The patient duties for "Papa" included: review of vital signs, physical exam, bathroom walk, and neurological exam.  These patient duties were completed, and results were noted on the patient's records ready to be present to the intern DVM by 7:30 a.m.  Plaintiff explained that the patient dog was in good condition, active, no signs of seizure throughout the night or morning, and asymptomatic during exam.  *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 032-035.***

Dr. Syp and Dr. Irizarry did not agree with the later time statement and wanted to see proof.  Plaintiff listened to their advice and made sure that his reports were completed by 7:15 a.m. per Dr. Syp and Dr. Irizarry's recommended time.

At the end of the rotation, Dr. Demars mentioned the timing of Plaintiff's reports negatively in Plaintiff's rotation evaluation grade.

///

5. __Week 3: End of Rotation Meeting Thursday February 27, 2020- Dr.__
   __Demars' office with Dr. Demars and Dr. Syp:__

**Issue Regarding Blood Pressure of a Dog Patient:**

Dr. Syp stated that Plaintiff could not take the blood pressure of a dog patient properly.  This statement was untrue.  Plaintiff never touched the patient nor took the patient's blood pressure.  Plaintiff only kindly affirmed that this patient was assigned and being worked on by another student in the rotation.  The problem was that several students in the rotation, including the student assigned to the case, were having trouble taking the blood pressure of this dog patient.  On that day, as Plaintiff returned to the rounds room from his emergency patient in ICU, the other rotation students asked him if he could find a technician to help them out.  Plaintiff went out to multiple departments looking for technicians who could assist, but none were available.  Finally, Ms. Twomey, one of the technicians, arrived in the room, and Plaintiff relayed to her the situation.  No clinicians, including Dr. Syp or Dr. Demars, were present during this incident and leveled accusations against Plaintiff based solely on rumors.  This was the first statement that Plaintiff was accused of at the beginning of the meeting.

**Number of Cases Done:**

Dr. Demars accused Plaintiff of taking the least number of cases in the rotation, seventeen (17), compared to the other students.  Plaintiff was assigned mostly emergency cases due to his schedule.  In total, there were approximately ten or eleven students in the rotation, two of which were males and the rest were females.  Plaintiff told Dr. Demars that his statement was incorrect, as Plaintiff had more cases than the only other male student in

10

the rotation, Jonathan Marlow, who was gone for a week of the three weeks' rotation with permission.

Plaintiff was sent home after his meeting with Dr. Demars. Plaintiff also lost three patient cases that day for which he had signed up earlier in the week. Since those cases were taken away from him and were given to other students, this further decreased his total number of cases for the rotation.

In summary, Plaintiff had twenty cases done at the time. Three additional cases could not be done because he was unjustly sent home.

**Female Students Allowed to do More Procedures:**

Plaintiff noticed that his female colleagues in this rotation were doing more procedures during their cases, with the help of the female technicians and female clinician, Dr. Syp, than the cases that were assigned to him and the other male student in the rotation. The other male student, Mr. Marlow, would complain privately to Plaintiff. Mr. Marlow asked Plaintiff if he was being mistreated during cases with Dr. Syp, as Mr. Marlow felt more hostility with Dr. Syp as opposed to Dr. Demars after coming back from his week off.

The majority of Mr. Marlow's complaints regarding Dr. Syp included being critical in knowledge, procedures, and accusing him of not doing more things during cases. Female students would complain about Dr. Demars, who is male, as being more aggressive in the rounds room or in private conversations.

///

11

**Dr. Demars Physically Grabbed Plaintiff:**

Dr. Demars physically grabbed and pulled Plaintiff by the left wrist as he escorted Plaintiff out of his office during their final meeting. Dr. Demars took Plaintiff to Dr. Daniel Burba's office, Clinical Director for Oklahoma State Center for Veterinary Health Sciences, to talk with him. At or around 10:00 a.m. that morning, Dr. Demars told Plaintiff to go home for the rest of the day. Dr. Demars then excused himself saying he needed to go give a lecture. Dr. Burba and Plaintiff then discussed his complaints he was having with the rotation and the aggression that he noticed throughout the meeting, including, Dr. Syp storming out yelling. Without prompting or Plaintiff describing the aggression, Dr. Burba asked, "Did Dr. Syp yell at you?" to which Plaintiff replied, "Yes, how did you know?" Dr. Burba did not reply. *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 040, 042-046.***

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

**INTERROGATORY NO. 6:**

Identify and describe with specificity the facts and/or information that supports your claim that during your meeting with the Professional Standards Committee ("PSC"), you ran out of time to fully explain what occurred and did not have an opportunity to present your defense as alleged in paragraph 37 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

Objection, this request is vague. Without waiving said objection, during Plaintiff's March 18, 2020, meeting with OSU's College of Veterinary Medicine ("CVM") PSC and

Dr. Margi Gilmour, Plaintiff requested reconsideration of his dismissal from the Veterinary clinical program based on subjectively graded evaluations.

During this meeting, as stated in most of the incidents previously described herein, there was not enough time to speak about the Community Practice rotation and all the past rotations that Plaintiff had completed in the prior seven months.

Plaintiff was being accused by his preceptors, and he was not allowed time to defend himself during his Community Practice rotation. This was the biggest issue Plaintiff faced and explained in detail of the miscommunications that led to this.

Throughout the PSC meeting on March 18, 2020, while Plaintiff was speaking, he noticed some of the PSC members were rolling their eyes, shaking their heads negatively, smirking, and generally demonstrating overall disinterest in what Plaintiff had to say. Plaintiff was discouraged. At that point, Plaintiff felt like the meeting was pointless and that anything he had to say would not be credible to them. Their attitude seemed to reflect their decision.

After reading the "evidence" posted by the PSC, Plaintiff drafted a response letter addressed to Dean Risco, DVM. *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 054-055.*** Plaintiff felt the PSC stood their ground in not letting him defend himself. Dr. Mason V. Reichard (PSC Chair member) replied, "Mr. Rivera-Pierola writes that he has started to seek the services of Mr. Jeremiah Grissett, CVM Counselor and Wellness Coordinator. We were pleased to hear this and hope that Mr. Rivera-Pierola continues to seek the services of a professional counselor. We believe this will help him become self-aware and take ownership of his actions."

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

## INTERROGATORY NO. 7:

Identify and describe with specificity the facts and/or information that supports your claim that OSU policies provide(d) for additional appeals for students on academic suspension as alleged in paragraph 44 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 7:

Objection, this request calls for a legal conclusion, is overly broad and vague. Without waiving said objection, Plaintiff cites to the OSU Student Handbook, at page 15:

XIV. Appeals to Initial Decisions Reached under This Policy

The Dean will provide a summary report to the PSC detailing the basis for his/her final action regarding the appeal. The appeals process stated herein is separate and not related to appeal of a course grade; a course grade appeal must be referred to the University Academic Appeals Board or the Emergency Academic Appeals Board for the College of Veterinary Medicine.

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

## INTERROGATORY NO. 8:

Identify and describe with specificity the facts and/or information that supports your claim that the virtual rotations utilized at the on-set of the COVID-19 pandemic failed to provide students with adequate instruction and anesthesiology experience as alleged in paragraph 45 of the Complaint, and identify any students, former students and/or other individuals you allege will testify to same.

14

**RESPONSE TO INTERROGATORY NO. 8:**

Objection, this request is overly broad and vague. Without waiving said objection, in Plaintiff's opinion, the best clinical experience the students had was when they were assigned past cases or emergency cases where they would fill out an anesthesia plan sheet detailing the premedication and anesthesia agents they would use based on their medical history, ASA risk status, etc. The students would discuss these patients such as they were rounds patients via Zoom. Though these were educational in a clinical sense, the students were *not* performing the *hands-on* practice such as intubating, using the anesthesia machine, and patient monitoring (oxygen, carbon dioxide, drug effects, vital signs, blood pressure etc.) during anesthesia administration and surgery. Plaintiff felt these clinical skills were very important in this clinical rotation prior to practicing/working in the field.

On the morning of April 10, 2020, the students found the final exam of the rotation to be quite difficult. They discussed many topics during rounds and together devised over 40 pages of notes throughout the rotation. The exam consisted of 64 questions; most were short answer/list questions, while the rest were multiple choice. The exam duration was only one hour. After the early termination of the anesthesia rotation and after the final exam that day, Dr. Di Concetto mentioned that rotation grades would be posted sometime next week.

On April 20, 2020, Plaintiff learned he received a grade of 79% for his anesthesia clinical rotation and a 66.4% for his exam grade. Students needed 70% to pass the rotation. After returning to Florida to work in his family's veterinary clinic during the COVID-19 pandemic, Plaintiff learned he ultimately received a D grade for the rotation.

Plaintiff immediately sent an email to Dr. Di Concetto to see if he could review Plainitff's exam with him.  After a few weeks had passed, Dr. Di Concetto responded to Plaintiff with a scheduled date for such a meeting.  Dr. Di Concetto and Plaintiff looked over the exam via Zoom videoconference.  Dr. Di Concetto expressed concern as to why Plaintiff did not pass.  Plaintiff explained to him that he was undergoing appeals during this rotation for the Community Practice rotation (which did cause stress) and that he felt like he ran out of time with a few questions that he had to leave blank.  Dr. Di Concetto advised Plaintiff that he could appeal the exam grade, which would allow him to retake it. Unfortunately, due to the Dean's appeal of academic suspension, Plaintiff was no longer allowed to appeal.  *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 225***, as an Audio recording between Plaintiff and Dr. Di Concetto.

There were uttered frustrations among students as to how the virtual anesthesia rotation was handled.  Students would say there were times they could not do their daily off-duty routines due to changes of times of expectedness.  Though for Plaintiff, he treated it like it was a full day at the clinic and that he always would need to be near a computer during normal clinic hours.  Even though the clinic was closed during COVID-19 for students, clinic and staff were still on duty for emergencies.  Schedules would change depending on the days as anesthesia emergencies would come in and out of the clinic. Because of this, the students would have to be on Zoom at unscheduled times for Dr. Di Concetto to go over anesthesia/surgery emergency patients with the students and ask them questions.  Despite Dr. Di Concetto doing the best he could with his camera and the technical difficulties he faced on his laptop or phone, there were times it was difficult due

16

to Dr. Di Concetto's wi-fi connection and his seemingly limited technological knowledge. One of the students delegated to help Dr. Di Concetto with such matters had quite the short temper and would lash out and vent her frustrations to the rest of the students outside the clinician's presence.  Such frustrations would then lead to the early termination of the virtual Anesthesia rotation, as listed in the email responses to Plaintiff and the other students.  This commentary ended up reaching out to other students to relay their own frustrations of the entire virtual clinical rotation experience. *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 057-061.***

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

**INTERROGATORY NO. 9:**

Identify and specifically describe each material instance in which you claim that you contacted administrators seeking to present your case but were rebuffed as alleged in paragraph 53 of the Complaint.  For each instance of alleged contact and/or being rebuffed identified, your answer must include:

A.   The person or persons who were allegedly contacted;
B.   The method by which you allegedly contacted these individuals;
C.   A complete description, in as full detail as possible, of the conduct or words you characterize as contact and/or being rebuffed. Such description should include a recitation of the words allegedly spoken by anyone present (as close as verbatim as possible) and by whom;
D.   The date and time each instance of alleged contact and/or being rebuffed;
E.   The identification of all persons who witnessed the alleged contact and/or instance of being rebuffed or were present during the alleged contact and/or instance of being rebuffed; and
F.   The name of anyone to whom you reported your alleged attempts to contact administrators and/or any alleged instances of being rebuffed.

**RESPONSE TO INTERROGATORY NO. 9:**

Objection, this request is compound and vague. Without waiving said objection, the following are instances in which Plaintiff contacted administrators seeking to present his case, but he was rebuffed:

1. The first instance was at the end of the third week of the Community Practice rotation. On February 27, 2020, during the meeting with Dr. Syp and Dr. Demars, Plaintiff was told that he would not be passing the rotation. Dr. Syp first accused Plaintiff of not being able to measure a dog patient's blood pressure. *See* Response to Interrogatory No. 5.

Plaintiff explained the situation to both Dr. Syp and Dr. Demars at the meeting, however, they did not investigate or seek out details of the incident nor did they apologize to Plaintiff. Dr. Syp and Dr. Demars merely blamed the incident on Plaintiff after he helped his fellow colleagues. This led Plaintiff to believe Dr. Syp and Dr. Demars did not want to hear what he had to say from then on. Plaintiff suggested that they to talk to the student in charge of the case, but they refused.

2. The next instance was when Dr. Demars, while in his office with Dr. Syp and Plaintiff, accused Plaintiff of having the lowest number of cases on the three-week rotation. Dr. Demars mentioned that Plaintiff had only seventeen cases. However, that number was lower than the actual number of cases Plaintiff had recorded on his case record sheet in the rotation (20 cases recorded plus 3 cases later in the day after the meeting that Plaintiff lost because Dr. Demars unjustly sent Plaintiff home that day).

Plaintiff mentioned to Dr. Demars that what he said was incorrect and that he had recorded all of the cases and case numbers he worked on.  Dr. Demars immediately said, "Are you calling me a liar?" to which Plaintiff replied, "There must be a misunderstanding or miscommunication and I can provide the case record sheet if needed."  There was no explanation or continuing to prove the completion of Plaintiff's work.

3.    The next instance was regarding a feline vaccination scheduled date: FVRCP (Feline viral rhinotracheitis (FVR), feline calicivirus (C), and feline panleukopenia (P)) vaccine booster.  Plaintiff was assigned to this case with Dr. Demars. This 20-week-old feline patient was named Augustus.  The physical exam was normal on that date and asymptomatic.  There was a previous medical history of a Herpes virus infection at 6 weeks old, however, Augustus had recovered since.  Due to this, Plaintiff's supervisor recommended no more boosters, but the previous encounter on the medical record recommended a booster.  After the discussion, they did not apply any booster for Augustus.  Plaintiff discussed the date of the FVRCP vaccine booster being due on February 25, 2020, according to the medical record typed on January 23, 2020, by the student, Bennet Lane, who was on the rotation before Plaintiff.  As a veterinary student, Plaintiff relied on the previous medical record encounter which was approved and signed off on by a DVM clinician.  Dr. Demars admonished Plaintiff saying that he was the latest student who wrote the discharge and did not want to hear what he had to say.  Dr. Demars therefore blamed Plaintiff for the scheduled booster date on the final rotation meeting.

4.    The last instance was from Dr. Gilmour, then Associate Dean of Student Affairs.  Plaintiff emailed Dr. Gilmour seeking to start an appeal of the D grade he

19

received for his Community Practice clinical rotation.  Dr. Gilmour told Plaintiff to meet at Dr. Gilmour's office during the time Plaintiff was assigned a surgery case during his small animal surgery rotation.  Plaintiff explained to the surgery clinicians, Dr. Erik Clary and Dr. Danielle Dugat (head of the small animal surgery rotation) via email and in person, that he had to leave early for the meeting with Dr. Gilmour.

During the meeting, Plaintiff presented Dr. Gilmour with evidence relating to Dr. Syp and Dr. Demars' accusations during his Community Practice rotation.  Such evidence included screenshots of treatment sheets, syllabus, bloodwork and UVIS patient information.  Dr. Gilmour then asked for permission to take copies of this evidence, and Plaintiff obliged.  After Plaintiff explained everything to her, Dr. Gilmour rejected the evidence and said there was nothing that she could do.  Knowing both Dr. Demars and Dr. Syp did not want to hear Plaintiff's explanations nor allow him to defend himself, Plaintiff expected the Associate Dean of Student Affairs to talk to both clinicians regarding the accusations.  In this instance, however, Dr. Gilmour surprised Plaintiff by saying there was nothing she could do.  Plaintiff expected Dr. Gilmour to at least speak to Dr. Demars and Dr. Syp regarding the accusations and then to inform Plaintiff of their responses and what the next steps would be.  Instead, she recommended that Plaintiff should speak to the PSC and, though it was voluntary for him to be there, Dr. Gilmour insisted that he should be present to explain everything he said in the meeting to them.

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

///

**INTERROGATORY NO. 10:**

Identify and describe with specificity the basis for your allegation that the OSU Academic Integrity Policy was applicable to you and/or your dismissal from the Oklahoma State University College of Veterinary Medicine ("OSUCVM") clinical program as alleged in paragraphs 69-74 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 10:**

Objection, this request calls for a legal conclusion, is vague, and overly broad. Without waiving said objection, the OSU Handbook sets forth the policies applicable to allegations of academic integrity violations, including the Academic Integrity Policy, for students enrolled in OSU, including SMU students.

OSU's Academic Integrity Policy, which applies to allegations including "Fabrication of Information," includes multiple procedural steps and protections, including notice to the student of the allegation, a resolution meeting with the instructor, and, if allegations are not then resolved, consideration by the Academic Integrity Panel ("AIP").

A student has a right to submit documentation and other material in support of their case to the AIP as well as meet with the AIP, composed of both faculty and students, and the instructor.

The appeals process requires the instructor to submit documentation and information to substantiate their allegations and make themselves available for a hearing. At the hearing, the student has the right to another person accompanying them, and to ask questions and call and question witnesses in support of their case.

Students are further provided with a final appeal to an appeal panel of independent,

objective members.

None of these procedures or protections are provided by the PSC process or were made available to Plaintiff.  Plaintiff was also never provided with the opportunity to contest the allegations in the final evaluation about his purported lying and the resulting lower grade.

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

**INTERROGATORY NO. 11:**

Identify and specifically describe each material instance in which you claim that Defendants violated the OSU Academic Integrity Policy as alleged in paragraphs 69-74 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 11:**

Objection, this request is vague and overly broad.  Without waiving said objection, according to the OSU Academic Integrity Policy and Procedures on 1.03:

> All members of the OSU community are entrusted with academic integrity, which encompasses the fundamental values of honesty, trust, respect, fairness, and responsibility. Therefore, students, instructors and members of the Academic Integrity Panel are expected to demonstrate academic integrity through the following actions:
> * * *
> B.     Instructors are expected to:
>
> 1.     Understand and uphold this academic integrity policy and procedures. Standards set by instructors in their classes should be consistent with guidelines provided within this policy.

22

While Plaintiff easily passed the written exam for the rotation, Dr. Syp and Mr. Demars raised false allegations in his final evaluation as the reason for giving him a 12.25/20 in professionalism.  Their downgrading resulted in a final grade of 68.317%, just below the 70 grade needed for passing.  But for the downgrading as a result of their false allegations, Plaintiff would have passed the rotation.

Plaintiff's final evaluation relayed the above incidents and wrongfully accused him of lying about what he had done for patient care on several occasions.

Despite this assertion, which qualified as an allegation of an academic integrity violation under both OSU and SMU policy, and the downgrading based on his purported dishonesty, no academic integrity complaint ever was filed.  Further, Plaintiff never was provided an adequate opportunity to respond to or rebut the allegations that were the basis for his failing grade.

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

**INTERROGATORY NO. 12:**

Identify and describe with specificity the facts and/or information that supports your claim that Defendants committed a breach of contract as alleged in the Complaint.

**RESPONSE TO INTERROGATORY NO. 12:**

Objection, this request calls for a legal conclusion, is vague, and overly broad. Without waiving said objection, OSU breached its contract when it failed to provide instruction covering all relevant material as a result of moving to a virtual setup, in which the preceptor was unable to operate the necessary technology, and when the preceptor

abruptly ended the rotation three days early.  *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 057-063.***

OSU also breached its contract with Plaintiff by failing to abide by its procedures, failing to provide the contracted for instruction, and dismissing Plaintiff based on false allegations and his resulting grade in the abbreviated rotation.  OSU acted in bad faith and in breach of its contractual duties.

*See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 042-046.***

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

**INTERROGATORY NO. 13:**

Identify and describe with specificity the facts and/or information that supports your claim that Defendants violated the duty of good faith and fair dealing as alleged in the Complaint.

**RESPONSE TO INTERROGATORY NO. 13:**

Objection, this request calls for a legal conclusion, is vague, and overly broad. Without waiving said objection, please see Plaintiff's complaint paragraphs 57 through 79.

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

///

///

**INTERROGATORY NO. 14:**

Identify all educational programs, including, but not limited to, veterinary medicine programs, to which you have sought admission subsequent to your dismissal from the OSUCVM clinical program, and include whether you were admitted to any such program.

**RESPONSE TO INTERROGATORY NO. 14:**

Objection, this request is overly broad, vague, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence. Without waiving said objections, a majority of veterinary schools in the United States do not allow veterinary students who have been dismissed from a previous school to apply to their veterinary programs (transfer or prospective student). Students applying must be in good standing at a current veterinary school for transfer. These schools have guidelines listed on their websites. Plaintiff has also communicated directly via email with several admissions directors, Associate Deans and/or Deans at potential schools regarding any rare considerations. Thus, it has been very difficult for Plaintiff to apply to veterinary schools in his current situation.

Currently, Plaintiff has applied for transfer to two veterinary schools:

1.      Lincoln University School of Veterinary Medicine (2021): During mid-application process, Plaintiff was told they do not offer seats to dismissed students.

2.      St. George University School of Veterinary Medicine (August 1, 2022) – The admissions director advised Plaintiff to complete a transfer request form to be considered as a dismissed student. If accepted by the admissions committee then the school would allow him to apply to the veterinary school as any normal applicant. Plaintiff was told they

would respond in a few weeks.  As of the date of these Responses, Plaintiff has not yet received a response.

Plaintiff reserves the right to supplement this response, inasmuch as discovery is ongoing.

**INTERROGATORY NO. 15:**

Identify all employment you have sought subsequent to your dismissal from the OSUCVM clinical program and include the income of any such employment offered and whether you accepted such employment. If you declined any offer of employment, state why.

**RESPONSE TO INTERROGATORY NO. 15:**

Objection, this request is overly broad, compounded, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving said objection, since Plaintiff's dismissal from OSU's CVM clinical program, he has been employed at his father's small animal family veterinary clinic, Westgate Animal Hospital, located in West Palm Beach, FL.   Plaintiff is currently making $17,000 a year as a veterinary assistant.

**INTERROGATORY NO. 16:**

Identify fully and in detail the type and amount of damages which you allege you have suffered as a result of action(s) and/or inaction(s) of Defendants with regard to each claim listed in the Complaint. Identify precisely how you calculated the amount of damages with regard to each claim listed in the Complaint and specifically itemize each type and category of damages.

**RESPONSE TO INTERROGATORY NO. 16:**

It has not been possible to calculate the exact amount of Plaintiff's damages at this point since their calculation, in part, may require information currently in Defendants' possession, custody, or control. Plaintiff is seeking injunctive relief; all available monetary damages, including compensatory damages; attorneys' fees; loss wages; tuition; costs and disbursements; and interest. Plaintiff may retain an expert to assist with calculating damages.

Plaintiff's damages to date that are discernable at this point include:

1. Tuition costs: $77,784
   (Plaintiff's clinical rotation costs through the 9 months of the clinical year program at OSU)
   This amount breaks down to $25,928 every three months.

   *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 209-217***.

2. Attorney's fees: (ongoing)

3. Medical fees:

   • Psychiatrist, Dr. Zawadzki, $2,400 ($300 first consultation plus $200 from January 2021 every 2 months until June 2022; $250 every 2 months thereafter) – ongoing

     *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 189-199***.

   • Psychotherapist, Dr. Zebel, $2,425 ($175 per week for 13 weeks plus $150 consultation fee)

     *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped document, ***Plaintiff 200-208***.

4. Living expenses in Stillwater, Oklahoma:

i.   1-Bedroom apartment rent: $7,452.09
     ($828.01/month for 9 months)
     Tradan Heights 920 Murphy Street, Apt. #24206, Stillwater, OK

     *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped
     document, ***Plaintiff 222-223***.

ii.  Apartment furniture rental: $2,021.13
     ($224.57/month for 9 months)
     Furniture Options, Edmond, OK

     *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped
     document, ***Plaintiff 218-219***.

iii. Utilities (water and electric): $738.57
     (for 9 months)
     City of Stillwater

     *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped
     document, ***Plaintiff 224***.

iv.  Internet: $450.00
     ($50/month for 9 months)
     AT&T

     *See* Plaintiff's Initial and Supplemental Disclosure Bates stamped
     document, ***Plaintiff 220-221***.

v.   Gasoline: $1,400.00
     ($70/bi-weekly for 9 months)

vi.  Food: $5,400.00
     ($150.00/week for 9 months)

Plaintiff reserves the right to supplement this response, inasmuch as discovery is

ongoing.

**INTERROGATORY NO. 17:**

Identify by name, case number, and court each and every civil and criminal case

(including arrests) in which you have ever been named as a party, either as a plaintiff or a

defendant, the name of the other party, and state with particularity the substance of the lawsuit and the ultimate disposition. This includes, but is not limited to, workers' compensation claims, bankruptcy, small claims, tax liens, unemployment compensation claims, and charges filed with any federal or state equal employment or human rights agency.

**RESPONSE TO INTERROGATORY NO. 17:**

Objection, this request is overly broad, vague, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence. Without waiving said objection, the instant matter is the only case in which Plaintiff has been named as a party.

DATED this 15th day of September, 2022.

Respectfully submitted,

**THE BACH LAW FIRM, LLC**

_/s/ Jason J. Bach_
JASON J. BACH
(Admitted _Pro Hac Vice_)
7881 West Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com
and
**LEVINSON, SMITH & HUFFMAN, PC**
R. JACK FREEMAN, OBA #3128
1861 East 71st Street
Tulsa, Oklahoma 74136
Telephone: (918) 492-4433
Facsimile: (918) 492-6224
Email: jack@lsh-law.com
_Attorneys for Plaintiff Jonathan Rivera-Pierola_

## **VERIFICATION**

I, Jonathan Rivera-Pierola, under penalty of perjury, being first duly sworn deposes and says: That I am a Plaintiff in the above-entitled action; that I have read the foregoing, Plaintiff's Responses to Defendant's First Set of Interrogatories to Plaintiff, and know the contents thereof; that the same is true of my own knowledge, except for those matters therein contained, stated upon information and belief, and as to those matters, I believe them to be true.

Dated:          September _14_ , 2022.

JONATHAN RIVERA-PIEROLA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of September, 2022, I caused to be served

***Plaintiff's Responses to Defendant's First Set of Interrogatories to Plaintiff*** as follows

by electronic mail and by First Class U.S. Mail, on the following counsel:

> Clinton W. Pratt
> Gaylan Towle II
> Board of Regents for the Oklahoma
> Agricultural and Mechanical Colleges
> 5th Floor, Student Union Building
> Stillwater, OK 74078
> Clint.pratt@okstate.edu
> Gaylan.towle@okstate.edu
> Attorneys for Defendants Board of Regents and
> the State of Oklahoma *ex rel.* Oklahoma State University

*/s/ Jason J. Bach*
Jason J. Bach